## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1)** | **PATRICIA THOMPSON, as Personal** ) | |
| | **Representative of the Estate of** ) | |
| | **MARCONIA LYNN KESSEE** ) | |
| | ) | |
| | **Plaintiff,** ) | |
| | ) | **Case No. CIV–19–113–SLP** |
| **vs.** | ) | |
| | ) | |
| **(1)** | **NORMAN REGIONAL HOSPITAL** ) | |
| | **AUTHORITY d/b/a NORMAN** ) | |
| | **REGIONAL HOSPITAL,** ) | |
| | **a public trust, et. al.** ) | |
| | ) | |
| | **Defendants.** ) | |

### PLAINTIFF'S SECOND AMENDED COMPLAINT

COMES NOW Plaintiff, Patricia Thompson ("Thompson") as Personal Representative of the Estate of Marconia Lynn Kessee ("Kessee") for her cause-of-action against Defendants Norman Regional Hospital Authority d/b/a Norman Regional Hospital ("Norman Regional"); Todd R. Gibson ("Gibson"); Zackery Andrews ("Andrews"); Brian Knapp ("Knapp"); Cody Barr ("Barr"); Stacy Shifflett ("Shifflett"); Stephen Scott ("Scott"); City of Norman ("Norman"); Keith Humphrey ("Humphrey"); Kyle Canaan ("Canaan"); Daniel Brown ("Brown"); Turn Key Health Clinics, LLC ("Turn Key"); Clayton Rickert ("Rickert"); Emergency Services of Oklahoma, P.C. ("Emergency Services"); Steven Roberts, D.O. ("Roberts"); and Justin Holbrook, A.P.R.N. C.N.P. ("Holbrook"), states as follows.

## INTRODUCTION

Thompson brings this civil rights action for damages against Defendants under the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution, and 42 U.S.C. § 1983, and tort claims under Oklahoma state law.

Thompson's claims arise from City of Norman Police officers Canaan and Brown's negligent, reckless, improper and unlawful seizure of his person inflicted upon Kessee by Canaan and Brown, while in the scope and course of their employment for the City of Norman and in violation of the law. Thompson's claims for damages are further based upon the deprivation of medical care suffered by Kessee at the hands of Canaan, Brown and Cleveland County Detention Center employees Andrews, Knapp, Barr, Shifflett, and Scott, and Turn Key employee, Rickert, while in the scope and course of their employment and in violation of law. Plaintiff further alleges liability on the part of Norman and Humphrey, as well as Gibson based upon their failure to train and supervise their respective officers, sheriff's deputies, and jail employees, as well as promulgating, creating, and implementing policies, procedures, and customs that deprived Kessee of necessary medical care and resulted in his death, especially policies wherein the officers, deputies, and jail employees are (1) instructed to arrest and detain individuals experiencing life-threatening degrees of intoxication, serious medical conditions, and/or mental health crises without timely medical or mental health assessment or access to medical or mental health professionals, and (2) inadequately trained in how to identify, respond to, and detain individuals exhibiting obvious and apparent

symptoms of life-threatening degrees of intoxication, serious medical conditions, and/or mental health crises.

Thompson further alleges claims against Norman Regional, Emergency Services, Roberts, and Holbrook for medical malpractice, as well as claims against Norman Regional for negligent credentialing and against Emergency Services for negligent hiring, supervision, retention and training.

## **THE PARTIES**

1. Plaintiff Kessee was a citizen and resident of Oklahoma County, Oklahoma at the time of the incident hereinafter described.

2. Defendant Gibson was, at all times relevant hereto, a Cleveland County Sheriff, employed by and working for the Board of County Commissioners for Cleveland County ("BOCC"). Defendant Gibson engaged in conduct complained of under color of law and within the scope of his employment as agent and representative of BOCC and/or Cleveland County Sheriff's Office. BOCC delegates final decision-making authority to Defendant Gibson to establish policy with regards to operation of the F. Dewayne Beggs Detention Center, including the detention and medical care for physically ill, intoxicated and/or mentally ill detainees. The policies, practices and customs, promulgated, created, implemented and/or utilized by Defendant Gibson represent the official policies and/or customs of BOCC and/or Cleveland County Sheriff's Office with regards to operation of the F. Dewayne Beggs Detention Center.

3. Defendant Andrews was, at all times relevant hereto, a sworn Cleveland County sheriff's deputy, employed by and working for BOCC, Defendant Gibson, and/or Cleveland County Sheriff's Office. Defendant Andrews engaged in the conduct complained of under color of law and within the scope of his employment as agent and representative of BOCC, Defendant Gibson, and/or Cleveland County Sheriff's Office.

4. Defendant Knapp was, at all times relevant hereto, a sworn Cleveland County sheriff's deputy, employed by and working for BOCC, Defendant Gibson, and/or Cleveland County Sheriff's Office. Defendant Knapp engaged in the conduct complained of under color of law and within the scope of his employment as agent and representative of BOCC, Defendant Gibson, and/or Cleveland County Sheriff's Office.

5. Defendant Barr was, at all times relevant hereto, a sworn Cleveland County sheriff's deputy, employed by and working for BOCC, Defendant Gibson, and/or Cleveland County Sheriff's Office. Defendant Barr engaged in the conduct complained of under color of law and within the scope of his employment as agent and representative of BOCC, Defendant Gibson, and/or Cleveland County Sheriff's Office.

6. Defendant Shifflett was, at all times relevant hereto, a sworn Cleveland County sheriff's deputy, employed by and working for BOCC, Defendant Gibson, and/or Cleveland County Sheriff's Office. Defendant Shifflett engaged in the conduct complained of under color of law and within the scope of his employment as agent and representative of BOCC, Defendant Gibson, and/or Cleveland County Sheriff's Office.

7. Defendant Scott was, at all times relevant hereto, a sworn Cleveland County sheriff's deputy, employed by and working for BOCC, Defendant Gibson, and/or Cleveland County Sheriff's Office. Defendant Scott engaged in the conduct complained of under color of law and within the scope of his employment as agent and representative of BOCC, Defendant Gibson, and/or Cleveland County Sheriff's Office.

8. Defendant Norman is a municipality and political subdivision located in Cleveland County, Oklahoma and is responsible for the operation of the Norman Police Department and its law enforcement officers. As such, Defendant Norman may sue or be sued by name and has the authority to employ law enforcement officers, appoint a police chief, and delegate to the police chief final policy and decision-making authority regarding law enforcement matters for the City of Norman.

9. Defendant Humphrey was, at all relevant times, a sworn Norman Police Officer and Chief of Police, employed by and working for Defendant Norman. Defendant Humphrey engaged in the conduct complained of under color of law and in the scope of his employment as agent, representative, and final delegated decision maker of Norman PD. Defendant Humphrey was responsible for ensuring that all officers, including Defendants Canaan and Brown, were adequately trained in regards to exercising the necessary force to accomplish an arrest and identifying and interacting with intoxicated, physically ill and/or mentally ill/unstable members of the community.

10. Defendant Canaan was, at all relevant times, a sworn Norman Police Officer, employed by and working for Defendant Norman. Defendant Canaan engaged in the conduct

complained of under color of law and in the scope of his employment as agent and representative of Defendant Norman.

11. Defendant Brown was, at all relevant times, a sworn Norman Police Officer, employed by and working for Defendant Norman. Defendant Brown engaged in the conduct complained of under color of law and in the scope of his employment as agent and representative of Defendant Norman.

12. Defendant Turn Key is a private Oklahoma Limited Liability Company that is independently contracted by Defendant Gibson to provide medical services at the F. Dewayne Beggs Detention Center.

13. Defendant Rickert was, at all relevant times, a Licensed Practical Nurse, employed by and working for Defendant Turn Key. Defendant Rickert engaged in the conduct complained of under color of law and in the scope of his employment as agent and representative of Defendant Turn Key.

14. Defendant Norman Regional is a public trust operated under the authority of Defendant Norman. Defendant Norman Regional has the authority to set and create hospital policies and procedures, employ staff, and to provide hospital privileges to medical professionals, including Defendant Roberts.

15. Defendant Emergency Services is an Oklahoma Professional Corporation that provides medical professional services to various hospitals including Defendant Norman Regional.

16. Defendant Roberts is a Doctor of Osteopathic Medicine. At all times relevant hereto, Defendant Roberts was employed by and working for Defendant Emergency Services,

6

and was granted privileges by Defendant Norman Regional to practice medicine as an ER physician at Norman Regional Hospital. Defendant Roberts engaged in the conduct complained of in the scope of his employment as agent and representative of Defendant Emergency Services.

17. Defendant Holbrook is an Advanced Practice Registered Nurse employed by and working for Defendant Emergency Services. Defendant Holbrook engaged in the conduct complained of in the scope of his employment as agent and representative of Defendant Emergency Services.

## JURISDICTION AND VENUE

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

18. This action arises from an incident that occurred in Cleveland County, Oklahoma.

19. Plaintiff has complied with all requirements under the Oklahoma Governmental Tort Claim Act, 51 O.S. § 151 et. seq.

20. With regard to claims made under the Oklahoma Governmental Tort Claim Act arising out of the conduct of Defendants were acting under color of state law and within the scope of their employment and/or authority as employees, agents and/or servants.

21. In the alternative, the individual Defendants involved in this incident were acting outside the scope of their employment, such that the Oklahoma Governmental Tort Claims Act, 51 O.S. § 153(C) does not exempt them from personal liability for their tortious conduct.

22. This Court has jurisdiction over the parties hereto, jurisdiction over the subject-matter hereof, and venue is proper.

## FACTUAL BACKGROUND

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

### *Kessee Presented to Norman Regional*

23. On or about January 16, 2018 at 5:36 pm, Kessee presented to Defendant Norman Regional, where he sought treatment from the Emergency Department ("ER").

24. Upon information and belief, Kessee presented with numerous signs of serious physical illness, mental illness and/or drug overdose, including seizures, convulsions, inability to speak coherently, considerable and objectively apparent pain, inability to walk, inability to perform basic tasks, inability to comprehend instructions and requests, unexplained perspiration, elevated body temperature, tremors, lack of physical coordination, racing thoughts, elevated blood pressure, headaches, elevated heart rate, confusion, disorientation, delayed responsiveness, and visible signs of anxiety, along with numerous other readily observable signs of distress.

25. Upon information and belief, Kessee's need for medical care was so obvious that even a lay person would recognize his need for medical attention.

26. On or about January 16, 2018, at Defendant Norman Regional, medical records state Defendant Roberts, Defendant Holbrook, Tiffany Caride, E.D.R.N., and Kerry Gasaway, E.D.R.N. were assigned to Kessee's care. No other individuals at Defendant Norman

8

Regional were assigned to Kessee on January 16, 2018 until he returned to Defendant Norman Regional in cardiac arrest at or around 10:30 pm.

27. Despite Kessee's obvious need for medical attention, Kessee was negligently and recklessly discharged from Defendant Norman Regional at or around 7:04 pm on January 16, 2018, without having received necessary life-saving treatment and care.

28. Defendant Norman Regional has a pattern and practice of treating patients perceived to have the same medical condition in a different manner based on the patients' perceived ability or inability to pay.

29. Upon information and belief, Defendants Norman Regional, Roberts, and Holbrook's decision to discharge Kessee without providing appropriate medical attention for Kessee was subjectively motivated by the fact that Kessee was poor, black, homeless, mentally ill, and unable to pay for the medical treatment.

30. Less than four (4) hours after being discharged, Kessee died.

### *Norman Police Responded to a Call from Norman Regional*

31. An employee of Defendant Norman Regional contacted Defendant Norman's Police Department at 6:57 pm on January 16, 2018, to have Kessee removed from the property.

32. On January 16, 2018 at or around 7:08 pm, Defendants Canaan and Brown were dispatched to Norman Regional Hospital, on a report that a black male was refusing to leave the hospital premises.

33. Kessee was not refusing to leave the hospital premises. He was unable to leave due to symptoms of physical illness, mental illness, and/or drug overdose.

34. The words and actions of Defendants Canaan and Brown, and Kessee are recorded with audio on the officers' body cameras.

35. Defendant Canaan entered the Defendant Norman Regional's ER entrance before Defendant Brown arrived.

36. When Defendant Canaan entered the ER entrance, Kessee was sitting on the floor in the ER waiting area. Defendant Norman Regional's security employee advised Defendant Canaan that Kessee began having some issues after being discharged.

37. Defendant Canaan observed and was aware of the obvious and readily apparent signs that Kessee was overdosing on drugs, physically ill and/or mentally ill/unstable, such that Kessee was unable to ambulate on his own, unable to put on his own glasses, unable to verbally communicate, and needed medical assistance. As a result of his observations, Defendant Canaan recognized the need to assist Kessee to a wheel chair and assist Kessee in putting on Kessee's glasses.

38. Defendant Canaan's observation of Kessee's symptoms made Canaan aware that there was a substantial risk that Kessee was suffering from a severe physical illness, mental illness, and/or drug overdose.

39. Despite Canaan's subjective knowledge and awareness of Kessee's objectively serious symptoms, Defendant Canaan did not seek medical attention for Kessee.

40. Defendant Brown arrived at Defendant Norman Regional's ER approximately one (1) minute after Defendant Canaan arrived at the ER. When Defendant Brown arrived, Kessee was seated in a wheel chair.

41. Prior to being wheeled out of the ER, Defendant Brown had observed and was aware of the obvious and readily apparent signs that Kessee was overdosing on drugs, physically ill, and/or mentally ill/unstable, such that Kessee was unable to ambulate on his own, unable to put on his own glasses, unable to verbally communicate, and needed medical assistance.

42. Defendant Brown's observation of Kessee's symptoms made Brown aware that there was a substantial risk that Kessee was suffering from a severe physical illness, mental illness and/or drug overdose.

43. Despite Brown's subjective knowledge and awareness of Kessee's objectively serious symptoms, Defendant Brown did not seek medical attention for Kessee.

44. Kessee's condition was so severe and obvious that a reasonable officer in Defendants Canaan and Brown's position would have sought medical attention for Kessee, despite the officer's knowledge or belief that Kessee had just been discharged from the ER.

45. A reasonable officer under the circumstances would not believe that Kessee was faking his symptoms.

### *Defendants Canaan and Brown took Kessee Outside*

46. Defendants Canaan and Brown disregarded Kessee's need for medical attention and escorted Kessee outside.

47. A security guard employed by and working for Defendant Norman Regional witnessed and assisted Defendants Canaan and Brown. Despite having witnessed Kessee suffering

from clear and obvious signs of drug overdose, physical illness and/or mental illness, the security guard negligently and recklessly failed to seek medical attention for Kessee.

48. Defendants Canaan and Brown possess specialized knowledge as law enforcement officers of the symptoms and typical duration of drug overdose, mental illness/instability and/or physical illness that was severe and would require medical attention.

49. In the alternative, Defendants Canaan and Brown should have been trained to possess specialized knowledge as law enforcement officers of the symptoms and typical duration of drug overdose, mental illness/instability and/or physical illness that would require medical attention.

50. Defendants Canaan and Brown's decision to not seek medical care was not because Kessee's symptoms were not obvious and severe, nor the result of Canaan and Brown's lack of subjective awareness of Kessee's need for medical attention; but, instead, the result of Canaan and Brown's conscious disregard of Kessee's severe and obvious serious medical crisis.

51. Defendants Canaan and Brown's decision to not seek medical attention for Kessee was subjectively motivated by the fact that Kessee was poor, black, homeless and mentally ill.

52. The temperature on January 16, 2018, at or around 7:08 pm, was approximately fifteen (15) degrees Fahrenheit.

53. Defendants Canaan and Brown did not speak to medical personnel prior to forcing Kessee outside in fifteen (15) degree weather.

54. Despite having only spoken to Defendant Norman Regional's security employee, neither Defendant Canaan nor Defendant Brown attempted to inquire about Kessee's medical condition or question the reasonableness of discharging Kessee in light of the obvious and readily apparent signs that Kessee was overdosing on drugs, physically ill and/or mentally ill/unstable, such that Defendants Canaan and Brown appreciated Kessee's need for medical attention.

55. Once outside, Defendant Norman Regional's security employee advised Defendants Canaan and Brown that Kessee was having an "episode" and that Kessee took his "morning meds" but that the security guard did not know what "meds" Kessee had taken.

56. Being told that Kessee had previously taken unknown "meds"; and that Kessee was now having an "episode" or having "issues" made Defendants Canaan and Brown aware that there was a substantial risk that the symptoms exhibited by Kessee were the result of drug overdose, such that Kessee required immediate medical attention.

57. Once outside, Defendants Canaan and Brown observed and were aware that Kessee was unable to communicate. Kessee's words were slurred, jumbled, and unintelligible, such that Defendants Canaan and Brown were aware of the substantial risk that Kessee was suffering from drug overdose, mental illness, and/or physical illness that required immediate medical attention.

58. Once outside, Defendants Canaan and Brown observed and were aware that Kessee was unable to stand or walk. Defendants Canaan and Brown observed Kessee convulsing, shaking, and lacking in basic coordination, such that Defendants Canaan and Brown were

aware of the probability that Kessee was suffering from drug overdose, mental illness, and/or physical illness that required immediate medical attention.

59. Defendants Canaan and Brown observed Kessee suffering from symptoms of drug overdose, mental illness and/or physical illness as he sat in the front of the ER in fifteen (15) degree weather—mere feet away from medical attention.

### *Canaan and Brown began Making Disparaging Comments to and about Kessee*

60. Citizens of Norman, Oklahoma have a right to expect that City of Norman Police Officers will take a citizen's attempt to obtain medical help seriously—especially when that citizen expresses to officers that "there is something going on" with the citizen mentally and/or physically.

61. A reasonable officer under the circumstances would have sought medical attention for Kessee.

62. Instead of seeking medical attention, Defendants Canaan and Brown began making disparaging comments to and about Kessee, including but not limited to:

    a. "Are you just putting on a show….?"

    b. "Is this discharge induced…"

    c. "You can't just act like this to get back in the hospital. That's not how it works."

    d. "You can stop with the show." "It ain't fooling a single person, I can tell you that."

    e. "What you are doing right now is putting on a show."

    f. "I am too cold to stand here and watch you play this game. Can you just get your show on and walk away?"

g. "Mr. Kessee, we're not playing with you…it's a bunch of B.S."

63. Defendant Canaan and Brown's verbal insults show malice and ill-will toward Kessee.

64. Defendant Canaan and Brown's verbal insults were motivated by Kessee's race, social status and mental illness. Had Kessee been a white, insured and/or wealthy person, without a history of mental illness, Canaan and Brown would have sought medical attention for Kessee.

65. While Defendants Canaan and Brown verbally assaulted and insulted Kessee, Kessee attempted to comply with their orders but, as shown in the body cam video, Kessee was physically and/or mentally unable to do so. In response to their orders, Kessee stated: "I'm not playing with you. There's something going on."

66. By Kessee's statement that "there's something going on," Kessee was communicating to Defendants Canaan and Brown information that would make Defendants Canaan and Brown aware of the substantial risk that Kessee's symptoms of acute physical illness, mental illness, and/or drug overdose, described herein, would cause serious harm to Kessee if Kessee did not receive immediate medical attention.

67. It is clear that Defendant Canaan comprehended Kessee's plea that "something was going on." Because Defendant Canaan responded "Yep, something is going on, get that shoe on, something is going on."

68. As Kessee struggled to put his shoe on and communicate to Defendants Canaan and Brown that he needed medical attention, Defendants Canaan and Brown observed and disregarded clear and obvious neurological and neuropsychiatric symptoms which

required immediate medical attention, including confusion, convulsions, incoordination, spasms, tremors, and difficulty speaking; and instead further demeaned Kessee—with Defendant Brown stating "be an adult for a second; quit putting on a show."

69. As Kessee continued to struggle to put on his shoe, Defendants Canaan and Brown again exhibited awareness of the substantial risk that Kessee was suffering from drug overdose, as they questioned Kessee about what drugs he had taken. This question shows Defendant Brown was aware of the substantial risk that Kessee was overdosing on drugs, physically ill and/or mentally ill/unstable, and that Defendants Canaan and Brown appreciated Kessee's need for medical attention.

70. Kessee remained on the concrete, outside in 15-degree weather, trembling, convulsing, having difficulties speaking, while suffering from the effects of drug overdose, physical illness, and/or mental illness, which would ultimately lead to his death, during the time period when Defendants Canaan and Brown stood over him making further disparaging remarks, such as:

    a. "Act like an adult"

    b. "Just like you did when you were a little kid"

    c. "Grip reality real quick, get a strong hold on it, and put your shoe on"

71. While Kessee struggled unsuccessfully to comply with Defendants Canaan and Brown's demands, Kessee again told Defendants Canaan and Brown that he needed to see a doctor, stating: "I need to talk to him…to a doctor."

72. Defendants Canaan and Brown negligently and recklessly disregarded Kessee's clear and obvious need for and verbal request for medical attention telling Kessee that he was "acting like a fool."

73. In light of Kessee's persistent and obvious symptoms, including but not limited to convulsions, inability to speak coherently, considerable and objectively apparent pain, inability to walk, inability to perform basic tasks, inability to comprehend instructions and requests, unexplained perspiration, elevated body temperature, tremors, lack of physical coordination, racing thoughts, elevated blood pressure, headaches, elevated heart rate, and visible signs of anxiety, along with numerous other readily observable signs of distress, along with Kessee's repeated verbal requests to see a doctor, Defendants Canaan and Brown's refusal to seek medical attention constituted deliberate indifference.

74. Defendant Canaan stated: "I'll take you to jail just the way you are. It doesn't matter to me." This statement shows Defendant Canaan's awareness and complete disregard of Kessee's safety and obvious medical needs.

75. Citizens of Norman, Oklahoma, including and especially those who suffer from mental health issues, have a right to expect the police officers entrusted to protect them and look out for their safety will seek medical attention for those citizens who exhibit confusion, convulsions, incoordination, spasms, tremors, difficulty speaking, and walking.

76. As Defendants Canaan and Brown continued to berate Kessee about putting on his shoe, Kessee makes a third (3rd) request for medical attention. In response, Defendant Canaan callously stated: "Nope…shoe." Defendant Brown stated: "You ain't seeing a doctor."

77. In response, Kessee again attempted to comply with Defendants Canaan and Brown's orders, while Defendant Brown likened Kessee to a dog, stating: "I could teach my dog to put a shoe on quicker than this."

78. Defendants Canaan and Brown treatment of Kessee took place while they were aware that children were watching.

79. Kessee told Defendants Canaan and Brown: "I'm sick."

80. As Kessee continued to convulse, hallucinate, exhibit slurred and unintelligible speech, Defendant Brown again asked Kessee what drugs he used. This is evidence that Defendant Brown was aware of the substantial risk that Kessee was suffering the effects of drug overdose, such that he required immediate medical attention.

81. A reasonable officer who suspected a citizen was potentially suffering from drug overdose would have sought immediate medical attention for the safety and well-being of the citizen.

82. Instead, Defendants Canaan and Brown again negligently and recklessly disregarded the clear and obvious signs that Kessee needed medical attention, choosing to continue to berate and demean Kessee.

83. At no time during Defendants Canaan and Brown's encounter with Kessee did Kessee make any actions which threatened the safety of Defendants Canaan or Brown, or any other individuals.

84. A reasonable officer under the circumstances would not believe that Kessee was refusing to leave the premises; rather that Kessee was physically and/or mentally unable to leave the premises, and that Kessee needed medical attention.

85. Defendants Canaan and Brown did not believe that Kessee was refusing to leave the premises; but were aware that Kessee was physically and/or mentally unable to leave the premises, and that Kessee needed medical attention.

86. Without provocation or justification, Defendant Brown threatened physical harm to Kessee, stating: "Here, in about 15 seconds, I am going to drag your ass to the curb..."

87. Kessee told Defendants Canaan and Brown that there was "medicine in me…" Defendants Canaan and Brown were aware of and negligently and recklessly disregarded Kessee's attempt to communicate that he was overdosing on prescription medications, with Defendant Brown interrupting Kessee by stating "time's ticking."

88. As Kessee continued to struggle to put on his shoe and communicate to Defendants Canaan and Brown his need for medical attention, Defendants Canaan and Brown told Kessee to pick up his shoe and walk off the property.

89. Defendant Brown observed that Kessee was sweating, despite the temperature being approximately 15 degrees Fahrenheit. Defendants Canaan and Brown, especially in light of the other symptoms exhibited by Kessee, recognized sweating in 15-degree weather as a sign that Kessee was suffering from the effects of a drug overdose, was physically ill and/or mentally ill/unstable, such that Kessee would suffer serious harm if he did not get immediate medical attention.

90. Defendant Brown recognized the substantial risk of harm to Kessee as a result of drug overdose, and asked Kessee, again, "what drugs did you take?". Despite this knowledge and awareness, Defendants Canaan and Brown did not seek medical attention for Kessee.

91. As Kessee continued to convulse, Defendants Canaan and Brown threatened him with jail, stating: "Listen, I'm not falling for your bullshit." Defendant Brown continued, stating: "You're putting on a show right now." Kessee told Defendants Canaan and Brown: "I'm not trying to. I'm not trying to."

92. During his encounter with Defendants Canaan and Brown, Kessee was suffering from a real medical and/or psychological problem, which required medical attention.

93. Kessee's words and actions show that Kessee was consciously aware that he was suffering from a real medical and/or psychological problem, which required medical attention, and that Kessee was distressed by Defendants Canaan and Brown's callous disregard to his pleas for help, and fearful that their refusal to get Kessee medical attention would result in serious harm or death to Kessee.

### *Defendants Canaan and Brown Dragged Kessee across the Pavement*

94. Defendant Canaan, without provocation or justification, forcefully grabbed Kessee by the collar, and began to drag him across the pavement. Defendant Brown assisted Defendant Canaan drag Kessee across the pavement.

95. At no point prior to or during Defendants Canaan and Brown's use of force against Kessee did Kessee pose any physical threat to Defendants Canaan and Brown or any other

persons. During this time, Kessee was unable to even stand or put on his shoe, much less pose a threat to two (2) trained police officers.

96. No weapons were found on Kessee's person.

97. While dragging Kessee across the pavement, Defendant Canaan stated: "I'm not above dragging you off this property."

98. While forcefully dragging Kessee across the pavement, without provocation or justification, Defendant Canaan stated: "We're just dragging him off the property, like a small-child that doesn't want to listen."

99. Defendants Canaan and Brown momentarily stopped dragging Kessee across the pavement. During this time, Defendant Brown told him to "Stand up." Kessee again told Defendants Canaan and Brown that he needed a doctor, stating "Please, I need to see a doctor." Defendants Canaan and Brown negligently and recklessly disregarded Kessee's obvious need for medical attention, and verbal request for a doctor, with Defendant Canaan stating: "You better get to goin'."

100. As Kessee laid on the pavement, pleading for his life, Defendant Canaan responded: "Bye…you better go." Defendant Brown told Kessee: "Quit playing games and go…"

101. After a brief period, Defendant Canaan exclaimed: "I got more energy." After which, Defendant Canaan grabbed Kessee by the collar and began dragging him on the pavement again.

102. While Defendant Canaan dragged Kessee across the pavement, Defendant Brown joked that "I think his butt is dragging now, his bare butt." This was in reference to Kessee's pants coming down and his backside rubbing directly on the concrete.

103. Defendants Canaan and Brown dragged Kessee a total of approximately seventy-five (75) feet across pavement.

104. As Kessee laid in the parking lot consciously aware that he was suffering from severe and life-threatening drug overdose, physical illness, and/or mental illness and after having been dragged by Defendants Canaan and Brown, Defendant Canaan taunted Kessee, stating: "I guess we are going to go to jail for trespassing. How does that sound?" Defendant Brown stated: "Sound good?"

105. Dragging a citizen on pavement under the circumstances presented to Defendants Canaan and Brown was cruel and malicious. Such actions do not conform to proper police procedure, and violate the rights and expectations of citizens, including Kessee.

106.  No reasonably competent law enforcement officer, with knowledge of the totality of the circumstances as Defendants Canaan and Brown reasonably understood them to be, could have reasonably believed Kessee had committed any offense, which required or authorized the use of such excessive force.

107. No reasonably competent law enforcement officer, with knowledge of the totality of the circumstances as Defendants Canaan and Brown reasonably understood them to be, could have reasonably believed that the amount of force utilized was necessary or warranted in the situation.

108. No reasonably competent law enforcement officer, with knowledge of the totality of the circumstances as Defendants Canaan and Brown reasonably understood them to be, could have reasonably believed Kessee needed to be dragged across pavement.

109. The actions of Defendants Canaan and Brown were negligent, intentional, reckless, willful, malicious, deliberate, and showed gross and reckless disregard for Kessee's rights.

110. Defendants Canaan and Brown handcuffed Kessee. As they were placing Kessee in handcuffs, Kessee exclaimed: "I'm sick."

111. After dragging Kessee across the pavement and placing him in handcuffs, Defendants Canaan and Brown continued to berate and insult Kessee, including Defendant Canaan stating: "Well, you're not the smartest, but you get results."

112. Defendant Canaan pulled a bag of Kessee's prescription medications out of Kessee's jacket pocket, immediately before placing Kessee in Defendant Brown's vehicle. In light of Kessee's repeated requests for medical attention, obvious signs of drug toxicity, numerous statements regarding taking too much medication, Defendants Canaan and Brown were aware of the substantial risk that Kessee was suffering from a life-threatening physical illness, mental illness and/or drug overdose.

113. Defendant Brown then walked back towards the ER entrance (where Defendants Canaan and Brown were before they dragged Kessee across the pavement) to get his vehicle, in order to transport Kessee to the jail.

114. Defendants Canaan and Brown had no justifiable reason to drag Kessee across the pavement, especially when the vehicle they were going to use to transport him was parked back near where Kessee was before they dragged him.

115. Defendants Canaan and Brown's choice to deny Kessee medical attention under these circumstances was made with malice and cruel intent.

116. Defendants Canaan and Brown's choice to drag Kessee under these circumstances was unreasonable and in reckless disregard to Kessee's rights.

### *Defendants Canaan and Brown Arrested Kessee for Misdemeanor Trespassing*

117. Kessee was arrested for a misdemeanor trespassing charge.

118. The fact that Kessee was not refusing to leave the hospital premises, but was unable to leave due to symptoms of physical illness, mental illness, and/or drug overdose was so obvious that no reasonable officer under the circumstances would believe he had probable cause to arrest Kessee for trespassing.

119. No force or much less force could have been used to gain control of the situation, rather than the unnecessary use of force to arrest a citizen for a simple trespassing charge.

120. Defendant Canaan left Kessee with Defendant Brown with knowledge that he would be transported to jail without having ever sought medical treatment for Kessee, despite clear and obvious signs that alerted Defendant Canaan that Kessee was at a serious risk of harm if he did not get immediate medical attention.

121. After placing Kessee in Defendant Brown's vehicle, Kessee continued to show signs that he was suffering from a drug overdose, physical illness and/or mental illness, including

yelling out in a manner that would indicate to Defendant Brown that Kessee was in pain and stating something about his "mind" being messed up.

122. Defendant Brown was aware of and disregarded the clear and obvious signs that Kessee needed medical attention, telling Kessee to "knock it off."

123. While being transported by Defendant Brown, Kessee continued to yell and convulse in a manner that indicated to Defendant Brown that Kessee was suffering from severe and life-threatening drug overdose, physical pain, and/or a mental breakdown.

124. While being transported by Defendant Brown, Kessee again stated that he needed to see a doctor. At one point Kessee stated, "I'm going to die in your car."

125. As a result of Kessee's actions and/or verbal requests, Kessee should have been transported to a hospital and/or mental health facility.

126. Defendant Brown was aware of and disregarded the clear and obvious signs that Kessee was in physical and/or emotional distress and needed medical attention, and transported Kessee to the F. Dewayne Beggs Detention Center.

### *Kessee Arrived at the F. Dewayne Beggs Detention Center*

127. As Defendant Brown attempted to get Kessee out of his vehicle, Kessee was convulsing in the back seat and showing clear and obvious signs that he needed medical attention. Defendant Brown negligently and recklessly disregarded Kessee's rights to appropriate medical attention, telling Kessee: "Come on. You're fine."

128. Kessee was unable to get out of the vehicle on his own. Kessee had to be carried into the jail by Defendant Brown and Defendants Barr and Shifflett.

129. Kessee continued to exhibit signs and symptoms that would indicate to a reasonable officer that he needed medical attention, including but not limited to convulsions, incoordination, slurred speech, glassy eyes, sweating, shortness of breath, and an inability to walk or stand.

130. Defendants Brown, Barr, and Shifflett sat Kessee in chair in the intake area, telling him to "sit your ass right there, don't move."

131. Defendant Brown told Defendants Barr, Shifflett and Rickert that Kessee went to the hospital for a headache. Kessee immediately responded "No," and attempted to tell the officers that he had serious medical symptoms and needed immediate medical attention.

132. Defendant Brown told Defendants Barr, Shifflett, and Rickert that Kessee had "like eight (8) medication bottles" on Kessee's person when he was arrested. Despite this knowledge, neither Defendants Barr, Shifflett nor Rickert inspected the medications further.

133. Defendant Brown told Defendants Barr, Shifflett and Rickert that Kessee had episodes while at the hospital that were similar, in Brown's mind, to seizures.

134. Defendant Rickert stated that "[o]n arrival into intake inmate was able to stand without [sic] assist and able to follow instructions, when asked to sit on the bench." This statement was false.

135. While Kessee was sitting on the bench in the intake area, he began violently convulsing, causing Kessee to hit his head on the wall.

26

136. As Kessee convulsed and yelled in pain and agony, Defendant Rickert administered an ammonia inhalant, while one of the Defendants in the room told Kessee to "quit acting like an idiot."

137. Defendants Barr and Shifflett claimed Kessee was "faking" a seizure.

138. An ammonia inhalant creates an irritative effect on nasal and pharyngeal mucus membranes and produces a sudden, violent avoidance response in a normal individual, as well as an individual who is "faking" a condition.

139. According to Defendant Shifflett, Kessee "did not react to the ammonia inhalant right away." Defendant Rickert recognized Kessee's delayed and blunted reaction to the ammonia inhalant as a sign that Kessee required medical attention.

140. In the alternative, Defendant Rickert should have possessed training to recognize that Kessee was suffering from the effects of drug overdose, physical illness, and/or mental illness, such that he required medical attention.

141. Defendant Knapp observed and was aware that Kessee was twitching and not verbally responding to verbal commands.

142. Defendants Brown, Shifflett, Barr, Knapp, and Rickert negligently and recklessly disregarded the clear and obvious signs that Kessee required immediate medical attention, with one of the Defendants stating "fuck his ass."

143. Instead of seeking necessary medical attention, Defendants Brown, Shifflett, Barr, and Rickert removed Kessee's pants and lifted Kessee to his feet in order to take him to a cell.

144. At this point, Defendant Brown witnessed Kessee exhibit signs of drug overdose, physical illness and/or mental illness, including difficulties with speech, incoordination, convulsions, trembling, sweating, shortness of breath, appearance of pain and grimacing, and an inability to stand or walk. Kessee had been exhibiting such symptoms continuously for more than forty-five (45) minutes.

145. Kessee was taken out of the intake area room into the jail facility. Defendant Brown exited the facility without having ever sought medical treatment for Kessee, despite clear and obvious signs that would alert a reasonable officer that Kessee required medical attention.

146. No citizen should have to endure the treatment and conduct exhibited by Defendants Canaan and Brown against Kessee.

147. Defendants Canaan and Brown inflicted unreasonable, unnecessary, excessive and negligent force upon Kessee and failed to exercise the care of a reasonably prudent and qualified officer while engaged in an activity undertaken for the safety of the public.

148. As a result of Defendants Canaan and Brown's deliberate, indifferent, callous, outrageous, unreasonable, and negligent actions, Kessee suffered physical and mental pain and anguish, and a tragic, preventable death.

149. Defendants Canaan and Brown's deliberate, indifferent, callous, outrageous, unreasonable, and negligent actions denied Kessee of access to medical care. Kessee died approximately two (2) hours later as a direct and foreseeable result of Defendants' reckless disregard to Kessee's need for medical care.

150. The actions of Defendants Canaan and Brown establish that they were not properly trained regarding the use of force or, in the alternative, that they failed to follow such training and that the other named Defendants failed to properly enforce such policies.

151. Upon information received, Plaintiff has reason to believe that Defendant Norman Police Department's inadequate training and supervision on both the policies of use of force and identification and interaction with mentally unstable citizens has resulted in the widespread use of excessive force on citizens who have not committed a criminal activity, are not armed, and/or are not attempting to flee in situations where less force would be effective.

152. The actions of Defendants Canaan and Brown establish that they were not properly trained regarding the identification and subsequent interactions with citizens that are intoxicated, physically and/or mentally ill/unstable or, in the alternative, that they failed to follow such training and that the other named Defendants failed to properly enforce such polices.

153. The above-described wrongful acts are proof of a policy in which Defendants deny citizens the rights, privileges, and immunity guaranteed to them by the United States Constitution, the laws of the United States, and the laws of Oklahoma.

154. This policy has no justification or excuse under the law but instead is improper, illegal, deliberately indifferent, and negligent and is unrelated to any activity in which law enforcement officers properly and legally carry out their sworn duty to enforce laws, protect persons and property, and ensure civil order.

155. Defendant Humphrey, as Chief of Police for Norman was aware or reasonably should have been aware of this policy and did not act to correct it, constituting negligent supervision and training.

156. Defendants Norman and Humphrey were negligent in the selection, appointment, training, supervision, and retention of their agents and employees, in that these Defendants knew or should have known their agents and employees were carrying out these policies. Defendants Norman and Humphrey directly or indirectly allowed an attitude that encouraged law enforcement officers to wrongfully detain and seize citizens and to use tactics and procedures violating citizens' right to life, liberty, and property in a manner that is reckless, irresponsible, dangerous, and negligent to the community at large and to Kessee and, in fact, had a policy of using unwarranted excessive force against citizens and denying citizens of necessary medical attention.

157. Despite Defendants Norman and Humphrey's knowing (or reasonably should have known) that this policy was being carried out, Defendants Norman and Humphrey failed to remove the individual Defendants from their positions, to take any disciplinary action, or provide redress for citizens, such as Kessee, who have been injured by such officers, and most importantly, put an end to the use of unwarranted excessive force and denial of medical care against the community.

158. The actions of Defendants were negligent, intentional, reckless, willful, and deliberate and showed gross and reckless disregard for Kessee's rights.

159. Defendants' acts and omissions were a direct and proximate cause of the harm to Kessee and his injuries.

160. The actions of Defendants Canaan, Brown, and Humphrey were done willfully, maliciously, unlawfully, and with callous and reckless indifference in total disregard of Kessee's safety and continued health. Therefore, Plaintiff is entitled to compensatory and punitive damages along with her attorney's fees.

### *Kessee was Detained at the F. Dewayne Beggs Detention Center*

161. During all material times while at the F. Dewayne Beggs Detention Center, Kessee was a pretrial detainee.

162. During all material times while at the F. Dewayne Beggs Detention Center, Kessee had not been convicted of a crime or incarcerated for a crime.

163. During all material times while at the F. Dewayne Beggs Detention Center, Kessee was not being held in custody for trial or sentencing.

164. During all material times while at the F. Dewayne Beggs Detention Center, Kessee was not on probation or parole.

165. Upon information and belief, Kessee exhibited numerous signs of serious physical illness, mental illness, and/or drug overdose, including seizures, convulsions, inability to speak coherently, considerable and objectively apparent pain, inability to walk, inability to perform basic tasks, inability to comprehend instructions and requests, unexplained perspiration, elevated body temperature, tremors, lack of physical coordination, racing

thoughts, elevated blood pressure, headaches, elevated heart rate, and visible signs of anxiety, along with numerous other readily observable signs of distress.

166. Kessee's need for medical care was so obvious that even a lay person would recognize his need for medical attention.

167. Kessee's condition was so severe and obvious that a reasonable jailer in Defendants Barr, Knapp, Shifflett, Andrews, Scott, and Rickert's position would have sought medical attention for Kessee, despite knowledge or belief that Kessee had just been discharged from the ER.

168. A reasonable jailer under the circumstances would not believe that Kessee was faking his symptoms.

169. While performing the book-in process, Defendants Barr, Knapp, Shifflett, Andrews, Scott, and Rickerts chose not to conduct the required initial health screening or determine whether medical treatment was necessary for Kessee's alleged severe intoxication, physical illness, and/or severe mental health crisis, contrary to state law and Cleveland County policies.

170. In a written statement created after Kessee was dead, Defendant Rickert claims he ordered Kessee be placed under "critical observation."

171. In written statements created after Kessee was dead, Defendants Andrews and Shifflett claim Defendant Rickert wanted Kessee placed under "medical observation;" not "critical observation."

172. In written statements created after Kessee was dead, Defendants Shifflett, Barr, Andrews, and Rickert claim Kessee "refused" to walk to his cell. This claim is false. Kessee was unable to walk due to the obvious symptoms of physical illness, mental illness and/or drug overdose which would and did result in considerable harm if Kessee did not receive immediate medical attention.

173. Defendants Shifflett, Barr, Andrews, and Rickert were aware of and recklessly disregarded the clear and obvious signs that Kessee was unable to walk to his cell as a result of the serious effects of drug overdose, physical illness and/or mental illness, which required immediate medical attention.

174. After book-in, at or around 8:00 pm, Sheriff's Office employees claim Kessee was placed in a padded holding cell, identified as B-130.

175. Defendants claim they removed Kessee's clothes and provided Kessee with a smock "suicide" blanket.

176. After more than one (1) hour elapsed, Kessee's obvious and readily apparent and life-threatening symptoms of drug overdose, physical illness and/or mental illness had not abated. Defendants disregarded the substantial and obvious risk that Kessee would suffer serious harm or death and chose to continue detaining Kessee in custody without completion of a medical assessment or medical attention.

177. Sheriff's Office employees, including Defendants Barr, Knapp, Shifflett Andrews, Scott, (collectively, "Defendant Jailers") and Turn Key employee, Rickert, claim to have checked on Kessee at fifteen (15) minute intervals.

178. The Defendant Jailers and Rickert negligently and recklessly disregarded actual knowledge and awareness that Kessee was suffering from serious and life-threatening effects of drug overdose, physical illness and/or mental illness, and did not perform an appropriate medical assessment on Kessee; nor seek necessary medical attention.

179. Neither the Defendant Jailers nor Rickert actually performed checks on Kessee at fifteen (15) minute intervals.

180. To the extent the Defendant Jailers and Rickert performed checks, said checks were so grossly inadequate and ineffective that they constitute a denial of medical care in violation of Kessee's rights.

181. None of the Defendant Jailers actually entered Kessee's cell during a check to determine his condition.

182. None of the Defendant Jailers actually attempted to speak to or seek a response from Kessee during a check to determine his condition.

183. The checks, if performed at all, constituted opening the door flap to observe Kessee's basic presence in the cell.

184. Defendant Barr claimed that at or around 7:59 pm, Kessee was lying face down just as they left him.

185. Defendant Shifflett claimed to have performed a check at or around 8:16 pm. In a written statement created after Kessee was dead, Defendant Shifflett claimed Kessee was "laying on his stomach…Inmate Kessee's head was facing away from me."

186. Defendant Shifflett observed no movement. Defendant Shifflett was subjectively aware that Kessee had not moved and appeared to be unconscious.

187. Defendant Shifflett was aware of and disregarded clear and obvious signs that Kessee was unconscious, in severe distress, or was dead. Defendant Shifflett did not investigate further and continued her normal duties.

188. In a written statement created after Kessee was dead, Defendant Knapp claimed on one (1) check, he saw "what looked like inmate Kessee [sic] right leg moving."

189. Kessee was still laying face down, just has he was when he was left in the room originally.

190. Defendant Knapp observed none to very little movement. Defendant Knapp was subjectively aware that Kessee had not moved and appeared to be unconscious.

191. Defendant Knapp was aware of and disregarded clear and obvious signs that Kessee was unconscious, in severe distress, or was dead. Defendant Knapp did not investigate further and continued his normal duties.

192. Defendant Scott claimed he opened Kessee's door flap at or around 9:04 pm, approximately one (1) hour after Kessee was placed in the cell.

193. In a written statement created after Kessee was dead, Defendant Scott stated, "when I opened the door flap I saw inmate Kessee [still] laying on the center of the cell face down underneath his smock. I thought I might have seen his left arm or some part of his body move while conducting the sight check."

194. Defendant Scott observed none to very little movement. Defendant Scott was subjectively aware that Kessee had not moved and appeared to be unconscious.

195. Defendant Scott was aware of and disregarded clear and obvious signs that Kessee was unconscious, in severe distress, or was dead. Defendant Scott did not investigate further and continued his normal duties.

196. Defendant Andrews claims to have performed four (4) checks. In a written statement created after Kessee was dead, Defendant Knapp stated that Kessee was laying down.

197. Kessee was still laying face down, just as he was when he was left in the room originally.

198. Defendant Andrews observed none to very little movement. Defendant Andrews was subjectively aware that Kessee had not moved and appeared to be unconscious.

199. Defendant Andrews was aware of and disregarded clear and obvious signs that Kessee was unconscious, in severe distress, or was dead. Defendant Andrews did not investigate further and continued his normal duties.

200. A reasonable jailer under the circumstances, especially in light of the other symptoms exhibited by Kessee, would have confirmed that Kessee was alive and not in distress before continuing his/her normal duties.

201. A reasonable jailer under the circumstances, especially in light of the other symptoms exhibited by Kessee, would have recognized that Kessee was suffering from the effects of a drug overdose, was physically ill and/or mentally ill/unstable, such that he required immediate medical attention.

202. Defendants Barr, Knapp, Shifflett Andrews, Scott, in light of the other symptoms exhibited by Kessee, were subjectively aware that Kessee was suffering from the effects

of a drug overdose, was physically ill and/or mentally ill/unstable, such that he required immediate medical attention.

203. Defendants Barr, Knapp, Shifflett Andrews, Scott, in light of the other symptoms exhibited by Kessee, acted in reckless disregard of obvious signs of the substantial risk that Kessee would suffer considerable harm by failing to check to see if Kessee was alive and not in distress before continuing his/her normal duties.

204. The above-mentioned Defendant Jailers and Rickert recklessly disregarded clear and obvious signs that Kessee needed immediate medical attention.

205. Defendant Rickert claimed that he performed a check on Kessee at or around 9:53 pm. Defendant Rickert claimed he "tapped on the window twice with no response."

206. Defendant Rickert entered Kessee's cell. When Defendant Rickert's entered Kessee's cell, Kessee was not responsive to verbal, physical or painful stimuli. Kessee was not breathing. Kessee's heart was not beating. Kessee was dead.

207. Kessee was dead less than two (2) hours after Defendant Rickert and other Defendant Jailers claimed Kessee was "faking" his symptoms, including a seizure.

208. After finding Kessee unresponsive, numerous Defendant Jailers and Defendant Rickert attempted Cardiopulmonary Resuscitation ("CPR"), chest compressions, and use of an Automated External Defibrillator ("AED").

209. AED's advise a shock only for ventricular fibrillation or pulseless ventricular tachycardia. According to Defendants, the AED did not advise a shock.

210. EMSTAT was called at or around 9:55pm on January 16, 2018, and Kessee was transported back to Defendant Norman Regional.

211. Kessee was pronounced dead at 10:37 pm on January 16, 2018.

212. During the entire time Kessee was in the F. Dewayne Beggs Detention Center, his symptoms were so objectively obvious that a lay person would recognize the need for immediate medical attention.

213. On January 17, 2016, an employee of the Sheriff's Office examined the contents of the prescription medication bottles that were in Kessee's possession when he presented to Norman Regional and remained in Kessee's possession until he was booked into jail. The medications were as follows:

   a. Lorazepam 1MG Tab – 34 out of 60 tablets found in the bottle with instructions to "take one tablet twice daily";

   b. Amlodipine Besylate 5MG Tab – 23 out of 30 tablets found in the bottle with instructions to "take one tablet by mouth at bedtime";

   c. Atomoxetine 100MG Cap – 12 out of 30 capsules found in the bottle within instructions to "take one capsule by mouth daily";

   d. Melatonin 10MG Capsule – 23 out of 30 capsules found in the bottle with instructions to "take one capsule by mouth at bedtime";

   e. Bupropion 100MG Tab – 52 out of 90 tablets found in the bottle with instructions to "take one tablet by mouth three times daily".

214. All five (5) prescriptions were valid prescriptions for Kessee and were filled on January 10, 2018.

215. Defendants Canaan, Brown, Knapp, Barr, Shifflett, Scott, Rickert, and Andrews were aware that Kessee was exhibiting signs of drug toxicity.

216. No Defendant or employee of a named Defendant reviewed, counted, or examined Kessee's prescription medications on January 16, 2018.

217. According to the Medical Examiner's Report, Kessee died of "Acute Bupropion, Methamphetamine, and Atomoxetine Toxicity."

218. No citizen should have to endure the treatment and conduct exhibited by Defendants Andrews, Knapp, Barr, Shifflett, Scott, and Rickert against Kessee.

219. Defendants Andrews, Knapp, Barr, Shifflett, Scott and Rickert's deliberate, indifferent, callous, outrageous, unreasonable, and negligent actions denied Kessee of access to medical care.

220. As a result of Defendants Andrews, Knapp, Barr, Shifflett, Scott and Rickert' deliberate, indifferent, callous, outrageous, and unreasonable actions, Kessee suffered physical and mental pain and anguish, and a tragic, preventable death.

221. The actions of Defendants Andrews, Knapp, Barr, Shifflett, Scott and Rickert establish that they were not properly trained to adequately identify, respond to, and detain individuals exhibiting obvious and apparent symptoms of severe physical illness, mental health crisis, and/or dangerously severe degrees of intoxication; or, in the alternative, that

they failed to follow such training and that the other named Defendants failed to properly enforce such policies.

222. The above-described wrongful acts are proof of a policy in which Defendants deny citizens the rights, privileges, and immunity guaranteed to them by the United States Constitution, the laws of the United States, and the laws of Oklahoma.

223. This policy has no justification or excuse under the law but instead is improper, illegal, deliberately indifferent, and negligent and is unrelated to any activity in which law enforcement officers properly and legally carry out their sworn duty to enforce laws, protect persons and property, and ensure civil order.

224. Defendant Gibson, as Cleveland County Sheriff, was aware or reasonably should have been aware of this policy and did not act to correct it, constituting negligent supervision and training.

225. Defendant Gibson was negligent in the selection, appointment, training, supervision, and retention of their agents and employees, in that Defendant Gibson knew or should have known his agents and employees were carrying out these policies. Defendant Gibson directly or indirectly allowed an attitude that encouraged law enforcement officers to wrongfully detain and seize citizens and to use tactics and procedures violating citizens' right to life, liberty, and property in a manner that is reckless, irresponsible, dangerous, and negligent to the community at large and to Kessee and, in fact, had a policy of denying citizens of necessary medical attention.

226. Despite Defendant Gibson's knowing (or reasonably should have known) that this policy was being carried out, Defendants failed to remove the individual Defendants from their positions, to take any disciplinary action, or provide redress for citizens, such as Kessee, who have been injured by such deputies, and most importantly, put an end to the denial of medical care against the community.

227. The actions of Defendants were negligent, intentional, reckless, willful, and deliberate and showed gross and reckless disregard for Kessee's rights.

228. Defendants' acts and omissions were a direct and proximate cause of the harm to Kessee and his injuries.

229. The actions of Defendants Andrews, Knapp, Barr, Shifflett, Scott and Rickert were done willfully, maliciously, unlawfully, and with callous and reckless indifference in total disregard of Kessee's safety and continued health. Therefore, Plaintiff is entitled to compensatory and punitive damages along with her attorney's fees.

## <u>COUNT I</u>
## <u>NEGLIGENCE</u>

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

230. Defendant Roberts was negligent and reckless in the medical assessment, diagnosis, and treatment administered to Kessee. Defendant Robert's conduct fell below the acceptable standards of medical care and treatment.

231. At all material times mentioned herein, Defendant Roberts was acting within the scope of his employment and/or authority as employee, agent, and/or servant for Defendant Emergency Services.

232. Defendant Holbrook was negligent and reckless in the medical assessment, diagnosis, and treatment administered to Kessee. Defendant's conduct fell below the acceptable standards of medical care and treatment.

233. At all material times mentioned herein, Defendant Holbrook was acting within the scope of his employment and/or authority as employee, agent and/or servant for Defendant Emergency Services.

234. In the alternative, Defendants Roberts and/or Holbrook were acting within the scope of their employment and/or authority as employees, agents and/or servants for Defendant Norman Regional.

235. Defendant Rickert was negligent and reckless in the medical assessment, diagnosis, and treatment administered to Kessee. Defendant Rickert's conduct fell below the acceptable standards of medical care and treatment.

236. Defendant Rickert negligently and recklessly failed to perform his duty to protect Kessee from injury. His repeated disregard of Kessee's medical needs caused and exacerbated Kessee's pain and suffering and his emotional distress.

237. At all material times mentioned herein, Defendant Rickert was acting within the scope of his employment and/or authority as employee, agent and/or servant for Defendant Turn Key and/or Defendant Gibson, in his official capacity as Sheriff.

238. In the alternative, Defendant Rickert failed to act in good faith in carrying out the duties of his employment and abused his power, while still acting under the pretense and color of state law. As such, Defendant Rickert was outside the scope of his employment.

239. The injuries and damages sustained by Kessee, more particularly described below, were produced in a natural and continuous sequence from and as a foreseeable result of the Defendants' violation of the above described independent duties of ordinary care for the safety of the Kessee.

## COUNT II
## NEGLIGENT HIRING, RETENTION, TRAINING, SUPERVISION

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

240. Defendant Emergency Services was negligent in failing to hire and employ competent medical personnel, including Defendants Roberts and Holbrook.

241. Defendant Emergency Services knew or should have known of their employees' carelessness, recklessness, and incompetence.

242. Defendant Emergency Services negligently failed to train and supervise their employees on how to assess, diagnose, and treat patients like Kessee.

243. Defendant Turn Key was negligent in failing to hire and employ competent medical personnel, including Defendant Rickert.

244. Defendant Turn Key knew or should have known of their employee's carelessness, recklessness, and incompetence.

245. Defendant Turn Key negligently and recklessly failed to train and supervise their employee on how to assess, diagnose, and treat patients like Kessee.

246. Defendant Turnkey negligently and recklessly failed to perform its duty to protect Kessee from injury. Its repeated disregard of Kessee's medical needs caused and exacerbated Kessee's pain and suffering and his emotional distress.

247. At all material times mentioned herein, Defendant Turnkey was acting within the scope of his employment and/or authority as employee, agent and/or servant for Defendant Gibson, in his official capacity as Sheriff.

248. In the alternative, Defendant Turnkey failed to act in good faith in carrying out the duties of its employment and abused its power, while still acting under the pretense and color of state law. As such, Defendant Turnkey was outside the scope of its employment/contract.

249. The injuries and damages sustained by Kessee, more particularly described below, were produced in a natural and continuous sequence from and as a foreseeable result of the Defendants' violation of the above described independent duties of ordinary care for the safety of the Kessee.

**COUNT III**
**CORPORATE LIABILITY: NEGLIGENT CREDENTIALING**

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

250. Defendant Norman Regional had a duty to use ordinary care to take reasonable measures to avoid granting hospital privileges to a careless, reckless, or incompetent doctor.

251. Defendant Norman Regional knew or should have known in the exercise of ordinary care that Dr. Steven M. Roberts was careless, reckless, and incompetent.

252. Defendant Norman Regional failed in its duty to take steps to monitor, discipline, and/or revoke hospital privileges to Dr. Steven M. Roberts.

253. The injuries and damages sustained by Kessee, more particularly described below, were produced in a natural and continuous sequence from and as a foreseeable result of the Defendant's violation of the above described independent duties of ordinary care for the safety of the Kessee.

## COUNT IV
## USE OF EXCESSIVE FORCE IN VIOLATION OF 42 U.S.C. § 1983

Plaintiffs incorporate all previous allegations and statements and further allege as follows:

254. Under the Fourth Amendment of the United States, every person in the United States of America has the right to be secure against unreasonable seizures of their person, and 42 U.S.C. § 1983 prevents individuals from acting in a government capacity or under color of law from unlawful deprivation of those rights.

255. Defendants Canaan and Brown's conduct on January 16, 2018, specifically, dragging a drug overdosing, physically ill, and/or mentally ill person across a parking lot, in an attempt to affect a misdemeanor trespassing arrest, where the individual was not dangerous and posed no threat of physical harm to Defendants Canaan or Brown, or others, constitutes excessive force and is a deprivation of Kessee's rights secured under the U.S. Constitution.

256. A reasonable law enforcement officer would know that the use of excessive force under these circumstances is a violation of constitutionally guaranteed rights and that a citizen's rights not to be subjected to such excessive force was clearly secured and established at the time. See *Graham v. Connor,* 490 U.S. 386, 397 (1989); *Buck v. City of Albuquerque*, 549 F.3d 1269, 1290 (10th Cir. 2008).

257. At the time of the actions and/or omissions of Defendants Canaan and Brown, 22 O.S. § 34.1 defined "excessive force" as "force which exceeds the degree of physical force permitted by law or the policies and guidelines of the law enforcement entity."

258. It is not reasonable to drag an individual across pavement and push him face down into the pavement, when that individual does not pose an immediate threat to an officer or others. See *Buck v. City of Albuquerque, 549 F.3d 1269, 1290 (10th Cir. 2008).*

259. Defendants Canaan and Brown had a duty to refrain from violating Kessee's constitutional rights.

260. Any reasonable law enforcement officer would have been aware that the conduct of Defendants Canaan and Brown, as described herein, would violate Kessee's constitutional rights.

261. The force that Defendants Canaan and Brown used was excessive and unnecessary under the totality of the circumstances.

262. The excessive force used by Defendants Canaan and Brown upon Kessee was not justified or privileged under clearly established law.

263. No legitimate law enforcement objective was accomplished by the degree of such force utilized by Defendants Canaan and Brown.

264. Defendants Canaan and Brown's use of force was objectively unreasonable, as well as intentional, willful, wanton, and in gross and reckless and negligent disregard of Kessee's rights under the Fourth Amendment of the United States Constitution.

265. The use of force by Defendants Canaan and Brown against Kessee posed a substantial risk of causing death or serious bodily harm that was known to Defendants Canaan and Brown at the time and did in fact cause great bodily harm, mental and emotional injury, and dignitary injury.

266. Kessee was aware that he was dying and needed immediate medical attention, while Defendants Canaan and Brown dragged him across a parking lot. Defendants Canaan and Brown's actions were indecent, inhumane, traumatic, and completely unacceptable in a civilized society.

267. The above-described conduct of Defendants Canaan and Brown was a direct and proximate cause of the deprivation of Kessee's clearly established Fourth Amendment rights, as well as the resulting injuries, and damages described below.

268. Defendants Canaan and Brown, under color of law, unjustifiably used excessive force, and thus, violated Kessee's constitutional rights and is therefore, "liable...in an action at law, suit in equity, or other proper proceeding for redress..." as per 42. U.S.C. § 1983.

## COUNT V
## DELIBERATELY INDIFFERENT POLICIES, PRACTICES AND CUSTOMS, AND DELIBERATELY INDIFFERENT TRAINING AND SUPERVISION IN VIOLATION OF 42 U.S.C. § 1983

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

269. Defendant Humphrey was aware that pursuant to 22 O.S. § 34.1 "[e]ach law enforcement entity which employs any peace officer shall adopt policies and guidelines concerning the use of force by peace officers which shall be complied with by peace officers in carrying out the duties of such officers within the jurisdiction of the law enforcement entity."

270. The above-described conduct reflects an established policy, practice, custom, or decision, officially adopted or informally accepted, ratified, or condoned by Defendant Humphrey, and his officials and employees, that consists of dispatching officers to situations involving individuals with serious, life-threatening drug overdose, physical illness and/or mental health crisis without proper training and supervision as to how encounter and communicate with those citizens and avoid unnecessary and unreasonable use of force.

271. During all times relevant hereto, there were no guidelines, or wholly inadequate guidelines, in place as to the standard of care specific to detainee/arrestee's physical and mental health. It is common knowledge that drug overdose, physical illness, and/or mental illness is prevalent in citizens who encounter police and it is vital that police departments have policies in place establishing a constitutionally permissible standard of care for officers to follow in order to address this crisis.

272. It is clearly established law that Defendant Humphrey must train and supervise police officers, deputies, and other law enforcement personnel about proper procedures for

arrests and the reasonable use of force, including, but not limited to, excessive force, to reduce the pervasive and unreasonable risk of grave constitutional injury.

273. Defendant Humphrey has an affirmative duty to take action to properly train and supervise its employees or agents and prevent their unlawful actions.

274. Defendant Humphrey failed to properly train and supervise its employees or agents in a manner and to an extent that amounts to deliberate indifference. Defendants Canaan and Brown engaged in the above-described conduct pursuant to this policy, practice, custom, or decision.

275. Defendant Humphrey was the official policymaker and final decision-maker for Norman and Norman PD in the area of law enforcement.

276. Under information and belief, Defendant Humphrey had a policy, custom, and procedure of not ensuring that officers like Defendants Brown and Canaan were appropriately and adequately trained as to when and under what circumstances to effectuate an arrest and under what circumstances to use force.

277. Under information and belief, Defendant Humphrey had a policy, custom, and procedure of not ensuring that officers like Defendants Brown and Canaan were appropriately and adequately trained as to when and under what circumstances to obtain medical care for citizens who Defendants would foreseeably encounter.

278. Upon information and belief, Defendant Humphrey, acting through its subordinate law enforcement officers, had a persistent, widespread practice of depriving citizens of their

constitutional rights, that it was sufficiently common and well established as to constitute municipal policy or custom.

279. Upon information and belief, these customs or policies of unconstitutional conduct, as shown by the acts and omissions of other subordinate law enforcement officers, permitted or condoned actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of such conduct.

280. Defendant Humphrey understood that police officers, such as Defendants Canaan and Brown:

    a.  could and would exceed constitutional limitations on the use of force;

    b.  that the use of force may arise under circumstances that constitute a usual and recurring situation with which officers such as Defendants Canaan and Brown must manage;

    c.  that providing inadequate training or failing to enforce existing policies under such circumstances demonstrates deliberate indifference on the part of the Defendants toward persons with whom Defendants Canaan and Brown would come into contact;

    d.  and that failing to provide such training or to enforce policies and procedures to ensure that Defendants Canaan and Brown followed such training would be a direct causal link between the constitutional deprivation to which citizens, such as Kessee, would be exposed—in other words, when Defendants sent Canaan and

Brown out in the public domain, it was obvious that failing to adequately train them or enforce policies and procedures would equate deliberate indifference to the rights of the public with whom they came into contact.

281. The above-described policies and customs of Defendant Humphrey permitted or condoned the violation of Kessee's rights, demonstrated deliberate indifference to the constitutional rights of the persons within the City of Norman and were the cause of the injuries and damages suffered by Kessee.

282. Defendant Humphrey also knew that absent the adoption of specific and/or adequate policies, procedures, and tactics governing law enforcement encounters with citizens like Kessee, and absent training of law enforcement officers in such policies, procedures, and tactics, it was highly predictable that such failure to train would lead to law enforcement officers' violation of the Fourth Amendment rights of citizens, and could likely result in the otherwise avoidable injury of such citizens.

283. Inadequate training and supervision of Defendants Brown and Canaan about the proper procedures to be used in making an arrest, the use of force, including, but not limited to, excessive force, was so likely to result in grave constitutional injury to citizens that the failure to provide adequate training and supervision to Defendants Brown and Canaan in these areas constituted a deliberate indifference to and acquiescence in such injury to Kessee.

284. Defendants Canaan and Brown received no form of discipline or reprimand from Defendant Humphrey for their above-described use of excessive force against Kessee.

285. Defendant Humphrey ratified the conduct of Defendant Canaan and Brown in concluding that the conduct was consistent with the policies, procedures, and training of the Defendant Humphrey.

286. Defendants Canaan and Brown's actions and/or inactions stem from the execution of a government policy, custom, or official decision of indifference as to the protection of citizens' constitutional rights and his actions can fairly be said to represent such a policy and custom.

287. Defendant Humphrey's failure to ensure and accomplish or enforce such proper training caused Defendants Canaan and Brown to effectuate an inappropriate/unlawful arrest and to use excessive force in violation of the U.S. Constitution, proximately and directly causing serious injury to Kessee.

## COUNT VI
## NEGLIGENCE

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

288. Defendants Canaan and Brown had a duty to act reasonably when encountering citizens, in an effort to prevent harm to Kessee and others.

289. On January 16, 2018, Defendants Canaan and Brown acted unreasonably and negligently when he encountered Kessee.

290. As a result of Defendants Canaan and Brown's choices and actions on January 16, 2018, Kessee suffered physical and mental injuries and damages.

291. Defendants Canaan and Brown were acting within the scope of their employment at all relevant times, such that Defendant Norman is liable for the damages caused to Kessee under the Oklahoma Governmental Tort Claims Act.

292. In the alternative, Defendants Canaan and Brown were acting outside the scope of their employment at all relevant times, such that Defendants Canaan and Brown are personally liable for the damages caused to Kessee.

293. The injuries and damages sustained by Kessee, more particularly described below, were produced in a natural and continuous sequence from and as a foreseeable result of the Defendant's violation of the above described independent duties of ordinary care for the safety of the Kessee.

## <u>COUNT VII</u>
## <u>ASSAULT AND BATTERY</u>

Plaintiffs incorporate all previous allegations and statements and further allege as follows:

294. Defendants Canaan and Brown without the consent of Kessee, acted either with the intent of making a harmful/offensive contact with the person of Kessee, or with the intent of putting Kessee in apprehension of such a contact.

295. Defendants Canaan and Brown's act resulted in a harmful/offensive contact with Kessee.

296. Defendants Canaan and Brown were acting in the scope of their employment, such that Defendants Norman and/or Norman PD are liable under the Oklahoma Governmental Tort Claims Act.

297. In the alternative, Defendants Canaan and Brown were acting outside the scope of their employment, such that Defendants Canaan and Brown are personally liable.

298. The injuries and damages sustained by Kessee, more particularly described below, were produced in a natural and continuous sequence from and as a foreseeable result of the Defendant's violation of the above described independent duties of ordinary care for the safety of the Kessee.

**COUNT VIII – DELIBERATE DISREGARD OF SERIOUS MEDICAL NEEDS IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS IN VIOLATION OF 42 U.S.C. § 1983**

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

299. Under the Eighth Amendment of the United States Constitution, inmates held in American prisons have a fundamental right to prison conditions that do not constitute "cruel and unusual punishment."

300. An arrestee and pretrial detainee, such as Kessee, who has not been convicted of a crime is at least "entitled to the degree of protection against denial of medical attention which applies to convicted inmates" under the Eighth Amendment. *Martinez v. Begg*, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Garcia v. Salt Lake County*, 768 F.2d 303, 307 (10th Cir. 1985); *Howard v. Dickerson*, 34 F.3d 978, 981 (10th Cir. 1994)).

301. The Tenth Circuit Court of Appeals applies the Eighth Amendment's "deliberate indifference" standard to determine whether a pretrial detainee has been deprived of medical attention to such a degree that his or her constitutional rights are violated. See *Id.*

54

302. The total failure of Defendants Canaan, Brown, Andrews, Knapp, Shifflett, Scott, and Rickert to provide to Kessee with medical assistance given their clear and admitted awareness of the severity of Kessee's symptoms during his arrest and detention violated his fundamental rights guaranteed under the U.S. Constitution to be free from deprivation of medical care constituting cruel and unusual punishment.

303. It was apparent to all Defendants who came into contact with Kessee from the period of his arrest until his death that he was either *very* severely intoxicated, such that he was unconscious and/or at risk of considerable harm, or suffering an extremely severe physical and/or mental health crisis.

304. The severity of Kessee's symptoms of drug overdose, physical illness, and/or mental health crisis at the time he was first encountered by police, to when he was booked into F. Dewayne Beggs Detention Center and up to the point he was found unresponsive, and likely dead, were so great in magnitude that even a lay person would have recognized the fact that he required treatment by a medical professional.

305. Defendants Canaan, Brown, Andrews, Knapp, Shifflett, Scott, and Rickert, and other jail employees were all personally present during Kessee's arrest and/or book-in process and failed to intervene to prevent or remedy Defendants' failure to provide a proper health evaluation, proper classification of Kessee's severe drug overdose, physical illness and/or mental health crisis, and adequate or timely medical attention.

306. Despite Defendants Canaan, Brown, Andrews, Knapp, Shifflett, Scott, and Rickert's knowledge and awareness as a law enforcement officers, jailers and/or medical

professionals with typical signs, symptoms and duration of drug overdose, physical illness and/or mental health crisis associated with the substances that Kessee was alleged to have consumed, Defendants denied repeated requests by Kessee for medical attention.

307. Defendants Canaan, Brown, Andrews, Knapp, Shifflett, Scott, and Rickert knew with substantial certainty that Kessee was experiencing acute drug overdose, physical illness and/or mental health crisis because of Kessee's own statements or because of their personal observations and knowledge of the numerous symptoms that he exhibited.

308. Despite their awareness of Kessee's heightened risk of injury, suffering, and death, Defendants Canaan, Brown, Andrews, Knapp, Shifflett, Scott, and Rickert chose to arrest and detain Kessee without access to medical care and instead of obvious and less burdensome alternatives including (1) walking twenty (20) feet back into Norman Regional to seek medical assistance or (2) taking Kessee to a Mental Health Center for assessment and treatment.

309. The aforementioned acts and/or omissions of Defendants Canaan, Brown, Andrews, Knapp, Shifflett, Scott, and Rickert, in light of their awareness and knowledge of Kessee's condition and serious medical needs, display deliberate indifference to the substantial likelihood that depriving Kessee of medical care would result in his injury and/or death.

310. The aforementioned acts and/or omissions of Defendants Canaan, Brown, Andrews, Knapp, Shifflett, Scott, and Rickert, were a direct and proximate cause of Kessee's avoidable and unnecessary physical pain, severe emotional distress, mental anguish, loss of life, and all other damages alleged herein.

311. The aforementioned acts and/or omissions of Defendants Canaan, Brown, Andrews, Knapp, Shifflett, Scott, and Rickert, were the direct and proximate cause of damages suffered by Kessee's heirs, including, but not limited to, pecuniary loss (including lost wages), grief, loss of companionship, pain, and suffering.

### COUNT IX – DELIBERATELY INDIFFERENT POLICIES, PRACTICES AND CUSTOMS, AND DELIBERATELY INDIFFERENT TRAINING AND SUPERVISION IN VIOLATION OF 42 U.S.C. § 1983

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

312. During all times relevant hereto, there were no guidelines, or wholly inadequate guidelines, in place as to the standard of care specific to detainees/arrestees' physical and mental health. It is common knowledge that drug overdose, physical illness, and/or mental illness is prevalent in citizens who encounter police officers and it is vital that police departments have policies in place establishing a constitutionally permissible standard of care for officers to follow in order to address this crisis.

313. Defendant Norman delegates final authority to establish municipal policy regarding detainee health and safety to Defendant Humphrey.

314. Defendant Humphrey, acting on behalf of Defendant Norman, as decisionmaker with final authority to establish municipal policy regarding arrestee/detainee's health and safety, deprived Kessee of rights and freedoms secured by the Fourteenth and Eighth Amendments of the U.S. Constitution—specifically freedom from deprivation of medical care constituting cruel and unusual punishment.

315. The policies, practices and customs, promulgated, created, implemented and/or utilized by Defendant Humphrey represent the official policies and/or customs of Defendant Norman with regards to detainee/arrestee health and safety.

316. Such policies, practices, and/or customs include, but are not limited to:

   a. The failure to promulgate, implement, or enforce adequate policies responsive to the serious medical needs of arrestees/detainees like Kessee;

   b. Inadequate medical triage screening that fails to identify arrestees/detainees with serious medical or mental health needs;

   c. Severe limitation or failure to utilize off-site medical, mental health, and diagnostic service providers, even in emergent situations;

   d. Untimely medical and mental health examinations and treatment;

   e. Untimely response to emergent medical or mental health crises;

   f. Detention of severely intoxicated, physically ill, or mentally unstable arrestees/detainees without medical attention.

317. The aforementioned policies, practices and/or customs promulgated, created and/or utilized by Defendant Humphrey, and thereby the official policies, practices and/or customs of Defendant Norman, were the direct and proximate cause of Kessee's deprivation of medical care which resulted in his death.

318. The aforementioned policies, practices and/or customs promulgated, created and/or utilized by Defendant Humphrey, and thereby the official policies, practices and/or customs of Defendant Norman, were the direct and proximate cause of Kessee's avoidable

and unnecessary physical pain, severe emotional distress, mental anguish, loss of his life, and all other damages alleged herein.

319. The aforementioned policies, practices and/or customs promulgated, created and/or utilized by Defendant Humphrey, and thereby the official policies, practices and/or customs of Defendant Norman, were the direct and proximate cause of damages suffered by Kessee's heirs, including, but not limited to, pecuniary loss (including lost wages), grief, loss of companionship, pain, and suffering.

320. Defendant Humphrey also failed to adequately train and/or supervise subordinates, including Defendants Canaan and Brown, in relation to tasks they must perform pursuant to those policies, practices, and/or customs outlined above.

321. As noted previously, Defendant Norman delegated policy-making authority to Defendant Humphrey and therefore the training and supervision policies and/or customs adopted by Defendant Humphrey are the official municipal policies and/or customs of Defendant Norman.

322. Defendant Humphrey knew or should have known that Norman PD, including Defendants Canaan and Brown, frequently encounters, arrests and/or detains individuals experiencing severe intoxication, physical illness, and/or mental health crises requiring emergency medical assistance.

323. Defendant Humphrey knew or should have known that Norman PD, including Defendants Canaan and Brown, frequently encounters, arrests, and/or detains individuals at heightened risk of injury or death.

324. Defendant Humphrey knew or should have known that police officers, under his exercise of control including Defendants Canaan and Brown, require training and supervision in order to adequately identify, respond to, and detain individuals exhibiting obvious and apparent symptoms of severe physical and/or mental health crisis, and/or dangerously severe degrees of intoxication.

325. Defendant Humphrey knew or should have known that his failure to adequately train and/or supervise police officers under his exercise of control, including Defendants Canaan and Brown, posed a substantial and excessive risk to the health and safety of Kessee and would inevitably result in unconstitutional deprivation of medical care of the type that Kessee suffered.

326. Defendant Humphrey failed to adequately train and/or supervise police officers, including Defendants Canaan and Brown in how to identify, respond to, and detain individuals exhibiting obvious and apparent symptoms of severe physical illness and/or mental health crisis, and/or dangerously severe degrees of intoxication.

327. Defendant Humphrey's failure to train and/or supervise police officers, including Defendants Canaan and Brown, exhibited deliberate disregard for the known and obvious excessive risk such policy and/or posed to Kessee's health and safety.

328. Defendant Humphrey's failure to train and/or supervise police officers, including Defendants Canaan and Brown, in reckless disregard to inevitable constitutional violations that would likely result constitutes the official policy and/or custom of Defendant Norman.

329. Defendant Humphrey's failure to train and/or supervise subordinate police officers, and thereby the official policies and/or custom of Defendant Norman, was the direct and proximate cause of Kessee's deprivation of medical care that resulted in his death.

330. Defendant Humphrey's failure to train and/or supervise subordinate police officers, and thereby the official policies and/or custom of Defendant Norman, was the direct and proximate cause of Kessee's avoidable and unnecessary physical pain, severe emotional distress, mental anguish, loss of his life, and all other damages alleged herein.

331. Defendant Humphrey's failure to train and/or supervise subordinate police officers, and thereby the official policies and/or custom of Defendant Norman, was the direct and proximate cause of damages suffered by Kessee's heirs, including, but not limited to, pecuniary loss (including lost wages), grief, loss of companionship, pain and suffering.

## COUNT X – DELIBERATELY INDIFFERENT POLICIES, PRACTICES AND CUSTOMS, AND DELIBERATELY INDIFFERENT TRAINING AND SUPERVISION IN VIOLATION OF 42 U.S.C. § 1983

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

332. During all times relevant hereto, there were no guidelines, or wholly inadequate guidelines, in place as to the standard of care specific to detainees/arrestees' physical and mental health. It is common knowledge that drug overdose, physical illness, and/or mental illness is prevalent in citizens who encounter jailers and it is vital that jails have policies in place establishing a constitutionally permissible standard of care for jailers and staff to follow in order to address this crisis.

333. The Cleveland County Board of County Commissioners delegates final authority to establish policy regarding detainee health and safety to Defendant Gibson.

334. Defendant Gibson as decisionmaker with final authority to establish policy regarding arrestee/detainee's health and safety, deprived Kessee of rights and freedoms secured by the Fourteenth and Eighth Amendments of the U.S. Constitution—specifically freedom from deprivation of medical care constituting cruel and unusual punishment.

335. The policies, practices and customs, promulgated, created, implemented and/or utilized by Defendant Gibson represent the official policies and/or customs of BOCC and/or Sheriff's Office with regards to detainee/arrestee health and safety.

336. Such policies, practices, and/or customs include, but are not limited to:

    a. The failure to promulgate, implement, or enforce adequate policies responsive to the serious medical needs of arrestees/detainees like Kessee;

    b. Inadequate medical triage screening that fails to identify arrestees/detainees with serious medical or mental health needs;

    c. Severe limitation or failure to utilize off-site medical, mental health, and diagnostic service providers, even in emergent situations;

    d. Untimely medical and mental health examinations and treatment;

    e. Untimely response to emergent medical or mental health crises;

    f. Detention of severely intoxicated, physically ill, or mentally unstable arrestees/detainees without medical attention.

337. The aforementioned policies, practices and/or customs promulgated, created and/or utilized by Defendant Gibson, and thereby the official policies, practices, and/or customs of BOCC and/or Sheriff's Office, were the direct and proximate cause of Kessee's deprivation of medical care which resulted in his death.

338. The aforementioned policies, practices and/or customs promulgated, created and/or utilized by Defendant Gibson, and thereby the official policies, practices and/or customs of BOCC and/or Sheriff's Office, were the direct and proximate cause of Kessee's avoidable and unnecessary physical pain, severe emotional distress, mental anguish, loss of his life, and all other damages alleged herein.

339. The aforementioned policies, practices and/or customs promulgated, created and/or utilized by Defendant Gibson, and thereby the official policies, practices and/or customs of BOCC and/or Sheriff's Office, were the direct and proximate cause of damages suffered by Kessee's heirs, including, but not limited to, pecuniary loss (including lost wages), grief, loss of companionship, pain and suffering.

340. Defendant Gibson also failed to adequately train and/or supervise subordinates, including Defendants Andrews, Knapp, Barr, Shifflett, Scott and/or Rickert, in relation to tasks they must perform pursuant to those policies, practices and/or customs outlined above.

341. As noted previously, BOCC and/or Sheriff's Office delegated policy-making authority to Defendant Gibson and therefore the training and supervision policies and/or customs adopted by Defendant Gibson are the official policies and/or customs of BOCC and/or Sheriff's Office.

342. Defendant Gibson knew or should have known that jailers, including Defendants Andrews, Knapp, Barr, Shifflett, Scott, and/or Rickert, frequently encounters, arrests and/or detains individuals experiencing severe intoxication, physical illness and/or mental health crises requiring emergency medical assistance.

343. Defendant Gibson knew or should have known that jailers, including Defendants Andrews, Knapp, Barr, Shifflett, Scott and/or Rickert, frequently encounters, arrests, and/or detains individuals at heightened risk of injury or death.

344. Defendant Gibson knew or should have known that jailers, under his exercise of control including Defendants Andrews, Knapp, Barr, Shifflett, Scott, and/or Rickert, require training and supervision in order to adequately identify, respond to, and detain individuals exhibiting obvious and apparent symptoms of severe physical and/or mental health crisis, and/or dangerously severe degrees of intoxication.

345. Defendant Gibson knew or should have known that his failure to adequately train and/or supervise jailers under his exercise of control, including Defendants Andrews, Knapp, Barr, Shifflett, Scott, and/or Rickert, posed a substantial and excessive risk to the health and safety of Kessee and would inevitably result in unconstitutional deprivation of medical care of the type that Kessee suffered.

346. Defendant Gibson failed to adequately train and/or supervise jailers, including Defendants Andrews, Knapp, Barr, Shifflett, Scott, and/or Rickert, in how to identify, respond to, and detain individuals exhibiting obvious and apparent symptoms of severe physical illness and/or mental health crisis, and/or dangerously severe degrees of intoxication.

347. Defendant Gibson's failure to train and/or supervise jailers, including Defendants Andrews, Knapp, Barr, Shifflett, Scott, and/or Rickert, exhibited deliberate disregard for the known and obvious excessive risk such policy and/or posed to Kessee's health and safety.

348. Defendant Gibson's failure to train and/or supervise jailers, including Defendants Andrews, Knapp, Barr, Shifflett, Scott, and/or Rickert, in reckless disregard to inevitable constitutional violations that would likely result constitutes the official policy and/or custom of BOCC and/or Sheriff's Office.

349. Defendant Gibson's failure to train and/or supervise subordinate jailers, and thereby the official policies and/or custom of BOCC and/or Sheriff's Office, was the direct and proximate cause of Kessee's deprivation of medical care which resulted in his death.

350. Defendant Gibson's failure to train and/or supervise subordinate jailers, and thereby the official policies and/or custom of BOCC and/or Sheriff's Office, was the direct and proximate cause of Kessee's avoidable and unnecessary physical pain, severe emotional distress, mental anguish, loss of his life, and all other damages alleged herein.

351. Defendant Gibson's failure to train and/or supervise subordinate jailers, and thereby the official policies and/or custom of BOCC and/or Sheriff's Office, was the direct and proximate cause of damages suffered by Kessee's heirs, including, but not limited to, pecuniary loss (including lost wages), grief, loss of companionship, pain and suffering.

### COUNT XI – DELIBERATELY INDIFFERENT POLICIES, PRACTICES AND CUSTOMS, AND DELIBERATELY INDIFFERENT TRAINING AND SUPERVISION IN VIOLATION OF 42 U.S.C. § 1983

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

352. During all times relevant hereto, there were no guidelines, or wholly inadequate guidelines, in place as to the standard of care specific to detainees/arrestees' physical and mental health. It is common knowledge that drug overdose, physical illness and/or mental illness is prevalent in citizens who encounter jail medical personnel and it is vital that jail medical providers have policies in place establishing a constitutionally permissible standard of care for jail medical personnel to follow in order to address this crisis.

353. BOCC and/or Defendant Gibson delegates final authority to establish municipal policy regarding detainee health and safety to Defendant Turn Key.

354. Defendant Turn Key, acting on behalf of BOCC and/or Defendant Gibson, as decisionmaker with final authority to establish municipal policy regarding arrestee/detainee's health and safety, deprived Kessee of rights and freedoms secured by the Fourteenth and Eighth Amendments of the U.S. Constitution—specifically freedom from deprivation of medical care constituting cruel and unusual punishment.

355. The policies, practices and customs, promulgated, created, implemented and/or utilized by Defendant Turn Key represent the official policies and/or customs of BOCC and/or Defendant Gibson with regards to detainee/arrestee health and safety.

356. Such policies, practices, and/or customs include, but are not limited to:

   a. The failure to promulgate, implement, or enforce adequate policies responsive to the serious medical needs of arrestees/detainees like Kessee;

66

b.  Inadequate medical triage screening that fails to identify arrestees/detainees with serious medical or mental health needs;

c.  Severe limitation or failure to utilize off-site medical, mental health, and diagnostic service providers, even in emergent situations;

d.  Untimely medical and mental health examinations and treatment;

e.  Untimely response to emergent medical or mental health crises;

f.  Detention of severely intoxicated, physically ill or mentally unstable arrestees/detainees without medical attention.

357.  The aforementioned policies, practices and/or customs promulgated, created and/or utilized by Defendant Turn Key, and thereby the official policies, practices and/or customs of BOCC and/or Defendant Gibson, were promulgated, created, and/or utilized with conscious disregard of a substantial risk of serious harm and were the direct and proximate cause of Kessee's deprivation of medical care which resulted in his death.

358.  The aforementioned policies, practices and/or customs promulgated, created and/or utilized by Defendant Turn Key, and thereby the official policies, practices and/or customs of BOCC and/or Defendant Gibson, were promulgated, created, and/or utilized with conscious disregard of a substantial risk of serious harm and constitutional violations and were the direct and proximate cause of Kessee's avoidable and unnecessary physical pain, severe emotional distress, mental anguish, loss of his life, and all other damages alleged herein.

359. The aforementioned policies, practices and/or customs promulgated, created and/or utilized by Defendant Turn Key, and thereby the official policies, practices and/or customs of BOCC and/or Defendant Gibson were promulgated, created, and/or utilized with conscious disregard of a substantial risk of serious harm and constitutional violations and were the direct and proximate cause of damages suffered by Kessee's heirs, including, but not limited to, pecuniary loss (including lost wages), grief, loss of companionship, pain and suffering.

360. Defendant Turn Key also failed to adequately train and/or supervise subordinates, including Defendants Andrews, Knapp, Barr, Shifflett, Scott and/or Rickert, in relation to tasks they must perform pursuant to those policies, practices and/or customs outlined above.

361. As noted previously, BOCC, Defendant Gibson and/or Sheriff's Office delegated policy-making authority to Defendant Turn Key and therefore the training and supervision policies and/or customs adopted by Defendant Turn Key are the official policies and/or customs of BOCC and/or Gibson.

362. Defendant Turn Key knew or should have known that jailers and medical personnel, including Defendants Andrews, Knapp, Barr, Shifflett, Scott and/or Rickert frequently encounter, arrest, and/or detain individuals experiencing severe intoxication, physical illness and/or mental health crises requiring emergency medical assistance.

363. Defendant Turn Key knew or should have known that jailers and medical personnel, including Defendants Andrews, Knapp, Barr, Shifflett, Scott, and/or Rickert, frequently encounter, arrest, and/or detain individuals at heightened risk of injury or death.

364. Defendant Turn Key knew or should have known that jailers and medical personnel, under its exercise of control including Defendants Andrews, Knapp, Barr, Shifflett, Scott, and/or Rickert, require training and supervision in order to adequately identify, respond to, and detain individuals exhibiting obvious and apparent symptoms of severe physical and/or mental health crisis, and/or dangerously severe degrees of intoxication.

365. Defendant Turn Key knew or should have known that his failure to adequately train and/or supervise jailers and medical personnel under its exercise of control, including Defendants Andrews, Knapp, Barr, Shifflett, Scott, and/or Rickert, posed a substantial and excessive risk to the health and safety of Kessee and would inevitably result in unconstitutional deprivation of medical care of the type that Kessee suffered.

366. Defendant Turn Key failed to adequately train and/or supervise jailers and medical personnel, including Defendants Andrews, Knapp, Barr, Shifflett, Scott, and/or Rickert, in how to identify, respond to, and detain individuals exhibiting obvious and apparent symptoms of severe physical illness and/or mental health crisis, and/or dangerously severe degrees of intoxication.

367. Defendant Turn Key's failure to train and/or supervise jailers and medical personnel, including Defendants Andrews, Knapp, Barr, Shifflett, Scott, and/or Rickert, exhibited

deliberate disregard for the known and obvious excessive risk such policy and/or posed to Kessee's health and safety.

368. Defendant Turn Key's failure to train and/or supervise jailers and medical personnel, including Defendants Andrews, Knapp, Barr, Shifflett, Scott, and/or Rickert, in reckless and conscious disregard to inevitable constitutional violations that would likely result constitutes the official policy and/or custom of BOCC and/or Defendant Gibson.

369. Defendant Turn Key's failure to train and/or supervise subordinate jailers and medical personnel, and thereby the official policies and/or custom of BOCC and/or Defendant Gibson, was the direct and proximate cause of Kessee's deprivation of medical care which resulted in his death.

370. Defendant Turn Key's failure to train and/or supervise subordinate jailers and medical personnel, and thereby the official policies and/or custom of BOCC and/or Defendant Gibson, was the direct and proximate cause of Kessee's avoidable and unnecessary physical pain, severe emotional distress, mental anguish, loss of his life, and all other damages alleged herein.

371. Defendant Turn Key's failure to train and/or supervise subordinate jailers and medical personnel, and thereby the official policies and/or custom of BOCC and/or Defendant Gibson, was the direct and proximate cause of damages suffered by Kessee's heirs, including, but not limited to, pecuniary loss (including lost wages), grief, loss of companionship, pain and suffering.

<u>**COUNT XII**</u>
<u>**FALSE ARREST IN VIOLATION OF 42 U.S.C. § 1983**</u>

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

372. Defendants Canaan and Brown violated Plaintiff's Fourth Amendment Rights cognizable under 42 U.S.C. § 1983, which guarantee security from unreasonable searches and seizures.

373. Defendants Canaan and Brown's conduct carried out under the color of state law deprived Kessee his rights, privileges, and immunities secured by the Constitution and laws.

374. Defendants Canaan and Brown wrongfully arrested and detained Kessee without probable cause for the arresting charge of trespassing.

375. No information or even mere suspicion existed that would lead a reasonably prudent person or officer to believe that Kessee committed or was committing the offense of trespassing; thus, no probable cause existed.

376. Kessee's numerous signs of serious physical illness, mental illness, and/or drug overdose, including seizures, convulsions, inability to speak coherently, considerable and objectively apparent pain, inability to walk, inability to perform basic tasks, inability to comprehend instructions and requests, unexplained perspiration, elevated body temperature, tremors, lack of physical coordination, racing thoughts, elevated blood pressure, headaches, elevated heart rate, confusion, disorientation, delayed responsiveness, and visible signs of anxiety, along with numerous other readily observable signs of distress, would prevent any reasonably prudent person or trained officer from believing that Kessee willfully remained upon the premises without permission.

71

377. The above-described conduct of Defendants Canaan and Brown was a direct and proximate cause of the deprivation of Kessee's clearly established Fourth Amendment rights, as well as the resulting injuries, and damages described below.

378. Defendants Canaan and Brown, under color of law, wrongfully arrested Kessee, and thus violated Kessee's constitutional rights and is therefore, "liable...in an action at law, suit in equity, or other proper proceeding for redress...," as per 42. U.S.C. § 1983.

## CAUSATION OF INJURIES AND DAMAGES

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

379. The injuries and damages sustained by Kessee, were produced in a natural and continuous sequence from Defendants' violation of one or more of the above described independent constitutional duties.

380. The injuries and damages sustained by Kessee were a probable consequence from Defendants' violation of one or more of the above described independent duties.

381. Defendants should have foreseen and anticipated that a violation of one or more of the above-described independent duties would constitute an appreciable risk of harm to others, including Kessee.

382. If Defendants had not violated one or more of the above-described independent duties, then Kessee's injuries, death, and other damages would not have occurred.

## COMPENSATORY DAMAGES SUSTAINED BY PLAINTIFF

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

383. The injuries and damages sustained by Kessee as a result of Defendants' violations include but are not limited to the following:

    a.  Kessee's physical pain and suffering, past and future;

    b.  Kessee's mental pain and suffering, past and future;

    c.  Kessee's age;

    d.  Kessee's physical condition immediately before and after the accident;

    e.  The nature and extent of Kessee's injuries;

    f.  Whether the injuries are permanent;

    g.  The physical impairment;

    h.  The disfigurement;

    i.  Loss of [earnings/time];

    j.  Impairment of earning capacity;

    k.  The reasonable expenses of the necessary medical care, treatment, and services, past and future.

384. The Plaintiff's injuries and damages include all wrongful death damages pursuant to 12 O.S. § 1053, including but not limited to: (1) medical and burial expenses, (2) loss of consortium and grief, (3) mental pain and anguish of the decedent, (4) pecuniary loss to survivors, and (5) grief and loss of companionship to children and parents of the decedent.

## **AMOUNT OF DAMAGES**

385. The Plaintiff's injuries and damages are in excess of the amount required for diversity jurisdiction under 28 U.S.C. 1332 (currently $75,000.00), plus attorney fees, interest, costs and all such other and further relief for which should be awarded as judgment against Defendants in an amount to fully and fairly compensate Plaintiff for each and every element of damages that has been suffered.

## PUNITIVE DAMAGES

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

386. Plaintiff is entitled to punitive damages on claims brought against individual Defendants pursuant to 42 U.S.C. § 1983 as Defendants' conduct, acts, and omissions alleged herein constitute reckless or callous indifference to Kessee's federally protected rights.

387. Plaintiff is entitled to punitive damages on claims brought against individual Defendants on state law claims where said individual Defendants were acting outside the scope of their employment, as Defendants' conduct, acts, and omissions alleged herein constitute reckless or callous indifference to Kessee's protected rights.

388. Plaintiff is entitled to punitive damages on all other claims pursuant to 12 O.S. § 1053.

## DEMAND FOR JURY TRIAL

389. The Plaintiff demands a jury trial for all issues of fact presented by this action.

## RESERVATION OF ADDITIONAL CLAIMS

390. The Plaintiff reserves the right to plead further upon completion of discovery to state additional claims and to name additional parties to this action.

WHEREFORE, Plaintiff, Patricia Thompson, as Personal Representative of the Estate of Marconia Lynn Kessee, prays for judgment against Defendants in a sum excess of the amount required for diversity jurisdiction under 28 U.S.C. § 1332 (currently $75,000.00) plus interest, attorneys fee, costs, and all such other relief as to which Plaintiff may be entitled.

s/Jason Hicks
_____
Chris Hammons, OBA #20233
Jason M. Hicks, OBA #22176
Jonathan Ortwein, OBA #32092
LAIRD HAMMONS LAIRD, PLLC
1332 S.W. 89th Street
Oklahoma City, OK 73159
Telephone: 405.703.4567
Facsimile:  405.703.4067
E-mail:      chris@lhllaw.com
              jason@lhllaw.com
              colby@lhllaw.com
ATTORNEYS FOR PLAINTIFF

**ATTORNEY LIEN CLAIMED**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 18, 2020, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the ECF registrants listed in this case.

s/Jason Hicks
ATTORNEY FOR PLAINTIFF

76