1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE WESTERN DISTRICT OF OKLAHOMA

3
   (1) PATRICIA THOMPSON, as     )
4  Personal Representative of the)
   Estate of MARCONIA LYNN       )
5  KESSEE,                       )
                                 )
6       Plaintiff,               )
                                 )
7  -vs-                          )      No. CIV-19-113-SLP
                                 )
8  (1) NORMAN REGIONAL HOSPITAL  )
   AUTHORITY d/b/a NORMAN        )
9  REGIONAL HOSPITAL, a public   )
   trust, et al.,                )
10                               )
        Defendants.              )
11

12

13                    * * * * *

14     REMOTE VIDEOCONFERENCE DEPOSITION OF DANIEL BROWN

15            TAKEN ON BEHALF OF THE PLAINTIFF

16             IN OKLAHOMA CITY, OKLAHOMA

17               ON OCTOBER 20, 2020

18             COMMENCING AT 2:54 P.M.

19                    * * * * *

20

21

22              INSTASCRIPT, L.L.C.
              125 PARK AVENUE, SUITE LL
23       OKLAHOMA CITY, OKLAHOMA  73102
                  405.605.6880
24          schedule@instascript.net

25  REPORTED BY:  BETH A. McGINLEY, CSR, RPR

EXHIBIT 12
Page 1 of 30

 1            MR. KNIGHTON:  Rick Knighton here for

 2   defendants City of Norman and Keith Humphrey.

 3            MS. GOOCH:  Ambre Gooch for defendants Brown

 4   and Canaan.

 5            MR. HOISINGTON:  Robert Hoisington and Kaitlyn

 6   Dunn for Norman Regional Hospital Authority.

 7            VIRTUAL ROOM MONITOR:  Would the court

 8   reporter please swear in the witness?

 9                      DANIEL BROWN,

10   having been first duly sworn, deposes and says in reply

11   to the questions propounded as follows:

12                   *  *  *  *  *  *

13                      EXAMINATION

14   BY MR. HAMMONS:

15      Q    Mr. Brown, have you ever given a deposition

16   before?

17      A    No, sir.

18      Q    You've probably given testimony in court;

19   true?

20      A    Yes, sir.

21      Q    Okay.  If I ask a question you don't

22   understand, just let me know and I'll do my best to ask

23   it to where you can understand it and answer it, okay?

24      A    Yes, sir.

25      Q    If you need a break at any point in time, just

EXHIBIT 12
Page 2 of 30

```
 1   from Marconia?

 2        A    No.

 3        Q    Was Marconia resisting arrest?

 4        A    No.

 5        Q    Was he attempting to evade you or Officer

 6   Canaan?

 7        A    No.

 8        Q    Did he ever attack you or Officer Canaan?

 9        A    No.

10        Q    Did you have any prior contact with Marconia

11   Kessee before January 16, 2018?

12        A    No, sir.

13        Q    Did you know anything about him as you walked

14   up and -- and saw him for the first time?

15        A    Only what I -- when I ran his name for a

16   warrant check.

17        Q    And what does that -- what did that -- what

18   did you learn from that warrant check?

19        A    His name, birth date.

20        Q    Anything else?

21        A    And address.

22        Q    Okay.  Nothing else?

23        A    No, sir.

24        Q    And I talked to Officer Canaan a little about

25   this.  He said there's -- sometimes, there is
```

EXHIBIT 12
Page 3 of 30

 1   information in the system that -- of --

 2       A    Uh-huh.

 3       Q    -- prior contacts with the Norman Police

 4   Department.  Is -- did you see any of that?

 5       A    Not -- not that I recall.

 6       Q    Okay.  Any exigent circumstances that would

 7   justify the use of force?

 8       A    No.

 9            MS. GOOCH:  Object to the form.

10       Q    (By Mr. Hammons) Now, if you could, move, on

11   Exhibit 1, to Page 47, and it's a -- 300.3.3, "Pain

12   compliance techniques."  Do you see that?

13       A    Yes, sir.

14       Q    At the time of the dragging of Marconia across

15   the sidewalks, were you authorized, under that section,

16   to use pain compliance techniques against Marconia?

17       A    No.

18       Q    Is the act of dragging a citizen a pain

19   compliance technique approved by the City of Norman?

20            MS. GOOCH:  Object to the form.

21       A    No.

22       Q    (By Mr. Hammons) What would be a pain

23   compliance technique?

24       A    I couldn't tell you the specific names.

25   There's one underneath the jaw bone.

EXHIBIT 12
Page 4 of 30

```
 1      A     No.

 2      Q     Why not?

 3      A     It's when I told him to stop.

 4      Q     Yeah, I understand you told him to stop, but

 5  why do you believe, as a police officer, that that

 6  conduct was unlawful?

 7            MS. GOOCH:  Object to the form.

 8      A     I wasn't sure where we were going.

 9      Q     (By Mr. Hammons) You weren't sure where

10  Officer Canaan was going with Marconia Kessee?

11      A     Correct.

12      Q     Okay.  Did the fact that Marconia -- he wasn't

13  threatening Officer Canaan, was he?

14      A     No, sir.

15      Q     So it's real simple, in my mind.  Why did you

16  tell Officer Canaan to stop?

17      A     His butt was dragging.

18      Q     Right.  It was hurting him?

19      A     Potentially --

20            MS. GOOCH:  Wait, let him ask a question.

21  He's just stating a comment there.

22            THE WITNESS:  Sorry.

23      Q     (By Mr. Hammons) So I said, "Why do you -- I

24  -- why did you ask him to stop?"  And you said, "His

25  butt was dragging."
```

EXHIBIT 12
Page 5 of 30

 1  that hurt him right there in that moment?

 2      A    No, sir.

 3      Q    Okay.  Did you ask Marconia Kessee if it hurt?

 4      A    No, sir.

 5      Q    And you feel that you did properly intervene

 6  in -- in that conduct that Officer Canaan was -- was

 7  doing?

 8      A    Yes, sir.

 9           MS. GOOCH:  Object to the form.

10      Q    (By Mr. Hammons) By telling him to stop?

11      A    Yes, sir.

12      Q    Well, telling him that the butt's dragging on

13  the ground; true?

14      A    I believe that's what I said.

15      Q    Okay.  Now, you have never used that technique

16  as a motivation tool, in your career as a police

17  officer, have you?

18      A    The dragging?

19      Q    Yes.

20      A    No, sir.

21      Q    Okay.  Did -- did you -- did it work, the

22  dragging?

23      A    No, sir.

24      Q    He still was in the same position, laying on

25  the ground, as he was before; true?

EXHIBIT 12
Page 6 of 30

```
 1        A    Correct.

 2        Q    At any point in time during that dragging

 3   incident -- strike that.

 4             I'm assuming the -- that threatening jail is

 5   to motivate him, to, say, call their bluff and maybe

 6   they get up and walk away; true?

 7        A    Yes.

 8        Q    And then the dragging was supposed to be kind

 9   of a -- a motivational to -- tool to get him to go, too;

10   true?

11        A    I -- I don't know how to answer, because I --

12   I -- when I touched him, it was to pick him up.

13        Q    Okay.  You don't feel that that was a

14   motivational tool, at all?

15             MS. GOOCH:  Object to the form.

16        Q    (By Mr. Hammons) Dragging him.

17             MS. GOOCH:  I'm sorry?

18        Q    (By Mr. Hammons) Dragging him is not a

19   motivational tool?

20        A    I would say it was used, yes, sir.

21        Q    Okay.  And my point is, is:  After those tools

22   are used and they don't work, does that change your

23   opinion?  After you try to use these motivational tools

24   and they don't work, is -- do you -- does it set off any

25   kind of buzzer in your head, like maybe this --
```

EXHIBIT 12
Page 7 of 30

```
 1      Q    (By Mr. Hammons) And I take it, is that you

 2   don't believe that that was something that you did

 3   wrong, either?

 4      A    Reword that.

 5      Q    Sure.  The idea that maybe Marconia Kessee

 6   might still be here had you recognized some of these

 7   potentially clear indicators that something was wrong,

 8   the idea of getting him medical treatment, was never

 9   anything in your mind that you did poorly?

10           MR. KNIGHTON:  Object as to form.

11           MS. GOOCH:  Same -- same objection.  Excuse

12   me.

13      A    I didn't think he needed medical attention.

14      Q    (By Mr. Hammons) And that would follow that

15   you don't believe you did -- your conduct there was out

16   of line with any policy that Norman has -- Norman Police

17   Department has?

18      A    Correct.

19      Q    And no one at the Norman Police Department or

20   the chief told you that, is what I'm getting at.  They

21   never said, "Hey, look, you violated our policy on

22   getting our citizens medical treatment when they need

23   it"?  Is that accurate?

24      A    Correct.

25      Q    Okay.  And the chief at the time -- who -- who
```

EXHIBIT 12
Page 8 of 30

1       A     Yes, sir.

2       Q     Okay.  Do you believe -- have you ever used,

3   in your DUI arrests, the phrase "thick, slurred speech"?

4       A     Yes, sir, I have.

5       Q     Yeah, it's the -- it's usually the same thing

6   every time: "thick, slurred speech, bloodshot, watery

7   eyes, unsteady on their feet."  I mean, you've written

8   that a million times on DUIs; true?

9       A     A handful of times, yes, sir.

10      Q     Okay.  Did he have thick, slurred speech?

11      A     Ye- -- he was mumbling, yes, sir.

12      Q     Was he mu- -- mumbling sounds, to me, like

13  when I just -- I'm mumbling right now, (indicating).  Or

14  was he just, literally, incoherent, you couldn't

15  understand his words?

16      A     I couldn't understand his words.

17      Q     Okay.  And that didn't give you any pause, to

18  think maybe something is going on; true?

19      A     I didn't think anything was going on.  The

20  whole time, I thought he was faking.

21      Q     Right.

22      A     He was -- he was -- like, I -- I -- it was all

23  just a show.

24      Q     And you thought that all the way up -- up to

25  the jail, to while he was in the jail?

EXHIBIT 12
Page 9 of 30

```
 1        A    I never thought there was anything wrong, no,

 2   sir.

 3        Q    No, I mean -- that's what I mean.  You thought

 4   he was faking even inside the jail, you were still,

 5   like, yelling at him and stuff; true?

 6             MS. GOOCH:  Object to the form.

 7        A    Correct, I thought he was faking at the jail,

 8   yes, sir.

 9        Q    (By Mr. Hammons) All right.  That was when you

10   called him an idiot?  "Stop acting like an idiot,"

11   right?

12        A    I don't remember saying that.

13        Q    We'll see it.

14        A    I...

15        Q    The security guard mentions Marconia does not

16   have an ID to get into the Salvation Army.  Can he get

17   into the Salvation Army without an ID?

18        A    No, he has to have -- we have to -- that -- I

19   believe pol- -- the Salvation Army, they want you -- the

20   person to be there with an ID.  If they don't, a police

21   officer has to, more or less, for lack of a better term,

22   vouch for them, say they don't have a warrant and that's

23   -- and be there when they go in.

24        Q    And is -- I -- is this, like, an after hours'

25   policy to get them in?
```

EXHIBIT 12
Page 10 of 30

Daniel Brown
10/20/2020                                                           Page 59

```
 1        A     Correct.

 2        Q     Okay.  Or how he was acting inside?

 3        A     From what I understand, is this started after

 4   he got discharged.

 5        Q     Right.  So, now, you -- my -- my question is,

 6   is:  Are you still relying on the security guard saying

 7   he's been discharged, so, in your mind, he's already

 8   seen a doctor?  Is that what you're relying on?

 9        A     Yeah, this -- this whole thing is -- he's

10   been -- he's already been cleared by a doctor and it

11   just seems, to me, like this is all just an act.

12        Q     And that's -- that's one conclusion.  The

13   other conclusion is, is it could be a condition, a

14   medical condition; true?

15             MS. DARK:  Object to the form.

16             MS. GOOCH:  Object to the form.

17        A     That -- at that night, I thought he was

18   putting on a show, he was acting.

19        Q     (By Mr. Hammons) He's unresponsive to you, at

20   times; true?

21        A     I believe -- he -- I mean, he mumbles a lot.

22   Like, I -- the conversation was difficult, yes.

23        Q     But in -- I mean, there's times where he,

24   literally, was just not responding to you; true?

25        A     I believe so.
```

EXHIBIT 12
Page 11 of 30

```
 1      Q    And he's certainly unsteady on his feet; true?

 2      A    Yes.

 3      Q    I mean, he falls on the ground?  I mean --

 4      A    Like I said, I -- I feel like what he was

 5  doing, what I'd call kind of like a fake seizure-type

 6  thing, it didn't seem real.  It seemed like it was just

 7  him not wanting to leave.

 8      Q    And you would agree with me it was really cold

 9  that night?

10      A    It was cold, yes.

11      Q    I believe in the -- some of the investigators

12  said 10 to 11 degrees.  Does that sound about right?

13      A    I don't remember what the weather conditions

14  were.

15      Q    I mean, you mentioned and Officer Canaan

16  mentioned, many times during this, how cold you are?

17      A    Yes, it was cold.

18      Q    And you had coats and jackets and hats and

19  beanies on; true?

20      A    I was dressed for the weather.

21      Q    Okay.  By this point -- I mean, I've seen it

22  on the video, everybody has seen it -- Marconia is

23  sweating; true?

24           MS. GOOCH:  Object to the form.

25      A    Yes.
```

EXHIBIT 12
Page 12 of 30

 1       Q    (By Mr. Hammons) All right.  He's still -- at

 2   this point in the video we just watched, he's -- he's

 3   got -- he's still, as you call it, mumbling, but he's

 4   got incoherent speech at times; true?

 5       A    I have a hard time hearing him, yes, sir.

 6       Q    And he is, at this point, do you believe,

 7   impaired, in any way, based on your training and

 8   knowledge as a police officer?

 9       A    No, like, this whole time, it's -- he gets

10   discharged, he doesn't want to leave, and he's putting

11   on a show, so he doesn't have to go anywhere.

12       Q    And all of those -- because you think he's

13   faking, any of those signs of impairment, you're

14   disregarding those signs completely?

15       A    He's been --

16            MS. GOOCH:  Object to the form.

17       A    He's just been cleared by the doctors, so I'm

18   under the impression he's medically fine.  And then, all

19   of a sudden, he -- this -- this show, for lack of better

20   words, happens.

21       Q    (By Mr. Hammons) Right.  And as part of your

22   training, when you're dealing with people, have you

23   dealt with people who are experiencing an overdose?

24       A    Yes, sir.

25       Q    And overdoses can happen rather quickly, can't

EXHIBIT 12
Page 13 of 30

 1   you ever, at any point in time, believe anything

 2   Marconia Kessee was trying to tell you?

 3       A    This entire time, it was -- he's faking all of

 4   this.

 5       Q    Right.  That's what you -- that's your belief?

 6       A    Yes, sir.

 7       Q    And based on that belief, you disregard every

 8   sign or symptom, potentially, Marconia is showing?

 9       A    I had no reason to believe otherwise.

10            (Plaintiff's Exhibit No. 5, Officer Brown's

11   Body Cam Footage, was played off the record).

12       Q    (By Mr. Hammons) Did you hear him there, where

13   he said, "I'm not trying to play, something is going

14   on"?

15       A    I under- -- I -- watching this video right

16   now, I understood the "something is going on" part.

17       Q    So you had said, earlier, about not having --

18   you had no reason to believe anything, other than he was

19   faking, was going on; true?

20       A    Yeah, there was -- he's -- I think at one

21   point.

22       Q    So reasons that, potentially, I think you --

23   I'm just going to ask you these -- these are -- seem

24   like reasons to believe there's something else going on.

25   The speech is not good, correct?  Whether you call it

EXHIBIT 12
Page 14 of 30

 1   the matter is, is y'all thought this was just some

 2   impaired, drugged-up homeless guy, and if y'all got him

 3   to the Salvation Army, he'd sleep it off.  That's the

 4   truth, isn't it?

 5          MS. GOOCH:  Object to the form.

 6     A    No, I -- I -- I can't tell you what I was

 7   thinking that night, exactly, why I asked him that

 8   question -- I don't think -- not at one point in time

 9   did I go, "Oh, this guy needs to go inside and get

10   medical attention."  I would have gotten him medical

11   attention.

12     Q    (By Mr. Hammons) Yeah, but this idea that you,

13   as a trained police officer, don't think that there's

14   anything wrong with him, watching this video -- we've

15   all watched it a million times.  The idea that a trained

16   police officer doesn't think that this man is impaired,

17   in any way, just doesn't seem plausible.  And I'm asking

18   you:  Can we just get to it, y'all thought this guy was

19   on drugs and he's homeless and you -- if y'all just got

20   him to the Salvation Army, everything would be fine?

21   Isn't that really what happened here?  This is --

22          MS. GOOCH:  Ob- --

23     Q    (By Mr. Hammons) -- that simple.

24          MS. GOOCH:  Object to the form.

25     A    No, sir, I didn't -- there -- it had nothing

EXHIBIT 12
Page 16 of 30

```
 1   to do with whether or not he was on something, whether

 2   he had a home or not.  It is trying to get him to

 3   Salvation Army, he -- his behavior started after he was

 4   dischar- -- he'd just seen a doctor.  In my mind, he

 5   is -- he's fine and he's -- all these things that he's

 6   doing is a -- is an act.  Like, I never once thought

 7   this guy needs to go see the doctor.

 8        Q    (By Mr. Hammons) But -- but -- and I get that.

 9   I'm asking:  Do you really not believe, as we sit here,

10   as you were looking at him, that he was on some kind of

11   episode of -- dealing with drugs?  Did you really

12   believe that?

13           MS. GOOCH:  Object to the form.  Asked and

14   answered numerous times.  Let's move on.

15        A    I don't know what else you want me to say.

16        Q    (By Mr. Hammons) Well, you keep going back to

17   medical treatment.  I get that.

18           I'm asking you -- again, I just want to know:

19   Did you think that this -- Marconia Kessee was on drugs?

20   That's all I want to know.

21        A    No.

22        Q    You didn't think there was any sign of drugs

23   or drug overdose?

24        A    No, sir.

25        Q    The whole time that you saw him?
```

Daniel Brown
10/20/2020                                                                    Page 77

```
 1   going to drag him off this property or something along

 2   those lines.

 3        Q    Drag his ass off the property?  Is that what

 4   you said?

 5        A    I believe so.  Something along those lines.

 6        Q    What do you mean by "empty threat"?  What's

 7   that mean?

 8        A    Bluffing.  I mean, like, as if I'm going to

 9   say I'm -- like, for instance, you -- I'm going to tell

10   you I'm going to drag your ass off of the curb, I'm not

11   really going to do it.

12        Q    But -- but y'all did?

13        A    Unfortunately, that's what happened.  That

14   wasn't a plan.  That's not like -- it was -- that was

15   just a -- something that was said with no ill intent

16   behind it, no thought of actually doing it.

17        Q    That's one of the things -- somewhere during

18   the internal investigation, I -- I read something that

19   said nothing was intentional.  But you intentionally

20   drug him across the pavement; true?

21        A    So I don't... when I contacted him, I tried

22   standing him on his feet to get him to walk.  There was

23   no intention of me...

24        Q    I take it, from -- I don't know, I can't see

25   the full footage, but -- and I take it, from your
```

EXHIBIT 12
Page 18 of 30

 1   answers, that as Officer Canaan was dragging him that

 2   first time, your intent was to try to pick him up and

 3   stop the dragging?

 4        A    I'm pretty certain I tell him to stand up.

 5        Q    But he can't; true?

 6        A    He didn't.

 7        Q    Right.  Did you ever hear him saying, "I've

 8   got medicine in me"?

 9        A    No, sir.

10        Q    Would that have changed -- it wouldn't have

11   changed your opinion, though, would it?

12        A    I -- I can't speak to the hypothetical.  I

13   don't remember him saying that, no.

14        Q    What sign or symptom or -- or action would it

15   have taken to get Marconia Kessee in to the doctor?

16        A    I -- I don't know.

17        Q    Like, Officer Canaan said if he'd lost

18   consciousness, he might have taken him in there.

19        A    Oh, yeah, I mean, a loss of consciousness or,

20   like... my biggest hangup is he -- his little -- the

21   seizure thing -- I'm air-quoting a "seizure", like being

22   -- I didn't think they were, so I didn't think he needed

23   anything.  But if he were to have, like, lost

24   consciousness, 100 percent.

25        Q    So, just so I'm clear -- I didn't give you,

EXHIBIT 12
Page 19 of 30

```
 1   really, that good a chance -- loss of consciousness,

 2   yes, we seek medical treatment.  Anything else?

 3       A    I mean, I -- had he started vomiting... Right

 4   now, off the top of my head, I can't really think of

 5   anything.  But nothing that he did that night made me

 6   think that I needed to go get him medical attention.

 7       Q    Right.  And do you think that -- that your

 8   conduct -- and I'm not talking about the being mean

 9   stuff, okay?  I'm talking about the recognition of

10   potential medical issues, all right?  That's what I'm --

11   that's focused right there.

12            Do you think that that conduct was reasonable

13   and in line with your training at Norman Police

14   Department?

15            MS. GOOCH:  Object to the form.

16       A    One more time.

17       Q    (By Mr. Hammons) Sure.  Speaking specifically

18   about the issue of him -- Marconia receiving medical

19   treatment or being provided medical treatment, was your

20   conduct that night reasonable and in line with the

21   training you received at Norman Police Department?

22       A    Yes.

23            MS. GOOCH:  Object to the form.

24       Q    (By Mr. Hammons) Do you -- I just rewound this

25   back towards the front because I forgot to ask you this.
```

EXHIBIT 12
Page 20 of 30

```
 1                (Plaintiff's Exhibit No. 5, Officer Brown's

 2    Body Cam Footage, was played off the record).

 3        Q    (By Mr. Hammons) So this is the first point

 4    that we stop at of -- this is the end of the first

 5    dragging, and this is where you -- you end your

 6    participation in -- in -- whether you were holding him

 7    up or dragging him, this is where it ends, right here,

 8    for you; true?

 9        A    Believe so, yes, sir.

10        Q    And is that first part of the dragging -- is

11    that what you talked about in your internal affairs

12    interview, where you said, "I really didn't know what we

13    were doing at that point"?

14        A    Yes, sir.

15        Q    Okay.  Explain that a little bit further for

16    me, that you "didn't know what we were doing" with the

17    dragging.

18        A    I wasn't clear on what the end goal was or --

19    like, when I -- when you see me come up to him, is

20    I'm -- I try to stand him up, because I had told him --

21    well, been telling him to stand up.  I try to stand up

22    (sic) and then he starts having that -- what I call a

23    fake seizure, and then Kyle grabs him, and then I'm not

24    sure what's going on and then I grab -- I try to -- I

25    say, "Stand up," and I'm trying to stand him up onto his
```

EXHIBIT 12
Page 21 of 30

1   was, more or less, without saying the word "stop," was

2   me stopping him.

3        Q    All right.  Did you -- did it come across your

4   mind, like, "Hey, stop, Officer Canaan, stop doing that

5   to this man?  What are you doing?"

6        A    That's what I'm saying, is, without me

7   actually -- the word "stop" coming out, that was me,

8   without saying it, saying stop, when I was -- my

9   gesture, saying, "Hey, his butt -- okay, his butt is

10  dragging," that's me, more or less, telling him to stop

11  doing it.

12       Q    I'm going to move forward, I'll try to -- I --

13  just real quick.  After this is when y'all finally make

14  the decision to arrest him for the trespassing; true?

15       A    Correct.

16       Q    And that's when you roll him over, place

17  handcuffs on him; true?

18       A    Yes, sir.

19       Q    And then you -- that's when you have to walk

20  and get your vehicle to come back?

21       A    Yes, sir.

22       Q    All right.  Did he need assistance into

23  the veh- -- your vehicle?

24       A    Did he?

25       Q    Yes.

EXHIBIT 12
Page 15 of 30

Daniel Brown
10/20/2020                                                                  Page 104

```
 1   to follow up on your testimony.

 2           You testified that you observed Marconia

 3   Kessee sweating at some point.  Did you observe him

 4   sweating outside or inside the hospital?

 5       A    Outside.

 6       Q    Did you see him inside the hospital at any

 7   time?

 8       A    I did see him inside, yes, ma'am.

 9       Q    Was Marconia sweating inside the hospital?

10       A    I don't believe so.

11       Q    So, from your recollection, he was sweating --

12   he began sweating when he went outside?

13       A    Yes.

14       Q    You sound unsure?

15       A    I'm trying to -- I'm fairly certain he started

16   sweating outside.

17       Q    You also testified that it was your

18   observation, based on Marconia's behavior, that he was

19   faking?  Is that -- is that your testimony?

20       A    Yes, I believe he was faking.

21       Q    In your experience, do individuals sometimes

22   fake their symptoms to get their way?

23           MR. HAMMONS:  Object to the form.

24       A    Yes, ma'am.

25       Q    (By Ms. Thompson) Is that what you believe
```

 1   Marconia was doing here?

 2        A    Yes.

 3        Q    What do you think he was trying to achieve?

 4             MR. HAMMONS:  Object to the form.

 5        A    I'm not sure what, exactly, he was trying to

 6   achieve.

 7        Q    (By Ms. Thompson) Did your opinion of the --

 8   of Marconia faking his symptoms change at any point

 9   during your encounter with him?

10             MR. HAMMONS:  Object to the form.

11        A    What do you --

12        Q    (By Ms. Thompson) Did you ever -- did you

13   continue thinking he was faking, the entire time you

14   were around Marconia?

15             MR. HAMMONS:  Object to the form.

16        A    Yes, that's -- I -- the whole time, I didn't

17   think he needed any medical attention, because I

18   thought it was -- it was -- he was faking his -- what

19   was going on.

20        Q    (By Ms. Thompson) So, just to confirm:  The

21   entire time you were around Marconia that night, you

22   thought that he was faking his symptoms, correct?

23             MR. HAMMONS:  Object to the form.

24        A    Yes, ma'am, I thought he was faking.

25        Q    (By Ms. Thompson) Did -- at any point during

EXHIBIT 12
Page 23 of 30

```
 1   your encounter with Marconia Kessee, did you think that

 2   he was having a serious medical condition that required

 3   immediate medical attention?

 4            MR. HAMMONS:  Object to the form.

 5       A    No, ma'am.

 6       Q    (By Ms. Thompson) Did you ever observe any

 7   symptoms in Marconia that led you to believe, in your

 8   experience, that he was having a serious medical

 9   condition that required immediate medical attention?

10       A    I didn't think he had any medical -- medic- --

11   need for medical assistance.

12       Q    And if you thought that, would you have tried

13   to get him some medical attention?

14            MR. HAMMONS:  Object to the form.

15       A    Yes, ma'am.

16       Q    (By Ms. Thompson) But you didn't think that

17   was necessary, based on what you saw, correct?

18            MR. HAMMONS:  Object to the form.

19       A    Correct.

20       Q    (By Ms. Thompson) Was it difficult to carry a

21   conversation with Marconia?

22       A    Yes.

23       Q    Was he not responsive to questions?

24       A    He was difficult to speak with, yes, ma'am.

25       Q    Was he slurring his words?
```

EXHIBIT 12
Page 24 of 30

 1   medication on him, correct?

 2       A    I don't believe so.

 3       Q    You did not find the medications during the

 4   pat-down?

 5       A    I don't -- I don't remember what all I found

 6   on him, other than we just watched the -- the video of

 7   the -- I don't remember seeing medications.

 8       Q    So you just don't remember, either way, what

 9   happened with the medications, correct?

10       A    Correct.

11       Q    Did you relay, in any way, to the nurse at the

12   jail, that Marconia Kessee needed immediate medical

13   attention?

14       A    No, ma'am.

15       Q    Did you request any kind of medical attention

16   from the nurse for Marconia?

17       A    No, ma'am.

18       Q    Did you feel, based on your observation, that

19   Marconia needed any medical attention?

20            MR. HAMMONS:  Object to the form.

21       A    No, ma'am.

22       Q    (By Ms. Thompson) Did the nurse ask you any

23   questions?

24       A    If he did, I don't remember them.

25            MS. THOMPSON:  I'm going to pass the witness.

EXHIBIT 12
Page 25 of 30

```
 1                      EXAMINATION

 2   BY MS. DARK:

 3       Q    Office Brown, I have a few questions for you.

 4   My name is Jessica Dark and I represent Cleveland County

 5   and the jailers that are involved in this lawsuit.

 6            We listened to the body camera footage and

 7   your discussions at the jail, but do you recall telling

 8   them that another officer was on the way with the fit

 9   slip?

10       A    Yes, ma'am.

11       Q    And when you exit the vehicle in the sallyport

12   area, a few of the jailers come out to assist you in

13   helping Mr. Kessee in; is that correct?

14       A    Yes, ma'am.

15       Q    And I believe that the jail nurse you've

16   described is standing in the intake area right when you

17   walk in; is that correct?

18       A    Yes, ma'am.

19       Q    So from the first second you and Mr. Kessee

20   arrive, the jail nurse is present, correct?

21            MR. HAMMONS:  Object to the form.

22       A    I believe he's -- ye- -- in that intake area,

23   yes, ma'am.

24       Q    (By Ms. Dark) And at the point that Mr. Kessee

25   is carried back to a padded cell, was the jail nurse
```

EXHIBIT 12
Page 26 of 30

 1   still present there with Mr. Kessee?

 2        A    I believe so.  I -- they went through the

 3   first set of doors that go in, and I don't know what

 4   happened from there.

 5        Q    When Mr. Kessee went back behind that first

 6   set of doors, is that the last time you saw him?

 7        A    Yes, ma'am.

 8        Q    Up until that point, was the jail nurse

 9   present with you and Mr. Kessee and the jailers?

10        A    Yes, ma'am.

11        Q    You were telling the jail nurse and the

12   jailers that were standing there that Mr. Kessee had

13   been acting this way back at the hospital, correct?

14        A    Yes, ma'am.

15        Q    And I believe you described a bit of an

16   episode that he had had at the hospital, correct?

17        A    Yes, ma'am.

18        Q    And did he then have another similar episode

19   while standing there in the intake area?

20        A    Yes, ma'am.

21        Q    And did that appear to be the same or similar

22   to the one that you had witnessed at the hospital?

23        A    Yes, ma'am.

24        Q    And you've seen people have seizures before,

25   correct?

EXHIBIT 12
Page 27 of 30

Daniel Brown
10/20/2020                                                                    Page 113

```
 1        A     Yes, ma'am.

 2        Q     Did you believe that this was a seizure?

 3        A     No, ma'am.

 4              MR. HAMMONS:  Object to the form.

 5        Q     (By Ms. Dark) Did you believe that this was

 6   any sort of serious medical issue at that time?

 7        A     No --

 8              MR. HAMMONS:  Object to the form.

 9        A     No, ma'am.

10        Q     (By Ms. Dark) You saw -- do you under- -- do

11   you know where -- or in what cell the jailers were

12   taking Mr. Kessee to be held?

13        A     No, ma'am.

14        Q     If -- do you have any reason to disagree that

15   he needed to be in a cell for observation?

16              MR. HAMMONS:  Object to the form.

17        A     No, ma'am.

18        Q     (By Ms. Dark) At the time that Mr. Kessee left

19   your sight, past that door, did you believe he needed

20   any elevated care than what the jail nurse could

21   provide?

22              MR. HAMMONS:  Object to the form.

23        A     No, ma'am.

24        Q     (By Ms. Dark) He hadn't lost consciousness or

25   vomited or anything like that, while you -- while you
```

Daniel Brown
10/20/2020                                                                  Page 116

```
 1        A    It's the slip that we give to the jailers that

 2    has the -- the date, the offense, the person's name and

 3    birth date, for them to be booked in.  I don't -- I

 4    don't know what the -- I guess you could call it a

 5    booking slip.

 6        Q    Okay.  And back here at 7:54, a man in a --

 7    or sev- -- yeah, 7:54:36 -- a man in a gray Polo enters

 8    the scene.  Is that the jail nurse you identified

 9    earlier?

10        A    Yes, ma'am.

11        Q    Okay.  We see him picking up that paperwork

12    that we now believe is the discharge paperwork, correct?

13        A    Yes, ma'am.

14        Q    Okay.  So by the time you leave the facility,

15    you've given this discharge paperwork to the jail nurse,

16    correct?

17        A    Yes, ma'am.

18             MS. DARK:  Okay.  I will pass the witness.

19                          EXAMINATION

20    BY MR. WHITWORTH:

21        Q    Office Brown, my name is Brandon Whitworth.  I

22    represent Justin Holbrook, Steven Roberts and Emergency

23    Services of Oklahoma.

24             Do you know who Justin Holbrook is?

25        A    No, sir.
```

EXHIBIT 12
Page 29 of 30

Daniel Brown
10/20/2020                                                              Page 122

```
 1        A     Yes, ma'am.

 2        Q     On this occasion with your interactions with

 3    Mr. Kessee, were you acting within the scope of your

 4    employment as a police officer for the City of Norman?

 5        A     Yes, ma'am.

 6        Q     To your knowledge, prior to this occasion, had

 7    you interacted with him?

 8        A     No, ma'am.

 9              MS. GOOCH:  That's all I have.  Anybody else?

10    Okay, we're done.  Read and sign.

11              MR. HAMMONS:  Hurry.

12              MS. GOOCH:  We're out of here.

13              VIRTUAL ROOM MONITOR:  One moment.  We are off

14    the record.  The time is 5:53 p.m.

15              (Deposition concluded at 5:53 p.m.)

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 12
Page 30 of 30