IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) PATRICIA THOMPSON, as Personal Representative of the Estate of MARCONIA LYNN KESSEE, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. CIV-19-113-SLP |
| (1) CITY OF NORMAN, et al., | ) ) | |
| Defendants. | ) | |

_____

**DEFENDANT KYLE CANAAN'S MOTION AND
BRIEF FOR SUMMARY JUDGMENT**

_____

Ambre C. Gooch, OBA No. 16586
COLLINS, ZORN  & WAGNER, P.C.
429 N.E. 50th Street, 2nd Floor
Oklahoma City, OK 73105-1815
Telephone:  (405) 524-2070
Facsimile:  (405) 524-2078
E-mail:   acg@czwlaw.com

ATTORNEY   FOR   DEFENDANT   KYLE
CANAAN

June 11, 2021

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

TABLE OF CONTENTS .............................................................................................. i

TABLE OF AUTHORITIES ...................................................................... ii - iv

LIST OF EXHIBITS ..................................................................................... v - vi

STATEMENT OF THE CASE  ................................................................................ 1

LOCAL RULE 56 STATEMENT OF MATERIAL FACTS  ............................................ 3

ARGUMENT AND AUTHORITY  ............................................................................ 12

I    CANAAN IS ENTITLED TO QUALIFIED IMMUNITY ON
THE CLAIM FOR DELIBERATE INDIFFERENCE TO
SERIOUS MEDICAL NEEDS  ............................................................. 12

II.   CANAAN IS IMMUNE FROM LIABILITY FOR NEGLIGENCE  ...................... 24

III   CANAAN WAS ACTING WITHIN THE SCOPE OF HIS
EMPLOYMENT AND IS THUS ENTITLED TO SUMMARY
JUDGMENT FOR ASSAULT AND BATTERY  ...................................... 26

CONCLUSION  .................................................................................................. 30

## TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE**

*Al-Turki v. Robinson*, 762 F. 3d 1188 ........................................................................ 16, 23

*Boston v. Muncy,* 1951 OK 175, 233 P. 2d 300 ................................................................ 27

*Casey v. City of Federal Heights,* 509 F. 3d 1278 (10th Cir. 2007) .................................. 29

*Clark v. Colbert*, 895 F. 3d 1258 (10th Cir. 2018) ............................................................ 12

*Cooper v. Millwood Independent School District No. 37,*
1994 OK CIV APP 114, 887 P. 2d 1370 ..................................................................... 25, 26

*Davis v. Township of Paulsboro*, 421 F. Supp. 2d 385 (2006) ......................................... 18

*District of Columbia v. Wesby*, ___U.S. ___, 138 S. Ct. 577, 586,
199 L. Ed. 2d 453 (2018)............................................................................................ 21, 22

*Drake v. Koss,* 445 F. 3d 1038 (6th Cir. 2006) ................................................................. 17

*Estate of Duke v. Gunnison County,*
752 Fed. Appx. 669 (10th Cir. 2018) ..................................................................... 20, 21, 22

*Estate of Hocker v. Walsh*, 22 F. 3d 995 (10th Cir. 1994) ................................................ 20

*Estate of Vallina v. County of Teller Sheriff's Office,*
757 F. Appx. 643 (10th Cir. 2018) ............................................................................... 15, 16

*Fitzer v. Independent School District No. 15 of McClain County,*
2015 WL 6160370 (W.D.  Okla. October 20, 2015) ......................................................... 26

*Garcia v. Salt Lake County*, 768 F. 2d 303 (1985).......................................................19-22

*Hodge v. Keene*, 2013 WL 372460 (W.D. Okla. January 30, 2013)................................. 28

*Hutchinson v. City of Oklahoma City*, 919 F. Supp. 2d 1163 (W.D. Okla. 2013) ...... 24, 25

*Hutto v. Davis*, 972 F. Supp. 1372 (W.D. Okla. 1997) ............................................... 25, 26

*Johnson v. Davis County,* 2021 WL 615325 (D. Utah Feb. 17, 2021) ............................ 20

-ii-

*Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466, 192 L.Ed. 2d 416 (2015) ........ 12

*Krout v. Goemmer*, 583 F. 3d 557 (8th Cir. 2009) ............................................................ 15

*Quintana v. Santa Fe County Board of Commissioners,*
 973 F. 3d 1022 (10th Cir. 2020) ................................................................................ 20, 22

*Martinez v. Beggs*, 563 F. 3d 1082 (10th Cir. 2009) .................................................. 12, 20-23

*Morales v. City of Oklahoma City*, 2010 OK 9; 230 P.3d 869 .................................... 27-29

*Muskrat v. Deer Creek Public Schools*, 2009 WL 2175883
(W.D. Okla. July 21, 2009) ............................................................................................ 26

*Perry v. City of Norman,* 2014 OK 119, 341 P. 3d 689 .................................................... 27

*Reece v. United States*, 2015 WL 4937436 (W.D. Okla. August 19, 2015) .................... 28

*Ridings v. Maze*, 2018 OK 18, 414 P. 3d 835 .................................................................. 25

*Salazar v. City of Oklahoma City*, 2016 WL 4150936
(W.D. Okla. August 4, 2016) ......................................................................................... 25

*Self v. Crum,* 439 F. 3d 1227 (10th Cir. 2006) .................................................................. 13

*Spears v. Ruth*, 589 F. 3d 249 (6th Cir. 2009) .................................................................. 15

*Speight v. Presley,*  2008 OK 99, 203 P.3d 173 ................................................................ 24

*State v. Anderson,* 1998 OK CR 67, 972 P. 2d 32 ............................................................. 27

*Strain v. Regalado,* 977 F. 3d 984 (10th Cir. 2020) .............................................. 12, 13, 15

*Tuffy's, Inc., v. City of Oklahoma City*, 2009 OK 4, 212 P. 3d 1158 .................... 24, 25, 27

*Varner v. City of El Reno*, 2011 WL 13113324 (W.D.Okla. March 17, 2011) .......... 29, 30

*Vasquez v. Davis,* 882 F.3d 1270 (10th Cir. 2018) ............................................................ 23

*Weatherford, ex. rel Thompson v. Taylor,*
347 F. Appx. 400 (10th Cir. 2009) .................................................................... 16, 17, 19

-iii-

## **STATUTES**

42 U.S.C. §1983 ........................................................................................... 2, 3, 28

21 O.S. §643 ........................................................................................................ 27

21 O.S. §643(1) ................................................................................................... 27

21 O.S. §643(3) ................................................................................................... 27

22 O.S. §34.1(B) ................................................................................................. 29

22 O.S. §34.1(C) ................................................................................................. 29

51 O.S. §151, *et seq.* ......................................................................................... 24

51 O.S. §153(B) .................................................................................................. 24

51 O.S. §163(C) ............................................................................................. 24-26

## **RULES**

Fed. R. Civ. P. 56 .................................................................................................. 1

LCvR 56 ................................................................................................................ 3

## <u>LIST OF EXHIBITS</u>

Exhibit 1       Norman Regional Hospital Emergency Department Patient Record
(Filed Under Seal)

Exhibit 2       Excerpts of the deposition of Kerry Hartman taken on April 2, 2021

Exhibit 3       Norman Regional Hospital Security Video

Exhibit 4       Report of Justin Holbrook    (Filed Under Seal)

Exhibit 5       Excerpts of the deposition of Justin Holbrook taken on December 20, 2020

Exhibit 6       Excerpts of the deposition of Jarod Terry taken on January 11, 2021

Exhibit 7       Norman Regional Hospital Security Department Incident Report
(Filed Under Seal)

Exhibit 8       First 911 call

Exhibit 9       Second 911 call

Exhibit 10      Excerpts of the deposition of Michael Jobin taken on May 25, 2021

Exhibit 11      Excerpts of the deposition of Kyle Canaan taken on October 20, 2020

Exhibit 12      Excerpts of the deposition of Daniel Brown taken on October 20, 2020

Exhibit 13      Canaan's body worn camera video footage

Exhibit 14      Brown's body worn camera video footage

Exhibit 15      Norman Regional Hospital discharge paperwork   (Filed Under Seal)

Exhibit 16       Expert Report of Dr. Jeff Reames

Exhibit 17      Excerpts of the deposition of Keith Humphreys taken on December 21, 2020

Exhibit 18      Norman Police Department Policy 320: Standards of Conduct

Exhibit 19      Trespass citation

Exhibit 20      There is no Exhibit 20

Exhibit 21      Expert Report of Dr. Darren Flamik

Exhibit 22      Cleveland County Incident Report

Exhibit 23      Norman Regional Hospital Emergency Department Report
                (Filed Under Seal)

Exhibit 24      Report of Investigation by Medical Examiner  (Filed Under Seal)

Exhibit 25      Excerpts of the deposition of Robert Prevot taken on May 19, 2021

Exhibit 26      *Johnson v. Davis County,* 2021 WL 615325 (D. Utah Feb. 17, 2021)

Exhibit 27      *Salazar v. City of Oklahoma City*, 2016 WL 4150936
                (W.D. Okla. August 4, 2016)

Exhibit 28      *Fitzer v. Independent School District No. 15 of McClain County,*
                2015 WL 6160370 (W.D.  Okla. October 20, 2015)

Exhibit 29      *Muskrat v. Deer Creek Public Schools*, 2009 WL 2175883
                (W.D. Okla. July 21, 2009)

Exhibit 30      *Reece v. United States*, 2015 WL 4937436 (W.D. Okla. August 19, 2015)

Exhibit 31      *Hodge v. Keene*, 2013 WL 372460 (W.D. Okla. January 30, 2013)

Exhibit 32      *Varner v. City of El Reno*, 2011 WL 13113324 (W.D.Okla. March 17, 2011)

Exhibit 33      Excerpts of the deposition of Jeff Reames taken on June 1, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) PATRICIA THOMPSON, as Personal | ) | |
| Representative of the Estate of | ) | |
| MARCONIA LYNN KESSEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-19-113-SLP |
| | ) | |
| (1) CITY OF NORMAN, et al., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## **DEFENDANT CANAAN'S MOTION AND BRIEF FOR SUMMARY JUDGMENT**

This Motion for Summary Judgment is submitted on behalf of Defendant Canaan, who requests that the Court enter summary judgment in his favor pursuant to Fed. R. Civ. P. 56 for the reasons stated in the following Brief.

## **STATEMENT OF THE CASE**

This case arises out of the January 16, 2018 arrest of Plaintiff's Decedent, Marconia Kessee, by Norman Police Officers Kyle Canaan and Daniel Brown, two Defendants in this case.  On January 16, 2018, Kessee went to the Norman Regional Hospital (NRH) Emergency Department (ED) complaining of a headache and seeking narcotics.  Kessee was examined and discharged by Defendant Justin Holbrook.  Holbrook refused to give Kessee the Narco he requested, but offered other non-narcotic treatment for the headache which Kessee refused.  After Kessee was discharged, he remained in the ED lobby.  NRH security guard Jarrod Terry was called to the lobby because Kessee was causing a disturbance.  According to Terry, Kessee was mumbling and acting aggressive, which was

behavior Terry believed was indicative of schizophrenia or some other mental health issue. Terry tried to ask Kessee if he needed help, but was advised by the ED triage nurse that Kessee had already been seen and discharged.  Terry then called the Norman Police Department and asked for assistance in removing Kessee from the hospital property.

Defendants Kyle Canaan and Daniel Brown were the NPD officers who responded. Officer Canaan reviewed Kessee's discharge paper work, which indicated Kessee was complaining of a headache and was seeking drugs. The officers spent several minutes trying to convince Kessee to leave the hospital property, and at one point dragged Kessee across the pavement.  The officers then asked Terry if he wanted to sign a trespass citation. Once Terry did so, Kessee was arrested for trespass and placed in Officer Brown's patrol car.  Officer Canaan had no further contact with Kessee. While Officer Brown transported Kessee to the Cleveland County Detention Center, Officer Canaan went back into the hospital with Terry to complete the trespass docket (i.e., citation) and to request a "fit slip," which is a document stating Kessee was fit for incarceration.  Officer Canaan requested the fit slip directly from Justin Holbrook, who had examined Kessee and had walked him into the ED waiting room earlier. Approximately two hours after Officer Brown transported Kessee to the jail, Kessee was found unresponsive in his cell.  The cause of death, according to the State ME's office, was acute bupropion, methamphetamine and atomoxetine toxicity.

Plaintiff filed suit against numerous defendants, including Defendants Canaan and Brown, alleging violations of 42 U.S.C. §1983 and state law.  Following the Court's Order (Doc. 83) entered on March 11, 2020 on Defendants Brown and Canaan's Motions to Dismiss,  the only remaining claims against the Defendants Canaan and Brown at this time

are a §1983 claim for deliberate indifference to serious medical needs, a state law claim for negligence, and a state law claim for assault and battery. See Doc. 83.

However, Officer Canaan is entitled to qualified immunity on the deliberate indifference claim for the reasons discussed in Proposition I of this brief.  He is not a proper party to the negligence claim, as is discussed in Proposition II.  Finally, as is discussed in Proposition III, He is entitled to summary judgment on the state law claim for assault and battery.

## LOCAL RULE 56 STATEMENT OF MATERIAL FACTS

Defendant Canaan contends the following are material facts for which there is no reasonable dispute:

1.      On January 16, 2018, at approximately 17:36, Marconia Kessee went to the Norman Regional Hospital (NRH) Emergency Department (ED) complaining of a headache.   He was triaged at 17:43 by ER Triage Nurse Kerry Hartman (her last name at the time was Gassaway). Ex. 1, NRH ED Patient Record at pp. 1-3; Ex. 2, Hartman Depo., pp. 10, 18, 23.

2.      NRH Security Video shows Kessee falling in the ED hallway and being assisted up and into a room by personnel. Ex. 3, NRH Security Video at approx. 1:24:20 to 1:29:20.[1] Hartman observed the fall and checked on Kessee. Ex. 2, Hartman Depo., pp. 41, 44-45, 49. Hartman testified she should have reported this fall to the attending physician

---

[1]These times are measured from the beginning of the NRH Security Video, and do not correspond with the actual time the event occurred. However, those portions of the NRH Security Video showing the ED waiting room do contain an actual time/date stamp as well as the time from the beginning of the NRH Security Video.

or other medical provider, but it was her understanding that Dr. Steven Roberts had also witnessed Kessee fall. Ex. 2, Hartman Depo., pp. 44-45, 50, 92-93, 96.

3.      Kessee was examined by Justin Holbrook, APRN CNP, beginning at 18:30 Ex. 4, Report of J. Holbrook, p. 1. Kessee complained of a headache and requested Norco, a narcotic.  Ex. 4, Report of J. Holbrook, pp. 1-2;  Ex. 5, Holbrook Depo., pp. 145-146. When Holbrook instead offered IV fluids and non-narcotic painkillers, Kessee stated he wanted to leave. Holbrook identified this as drug-seeking behavior. Ex. 4, Report of J. Holbrook, p.3; Ex. 5, Holbrook Depo., p. 147.

4.      At approximately 18:50, Holbrook walked Kessee out to the ED lobby.  Ex. 3,  NRH Security Video at approx. 1:39:40 to 1:41:00; Ex. 5, Holbrook Depo., p. 96. Between approximately 18:52 and 18:54, Kessee can be seen walking around the ED waiting room.  Ex. 3,  NRH Security Video at approx. 1:42:00 to 1:44:30.

5.      Jarrod Terry, who was employed by NRH as a security guard, was called to the waiting room at approximately 18:54 because Kessee was causing a disturbance. Ex. 6, Terry Depo., pp. 16-17; Ex. 7, NRH Security Department Incident Report, pp 3-4.  When Hartman saw security walk over to Kessee, she also walked over to check the situation out and see what was going on. Ex. 2, Hartman Depo., p. 72.

6.      Terry observed Kessee mumbling under his breath and acting as if he was hearing voices. Terry believed this behavior was indicative of an ongoing mental health issue. Ex. 6, Terry Depo., pp. 17, 62-63. Terry was advised by the triage nurse Kerry Gassaway (now Hartman) that Kessee had already been seen and discharged.  Ex. 6, Terry Depo., pp. 16-17.  Terry testified that if the nurse did not believe Kessee needed to be seen

4

again by a doctor, Terry did not believe he should tell her otherwise. Ex. 6, Terry Depo., pp. 37-38, 92-93.

7.      At 6:57 p.m., Terry called Norman 911 requesting police assistance to get Kessee into the Salvation Army for the night. Ex. 8, 911 call (first one). A second call was placed a few minutes later by "Larry" with NRH Security stating "we've got a patient out in our waiting room that is wigged out and they need some assistance" and that he (Larry) was told to "get PD here." Ex. 9, 911 call (second one).

8.      Kessee was clearly exhibiting symptoms of neurological decline, including partial seizures, while he was in the NRH ED waiting room. Ex. 10, Jobin Depo., pp. 156, 159.

9.      Defendants Kyle Canaan and Daniel Brown were two Norman Police Department (NPD) Officers who responded to the call. Kessee had been the subject of previous calls to the NPD, but neither Canaan nor Brown had any prior interaction with Kessee. Ex. 11, Canaan Depo., p. 31; Ex. 12, Brown Depo., pp. 22-23, 122.

10.      Canaan activated his body worn camera (BWC) at 19:07 and walked into the NRH ED room approximately one minute into his video. Ex. 13, Canaan BWC at 00:59. Brown activated his BWC at 19:09 and entered the NRH ED approximately 40 seconds into his video. Ex. 14, Brown BWC 00:40.[2]

11.      When Canaan first entered the NRH ED, he observed Kessee sitting on the floor and was advised by Terry that Kessee had been discharged from NRH but was

---

[2] This is at approximately 02:15 on Canaan's BWC (Ex.13).

"having issues."  Ex. 13, Canaan BWC at 1:03 to 1:13.  Canaan told Kessee he (Kessee) needed to go outside and offered to help Kessee.  Terry then assisted Kessee into a wheelchair.  Ex. 13, Canaan BWC at 1:15 to 1:50.

12.    Once they were outside, Terry handed the discharge paperwork to Canaan. Ex. 13, Canaan BWC at 3:00-3:05; Ex. 15, NRH Discharge paperwork[3]. Canaan looked at the paperwork and told Kessee that "a doctor said you were free and clear to go" so Kessee needed to walk across the street [to the Salvation Army].  Ex.  13, Canaan BWC at 3:40-3:50; Ex. 14, Brown BWC at 2:00-2:15.  Brown also told Kessee he had been discharged from NRH and asked Kessee if he knows where the Salvation Army is. Ex. 14, Brown BWC at 2:20-2:30.

13.    Kessee got out of the wheelchair without assistance, took a few steps, then turned around to come back to the wheelchair.  He was standing up and shaking, then grabbed and shook the arm of the wheelchair, then fell down. Ex. 13, Canaan BWC at 4:03-4:25; Ex. 14, Brown BWC at 2:28-2:50.  Terry observed this behavior and said "this is the way he has been doing, jumping on the ground." Ex. 13, Canaan BWC at 4:05-4:11.  Terry then told Canaan that Kessee "started acting like that out here [the waiting room] before we were called; that is why we were called." Ex. 13, Canaan BWC at 4:45-4:52.

14.    Brown told Kessee "You can stop with the show. You've been discharged.

---

[3]Ex. 15 is the NRH Discharge paperwork AND a Fit Slip. Apparently, Jail staff affixed the Fit Slip directly to the NRH Discharge paperwork (Ex. 15) because Brown provided only the Discharge paperwork (not the Fit Slip) to Jail staff.  See Fact 29 to Brown's MSJ (Doc. 198); Canaan returned to the ED to obtain the Fit Slip from Holbrook, while Brown took Kessee (with the Discharge paperwork) to Jail.  See Facts 25-28 herein.

A doctor already says you are medically cleared from being here." Ex. 14, Brown BWC at 4:40-4:48.  Kessee then gestured towards his head or face and said "there is something going on." Ex. 13, Canaan BWC at 6:56-7:00; Ex. 14, Brown BWC at 5:19-5:23.  Brown and Canaan told Kessee numerous times, over a span of several minutes, to put his shoe on.  Terry is visible on the body camera video throughout this period.  Ex. 13, Canaan BWC at 6:15 to 16:00; Ex. 14, Brown BWC at 3:55-14:35.

15.     During this period of time, Kessee said he wanted to talk to a doctor. Brown responded that Kessee had already seen a doctor and had been cleared for discharge. Ex. 13, Canaan BWC at 9:55-10:05; Ex. 14, Brown BWC at 8:20-8:30.

16.     Brown also asked Kessee what drugs he used, and Kessee responded "I'm not on no drugs." Ex. 13, Canaan BWC at 11:50-12:10; Ex. 14, Brown BWC at 10:15-10:32.

17.     Canaan asked Terry, "Should he not get off the property, do you guys want to trespass him?"  Terry said yes and stated "We can't have him staying around doing this." Ex. 13, Canaan BWC at 9:20-9:30.  Canaan reviewed the discharge paperwork again and stated that Kessee was at the hospital because of a headache and "drug-seeking" behavior. Ex. 14, Brown BWC at 12:15-13:17.

18.     Because Kessee had just been seen and discharged from the hospital, Canaan did not believe Kessee was in need of medical treatment.  Ex. 11, Canaan Depo., pp. 56, 67, 70-72, 77, 80-83, 85, 87, 94, 104, 109-110, 158, 162-163.  Based on the paperwork stating that Kessee had been seen for a headache and was seeking drugs, Canaan believed Kessee was faking symptoms because he wanted to stay at the hospital.  Ex. 11, Canaan

Depo., pp. 73, 77, 58, 109-110.

19.    Brown grabbed Kessee's arm and tried to stand Kessee up. Ex. 13, Canaan BWC at 16:05-16:10.  Canaan then drug Kessee away from the hospital entrance.  Ex. 13, Canaan BWC at 16:18-16:55, 17:40-18:02; Ex. 14, Brown BWC at 14:42-15:20; 16:02-16:15. Canaan's intent in dragging Kessee was to motivate Kessee to leave the hospital and walk to the Salvation Army.  Ex. 11, Canaan Depo., pp. 42-43, 88-89, 118.

20.    Canaan believed Kessee was "being difficult" or "acting out," rather than in need of medical treatment, based on the fact Kessee had been treated and discharged from the hospital less than 30 minutes earlier. Ex. 11, Canaan Depo., pp. 112-113.

21.    None of Kessee's behaviors actions or behaviors in the ED waiting room or ED driveway suggested that Kessee had a clinical condition or change in condition that warranted a repeat medical evaluation 30 minutes after the initial ED evaluation.  Ex. 16, Report of Jeff Reames, MD, MBA, FACEP, p. 2. Ex. 33, Reames Depo., pp. 38, 126-127, p.133.  In her Second Amended Complaint, Plaintiff alleges the Defendant officers should have recognized Kessee needed medical attention based on symptoms including convulsions, unexplained perspiration, tremors, and lack of physical coordination, elevated blood pressure, and elevated heart rate. See Doc. 106, ¶73.  Tremors, loss of balance, shaking and sweating are common symptoms of someone under the influence of illegal substances. Ex. 16, Reames Report, p. 5. Ex. 33, Reames Depo., p.128. Kessee's pulse rate of 116 and blood pressure of 155/93 are within the normal range of someone in the custody

of law enforcement.  Ex. 16, Reames Report, p. 5. [4]

22.     NPD Chief Keith Humphrey was the final policy maker for the NPD at the time of this incident. Ex. 17, Humphrey Depo., p. 104.  Chief Humphrey testified that dragging Kessee did not violate NPD policy and training.  Ex. 17, Humphrey Depo., p. 55. Specifically, Canaan's conduct did not violate NPD Policy 320.5.9(b), which prohibits the use of "unreasonable and unwarranted force to a person encountered or a person under arrest" because there was no intentional excessive force. Ex. 17, Humphrey Depo., pp. 46-49, 151; Ex. 18, NPD Policy 320.5.9.

23.     Brown and Canaan were disciplined for "exceeding lawful peace officer powers" and for conduct which is "tends to reflect unfavorably upon this [NPD] department," in violation of NPD Policy 320.5.9(c) and (m), because some of the statements the officers made to and about Kessee were condescending and disrespectful. Ex. 17, Humphrey Depo., pp. 41-42, 52-54.

24.     When Canaan stopped dragging Kessee, he and Brown discussed arresting Kessee, Ex. 13, Canaan BWC at 18:06-18:12; Ex. 14, Brown BWC at 16:28-16:35. Canaan asked Terry if Terry would sign a docket against Kessee for trespassing. Terry agreed, stating "That's fine, he can't just stay here." Ex. 13, Canaan BWC at 18:13-18:20; Ex. 14, Brown BWC at 16:38-16:45; Ex. 19, Trespass Citation signed by Terry.

25.     Canaan and Brown handcuffed Kessee, and put Kessee into Brown's patrol car. Ex. 13, Canaan BWC at 18:33-19:00 and 20:40-21:40; Ex. 14, Brown BWC at 17:00-

---

[4] Hartman and Holbrook were also aware of his blood pressure and heart rate. See Fact 1.

17:25 and 19:05-20:05. When Brown tells Kessee to sit up, Kessee responds "I'm sitting." Ex. 14, Brown BWC at 19:38-19:40. Brown pat-searched Kessee and left for the Cleveland County Detention Center.  Ex. 14, Brown BWC at 21:30-21:52, 23:00-24:00.

26.    Canaan went back into the hospital with Terry to complete the trespass citation and to request a fit slip stating Kessee was fit for incarceration. Ex. 13, Canaan BWC at 25:05-33:10 (end of recording); Ex. 19, Trespass Citation.

27.   Canaan asked Holbrook for a fit slip. Ex. 13, Canaan BWC at 27:20-27:23; Ex. 5, Holbrook Depo., pp. 12,123,177.  Holbrook responded "Oh yeah, he was here earlier." Ex. 13, Canaan BWC at 27:23-27:25.[5]  Canaan told Holbrook he had dragged Kessee across the parking lot, and Holbrook responds by laughing. Ex. 13, Canaan BWC at 27:45-27:55; Ex. 5, Holbrook Depo., p. 122. Canaan then stated to Holbrook that "He [Kessee] can pretend mumble all he wants across the jail," and Holbrook responds "oh no, he was very coherent, he was able to sit there and beg for drugs." Ex. 13, Canaan BWC at 28:16-28:26.

28.    Holbrook filled out the fit slip and gave it to Canaan.  Ex. 13, Canaan BWC at 28:16-28:26; Ex. 5, Holbrook Depo., p.113. Ex. 15, FIT slip.  It was appropriate for Holbrook to sign the fit slip based on his recent evaluation of Kessee.  Ex. 21, Report of Darren E. Flamik, M.D., FACEP, pp. 4-6.  Police officers routinely rely on fit slips to take patients to detention centers from medical facilities. Ex. 10, Jobin Depo., pp. 192-193, 233.

29.    Kessee was found unresponsive in his cell at the Jail at approximately 21:55.

---

[5] Canaan's body camera covered by his coat during much of this period, so some portions of his conversations with Holbrook can be heard but not seen.

Ex. 22, Cleveland County Incident Report.   Kessee was taken back to NRH at approximately 22:25 and was pronounced dead at approximately 22:37.  Ex. 23, NRH ED Report at pp. 1-2.

30.     The Oklahoma Medical Examiner determined the cause of death was acute Buproprion, Methamphetamine, and Atomoxetine Toxicity. Ex. 24, Report of Investigation by Medical Examiner.  These drugs were taken prior to the time Kessee entered the emergency department. Ex. 10, Jobin Depo., pp.  241.

31.     It would have been impossible for non-clinically trained law enforcement personnel to recognize that Kessee's condition indicated multiple drug toxicities.  Ex. 16, Reames Report, pp. 5-6; Ex. 33, Reames Depo., pp. 38, 129, 131.

32.     Methamphetamine use frequently causes cardiac dysrhythmia, and Atomoxetine and Buproprion could have contributed to a fatal dysrhythmia. It is likely that a fatal dsyrhythmia was the ultimate cause of death.  Ex. 16, Reames Report, p. 6; Ex. 33, Reames Depo., pp. 105-106.  Lethal cardiac dsyrhythmias are almost impossible to prevent, detect and treat outside of a hospital setting, and very difficult to treat even in an ED or ICU setting.  Once Kessee took these drugs, nothing could be done to reverse the effects, and the fatal dysrhythmia would likely have occurred regardless of whether Kessee was in the ED, the ICU, the jail, or at home. Ex.16, Reames Report, p. 6; Ex. 33, Reames Depo., pp. 115-116. [6]

---

[6] While Plaintiff's expert Dr. Jobin believes the effect could have been reversed with proper treatment, he also believes that  Kessee's likelihood of survival did not decrease during the time Kessee was in the defendant officers' custody. Ex. 10, Jobin Depo., pp. 207-208.

33.     The Officers believed Kessee was faking it, according to Plaintiff's own expert.  Ex. 25, Prevot depo at p. 189, ln. 4-6.

## ARGUMENT AND AUTHORITY

## I.     CANAAN IS ENTITLED TO QUALIFIED IMMUNITY ON THE CLAIM FOR DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS.

The general standards governing Plaintiff's claim for deliberate indifference to serious medical needs were recently reaffirmed in *Strain v. Regalado,* 977 F. 3d 984 (10th Cir. 2020). To state a cognizable claim, a plaintiff must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. *Id.* at 989. This standard includes both an objective and a subjective component. *Id.*, citing *Clark v. Colbert*, 895 F. 3d 1258, 1267 (10th Cir. 2018). To establish the objective component, the alleged deprivation must be sufficiently serious to constitute a deprivation of constitutional dimension. A medical need is objectively serious if it one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.  *Strain* at 990. [7]The subjective component requires a plaintiff to establish that the defendant knew of and disregarded an excessive risk to the detainee's health or safety. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.*[8]  Speculation is not enough; an official's failure to

---

[7] As this Court noted in its March 11, 2020 Order, death satisfies the objective component. Doc. No. 83, p. 14, citing *Martinez v. Beggs*, 563 F. 3d 1082, 1088 (10th Cir. 2009).

[8] *Strain* forecloses any argument that *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466, 192 L.Ed. 2d 416 (2015) eliminated the subjective component of this test. See *Strain*

alleviate a significant risk that he should have perceived but did not, while no cause for commendation, does not establish deliberate indifference. *Self v. Crum,* 439 F. 3d 1227, 1235 (10th Cir. 2006).

Deliberate means intentional, premeditated, or fully considered; therefore deliberate indifference requires an official to subjectively disregard a known or obvious serious medical need. *Id.* at 992. Intent matters not only as to what the official did (or failed to do) but also why the official did it. *Id.* Thus, as *Strain* makes clear, Plaintiff cannot defeat qualified immunity by proving Officer Canaan *should* have recognized Kessee needed additional medical care. Instead, to recover, Plaintiff must prove that Officer Canaan *did* recognize the seriousness of Kessee's condition. The undisputed evidence establishes that Officer Canaan did not recognize Kessee needed medical attention, because he knew Kessee had just been discharged from the hospital. Facts 18, 20. Based on the discharge paperwork, which stated Kessee had been seen for a headache and was exhibiting "drug-seeking behavior," Officer Canaan believed Kessee was faking symptoms because he wanted to stay at the hospital. Fact 18. Plaintiff's own expert admitted that the Officers believed Kessee was faking it. Fact 33.

In considering Officer Canaan's Motion to Dismiss on the claim of deliberate indifference, the Court expressed concern that the only information Officer Canaan received came from the hospital security guard (Jarrod Terry) and stated there is no indication that the officers knew what level of medical attention Kessee received. Doc. 83

at pp. 990-993.

at pp. 18, 20.   However, while the Complaint makes no mention of it, in addition to providing verbal information, Terry also gave the discharge paperwork to Officer Canaan shortly after they walked outside the hospital. Fact No. 12. From reviewing the discharge paperwork, Officer Canaan knew that Kessee was at the hospital because of a headache and "drug-seeking" behavior. Fact 17. He also knew Kessee had been seen and discharged by Justin Holbrook, APRN-CNP. Fact Nos. 6, 11, 12, 15.   He also knew that NRH had contacted the police and requested that Kessee be removed from the property AND requested that he be cited for trespass. Facts 17, 24. Thus, while Officers Canaan and Brown did know what level of medical attention Kessee had received, they did know that a medical professional had made an affirmative decision that treatment was not needed AND that the NRH wanted him off its premises.   Logically, if NRH felt he needed additional treatment, it wouldn't have discharged him OR requested that he be removed from the property and arrested for trespass.

The Court also expressed concern that, because the Complaint alleges Terry told Officer Canaan that Kessee began having issues after he was discharged, Kessee's medical condition when he was observed by the officers might have been different than when he was evaluated by medical personnel. Doc. 83 at p. 18. However, this concern is not supported by the evidence.  Holbrook walked Kessee to the ER waiting room at 18:50. Fact 4.  This was only four minutes before Terry was called to the ER waiting room at approximately 18:54.  Fact 5.  Terry observed Kessee mumbling under his breath and acting as if he was hearing voices.  Fact 6.

When the ER triage nurse Kerry Hartman saw security walk over to Kessee, she

14

also walked over to check the situation out and see what was going on.  Fact 5. According to Plaintiff's emergency department expert, Dr. Jobin, Kessee was exhibiting signs of neurological deterioration while in the waiting room  Fact 8. Hartman was the nurse who triaged Kessee when he came to the ED at approximately 17:43, before he was seen by Holbrook. Fact 1.  Thus, if Kessee's behavior had changed since he was treated, Hartman would have been in the best position to observe that change.  However, despite Kessee's alleged strange behavior in the waiting room, Hartman told Terry that Kessee had already been seen and discharged.  Fact 6.

The Court previously granted qualified immunity to Officer Brown on Plaintiff's claim for deliberate indifference to medical needs for the period after Kessee arrived at the jail, relying on *Spears v. Ruth*, 589 F. 3d 249 (6th Cir. 2009) and *Estate of Vallina v. County of Teller Sheriff's Office*, 757 F. Appx. 643, 647 (10th Cir. 2018), the Court found Officer Brown was entitled to rely on the jail nurse's superior medical knowledge regarding whether Kessee needed medical treatment.  Doc. 83 at p. 16.  The same analysis should apply to Officer Canaan in the pre-jail period.  If Hartman did not recognize Kessee's behavior indicated he needed to be medically re-evaluated, then the need to seek additional medical care would not have been obvious to Officer Canaan. See *Spears* at 255.  See also *Krout v. Goemmer*, 583 F. 3d 557, 569 (8th Cir. 2009) (The fact that a trained medical technician did not appreciate the risks of a detainee's condition undermines an inference that the untrained officers obviously knew the detainee's neck was broken or that he was at serious risk to stop breathing.)

As the discussion of intent in *Strain* illustrates, the context in which Officer Canaan

observed Kessee's behavior must be considered. The issue is not just whether he failed to recognize obvious signs that Kessee was in medical distress, but if so, why he failed to recognize those signs. Officer Canaan knew these things: 1) Kessee had just been discharged from the hospital a few minutes earlier for drug seeking behavior; 2) NRH contacted the police and wanted him removed from its premises and arrested for trespass; 3) Kessee's behavior outside the hospital, while perhaps strange, was similar to the way Kessee was acting in the waiting room after discharge, per the security guard; 4) once outside, when Kessee got out of the wheelchair then began shaking and fell down, Terry told the defendant officers that "this is the way he has been doing, jumping on the ground," and that Kessee "started acting like that out here [the waiting room] before we were called; that is why we [security] were called;" 5) the medical professional who evaluated and discharged Kessee had concluded Kessee did not need treatment but was seeking drugs and 6) Holbrook provided a fit slip. Under *Al-Turki v. Robinson*, 762 F. 3d 1188, 1191, n.1, a non-medical official does not violate clearly established law by relying on a medical professional's decision not to provide medical treatment.

Similarly, in *Estate of Vallina,* the Tenth Circuit held prison officials did not act recklessly or with deliberate indifference in failing to avert the suicide of a detainee who had been cleared by a psychiatrist to be detained in general population. *Id.* at 647. The psychiatrist's report described the inmate as "not aggressive or suicidal" but "malingering because he did not want to return" to general population. *Id.* at 645. "A prison official may rely on a medical professional's opinion if such reliance is reasonable." *Estate of Vallina* at 647, quoting *Weatherford ex. rel Thompson v. Taylor,* 347 F. Appx. 400, 403 (10th Cir.

2009). See also *Drake v. Koss,* 445 F. 3d 1038 (6ᵗʰ Cir. 2006) (The law does not require an official with less medical training to second-guess or disregard a treating physician's opinions or treatment decisions.) *Drake* held that the defendant jailers' failure to take certain suicide prevention measures was not unreasonable in light of the risks as the jailers understood them at the time. *Id.* at 1042. The jailers' view of the risk was shaped by the discharge summary and recommendations of a psychiatrist who did not indicate the decedent was suicidal but instead characterized his behavior as manipulative. *Id.* In light of that opinion, the jailers' actions did not constitute deliberate indifference. *Id.*

In the instant case, the Court found that merely being informed Kessee had been discharged was not enough, standing alone, to negate the allegation that the officers acted with deliberate indifference to serious medical needs. Doc. 83 at p. 20.  However, Officer Canaan was not relying solely on the fact of discharge. Although it is not mentioned in the 95 paragraphs of the Second Amended Complaint detailing the officers' actions,[9] Officer Canaan went back into the hospital to request, and he received, a fit for incarceration slip. Facts 26-28. He spoke directly to Holbrook, who had treated Kessee earlier, and Holbrook signed the fit slip. Canaan did not describe his interaction with Kessee in detail, but he did tell Holbrook that Kessee was pretend mumbling and was dragged across the parking lot. Holbrook responded by laughing and stating Kessee was "very coherent" and able to "sit there and beg for drugs" when Holbrook examined him.  Fact 27. The discrepancy between initially coherent but now mumbling did not cause Holbrook to ask any questions or seek

---

[9] *See* Doc. 106 at pp. 9-25, ¶¶31-126.

any additional information before signing the fit slip. The District Court of New Jersey granted summary judgment to police officers who relied on a fit slip in *Davis v. Township of Paulsboro,* 421 F. Supp. 2d 385 (2006), stating:

> While there is evidence that Davis vomited and was still bleeding, we cannot conclude that any of the Paulsboro officers were deliberately indifferent to an obvious medical need because only a few hours earlier an emergency room doctor had declared Davis fit for incarceration and sent Davis away with instructions to take Advil and apply ice. Under these circumstances the Paulsboro Defendants are not expected to second-guess an emergency room physician's determination about Davis' medical condition. *Davis* at 857.

In finding that the officers were entitled to rely on the fit slip for a "few hours," *Davis* implicitly recognizes a fit slip will not protect an officer indefinitely. However, the outer limits of protection are not at issue in the instant case. The purpose of a fit slip is to ensure that medical decisions regarding whether an individual can safely be taken to jail are being made by medical professionals rather than police officers. Therefore, at a bare minimum, a police officer should be able to rely on a fit slip *at the time it is written.* An officer will not always be present when an individual is evaluated, and there will often be some time lapse between the examination and the issuance of the fit slip. In the instant case, that period was well under an hour. If that delay made it impossible for Holbrook to affirmatively state Kessee was fit for incarceration *at the time he signed the fit slip,* then Holbrook should have the obligation of seeking additional information before issuing it. The burden should not be on a non-medically trained officer to second guess a diagnosis made by a medical professional. [10]   More importantly, no matter how the Court believes

---

[10] In the instant case, Dr. Holbrook's medical expert stated in his report that it was appropriate for Holbrook to sign the fit slip based on his recent evaluation of Kessee, while

responsibility should be allocated between a treating medical professional and an arresting officer, Officer Canaan is entitled to qualified immunity because the law in January of 2018 would not have put a reasonable officer on notice of a duty to question the medical judgment behind a fit slip.[11]

Even if the Court does not believe Officer Canaan should have relied on the fact Kessee had just been treated and discharged, Canaan is still entitled to qualified immunity because it is not clearly established that the symptoms he observed indicated an obvious need for medical attention.  In *Garcia v. Salt Lake County*, 768 F. 2d 303, 308 (1985), the Tenth Circuit held unconsciousness presents an obvious risk.  However, "incoherent" and

---

Plaintiff's medical expert opined that no reasonably trained medical or lay person would have believed Kessee was medically stable and could be cleared for incarceration. Compare, Ex. 21, Report of Darren E. Flamik, M.D., FACEP, pp. 4-6 and Ex. 10, Jobin Depo., pp. 162-163.  It is not necessary to resolve this factual dispute to determine that Officer Canaan is entitled to qualified immunity. The fact that two emergency room physicians, with the benefit of hindsight and the opportunity to review video evidence of Kessee's condition, can disagree on whether Kessee was fit for incarceration explicitly demonstrates that Officer Canaan, a lay person, did not act with deliberate indifference to serious medical needs.

[11] *Weatherford*, which is not a published case, does hold that "unreasonable reliance on the advice of a medical professional will not excuse deliberate indifference to a prisoner's serious medical needs," *Weatherford*  at 404, but does not provide any guidance regarding when reliance becomes unreasonable. The defendant jailer in *Weatherford* ignored the decedent's complaints of chest pain for more than three hours, until he collapsed, based on phone advice from a jail medical professional that the decedent "would be fine" until morning because "the pain was on the wrong side of his chest" to indicate a heart attack. *Id.* at *1.  That is quite different than relying on the medical judgment of a medical professional who had actually examined Kessee and who stated in writing that Kessee was fit for incarceration.

"intoxicated" are not synonymous with "unconscious." *Estate of Hocker v. Walsh*, 22 F. 3d 995, 999 (10th Cir. 1994). The Tenth Circuit affirmed qualified immunity for the arresting officers on the claim for deliberate indifference to serious medical needs in *Martinez v. Beggs,* 563 F. 3d 1082 (10th Cir. 2009), in which the decedent exhibited symptoms similar to those exhibited by Kessee in the instant case.

In *Martinez,* the plaintiff's decedent was arrested for public intoxication and taken to jail, where he died a few hours later of a heart attack. The arresting officers knew the decedent had consumed an entire bottle of whiskey, could not walk without help, may have been unconscious for a short time, and was talking as if he were hallucinating. *Id.* at 1090. They also knew that the neighbor who called the police thought the decedent needed medical care. *Id.* The plaintiff relied on *Garcia* to support her deliberate indifference claim, but the Tenth Circuit rejected this comparison because the decedent was not unconscious. He was conscious, on his feet, argumentative, and cognizant that he was being arrested. In short, he exhibited "characteristics that are common to many intoxicated individuals." *Id.* at 1091.[12] The Tenth Circuit followed this precedent in two recent case, *Quintana v. Santa Fe County Board of Commissioners,* 973 F. 3d 1022 (10th Cir. 2020) and *Estate of Duke v.*

---

[12] Similarly, the symptoms Plaintiff alleges Officer Canaan should have recognized as an indication Kessee needed medical attention, such as unexplained perspiration, tremors, and lack of physical coordination, are also common symptoms of someone under the influence of illegal substances. Ex. 16, Reames Report, p. 5; Ex. 33, Reames Depo., p. 128. See also, *Johnson v. Davis County,* 2021 WL 615325 (D. Utah Feb. 17, 2021) (attached as Ex. 26). In *Johnson*, relying on *Martinez*, the court held symptoms of intoxication such as lethargy, perspiration, slurred speech and slow answers to questions were not indicative of the necessity for medical attention. *Johnson* at *13.

*Gunnison County*, 752 Fed. Appx. 669 (10th Cir. 2018).

In *Quintana*, the decedent died in his jail cell four days after arrest from gastrointestinal hemorrhage due to probable heroin withdrawal. The defendant jailers supervised or interacted with the decedent in some way during this period, and by their own admission, knew the decedent was suffering withdrawal symptoms. *Id.* at 1027. The Tenth Circuit upheld the dismissal of deliberate indifference claims for most of the jailers, including one who observed the decedent vomiting in his cell. *Id.* at 1029. Citing *Martinez*, and describing it as "the case whose circumstances most nearly match those of this case," *Quintana* reiterated that characteristics common to many intoxicated individuals do not prevent an obvious risk. *Id.* at 1029. The court denied qualified immunity only to the jailer who knew the decedent was throwing up blood, because blood would imply to a reasonable detention officer that there was an actual internal injury. *Id.* at 1029-1030.

In *Estate of Duke*, the decedent was taken into custody for suspicion of using a controlled substance and died the next morning of a fentanyl overdose. *Id.* at 671-672. When arrested, the decedent's pupils were pinpointed, his eyes were glassy, and he seemed disoriented. On the way to jail, the decedent was able to sustain a conversation but appeared to be asleep during lulls in the conversation. *Id.* at 671. The Tenth Circuit discussed both *Garcia* and *Martinez*, and held *Garcia* does not apply to detainees who are inebriated but conscious and responsive. *Id.* at 673. The Tenth Circuit then rejected the plaintiffs' attempts to distinguish *Martinez* on the grounds the decedent in *Martinez* died of medical issues other than intoxication, and held the individual defendants were entitled to qualified immunity. *Id.* at 674. Citing *District of Columbia v. Wesby*, ___U.S. ___, 138

S. Ct. 577, 586, 199 L. Ed. 2d 453 (2018), the court held:

> [T]o defeat a qualified immunity defense existing law must have placed the constitutionality of the officer's conduct beyond debate. Duke, like the detainee in *Martinez,* exhibited many common characteristics of intoxicated individuals but was responsive and functioning. We conclude it is at least reasonably debatable that *Martinez* rather than *Garcia* provides the controlling precedent, and thus affirm the grant of qualified immunity to the individual defendants. (citations, quotations omitted) *Estate of Duke* at 674.

*Martinez, Quintana,* and *Estate of Duke* support qualified immunity in the instant case.  Kessee may have been disoriented, unsteady on his feet, and incoherent at times, but he was conscious and cognizant of the fact that he was being arrested.  He may not have carried on a conversation with the officers, but he did understand and respond to certain questions and statements.  When Officer Brown asked Kessee what drugs he used, Kessee responded "I'm not on no drugs." Fact 16.  And when Brown told Kessee to sit up, as the officers were putting Kessee into the patrol car, Kessee responded "I'm sitting." Fact 25.   Like the detainees in *Martinez* and *Estate of Duke*, Kessee exhibited many characteristics common to intoxicated individuals.  Kessee did not exhibit the type of obvious symptoms, like unconsciousness or bloody vomiting, that would cause a layperson to recognize the need for medical attention.[13]

It is important to note: Canaan knew that Kessee had just been discharged from the hospital a few minutes earlier for drug seeking behavior; that NRH contacted the police and wanted him removed from its premises and arrested for trespass; that Kessee's

---

[13] In fact, Officer Canaan testified that loss of consciousness and vomiting were the type of symptoms which would cause him to seek medical attention despite knowing Kessee had just been discharged.  See, Ex. 12, Brown Depo, pp. 78-79.

behavior outside the hospital, while perhaps strange, was similar to the way Kessee was acting in the waiting room after discharge, per the security guard; that once outside, the security guard told the defendant officers that "this is the way he has been doing, jumping on the ground," and that Kessee "started acting like that out here [the waiting room] before we were called; that is why we [security] were called;" that the medical professional who evaluated and discharged Kessee had concluded Kessee did not need treatment but was seeking drugs; that Holbrook had provided a fit slip; and that the signs and symptoms discussed above are signs and symptoms of an intoxicated individual, not necessarily a medical condition.

It is also important to note that, while death satisfies the objective component of the deliberate indifference test under *Martinez*, there is no evidence Officer Canaan's actions caused Kessee's death. According to Dr. Reames, once Kessee took the combination of methamphetamine, atomoxetine and buprorion, nothing could be done to reverse the effects of the drugs or prevent his death. Fact 32. However, even assuming there was some chance of reversal and survival, that chance did not change while Kessee was in Officer Canaan's custody. Fact 32, n. 13. When a claim of deliberate indifference is based on a delay in treatment, the plaintiff must show that the delay itself resulted in significant harm. *Vasquez v. Davis,* 882 F.3d 1270, 1275 (10th Cir. 2018), citing *Al-Turki* at 1193. To satisfy this standard a plaintiff must show the delay caused a lifelong handicap, permanent loss, or considerable pain. *Vasquez* at 1275. Plaintiff has presented no evidence Kessee suffered any of these conditions in the relatively short period of time he was in Officer Canaan's custody.

Consistent with the cases discussed above, and considering the particularized facts of this case, Officer Canaan is entitled to qualified immunity on the claim for deliberate indifference to serious medical needs.

## II.     CANAAN IS IMMUNE FROM LIABILITY FOR NEGLIGENCE.

Count VI of Plaintiff's Second Amended Complaint (SAC) (Doc. 106) is a cause of action for negligence against the City of Norman and Officers Canaan and Brown.  Plaintiff asserts Defendant Canaan "had a duty to act reasonably when encountering citizens, in an effort to prevent harm to Kessee and others" but breached this duty by acting "unreasonably and negligently when he encountered Kessee." Doc. 106, ¶¶288-289.  It is well established that Officer Canaan cannot be held personally liable on a negligence claim. The Oklahoma Governmental Tort Claims Act (GTCA), 51 O.S. §151 et seq. is the exclusive remedy for an injured party to recover against a governmental entity in tort.  *Tuffy's, Inc.,*  at 1163; *Speight v. Presley*,  2008 OK 99, 203 P.3d 173, 176.  The liability of the state or political subdivision is exclusive, and in place of all other liability of the state, a political subdivision or employee at common law or otherwise. *Id.* quoting 51 O.S. §153(B).  In no instance shall an employee acting within the scope of employment be named as a defendant. *Id.* at 179, quoting 51 O.S. §163(C).

Plaintiff apparently recognizes and tries to evade this statutory limitation by pleading in the alternative. The SAC alleges that if Defendant Canaan was acting in the scope of employment then Defendant City of Norman would be liable, but that if Defendant Canaan was acting outside the scope of employment then he would be personally liable. See Doc. 106 at ¶¶291-292. By definition, negligence claims are based on a lack of

24

malicious or willful conduct and thus there is no allegation that the actor was acting in bad faith. *Hutchinson v. City of Oklahoma City*, 919 F. Supp. 2d 1163, 1183 (W.D. Okla. 2013). More importantly, in order to state a claim for negligence, a litigant must show the existence of a duty on the part of the defendant to protect plaintiff from injury, a failure of the defendant to perform the duty, and an injury to plaintiff proximately resulting from the failure. *Ridings v. Maze*, 2018 OK 18, 414 P. 3d 835, 837; *Tuffy's, Inc.*, at 1167. There is no basis for personal liability, as this Court recognized in *Salazar v. City of Oklahoma City*, 2016 WL 4150936 (W.D. Okla. August 4, 2016) (attached as Ex. 27) because any duty Officer Canaan had to protect Kessee arose out of Canaan's his employment and responsibilities as a police officer. *Salazar* stated:

> If [Officer] Stark was acting within the scope of his employment, he cannot be named as a defendant in plaintiff's negligence claim. Further, the Court finds that if Stark was not acting within the scope of his employment, any negligence claim against him in his individual capacity would fail because any duty he would owe to Salazar would derive only from Stark's duties as a police officer. *Salazar* at *2.

> *Salazar* relied on *Cooper v. Millwood Independent School District No. 37*, 1994 OK CIV APP 114, 887 P. 2d 1370. In *Cooper,* the plaintiff sued a school bus driver for injuries

inflicted by another student on the bus, alleging the driver failed to control and supervise the students. The Court of Appeals found the driver could not be sued individually, stating:

> [N]o claim arising from the performance of his duties may be made against Neal individually, because "scope of employment" claims against employees are prohibited by § 163(C) of the Act. Further, if Neal's alleged omissions were found to have been outside the scope of employment, a negligence claim against him individually would fail because Neal had no duty to act in the preservation of Darshaun's person in the absence of a "special relationship". As the claims are alleged in Cooper's Petition, that "special relationship" would derive only from Neal's duties as bus driver, and would

again bring Neal within the exception of § 163(C). (footnotes and citations omitted) *Cooper* at 1375.

The allegedly negligent conduct in *Salazar* was the defendant officer's use of deadly force.  The Court had previously applied *Cooper* in *Hutto v. Davis*, 972 F. Supp. 1372, 1379 (W.D. Okla. 1997), in which the alleged negligence was a failure by jailers to obtain medical treatment.  If the alleged omission of medical care occurred outside of the defendants' scope of employment, the negligence claim would fail because any duty to provide care was imposed on the defendants by virtue of their employment. *Id.* at 1379. See also, *Fitzer v. Independent School District No. 15 of McClain County,* 2015 WL 6160370 (W.D. Okla. October 20, 2015) (attached as Ex. 28) and *Muskrat v. Deer Creek Public Schools*, 2009 WL 2175883 (W.D. Okla. July 21, 2009) (attached as Ex. 29); in both cases, the Court dismissed the plaintiffs' claims of negligence and negligent supervision against school district employees because, under *Cooper*, any duty to act would derive only from their employment. *Fitzer* at *3; *Muskrat* at *4. The allegedly negligent conduct in *Salazar* was the defendant officer's use of deadly force. As the above cases illustrate, Plaintiff cannot recover from Officer Canaan personally on a claim for negligence and Officer Canaan is therefore entitled to summary judgment on this claim.

## III.  CANAAN WAS ACTING WITHIN THE SCOPE OF HIS EMPLOYMENT AND IS THUS ENTITLED TO SUMMARY JUDGMENT FOR ASSAULT AND BATTERY.

Count VI of Plaintiff's SAC (Doc. 106) is a cause of action for assault and battery against the City of Norman and Officers Canaan and Brown.  Like the negligence claim discussed in Proposition II, Plaintiff alternatively pleads that if Defendant Canaan was

acting in the scope of employment then Defendant City of Norman would be liable, but that if Defendant Canaan was acting outside the scope of employment then he would be personally liable.  See Doc. 106 at ¶¶ 296-297. While it is true that for most occupations, an assault on a third person would not be within the scope of an employee's employment, there are certain occupations, including police officer, in which an employee's act is within the scope of employment if it is incidental to some service being performed for the employer or it arises out of an emotional response to actions being taken for the employer. *Perry v. City of Norman,* 2014 OK 119, 341 P. 3d 689, 691, citing *Tuffy's, Inc., v. City of Oklahoma City*, 2009 OK 4, ¶7, 212 P. 3d 1158, 1166.

The assault and battery claim is governed by the analysis of *Morales v. City of Oklahoma City*, 2010 OK 9; 230 P.3d 869. Although the specific claim at issue in *Morales* was a negligence claim against the City, the Oklahoma Supreme Court relied on 21 O.S. §643, and noted the statute affords a defense to a civil claim for assault and battery for police officers. *Id.* at 877, n. 28, citing *Boston v. Muncy,* 1951 OK 175, 233 P. 2d 300, 302. Under §643(1), to use or to attempt to use force or violence upon or toward the person of another is not unlawful when the force is necessarily committed by a public officer in the performance of any lawful duty.[14]

*Morales* began its analysis by "noting the obvious." A police officer does not stand

---

[14] In its March 11, 2020 Order (Doc. 83) regarding the Defendant Officers' Motion to Dismiss, this Court held 21 O.S. §643(3) implicitly imposes a reasonableness standard on the force used.  Doc. 83 at p. 24, citing *State v. Anderson,* 1998 OK CR 67, ¶16, 972 P. 2d 32, 37.  *Morales* does not discuss *Anderson*, or §643(3), but Defendant Canaan agrees *Morales* incorporates a reasonableness standard.

in the same shoes as an ordinary citizen when it comes to using force against another person which exposes that person to a risk of injury. *Id.* at 879. If police officers were exposed to suit every time the risk of harm inherent in an arrest culminated in actual harm, law enforcement would grind to a halt. *Id.* at 880. Under *Morales,* a police officer's duty is very specific: it is to use only such force in making an arrest as a reasonably prudent police officer would use in light of the objective circumstances confronting the officer at the time of the arrest. *Id.* In applying this standard, an officer's subjective mistake of fact or law is irrelevant, including whether he or she is acting in good faith or bad. *Id. Morales* incorporates the analysis of *Graham*, although it lists additional factors a court may consider in assessing reasonableness. While *Morales* discusses the law enforcement privilege in the context of an arrest, the privilege also provides a defense to assault and battery claims arising out of investigative detention or police protective functions. *See Reece v. United States*, 2015 WL 4937436 (W.D. Okla. August 19, 2015) (attached as Ex. 30); *Hodge v. Keene*, 2013 WL 372460 (W.D. Okla. January 30, 2013) (attached as Ex. 31).

Although the objective reasonableness standard is similar to that employed in §1983 excessive force claims, the ultimate inquiries are different. *Hodge* at *9, citing *Morales* at 880, n. 47. In a constitutional tort, the objective reasonableness inquiry is designed to balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. *Morales* at 880, n. 47. Striking this balance is not a consideration in a negligence action where the question is simply whether the applicable standard of care has been met

or not. *Id.*  Under Oklahoma law, excessive force is statutorily defined as physical force which exceeds the degree of physical force permitted by law or the policies and guidelines of the law enforcement entity.  *Morales* at 879, citing 22 O.S. §34.1(B). Under §34.1(C), each law enforcement entity which employs any peace officer shall adopt policies or guidelines concerning the use of force by peace officers. An officer who acts in accordance with department policy should be deemed to be acting within the scope of employment, as a matter of law, even if summary judgment is not appropriate on the Fourth Amendment excessive force claim.

In *Varner v. City of El Reno*, 2011 WL 13113324 (W.D.Okla. March 17, 2011) (attached as Ex. 32), the defendant officers responded to a call regarding a potentially suicidal woman in her 80s. The woman (plaintiff Varner) was in a hospital-type bed and on oxygen, but holding a knife, when the officers arrived.  *Id.* at *2.  When Varner did not immediately drop the knife, she was tased multiple times.  *Id.*  Citing *Casey v. City of Federal Heights,* 509 F. 3d 1278 (10th Cir. 2007), the Court held the defendant officers were not entitled to qualified immunity on Varner's excessive force claim.  *Varner* at *5. However, citing *Morales*, the Court granted summary judgment to the individual officers on the state law claim for assault and battery because there was no evidence that the officers were acting outside the scope of their employment at the time of the incident. *Varner* at *9.[15]

In the instant case, Kessee was not tased.  Defendants Canaan and Brown did not

---

[15] The Court denied summary judgment on the assault and battery claim to the City of El Reno. *Varner* at *10.

use any other weapons, and did not strike Kessee. The only force used was dragging Kessee away from the hospital entrance.   Fact 19.   The purpose of this action, from Officer Canaan's perspective, was to motivate Kessee to leave the hospital property. Fact 19. Officer Canaan did receive discipline for this incident, for "exceeding lawful peace officer powers" and for conduct which is "tends to reflect unfavorably upon this [NPD] department," in violation of NPD Policy 320.5.9(c) and (m). Fact 23.   However, Officer Canaan's conduct was not found to violate NPD Policy 320.5.9(b) which prohibits the use of "unreasonable and unwarranted force to a person encountered or a person under arrest" because there was no intentional excessive force. Fact 22. Specifically, Chief Humphrey, who is the final policy maker for the NPD, did not find that Officer Canaan dragging Kessee to be a violation of Norman police policy and training.   Fact 22.

Because the force used by Officer Canaan did not violate NPD policy and because he was clearly acting in his capacity as a police officer, the force should not be deemed outside the scope of his employment. Thus, as in *Varner*, there is no evidence in the instant case which would support a finding that Officer Canaan was acting outside the scope of employment and subject to personal liability for the force used against Kessee.   Officer Canaan is entitled to summary judgment on the assault and battery claim.

## CONCLUSION

Canaan is entitled to qualified immunity on the alleged denial of medical care claim. He is immune from suit for alleged negligence.  He was acting within the course and scope of his employment as a police officer for the City of Norman during his interactions with Kessee and as such cannot be liable for assault and battery.

Respectfully submitted,

s/ Ambre C. Gooch
Ambre C. Gooch, OBA No. 16586
COLLINS, ZORN  & WAGNER, P.C.
429 N.E. 50th Street, 2nd Floor
Oklahoma City, OK 73105-1815
Telephone:  (405) 524-2070
Facsimile:  (405) 524-2078
E-mail:    acg@czwlaw.com

ATTORNEY FOR DEFENDANTS
KYLE CANAAN AND DANIEL BROWN

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2021, I electronically transmitted this filing to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant:

Chris Hammons, email at: chris@lhllaw.com
Jason M. Hicks, email at: jason@lhllaw.com
Jonathan Ortwein, email at: jonathan@lhllaw.com
LAIRD HAMMONS LAIRD, PLLC
1332 S.W. 89th Street
Oklahoma City, OK 73159
*Attorneys for Plaintiff*

Paulina Thompson, email at: pthompson@johnsonhanan.com
Sean P. Snider, email at: ssnider@johnsonhanan.com
Austin J. Young, email at: ayoung@johnsonhanan.com
JOHNSON HANAN VOSLER
HAWTHORNE & SNIDER
9801 N. Broadway Extension
Oklahoma City, OK 73114
*Attorneys for Defendants Turn Key Health Clinics, LLC*
  *and Clayton Rickert*

Robert S. Lafferrandre, email at rlafferrandre@piercecouch.com
Jessica L. Dark, email at: jdark@piercecouch.com
Randall J. Wood, email at: rwood@piercecouch.com
Pierce Couch Hendrickson
  Baysinger & Green, L.L.P.
1109 North Francis Avenue
Oklahoma City, OK 73106
*Attorneys for Defendants Todd R. Gibson, in his individual*
  *capacity, Blake Green, in his official capacity,*
  *Zachary Andrews, Brian Knapp, Cody Barr,*
  *Stacy Shifflett and Stephen Scott*

Jeanne M. Snider, email at: Jeanne.snider@ci.norman.ok.us
Rickey J. Knighton, email at: rick.knighton@ci.norman.ok.us
City of Attorney
City of Norman
P.O. Box 370
Norman, OK 73070
*Attorneys for Defendants City of Norman and Keith Humphrey*

Brandon C. Whitworth, email at: brandonw@rodolftodd.com
Emily J. Ludiker, email at: emily@rodolftodd.com
David A. Russell, email at: drussell@rodolftodd.com
RODOLF & TODD
15 E. 5th Street, Sixth Floor
Tulsa, OK 74103-4346
*Attorneys for Defendants Emergency Services of Oklahoma, PC.,*
  *Steven M. Roberts and Justin L. Holbrook*

s/  Ambre C. Gooch
Ambre C. Gooch