IN THE UNITED STATES DISTRICT COURT

STATE OF OKLAHOMA

(1) PATRICIA THOMPSON, as          )
Personal Representative of the     )
Estate of MARCONIA LYNN            )
KESSEE,                            )
                                   )
        Plaintiff,                 )
                                   )
-vs-                               )     No. CIV-19-113-SLP
                                   )
(1) NORMAN REGIONAL HOSPITAL       )
AUTHORITY d/b/a NORMAN             )
REGIONAL HOSPITAL, a public        )
trust, et al.,                     )
                                   )
        Defendants



\* \* \* \* \* \*

VIDEOCONFERENCE DEPOSITION OF CLAYTON RICKERT

TAKEN ON BEHALF OF THE PLAINTIFF

IN OKLAHOMA CITY, OKLAHOMA

ON DECEMBER 15, 2020

COMMENCING AT 9:10 A.M.

\* \* \* \* \* \*

REPORTED BY:  BETH A. McGINLEY, CSR, RPR

INSTASCRIPT, LLC
125 PARK AVENUE, LL
OKLAHOMA CITY, OKLAHOMA 73102
schedule@instascript.net
Phone:(405)605-6880 Fax:(405)605-6881

EXHIBIT 14

```
 1    population or housing area.  An inmate whose screening

 2    indicates a significant medical or psychiatric problem

 3    or who may be a suicide risk shall be observed

 4    frequently by staff, consistent with the facility's

 5    policy."

 6              Do you see that portion of the -- of the

 7    Oklahoma Jail Standards?

 8        A    Yes.

 9        Q    Okay.  Now, obviously, on January 16, 2018,

10    there was no medical screening done of Marconia Kessee;

11    true?

12              MS. DARK:  Object to the form.

13              MS. THOMPSON:  Object to the form.

14        A    No, I did a visual assessment on him.

15        Q    (By Mr. Hammons) And what was your visual

16    assessment of him?

17        A    I believed, at the time, that he was acting

18    out, having a behavioral issue, and that he was trying

19    to harm himself.

20        Q    Okay.  Do you -- do you -- why did you put him

21    in the cell?

22        A    Because I thought he was trying to harm

23    himself.

24        Q    So you thought he would -- you put him on

25    suicide watch?
```

```
 1        A     No, I just -- not necessarily suicide watch,

 2   just wanted to protect him from himself if -- so he

 3   wouldn't -- couldn't hurt himself.

 4        Q     Okay.  Well, I guess, what's the difference?

 5        A     Well, one, you're just trying to hurt yourself

 6   to get attention, and the other one, you're trying to

 7   kill yourself.

 8        Q     Okay.  What's the difference in the way you

 9   treat those?

10        A     There's not any difference.

11        Q     Okay.  So at the time of the visual screening,

12   what indications made you believe that he was -- I'm

13   going to use the word "faking."  Is that what you would

14   use?

15        A     When he just was -- he made this shaking

16   movement, that I used an ammonia inhalant to prove that

17   it wasn't a seizure, and then he was not cooperative,

18   and that's -- was my assessment.

19        Q     Okay.  We can come back to that.

20              Part of this is medications in possession of

21   the inmate at the time of booking.  What did you do

22   with -- it's -- from watching the video back, I see that

23   after you -- y'all put Marconia in the cell, Officer

24   Brown hands you the big bag of pills for Marconia?

25        A     Correct.
```

```
 1        Q    -- right there?  Okay.

 2             Just real fast while I'm thinking about it.

 3   This cell that Marconia was put in, they call it --

 4   everybody references it as a padded cell?

 5        A    Yes.

 6        Q    Is it padded?

 7        A    Yes.

 8        Q    It just looks -- it looks normal.  It -- is

 9   the floor soft?

10        A    The floor is soft, yes.

11        Q    Is the -- the wall- -- are the walls soft?

12        A    Yes.

13        Q    I've just been curious about that.

14             Now, obviously, Marconia was just taken from

15   the -- would you call that room, y'all are in, the

16   intake room?  Book-in room?  What do you call it?

17        A    Book-in room.

18        Q    Book-in?

19        A    (Moved head up and down.)

20        Q    He was taken from the book-in room to the

21   padded cell; true?

22        A    True.

23        Q    And then, there, he was stripped naked; true?

24        A    True.

25        Q    And then a suicide smock was placed over him?
```

```
 1       A    Yes.

 2       Q    He was lying face down; true?

 3       A    I don't recall.

 4       Q    And then you found him, a couple of hours

 5   later, dead or dying; true?

 6       A    True.

 7       Q    If you'd turn to 378 on Exhibit No. 6.  This

 8   is a section on processing.  It's -- it's 3.02, "Initial

 9   Medical and Mental Health Screening."  Do you see that?

10   At the very top, the title of it?  Under --

11       A    Okay.

12       Q    Yeah, see that?

13       A    Yes.

14       Q    Okay.

15            MR. WHITWORTH:  I'm sorry, could you tell us

16   what page you're -- you're on?

17            MR. HAMMONS:  Yeah, it's 378 of --

18            MR. WHITWORTH:  Okay.

19            MR. HAMMONS:  -- Exhibit 6.

20            MR. WHITWORTH:  Yeah, thank you.

21            MR. HAMMONS:  Uh-huh.

22       Q    (By Mr. Hammons) And, again, this is a policy

23   and procedure of Cleveland County Detention Center that

24   you didn't know about; true?

25       A    True.
```

 1  have to come from the hospital to have a fit slip.

 2      Q    (By Mr. Hammons) Okay.

 3      A    If they're coming from the hospital and they

 4  don't have a fit slip, that -- the hos- -- the -- the

 5  hospital would have to provide a fit slip before I can

 6  accept them.

 7      Q    Okay.  But that didn't happen in Marconia's

 8  situation; true?

 9      A    I had a fit slip.

10      Q    You didn't at the time you put him in a cell?

11           MS. THOMPSON:  Object to the form.

12      Q    (By Mr. Hammons) -- true?

13      A    It was on the facility.

14      Q    No, it wasn't.

15           MS. THOMPSON:  Are you arguing with the

16  witness?

17      Q    (By Mr. Hammons) Well, I can show you.  I

18  mean, you know Officer Canaan was involved in this;

19  true?

20      A    I don't know the officers' names.

21      Q    Okay.  Well, Officer Brown told you somebody

22  is getting the fit slip; true?

23      A    True.

24      Q    Okay.  Well, Officer Canaan was at the

25  hospital, trying to obtain a fit slip?

EXHIBIT 14

```
 1        Q    Okay?  You said, "Yeah, I saw that.  Oh,

 2   hospital.  Yeah, same thing he did," and then there's

 3   one word that's inaudible.  "Hey, get -- get Beck,

 4   Beckler, Beckwell, out of the padded cell -- Beckwood

 5   out of the padded cell.  I can get his feet."

 6             MS. DARK:  Object to the form.

 7             MS. THOMPSON:  Object to the form.

 8        Q    (By Mr. Hammons) Okay?  Those were the words

 9   you said -- and you'll watch it, we'll -- we'll see it

10   on the deal.  Do you think that's adequate inquiry into

11   Marconia Kessee's condition, to make a determination of

12   what his mental or physical status is?

13             MS. THOMPSON:  Object to the form.

14             MS. DARK:  Object to the form.

15        A    Like I said, I did a visual assessment of him.

16   And the way he was acting.

17        Q    (By Mr. Hammons) Do you wish you would have

18   asked some questions?

19             MS. DARK:  Object to the form.

20             MS. THOMPSON:  Object to the form.

21        A    I wish a lot of things could have happened

22   different.

23        Q    (By Mr. Hammons) Well, specifically, I'm

24   asking:  Do you wish you would have asked questions?

25             MS. THOMPSON:  Object to the form.
```

```
 1   behavior?
 2           MS. DARK:  Object to the form.
 3       Q   (By Mr. Hammons) To treat a human being like
 4   that?
 5       A   No.
 6       Q   Now, I counted about nine, 10 seconds that you
 7   held something to his nose.  What was that?
 8       A   That's the ammonia inhalant.
 9       Q   You've had ammonia inhalant stuck up his nose
10   for nine or 10 seconds and he hasn't moved.  What does
11   that tell you?
12           MS. DARK:  Object to the form.
13           MS. THOMPSON:  Object to the form.
14       A   He was holding his breathe for a little while.
15       Q   (By Mr. Hammons) You believe Marconia Kessee
16   was holding his breath?
17       A   Yes.
18       Q   Do you often use ammonium capsules or smelling
19   salts as a diagnostic tool in the jail?
20       A   Yes.
21       Q   And, again, that's without knowing what it's
22   actually for?
23           MS. THOMPSON:  Object to the form.
24       A   That's what it's used for.  It was what it was
25   used for at the jail.
```

```
 1        Q    (By Mr. Hammons) Who taught you that?

 2        A    I couldn't -- I don't remember.

 3        Q    The Cleveland County Detention Center taught

 4   you to stick smelling salts in people's face?

 5        A    No.

 6             MS. DARK:  Object to the form.

 7        Q    (By Mr. Hammons) Who did?

 8        A    I don't remember.

 9        Q    Turn Key?  Was it Turn Key?

10        A    Somebody at Turn Key.

11        Q    Okay.  Someone at Turn Key said, "Just

12   keep" -- do you keep a pocket full of them?

13        A    Kept them on me at all times, yes.

14        Q    And you just -- whenever you felt like --

15   necessary, you'd break them open and stick them in

16   people's face, see what they did?

17             MS. THOMPSON:  Object to the form.

18             MS. DARK:  Object to the form.

19        A    Only if they were acting like -- if they were

20   having seizures, to see whether they were really having

21   a seizure or faking it.

22        Q    (By Mr. Hammons) And that's a good diagnostic

23   tool for seeing if somebody is faking a seizure?

24        A    It works.

25        Q    How do you know it works?
```

1        A     Because you can't immediately come out -- you

2   can't stop having a seizure just because somebody puts

3   an ammonia inhalant at your nose.

4        Q     Do you think Marconia Kessee was having a

5   seizure?

6        A     No.

7        Q     Then why were you using an ammonium thing?

8        A     To prove that it wasn't a seizure.

9        Q     Okay.  Is there any medical training

10  documentation journal out there, on earth, that you know

11  of, that says to -- I can determine whether somebody is

12  faking a seizure or not based on a smelling salts

13  caplet?

14       A     Not that I'm aware of.

15       Q     Ever, ever -- have you ever used the ammonia

16  caplet on people at the nursing homes you were at, to

17  see if they were faking?

18       A     No.

19       Q     What about the Department of Corrections, did

20  they let you stick ammonium caplets --

21       A     Yes.

22       Q     -- up people's nose?  They did?

23       A     Yes.

24       Q     What about any other facility you worked at?

25  The hospital down in Pauls Valley, did they let you do

EXHIBIT 14

```
 1   that?

 2        A    No.

 3        Q    Why not?

 4        A    Well, we didn't typically have people faking

 5   seizures.

 6        Q    Okay.  And -- and you believed Marconia was

 7   faking on that day?

 8        A    Yes.

 9        Q    Okay.

10             (Plaintiff's Exhibit 7, Officer Brown's Body

11   Cam Footage, was played off the record).

12             MR. HAMMONS:  I pushed play.  Sorry, guys.

13        Q    (By Mr. Hammons) Now, again, up to this point,

14   you don't think you could have taken a blood pressure,

15   taken a temperature, done any kind of intake process?

16        A    No, he was still in handcuffs.  I couldn't

17   have got a blood pressure on him.

18        Q    Okay.  Did you ever take his blood pressure?

19        A    No.

20        Q    Huh?

21        A    No.

22        Q    Did you ever tell somebody you took his blood

23   pressure?

24        A    No.

25        Q    Well, what if somebody says that you told them
```

```
 1      A    No.

 2      Q    Not part of Turn Key's policies and procedures

 3  or not part of Cleveland County's?

 4      A    As far as I know, it's not part of any policy

 5  and procedure, to count and log how many pills are in

 6  the bottle.

 7      Q    Okay.  Now, I've read some of the -- have you

 8  read these reports written -- or these typed reports

 9  from the jailers and detention officers involved in

10  this?

11      A    Just pieces of the ones that were in the -- in

12  the complaint.

13      Q    So it seems like there's some disagreement,

14  when I'm reading that record, as to whether you wanted

15  Marconia on critical observation or something called

16  medical observation.  I -- I've seen those two phrases

17  in the record.  What is critical observation?

18      A    Critical observation is what he was put on,

19  that he was put in a padded cell and checked on by the

20  detention staff.

21      Q    Well, what's the -- what's the parameters for

22  critical observation?  Why are you put in critical

23  observation?

24      A    Just because he tried to hurt himself.

25      Q    Well, that's what I'm getting at.  Is that
```

1  January 16th, 2018, whose decision is it, ultimately,

2  whether it's medical or critical observation?

3      A    Well, medical would be mine.  Critical could

4  be -- like I said, if it -- it could -- they could get

5  put in critical observation -- doesn't have to be a

6  medical staff to put somebody in critical observation.

7      Q    Yeah, I guess what I'm getting at is:  I take

8  it you wanted him in critical observation?

9      A    Correct.

10     Q    Could somebody at Cleveland County that was

11 present that night, on January 16th, 2018, override your

12 decision and put him in some other -- medical

13 observation, for instance?

14     A    No.

15     Q    If you put him in medical observation, could

16 anybody at Cleveland County Detention Center that night

17 override that decision?

18     A    No.

19     Q    Okay.

20     A    Well, I mean, I -- I -- I take that back.  I

21 guess they could, because they have ac- -- they have

22 control of the jail.

23     Q    Yeah, and I'm just -- a general understanding

24 of what you thought the procedure was, that you had

25 control over that if you put them in it?

```
 1        A     Yes.

 2        Q     That definition of "critical observation"

 3   says, "An inmate who is observed in a more frequent

 4   manner due to health risk, either mental or physical."

 5             What -- what was Marconia put in there for, on

 6   critical observation?

 7        A     Because he hit his head.

 8        Q     So it's more of the physical?

 9        A     Yes.

10        Q     Okay.  And when you say "hit his head," you're

11   talking about the one time his head hit the wall?

12        A     Yes.

13        Q     Okay.  Now, do you know, once an inmate is

14   given a suicide smock, are they considered on suicide

15   watch at that point?

16        A     I don't know whether they're considered on

17   suicide watch because -- just because they got a smock

18   or not.

19        Q     Okay.  You don't know what the policy at

20   Cleveland County Detention Center, on that, would be?

21        A     No.

22        Q     What is a sight check?

23        A     I don't know.

24        Q     You were never trained, at Cleveland County

25   Detention Center or by Turn Key, on what a sight check
```

Clayton Rickert
12/15/2020                                                                Page 152

```
 1       A    I was in the area for an unrelated reason,

 2   somebody else had called for medical, and I just wanted

 3   to check on him.

 4       Q    Okay.

 5       A    Just because.

 6       Q    Okay.  And this is -- this is a -- I don't

 7   know, an hour and 50 or so minutes after he was placed

 8   in the cell, would you say?

 9       A    I have no idea how long it had been.

10       Q    Okay.  Who is the individual in the cell with

11   you on that cam- -- that footage?

12       A    I can't tell from this view.

13       Q    Okay.  Let me see if I can -- well, if you

14   get -- here in a second, if you get to where you know

15   who it is, tell me, okay?

16       A    Okay.

17       Q    When you enter the cell in a situation like

18   this and you're -- who's in charge of inside the jail

19   cell on -- on decision making, medically?

20       A    Medically?

21       Q    Yes.

22       A    It would be me.

23       Q    Okay.  And right now, it shows you kind of

24   leaned over.  We can't see Marconia's head in the video,

25   but it seems he's face down at this point?
```

 1  and stare at him.

 2      Q    (By Mr. Hammons) Okay.  You reached down and

 3  you did something on his neck; true?

 4      A    I was assessing him for his level of

 5  consciousness and then checked for respirations and

 6  pulse.

 7      Q    Okay.  And you -- you drug your pen on his

 8  feet?

 9      A    Yes.

10      Q    Okay.  And then you flipped him over; true?

11      A    True.

12      Q    Okay.  Now, this -- this breathing apparatus

13  that you're pulling out of this bag, do you know how to

14  use it?

15      A    Yes.

16      Q    Okay.  Again, do you believe the 2 minutes and

17  54 seconds before starting CPR are acceptable?

18      A    Under the circumstances, yes.

19      Q    In that 2 minutes and 54 seconds, do you

20  believe Marconia Kessee was breathing or his heart was

21  beating?

22      A    No.

23      Q    Do you believe, at this point in time, as

24  you're sitting there, that Marconia Kessee is dead?

25      A    I can't make that determination.

```
 1   stories, aren't they?

 2            MS. THOMPSON:  Object to the form.

 3       A    Yes.

 4       Q    (By Mr. Hammons) And, fortunately, we have a

 5   video to show which one of them is true, correct?

 6       A    Yes.

 7            MS. THOMPSON:  Is it okay for a quick break?

 8            MR. HAMMONS:  Sure.

 9            THE MONITOR:  Going off the record.  The time

10   is 1:57 p.m.

11            (Recess was had from 1:57 p.m. to 2:05 p.m.)

12            THE MONITOR:  We are back on the record.  The

13   time is 2:05 p.m.

14       Q    (By Mr. Hammons) Are you ready to proceed,

15   Mr. Rickert?

16       A    Yes.

17       Q    Okay.  Now, just a little bit of overview

18   here.  The process, whatever you want to call it, that

19   took place inside this book-in room, is that consistent

20   with how you treated other inmates while working for

21   Turn Key at Cleveland County Detention Center?

22            MS. THOMPSON:  Object to the form.

23       A    Nev- -- I don't remember ever having a

24   situation like that one.

25       Q    (By Mr. Hammons) Well, consistent in, you make
```

EXHIBIT 14

```
 1   a determination of -- based on whatever you used in this

 2   situation, and you decide to bypass the medical

 3   screening and everything and you put them into the

 4   padded cell?

 5           MS. THOMPSON:  Object to the form.

 6       Q   (By Mr. Hammons) Have you done that to other

 7   inmates?

 8       A   Never done that.

 9       Q   You've -- you've never bypassed the medical

10   screening process and placed somebody in a --

11       A   Never had to bypass a medical screening, that

12   I can recall.

13           MS. THOMPSON:  Objection to the last question.

14       Q   (By Mr. Hammons) Okay.  And never before,

15   the -- the reaction and the CPR situation that happens

16   in the cell after you find Macrony -- Macrony --

17   Marconia, and no heartbeat, no breathing, is that

18   consistent with treatment of other inmates that you've

19   seen in the jail?

20           MS. DARK:  Object to the form.

21           MS. THOMPSON:  Object to the form.

22       A   Can you rephrase the question?

23       Q   (By Mr. Hammons) Sure.  I'm trying to get a

24   sense of:  Is that reaction and that -- the way you

25   treated Marconia in that cell, consistent with the way
```

```
 1   you've treated other inmates found unconscious or not

 2   breathing at the Cleveland County Detention Center?

 3            MS. DARK:  Object to the form.

 4            MS. THOMPSON:  Object to the form.

 5       A    I've never had a situation like that before at

 6   Cleveland County Jail.

 7       Q    (By Mr. Hammons) You've never had a situation

 8   where you've had to perform -- an emergency CPR

 9   situation?

10       A    Not at the jail.

11       Q    Not at the Cleveland County Detention Center?

12       A    No.

13       Q    Okay.  Have you ever had a scenario of

14   training on that at the Cleveland County Detention

15   Center?

16       A    No.

17       Q    So Marconia Kessee was your first attempt at

18   it; true?

19       A    True.

20       Q    And it was a blatant failure?

21            MS. DARK:  Object to the form.

22            MS. THOMPSON:  Object to the form.

23       Q    (By Mr. Hammons) True?

24       A    It wasn't a success.

25       Q    Yeah, it was a complete failure, right?  The
```

 1   whole mission failed; true?

 2           MS. THOMPSON:  Object to the form.

 3           MS. DARK:  Object to the form.

 4      A    True.

 5      Q    (By Mr. Hammons) You have -- as far as the

 6   timeline when Marconia was seen by a doctor at Norman

 7   Regional Hospital, you have no idea on January 16, 2018;

 8   true?

 9      A    True.

10      Q    You had no idea the last time a doctor saw him

11   and -- in -- when I say "last," in time, as it relates

12   to when you saw Marconia; true?

13      A    True.

14      Q    You don't even know when -- as we sit here

15   right now, when a fit slip arrived at Cleveland County

16   Detention Center; true?

17      A    True.

18      Q    And a fit slip is only as good as when a

19   doctor last saw that human being; true?

20           MS. DARK:  Object to the form.

21           MS. THOMPSON:  Object to the form.

22      A    I couldn't answer that.  I don't know what the

23   policies and procedures are for fit slips at the

24   hospital.

25      Q    (By Mr. Hammons) Well, just common sense tells

 1   medical attention, will be referred to Community

 2   Hospital for care."

 3            Do you believe Marconia was semi-conscious?

 4       A    No, I believe he was conscious.

 5       Q    Okay.  And we already went over this.  You

 6   don't think he was obviously in need of immediate

 7   medical attention?

 8       A    No.

 9       Q    On -- on No. 2, under "Procedure," the second

10   sentence of that says, "Prebooking medical screening

11   criteria used to guide the determination of medical

12   stability shall be approved by the medical authority."

13            What is the prebooking medical screening

14   criteria?

15       A    I don't know.

16       Q    It says it's used to guide the determination

17   of medical stability.  And you don't know what the

18   criteria for that is?

19       A    No.

20       Q    Did anybody at Turn Key ever teach you that?

21       A    Not that I can remember.

22       Q    Okay.  It might have been in that first day

23   where you went over the -- over 100 categories of

24   training policies in orientation?

25            MS. THOMPSON:  Object to the form.

```
 1        A    True.

 2        Q    (By Mr. Hammons) Protocols that may save

 3   lives; true?

 4             MS. THOMPSON:  Object to the form.

 5        A    True.

 6        Q    (By Mr. Hammons) Page 19, Exhibit 1.  No. 3,

 7   it says, "Nursing staff will be provided with

 8   orientation in-service prior to utilization of nursing

 9   protocols."

10             I'm assuming you don't recall having an

11   orientation or in-service about these nursing protocols?

12             MS. THOMPSON:  Object to the form.

13        A    No, I don't recall.

14        Q    (By Mr. Hammons) Page 20.  "Mental Health

15   Services."  Anything in your training and experience as

16   a nurse or your training and experience with Turn Key

17   give you any indication that Marconia Kessee may have a

18   mental health issue?

19        A    The only thing that give me any indication

20   that he had a mental health issue was when I looked at

21   his medications.

22        Q    Okay.  But that didn't prompt you to do

23   anything different than you would have done; true?

24        A    True.

25        Q    Now, you had said, earlier, about performing
```

```
 1      Q    Is it true you've dealt with inmates who have

 2   had seizures before?

 3      A    Yes.

 4      Q    Is it true you've dealt with inmates who had

 5   faked seizures before?

 6      A    Yes.

 7      Q    Also true you had dealt with a lot of

 8   uncooperative inmates?

 9      A    Yes.

10      Q    In your experience, did Mr. Kessee appear to

11   be having a seizure at any time on January 16th, 2018?

12      A    No.

13      Q    Were you ever disciplined, while you were

14   working at Cleveland County, for any sort of improper

15   medical care or medical treatment you provided to an

16   inmate?

17      A    No.

18      Q    Or were you ever disciplined, while you were

19   at Cleveland County, for not providing medical care or

20   medical treatment to an inmate?

21      A    No.

22      Q    Prior to Mr. Kessee's incarceration at -- in

23   January of 2018, had anyone with the county ever

24   contacted you or reached out to you about anything about

25   your performance as an LPN at the jail?
```

```
 1        A    No.
 2        Q    Likewise, do you feel like you had ever
 3   committed any act or, you know, done something that
 4   would have warranted anyone from the county reaching out
 5   to you about your performance?
 6        A    No.
 7        Q    Prior to this incident with Mr. Kessee, there
 8   would never have been any reason for anyone at the
 9   county to think that you were incapable of doing your
10   job, right?
11        A    Right.
12        Q    At the time that you were -- or as of
13   January 16th, 2018, your LPN license was active,
14   correct?
15        A    Correct.
16        Q    You had no restrictions on it, correct?
17        A    Correct.
18        Q    And you testified to this earlier, but there
19   had been no -- no prior incident like this at Cleveland
20   County that you had been involved in, right?
21        A    Correct.
22        Q    Are you aware of any policy or procedure at
23   Turn Key that you personally violated with regard to
24   Mr. Kessee?
25        A    No.
```

 1   any jail?

 2        A    No.

 3        Q    You don't have any knowledge as to how

 4   Cleveland County detention officers are trained, do you?

 5        A    No.

 6        Q    You have no knowledge that they are not

 7   trained appropriately, correct?

 8        A    Correct.

 9        Q    Also, you are -- you're not an expert in jail

10   policies, right?  That's not your field of expertise?

11        A    Correct.

12        Q    Okay.  So when you are at the jail and you are

13   the medical provider on duty, it's -- it's your

14   responsibility to deal with any inmate medical issues,

15   correct?

16        A    Correct.

17        Q    And that would include any inmate medications,

18   right?

19        A    Correct.

20        Q    Making sure that they received medications as

21   needed or anything like that, right?

22        A    Yes.

23        Q    That's not something we have jailers do,

24   correct?

25        A    Correct.

1        Q    You're aware that detention officers at

2   Cleveland County have received CPR and first aid

3   training?  Are you aware of that?

4        A    No.

5        Q    Are -- were you aware of any of the jailers on

6   duty that night having any elevated medical training

7   like you do?

8        A    No.

9        Q    As far as you know, you're the highest level

10  of medical at the jail on January 16th, 2018, correct?

11       A    Yes.

12       Q    So, with that, as far as you're aware, you

13  have more medical training and experience than anyone

14  else in that jail at the time?

15       A    Yes.

16       Q    And whenever -- like I said, I'm going to be

17  kind of all over the place.  But you, as the jail --

18  jail nurse, you -- you make the decision about what kind

19  of treatment each inmate needs, correct?

20       A    Within parameters.  I mean, I can't just make

21  up stuff.

22       Q    Right.  If -- you -- you take the situation as

23  it is, you use your knowledge and expertise and

24  training, and you decide what needs to be done; is that

25  fair?

```
 1        A     Yes.

 2        Q     In a medical related standpoint?

 3        A     Yes.

 4        Q     And it's obvious, then, that the detention

 5   officers, who don't have that same training, they're

 6   going to rely on you, as the nurse, to tell them what to

 7   do with regard to medical care for inmates, correct?

 8        A     Yes.

 9        Q     And you agree that that -- that makes sense,

10   right?  We don't want unqualified or un- --

11   non-medical-trained people making medical decisions when

12   there's a nurse right there, right?

13        A     Yes.

14        Q     There's nothing that prevented you from going

15   to Mr. Kessee's padded cell and opening the flap and

16   looking in on him at any time, right?

17        A     Except for my other duties.

18        Q     But no -- no jail staff, no policy, ever told

19   you that you couldn't go and look in on him, correct?

20              MR. HAMMONS:  Object to the form.

21        A     Correct.

22        Q     (By Ms. Dark) And, in fact, you did.  We saw,

23   in the video, you went by and you looked in on him,

24   correct?

25        A     Correct.
```

```
1      Q    So we saw in the video of -- I think with

2   Officer Brown's video -- that you were standing in the

3   intake area as Mr. Kessee is being brought in from the

4   sally port, correct?

5      A    Yes.

6      Q    So from the time he enters the facility,

7   you're already there, right?

8      A    Yes.

9      Q    And as he enters the facility, as he's sitting

10  in that intake area, does he ever appear to be in any

11  medical distress?

12     A    No.

13     Q    Does he ever appear, to you, to need any

14  elevated level of care that you can't provide there at

15  the jail?

16     A    No.

17     Q    If he had, I assume you would have done

18  something, whether that's send him back out or call for

19  more assistance, right?

20     A    Yes.

21     Q    When Officer Brown told you that he -- that

22  Mr. Kessee had a fit for incarceration slip, you didn't

23  have any reason to not believe him, correct?

24          MR. HAMMONS:  Object to the form.

25     A    Correct.
```

Clayton Rickert
12/15/2020                                                                    Page 241

```
 1       Q    (By Ms. Dark) There's no reason to doubt that
 2    a fit slip was coming, correct?
 3            MR. HAMMONS:  Object -- object to the form.
 4       A    I -- like I said, I thought it was there, that
 5    maybe it was in the car.
 6       Q    (By Ms. Dark) Okay.  And at some point, you
 7    saw a fit for incarceration slip, right?
 8            MR. HAMMONS:  Object --
 9       A    Yes.
10            MR. HAMMONS:  Object to the form.
11       Q    (By Ms. Dark) And that fit slip tells you that
12    he has -- Mr. Kessee had been seen at a hospital prior
13    to his arrival, correct?
14       A    Correct.
15       Q    You agree with me that the Norman Regional
16    Hospital is about a 10-minute drive from the jail?  Does
17    that sound right to you?
18            MR. HAMMONS:  Object to the form.
19       A    Yes.
20       Q    (By Ms. Dark) So, as far as you knew,
21    Mr. Kessee had just been seen at the hospital within 10,
22    20 minutes of his arrival at the jail, correct?
23       A    Yes.
24       Q    And we looked at the fit slip earlier, which
25    was Exhibit 11.  And on that slip, it states, "Fit for
```

EXHIBIT 14

```
 1    incarceration," and then it gives a phone number for if

 2    you called with any -- call with any questions.

 3              That fit slip doesn't have any -- on the fit

 4    slip itself -- not the discharge paperwork, but the fit

 5    slip itself doesn't have any sort of "Call if you see X,

 6    Y or Z," does it?

 7       A    No.

 8       Q    This is unconditional, this is saying, "We've

 9    seen him, he's good, he can come into the jail," right?

10       A    Right.

11       Q    At any time that you observed Mr. Kessee, was

12    he vomiting?

13       A    No.

14       Q    Did he have any change in color, skin tone?

15       A    No.

16       Q    Did he ever lose consciousness that you saw?

17       A    No.

18       Q    Did you see any wounds or injuries?

19       A    No.

20       Q    Was he clutching his chest or complaining of

21    chest pain at any time?

22       A    No.

23       Q    Did you ever see him bleeding?

24       A    No.

25       Q    Okay.
```

```
 1              MS. DARK:  If -- Chris, I'm sorry, can you
 2   hand him Exhibit 6, the policies and procedures, at CCSO
 3   376.
 4              MR. HAMMONS:  (Handed the witness Exhibit 6.)
 5         Q    (By Ms. Dark) Okay.  And at the bottom of the
 6   page, it says -- well, at the middle of the page,
 7   there's F, "Admission of a Compliant Arrestee."  Do you
 8   see that?
 9         A    Yes.
10         Q    And if you go to the next page, No. 10, "The
11   arrestee will be taken to the medical screening room and
12   overseen by the detention officer."
13         A    Yes.
14         Q    At that time that Mr. Kessee was in the intake
15   area, you wouldn't call him a compliant arrestee, would
16   you?
17              MR. HAMMONS:  Object to the form.
18         A    No.
19         Q    (By Ms. Dark) He was uncooperative, wasn't he?
20              MR. HAMMONS:  Object to the form.
21         A    Yes.
22         Q    (By Ms. Dark) And if you look on the page just
23   before that, CCSO 375, E, "Officer assistance with" --
24   sorry, "Officer assistance with new combative arrestee."
25   And then flip the page, so back to CSSO 376, No. 7.  "If
```

1    compliance is not gained, the arrestee will be escorted

2    to a designated cell."  Did I read that correctly?

3         A    Yes.

4         Q    And that's what happened here, right?

5    Mr. Kessee was not being compliant, so he was taken to a

6    designated cell, correct?

7         A    Yes.

8         Q    And you touched on this earlier, but just to

9    be clear:  The -- the plan was to place him in this

10   designated cell, make sure he isn't harming himself, and

11   when he calms down, then you'll be able to finish the

12   intake process, correct?

13        A    Yes.

14        Q    Are you aware of any requirement in any

15   policy, any standard, that gives an exact amount of time

16   as to when that initial medical screening intake has to

17   occur?

18        A    No.

19        Q    And it tracks that if you have someone who's

20   not being cooperative, you want to give them time to

21   calm down, so he's able to provide you reliable answers,

22   correct?

23        A    Correct.

24        Q    In the video, we watched the portion where

25   Mr. Kessee hit his head on the wall, and you agree with

 1   nursing -- as a nurse, to decide if someone is having

 2   a -- a real seizure, right?

 3       A    Correct.

 4       Q    And as we discussed before, you've dealt with

 5   people, whether inmates or patients, faking seizures

 6   before, right?

 7       A    Yes.

 8       Q    And we don't expect that -- a jailer, who

 9   doesn't have any medical training, to be able to

10   identify a real versus a fake seizure --

11       A    Correct.

12       Q    -- right?

13       A    Correct.

14       Q    That's why you're there as the nurse, because

15   you have that training, correct?

16       A    Correct.

17       Q    From the time that Mr. Kessee enters the

18   facility, which I believe is around 7:46, to the time he

19   goes into the padded cell, you're with him every step of

20   the way, correct?

21       A    Yes.

22       Q    And even whenever the officers take Mr. Kessee

23   into the cell, you enter the cell with them, correct?

24       A    Yes.

25       Q    Until that door is shut, which I believe is at

**EXHIBIT 14**

```
 1   around 7:55, you're with Mr. Kessee the entire time,

 2   right?

 3        A    Yes.

 4        Q    And at no time during that course of events

 5   did you believe he needed any additional medical care?

 6        A    Correct.

 7        Q    At no time did you believe he was having any

 8   serious mel- -- medical issue that would require --

 9   require medical treatment?

10        A    Correct.

11        Q    Do you have any information or indication that

12   Officer Shifflett and Barr were lying to the OSBI?

13        A    Just what was presented today.

14        Q    Is it common that if a -- you know, incident

15   like this, that events happen quickly, it may be hard to

16   remember the exact sequence of events?

17             MR. HAMMONS:  Object to the form.

18        A    Exactly.

19        Q    (By Ms. Dark) Yeah.  You don't have specific

20   information that they were trying to impede any

21   investigation, do you?

22             MR. HAMMONS:  Object to the form.

23        A    No.

24        Q    (By Ms. Dark) Did you see anything that any of

25   the detention officers did, with regard to Mr. Kessee,
```

 1   diagnose any condition; is that correct?

 2       A    Correct.

 3       Q    And you're not trained to prescribe

 4   medication?

 5       A    Correct.

 6       Q    Based on your nursing training and experience,

 7   are you able to determine if an individual is

 8   experiencing signs or symptoms of a condition that would

 9   require immediate medical care?

10       A    Yes.

11       Q    And I know you've discussed that a bit with

12   Ms. Dark earlier, but did you see any -- other than

13   behavioral symptoms, did you see any medical symptoms in

14   Mr. Kessee, on January 16th of 2018, that would require

15   immediate medical care --

16       A    No.

17       Q    -- in your opinion?

18            Is that unusual, based on your prior

19   experience in correctional nursing, for an inmate to

20   fake their symptoms?

21       A    No.

22            MR. HAMMONS:  Object to the form.

23       Q    (By Ms. Thompson) Did you encounter that in

24   the past, in your correctional nursing experience?

25       A    Yes.

**EXHIBIT 14**

```
 1      Q    We had discussed a fit for incarceration slip

 2   earlier.  Based on the condition that you observed in

 3   Mr. Kessee, did you have any reason to believe that he

 4   was no longer fit for incarceration after arrival at the

 5   Cleveland County Detention Center?

 6      A    No.

 7      Q    So you didn't have any reason to call the

 8   phone number on the fit slip for further instruction; is

 9   that correct?

10      A    Correct.

11      Q    Did you see any need, based on your

12   observations of Marconia's condition, to contact a

13   higher level provider?

14      A    No.

15      Q    Did you see any need, based on your

16   observations of Marconia's condition, to send him back

17   to the hospital for higher level care?

18      A    No.

19      Q    Between your first encounter with Marconia

20   Kessee and until you later found him unresponsive in his

21   padded cell, during that time period, did your

22   impression of his condition change at any point?

23      A    No.

24      Q    Did his symptoms change, based on your

25   observations, during that time period?
```

```
 1        A     From -- until I found him?

 2        Q     Yes, from the time that you first saw him

 3   being brought in and just before you found him.

 4        A     Okay, just before I found -- no, not that I'm

 5   aware of.

 6        Q     When you were visually assessing Marconia

 7   Kessee when he was first brought in, you stated,

 8   earlier, that you had observed him being alert; is that

 9   correct?

10        A     Yes.

11        Q     And you had observed him converse with the

12   detention officers; is that correct?

13        A     Yes.

14        Q     From your observation of that interaction with

15   detention officers, did you make a determination whether

16   Mr. Kessee was in a condition -- whether Mr. Kessee

17   would be able to answer your question about his medical

18   history?

19        A     Yes.

20        Q     And what was your determination?

21        A     That he would not be able to answer

22   appropriately at the time.

23        Q     And why did you think that?

24        A     Because he wasn't answering appropriately to

25   the officers.
```

1      Q    Prior to placing Mr. Kessee in the padded

2    cell, you did not observe him to lose any cons- -- lose

3    consciousness, correct?

4      A    Correct.

5      Q    And no one with the county ever told you that

6    you had violated any of their policies; regardless of

7    whether you knew what they were or weren't, no one told

8    you, you had violated them, right?

9      A    Correct.

10          MS. DARK:  Pass the witness.

11          MS. THOMPSON:  Two questions.

12                    FURTHER EXAMINATION

13   BY MS. THOMPSON:

14     Q    Mr. Rickert, you discussed with plaintiff's

15   counsel about how Marconia was only asked one question

16   by the jailers, about the size of his shoe.

17          Did you also see Marconia, back on the day,

18   and today on the video, just making statements, without

19   being asked a question?

20     A    Yes.

21     Q    And was he making sense when he was making

22   those statements?

23     A    No.

24     Q    Was that part of your assessment that he

25   probably would not be able to accurately answer