## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| PATRICIA THOMPSON, as Personal | ) | |
| Representative of the Estate of | ) | |
| MARCONIA LYNN KESSEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-19-113-SLP |
| | ) | |
| NORMAN REGIONAL HOSPITAL | ) | |
| AUTHORITY d/b/a NORMAN REGIONAL | ) | |
| HOSPITAL, a public trust, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION FOR SUMMARY JUDGMENT OF DEFENDANT AMASON
## AND BRIEF IN SUPPORT

Randall J. Wood, OBA No. 10531
Robert S. Lafferrandre, OBA No. 11897
Jessica L. Dark, OBA No. 31236
PIERCE COUCH HENDRICKSON
 BAYSINGER & GREEN, L.L.P.
1109 North Francis Avenue
Oklahoma City, Oklahoma 73106
Telephone: (405) 235-1611
Facsimile: (405) 235-2904
jdark@piercecouch.com

***Attorneys for Defendants*,
*Amason*, *Gibson*, *Andrews*, *Knapp*,
*Barr*, *Shifflett*, *and Scott***

— July 1, 2021 —

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ........................................................................................................ **i**

**TABLE OF AUTHORITIES** .............................................................................................. **iii**

**INDEX OF EXHIBITS** ...................................................................................................... **vii**

**I.**  **INTRODUCTION** ..................................................................................................... **1**

**II.**  **STATEMENT OF UNDISPUTED FACTS** ............................................................ **3**

    A.  THE COUNTY'S RELEVANT POLICIES AND PRACTICES IN EFFECT IN
        JANUARY 2018 ....................................................................................... 3

    B.  THE COUNTY'S RELEVANT TRAINING IN EFFECT IN JANUARY 2018 .......... 7

    C.  THE COUNTY'S RELATIONSHIP WITH TURN KEY HEALTH CLINICS ......... 10

    D.  TURN KEY HEALTH CLINICS' RELEVANT POLICIES IN EFFECT AT THE
        CCDC IN JANUARY 2018 ...................................................................... 14

    E.  THE JANUARY 2018 INCIDENT ................................................................ 16

**III.**  **STANDARD OF DECISION** .............................................................................. **16**

**IV.**  **ARUGMENTS AND AUTHORITIES** ............................................................... **17**

**PROPOSITION ONE: THE COURT SHOULD GRANT DEFENDANT
AMASON JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S
*MONELL* WRITTEN-POLICY CLAIMS** .................................................................. **18**

    A.  THE COUNTY'S WRITTEN POLICIES COMPLIED WITH CONSTITUTIONAL
        STANDARDS .............................................................................................. 19

    B.  THE COUNTY'S WRITTEN POLICIES DID NOT CAUSE KESSEE'S
        DEATH ...................................................................................................... 22

    C.  THE COUNTY'S POLICIES WERE NOT MAINTAINED WITH
        DELIBERATE INDIFFERENCE ...................................................................... 23

    D.  THE OFFICERS INVOLVED COMMITTED NO UNDERLYING
        CONSTITUTIONAL VIOLATION .................................................................. 27

**PROPOSITION TWO: THE COURT SHOULD GRANT DEFENDANT AMASON JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S** *MONELL* **"FAILURE-TO-TRAIN" CLAIMS** ........................................................... 28

    A.    THE COUNTY DID NOT FAIL TO TRAIN THE OFFICERS INVOLVED ............ 29

    B.    THE COUNTY'S TRAINING DID NOT CAUSE KESSEE'S DEATH ................. 30

    C.    THE COUNTY DID NOT EXHIBIT DELIBERATE INDIFFERENCE IN TRAINING .................................................................................................. 31

    D.    THE COUNTY CANNOT BE LIABLE FOR FAILURE-TO-TRAIN WHERE THERE IS NO UNDERLYING CONSTITUTIONAL VIOLATION ....................... 33

    E.    THE COUNTY CANNOT BE LIABLE FOR FAILURE-TO-TRAIN WHERE THERE IS NO CLEARLY ESTABLISHED RIGHT ON WHICH OFFICERS CAN BE TRAINED ........................................................... 34

**IV.**    **CONCLUSION** ................................................................................... 35

**CERTIFICATE OF SERVICE** .................................................................... 37

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*A.M. v. Holmes*,
   880 F.3d 1123 (10th Cir. 2016) ................................................................... 35

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ........................................................................... 16, 17

*Anglin v. City of Aspen, Colo.*,
   552 F. Supp. 2d 1205 (D. Colo. 2008) ......................................................... 25

*Archuleta v. Correctional Healthcare Mgmt., Inc.*,
   No. 08-CV-2466-REB-BNB, 2009 WL 1292838 (D. Colo. May 8, 2009) ................. 24

*Arocho v. Nafziger*,
   367 F. App'x. 942 (10th Cir. 2010) ............................................................. 25

*Arrington-Bey v. City of Bedford Heights, Ohio*,
   858 F.3d 988 (6th Cir. 2017) ................................................................ 34, 35

*Barney v. Pulsipher*,
   143 F.3d 1299 (10th Cir. 1998) ............................................................. 19, 31

*Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*,
   520 U.S. 397 (1997) ................................................................... 23, 28, 35

*Brumfield v. Hollins*,
   551 F.3d 322 (5th Cir. 2008) .................................................................... 21

*Bryson v. City of Oklahoma City*,
   627 F.3d 784 (10th Cir. 2010) .............................................................. 28, 30

*Calhoun v. Ramsey*,
   408 F.3d 375 (7th Cir. 2005) .................................................................... 24

*Cardenas v. Lee County, Tx.*,
   569 F. App'x. 252 (5th Cir. 2014) ............................................................. 22

*Carr v. Castle*,
   337 F.3d 1221 (10th Cir. 2003) ................................................................. 28

*Christensen v. Park City Mun. Corp.*,
   554 F.3d 1271 (10th Cir. 2009) ............................................................ 20, 22

*City of Canton v. Harris*,
   489 U.S. 378 (1989) ............................................................................. 33

*Connick v. Thompson*,
   563 U.S. 51 (2011) ..................................................................... 30, 31, 33

*Contreras on behalf of A.L. v. Dona Ana Cty. Bd. of Cty. Comm'rs*,
   965 F.3d 1114 (10th Cir. 2020) ............................................................ 34, 35

*Cox v. Glanz*,
    800 F.3d 1231 (10th Cir. 2015) ...................................................................... 34

*Crowson v. Washington Cty. Utah*,
    983 F.3d 1166 (10th Cir. 2020) .................................................. 20, 24, 27, 34

*Daniel v. Cook County*,
    833 F.3d 728 (7th Cir. 2016) ......................................................................... 24

*Domino v. Tex. Dep't of Criminal Justice*,
    239 F.3d 752 (5th Cir. 2001) ......................................................................... 31

*Ernst v. Creek Cty. Pub. Facilities Auth.*,
    No. 14-CV-504-GKF-PJC, 2016 WL 4442803 (N.D. Okla. Aug. 22, 2016)............... 25

*Farmer v. Brennan*,
    511 U.S. 825 (1994)....................................................................................... 20

*Gordon v. Cty. of Orange*,
    888 F.3d 1118 (9th Cir. 2018) ....................................................................... 20

*Gose v. Bd. of Cty. Comm'rs. of Cty. of McKinley*,
    778 F.Supp.2d 1191 (D.N.M. 2011)................................................................ 30

*Graves v. Thomas*,
    450 F.3d 1215 (10th Cir. 2006) ..................................................................... 24

*Hayes v. Snyder*,
    546 F.3d 516 (7th Cir. 2008) ......................................................................... 26

*Hines v. Anderson*,
    547 F.3d 915 (8th Cir. 2008) ......................................................................... 21

*Houston v. Reich*,
    932 F.2d 883 (10th Cir. 1991) ....................................................................... 28

*Jackson v. Fair*,
    856 F.2d 811 (1st Cir. 1988)........................................................................... 20

*Johnson v. Doughty*,
    433 F.3d 1001 (7th Cir. 2006) ....................................................................... 26

*Jones v. Barber*,
    No. 17-CV-7879, 2020 WL 1433811 (N.D. Ill. Mar. 24, 2020) ...................... 24

*Keehner v. Dunn*,
    409 F.Supp.2d 1266 (D. Kan. 2005)............................................................... 30

*Keith v. Koerner*,
    843 F.3d 833 (10th Cir. 2016) ....................................................................... 28

*Key v. McLaughlin*,
    No. 10-CV-103-WJM-CBS, 2013 WL 1507950 (D. Colo. Mar. 19, 2013)................. 25

*Lance v. Morris*,
    985 F.3d 787 (10th Cir. 2021) ....................................................................... 31, 32, 33

*Lewis v. City of West Palm Beach, Fla.*,
    561 F.3d 1288 (11th Cir. 2009) ................................................................................ 33

*Lopez v. LeMaster*,
    172 F.3d 756 (10th Cir. 1999) ......................................................................... 23, 28

*Meloy v. Bachmeier*,
    302 F.3d 845 (8th Cir. 2002) ................................................................................... 26

*Monell v. Dep't of Soc. Servs.*,
    436 U.S. 658 (1978) ................................................................................................ 20

*Murphy v. City of Tulsa*,
    950 F.3d 641 (10th Cir. 2019) ......................................................................... 29, 30

*Myers v. Bd. of Cty. Comm'rs. of Okla. Cty.*,
    151 F.3d 1313 (10th Cir. 1998) ............................................................................... 29

*Plumhoff v. Rickard*,
    572 U.S. 765 (2014) ................................................................................................ 35

*Quintana v. Santa Fe Cty. Bd. of Commissioners*,
    973 F.3d 1022 (10th Cir. 2020) ............................................................................... 19

*Rice ex rel. Rice v. Corr. Med. Servs.*,
    675 F.3d 650 (7th Cir. 2012) ................................................................................... 26

*Riggins v. City of Indianola, Mississippi*,
    196 F. Supp. 3d 681 (N.D. Miss 2016) ................................................................... 21

*Rivers v. Alderden*,
    2006 WL 686568 (D. Colo. Mar. 17, 2006) ........................................................... 30

*Roberts v. Jackson Hole Mtn. Resort Corp.*,
    884 F.3d 967 (10th Cir. 2018) ......................................................................... 17, 18

*Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins. Co.*,
    960 F.3d 1255 (10th Cir. 2020) ............................................................................... 16

*Russell v. Sheffer*,
    528 F.2d 318 (4th Cir. 1975) ................................................................................... 21

*Schneider v. City of Grand Junction Police Dep't*,
    717 F.3d (10th Cir. 2013) ............................................................................... 19, 31

*Smith v. Sangamon Cty. Sheriff's Dep't.*,
    715 F.3d 188 (7th Cir. 2013) ................................................................................... 27

*Spruill v. Gillis*,
    372 F.3d 218 (3d Cir. 2004) ........................................................................... 25, 26

*Stone v. Porter Cty. Sheriff's Dep't.*,
  No. 2:14-CV-287, 2017 WL 4357453 (N.D. Ind. Sept. 29, 2017) ................................ 27

*Strain v. Regalado*,
  977 F.3d 984 (10th Cir. 2020) .................................................................................. 23

*Szabla v. City of Brooklyn Park*,
  486 F.3d 385 (8th Cir. 2007) ................................................................... 20, 22, 35

*Taylor v. Barkes*,
  575 U.S. 822 (2015) ................................................................................................ 34

*Thomson v. Salt Lake County*,
  584 F.3d 1304 (10th Cir. 2007) ........................................................................ 27, 33

*Tivis v. City of Colorado Springs*,
  No. 19-CV-867-KMT, 2020 WL 116842 (D. Colo. Mar. 11, 2020) .......................... 28

*Townes v. City of New York*,
  176 F.3d 138 (2d Cir. 1999) ................................................................................... 34

*Walker v. New York*,
  974 F.2d 293 (2d. Cir. 1992) ............................................................................ 32, 33

*Waller v. City and Cty. of Denver*,
  932 F.3d 1277 (10th Cir. 2019) ....................................................................... 28, 31

*Wray v. City of New York*,
  490 F.3d 189 (2d. Cir. 2007) .................................................................................. 30

## **Statutes**

42 U.S.C. § 1983 ........................................................................................................... 1

## **Rules**

Fed. R. Civ. P. 56(a) ................................................................................................ 1, 16

## <u>INDEX OF EXHIBITS</u>

Defendants Chris Amason, in his official capacity, Todd Gibson, Zackery Andrews, Cody Barr and Stacy Shifflett have filed as Document No. 235 an Appendix of Exhibits for use in all Defendants Motions for Summary Judgment and Briefs in Support, filed concurrently. The following exhibits are listed in that Appendix in the order below, with their docketing number set out next to the exhibit number. The brief will refer to the exhibits by their name and docketing number.

Exhibit 1 - Brown Body Cam Video (filed conventionally and under seal)

Exhibit 2 - Jail Intake Video, Clip 1 (filed conventionally and under seal)

Exhibit 3 - Processing Corridor Video, Clip 2 (filed conventionally and under seal)

Exhibit 4 - Processing Corridor Video, Clip 4 (filed conventionally and under seal)

Exhibit 5 - Processing Corridor Video, Clip 5 (filed conventionally and under seal)

Exhibit 6 - Pad A, Clip 3 (filed conventionally and under seal)

Exhibit 7 - Affidavit of Andrews

Exhibit 8 - Deposition of Barr

Exhibit 9 - Deposition of Gibson

Exhibit 10 Deposition of Andrews

Exhibit 11 Deposition of Cooper

Exhibit 12 Deposition of Carter

Exhibit 13 - Deposition of Shifflett

Exhibit 14 - Deposition of Rickert

Exhibit 15 - Deposition of Brown

Exhibit 16 - Deposition of Jobin

Exhibit 17 - Deposition of Reames

Exhibit 18 - Deposition of Roscoe

Exhibit 19 - Deposition of Prevot

Exhibit 20 - Policy Manual Table of Contents (CCSO 0300-0304) (filed under seal)

Exhibit 21 - Policy 3.01 (CCSO 0375-0377) (filed under seal)

Exhibit 22 - Policy 3.02 (CCSO 0378-0379) (filed under seal)

Exhibit 23 - Policy 3.15 (CCSO 407-408) (filed under seal)

Exhibit 24 - Policy 4.15 (CCSO 0464-0465) (filed under seal)

Exhibit 25 - Policy 6.03 (CCSO 0521-0522) (filed under seal)

Exhibit 26 - Policy 6.05 (CCSO 0524-0525) (filed under seal)

Exhibit 27 - Policy 8.03 (CCSO 0547-0548) (filed under seal)

Exhibit 28 - Policy 8.05 (CCSO 0552-0553) (filed under seal)

Exhibit 29 - Policy 8.06 (CCSO 0554-0555) (filed under seal)

Exhibit 30 - Policy 8.07 (CCSO 0556-0557) (filed under seal)

Exhibit 31 - Sight Check Log (CCSO 0065)

Exhibit 32 - Turn Key Agreement (TK 021-030) (filed under seal)

Exhibit 33 - ME Report (Kessee 2150-2151, 2155) (filed under seal)

Exhibit 34 - Dept. of Health Records (DOH 001-007)

Exhibit 35 - Expert Report of Jeffrey Carter

Exhibit 36 - Turn Key Policies and Procedures (TK P&P 000001 – 000051) (filed under seal)

Exhibit 37 - Declaration of Wheeler

Exhibit 38 - Declaration of Keller

Exhibit 39 – Policy 3.03 (CCSO 0380-0381)

**MOTION FOR SUMMARY JUDGMENT OF DEFENDANT AMASON
AND BRIEF IN SUPPORT**

COMES NOW Defendant Chris Amason, in his official capacity, ("County")[1] and pursuant to Fed. R. Civ. P. 56(a) and LCvR56.1, moves for an Order from this Court granting him summary judgment on all of Plaintiff Thompson's claims against him. In support thereof, Defendant Amason submits the following brief.

## I.    INTRODUCTION

This action arises under 42 U.S.C. § 1983 for the alleged denial of medical care during the incarceration of Marconia Kessee ("Kessee") at the Cleveland County Detention Center ("CCDC") arising out of his death on January 16, 2018. Kessee was 35 years old and had an inordinately lengthy history of drug use and abuse. In the few years before his death, Kessee had tested positive for methamphetamine, cocaine, PCP, cannabis, opioids, barbiturates and other prescription drugs. Kessee was a frequent flyer in emergency rooms throughout the Oklahoma City metropolitan area where he repeatedly asked for specific narcotic medications such as Dilaudid, Norco, Lortab, and Percocet. If he was refused his drug of choice, Kessee would call an ambulance to take him to another ER where he would feign or exaggerate his condition and again request highly addictive medications by name.

Kessee, who was transient at the time of his death, had also experienced mental health issues since he was a child and was diagnosed with bipolar disorder, schizophrenia, post-traumatic stress disorder, and attention deficit disorder. Kessee had been prescribed a plethora of medications for these and other psychiatric conditions, like anxiety, paranoia,

---

[1] For ease, this brief will refer to Defendant Amason as "the County."

depression, etc., but he was not regularly compliant with his prescriptions. In fact, just a few months before his death, Kessee was observed crushing and snorting his Buproprion in an effort to get high. Kessee's psychiatric disorders, drug addiction, and drug abuse culminated in multiple suicide attempts or threats, including several threats that he would overdose on his mental health medications. The most recent of these suicide-by-overdose threats was just the day before his death.

Kessee was in the CCDC only approximately two hours on that day on January 16, 2018 he died from an unforeseen cardiac event related to this chronic and acute abuse of prescription and illegal drugs. The Medical Examiner performed an autopsy and determined the cause of death was "Acute Bupropion, Methamphetamine, and Atomoxetine Toxicity" and the manner was "accident." The OSBI and Department of Health investigated the death of Kessee. The CCDC was found to be in substantial compliance with the Oklahoma Jail Standards and no deficiencies were noted. On top of this, the CCDC maintained a sterling record before Kessee's death. The undisputed facts show the County maintained CCDC policies and practices requiring fifteen-minute sight checks, observing for presence, breathing, movement, or obvious physical distress (which the officers did). Moreover, the undisputed facts show no one affiliated with the County was aware of any issue that would have put the County on notice that its CCDC policies could lead to unconstitutional outcomes. Commensurate with these policies, the County provided detailed training to its detention officers in which officers were taught to monitor inmates consistent with CCDC policy and practice.

In the same vein, the undisputed facts show no one affiliated with the County was

aware of any issue that would have put the County on notice that its training could lead to unconstitutional outcomes. Case in point: *six days* before the incident occurred, the Oklahoma State Department of Health informed then-Sheriff Todd Gibson that the CCDC had no deficiencies and the facility was in substantial compliance with the Oklahoma Jail Standards. To put it simply, no known CCDC policy or practice caused Kessee's death. The Court should so hold and enter summary judgment in Sheriff Amason's favor.

## II.   STATEMENT OF UNDISPUTED FACTS

### A.   THE COUNTY'S RELEVANT POLICIES AND PRACTICES IN EFFECT IN JANUARY 2018.

1.      The Cleveland County Detention Center maintains a policy that guarantees "every new intake to the facility will be given a medical and mental health screening to detect the need for medical/mental health care including medications and emergency treatment." [Exh 22, CCDC Policy No. 3.02, CCSO 0378-0379]. The intake-screening policy, however, also requires officers to call for emergency assistance and to secure the inmate if, at any time during in-processing, the inmate attempts to harm themselves. [*Id*. at CCSO 0379]. The policy requires that the detention officer or officers secure the inmate to make sure they cannot injure themselves further. Once the inmate is secure, medical staff attends to the inmate's needs. [*Id*.] This policy complied with national standards as well as the Oklahoma Jail Standards. [Exh. 35, Expert Report of Jeffrey S. Carter, ¶ 106, pg. 23].

2.      If an arrestee becomes uncooperative, combative, fighting or otherwise unable to provide reliable responses during the book-in process, CCDC policy allows medical staff to place the arrestee in a padded cell for a "cool down" period. [Exh. 22, CCDC Policy No. 3.03, CCSO 0380-0381]; [Exh. 23, CCDC Policy No. 3.15, CCSO

0407]. This cool-down period can include intoxicated or self-harming inmates. Any inmate exhibiting self-harm or suicidal tendencies that is placed in a padded cell for a "cool down" period is considered a "critical observation" inmate such that jailers are required to conduct sight checks approximately every 15 minutes. The inmates are given a suicide smock. [Exh. 9, Deposition of Todd Gibson, at 245:3-245:16; 246:7-248:5; 271:4-271:23; 278:1-278:23; 280:6-280:10]; [Exh. 23, CCDC Policy No. 3.15, CCSO 0407-0408]. Per the policy, if inmates are placed in padded cells (and consequently deemed critical observation), only medical staff can move them out. [*Id*].

3.      The "cool down" policy allows staff and medical officers to give an arrestee or an inmate the opportunity to calm down so they can more clearly answer intake questions. The health of the inmate or arrestee depends, in part, on their ability to give true answers to intake questions. [Exh. 12, Deposition of Jeffrey Carter, at 148:18-149:8, 149:14-150:10, 150:15-151:2]. It is within accepted national standards to place an arrestee or inmate in such a "cool down" cell while awaiting medical confirmation that they are fit to be incarcerated. [Exh. 12, Carter Depo, at 156:22-157:17, 157:23-158:11, 158:16-158:21, 159:14-159:25, 162:18-163:15, 164:5-164:7].

4.      The CCDC maintains a policy whereby officers are to conduct sight checks of inmates and inmate cells. [Exh. 24, CCDC Policy No. 4.15, CCSO 0464-0465]; [Exh. 37, Sworn Declaration of Jacob T. Wheeler, ¶ 8, pg. 2]. This general sight check policy requires officers to visually check bunks or cell areas. [*Id*. at 0464]. This policy requires officers to maintain their situational awareness at all times by noting anything unusual. [*Id*. at 0465]. This policy is maintained in order to help increase the safety of both the detention

officers and the inmates. [*Id*]. This policy complied with national standards as well as the Oklahoma Jail Standards. [Exh. 35, Carter Report, ¶ 106, pg. 23].

5.     The CCDC likewise maintains a policy whereby officers are to conduct sight checks of "critical observation" inmates approximately every fifteen minutes. [Exh. 23, Policy No. 3.15, CCSO 0407-0408]; [Exh. 37, Wheeler Declaration, ¶ 8, pg. 2]. In these "critical observation" sight checks, detention officers were to observe inmates for signs of life, including breathing, movement, and any outwardly obvious physical injury. [Exh. 9, Gibson Depo, 281:15-281:24]; [Exh. 37, Wheeler Declaration, ¶ 8, pg. 2]. The CCDC likewise maintained a practice whereby if a detention officer observed an inmate in distress, medical services would be called and medical care provided. [Exh. 9, Gibson Depo, 283:22-283:24; 286:3-286:13]. This policy is consistent with national standards and training provided by jail policy expert Jeffrey S. Carter, who testified that officers are trained to observe anything out of the ordinary. [Exh. 12, Carter Depo, at 28:12-29:12; 31:15-31:23, 52:17-53:7]. These policies and practices complied with national standards as well as the Oklahoma Jail Standards. [Exh. 35, Carter Report, ¶ 106, pg. 23]; [Exh. 12, Carter Depo, 52:22-53:7].

6.     CCDC policies require detention officers to escort inmates to medical staff and monitor inmates while they are being seen by the medical staff team. [Exh. 25, Policy No. 6.03, CCSO 0521-0522]. This policy complied with national standards as well as the Oklahoma Jail Standards. [Exh. 35, Carter Report, ¶ 106, pg. 23].

7.     CCDC policies require detention officers to "seek immediate medical attention" for any inmate who is injured in a housing pod. [Exh. 28, Policy No. 8.05, CCSO

0552-0553]. This policy, which is expressly designed to "avoid medical complications and undo pain and suffering," requires detention officers to immediately notify medical if staff become aware an inmate has been injured. [*Id*. at 0552]. If the detention officer finds the inmate unconscious or unresponsive, the detention officer must radio for immediate medical assistance. [*Id*]. This policy complied with national standards as well as the Oklahoma Jail Standards. [Exh. 35, Carter Report, ¶ 106, pg. 23].

8.      Todd Gibson was appointed interim Cleveland County Sheriff in October of 2017, just about three-and-a-half months before Kessee's incarceration. [Exh. 9, Gibson Depo, 19:25-20:1; 20:9-20:16]. He was then elected as Cleveland County Sheriff in November of 2018 and served until April of 2020. [Exh. 9, Gibson Depo, 20:1-20:5].

9.      When Gibson took over as Cleveland County Sheriff in October 2017, he reviewed the policies and procedures in place at the CCDC and signed them as effective under his administration. [Exh. 9, Gibson Depo, 75:20-75:25].

10.      Similarly, when Jacob Wheeler assumed the rule as CCDC Chief of Detention in December 2017, he reviewed the policies and procedures in place at the CCDC. Based on his ten-years of experience as a detention officer at the CCDC, Mr. Wheeler did not observe any issues in the policies he reviewed, which included Policy Nos. 3.01 (Admission of New Inmates), 3.02 (Initial Medical Screening), 3.03 (Booking Procedure), 3.15 (Critical Observation Inmates), and 4.15 (Sight Checks). [Exh. 37, Sworn Declaration of Jacob Wheeler, ¶ 5, pg. 1].

11.      Gibson expected CCDC staff knew the policies and procedures in place and relied on the CCDC executive staff to ensure that the jailers were adequately trained on the

policies and procedures. CCDC staff, in turn, had knowledge of the relevant policies and procedures, including how inmates are to be processed through the CCDC system and how sight checks are to be conducted. [Exh. 9, Gibson Depo, 75:14-75:19; 75:25-76:3].

12.    Neither Gibson nor other CCDC administrators, such as Wheeler, had knowledge of any deficiency as it related to the operation of the jail or any jailer prior to Kessee's incarceration. In fact, the Department of Health had recently conducted a jail inspection and informed Gibson six days before Kessee's incarceration that there were no deficiencies and the CCDC was in substantial compliance with the Oklahoma Jail Standards. [Exh. 9, Gibson Depo, 77:23-78:9]; [Exh. 34, Department of Health Jail Certification, 001-002]; [Exh. 37, Wheeler Declaration, ¶ 10, pg. 2].

13.    The CCDC policies met industry standards. [Exh. 12, Carter Depo, at 225:17-225:23].

14.    Throughout his tenure as Sheriff and, Gibson frequently visited the jail and monitored its operations. [Exh. 9, Gibson Depo, 118:17-118:22; 121:3-121:10]; [Exh. 37, Wheeler Declaration, ¶ 7, pg. 2].

15.    Gibson met with CCDC executive staff weekly and was provided overviews and updates of the jail's operations. The jail's executive staff never discussed any deficiencies or areas of correction with Gibson. [Exh. 9, Gibson Depo, 77:2-77:22; 78:5-78:9; 78:13-79:11; 108:19-109:2; 120:2-120:12; 128:8-128:25; 130:4-130:7]; [Exh. 37, Wheeler Declaration, ¶ 7, pg. 2].

B.    THE COUNTY'S RELEVANT TRAINING IN EFFECT IN JANUARY 2018.

16.    Pursuant to its policies, the CCDC provided extensive training to its jailers;

each jailer received an orientation and on-the-job training upon hire, and attended a basic jail academy, which included specific training regarding the Oklahoma Jail Standards. This training included training on conducting sight checks. [Exh. 9, Gibson Depo, 135:20-136:10; 200:7-200:19; 201:1-201:17; 203:14-203:19; 203:25-204:1]; [Exh. 8, Deposition of Cody Barr, at 16:9-16:21; 16:25-17:19, 27:18-27:21, 50:15-50:18]; [Exh. 10, Deposition of Zackery Andrews, 16:15-16:21; 17:2-17:7; 18:20-19:5; 97:5-97:15]; [Exh. 37, Wheeler Declaration, ¶ 8, pg. 2]; [Exh. 38, Sworn Declaration of Kyle Keller, ¶ 5, pg. 1]; [Exh. 35, Carter Report, ¶¶ 112-115, pgs. 24-25].

17.    The CCDC employed a training coordinator, Kyle Keller, who provided training to the detention officers. [Exh. 38, Keller Declaration, ¶ 5, pg. 1]; [Exh. 37, Wheeler Declaration, ¶ 8, pg. 2]. Officers also received field training via supervisors. [Exh. 12, Carter Depo, at 50:23-51:10, 51:18-51:20].

18.    In the CCDC-provided training, detention officers are taught that during sight checks they are to look for signs of life, including breathing and associated motions, such as the rise and fall of the chest, movement of limbs, torso, head or neck, and observation of other outward signs of physical or mental distress, such as obvious wounds or injuries or concerning inmate conduct. [Exh. 9, Gibson Depo, 281:15-281:24]; [Exh. 37, Wheeler Declaration, ¶ 8, pg. 2]; [Exh. 38, Keller Declaration, ¶ 5, pg. 1]; [Exh. 12, Carter Depo, 48:8-48:16]. The officer's general job in performing sight checks is to identify something that stands out. [Exh. 12, Carter Depo, at 81:23-81:25].

19.    In the CCDC-provided training, detention officers, are taught that if they observe that the inmate is in distress, they are to promptly advise medical staff. [Exh. 9,

Gibson Depo, 283:22-283:24; 286:3-286:13]; [Exh. 13, Deposition of Stacey Shifflett, at 275:8-275:13]; [Exh. 8, Barr Depo, at 20:6-20:8, 113:4-113:18]; [Exh. 10, Andrews Depo, at 18:18-18:21].

20.     The particular officers in question, those being Zackery Andrews, Cody Barr, and Stacey Shifflett, knew how to conduct sight checks and what to observe when performing sight checks. [Exh. 38, Keller Declaration, ¶ 6, pg. 1]; [Exh. 10, Andrews Depo, at 85:25-86:10, 93:1-93:6, 94:3-94:6. 101:1-101:3, 101:14-101:21]; [Exh. 13, Shifflett Depo, 115:3-116:9, 116:19-116:25, 119:8-119:18, 112:20-113:8]; [Exh. 8, Barr Depo, 32:7-32:13, 34:15-34:21].

21.     The particular officers in question knew that if they observed an inmate they believed were in need of medical attention, they would take that inmate to medical staff. [Exh. 13, Shifflett Depo, at 275:8-275:13]; [Exh. 8, Barr Depo, at 20:6-20:8].

22.     As detention staff were not medical professionals, the CCDC also provided them training in First Aid and CPR. [Exh. 8, Barr Depo, at 49:20-49:24, 91:4-91:6, 93:1-93:3]; [Exh. 13, Shifflett Depo, at 76:17-76:22, 271:11-272:10, 277:7-277:9, 285:16-285:22]; [Exh. 10, Andrews Depo, at 76:13-76:17].

23.     The CCDC staff's intake was in accordance with national standards. [Exh.12, Carter Depo, at 139:17-140:7, 224:20-225:7].

24.     The sight checks performed by the CCDC staff on Mr. Kessee were in compliance with the policies and procedures of the jail and in accordance with industry standard. [Exh. 9, Gibson Depo, 98:20-99:21; 101:4-101:18; 192:13-192:20; 193:6-193:20; 196:20-196:23]; [Exh. 12, Carter Depo, 225:9-225:13].

25.     Plaintiff's expert agrees that both Cleveland County and Turn Key Health Clinics had extensive policies and procedures designed to ensure the inmates were provided with safe, appropriate, and adequate medical care. [Exh. 18, Deposition of Lori Roscoe, at 153:10-153:25].

###     C.     THE COUNTY'S RELATIONSHIP WITH TURN KEY HEALTH CLINICS.

26.     When Gibson was appointed sheriff, Turn Key Health Clinics was already providing medical services to the jail under an existing contract with Cleveland County's Board of County Commissioners. [Exh. 9, Gibson Depo, 27:4-27:11; 28:5-28:17].

27.     The Agreement provides that Turn Key is the "sole supplier and/or coordinator of the health care delivery system at the CCDC." [Exh. 32, Turn Key Agreement, CCSO 0155]; [Exh. 11, Deposition of William Cooper, D.O., at 123:22-124:5].

28.     Pursuant to the Agreement, Turn Key provided a certified and trained Licensed Practical Nurse to be at the CCDC 24 hours a day, 7 days a week and constant on-call coverage by mid or advanced level providers. [Exh. 32, Turn Key Agreement, CCSO 0155]; [Exh. 11, Cooper Depo, 127:1-127:16].

29.     Services provided under this Agreement by Turn Key to the CCDC include performing medical screenings of inmates; pharmaceutical services; and appropriate timely response to medical needs and emergencies. [Exh. 32, Turn Key Agreement, CCSO 0155, 0158]; [Exh. 11, Cooper Depo, 125:6-125:17; 127:17-127:20; 128:4-128:12; 134:16-134:21].

30.     After taking office and prior to Kessee's incarceration in January 2018,

Gibson met with representatives from Turn Key to learn about their company, the services they provided and what other agencies they serviced. After this meeting, Gibson was confident that Turn Key provided the highest quality jail medical services and performed similar duties at the most reputable jails in Oklahoma. [Exh. 9, Gibson Depo, at 28:2-28:17; 30:2-31:17; 35:6-35:14; 42:3-42:21].

31.     Prior to Kessee's incarceration, Gibson also spoke to Turn Key's Chief Executive Officer, Flint Junod, via telephone regarding the services provided by Turn Key. [Exh. 9, Gibson Depo, at 45:21-46:14].

32.     Gibson also conducted internet research of Turn Key and its competitors to ensure it was a good fit for the CCDC. [Exh. 9, Gibson Depo, at 31:18-32:2].

33.     Gibson expected Turn Key to provide the highest quality and trained medical staff to work at the CCDC. [Exh. 9, Gibson Depo, at 64:13-64:21]. Gibson and the County relied upon Turn Key to set the practices, policies and expectations for the nursing staff and to take all actions necessary to provide medical treatment to inmates in the CCDC. Gibson and the County also relied on Turn Key personnel to determine whether an inmate needs additional treatment during the intake process. [Exh. 9, Gibson Depo, at 66:5-66:16]; [Exh. 12, Carter Depo, at 146:6-146:21]. Such reliance is on medical staff for recognition, screening, and treatment is reasonable and in accord with nationally accepted jail practices. [Exh. 35, Carter Report, ¶ 95, pg. 21]; [Exh.12, Carter Depo, 170:14-171:8].

34.     Gibson and other Cleveland County personnel expected that the medical staff were trained to provide medical services in compliance with state and federal standards; that they would ensure the health, safety, and well-being of inmates in the CCDC; and that

they would address any identified medical needs. [Exh. 9, Gibson Depo, at 87:13-87:22; 88:1-88:7; 89:20-89:21]; [Exh. 11, Cooper Depo, 138:5-138:10]; [Exh. 10, Andrews Depo, 73:25-74:5].

35.     Clayton Rickert completed nursing school; passed his nursing certification examination; held an unlimited LPN license; and had experience working in jails as an LPN. Nurse Rickert was trained to do a medical screening. [Exh. 11, Cooper Depo, 128:13-129:22]; [Exh. 12, Carter Depo, at 46:17-46:21].

36.     Sheriff Gibson did not know Rickert personally, but knew that there was a nurse at the jail who had been certified as a nurse and vetted by Turn Key and expected he would comply with his employer's policies. [Exh. 9, Gibson Depo, 63:9-63:19; 145:12-145:16; 182:5-182:8; 266:20-266:24].

37.     No one with Turn Key ever advised Gibson that Rickert had any deficiency in his job performance as an LPN at the jail. [Exh. 11, Cooper Depo, at 129:23-130:4, 139:8-139:13].

38.     Rickert had never been disciplined while working at CCDC for any improper medical care or medical treatment to an inmate or for not providing medical care or treatment to an inmate. [Exh. 14, Deposition of Clayton Rickert, at 234:13-234:21].

39.     No one with Turn Key advised County personnel that Rickert had any deficiency in his job performance as an LPN at the jail. [Exh. 11, Cooper Depo, 129:23-130:4; 139:8-139:13]; [Exh. 37, Wheeler Declaration, ¶ 11, pg. 2]; [Exh. 38, Keller Declaration, ¶ 7, pg. 2].

40.     Prior to Kessee's incarceration, County personnel had no knowledge of any

deficiencies or failures of Turn Key in providing medical services at the CCDC. Gibson, for his part, had no concerns regarding the operation of the CCDC. [Exh. 9, Gibson Depo, at 41:1-42:22; 69:11-69:12; 77:23-78:4; 168:7-168:22]; [Exh. 37, Wheeler Declaration, ¶ 11, pg. 2]; [Exh. 38, Keller Declaration, ¶ 7, pg. 2]; [Exh. 12, Carter Depo, at 94:9-94:10].

41.     Similarly, Turn Key never advised Gibson or anyone with Cleveland County that it was unable to perform its duties or that it had any deficiency in providing its medical services as outlined in the Agreement and as relied upon by the County. [Exh. 11, Cooper Depo, at 125:22-126:6; 127:22-128:3; 134:2-134:7; 137:6-137:24]; [Exh. 37, Wheeler Declaration, ¶ 11, pg. 2]; [Exh. 38, Keller Declaration, ¶ 7, pg. 2].

42.     Prior to Kessee's incarceration, Gibson and other County personnel had no knowledge that Rickert would perform his medical duties at the CCDC inadequately. [Exh. 9, Gibson Depo, at 147:13-147:15]. Turn Key never advised Gibson or anyone at Cleveland County that Rickert had any deficiency in performing his assigned duties. [Exh. 11, Cooper Depo, at 126:7-126:21]; [Exh. 37, Wheeler Declaration, ¶ 11, pg. 2]; [Exh. 38, Keller Declaration, ¶ 7, pg. 2].

43.     When Gibson observed Rickert's response to finding Kessee unresponsive and did not believe it was satisfactory, Gibson promptly took action in removing him from working at the jail. [Exh. 9, Gibson Depo, at 145:17-145:20; 178:8-178:11; 218:8-218:17].

44.     Plaintiff's own expert witness testified it is reasonable for a sheriff to rely on the promises made by Turn Key in its contract to provide medical services to the inmates in the CCDC. [Exh. 19, Deposition of Robert Prevot, at 144:21-145:8].

D.   **TURN KEY HEALTH CLINICS' RELEVANT POLICIES IN EFFECT AT THE CCDC IN JANUARY 2018.**

45.   As part of its services to clients Turn Key Health Clinics maintained a set of policies and procedures governing their provenance of medical care at the contracted-for facility. [Exh. 36, Turn Key Policies and Procedures, TK P&P 000007]; [Exh. 11, Cooper Depo, at 41:3-41:17]. Turn Key and the CCDC maintained a contract by which these policies would apply at the CCDC. [Exh. 32, Turn Key Agreement, CCSO 0155]; [Cooper Depo, at 137:16-137:18]. Turn Key represented to CCDC personnel that these policies were qualified to run a medical unit in a jail. [Exh. 11, Cooper Depo, at 137:16-137:18].

46.   Turn Key policy declared that clinical decisions and actions regarding health care provided to inmates to meet serious medical needs were solely the responsibility of qualified health care professionals. [Exh. 32, Turn Key Policy J-5, TK P&P 000008]; [Exh. 11, Cooper Depo, 115:11-115:16].

47.   Turn Key policy declared that health-trained jail staff or qualified health care personnel screened inmates or arrestees upon arrival. [Exh. 32, Turn Key Policy J-9, TK P&P 000013]. A qualified health care personnel would review any screenings completed by correctional staff. [*Id*. at 000014]. The policy set forth items about the inmate's condition that the reception personnel should identify. [*Id*. at 000014-15].

48.   Turn Key policy required health care personnel to make disposition recommendations for inmate housing, which could include placing patients in mental health/suicide observation or medical housing/observation for patients with intoxication or possible drug withdrawal. [Exh. 32, Turn Key Policy J-9, TK P&P 000015].

49.   Turn Key policy stated that inmates can request health care on a daily basis.

[Exh. 32, Turn Key Policy J-11, TK P&P 000016]. This policy set forth the procedure for inmates submitting requests, including that any request which suggested an emergent problem shall receive immediate attention. [*Id*].

50.    Turn Key policy stated that inmates have access to mental health care as clinically indicated. These mental health needs were addressed on-site or by referral to appropriate off-site psychiatric care as required. [Exh. 32, Turn Key Policy J-13, TK P&P 000020]. This policy stated that inmates are screened for mental health problems on intake. [*Id*. at 000021].

51.    Turn Key policy provided that on-site emergency first-aid and crisis intervention services are available for medical, behavioral, and dental needs 24 hours per day. [Exh. 32, Turn Key Policy J-16, TK P&P 000026]. This policy provided a procedure for responding to a notification of emergencies for health personnel. [*Id*. at 000026-28].

52.    Turn Key policy provided that all aspects of inmate care are coordinated and monitored from admission to discharge. [Exh. 32, Turn Key Policy J-20, TK P&P 000038-39].

53.    Turn Key policy stated that inmates are evaluated for the risk of alcohol and/or drug intoxication and withdrawal, and provided treatment if clinically indicated. [Exh. 32, Turn Key Policy J-22, TK P&P 000040]. The policy required inmates who were at risk for progression to more severe levels of intoxication or withdrawal to be kept under constant observation by qualified health care professionals or health-trained correctional staff. [*Id*. at 000040-42].

54.    Turn Key policy required staff to recognize verbal and behavioral cues that

indicate potential suicide and how to respond. [Exh. 32, Turn Key Policy J-26, at 000043-45]. The policy required that qualified medical personnel be notified that any inmate is potentially suicidal. [*Id*]. These inmates were then kept under close observation by correctional or medical staff. [*Id*]. The policy also noted that Turn Key staff should follow the facility's policies for suicidal or observation patient housing. [*Id*. at 000044]. The policy also required inmates to be observed every fifteen minutes. [*Id*. at 000045].

### E.   THE JANUARY 2018 INCIDENT.

55.   Regarding facts specific to the January 2018 incident involving Marconia Kessee, Defendant Amason adopts and incorporates the statements of undisputed facts contained in the Motions for Summary Judgment of Defendant Zackery Andrews, Defendant Stacey Shifflett, and Defendant Cody Barr. *See* Mots., filed concurrently.

## III.   STANDARD OF DECISION.

Per Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, *Inc*., 477 U.S. 242, 250 (1986) A mere "scintilla" of evidence will not avoid summary judgment. *Rocky Mountain Prestress*, *LLC v. Liberty Mut. Fire Ins. Co*., 960 F.3d 1255, 1259 (10th Cir. 2020) (citation omitted). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmovant. *Anderson*, 477 U.S. at 251. That said, "[i]f the evidence is merely colorable…or is not significantly probative…summary judgment may be

granted." *Id*. at 249. In that vein, "unsupported and conclusory statements…even from experts, are insufficient to defeat summary judgment. *Roberts v. Jackson Hole Mtn. Resort Corp*., 884 F.3d 967, 977 (10th Cir. 2018).

## IV.   <u>ARGUMENTS AND AUTHORITIES</u>

Plaintiff Thompson makes the following claims against the County: (1) a *Monell* written-policy claim, asserting the County maintained constitutionally-deficient policies and procedures or outright lacked the same, resulting in a denial of medical care, and (2) a *Monell* failure-to-train/supervise claim, resulting in a denial of medical care. *See* Pl.'s Second Am. Compl., Doc. 106, ¶¶ 332-351, pgs. 61-65. The gist of Thompson's complaint is that:

- the County's intake policy permitted officers to put Kessee in a padded holding cell before completing a medical intake;

- the County lacked language in its sight check policy telling officers precisely how to conduct a sight check;

- the County did not train its officers to recognize specific signs of withdrawal and/or intoxication, instead relying upon medical staff to so recognize; and

- the County did not train its officers in how to conduct sight checks.

Some of these arguments are factually unfounded or lack context, while others are factually correct but perfectly permissible under the U.S. Constitution. *First*, on Thompson's written-policy *Monell* claim, the undisputed facts show the County's policies and practices were constitutionally valid; they did not cause Kessee's death; no officers nor policymakers disregarded a known risk to Kessee's constitutional rights; and no officer committed an underlying constitutional violation in acting on the policies' requirements.

*Second*, on Thompson's failure-to-train *Monell* claim, the undisputed facts show the Court trained the responding officers on the relevant County policies and practices; no officers nor policymakers disregarded a known risk to Kessee's constitutional rights; no officers, separately or together, engaged in an underlying constitutional violation; and no clearly-established right existed on which the County could train its officers. For these reasons, the Court should grant the County judgment as a matter of law.

## PROPOSITION ONE: THE COURT SHOULD GRANT DEFENDANT AMASON JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S WRITTEN-POLICY CLAIM.

Thompson's first claim against the County is that it maintained deficient policies and procedures that led to Kessee's death. *See* SAC, Doc. 109, ¶¶ 334-336, pg. 62. As discussed above, the factual gist of this claim is that Thompson blames the County's written policy for permitting officers to place Kessee in a holding cell before completing a medical intake. Thompson also complains that the County's sight check policy does not contain specific language telling officers how to conduct a sight check. *Id*.

But written policies must only vindicate the baseline constitutional right at issue, and the undisputed facts show that both the County and Turn Key—the healthcare entity to which the County delegated responsibility for medical services at the CCDC— maintained specific written policies protecting Kessee's right to medical care. Further, the existence of a facially constitutional policy limits Thompson's ability to prove causation to a set of circumstances on which she cannot prevail. Finally, Thompson has no evidence that County personnel knew of existing issues with their policies or Turn Key's policies such that Thompson could establish the County acted with deliberate indifference.

The Court is undoubtedly familiar with the standards governing *Monell* claims and they do not bear repeating at length; put simply, "[a] municipality is liable only when the official policy [or custom] is the moving force behind the injury alleged." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). To establish municipal liability, therefore, plaintiff must show (1) an official policy or custom, (2) causation, and (3) state of mind. *Quintana v. Santa Fe Cty. Bd. of Commissioners*, 973 F.3d 1022, 1034 (10th Cir. 2020). On the third prong—deliberate indifference—the plaintiff must then show 'that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury.'" *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d at 769 (10th Cir. 2013) (citation omitted).

## A. THE COUNTY'S WRITTEN POLICIES COMPLIED WITH CONSTITUTIONAL STANDARDS.

Thompson claims the County maintained unconstitutional written policies and, via discovery, appears to take issue with the County's policy that allows individuals to be placed in holding cells before a medical screen and/or the County's sight-check policy that does not list out specific physiological factors for which officers should look when conducting a sight-check. *See* Doc. 106. ¶¶ 332-351, pgs. 61-65. As the County will show, however, these complaints do not reveal constitutionally deficient written policies. Turning to the specifics: a written-policy claim can take two forms, both of which the County assumes are at play. It can either be a claim that the policy is facially unconstitutional, or a claim that a policy should contain items it does not. The County addresses the existing policies here, and the failure-to-promulgate claim in Subsection C ("The County's Policies Were Not Maintained With Deliberate Indifference"), because the failure-to-promulgate

claim involves the deliberate-indifference standard.

A plaintiff may sue a municipality under § 1983 by alleging the municipality implemented or executed an unconstitutional written policy statement, ordinance, regulation, or decision. *Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1279 (10th Cir. 2009) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)); *see also Crowson v. Washington Cty. Utah*, 983 F.3d 1166, 1184 (10th Cir. 2020). A plaintiff need not show that the policy promulgated by the municipality is unconstitutional in every situation; proof that the policy, or failure to so promulgate, is unconstitutional as applied in the plaintiff's case will suffice. *Id.* at 1280. But no municipal liability lies when an officer enforces a constitutional ordinance in an unconstitutional manner unless the municipality affirmatively sanctioned that conduct, some other municipal policy (such as failure to train) was causally responsible, or the decision to inflict the constitutional injury was made by an official-policy maker. *Id.* (citing *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 390-91 (8th Cir. 2007)).

Here, there is *no* doubt the CCDC maintained express policies that guarded against violations of a pretrial detainee's right to medical care under the Fourteenth Amendment. The right itself, though indisputably fundamental, is limited; it entitles pretrial detainees like Mr. Kessee to a "minimum" standard of care consistent with that held for convicted prisoners, *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1122 (9th Cir. 2018), as the Constitution "does not mandate comfortable prisons." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). To that end, the Constitution requires only that prisoners receive adequate care; a prisoner is not guaranteed his choice of treatment. *See Jackson v. Fair*, 856 F.2d 811, 817

(1st Cir. 1988); *Russell v. Sheffer*, 528 F.2d 318, 318 (4th Cir. 1975). One circuit has even concluded that the right does not guarantee prisoners medical care commensurate with that enjoyed by civilian populations. *Hines v. Anderson*, 547 F.3d 915, 922 (8th Cir. 2008).

Whatever the detailed contours of the right to medical care are, it is clear the CCDC's and, by extension, Turn Key's policies protect it. The undisputed facts could not be more clear on this point. The County maintains a specific policy that establishes each inmate will receive a medical screening upon arrival, unless extenuating circumstances apply. [Fact 1]. The County likewise requires officers, via written policy, to conduct sight checks on all cells, and, more specifically, sight checks on inmates deemed "critical observation" because of their behavior. [Facts 4, 5]. Moreover, the County contracted with a medical provider, Turn Key, so that a certified and trained Licensed Practical Nurse was present at the CCDC 24 hours a day, seven days a week, with constant on-call coverage by mid- or advanced-level providers. [Facts 26-28]. Under the contract, Turn Key provided medical screenings, pharmaceutical services, and timely responses to medical needs and emergencies. [Fact 29]. And Turn Key itself maintained policies requiring health-trained staff to conduct medical screenings [Fact 44], to make recommendations for housing [Fact 45], and to provide on-site emergency first-aid and crisis intervention services [Fact 46].[2]

These detailed policies, based on their text, more than vindicate inmates' right to medical care. The Fifth Circuit, for example, found that a policy which guaranteed that

---

[2] To the extent Thompson argues that some of these policies were not written, it remains that the "validity of prison policies is not dependent on whether they are written or verbal. A policy is a policy…" *Brumfield v. Hollins*, 551 F.3d 322, 327 (5th Cir. 2008); *accord*. *Riggins v. City of Indianola, Mississippi*, 196 F. Supp. 3d 681, 605 (N.D. Miss 2016).

"emergency medical care is available twenty-four (24) hours a day" was sufficient, on summary judgment, to defeat an argument that the municipality had an express policy of denying medical care to inmates. *Cardenas v. Lee County, Tx.*, 569 F. App'x. 252, 255-56 (5th Cir. 2014). Based on that sole policy, it was "immediately clear that [plaintiff] could not establish that the County has an express policy of refusing medical care to inmates." *Id.* Just so here. The written policies of the CCDC, and its contracted-for medical provider Turn Key, show that the County values and safeguards inmate medical care, and should sustain a grant of summary judgment.

## B. THE COUNTY'S WRITTEN POLICIES DID NOT CAUSE KESSEE'S DEATH.

Because the County's medical-care policies (1) exist and (2) are facially constitutional, a "direct causal link" can only exist if the County affirmatively sanctioned an unconstitutional execution of the policy, some other municipal policy was causally responsible, or the decision to inflict the constitutional injury was made by an official-policy maker. *Christiansen*, 554 F.3d at 1280 (citing *Szabla*, 486 F.3d at 390-91). Here, Thompson's *Monell* written-policy claims fall flat again. *First*, the officers involved did not commit any underlying constitutional violation, so there was no unconstitutional act for the County to sanction. *See* Mots. for Summ. J. of Defendants Barr, Shifflett, and Andrews, filed concurrently. Moreover, it is undisputed that the officers acted within County policy and procedure. [Fact 24]. *Second*, Plaintiff Thompson has not identified any other alleged County policy that was causally responsible for Kessee's death aside from the ones discussed in this motion, and the undisputed facts show those alleged policies do not exist and did not cause any constitutional violation. *See* Proposition Two, *infra*.

*Third*, and finally, Thompson cannot claim that an official policy-maker made the decision to violate Kessee's rights. Under Oklahoma law, the Sheriff is the final policy-maker for the jail. *See Lopez v. LeMaster*, 172 F.3d 756, 763 (10th Cir. 1999). There is no evidence Mr. Gibson, the then-Cleveland County Sheriff, made a decision to inflict the constitutional injury, because Sheriff Gibson was not present at the CCDC on the night of Kessee's death. *See* Def. Gibson's Mot. for Summ. J, filed concurrently, at page 19. For those reasons, the Court should grant the County judgment as a matter of law on Thompson's *Monell* written-policy claim.

## C.   THE COUNTY'S POLICIES WERE NOT MAINTAINED WITH DELIBERATE INDIFFERENCE.

More reasons for summary judgment abound. In addition to the fact that the County's policies were constitutional and did not cause Kessee's injury, the County did not act with deliberate indifference to a substantial risk of harm such that it could incur *Monell* liability. As discussed above, state-of-mind is relevant to Thompson's written-policy claim for two reasons: First, in a *Monell* written-policy claim, the plaintiff must prove the County acted with whatever state-of-mind the underlying constitutional violation requires. *See Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 405 (1997). For Fourteenth Amendment denial of medical care claims, that is deliberate indifference. *Strain v. Regalado*, 977 F.3d 984, 989 (10th Cir. 2020). Second, Thompson alleges the County failed to act by not modifying or adding more detail to its written policies.[3] In the Tenth

---

[3] Thompson will likely argue the County should have modified the intake policies to disallow the "cool down" period, and added policy details about what physiological signs officers should look when doing sight checks. *See* Doc. 106, ¶¶ 332-351. But the failure to establish or implement certain policies must be "so pervasive that acquiescence on the part

Circuit, a "failure to promulgate" claim is viewed akin to a failure-to-act claim, *see Crowson*, 983 F.3d at 1166, and the failure-to-act species of *Monell* claims require plaintiff to show the municipality acted with deliberate indifference. *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (failure to act claims require application of deliberate indifference); *accord. Archuleta v. Correctional Healthcare Mgmt., Inc.* No. 08-CV-2466-REB-BNB, 2009 WL 1292838, at *2 (D. Colo. May 8, 2009) (citing *Graves* in applying deliberate indifference to a failure-to-promulgate policy allegation). Here, the undisputed evidence shows that neither the County nor Turn Key acted with deliberate indifference to a substantial risk of harm posed by the existing policies or practices at the CCDC.

The undisputed facts show that County ensured inmates' medical needs were taken care of through the contract with medical provider Turn Key. It is undisputed that then-Sheriff Gibson did his due diligence to ensure Turn Key was a reputable vendor. [Facts 26-34]. The County, vis-à-vis Sheriff Gibson, expected that Turn Key trained its staff pursuant to its policies and procedures and ensured its staff were qualified to do the functions of the job. [Facts 33-36]. It is undisputed that the County relied, reasonably, on Turn Key and its nurse to provide adequate medical care to inmates. [Fact 33]. The County expected, under

---

of policymakers was apparent and amounted to a policy decision." *Daniel v. Cook County*, 833 F.3d 728, 734 (7th Cir. 2016) (cite omitted). For that reason, "this method of alleging a *Monell* claim brings its own challenges." *Jones v. Barber*, No. 17-CV-7879, 2020 WL 1433811, at *5 (N.D. Ill. Mar. 24, 2020) When a plaintiff relies on a gap in policies to support his claims, "he must provide enough evidence...to permit an inference that the [entity] has chosen an impermissible way of operating." *Calhoun v. Ramsey*, 408 F.3d 375, 381 (7th Cir. 2005) (emphasis added). "A 'random event' confined to one person doesn't cut it." *Jones*, 2020 WL 1433811, at *5 (cite omitted). More to the point: "It is not enough to allege that there must be an unlawful policy because something bad happened to the plaintiff." *Id*.

Turn Key's nurse's license and credentials, as well as Turn Key's policies and representations, Turn Key would promptly attend to any inmate experiencing a medical emergency. [Facts 33-36, 44-51]. The record lacks *any* evidence suggesting County personnel had knowledge or reason to believe Turn Key and/or Nurse Rickert were unable to perform these functions, or that past instances at the CCDC suggested as much. Thompson's *own expert* agrees it was reasonable for the County to rely on Turn Key to provide medical care to inmates at the CCDC. [Facts 37-40, 42].

Case law throughout the Tenth Circuit affirms the County's reasonableness in relying on Turn Key and its medical staff. "A municipality that delegates the provision of medical care to a contractor is not considered to have demonstrated deliberate indifference to a prisoner's serious medical needs 'absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner...'" *Ernst v. Creek Cty. Pub. Facilities Auth.*, No. 14-CV-504-GKF-PJC, 2016 WL 4442803, at *8 (N.D. Okla. Aug. 22, 2016), aff'd, 697 F. App'x 931 (10th Cir. 2017) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)); *see also Arocho v. Nafziger*, 367 F. App'x. 942, 956 (10th Cir. 2010) ("The complaint bespeaks nothing more than a warden's reasonable reliance on the judgment of prison medical staff, which negates rather than supports liability." (emphasis in original); *Key v. McLaughlin*, No. 10-CV-103-WJM-CBS, 2013 WL 1507950, at *5 (D. Colo. Mar. 19, 2013) (explaining that "[a] correctional officer is generally entitled to rely upon the advice and course of treatment prescribed by medical personnel"); *Anglin v. City of Aspen, Colo.*, 552 F. Supp. 2d 1205, 1225 n.4 (D. Colo. 2008) ("As a non-medical professional, a reasonable law enforcement officer cannot be expected

to question the judgment of qualified medical professional absent some extraordinary circumstances, the nature of which the court cannot even conjecture at this point.").

Moreover, courts outside the Tenth Circuit agree. *See Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 676, 678-79 (7th Cir. 2012) ("When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention."); *Hayes v. Snyder*, 546 F.3d 516, 526-27 (7th Cir. 2008) (non-medical prison officials entitled to defer to the professional judgment of facility's medical officials on questions of prisoner's medical care); *Johnson v. Doughty*, 433 F.3d 1001, 1010-11 (7th Cir. 2006) (prison official may reasonably rely on the judgment of medical professionals); *Spruill*, 372 F.3d at 236 (where "a prisoner is under the care of medical experts...a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."); *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002) ("The law does not clearly require an administrator with less medical training to second-guess or disregard a treating physician's treatment decision.").

Here, it is undisputed that the County maintained an active contract with Turn Key to provide all aspects of medical care and services to the inmates at the CCDC. [Facts 26-29]. Before January 2018, neither then-Sheriff Gibson, or any other County personnel, were aware deficiencies in Turn Key's policies, in its ability to provide medical care, or in Rickert's performance as an LPN at the CCDC. [Facts 26-42]. The County reasonably and constitutionally relied on Turn Key's promises to provide constitutional healthcare to inmates at the CCDC. Plaintiff Thompson simply cannot contravene these undisputed facts.

The bottom line is that Thompson's policy complaints sound in negligence, not

constitutional liability. The Constitution does not impose liability for what policies *should* contain, which would be akin to an impermissible negligence claim for failure to have *more* or *better* policies, but whether the policy is unconstitutional or the County was deliberately indifferent in maintaining it. *See*, *e.g*., *Smith v. Sangamon Cty. Sheriff's Dep't*., 715 F.3d 188, 191 (7th Cir. 2013) ("Prison and jail officials are not … required to guarantee the detainee's safety. The existence of other better policies…does not necessarily mean the defendant was being deliberately indifferent"). After all, the Court is tasked with "deciding what is constitutional, not what is preferable." *See Stone v. Porter Cty. Sheriff's Dep't*., No. 2:14-CV-287, 2017 WL 4357453, at *6 (N.D. Ind. Sept. 29, 2017).

## D. THE OFFICERS INVOLVED COMMITTED NO UNDERLYING CONSTITUTIONAL VIOLATION.

Yet even if none of the above were true, and the County's written policies or failure to include more language in their sight check policy were unconstitutional in some form, it remains that in a *Monell* written-policy claim, a municipality cannot be liable for damages if its officers, with their independent acts taken together, committed no underlying constitutional violation. *Thomson v. Salt Lake County*, 584 F.3d 1304, 1322 (10th Cir. 2007); *see also Crowson*, 983 F.3d at 1191 (written-policy liability can lie absent an underlying constitutional violation only when the sum of actions violates the plaintiff's constitutional rights).

Here, *none* of the officers, individually or together, denied Kessee medical care nor possessed a constitutionally culpable state of mind. Thus, there is no underlying constitutional violation upon which Thompson can premise a municipal denial-of-medical care claim. For further argument, Defendant County adopts and incorporates the arguments

raised in Defendants Barr, Shifflett, and Andrews' Motions for Summary Judgment, filed concurrently. For that additional reason, the Court should grant the County judgment as a matter of law on Plaintiff Thompson's *Monell* written-policy claims.

**PROPOSITION TWO: THE COURT SHOULD GRANT DEFENDANT AMASON JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S MUNICIPAL "FAILURE-TO-TRAIN" CLAIMS**

Plaintiff Thompson's second claim against the County alleges that it failed to train or supervise[4] its officers by the County did not train its officers to recognize specific signs of withdrawal and/or intoxication, instead relying upon medical staff to so recognize; and the County did not train its officers in how to conduct sight checks. *See* SAC, Doc. 106.

To prove a failure-to-train claim, Thompson must show "there [was] essentially a complete failure to train, or training that [was] so reckless or grossly negligent that future misconduct [was] almost inevitable." *Keith v. Koerner*, 843 F.3d 833, 838-39 (10th Cir. 2016) (citing *Houston v. Reich*, 932 F.2d 883, 888 (10th Cir. 1991)). Thompson cannot prevail by alleging "general deficiencies" in a particular training program. *Id.* (citing *Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999)). Instead she "must identify a specific deficiency in the [entity's] training program closely related to his ultimate injury[.]" *Id.* She must also meet the stringent "deliberate indifference" standard of fault. *Waller v. City and Cty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) (*citing Bd. of Cty. Comm'rs v. Brown*, 520 U.S. at 410-12); *see also Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003).

---

[4] As the District of Colorado noted, "failures to train or supervise are so similar that they are discussed together and required the same elements." *Tivis v. City of Colorado Springs*, No. 19-CV-867-KMT, 2020 WL 116842, at *4 (D. Colo. Mar. 11, 2020) (citing *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010). For ease, the County will only reference failure to train here.

Given these requirements, Thompson must muster a significant amount of evidence to avoid summary judgment. She cannot. The undisputed facts show (1) the detention officers had adequate training when Kessee arrived on January 16, 2018; (2) the officers' training did not cause Kessee's injuries; (3) no officers nor policymakers disregarded a known risk to Kessee's constitutional rights; (4) no officer, separately or together, engaged in an underlying constitutional violation; and (5) there is no clearly established right on which the County could train.

## A.    THE COUNTY DID NOT FAIL TO TRAIN THE OFFICERS INVOLVED.

Thompson's failure-to-train claim fails in the first instance. Here, the County gave its officers the policies, trained them on the policies, put officers through its Jail Academy, conducted in-service training. [Fact 16]. The County, in fact, specifically employed a training coordinator for the purposes of training the officers on sight checks. [Fact 17]. In the CCDC-provided training, detention officers are taught that during sight checks they are to look for signs of life, including breathing and associated motions, such as the rise and fall of the chest, movement of limbs, torso, head or neck, and observation of other outward signs of physical or mental distress, such as obvious wounds or injuries or concerning inmate conduct. [Fact 18]. And, notably, the relevant officers—including Defendants Andrews, Barr, and Shifflett, understood what the governing policies required. [Fact 20].

Authority for the County's conduct stems from court decisions throughout the Tenth Circuit and nationwide. *See*, *e.g.*, *Murphy v. City of Tulsa*, 950 F.3d 641, 654-655 (10th Cir. 2019) (no failure to train where evidence shows training materials were provided and training was conducted); *Myers v. Bd. of Cty. Comm'rs. of Okla. Cty.*, 151 F.3d 1313, 1318-

19 (10th Cir. 1998) (no failure to train where plaintiff did not present evidence that the county policy was deliberately indifferent to the alleged harm and the record showed the County presented evidence that officers received training in the specified area); *Gose v. Bd. of Cty. Comm'rs. of Cty. of McKinley*, 778 F.Supp.2d 1191, 1209-1210 (D.N.M. 2011) (no failure to train where, among other things, plaintiff did not present evidence of a uniform policy of not training officers in area of the alleged constitutional violation); *Rivers v. Alderden*, 2006 WL 686568, at *6-7 (D. Colo. Mar. 17, 2006) (unpublished) (granting summary judgment on a failure-to-train claim because there was no evidence the entity acted egregiously while training and no causal connection to an alleged violation); and *Keehner v. Dunn*, 409 F.Supp.2d 1266, 1273-74 (D. Kan. 2005) (no failure to train where policies covering the alleged conduct existed and were followed).

The training on these policies of general application was sufficient, as "a policymaker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events." *Wray v. City of New York*, 490 F.3d 189, 196 (2d. Cir. 2007). Further, Thompson cannot prevail simply by showing that training was just inadequate, as "showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability." *Murphy*, 950 F.3d at 655 (citing *Connick v. Thompson*, 563 U.S. 51, 68 (2011)).

## B.   THE COUNTY'S TRAINING DID NOT CAUSE KESSEE'S DEATH.

In addition, there is no evidence the officers' training caused Kessee's death. Thompson must demonstrate "a direct causal link between the policy or custom and the injury alleged." *Bryson*, 627 F.3d 784, 788 (10th Cir. 2010). On a failure-to-train claim,

the Tenth Circuit has explained that "the causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." *Schneider*, 717 F.3d at 770.

## C.   THE COUNTY DID NOT EXHIBIT DELIBERATE INDIFFERENCE IN TRAINING.

Finally, for a failure-to-train claim, Thompson must show the failure was made with deliberate indifference. *Waller*, 932 F.3d 1277, 1284 (10th Cir. 2019) (cite omitted). This requires Thompson to prove the municipal actor disregarded a known or obvious consequence of his action. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). (citation omitted). Deliberate indifference is a high bar, generally only cleared if the plaintiff proves the municipality "ha[d] actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately [chose] to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). It is, to put it mildly, an "extremely high standard to meet." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).

That established, the County turns to Thompson's specific claims. She must prove that the County failed to train guards on how to handle recurring situations presenting an obvious potential to violate the Constitution. *Lance v. Morris*, 985 F.3d 787, 801 (10th Cir. 2021) (cite omitted). To identify a recurring problem, the Tenth Circuit set adapted three-part test from the Second Circuit, to wit, whether: (1) the county's policymakers know to a moral certainty that their employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision

will make less difficult; and (3) that the wrong choice will frequently cause the deprivation of the citizen's constitutional rights. *Id*. at 802. (*citing Walker v. New York*, 974 F.2d 293, 297-98 (2d. Cir. 1992)).

*Lance* is a perfect example of what this case is not. In *Lance*, the Tenth Circuit reversed a summary judgment grant to a sheriff on a failure-to-train denial-of-medical-care claim by applying the aforementioned test. *Id*. In a case where a jail only staffed a nurse from 8-5 and never on weekends, the Tenth Circuit concluded that because "medical emergencies will obviously occur sometimes on evenings and weekends," county policymakers "had known to a moral certainty that jail guards would need to independently assess detainees' medical conditions." *Id*. Similarly, because training on medical assessments would make the theretofore medically-untrained officers decision to call an off-site nurse easier, the Tenth Circuit found the second prong satisfied. *Id*. Finally, the Tenth Circuit concluded that the lack of medical-assessment training for officers who would, on nights and weekends, be without any medical personnel to assist in assessment presented a situation where "the wrong choice" would "frequently lead to disregard of serious pain complaints, violating detainees' right to medical care." *Id*.

This case is, in many ways, the complete opposite of *Lance*. Not only were the officers trained, [Facts 16-18], but a medical professional was present at the CCDC twenty-four hours a day, seven days a week, with additional on-call coverage by additional and more advanced providers. [Fact 28]. Turn Key also provided medical personnel to conduct medical screenings and respond to emergencies. [Fact 29]. In the rare case where an officer conducted a medical screen, Turn Key healthcare personnel reviewed the medical screen.

[*Id*]. In other words, unlike the policymakers in *Lance*, County policymakers here would ***not*** know "to a moral certainty" that officers would have to make independent medical assessments. Quite the opposite, actually. CCDC policymakers, if anything, knew to a moral certainty that County personnel *wouldn't* have to make medical assessments *because* medical personnel were ***always*** available. Moreover, the continuous presence of medical staff removed from the jail staff's hands any medical-decision making. Thus this case, unlike *Lance*, does not present CCDC personnel with a difficult decision on which training would ease the burden. Medical staff is always there. [Fact 28].

In addition, Thompson's failure-to-train claim fails for other reasons. First, *Connick*'s language suggests employees must be "untrained" to establish a pattern of violations, *see* 563 U.S. at 61; the officers indisputably were trained on the precise policies at issue. Second, Thompson can point to no evidence that shows a pattern of similar constitutional violations. Third, Thompson's claims do not set out the "narrow range of circumstances" where liability should lie against the County without a past pattern of similar violations. Consider *Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1293 (11th Cir. 2009) (no failure to train where the need for more training was not "so obvious" because it did not involve items that present a "flagrant risk of constitutional violations" like the firearms contemplated in *City of Canton*, 489 U.S. 378, 390, n. 10 (1989)).

## D.   THE COUNTY CANNOT BE LIABLE FOR FAILURE-TO-TRAIN WHERE THERE IS NO UNDERLYING CONSTITUTIONAL VIOLATION.

As discussed elsewhere, a municipality cannot be liable for damages regardless of the existence of a policy or custom if its officers committed no underlying constitutional violation. *Thomson*, 584 F.3d at 1322. This is doubly true when the claim is not one of

direct municipal liability, but derivative liability based entirely on the act of an employee. *Crowson*, 983 F.3d at 1192. Additionally, to the extent Thompson's failure-to-train claim is premised on the decision to place Kessee in a holding cell instead of force through a medical screening, it remains true that no Supreme Court or Tenth Circuit decision requires medical screening to discover a latent condition in need of treatment. *See Taylor v. Barkes*, 575 U.S. 822, 825-26 (2015); *Cox v. Glanz*, 800 F.3d 1231, 1251 (10th Cir. 2015).

E. **THE COUNTY CANNOT BE LIABLE FOR FAILURE-TO-TRAIN WHERE THERE IS NO CLEARLY ESTABLISHED RIGHT ON WHICH OFFICERS CAN BE TRAINED.**

Finally, Thompson's failure-to-train claim warrants dismissal for an additional reason: the officers involved in Kessee's internment did not violate any of his clearly established rights. *See* Defs.' Mots. for Summ. J, filed concurrently. In a failure-to-train claim, the theory stems from the municipality's alleged failure to teach its employees not to violate a person's constitutional rights. *Contreras on behalf of A.L. v. Dona Ana Cty. Bd. of Cty. Comm'rs*, 965 F.3d 1114, 1124 (10th Cir. 2020) (Carson, J., concurring). In that posture, the "municipality's alleged responsibility for a constitutional violation stems from an employee's unconstitutional act [and the municipality's] failure to prevent the harm must be shown to be deliberate under 'rigorous requirements of culpability and causation.'" *Id.* (citing *Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 995 (6th Cir. 2017)). Thus, the violated right in a failure to train case "must be clearly established because a municipality cannot deliberately shirk a constitutional duty unless that duty is clear." *Id.* (citing *Arrington-Bey*, 858 F.3d at 995). The Second, Sixth, and Eighth Circuits have also reached this conclusion. *Townes v. City of New York*, 176 F.3d 138, 143–44 (2d Cir. 1999); *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017);

*Szabla v. City of Brooklyn*, 486 F.3d 385, 390-91 (8th Cir. 2007).

Thompson advances a failure-to-train theory that requires her to show "not only that an employee's act caused a constitutional tort, but also that the city's failure to train its employees caused the employee's violation and that the city culpably declined to train its 'employees to handle recurring situations presenting an obvious potential for such a violation.'" *Arrington-Bey*, 858 F.3d at 995 (citing *Brown*, 520 U.S. at 409, 117 S.Ct. 1382). The "obvious potential for such a violation" requires that the constitutional violation be *obvious* (i.e., clearly established). *Contreras*, 965 F.3d at 1124.

As discussed in further detail in Defendants Shifflett, Andrews, and Barr's Motions for Summary Judgment, there is no robust consensus of case law that condemns those officers' actions, or the actions of the other officers that responded to the scene. *See A.M. v. Holmes*, 880 F.3d 1123, 1150 (10th Cir. 2016) (using law outside the Tenth Circuit requires a showing of "a robust consensus of cases of persuasive authority") (citing *Plumhoff v. Rickard*, 572 U.S. 765, 780 (2014)). Those officers are entitled to qualified immunity both because they committed no underlying constitutional violation and violated no clearly established right. As such, the County cannot be liable for failing to train them. *See Contreras*, 965 F.3d at 1125 (Carson, J. concurring). The Court should grant the County judgment as a matter of law.

## **CONCLUSION**

For the reasons stated herein, Defendant Chris Amason, in his official capacity, requests the Court enter an Order granting him summary judgment on all claims brought by Plaintiff Patricia Thompson.

Date: July 1, 2021

Respectfully submitted,

 s/ Jessica L. Dark
Randall J. Wood, OBA No. 10531
Robert S. Lafferrandre, OBA No. 11897
Jessica L. Dark, OBA No. 31236
PIERCE COUCH HENDRICKSON
 BAYSINGER & GREEN, L.L.P.
1109 North Francis Avenue
Oklahoma City, Oklahoma 73106
Telephone:(405) 235-1611
Facsimile:  (405) 235-2904
jdark@piercecouch.com

***Attorneys for Defendants*, *Amason*, *Gibson*, *Andrews*, *Knapp*, *Barr*, *Shifflett*, *and Scott***

<u>**CERTIFICATE OF SERVICE**</u>

  I hereby certify that on July 1, 2021, I electronically transmitted this filing to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Chris Hammons
Jason M. Hicks
Jonathan R. Ortwein
LAIRD, HAMMONS, LAIRD, P.L.L.C.
1332 SW 89th Street
Oklahoma City, Oklahoma 73159
Telephone: (405) 703-4567
Facsimile:  (405) 703-4061
chris@lhllaw.com
jason@lhllaw.com
jonathan@lhllaw.com
*Attorneys for Plaintiff*

Sean P. Snider
Austin J. Young
Anthony C. Winter
JOHNSON, HANAN AND VOSLER
9801 North Broadway Extension
Oklahoma City, Oklahoma 73114
Telephone: (405) 232-6100
Facsimile:  (405) 232-6105
ssnider@johnsonhanan.com
ayoung@johnsonhanan.com
awinter@johnsonhanan.com
*Attorney for Defendants*,
*Turn Key Health Clinics*, *LLC*
*and Rickert*

Brandon Whitworth
Emily Jones Ludiker
David Russell
RODOLF & TODD
15 E. 5th Street, Sixth Floor
Tulsa, Oklahoma 74103
Telephone: (918) 295-2100
Facsimile:  (918) 295-7800
brandonw@rodolftodd.com
emily@rodolftodd.com

Rickey J. Knighton II
Jeanne Snider
Assistant City Attorneys
City of Norman, Oklahoma
Kathryn Walker, Interim City Attorney
201 West Gray
Norman, Oklahoma 73069
Telephone: (405) 217-7700
Facsimile:  (405) 366-5425
rick.knighton@ci.norman.ok.us
jeanne.snider@ci.norman.ok.us
*Attorneys for Defendants*,
*City of Norman*, *Norman Police*
*Department*, *Humphrey*, *Canaan*
*and Brown*

Ambre C. Gooch
COLLINS, ZORN & WAGNER, P.C.
429 N.E. 50th Street, 2nd Floor
Oklahoma City, Oklahoma 73105
Telephone: (405) 524-2070
Facsimile:  (405) 524-2078
acg@czwlaw.com
*Attorney for Defendants*
*Kyle Canaan and Daniel Brown*

david@rodolftodd.com

*Attorneys for Defendants*,
*Emergency Services of*
*Oklahoma*, *P.C. and Dr. Roberts*

s/Jessica L. Dark
Jessica L. Dark