```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE WESTERN DISTRICT OF OKLAHOMA

 3
    (1) PATRICIA THOMPSON, as        )
 4  Personal Representative of the)
    Estate of MARCONIA LYNN          )
 5  KESSEE,                          )
                                     )
 6         Plaintiff,                )
                                     )
 7  -vs-                             )   No. CIV-19-113-SLP
                                     )
 8  (1) NORMAN REGIONAL HOSPITAL     )
    AUTHORITY d/b/a NORMAN           )
 9  REGIONAL HOSPITAL, a public      )
    trust, et al.,                   )
10                                   )
           Defendants.               )
11

12

13                      * * * * *

14       VIDEOCONFERENCE DEPOSITION OF TIM TIPTON

15           TAKEN ON BEHALF OF THE PLAINTIFF

16              IN OKLAHOMA CITY, OKLAHOMA

17                   ON JUNE 4, 2021

18              COMMENCING AT 9:07 A.M.

19                      * * * * *

20

21

22                  INSTASCRIPT, L.L.C.
                125 PARK AVENUE, SUITE LL
23             OKLAHOMA CITY, OKLAHOMA  73102
                       405.605.6880
24                schedule@instascript.net

25  REPORTED BY:  BETH A. McGINLEY, CSR, RPR, RMR
```

```
 1     Q     All right.  Now -- now, you would agree with
 2   me that there is -- there is a certain point in this --
 3   in this -- the video footage, where Officer Brown
 4   clearly understands Marconia says something about a
 5   doctor, because he responds, "You already talked to a
 6   doctor, you've been discharged, you've already been seen
 7   by a doctor, you've been cleared by a doctor that you
 8   are able to be discharged from this facility; hence, why
 9   are you sitting here acting like a fool?"
10            What is the training of an off- -- a
11   reasonable officer when a citizen is asking to see a
12   doctor?
13     A     Again, in -- in this scenario, in this exact
14   set of circumstances, with this information, that
15   statement by the officer tells me exactly what he
16   believes.  He believes that he was just discharged, that
17   the doctor said he's good to go, he needs to leave.  The
18   security officer has given him the paperwork, to say,
19   "He needs to leave, we don't want him here anymore."
20            So it's a hundred percent belief of the
21   officer that there's nothing wrong, that this guy is
22   faking it, acting like this, and the doctors know it and
23   they want him gone.  He was there seeking drugs and they
24   want him to leave, I mean, so --
25     Q     Well, like, for instance when you first
```

1  watched this video, did you get the sense -- I mean, I
2  want your impression, not anything else.  The first time
3  you saw it, did you believe Marconia Kessee was faking
4  in that video?
5       A    Again, my first watch of the video, I already
6  knew that Mr. Kessee dies.
7       Q    Sure.
8       A    I knew it was a tragic end, so I couldn't even
9  view it, without 20/20 hindsight.  So very difficult for
10 me to say that -- that -- that -- what my view of it
11 was, because I had the privilege of having 20/20
12 hindsight before I even viewed it.
13      Q    I -- I guess what I'm saying is, is when does
14 it become so obvious that somebody -- I mean, do they
15 just need to pass out and die in front of an officer,
16 before an officer has a light bulb over their head that
17 says, "Oh, my God, something is on?"
18           Can an officer, literally, just take the word
19 of a security guard and that's enough for him to avoid
20 any kind of responsibility in -- in a case like this?
21 He gets -- he gets secondhand knowledge from a security
22 guard and you -- what does it take for it to flip the
23 other way?  Does the guy have to die in front of him?
24           MS. GOOCH:  Object to the form.
25      A    So, again, I -- I think a reasonableness

1   standard, under the Graham standard, is we have to take
2   the totality of the circumstances and -- and slosh
3   through the facts of the case. That's what the Courts
4   have told us to do, slosh through every fact of it.
5           And in this case particularly, when we look at
6   all the priming elements: what the dispatch call was,
7   what the call notes said, what the officer saw when he
8   originally walked into the hospital and the actions that
9   he saw by Mr. Kessee, what he was told by the security
10  officer, what the paperwork written by the doctor said,
11  what the security officer further told them once they
12  were outside, when you take all of those things into
13  consideration to -- to do the reasonableness standard,
14  in my opinion, it's reasonable, what they believed at
15  the time.
16          Now, a different set of circumstances, a
17  different set of information not given to them or told
18  to them in a different way, could, obviously, change
19  this entire reasonableness scenario. But in this case,
20  when you look at each one of those items, at that
21  moment, I believe it's reasonable what the officers
22  believed.
23      Q   (By Mr. Hammons) And that's based on looking
24  at this video -- you -- you agree with me the video is
25  terrible?

```
 1      Q    You don't believe Marconia Kessee was
 2 attacking either officer in any portion of this video?
 3      A    I never saw any assaultive behavior, on his
 4 part, toward the officers.
 5      Q    Any exigent circumstances that would justify
 6 the use of force in this case?
 7      A    Well, I believe the totality of the
 8 circumstances made the use of force reasonable.  I don't
 9 know about exigency.
10      Q    On Exhibit 1 -- again, I understand this isn't
11 the one covering it.  I think it's pretty close.  "Use
12 of Force," Page 47 of Exhibit 1.  Towards the bottom,
13 it's 300.3.3:  "Pain Compliance Techniques."
14           Is that a fairly common category of use of
15 force --
16           MS. GOOCH:  Object --
17      Q    (By Mr. Hammons) -- policies?
18           MS. GOOCH:  Oh, I'm sorry.  Object to the
19 form.
20      A    Yes.
21      Q    (By Mr. Hammons) Okay.  And you reviewed the
22 pain compliance technique policy, not only the one
23 you're looking at, but the one that was from 2018, for
24 Norman Police Department?
25      A    Yes, I did review the -- the use of force
```

1    Norman?

2        A    I've not read anything in their use of force
3    policy that addresses dragging.

4        Q    Okay.  Your understanding of this is that
5    Norman Police Department did not punish either Canaan or
6    Brown for any violation of a pain compliance technique
7    policy; true?

8        A    Correct.

9        Q    Okay.  Within the use of force policy that you
10   reviewed, the one at the time -- I get it, Exhibit 1 is
11   not the one, it's probably close to it, if not exact.
12   But the one that you did review, did you find in --
13   anywhere in the use of force policy where it authorized
14   the dragging of a person across concrete?

15       A    I didn't find anywhere in their policy that it
16   addressed dragging.

17       Q    Do you agree with Canaan that he believes that
18   that conduct is not reasonable?

19            MS. GOOCH:  Object to the form.

20       A    Well, he -- he can -- well, I don't know that
21   I -- it -- not reasonable, as in it's an excessive use
22   of force?

23       Q    (By Mr. Hammons) I don't know.  I just -- I'm
24   reading directly from his deposition.

25            "And I take it, from your answer, you do not

1    believe that conduct to be reasonable?"

2           And he said, "No."

3    A   Yeah, I don't -- I don't know what -- in what
4    manner he believes it's not reasonable.

5    Q   I put -- "Now, within the use of force policy
6    contained in Exhibit 1, can you point to anywhere in
7    there that would authorize the dragging of a person
8    across the concrete, a citizen?"

9           He said, "No."

10          "I take, from your answer, you do not believe
11   that conduct reasonable?"

12          And he said, "No."

13          I just wonder if you agree with him or
14   disagree.

15   A   No, I don't believe that this was a -- an
16   excessive use of force or a violation of the force
17   policy.

18   Q   So you believe the force was reasonable?

19   A   Yes.

20   Q   Okay.  So the dragging of the citizen across
21   the concrete in this particular instance was reasonable?

22   A   Yes, I don't believe it was a -- a
23   constitutional violation, the -- the use of force.

24   Q   Okay.  Do you agree with Canaan -- I asked him
25   if -- "Is there any lawful reason that you can point to,

```
 1   to the jury, dragging -- for dragging Marconia Kessee
 2   across the pavement on January 16, 2018?"
 3            His answer was, "No."
 4            Is there some lawful reason you can point
 5   to -- the jury to?
 6       A    For moving him?
 7       Q    Yeah, for dragging him across the pavement.
 8            MS. GOOCH:  Object to the form.
 9       A    Well, I -- I believe that there's a -- a
10   lawful violation that -- that -- that Mr. Kessee would
11   not leave the property.  I believe that the officers
12   believed, at the time, that he had the ability to leave
13   and -- and comply with that lawful order.  He refused
14   to.  And an empty-hand dragging, escort, however you
15   want to call it, was a reasonable use of force at that
16   time.
17       Q    (By Mr. Hammons) I asked Officer Canaan, "The
18   force you used against Marconia Kessee was not lawful
19   force; true?"  And he agreed with that.
20            You disagree with that; you believe it is
21   lawful?
22       A    Yes, I believe it's reasonable and
23   justifiable.
24       Q    Would you agree with me that the dragging of a
25   person, that would be offensive to the individual being
```

```
 1   dragged?
 2       A    Yes.
 3       Q    And do you have an opinion as to whether or
 4   not the dragging of Marconia Kessee caused him some
 5   abrasions on his back?
 6       A    I -- I read the autopsy and looked at the
 7   pictures of the seven-centimeter and the nine-centimeter
 8   abrasions, scrapes, and it's reasonable to believe those
 9   could have happened during that time, but I don't know
10   for a fact.
11       Q    It would be consistent with what you saw in
12   the video and what we see in the records?
13       A    The problem is, the video -- we can't see what
14   part of his skin comes in contact with the -- with the
15   pavement, so that's the reason that I'm not able to say
16   with certainty that it is or isn't, but it -- I mean, it
17   very well could have been.
18       Q    Pretty good piece of evidence if I wanted to
19   say that those abrasions came from being drug across the
20   parking lot?
21       A    Yeah, I would say that's reasonable to
22   believe.
23       Q    All right.  Abrasions from concrete, have you
24   ever had any?
25       A    Sure.
```

1   gets them off the hook here.
2           MS. GOOCH:   Ob- -- is that a question?
3       Q   (By Mr. Hammons) Is that what you think?
4           MS. GOOCH:   Object to the form.
5       A   So I believe, when you view the -- the
6   totality of everything that the officers were told, what
7   Officer -- or Security Officer Terry told them, again
8   be- -- beginning with what dispatch told them, with what
9   they saw with -- what they were seeing with their own
10  eyes, with what the discharge paperwork from the doctor
11  told them, so it was a combination of not just what Off-
12  -- Security Officer Terry told them, but a combination
13  of all these elements, are what developed their
14  reasonable belief of the totality of the circumstances.
15      Q   (By Mr. Hammons) If you go back to your
16  report.  Have you got -- do you have that?
17      A   Yes, sir.
18      Q   We'll go through it a little bit.
19          We'll go to Page -- go to Page 9.  We're under
20  the category of "Opinions Concerning Issue No. 1."  I
21  guess we should state what Issue No. 1 is, first.
22          Issue No. 1, on Page 7, is:  "Did Officer
23  Canaan and Officer Brown apply appropriate police
24  practices during the interaction with Mr. Kessee?"  Do
25  you see that?

1   made a claim of constitutional violations.
2          So we -- that claim has to be viewed in how
3   the Courts have directed us to view it, where the agency
4   can -- can use 20/20 hindsight and doesn't have to be
5   held to those same standards as would be directed in
6   a -- in a federal civil rights violation.
7      Q    (By Mr. Hammons) Well, and I understand that,
8   but -- and I understand we don't know -- we --
9   hindsight, we know he's dead, we know Marconia is dead.
10  But if we review this video, I'm more concerned with
11  this dragging of Marconia. That doesn't have to be
12  viewed in hindsight. We know exactly what happened. He
13  was not under arrest, he was not being detained, and
14  these officers grabbed him and they drug him across the
15  parking lot.
16         You believe that that falls in line with
17  acceptable police practices based on that scenario? Not
18  hindsight of him being dead. We're talking about that
19  scenario.
20     A    So based on what the officers reasonably knew
21  and believed at that time and evaluating that use of
22  force, I believe that when you apply the Graham
23  standard, that that use of force is not excessive and
24  not a constitutional violation.
25     Q    Well, doesn't the Graham standard require a

1   crime to be looking -- to look at a crime, like a crime

2   being committed?

3       A    And there was a crime committed.

4       Q    Well, at the time, they -- after they drug

5   him, they said, "Let's -- let's tune him up, let's get

6   him a -- a trespassing," but they -- he literally was

7   not under arrest, not detained, not being held, was free

8   to leave, and they're dragging him across the parking

9   lot.  I don't know how a police officer is allowed to do

10  that.

11           MS. GOOCH:  The -- that's not a -- is that a

12  question?

13      Q    (By Mr. Hammons) Can -- I mean, do you -- have

14  you seen a situation where an officer is allowed to use

15  force on somebody who's not under arrest, not detained,

16  and is free to leave, and they get to -- they can just

17  drag them across parking lots?

18           MS. GOOCH:  Object to the form.

19      A    So police officers can and do use force, as

20  long as that force is reasonable based on a crime

21  committed.  Whether or not there's an arrest made out of

22  that violation is a different question.

23           So, yes, I believe it can be use- --

24  reasonable to use force when the officer can articulate

25  a crime has been committed, even though the officer

1  hasn't made the decision to take them into custody and
2  take them to jail.
3       Q     (By Mr. Hammons) So under -- there's no
4  circumstance in this case that you see that would make
5  their use of force of dragging Marconia Kessee across
6  the parking lot, there's nothing you see that makes this
7  in the -- even in the slightest bit unreasonable?
8            MS. GOOCH:  Object to the form.
9       A     So, again, whenever I view it based on what
10 the officers knew at the time, based on what -- the
11 information they have been given, and then we look at
12 that technique or that dragging and we -- and we compare
13 it the way Graham -- the Graham standard has told us to,
14 what was the type of crime committed and what was the --
15 what was the propensity for pain and injury of the
16 technique, do those balance, I believe they do.  So I
17 don't believe it was a constitutional violation or
18 excessive for them to -- to -- to drag him in the manner
19 that they did.
20      Q     (By Mr. Hammons) Well, another -- another
21 question:  Canaan, Brown, their videos, are you saying
22 that we can take those videos to a training facility
23 right now and say, "Here's how you use empty-hand
24 technique to carry an individual," and say, "That --
25 this is my stamp of approval, I'm Captain Tim Tipton,

```
 1   build their knowledge base of what they believed was
 2   going on?
 3        Q    Right.
 4        A    And then was it reasonable for them to believe
 5   that the property owner had the lawful authority to tell
 6   them, "We want him moved, we want him off the property"?
 7        Q    Right.
 8        A    If all of those elements are there, then they
 9   have a crime as soon as he refuses to leave.
10        Q    Right.
11        A    And in their mind, in their belief, and I
12   believe in their reasonable belief, that they believed
13   he had the ability and was refusing to do that at that
14   time.
15        Q    Right.  And so my question is, is:  Taking all
16   of that as true, dragging a man, a citizen of Norman,
17   across the parking lot, is something that you, in this
18   very situation, would train your officers to do -- based
19   on this scenario, you would say, "That is -- this is the
20   way we do it, drag them across the parking lot"?
21        A    No, I wouldn't.
22        Q    All right.  You -- I don't -- I'm not -- and
23   this is based on their knowledge, they know -- they --
24   he is faking -- Marconia Kessee is faking every bit of
25   this, the doctor said he's clear, all of that, they're
```

1  occasions to do it and he did not request it himself.
2  Trying to think how to ask this.  Strike that.  I don't
3  know how to ask it.
4         On Page 14, we get into, "Once it becomes
5  clear to the officer that Mr. Kessee is not going to
6  comply, the physical use of force occurs.  When
7  evaluating the use of force, the Graham standard once
8  again provides guidance, the evaluation is done by
9  balancing the crime committed with the type of force
10 used."  Again, this is where I have some confusion.
11        If, in fact, he's not under arrest for a
12 crime, he's not being detained for a crime, he's not
13 being combative, he's not a -- a threat to anybody,
14 according to these officers, how is it that any force
15 can be used against this individual?
16    A   Well, again, in my opinion, there was a lawful
17 violation.  They had the -- they had established the
18 legal authority to be there.  They had established the
19 legal authority to take action.  The -- the property
20 owner is requesting them to take action.  They start out
21 by merely trying to gain verbal compliance with the
22 individual.  He -- he -- he doesn't comply.  I believe
23 it's reasonable for them to believe that he had the
24 ability to comply and was choosing not to.
25        Even though they had not told him, "You're

```
 1   under arrest," I believe that they could articulate a --
 2   a -- an arrestable offense, and they were attempting to
 3   use a low level of force to gain compliance from him, in
 4   lieu of taking him into custody and taking him to jail.
 5        Q    Okay.  Are -- are you D -- DRE certified --
 6        A    No, sir.
 7        Q    -- or --
 8        A    No.
 9        Q    Do you teach in that or any --
10        A    No.
11        Q    No?
12             MS. GOOCH:  Do you need a break?  Okay.  Just
13   checking.
14        Q    (By Mr. Hammons) You do know that those -- the
15   DRE guys, they -- they take blood pressures and look at
16   the pupils and do the temperatures and kind of a --
17   quite frankly, a -- an exam of -- of the individuals;
18   true?
19        A    Yes --
20             MS. GOOCH:  Object to the form.
21             THE WITNESS:  Oh, sorry.
22        A    Yes, sir.
23        Q    (By Mr. Hammons) Yeah.  Have you ever seen one
24   of those -- that procedure done?
25        A    Oh, sure.
```

```
 1              "Did Officer Canaan and Officer Brown apply
 2      appropriate police practices during the interaction with
 3      Mr. Kessee?"
 4              Does that encompass the idea of -- of whether
 5      or not they should or should not have got him medical
 6      treatment?
 7              MS. GOOCH:  Object to the form.
 8         A    So it -- it will include:  Is it reasonable --
 9      was it -- were their interactions reasonable, based on
10      the totality of the circumstances.  So should they have
11      believed what they believed, was it reasonable for them
12      to believe what they believed.  So I guess, yes, that
13      would be...
14         Q    (By Mr. Hammons) I -- yeah, I'm just making
15      sure that -- and I believe -- I -- I think we're on the
16      same page.  I just want to make sure we're on the same
17      page.
18              That based on your review of the situation,
19      the totality of the circumstances, that you believe it
20      was reasonable for these officers to rely on what they
21      relied on and not get Marconia Kessee medical treatment,
22      based on your review?
23         A    Yes, I believe that -- that they believed that
24      had already been done.
25         Q    Right, that in -- I mean, that's going to be
```