## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) | **PATRICIA THOMPSON, as Personal Representative of the Estate of MARCONIA LYNN KESSEE** | ) ) ) ) |
| | **Plaintiff,** | ) ) |
| **vs.** | | ) **Case No. CIV–19–113-SLP** ) |
| (1) | **NORMAN REGIONAL HOSPITAL AUTHORITY d/b/a NORMAN REGIONAL HOSPITAL, a public trust, et. al.** | ) ) ) ) ) |
| | **Defendants.** | ) |

## PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF NORMAN'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN OPPOSITION

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................. iii

**TABLE OF EXHIBITS** ...................................................................... v

**INTRODUCTION** ............................................................................ 1

**PLAINTIFF'S STATEMENT OF FACTS** ........................................... 3

    **A.** Plaintiff's Response to Defendant's Statement of Undisputed Facts ............. 3

    **B.** Plaintiff's Statement of Material Facts Precluding Summary Judgment in Defendant City of Norman's Favor ........................................................ 4

        Defendants Brown and Canaan's Deliberate Indifference to Mr. Kessee's Serious Medical Need ........................................................................... 4

        Dragging Mr. Kessee 75 Feet ................................................................ 11

        NPD Training and Policies .................................................................. 12

        Injury to Mr. Kessee .......................................................................... 14

**ARGUMENT AND AUTHORITIES** .................................................. 15

    STANDARD OF REVIEW ........................................................................ 15

    PROPOSITION I: A REASONABLE FACTFINDER COULD CONCLUDE CITY OF NORMAN'S FAILURE TO PROPERLY TRAIN ITS OFFICERS RELATED TO PROCURING MEDICAL TREATMENT AND EXCESSIVE FORCE WAS OBVIOUS, CLOSELY RELATED TO MR. KESSEE'S INJURY, AND PERFORMED WITH DELIBERATE INDIFFERENCE ........................ 16

    **A.** A REASONABLE FACTFINDER COULD DETERMINE THE CITY OF NORMAN'S FAILURE TO PROPERLY TRAIN ITS OFFICERS TO RESPOND APPROPRIATELY TO A PRETRIAL DETAINEES CONSTITUTIONAL RIGHT TO MEDICAL TREATMENT WAS OBVIOUS, CLOSELY RELATED TO MR. KESSEE'S INJURY, AND PERFORMED WITH DELIBERATE INDIFFERENCE ................................................ 17

        **1.** City of Norman Trained Defendants Brown and Canaan to Disregard an Obvious and Substantial Risk of Harm to City of Norman Citizens Requiring Medical Care ..................................................................... 17

            a. The facts Related to Mr. Kessee's "Clear" and "Obvious" Need for Medical Care ................................................................................. 17

b. <u>The Existence of a Policy or Custom Involving Deficient Training That Caused Injury (Prongs 1 and 2)</u> ................................................................... 20

c. <u>City of Norman Adopted the Policy or Custom with Deliberate Indifference</u> ............................................................................ 23

**B. A REASONABLE FACTFINDER COULD DETERMINE THE CITY OF NORMAN'S TRAINING ON THE ISSUE OF EXCESSIVE FORCE WAS OBVIOUS, CLOSELY RELATED TO MR. KESSEE'S INJURY, AND PERFORMED WITH DELIBERATE INDIFFERENCE**.................................................................................... 25

a. <u>The Existence of a Policy or Custom Involving Deficient Training That Caused Injury (Prongs 1 and 2)</u> ............................................................ 25

b. <u>The Municipality's Adoption of a Policy or Custom With Deliberate Indifference</u>................................................................................ 25

**PROPOSITION II: A REASONABLE FACTFINDER COULD CONCLUDE CITY OF NORMAN MAINTAINED AN UNCONSTITUTIONAL POLICY OR CUSTOM THAT CAUSED KESSEE'S INJURY** ............................................ 26

**PROPOSITION III: QUESTIONS OF FACT EXIST AS TO PLAINTIFF'S CLAIMS OF NEGLIGENCE** ............................................................... 27

**CONCLUSION** ......................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997) ........................................................................23

*Al-Turki v. Robinson*, 762 F.3d 1188 (10th Cir. 2014) ................................................................22

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1996) ................................................................16

*Barton v. Taber*, 820 F.3d 958 (8th Cir. 2016) ............................................................................22

*Border v. Trumbull Cty. Bd. of Com'rs*, 414 Fed. Appx. 831 (6th Cir. 2011) ............................22

*Boretti v. Wiscomb*, 930 F.2d 1150 (6th Cir. 1991) ....................................................................23

*Brown v. Hughes*, 894 F.2d 1533 (11th Cir. 1990) .....................................................................23

*Combs v. West Siloam Speedway Corp.*, 2017 OK CIV APP 64, 406 P.3d 1064 .........................27

*D.T. by M.T. v. Independent School Dist. No. 16*, 896 F.2d 1176 (10th Cir. 1990) ....................26

*Lance v. Morris*, 985 F.3d 787 (10th Cir. 2021) ...................................................................passim

*Lewis v. Wallenstein*, 769 F.2d 1173 (7th Cir. 1985) ..................................................................23

*Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005) ...............................................................................22

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ..................................................................16

*Myers v. Lashley*, 2002 OK 14, 44 P.3d 553 ...............................................................................27

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ..................................................................26

*Russillo v. Scarborough*, 935 F.2d 1167 (10th Cir. 1991) ..........................................................16

*Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760 (10th Cir. 2013) ....................16

*Sealock v. Colorado*, 218 F.3d 1205 (10th Cir. 2000) ................................................................22

*Ware v. Jackson Cty*, 150 F.3d 873 (8th Cir. 1998) .....................................................................27

**Statutes**

42 U.S.C. § 1983 ........................................................................................................................16

## __TABLE OF EXHIBITS__

Exhibit 1 – Deposition of Chief Humphrey

Exhibit 2 – Deposition of Officer Brown

Exhibit 3 – Norman Regional Discharge Papers of 1/16/18

Exhibit 4 – Deposition of Justin Holbrook

Exhibit 5 – Audio of Jarrod Terry Call to Police

Exhibit 6 – Norman PD Confidential Investigation Report

Exhibit 7 – Canaan Bodycam Footage

Exhibit 8 – Brown Bodycam Footage

Exhibit 9 – Deposition of Officer Canaan

Exhibit 10 – Norman PD Policy

Exhibit 11 – Deposition of Dr. Michael Jobin

Exhibit 12 – Medical Examiner's Report

Exhibit 13 – Norman Regional Medical Records of 1/16/18

COMES NOW, the Plaintiff and submits this Response in Opposition to Defendant City of Norman's Motion for Summary Judgment and Brief in Support (Doc. 210).  In support this Response, Plaintiff would show this Court as follows:

## **INTRODUCTION**

This case arises out of tragic facts where a Citizen of this State was wholly failed by law enforcement officials despite his "obvious" cries for help.  Specifically, on January 16, 2018, two officers of the Norman Police Department (NPD), Defendants Kyle Canaan and Daniel Brown, presented to Norman Regional Hospital to assist Plaintiff's decedent, Marconia Lynn Kessee (hereinafter "Kessee") across the street to the Salvation Army.  Upon arrival, Defendants Canaan and Brown were told that Mr. Kessee began having problems after discharge, and while in the hospital's waiting room.

Both Defendants Canaan and Brown admitted in their depositions that, instead of heeding the "clear" and "obvious" signs, symptoms, and indicators of an active overdose with which Mr. Kessee presented that evening, they chose to completely disregard those signs in favor of berating, belittling, and chastising Mr. Kessee for his inability to comply with their demands.  While Defendants Canaan and Brown have argued all of Mr. Kessee's behaviors indicating active overdose – babbling incoherently, stumbling, falling, and convulsions or seizure activity - could be "faked," Defendant Canaan admitted objective indicators of overdose – dilated pupils, high blood pressure, elevated heart rate - could not.[1]  Yet, instead of checking the objective indicators of overdose, Defendants chose to instead stand over Mr.

---

[1] Mr. Kessee was also sweating profusely in 11.7-degree temperatures, which is another objective indicator of overdose that, obviously, cannot be "faked," but again, Defendants Canaan and Brown chose to disregard this "clear" indicator of overdose.

Kessee, yelling directives with which he obviously could not comply.

Ultimately, Defendants Brown and Canaan decided they did not want to stand in the cold parking lot any longer and dragged Mr. Kessee along the pavement of the parking lot for 75 feet. At one point, Defendant Brown noted Mr. Kessee's "bare butt" was dragging on the pavement. Mr. Kessee was not under arrest, was not being detained, and was not evading the officers at this time. After the dragging, Defendants Brown and Canaan placed Mr. Kessee under arrest after which Defendant Brown had to walk back to retrieve his vehicle (which was in the area where they started dragging Mr. Kessee) in order to transport Mr. Kessee to jail.

During this entire period, and of the few remarks that were somewhat intelligible, Mr. Kessee begged Defendants Brown and Canaan to allow him to see a doctor. Mr. Kessee's pleas for medical treatment were not only ignored; they were refused. Even after Mr. Kessee advised he "had medicine in [him]" and was "going to die," Defendants Brown and Canaan not only did **nothing**, but they also contemptuously denied his pleas. As a result, Mr. Kessee died.

Though Defendant City of Norman has requested this Court grant summary adjudication in its favor because, according to its Motion, no genuine issues of fact exist related to **any** of Plaintiff's claims against it, the testimony and evidence in this case reveals Defendant Brown and Canaan's behavior was actually consistent with their training. This training caused them to disregard Mr. Kessee's substantial need for prompt medical treatment – his right to which is a clearly established right. It also resulted in the excessive force these Defendants utilized in dragging Mr. Kessee 75 feet while he was not under arrest and not being detained. Therefore, this Court should deny Defendant City of Norman's Motion for Summary

Judgment in its entirety.

**PLAINTIFF'S STATEMENT OF FACTS**

**A. Plaintiff's Response to Defendant's "Statement of Undisputed Facts."**

For purposes of this Response, Plaintiff does not dispute, Defendant City of Norman's "Undisputed Facts" ¶¶1, 2, 3, 5, 6, 8, 9, 10, 11, 13.  Plaintiff denies the remaining "Facts" as follows:

**Response to ¶4**:     Plaintiff denies this fact.  While Defendant Canaan and Brown's **hours** of training may have exceeded the hourly training requirements, hours of training do not translate into **proper** training, which they did not receive.  Here, Defendant Humphrey admitted that the conduct at issue in this case was consistent with NPD training.  *See* Ex. 1: Humphrey Dep., 12/21/2020, at 55:13-16, 106:17-108:16.

**Response to ¶7**:     Denied.  Defendant Humphrey testified he did not find dragging Mr. Kessee violated NPD policy or training.  Further, he testified dragging is an option, just not the first option, in circumstances such as that presented here.  *See* Ex. 1: Humphrey Dep., 12/21/2020, at 55:13-16, 106:17-108:16.

**Response to ¶12**:     Denied. Brown and Canaan were aware the jail would not accept Kessee in the condition he was in without a "fit slip". *See* Ex. 6, NPD Confidential Report at p. 10; Ex. 7: Canaan Bodycam Footage beginning at timestamp 23:50.[2] There is no dispute that Defendant Brown took Kessee to jail and booked him **prior to** obtaining a fit slip, *i.e.,* prior to him being medically cleared.  *See* Ex. 2: Brown Dep., 10/20/2020, at 95:17-96:3.

---

[2] The bodycam footage in this case, along with other videotape evidence, is provided as indisputable evidence of what occurred. *See Thomas v. Durastanti*, 607 F.3d 655, 666 (10th Cir. 2010) (a fact clearly shown by a videotape of the incident cannot be disputed).

Brown did so in contradiction of Norman PD policy. *See* Ex. 10 - NPD Policy, No. 429.5.1. Further, the fit slip provided to Defendant Canaan was based off Defendant Canaan's willfully withholding from APRN Holbrook Mr. Kessee's known deteriorating medical condition of which Canaan was aware but chose to disregard. According to APRN Holbrook's testimony, if he had been provided this information, he would have re-evaluated Mr. Kessee before signing a fit slip. *See* SOF Nos. 26-28, below.

**B. PLAINTIFF'S STATEMENT OF MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT IN DEFENDANT CITY OF NORMAN'S FAVOR.**

**Defendants Brown and Kessee's Deliberate Indifference to Mr. Kessee's Serious Medical Need**

1.   Mr. Kessee presented to the Norman Regional Hospital ("NRH") emergency room on January 16, 2018, and was discharged with the discharge paperwork identifying the primary diagnosis as a headache. *See* Ex. 3: NRH Discharge Papers 1/16/2018.[3]

2.   APRN Holbrook discharged Mr. Kessee and walked him to the waiting room to have someone contact police to have Mr. Kessee escorted to the Salvation Army because Salvation Army would not allow someone to stay without an ID or police escort vouching the individual did not have warrants. *See* Ex. 2: Brown Dep., 10/20/2020, at 56:15-23.

3.   At 6:57 p.m., Jarrod Terry, security for Norman Regional Hospital ("NRH") called police, asking them to come assist Mr. Kessee to Salvation Army because he did not have ID. There was no concern or urgency in Mr. Terry's voice, and he did not report any

---

[3]At the time of discharge, Kessee had a Glascow Coma Score of 15, and was noted as alert and oriented to time and place. *See* Ex. 13 - Norman Regional Medical Records of 1/16/18. Although this information was not known to Canaan and Brown at the time of their encounter, it is included to provide for the Court a more detailed explanation of the change in Kessee's condition which was recognized by Terry, Canaan, and Brown.

strange behavior. *See* Ex. 5: Audio of Call to Police at 6:57 p.m.

4. Defendant Canaan arrived first while Mr. Kessee was still in the NRH waiting room where Mr. Kessee "appeared to be out of breath, wide eyed, and occasionally moaning." Defendant Canaan and Mr. Terry had to assist Mr. Kessee to stand, and Mr. Kessee "is clearly observed being very unsteady on his feet and unable to stand fully." Further, Defendant Canaan had to assist Mr. Kessee in putting his glasses on because Mr. Kessee's hands were "significant[ly] shaking." *See* Ex. 6, NPD Confidential Report re: Defendant Brown[4] at p. 7; Ex. 7: Canaan Bodycam Footage.

5. Defendant Brown arrived while Mr. Kessee was taken outside in a wheelchair. Mr. Kessee then attempts to speak, but his "speech is very **_thick and slurred_** and his hands are moving around in a very uncoordinated manner."[5] *See* Ex. 7, NPD Confidential Report at p. 7 (Emphasis Added); Ex. 7: Canaan Bodycam Footage.

6. Mr. Kessee attempts to comply with Defendant Canaan's command to "get to walking across the street," but after standing from the wheelchair, "takes several quick unsteady steps forward, nearly striking a nearby wall headfirst" before attempting to move back to the wheelchair "before shaking violently and losing his balance before he falls to the ground…" *See* Ex. 6, NPD Confidential Report at p. 7; Ex. 7: Canaan Bodycam Footage.

7. Mr. Terry then provided Defendant Canaan with Mr. Kessee's discharge paperwork. The discharge paperwork shows that Mr. Kessee presented to NRH complaining

---

[4] The Confidential Reports for each officer were identical expect for their names. *See* Ex. 1: Humphrey Dep., 12/21/2020, at 36:17-24.
[5] It is virtually impossible to capture the seriousness of Mr. Kessee's conduct and symptoms on a black-and-white record. Viewing bodycam videos is truly the only means by which the Court may fully assess the nature of the conduct involved in this case.

of a headache and was suspected of drug-seeking behavior. The paperwork does not mention any problems related to ambulation and balance, coherence, sweating, labored breathing, convulsions, or seizure-like activity. The paperwork indicates Kessee was stable as of 7:03 p.m. *See* Ex. 6, NPD Confidential Report at p. 7; Ex. 7: Canaan Bodycam Footage; Ex. 3: NRH Discharge Papers, 1/16/2018.

8.  Defendant Canaan reviewed the discharge paperwork and then asked if Mr. Kessee had been acting like this prior to discharge to which Mr. Terry advises, "I don't think so." Defendant Brown then asks if his conduct is "discharged induced." *See* Ex. 6, NPD Confidential Report at p. 7; Ex. 7: Canaan Bodycam Footage.

9.  Mr. Kessee is attempting to communicate throughout this time "but is unable to do so." Mr. Kessee "become[s] clearly out of breath." Further, despite being told "approximately 42 times," Mr. Kesssee tried, but could not put on his shoe. *See* Ex. 6, NPD Confidential Report at p. 8; Ex. 7: Canaan Bodycam Footage.

10.  Further, about 12 minutes into the bodycam footage, Defendant Brown makes a comment that Mr. Kessee is "beginning to sweat" despite the fact that the documented temperature that evening was 11.7 degrees. *See* Ex. 6, NPD Confidential Report at p. 6, 8; Ex. 7: Canaan Bodycam Footage; Ex. 2, Brown Dep., 10/20/2020, at 104:9-16.

11.  Throughout this time period, Mr. Kessee "is yelling inaudible sounds, moving about the ground and shaking." There are times, however, when Mr. Kessee's words can be deciphered, and he is undisputedly asking for help, saying, among other things: **(1)** "I'm not playing with you. Something's going on here" (as he points to his head); **(2)** he needs to see a doctor; **(3)** "I'm sick"; **(4)** "There's medicine in me."; **(5)** "You're not going to kills me are

you?"; **(6)** "I need to talk to him…to a doctor."; **(7)** "I'm going to die in your car, man." *See* Ex. 6, NPD Confidential Report at p. 8-10; Ex. 8: Brown Bodycam Footage.

12.     After dragging Mr. Kessee approximately 75 feet away from the hospital entrance, Defendants Brown and Canaan decide to arrest Mr. Kessee for trespassing.  He was cuffed and placed in Defendant Brown's vehicle, while still pleading, "I'm sick."  "Once in the vehicle Mr. Kessee is clearly out of breath and is hear[d] saying, 'Oh God.  Don't kill me."  He also warned, "I'm going to die in your car." *See* Ex. 6, NPD Confidential Report at p. 9-10; Ex. 8: Brown Bodycam Footage.

13.     Defendant Canaan is then heard saying he would get a "FIT [slip] because when 'we get to the jail they're gonna be like, we're not taking him, look at em." *See* Ex. 6, NPD Confidential Report at p. 10; Ex. 7: Canaan Bodycam Footage, starting at timestamp 23:50.

14.     During the car ride to the jail, Mr. Kessee can be heard yelling for help and asking for medical treatment.  During this period, he is still sweating profusely and exhibiting labored breathing. *See* Ex. 6, NPD Confidential Report at p. 10; Ex. 8: Bodycam Footage; *See* Ex. 2: Brown Dep., 10/20/2020, at 91:19-92:3.

15.     Upon arrival to the jail, Defendant Brown is assisted in getting Mr. Kessee inside.  Once Mr. Kessee is seated and "[w]ithout warning, [he] again tenses up and begins hitting his head against the jail."  He is carried to a cell without an evaluation where he was found, shortly thereafter, unresponsive and was pronounced dead upon arrival to the hospital. *See* Ex. 6, NPD Confidential Report at p. 11; Ex. 8: Brown Bodycam Footage.

16.     The NPD's Internal Affairs concluded, based on watching the bodycam footage, that: "there are clear indications that there was something wrong with Mr. Kessee

that the officers overlooked or misunderstood." Defendant Humphrey testified Mr. Kessee's overdose indicators were "obvious" when viewing the bodycam footage and would have been "obvious" to Defendants Brown and Canaan. Defendant Humphrey also confirmed it was "obvious" that Mr. Kessee could not comply with the officers' directives. *See* Ex. 6, NPD Confidential Report at p. 18; Ex. 1: Humphrey Dep., 12/21/2020, at 123:17-125:16, 177:2-178:3

17. Despite these "obvious" and "clear indications" and Mr. Kessee's attempts to plead for help, neither Defendants Brown nor Canaan seek out or allow Mr. Kessee to seek out medical care. Instead, they refuse him such care, stating, among other things: **(1)** "Are you just putting on a show...?" **(2)** "You can't just act like this to get back in the hospital. That's not how it works." **(3)** "You can stop with the show. It ain't fooling a single person, I can tell you that." **(4)** "What you are doing now is putting on a show." **(5)** "I am too cold to stand here and watch you play this game. Can you just get your shoe on and walk away?" **(6)** "I'll take you to jail just the way you are. It doesn't matter to me." **(7)** "You ain't seeing a doctor" and "I could teach my dog to put a shoe on quicker than this." *See* Ex. 6, NPD Confidential Report at p. 8-9; Ex. 7: Canaan Bodycam Footage.

18. Defendants Canaan and Brown instructed Mr. Kessee to walk off of the hospital's property carrying his shoe if he was unable to put it on his foot. Mr. Kessee did not do so. The officers told Mr. Kessee that they were "not falling for [his] bullshit" and Mr. Kessee responded: "I'm not trying to. I'm not trying to." *See* Ex. 7: Canaan Bodycam Footage.

19. Defendants Brown and Canaan disregarded, did not listen to, and did not "pay[] attention" to the "clear indications" of Mr. Keessee's overdose, including the fact that Mr.

Kessee lacked coordination and fell, needed assistance to get in Defendant Brown's vehicle, was incoherent and unresponsive at times, exhibited labored breathing, had convulsions or seizures, and was sweating profusely in very cold temperatures. Defendants Brown and Canaan disregarded these "clear indications" because they had already decided Mr. Kessee was "faking." *See* Ex. 2: Brown Dep., 10/20/2020, at 55:10-23, 59:17-61:20, 64:22-67:1, 69:6-17, 83:21-25, 87:22-88:11, 107:8-10; Ex. 9: Canaan Dep., at 10/20/2020, at 51:11-52:10, 53:9-16, 66:6-24, 67:19-25, 69:8-16, 73:17-74:6, 86:6-87:5, 97:3-98:14, 104:16-25, Ex. 1: Humphrey Dep., 12/21/2020, at 115:25-117:24.

20.     Despite his belief that Mr. Kessee was "faking" these indicators, Defendant Canaan admitted he would not have allowed Mr. Kessee to drive that evening because "he's acting that way…" *See* Ex. 9: Canaan Dep., 10/20/2020, at 92:19-93:17.

21.     Though each of the signs and symptoms Mr. Kessee displayed that night were indicators of serious impairment and overdose, Defendant Canaan said he would have only believed Mr. Kessee was not "faking" his illness if there were objective indicators of overdose, such as high blood pressure, elevated heart rate, dilated pupils; however, neither Canaan nor Brown bothered to check these objective indicators, although they had ability and ample time to do so.  Instead, they testified, Mr. Kessee would have had to become unconscious to get medical help that night.  *See* Ex. 2: Brown Dep., 10/20/2020, at 83:19-20, 98:23-100:10; Ex. 9: Canaan Dep., 10/20/2020, at 77:9-78:20, 83:18-85:17, 99:16-22.

22.     Defendant Canaan disregarded these indicators because a "doctor [said] he's [at the hospital] for a headache and drug-seeking behavior and he's clear to go." *See* Ex. 9: Canaan Dep., 10/20/2020, at 80:17-81:5, 4-6.

23.     Defendant Canaan, however, admitted the "way [Kessee] was acting" indicated he "needed help.  Medical help." Ex. 9: Canaan Dep., 10/20/2020, at 49:8-22.

24.     Defendants Brown and Canaan understood Mr. Kessee only began behaving in the manner which can be observed on their bodycams **after** he was discharged.  The information they had was the "doctors had not seen him when he was acting up."  *See* Ex. 2: Brown Dep., 10/20/2020, at 59:3-4; Ex. 9: Canaan Dep., 10/20/2020, at 103:9-104:6, 105:24-106:2.

25.     Neither Defendant spoke to a medical professional or EMSA (both of whom were mere feet away) about Mr. Kessee's condition or asked for help.  Defendant Canaan admitted he should have asked "the hospital to assist" and determine "whether he's okay to be released or unreleased at the point of my contact."  Defendant Humphrey confirmed these NPD officers should have gotten Mr. Kessee medical attention, and a reasonable officer would have realized "that something is wrong" with Mr. Kessee. *See* Ex. 2: Brown Dep., 10/20/2020, at 62:9-14, 62:18-63:12, 83:5-18; Ex. 9: Canaan Dep., 10/20/2020, at 28:10-17; Ex. 1: Humphrey Dep., 12/21/2020, at 126:14-23, 135:5-136:4, 155:17-25.

26.     Defendant Canaan did not talk to Dr. Roberts, the attending ER physician on duty on January 16, 2018.  When he obtained a fit slip from APRN Holbrook, Defendant Canaan did not tell him Mr. Kessee had asked for a doctor or about any of the indicators of overdose with which Mr. Kesee was suffering during his interaction with Canaan.  Defendant Canaan had ample opportunity to discuss this with him. *See* Ex. 9: Canaan Dep., 10/20/2020, at 151:20-22, 156:10-157:24; Ex. 1: Humphrey Dep., 12/21/2020, at 166:16-20, 167:10-13.

27.     A fit slip is "essentially…a prescription that…states that based upon the exam

that was performed, that the patient is…fit for incarceration," and would be written for "somebody that's…alert, oriented and medically stable."  The fit slip for Mr. Kessee was, therefore, "saying he was stable at discharge," i.e., at the time APRN Holbrook examined him. *See* Ex. 4: Holbrook Dep., 12/2/2020 at 113:7-18, 184:14-18; Ex. 1: Humphrey Dep., 12/21/2020, at 163:10-21, 117:4-5.

28.    APRN Holbrook testified Defendant Canaan did not tell him how Mr. Kessee was acting after discharge. Had he known of the behavior Mr. Kessee was exhibiting outside during his encounter with Defendants Brown and Canaan, Holbrook would have "wanted to reevaluate" him.  Ex. 4: Holbrook Dep., 12/2/2020 at 113:25-114:15.

**Dragging Mr. Kessee 75 Feet**

29.    When Mr. Kessee was unable to comply with Defendant Brown and Canaan's demands that he "go," Brown and Canaan threatened to "drag [his] ass to the curb. Get you off this property and then you can find your own way to Salvation Army…Time's ticking."  A few minutes later, Brown and Canaan began dragging Kessee away from the hospital approximately 40 to 50 feet from the starting location.  When an EMSSTAT staff member asked if he could assist the officers, Defendant Canaan declines and advises, "[w]e're just dragging him off the property.  A small child that doesn't want to listen." Mr. Kessee said, "Please, I need to see a doctor." *See* Ex. 6, NPD Confidential Report at p. 8-9; Ex. 7: Canaan Bodycam Footage.

30.    Defendant Canaan again tells Mr. Kessee to "go. Get up.' Mr. Kessee responds by stating, 'Yes sir' and attempts to sit up with no results."  Defendant Canaan then drags Mr. Kessee another 15-25 feet, dragging "his bare butt."  *See* Ex. 6, NPD Confidential Report at

p. 9; Ex. 7: Canaan Bodycam Footage.

31.     During this time period, neither officer perceived Mr. Kessee to be a threat or to cause danger to them.  Further, neither officer believed Mr. Kessee needed to be restrained or were fearful of Mr. Kessee.  Mr. Kessee was not resisting or evading them, nor did he attack them.  *See* Ex. 2: Brown Dep., 10/20/2020, at 19:4-20-8, 21:24-22:9; *See* Ex. 9: Canaan Dep., 10/20/2020, at 25:15-26:4, 30:20-25, 64:11-16, 129:7-15.

32.     Defendants Brown and Canaan both confirmed when they dragged Mr. Kessee he was not under arrest or being detained, and there were no exigent circumstances that justified any use of force.  *See* Ex. 2: Brown Dep., 10/20/2020, at 18:18-24, 20:9-21, 23:6-8, 85:6-24; *See* Ex. 9: Canaan Dep., 10/20/2020, at 23:9-18, 31:7-10, 42:17-22.

33.     Defendants Brown, Canaan, and Humphrey each confirmed, the act of dragging Mr. Kessee across the parking lot was not "reasonable." *See* Ex. 2: Brown Dep., 10/20/2020, at 24:11-20; Ex. 9: Canaan Dep., 10/20/2020, at 36:1-37:7; Ex. 1: Humphrey Dep., 12/21/2020, at 160:17-21.

**NPD Training and Policies**

34.     Defendant Humphrey was the Chief of Police at the NPD from 2011 to 2019. As such, he was the final decision maker at the NPD.  *See* Ex. 1: Humphrey Dep., 12/21/2020, at 19:22-24, 104:12-105:1.

35.     Defendant Humphrey disciplined Defendants Brown and Canaan with a two-day suspension without pay and initially required them to speak "to each shift and new academy about your experience" (the latter portion of the punishment was not enforced). After this punishment was given, Defendant Humphrey advised Defendants Brown and

Canaan they could have an "informal discussion" with him about their conduct. The discussion was voluntary, and Defendant Canaan declined the discussion. *See* Ex. 1: Humphrey Dep., 12/21/2020, at 23:20-24:21, 29:9-23.

36.     Though it appears the act of dragging Mr. Kessee was not in compliance with or approved by the ***official*** written NPD Policy, Defendant Humphrey testified it was an option, though not "the first option," the Officers could have used.  However, Defendant Humphrey did not punish or discipline Defendants Brown or Canaan for violating this ***official*** Policy, nor were they told the force used was unlawful.  *See* Ex. __2: Brown Dep., 10/20/2020, at 23:10-21, 25:19-23; Ex. 1: Humphrey Dep., 12/21/2020, at 106:17-108:16; Ex. 6: NPD Policy at 300.3.3, "Pain Compliance Techniques."

37.     While Defendants Brown and Canaan received discipline for the NPD's written Standards of Conduct §320.5.9(c) – "Exceeding lawful peace officer powers by unreasonable, unlawful or excessive conduct" - and §320.5.9(m) – "[C]onduct which any members knows or reasonably should know is unbecoming a member of this department…, they were not disciplined for or told their force was "[u]nreasonable and unwarranted" under §320.5.9(b). Defendant Humphrey did not find they violated §320.5.9(b), and their conduct was consistent with their training and NPD policies.  *See* Ex. 6: NPD Confidential Report at p. 6; Ex. 2: Brown Dep., 10/20/2020, at 31:11-24; Ex. 1: Humphrey Dep., 12/21/2020, at 44:19-22, 47:21-48:6.

38.     Defendant Humphrey did not find dragging Mr. Kessee violated NPD policy or training.  *See* Ex. 1: Humphrey Dep., 12/21/2020, at 55:13-16.

39.     Defendant Brown viewed the fact that he was not disciplined for dragging Mr.

Kessee as the City of Norman adopting his conduct. This was also one reason why Defendant Brown felt his conduct in dragging Mr. Kessee was lawful.  *See* Ex. 2: Brown Dep., 10/20/2020, at 32:11-32:18, 33:6-9.

40.     At the time of the dragging, Defendant Brown believed he had "legal authority to drag Marconia Kessee…based on, in part, [his] training from the [NPD]."  *See* Ex. 2: Brown Dep., 10/20/2020, at 38:5-10.

41.     Defendant Brown believed the force he used in dragging Mr. Kessee was "lawful" at the time it occurred.  It was, therefore, in compliance with the training he received from NPD.  *See* Ex. 2: Brown Dep., 10/20/2020, at 25:9-13, 27:4-8.

42.     Defendant Brown testified that, other than being "mean" to Mr. Kessee, his conduct, including not providing Mr. Kessee with medical treatment, was consistent with his NPD training.  *See* Ex. 2: Brown Dep., 10/20/2020, at 68:15-21, 79:17-22.

43.     Defendant Canaan confirmed he was not told his "conduct in not getting [Kessee] medical treatment" violated City of Norman or NPD Policy.  *See* Ex. 9: Canaan Dep., 10/20/2020, at 55:21-56:13.

44.     Defendant Canaan confirmed officers are confronted on a regular basis with people dealing with drug related issues.  *See* Ex. 9: Canaan Dep., 10/20/2020 at 136:6-16.

**Injury to Mr. Kessee**

45.     Hours after his encounter with Defendants Canaan and Brown and being placed in a jail cell, Mr. Kessee died.  *See* Ex. 4: Holbrook Dep., 12/2/2020, at 166:4-12.

46.     Mr. Kessee's cause of death was "seizures and hypoxia, loss of oxygen resulting in cardiac arrythmia" caused by overdose.  *See* Ex. 11: M. Jobin, M.D. Dep., 5/25/2021 at

209:14-24.

47.     Had Defendants Brown and Canaan properly submitted Mr. Kessee for medical care while they were at the hospital, he would have likely (90% chance) survived.  *See* Ex. 11: M. Jobin, M.D. Dep., 5/25/2021 at 209:14-24.

48.     While Mr. Kessee was being dragged, he "begins verbally yelling in what appears to be a pain response as he lands on his tailbone."  *See* Ex. 6, NPD Confidential Report at p. 9; Ex. 7: Canaan Bodycam Footage.

49.     While being dragged, Mr. Kessee's abdomen and "bare butt" are alternatively dragged across the pavement.  *See* Ex. 6, NPD Confidential Report at p. 9; Ex. 7: Canaan Bodycam Footage.

50.     After eliciting the "pain response" from Mr. Kessee, Defendant Canaan asked: "I'm sorry, did I get the injury out of ya?" *See* Ex. 6, NPD Confidential Report at p. 9; Ex. 7: Canaan Bodycam Footage.

51.     Defendant Canaan admitted Mr. Kessee likely suffered pain as a result of his bare skin being drug on the pavement.  *See* Ex. 9: Canaan Dep., 10/20/2020, at 39:3-12

52.     The Medical Examiner's Report noted red abrasions on Mr. Kessee's left low back, right low back, and left hip.  *See* Ex. 12: ME Report.

## ARGUMENTS AND AUTHORITIES

### STANDARD OF REVIEW

Summary judgment is only appropriate when, viewing the record in the light most favorable to the nonmoving party, "there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Russillo v. Scarborough*, 935 F.2d 1167,

1170 (10th Cir. 1991) (Citations Omitted). At this stage, the court's function is not "to weigh

the evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1996).

## PROPOSITION I
### A REASONABLE FACT FINDER COULD CONCLUDE CITY OF NORMAN'S FAILURE TO PROPERLY TRAIN ITS OFFICERS RELATED TO PROCURING MEDICAL TREATMENT AND EXCESSIVE FORCE WAS OBVIOUS, CLOSELY RELATED TO MR. KESSEE'S INJURY, AND PERFORMED WITH DELIBERATE INDIFFERENCE.

It is well established that "a municipality cannot be held liability under §1983 on a

respondeat superior claim." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  However,

§1983 extends liability to a municipal organization where the policies or customs it has

sanctioned, led to an independent constitutional violation.  *Id.* at 694 ("[I]t is when execution

of a government's policy or custom, whether made by its lawmakers or by those whose edicts

or acts may fairly be said to represent official policy, inflicts the injury that the government as

an entity is responsible under §1983.").  "A challenged practice may be deemed an official

policy or custom for §1983 municipal-liability purposes if it is a formally promulgated policy,

a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately

indifferent training or supervision." *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760,

770 (10th Cir. 2013) (Citation Omitted).

"To recover for a failure to train, [Plaintiff] needs to prove three elements:

1.  the existence of a county policy or custom involving deficient training

2.  the policy or custom's causation of an injury

3.  the [municipality's] adoption of a policy or custom with deliberate indifference."

16

*Lance v. Morris*, 985 F.3d 787, 800 (10th Cir. 2021).

**A. A Reasonable Factfinder Could Determine the City of Norman's Failure to Properly Train Its Officers to Respond Appropriately to a Pretrial Detainee's Constitutional Right to Medical Treatment Was Obvious, Closely Related to Mr. Kessee's Injury, and Performed With Deliberate Indifference.**

**1. <u>City of Norman Trained Defendants Brown and Canaan to Disregard An Obvious and Substantial Risk of Harm to City of Norman Citizens Requiring Medical Care.</u>**

**a. <u>The Facts Related to Mr. Kessee's "Clear" and "Obvious" Need for Medical Care.</u>**

On January 16, 2018, Marconia Lynn Kessee sought medical treatment from Norman Regional Hospital, presenting with a primary diagnosis of headache. SOF 1. ARPN Holbrook believed Mr. Kessee was seeking drugs and discharged him.  SOF 1. Per the discharge paperwork the officers saw that evening, Mr. Kessee was stable as of 7:03 p.m.. Kessee was not suffering from the same physical and mental issues with which he presented during their encounter with him. SOF 7.

Once Mr. Kessee was discharged, a security guard at NRH called NPD, requesting an officer to assist Mr. Kessee to the Salvation Army because he did not have any identification. SOF 2-3.  Thereafter, Officer Canaan arrived at the hospital and found Mr. Kessee sitting on the floor of the emergency room waiting area, where he appeared to be out of breath, wide eyed, and occasionally moaning.  SOF 4.  Defendants Brown and Canaan were informed by a hospital security employee that Mr. Kessee had begun having his issues after being discharged. SOF 8, 24.

While still in the waiting room, Mr. Kessee was unable to ambulate on his own, was unable to put on his own glasses, and was unable to verbally communicate.  SOF 4.  Defendant

Canaan assisted Mr. Kessee into a wheelchair and helped him put his glasses on.  SOF 4.  Mr. Kessee's hands can be seen shaking in Canaan's bodycam.  SOF 4.  Officer Brown then arrived.  SOF 5.  Mr. Kessee was wheeled out of the building—to where it was about 11.7 degrees Fahrenheit—without additional medical assistance being sought for him by Officers Canaan and Brown.  SOF 5. Neither Officer Canaan nor Officer Brown spoke with any hospital staff other than the single security employee about Mr. Kessee's condition.  SOF 25.

Once outside, Mr. Kessee attempted to communicate with the Officers, but his words were thick, slurred, and largely incoherent.  SOF 5, 9.  When the Officers told him to walk to the Salvation Army, Mr. Kessee got out of the wheelchair as if to comply, but immediately attempted to get back in the wheelchair before shaking violently and falling to the ground.  SOF 6.  Mr. Kessee was seen throughout the video convulsing, and he lacked basic coordination, rendering him unable to stand or walk.  SOF 4-16. During this time, the officers were provided with Kessee's discharge paperwork that indicated he was stable as of 7:03p.m. SOF 1. They ignored the obvious change in Kessee's condition, which they were aware of. *See* Resp. to Def's Fact, ¶ 12; SOF 4-8, 13.

Once outside, the officers made various comments to Mr. Kessee including: (i) "Are you just putting on a show...?" (ii) "You can't just act like this to get back in the hospital. That's not how it works." (iii) "You can stop with the show. It ain't fooling a single person, I can tell you that." (iv) "What you are doing now is putting on a show." and (v) "I am too cold to stand here and watch you play this game. Can you just get your shoe on and walk away?"  SOF 17. In one of the few partially intelligible things Mr. Kessee said that evening, he responded to the Officers saying, he was "not playing" and that there is "something going on." SOF 11.  The

Officers repeatedly denied and disregarded Mr. Kessee's requests to see a doctor.  SOF 17, 19-23.

Despite the cold temperature, Mr. Kessee began sweating profusely during his encounter with the police officers.  SOF 10. Mr. Kessee was unable to put his shoe on by himself and said, "I need to talk to him . . . to a doctor." SOF 11.  Officer Canaan informed Mr. Kessee: "I'll take you to jail just the way you are. It doesn't matter to me." SOF 17.  And Officer Brown stated: "You ain't seeing a doctor" and "I could teach my dog to put a shoe on quicker than this." SOF 17. Mr. Kessee said that he was "sick" and that there was "medicine in [him];" Officer Brown said "Here, in about 15 seconds, I am going to drag your ass to the curb" and "time's ticking." SOF 29.

Defendants Canaan and Brown subsequently instructed Mr. Kessee to walk off of the hospital's property carrying his shoe if he was unable to put it on his foot. SOF 18. Mr. Kessee did not do so.  SOF 18. The officers told Mr. Kessee that they were "not falling for [his] bullshit" and Mr. Kessee responded: "I'm not trying to. I'm not trying to." SOF 18.

Sick of being in the cold, Defendants Canaan and Brown began dragging Mr. Kessee across the pavement, eventually going about 75 feet. SOF 28.  In response to an EMSA personnel's offer to assist them, Officer Canaan stated: "[w]e're just dragging him off the property, like a small[] child that doesn't want to listen" and told Mr. Kessee to "[s]tand up" when they briefly stopped.  SOF 28. Mr. Kessee said: "Please, I need to see a doctor." SOF 29. When the Canaan resumed dragging Mr. Kessee across the pavement, Officer Brown observed that Mr. Kessee's "bare butt . . . [was] dragging" because his pants had fallen. SOF 19.

Eventually, the officers informed Mr. Kessee that he would be arrested and taken to jail for trespassing on the hospital's property. SOF 12. They handcuffed Mr. Kessee, who exclaimed: "I'm sick." SOF 12. Mr. Kessee was placed in Officer Brown's vehicle after Officer Brown retrieved it from near the entrance to the emergency room—i.e., the approximate location that Mr. Kessee and the officers were before Mr. Kessee was dragged by the officers across the pavement. SOF 12.

Despite knowing the doctor had not seen him in the condition with which he presented to the officers, neither Defendant Brown nor Canaan ever discussed Mr. Kessee's condition with a medical provider at NRH. SOF 26-28. And, ***knowing the jail would never accept him in his condition***, Defendant Canaan obtained a "fit slip" from APRN Holbrook while withholding the obvious, known changes in Kessee's condition from APRN Holbrook. Meanwhile Defendant Brown drove Kessee to the jail, disregarding Mr. Kessee's continued pleas for medical care. *See* Resp. to Def. Fact ¶ 12, SOF 26-28.

Mr. Kessee yelled out repeatedly and convulsed while being transported by Officer Brown from the hospital to the F. Dewayne Beggs Detention Center (located in Norman and operated by the Cleveland County Sheriff's Office). At one point, Mr. Kessee warned: "I'm going to die in your car." SOF 11. Mr. Kessee convulsed while in the jail's intake area, causing him to strike his head against the wall. SOF 15. Mr. Kessee had to be carried to a cell. SOF 15. Approximately two hours later, Mr. Kessee was discovered dead in his cell. SOF 46.

      b.  <u>The Existence of a Policy or Custom Involving Deficient Training That Caused Injury (Prongs 1 and 2).</u>

Both Defendants Brown and Canaan admitted they disregarded the "clear" and "obvious" indicators that Mr. Kessee was overdosing because they had decided he was

"faking" it.  SOF 4-21.  Neither checked for the objective indicators they would have required to confirm an overdose and/or Mr. Kessee's need for immediate medical treatment.  SOF 21. Again, **despite knowing the doctor had not seen him in the condition with which he presented to the officers**, neither Defendant Brown nor Canaan ever discussed Mr. Kessee's condition with a medical provider at NRH.  SOF 26-28.  And, **knowing the jail would never accept him in his condition**, Defendant Canaan obtained a "fit slip" from APRN Holbrook while withholding the obvious, known changes in Kessee's condition from APRN Holbrook. Meanwhile Defendant Brown drove Kessee to the jail, disregarding Mr. Kessee's continued pleas for medical care.  *See* Resp. to Def. Fact ¶ 12, SOF 26-28.

During his deposition, Defendant Brown testified that, other than being "mean" to Mr. Kessee, his conduct, including not providing Mr. Kessee with medical treatment at any point in his encounter with him, was consistent with the training he received from the NPD. SOF 39-42.  Further, Defendant Brown was not disciplined for this conduct.  SOF 35, 37, 39-42.  Defendant Canaan similarly testified he was never told this same conduct violated any NPD Policy and was not disciplined for it.  SOF 43.

Pursuant to this testimony, it is clear the training provided by the City of Norman and the NPD includes training to **(1)** disregard "obvious" signs of drug overdose and a life-threatening medical condition; and **(2)** not properly communicate to a doctor a known change in condition when obtaining medical clearance for incarceration.  This training is contrary to Mr. Kessee's Constitutionally and clearly-established right to medical care.  Further, "[a] reasonable factfinder could infer this deficiency in the training was both obvious and closely related to [Mr. Kessee's] injury."  *Lance*, 985 F.3d at 801. Defendant avers that "[s]eeking and

obtaining a fit for incarceration slip and delivering Mr. Kessee to facility is the antithesis of an alleged policy of failing to provide medical care to arrestees" and asserts that Brown and Canaan did not fail to provide Mr. Kessee with medical care.[6] However, the facts disagree.

Moreover, "choosing to ignore [a detainee's] repeated complaints' that something is wrong "and requests for medical assistance" in light of obvious signs of a potentially life-threatening condition is sufficient to establish deliberate indifference. *Al-Turki v. Robinson*, 762 F.3d 1188, 1194-95 (10th Cir. 2014). Going further, "withholding" knowledge of a detainee's condition from a medical provider "violate[s] [a detainee's] constitutional rights" and constitutes "deliberate[ ] indiffern[ce] to [Mr. Kessee's] medical care" needs. *Border v. Trumbull Cty. Bd. of Com'rs*, 414 Fed. Appx. 831, 834 (6th Cir. 2011). "[F]ailing to seek medical care for an intoxicated arrestee who exhibits symptoms substantially more severe than ordinary intoxication violates the arrestee's constitutional rights, all the more so when the surrounding circumstances indicate that a medical emergency exists." *Barton v. Taber*, 820 F.3d 958, 967 (8th Cir. 2016). A delay in providing medical treatment which causes either unnecessary pain or a worsening of a detainee's medical condition can be a constitutional violation – "[e]ven a brief delay may be unconstitutional." *See Mata v. Saiz*, 427 F.3d 745, 755; (10th Cir. 2005) *see also Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (delay of "several hours" in taking

---

[6] To the extent Defendant takes the position that these two sentences buried in its brief (*See* Doc. 210, p.13) properly raise the issue that there was no underlying constitutional violation as pertains to Mr. Kessee's need for medical care, Plaintiff disputes that such issue has been properly raised. Plaintiff's facts demonstrate such failure throughout this brief. In an abundance of caution, Plaintiff has provided legal authority supporting a finding of an underlying violation based on the facts presented herein. Defendants Canaan's and Brown's failure to properly provide or seek medical to Kessee will be more thoroughly addressed in the responses to their respective Motions for Summary Judgment.

inmate with chest pains to hospital violated Eighth Amendment); *Boretti v. Wiscomb*, 930 F.2d 1150, 1154-55 (6th Cir. 1991)("prisoner who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering."); *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990)(few hours delay in treating inmate's broken foot could render defendants liable); *Lewis v. Wallenstein*, 769 F.2d 1173, 1183 (7th Cir. 1985) (fifteen minute delay in treating inmate in cardiac arrest may violate Eighth Amendment).

  c. <u>City of Norman Adopted the Policy or Custom With Deliberate Indifference.</u>

   Under this prong of the analysis, "[d]eliberate indifference can exist when a [City] fails to train [officers] on how to handle recurring situations presenting an obvious potential to violate the Constitution." *Lance*, 985 F.3d at 801, citing *Allen v. Muskogee*, 119 F.3d 837, 842 (10th Cir. 1997).  To evaluate this prong, the Tenth Circuit has adopted the three-part test devised by the Second Circuit Court of Appeals, which requires: **(1)** The City's "policymakers know 'to a moral certainty' that their employees will confront a given situation"; **(2)** "The situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult"; and **(3)** "The wrong choice…will frequently cause the deprivation of a citizen's constitutional rights." *Id.* at 802.

   As to the first prong, that Defendant Humphrey knew to a "moral certainty" that Officers will confront a given situation, Defendant Canaan confirmed officers are confronted on a regular basis with people dealing with drug related issues.  SOF 44.  In fact, it is common knowledge that police officers frequently deal with individuals dealing with various levels of intoxication – many of which can be life-threatening.  Therefore, a reasonable factfinder could

determine that policymakers knew "to a moral certainty" that its Officers would need to assess the medical needs of such individuals and **not** disregard "clear" and "obvious" indicators of overdose.

As to the second prong, a reasonable fact finder could also determine that "training would have helped [officers] make the difficult decision of whether to" immediately seek medical care for Mr. Kessee, especially when they were mere feet from a hospital and EMTs. SOF 25.  Finally, "a factfinder could determine that the [officers'] lack of [or improper] training would frequently lead to disregard of serious [medical] complaints [and signs], violating a detainee's constitutional right to medical care." *Lance*, 985 F.3d at 803.

As to training officers to **not** properly communicate with a detainee's physician a known change of condition, a reasonable factfinder could conclude that policymakers knew "to a moral certainty" officers would need to communicate with physicians in order to obtain a medical clearance for incarceration.  A reasonable factfinder could also determine that training would have helped officers understand a physician who is providing medical clearance for incarceration must know all of the detainee's ***current*** and/or ***changed*** medical conditions. Finally, a reasonable factfinder could conclude that failure to adequately communicate such ***changed*** conditions would cause a deprivation of a detainee's constitutional right to medical care.  Further, Mr. Kessee was clearly harmed by this conduct.  SOF 45-52.[7]

For these reasons, Defendant City of Norman's Motion for Summary Judgment must

---

[7] To the extent Defendant City of Norman adopts and incorporates its arguments from §B(2) of Defendant Keith Humphrey's Motion for Summary Judgment, Plaintiff in turn adopts and incorporates her arguments in response thereto from her Response to Defendant Humphrey's Motion for Summary Judgment.

be denied.

### B. A Reasonable Factfinder Could Determine the City of Norman's Training On the Issue of Excessive Force Was Obvious, Closely Related to Mr. Kessee's Injury, and Performed With Deliberate Indifference.

a. The Existence of a Policy or Custom Involving Deficient Training That Caused Injury (Prongs 1 and 2).

As it relates to the excessive force claim, the facts also show a failure to train in this regard. First, Defendant Humphrey testified that, while dragging did not appear to be consistent with the NPD's policy, dragging was an option, even if not the first option, an Officer could use in a situation such as that presented here – where Mr. Kessee was not under arrest, was not being detained, was not evading officers, and posed no threat to them. SOF 31-32. Further, Defendant Humphrey testified that the act of dragging did not violate NPD training. SOF 34, 36, 38. Finally, Defendant Brown believed the training was lawful and that the City of Norman adopted his conduct when it did not punish him for it. SOF 39-42. Brown also confirmed this conduct was in compliance with his training. *Id.*

Pursuant to this testimony, it is clear the training provided by the City of Norman and the NPD includes training that dragging **is** an "option" in dealing with a non-threatening, non-resisting, and non-evasive, citizen who are not under arrest or being detained. This training is contrary to Mr. Kessee's Constitutionally established right to be free of excessive force. Further, "[a] reasonable factfinder could infer this deficiency in the training was both obvious and closely related to [Mr. Kessee's] injury." *Lance*, 985 F.3d at 801.

b. The Municipality's Adoption of a Policy or Custom With Deliberate Indifference.

A reasonable factfinder could conclude that policymakers knew to a "moral certainty" that Officers will confront a situation where, for whatever reason, a Citizen may be unable to comply with their requests. Therefore, a reasonable factor finder could determine that policymakers knew "to a moral certainty" that its Officers would need to know that, in those situations, dragging is **not** an option.  Further, a reasonable fact finder could also determine that "training would have helped" officers determine the best course of action to assist Mr. Kessee in complying with their requests.  Finally, "a factfinder could determine that the [officers'] lack of training [or improper training] would frequently lead to disregard" of a detainee's Constitutional right to be free from excessive force.  Further, Mr. Kessee was clearly harmed by this conduct.  SOF 45-52.

For these reasons, Defendant City of Norman's Motion for Summary Judgment must be denied.

<u>**PROPOSITION II**</u>
**A REASONABLE FACT FINDER COULD CONCLUDE CITY OF NORMAN MAINTAINED AN UNCONSTITUTIONAL POLICY OR CUSTOM THAT CAUSED KESSEE'S INJURY**

A municipality and its supervisors can be held liable for civil rights violations where "an affirmative link" exists between the complained of conduct and the "adoption of any plan or policy – express or otherwise – *showing their authorization or approval of such misconduct*."  *D.T. by M.T. v. Independent School Dist. No. 16*, 896 F.2d 1176, 1187 (10th Cir. 1990).  "To be sure, 'official policy' often refers to formal rules or understandings – often but not always committed to writing – that are intended to, and do, establish fixed plans of actions to be followed under similar circumstances consistently over time."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986).  "Official policy involves a deliberate choice to follow a course of

action…made from among various alternatives by an official who" is determined to have "the final authority to establish governmental policy." *Ware v. Jackson Cty*, 150 F.3d 873, 880 (8th Cir. 1998) (internal brackets and citations omitted).

In this case, Defendant Humphrey testified that dragging Mr. Kessee did not violate NPD policy. SOF 38, 40. Further, Mr. Kessee was clearly harmed by this conduct. SOF 45-52. Therefore, regardless of whether NPD had a policy that would appear to prohibit this type of behavior, the NPD had a custom that it did not. For these reasons, Defendant City of Norman's Motion for Summary Judgment must be denied.

## PROPOSITION III
## QUESTIONS OF FACT EXIST AS TO PLAINTIFF'S CLAIMS OF NEGLIGENCE.

Under Oklahoma law, a claim for negligence can be predicated on conduct that amounts to gross negligence. *Combs v. West Siloam Speedway Corp.*, 2017 OK CIV APP 64, ¶20, 406 P.3d 1064, 1070. "Gross negligence is characterized as reckless indifference to the consequences." *Id.*, citing *Myers v. Lashley*, 2002 OK 14, ¶22, 44 P.3d 553. Reckless indifference includes conduct that is done intentionally without regard the unreasonable risk of harm to another. *Id.* at ¶22, 406 P.3d at 1070.

A properly instructed jury could determine under the facts of this case, as detailed herein above, that Defendants Brown and Canaan acted in gross negligence, or reckless disregard when they intentionally dragged Mr. Kessee 75 feet in the NRH parking lot. This is a question of fact that must be submitted to the jury's determination.

## CONCLUSION

The evidentiary materials presented do not eliminate but rather tender key questions

of fact as to Plaintiff's claims against the City of Norman. Therefore, the City of Norman's

Motion for Summary Judgment should be denied.

Respectfully submitted,

s/ Jonathan R. Ortwein
Chris Hammons, OBA #20233
Jason M. Hicks, OBA# 22176
Jonathan R. Ortwein, OBA #32092
LAIRD, HAMMONS, LAIRD, PLLC
1332 S.W. 89th Street
Oklahoma City, OK 73159
Telephone:    (405) 703-4567
Facsimile:    (405) 703-4061
E-mail:        Chris@lhllaw.com
               Jason@lhllaw.com
               Jonathan@lhllaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 14, 2021, I electronically transmitted the attached

document to the Clerk of Court using the Electronic Case Filing System for filing. Based on

the records currently on file in this case, the Clerk of Court will transmit a Notice of Electronic

Filing to those registered participants of the ECF System.

s/ Jonathan R. Ortwein
Jonathan R. Ortwein
