## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

PATRICIA THOMPSON, as Personal )
Representative of the Estate of )
MARCONIA LYNN KESSEE )
  )
           Plaintiff, )
  )
v. )      Case No. 19-CV-113-SLP
  )
NORMAN REGIONAL HOSPITAL )
AUTHORITY, d/b/a NORMAN REGIONAL )
HOSPITAL, a public trust, *et al.*, )
  )
           Defendants. )

## DEFENDANT CLAYTON RICKERT'S RESPONSE TO PLAINTIFF'S MOTION TO STRIKE ERRATA SHEET OF CLAYTON RICKERT

COMES NOW Defendant Clayton Rickert, LPN ("Nurse Rickert"), by and through the undersigned Counsel and submits its Response to Plaintiff's Motion to Strike Errata Sheet of Clayton Rickert. Defendant files this Response for purposes of responding to arguments and positions propounded by Plaintiff in their Motion (Doc. No. 218).

## ARGUMENT AND AUTHORITIES

### I.    NURSE RICKERT'S ERRATA SHEET IS NOT AN ATTEMPT TO CREATE A SHAM FACT ISSUE.

Under Federal Rule of Civil Procedure 30(e), upon request, a deponent is permitted to review the transcript of an oral deposition and "to indicate any changes in form or substance." Fed. R. Civ. P. 30(e) Ordinarily, after a deposition witness records changes on an errata sheet, the parties may then reexamine the witness about the reasons for the changes. *See, e.g., Erstad v. Curtis Bay Towing Co.,* 28 F.R.D. 583, 584 (D. Md.

1961); *Pepsi-Cola Bottling Co. of Pittsburgh, Inc. v. PepsiCo, Inc.,* No. CIV.A.01-2009-KHV, 2009 WL 511506, at *2 (D. Kan. Apr. 3, 2002). Despite the broad language of Rule 30(e), the Tenth Circuit has limited its application to prevent deponents from using an errata sheet to contradict their original testimony for the purpose of creating a sham issue of fact. Accordingly, the Tenth Circuit has applied the "sham affidavit" doctrine, as articulated in *Franks v. Nimmo,* 796 F.2d 1230 (10th Cir. 1986), to errata sheet corrections. *See also Burns v. Board of County Commissioners of Jackson County,* 330 F.3d 1275, 1278 (10th Cir. 2003); *Rios v. Bigler,* 67 F.3d 1543 (10th Cir. 1995).

In *Franks*, the Tenth Circuit acknowledged the general rule that "an affidavit may not be disregarded because it conflicts with the affiant's prior sworn statements," but the court concluded the general rule does not apply in "one of those unusual cases" where a conflict between testimony and an affidavit raises a sham issue. *Franks*, 796 F.2d at 1237. A "sham affidavit" is a "contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment." *Jiminez v. All Amercian Rathskeller, Inc.,* 503 F.3d 247, 253 (3d. Cir. 2007). Thus, "courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." *Franks*, 796 F.2d at 1237. For example, the plaintiff in *Franks* was a federal employee who claimed the government failed to follow proper procedures to terminate him because he was a permanent employee, not a probationary employee. *Id.* at 1236-37. Although he testified in a hearing that no statements were made to him about his status as a probationary employee, he declared in a

subsequent affidavit that he was told by supervisors that he was a permanent employee, not a probationary employee. *Id.* His affidavit flatly contradicted his prior "unequivocal" testimony in an attempt to create a factual dispute and preclude summary judgment, and therefore, the court concluded the later affidavit was a sham. *Id.*

Other cases invoking the "sham affidavit" doctrine also involve circumstances where a subsequent affidavit or errata sheet utterly contradicts the witness's original testimony. For example, in *Garcia v. Pueblo Country Club,* 299 F.3d 1233, 1242 n.5 (10th Cir. 2002), the Tenth Circuit expressed concern over an errata sheet that "strayed substantively" from the witness's original testimony. *Id.* The deponent in *Garcia* originally testified that he did not know why a job listing was advertised; in his errata sheet, however, he answered that the reason for the advertisement was "to have the right person in place." *Id.* The court stated:

> [We] do not approve of the use of such altered testimony that is controverted by the original testimony... [Rule 30(e)] cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses... A deposition is not a take home examination.

*Id.*

As these cases make clear, the "sham affidavit" doctrine only applies when the court determines that an errata sheet contradicts or materially alters the deponent's original testimony. It does not apply when errata sheet changes merely clarify or correct the original testimony. *Whitaker III v. Trans Union Corp.,* No. 03-25510GTV, 2004 WL 1982527, at *2 (D. Kan. Sept. 3, 2004) (stating that errata sheets may be used to clarify or correct

3

errors, as when a question is not understood); *see also Pepsi-Cola Bottling Co. of Pittsburgh, Inc. v. PepsiCo, Inc.,* No. CIV.A.01-2009-KHV, 2009 WL 511506, at *4 (D. Kan. Apr. 3, 2002) (permitting even contradictory errata sheet changes as long as no dispositive motions are pending).

The correction of his testimony is not an improper attempt to materially change Nurse Rickert's testimony or create controverted facts to defeat summary judgment; rather it is merely a change in form to clarify and provide consistency; thus, the corrections to the deposition should be permitted and Plaintiff's Motion should be denied.

## II.   NURSE RICKERT'S ERRATA SHEET DOES NOT CONTRADICT OR MATERIALLY ALTER HIS ORIGINAL TESTIMONY.

A deponent is afforded the specific statutory right to review his deposition transcript and list changes thereto, in form or substance, and the reasons for making them. Fed. R. Civ. P. 30(e). Where there has been a material alteration in deposition testimony, the affidavit is not automatically disregarded; however, such must be evaluated under the Tenth Circuit's Rule 30(e) analysis, as set forth in *Burns v. Bd. of Cty. Comm'rs*, 330 F.3d 1275, 1282 (10th Cir. 2003), wherein the Court must first decide if the challenged deposition corrections materially alter the deposition testimony. If the changes are material and internally inconsistent with the deponents other testimony, only then should the Court the Court apply the *Burns* analysis. *Fullbright v. State Farm Mut. Auto. Ins. Co.*, No. CIV-09-297-D, 2010 WL 455179 at * 2 (W.D. Okla. Feb. 2, 2010). When the errata entry does not alter the substance of the testimony and is internally consistent, the Court need not

apply the *Burns* factors. Id. Additionally, errata is appropriate where it does not alter the substance of the testimony and is consistent with other portions of the deponent's testimony. *Id* at * 3. Here, Nurse Rickert's errata entries do not alter the substance of his testimony, and they are internally consistent with other portions of his testimony. See Exhibit 2, Rickert Jurat and Errata.

During his deposition, Nurse Rickert was asked multiple times about his qualifications as a Licensed Professional Nurse ("LPN") and the intake of Mr. Kessee. Ex. 1, Rickert Dep., at 72:12, 73:18, 98:14, 99:18, 102:15, 118:15, 125:3, 159:4, 163:4-5, and 227:1. Throughout the deposition, the words "assess" and "screen" were used interchangeably. However, according to the Oklahoma Nursing Practice Act, LPNs cannot assess a patient, whereas an assessment is within the scope of Registered Nurses and other healthcare providers whose training and education exceeds that of an LPN:

> 3. "Registered nursing" means the practice of the full scope of nursing which includes, but is not limited to:
> a. **assessing** the health status of individuals, families and groups,
> b. **analyzing assessment data** to determine nursing care needs,
> 4. "Licensed practical nursing" means the practice of nursing under the supervision or direction of a registered nurse, licensed physician or dentist. This directed scope of nursing practice includes, but is not limited to:
> a. **contributing to the assessment** of the health status of individuals and groups,
> b. participating in the development and modification of the plan of care.
> O.S. tit. 59, § 567.3a (3)-(4) (emphasis added)

In accordance with Oklahoma Law, Nurse Rickert correctly testified LPNs, including himself, are not qualified to "assess" patients. Ex. 1, Rickert Dep., at 72:10-23.

Accordingly, where Nurse Rickert's errata sheet changes "assess" to "screen", it in no way contradicts his original testimony or materially alters it. It simply streamlines the testimony for internal consistency and in compliance with Oklahoma law.

Plaintiff also takes issue with Nurse Rickert's clarifications regarding his reliance on the "fit slip" that Mr. Kessee that was issued at the hospital and that told Nurse Rickert that Mr. Kessee had been seen and treated by a physician at a hospital and deemed to be healthy enough for incarceration. Such clarifications do not contradict or materially alter Nurse Rickert's testimony, and in fact, they are consistent with other portions of his testimony.

> Q When Officer Brown told you that he -- that Mr. Kessee had a **fit for incarceration slip**, you didn't have any reason to not believe him, correct?
> MR. HAMMONS: Object to the form.
> A Correct.
> Q (By Ms. Dark) There's no reason to doubt that a **fit slip** was coming, correct?
> MR. HAMMONS: Object -- object to the form.
> A I -- like I said, I thought it was there, that maybe it was in the car.
> Q (By Ms. Dark) Okay. And at some point, you saw a **fit for incarceration slip**, right?
> MR. HAMMONS: Object --
> A Yes.
> MR. HAMMONS: Object to the form.
> Q (By Ms. Dark) **And that fit slip tells you that he has -- Mr. Kessee had been seen at a hospital prior to his arrival, correct?**
> **A Correct.**
>                                    ***
>
> **Q [The Fit Slip] is unconditional, this is saying, "We've seen him, he's good, he can come into the jail," right?**
>                                    ***

Q (By Ms. Thompson) And as far as your understanding was, based on Officer Brown's representation, the **fit slip** existed at the time Marconia Kessee arrived at the jail, correct?
A Correct.
Q Because that's what he told you, right?
A Yes.
Q And you didn't have any reason to doubt that rep- -- representation, correct?
A Correct.

Ex. 1, Rickert Dep., at 240:21-241:14; 242:3-9; 273:4-13 (emphasis added)

As such, Nurse Rickert's errata clarifications regarding the meaning of and his reliance on the fit slip are consistent with the other portions of his deposition testimony.

Additionally, Nurse Rickert made corrections to deposition testimony to clarify his testimony regarding his belief that Mr. Kessee was exhibiting behavioral issues, not medical problems, and he was being uncooperative on presentation to the correctional facility. Ex. 1, Rickert Dep., at 104:4-15. The questioning proceeded as follows:

Q: Do you think that Marconia got the benefit of that procedure?
MS. DARK:   Object to the form. MS. THOMPSON:   Object to the form.
A: No, "because of his uncooperative condition."
Q: By Mr. Hammons) He was surrounded by people telling him to shut up and that he was an idiot and to sit his ass down and to fuck his ass.   That's all he got.   He didn't get -- he didn't get that access, did he?
A: No, "because of his uncooperative condition."
MS. DARK: Object to the form.
MS. THOMPSON: Object to the form.
A: No, "because of his uncooperative condition."

Ex. 1, Rickert Dep., at 209:22-25 and 210:1-10 [Errata sheet correction is underlined.]

Q: Okay.   "Inmates" -- second bullet point on Page 13:   "Inmates are

7

screened for suicidal tendencies, chronic medical problems, unresolved acute medical problems, communicable diseases and PREA.   Those are -- those with positive findings or receiving screening, will receive a comprehensive medical intake." Of course, Marconia did not get a concer- -- comprehensive medical intake; true?

A: True, <u>"because of his uncooperative condition."</u>

Ex. 1, Rickert Dep., at 211:14-22 [Errata sheet correction is underlined.]

Q: (By Mr. Hammons) You should start out with –even if you think they're faking, you should start out 16 on the basis that they're not faking and -- and you disprove it through your medical education and training; true?

A: True, <u>"but I can't screen an uncooperative patient."</u>

Q: Because that's the way that we don't miss things like this, when we assume people are faking when they're not faking; true?

MS. THOMPSON:   Object to form.

A: Yes, <u>"but I can't screen an uncooperative patient."</u>

Ex. 1, Rickert Dep., at 266:14-24. [Errata sheet correction is underlined.]

Q: Okay. So at the time of the visual screening, what indications made you believe that he was -- I'm going to use the word "faking." Is that what you would use?

A:When he just was -- he made this shaking movement, that I used an ammonia inhalant to prove that it wasn't a seizure, and then he was not cooperative, and that's -- was my assessment. <u>"In my observation, this appeared to be a behavioral problem, not a medical problem. I had an uncooperative inmate, who I was told was heal thy enough to be discharged from the hospital. Inmates often fake symptoms for sympathy or to get out jail, so it seemed reasonable to me that that was the case here."</u>

Ex. 1, Rickert Dep., at 99:11-18 [Errata sheet correction is underlined.]

However, Nurse Rickert's errata sheet corrections in no way contradicts his original testimony. Rather, when read in context, his errata sheet correction reinforces his original testimony.

Q (By Mr. Hammons) And what was your visual

8

assessment of him?

**A I believed, at the time, that he was acting out, having a behavioral issue, and that he was trying to harm himself.**

Q Okay. Do you -- do you -- why did you put him in the cell?

\*\*\*

Q (By Mr. Hammons) What did you think he was faking?

**A Just -- he was just having the behavior issue, thought he was faking his symptoms to...**

Q To, what?

A I don't know, to the end, that... because he didn't want to be messed with, I don't know.

\*\*\*

Q And I know you've discussed that a bit with Ms. Dark earlier, but did you see any -- **other than behavioral symptoms, did you see any medical symptoms in Mr. Kessee, on January 16th of 2018, that would require immediate medical care --**

**A No.**

Q -- in your opinion?

**Is that unusual, based on your prior experience in correctional nursing, for an inmate to fake their symptoms?**

**A No.**

\*\*\*

Q What -- how would you know anything about him or whether he was cooperative or not if you didn't ever ask him a question?

**A Because he wasn't cooperating with the book-in, which has to be done before I get to do my medical examination.**

\*\*\*

Q Does your training tell you that you still have to do some sort of assessment on people and you got to give them the benefit of the doubt?

**A Well, he wasn't very cooperative**, so I didn't figure that the -- I didn't think the -- well, the blood pressure wouldn't have been very accurate, using the equipment that I had, so I was going to let him – which I've done in the past, that -- let them calm down and then finish the intake after they've

calmed down.

**Q So you take it he was being uncooperative, based on your observations?**

**A Yes.**

                             \*\*\*

Wouldn't it be to take his blood pressure, take a temperature, just give him the benefit of the doubt for maybe a minute or two? Wouldn't that have been the prudent move here?

MS. DARK: Object to the form.

MS. THOMPSON: Object to the form.

A As I've --

MS. GOOCH: Object to the form.

**A As I've stated, that I couldn't do his blood pressure because he was in handcuffs and, two, the machine that I used, if they're not cooperative, then it wouldn't have been accurate.**

Ex. 1, Rickert Dep., at 98:15-21; 102:16-21; 104:4-15; 192:13-24; 208:10-16; 253:11-21 (emphasis added)

As this testimony shows, the errata clarifications Nurse Rickert offered to explain his opinion that Mr. Kessee was being uncooperative and exhibiting behavioral problems at the time of his intake screening do not materially alter his testimony, and moreover, the clarifications consistent with his deposition testimony. Such is not an improper attempt to materially change his testimony, rather Nurse Rickert's reasoning for his correction, along with his deposition transcript, demonstrate the context in which he initially answered the questions and the proposed changes are not even substantive, but merely a change in form that helps clarify his testimony and provide consistency.

## III.   CLAYTON RICKERT WAS CLEARLY CONFUSED REGARDING CERTAIN LINES OF QUESTIONING DURING HIS DEPOSITION.

One factor relevant for consideration as to whether errata changes are appropriate is

whether the earlier testimony reflects confusion which the affidavit attempts to explain. *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). Here, Nurse Rickert was clearly confused when he testified at his deposition regarding the training he received. As such, Nurse Rickert made corrections to deposition testimony regarding the use of ammonium capsules and where he was trained on the capsules.

As a precursor, it is important to understand and remember that as a trained Licensed Professional Nurse, Nurse Rickert received education and training to earn his degree and license. Ex. 1, Rickert Dep., 12:12-13:5. Also, prior to working for Turn Key, Nurse Rickert had held multiple jobs in healthcare where he received various types of training. Id. at 13-24. It is also noteworthy that the incident involving Mr. Kessee occurred on January 16, 2018, and Nurse Rickert was deposed on December 15, 2020, and in the interim, Nurse Rickert had taken another healthcare job with the Oklahoma Department of Veterans Affairs. Id. at 24. Nurse Rickert's educational, training, and employment history are relevant because at his deposition, counsel questioned Nurse Rickert regarding the exact sources of his training, and Nurse Rickert understandably got confused. For example, Nurse Rickert admitted that he got confused regarding which of his jobs trained him to use a log book for mental health referrals:

> Q Okay. And what's -- is -- is he taken somewhere or does somebody come in and do that?
> **A I'm -- I'm not aware of how that works.**
> Q Had -- was he your first to do that on?
> A No. There's a book and I put their name in a book. **I -- I don't know -- I don't know how the process goes.**
> Q In the medical screening room, there's just a book and you write his name

11

in there?
A The book's in the infirmary.
Q Okay. And it's just a log of some sort?
A Right.
Q Okay. And what do you write, just his name?
**A I -- I don't remember everything you put in there.**
Q Well, do you have to write a reason why you want him mentally assessed?
**A I -- I don't remember everything you have to put in there.**
Q Well, do -- well, do you remember -- I mean, it seems -- you -- you have to get some reason, right?
**A He -- I don't -- I don't -- I don't -- I don't remember, I really don't.**
Q Have you looked at that recently, too, that -- whatever you wrote on that...
A No, I haven't looked at anything.
Q Well, I'm talking about when you were reviewing for this deposition. Did
A No.
Q -- somebody show you that?
A No.
Q Okay. I've never seen it. Do you think it still exists?
A It should.
Q How do you know that?
**A Unless I'm getting my jobs confused, I...**

Ex. 1, Rickert Dep., 222:7-223:17 (emphasis added)

Not only did Nurse Rickert testify as to his confusion, but the above excerpt demonstrates how counsel continually pressed when Nurse Rickert testified that he could not remember something. This pattern continued with the ammonia capsules. As shown below, Nurse Rickert repeatedly answered "I don't remember," but counsel badgered him with the same question until he answered "Somebody at Turn Key." Nurse Rickert was clearly confused at the time, and he used the errata to clarify his confused testimony.

Q: (By Mr. Hammons) Who taught you that?
A: **I couldn't -- I don't remember.**
Q: The Cleveland County Detention Center taught you to stick smelling salts in people's face?
A: No.

12

MS. DARK: Object to the form.

Q: (By Mr. Hammons) Who did?

A: **I don't remember.**

Q: Turn Key? Was it Turn Key?

A: ~~Somebody at Turn Key.~~ "<u>I was trained to use smelling salts before I worked at Turn Key at one of my previous jobs. I do not recall whether I was trained by Turn Key to use them.</u>"

\*\*\*

Q: (By Mr. Hammons) And that's -- that – that smelling salts technique was taught to you by Turn Key; true?

A: ~~True.~~ "<u>I was trained to use smelling salts before I worked at Turn Key at one of my previous jobs. I do not recall whether I was trained by Turn Key to use them.</u>"

Q: And they -- they teach their medical personnel at jails across the -- Oklahoma and -- well, maybe even further than Oklahoma -- to stick smelling salts in people's face to make a determination of whether they're having seizures; true?

MS. THOMPSON: Object to the form.

A: ~~True.~~ "<u>I was trained to use smelling salts before I worked at Turn Key at one of my previous jobs. I do not recall whether I was trained by Turn Key to use them.</u>"

Ex. 1, Rickert Dep., 128:1-10; 191:2-12 [Errata sheet correction is underlined.] (emphasis added). The corrections are necessary as Nurse Rickert was confused and misspoke after being asked the same question in a different manner. The exact source of Nurse Rickert's training was clearly an area of confusion for him at the time of his deposition, so he utilized his statutory right to review his deposition transcript and set forth the reason for making such change to his testimony by specifically explaining the reason behind his misstatement – changes squarely permitted by Federal Rules of Civil Procedure 30(e).

## CONCLUSION

WHEREFORE, Defendant Clayton Rickert respectfully requests this Court deny

13

Plaintiff's Motion to Strike Errata Sheet of Clayton Rickert and permit his appropriate use of the jurat and errata process.

Respectfully submitted,

s/Austin J. Young

_____

Sean P. Snider, OBA # 22307
Austin J. Young, OBA # 32684
JOHNSON HANAN VOSLER
HAWTHORNE & SNIDER
9801 N. Broadway Extension
Oklahoma City, OK 73114
Telephone: (405) 232-6100
Facsimile: (405) 232-6105
E-Mail: ssnider@johnsonhanan.com
E-Mail: ayoung@johnsonhanan.com
*Attorneys for Defendant, Turn Key Health Clinics, LLC, and Clayton Rickert*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on the 15th day of **July,** 2021, a true and correct copy of the above and foregoing was electronically transmitted to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.

| | |
|---|---|
| Chris Hammons | chris@lhllaw.com |
| Jason M. Hicks | jason@lhllaw.com |
| Jessica Dark | JDark@piercecouch.com |
| Randall J. Wood | rwood@piercecouch.com |
| Robert S. Lafferrandre | rlafferrandre@piercecouch.com |
| Emily J. Ludiker | emily@rodolftodd.com |
| Rickey J. Knighton | Rick.Knighton@ci.norman.ok.us |
| Brandon C. Whitworth | BrandonW@rodolftodd.com |
| Eric S. Loggin | ELoggin@rodolftodd.com |
| Glen D. Huff | FoliartFirm@oklahomacounsel.com |
| Jeanne M. Snider | Jeanne.Snider@ci.norman.ok.us |

14

Kristina L. Bell          Kristina.Bell@NormanOK.gov
Robert D. Hoisington      RobertHoisingtoin@oklahomacounsel.com


                              *s/Austin J. Young*
                          _____
                                  Austin J. Young

15