IN THE UNITED STATES DISTRICT COURT

STATE OF OKLAHOMA

| | | |
|---|---|---|
| (1) PATRICIA THOMPSON, as | ) | |
| Personal Representative of the | ) | |
| Estate of MARCONIA LYNN | ) | |
| KESSEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No. CIV-19-113-SLP |
| | ) | |
| (1) NORMAN REGIONAL HOSPITAL | ) | |
| AUTHORITY d/b/a NORMAN | ) | |
| REGIONAL HOSPITAL, a public | ) | |
| trust, et al., | ) | |
| | ) | |
| Defendants | | |



* * * * * *

VIDEOCONFERENCE DEPOSITION OF CLAYTON RICKERT

TAKEN ON BEHALF OF THE PLAINTIFF

IN OKLAHOMA CITY, OKLAHOMA

ON DECEMBER 15, 2020

COMMENCING AT 9:10 A.M.

* * * * * *

REPORTED BY:  BETH A. McGINLEY, CSR, RPR

INSTASCRIPT, LLC
125 PARK AVENUE, LL
OKLAHOMA CITY, OKLAHOMA 73102
schedule@instascript.net
Phone:(405)605-6880 Fax:(405)605-6881

Clayton Rickert
12/15/2020

```
 1        A     Lexington High School.

 2        Q     Okay.  Did you attend a university or college?

 3        A     Not to speak of.  Just a little bit.

 4        Q     Like a community college or --

 5        A     Yeah.  Yes, sir.

 6        Q     What was that?

 7        A     OSU.

 8        Q     At OKC?

 9        A     OKC.

10        Q     Okay.  What about a vocational school?

11        A     Mid-America Vo-Tech in Wayne.

12        Q     Okay.  And that was to obtain a -- what

13   degree?

14        A     I obtained an EMT and my nursing practice.

15        Q     The -- like, an LPN license; is that where you

16   got it?

17        A     Well, my LPN training, yes.

18        Q     Okay.  Did that give you, like, a certificate

19   or degree, something --

20        A     Yes.

21        Q     -- to say you went through it?

22        A     A certificate, yes.

23        Q     Okay.  And when was that?

24        A     I graduated in 1999.

25        Q     And after you graduate, then what, do you take
```

```
 1   a board test?

 2        A    Yes.

 3        Q    Okay.  And when did you take that?

 4        A    It was soon after I got out of school.  I

 5   don't recall exactly when it was.

 6        Q    Yeah, so you graduated sometime in '99.  Do

 7   you feel like you took the test thereafter, so you could

 8   start working?

 9        A    Yes.

10        Q    Okay.  Have you ever served in the military?

11        A    No, sir.

12        Q    I'm not really concerned with other jobs that

13   you've had, but nursing jobs, could you take me through

14   your -- your history of nursing jobs from the time that

15   you -- first job to today?

16        A    Oh, my goodness.  My first job was at... I

17   can't think.

18        Q    That's okay.  Do you -- do you know, was it in

19   Oklahoma?

20        A    Oh, yes, it was -- it was a nursing home.  My

21   second job was at Griffin.

22        Q    Is that Griff- -- Griffin in Norman?

23        A    Yes, Griffin --

24        Q    Okay.

25        A    -- Memorial in Norman.
```

Clayton Rickert
12/15/2020                                                        Page 14

```
 1        Q     And that was in the capacity as an LPN?

 2        A     Yes.

 3        Q     Okay.  And how -- just approximately how long

 4   did you work at Griffin?

 5        A     A little over a year.

 6        Q     Why did you leave Griffin?

 7        A     They closed the unit down that I was working

 8   at.

 9        Q     Okay.  Where did you go after Griffin?

10        A     I went to the Department of Corrections in

11   Lexington.

12        Q     Now, at the Department of Corrections in

13   Lexington, what -- describe for me what you would -- did

14   you work in, like, the actual, like, medical unit?

15        A     I worked intake.  I only worked there about

16   three months at that time, and then I went to work as a

17   travel nurse.

18        Q     At the Department of Corrections intake, these

19   would be inmates that were either being transferred from

20   another prison or a county facility?

21        A     It would be inmates just being sentenced to

22   prison and being intake into the system.

23        Q     So, mainly, you dealt with new intakes and

24   those mostly would be coming from either a county or

25   from court?
```

```
 1        A     Yes.

 2        Q     Okay.  And that intake process -- what was it?

 3        A     My part -- I worked nights, so mostly what I

 4   would do would -- draw blood.  I did that a lot.

 5        Q     Take temperatures, blood pressure?

 6        A     Not very often.

 7        Q     Okay, just draw blood.  What -- what reason

 8   would you draw blood?

 9        A     They drew blood on everybody that came in.

10        Q     Okay.  You just drew the blood and labeled it

11   and sent it off to wherever it went?

12        A     Right.

13        Q     Okay.  You didn't -- the Department of

14   Corrections didn't necessarily provide treatment to

15   anybody, you just had that job to do?

16        A     Yes.

17        Q     Okay.  And, sorry, after the Department of

18   Corrections, where did you go?

19        A     Griffin.

20        Q     Back to Griffin?

21        A     No, no, I -- travel nursing, I'm sorry.

22        Q     Okay.  Travel nursing?

23        A     Yes.

24        Q     Okay.  So you would be -- you worked for some

25   company and they would send you to a home to --
```

Clayton Rickert
12/15/2020                                                                      Page 16

```
 1        A    To nursing homes, yeah.  Different nursing

 2   homes, yes.

 3        Q    Okay.  Different nursing homes --

 4        A    Yes.

 5        Q    -- around the state?

 6        A    Yes.

 7        Q    All Oklahoma?

 8        A    Yes.

 9        Q    Okay.  I'm assuming -- backing up -- you left

10   the Department of Corrections to take that nursing job?

11        A    Yes.

12        Q    Okay.  You weren't fired or resigned?

13        A    No.

14        Q    Okay.  How long did you do the travel nursing?

15        A    I don't remember.

16        Q    Okay.  Do you recall -- did you -- why did you

17   leave that job?

18        A    I wasn't getting enough work.

19        Q    Okay.  So you went to where?

20        A    I don't -- I don't remember.

21        Q    Okay.  Do you know approximately where we're

22   at in year --

23        A    No.

24        Q    -- at this point?

25             Okay.  What -- what's the next job you
```

Clayton Rickert
12/15/2020                                                                    Page 17

```
 1   actually remember?

 2      A     Pauls Valley Hospital.

 3      Q     Okay.  And was this a normal shift work?

 4      A     Yes.

 5      Q     Okay.  And how long did you work for Pauls

 6   Valley?

 7      A     Six years, approximately.

 8      Q     Okay.  Why did you leave?

 9      A     I met somebody online and moved to Montana.

10      Q     Okay.  Just completely personal reasons, no

11   firing or --

12      A     Personal reasons, yes.

13      Q     Okay.  Did you get a job in Montana?

14      A     Yes.

15      Q     As a nurse?

16      A     Yes.

17      Q     What was it?

18      A     A nursing home.

19      Q     Okay.  Do you remember approximately what year

20   that was?

21      A     No.

22      Q     Okay.  What's -- what's the next job?

23      A     I had two jobs -- we moved once while I was in

24   Montana, to another city, and I had another nursing home

25   job there.
```

```
 1        Q     Okay.

 2        A     And then... I don't remember what I did when I

 3   came back.

 4        Q     Back to Oklahoma?

 5        A     Yes.

 6        Q     Okay.  Do you know when you moved back

 7   to Oklahoma?

 8        A     I remember it was on my -- it was in October,

 9   that's -- it was on my birthday.  That's all I can

10   remember.

11        Q     Okay.

12        A     I don't know what year it was.

13        Q     Okay.  What's the next job you remember when

14   you got back to Oklahoma?

15        A     Oh... I know I went to work at Lexington

16   Nursing Home...

17        Q     Would it help if we start at present and work

18   backwards for a minute?

19        A     Um... no, it was Purcell Nursing Home, was the

20   next one.  And then Lexington Nursing Home.

21        Q     Now, each of those -- did you -- Purcell,

22   you -- that -- you think that might have been the one

23   when you first moved back to Oklahoma?

24        A     Yes, I think so.

25        Q     Okay.  Did you --
```

Clayton Rickert
12/15/2020                                                              Page 19

```
 1       A    I'm not sure.

 2       Q    Okay.  Did you get fired or did you just

 3   leave?

 4       A    I left.  Had a personnel conflict with another

 5   nurse.

 6       Q    Okay.  So you just quit?

 7       A    Yes.

 8       Q    Okay.  And that's when you went to

 9   Lexington --

10       A    Yes.

11       Q    -- Lexington Nursing Home?

12       A    Yes.

13       Q    Okay.  And why did you leave Lexington Nursing

14   Home?

15       A    I was terminated from Lexington Nursing Home.

16       Q    What for?

17       A    A poorly-chosen joke.

18       Q    What was the joke?

19       A    I had blown my nose in a rag, threw it behind

20   the trashcan, and made a mention that it would be funny

21   if another nurse found it.

22       Q    Okay.  And then they fired you for that?

23       A    Yes.

24       Q    Okay.  Where did you go after Lexington?

25       A    I went back to the prison.
```

Clayton Rickert
12/15/2020

```
 1        Q    Department of Corrections?

 2        A    Yes.

 3        Q    Same kind of job?

 4        A    Yes.

 5        Q    Intake?

 6        A    Intake, yeah.  Meds, would pass some meds,

 7   finger sticks, and then drawing -- did a lot of drawing

 8   blood.

 9        Q    Okay.  How long was that stint with the

10   Department of Corrections?

11        A    Approximately two years.

12        Q    Okay.  Why did you leave the Department of

13   Corrections?

14        A    I had gotten a neck injury while working at

15   Lexington Nursing Home, and I was losing the use of my

16   left arm and I could no longer fulfill the job

17   requirements at the prison.

18        Q    Okay.  So you just resigned?

19        A    Yes.

20        Q    Okay.  Where did you go next?

21        A    I went to work at a clinic in Norman.

22        Q    Was that -- were they able to accommodate

23   your --

24        A    Yes.

25        Q    -- your physical restraint?
```

Clayton Rickert
12/15/2020                                                                    Page 21

```
 1        A    Yes.  I drew blood and give immunization

 2   shots.

 3        Q    Okay.  Anything else there that --

 4        A    No.

 5        Q    Did you administer medicines or anything other

 6   than giving shots?

 7        A    No.

 8        Q    Okay.  How long -- what happened -- where did

 9   you go after that, or why did you leave there?

10        A    Well, I put in my two weeks' notice, and I had

11   surgery and the surgery didn't go as well as I had

12   hoped, and then I had quit there and then I was off work

13   for a while.

14        Q    And I -- and I don't care about what type of

15   surgery, but was this a surgery to help with the

16   problem -- the issue you were having at the Department

17   of Corrections?

18        A    Yes.

19        Q    Okay.  All right.  So you were off work due to

20   some of this injury and the surgery --

21        A    Yes.

22        Q    -- not going well?

23             When did you pick back up at work?

24        A    I went back to Pauls Valley as a clerk.

25        Q    At the hospital?
```

```
 1        A     Yes.

 2        Q     Okay.

 3        A     In the ER, as a clerk.

 4        Q     Do you now know what year that might have

 5   been?

 6        A     No, sir.

 7        Q     I mean, are we talking early 2000s, are we

 8   talking we're moving into the mid --

 9        A     I -- without having my resume in front of me,

10   I would not be able to answer that question.

11        Q     Okay.  Where did you go next?

12        A     I guess the next -- the next one I can

13   remember is mental health in Oklahoma City.

14        Q     What -- what's -- is it called mental health

15   or --

16        A     It's... Oklahoma Department of Mental Health.

17        Q     Okay.

18        A     The crisis center.

19        Q     What did you do there?

20        A     Pass meds.

21        Q     But you dealt mainly with people who were

22   having a mental crisis?

23        A     Most of the time, it was just people wanting a

24   place to stay overnight, but, yeah, there was some that

25   were having an actually mental crisis.
```

Clayton Rickert
12/15/2020                                                                    Page 23

```
 1        Q    What -- suicidal?

 2        A    Some of them said that they were, yes.

 3        Q    Okay.  Where did you go next?

 4        A    My current job.  I work at the Oklahoma

 5   Department of Veterans Affairs in Norman.

 6        Q    In where?

 7        A    Norman.

 8        Q    Norman?  Okay.  So what did you -- what did

 9   you do there?

10        A    I work night shift.  I take care of the

11   elderly nursing home patients.

12        Q    Okay.  Any -- did you hand out any meds?

13        A    Yes.

14        Q    Were you taking blood pressures?

15        A    Sometimes, when the -- I don't have enough

16   nurse aides, I do, yes.

17        Q    Okay.  Taking temperatures?

18        A    Yes.

19        Q    That kind of stuff, right?

20        A    Treatments, yes.

21        Q    Okay.  So you worked at the Veteran -- the

22   Department of Veterans Affairs how long?

23        A    I've been there two years.

24        Q    Oh, so you're talking about that's your

25   current job.  Well, what about --
```

Clayton Rickert
12/15/2020                                                                    Page 24

```
 1        A     Currently.

 2        Q     What about Turn Key nursing -- we left out --

 3        A     Oh, yeah.

 4        Q     You left out the reason we're here.

 5        A     When was that?

 6        Q     Do you think it's 2016?

 7        A     It would have been before my injury, so it was

 8   before '13 -- no -- or was it after my injury?  I --

 9   honestly, I don't remember when it was.

10        Q     Well, is it safe to say the job that you had,

11   before the Veterans Affair, was working for Turn Key?

12        A     I would say maybe the job before the crisis

13   center was Turn Key.

14        Q     Okay.  And what -- when did you -- when did

15   you leave Turn Key?

16        A     I don't remember.

17        Q     Okay, this -- this incident happened in --

18   January 16, 2018.

19        A     Okay.

20        Q     Okay?  So, obviously, you were working that

21   day.

22        A     Right.

23        Q     Okay.  How long after this incident did you

24   stop working for Turn Key?

25        A     Two days afterwards.
```

Clayton Rickert
12/15/2020

```
 1      A    I'm -- I've seen cases, but I haven't had
 2  specific training on drug overdose.
 3      Q    You would consider yourself not qualified to
 4  make a decision whether somebody was experiencing a drug
 5  overdose or not; true?
 6      A    No.  I would...
 7           MS. THOMPSON:  Not true or not qualified?
 8      A    I'm not qualified.
 9      Q    (By Mr. Hammons) What's that?
10      A    I'm not qualified to make a decision whether
11  somebody is having -- actually having a drug overdose or
12  not.  I do my assessment and determine whether they
13  could stay at the jail or if they needed to go to the
14  hospital.
15      Q    Well, yeah, the assessment would -- would seem
16  to indicate that you would know problems associated with
17  those things.
18      A    Problems --
19           MS. THOMPSON:  Object to form.
20      A    Problems associated to many things.
21      Q    (By Mr. Hammons) But you don't think you're
22  qualified to do that?
23      A    I'm not a doctor.  I'm just a nurse.
24      Q    Well, I understand, and I'm just asking you if
25  you don't think you're qualified to make those
```

Clayton Rickert
12/15/2020                                                             Page 73

```
 1  assessments or not.

 2       A    I can't assess a medical condition.

 3       Q    Okay.  Yeah, you did say you take blood

 4  pressures?

 5       A    Yes.

 6       Q    Why do you do that?

 7       A    It's on the form.  I mean...

 8       Q    No other reason?

 9       A    Well, to see if their blood pressure is

10  elevated.

11       Q    Right.  Why -- why would you want to know

12  that?

13       A    See if they have blood pressure issues.

14       Q    What else could high blood pressure indicate?

15       A    They could be upset, they could...

16       Q    And this is based on your medical training and

17  expertise as being a nurse for, I don't know, 20 years?

18       A    Like I said, I just assess and treat them, I

19  don't diagnose it.

20       Q    So when you -- somebody -- you take their

21  blood pressure, they have high blood pressure, you just

22  write the number down and move on to the next box?

23            MS. THOMPSON:  Object to form.

24       A    It depends on what the parameters of the blood

25  pressure is.  I have --
```

1   population or housing area.  An inmate whose screening

2   indicates a significant medical or psychiatric problem

3   or who may be a suicide risk shall be observed

4   frequently by staff, consistent with the facility's

5   policy."

6           Do you see that portion of the -- of the

7   Oklahoma Jail Standards?

8       A   Yes.

9       Q   Okay.  Now, obviously, on January 16, 2018,

10  there was no medical screening done of Marconia Kessee;

11  true?

12          MS. DARK:  Object to the form.

13          MS. THOMPSON:  Object to the form.

14      A   No, I did a visual assessment on him.

15      Q   (By Mr. Hammons) And what was your visual

16  assessment of him?

17      A   I believed, at the time, that he was acting

18  out, having a behavioral issue, and that he was trying

19  to harm himself.

20      Q   Okay.  Do you -- do you -- why did you put him

21  in the cell?

22      A   Because I thought he was trying to harm

23  himself.

24      Q   So you thought he would -- you put him on

25  suicide watch?

```
 1      A    No, I just -- not necessarily suicide watch,

 2   just wanted to protect him from himself if -- so he

 3   wouldn't -- couldn't hurt himself.

 4      Q    Okay.  Well, I guess, what's the difference?

 5      A    Well, one, you're just trying to hurt yourself

 6   to get attention, and the other one, you're trying to

 7   kill yourself.

 8      Q    Okay.  What's the difference in the way you

 9   treat those?

10      A    There's not any difference.

11      Q    Okay.  So at the time of the visual screening,

12   what indications made you believe that he was -- I'm

13   going to use the word "faking."  Is that what you would

14   use?

15      A    When he just was -- he made this shaking

16   movement, that I used an ammonia inhalant to prove that

17   it wasn't a seizure, and then he was not cooperative,

18   and that's -- was my assessment.

19      Q    Okay.  We can come back to that.

20           Part of this is medications in possession of

21   the inmate at the time of booking.  What did you do

22   with -- it's -- from watching the video back, I see that

23   after you -- y'all put Marconia in the cell, Officer

24   Brown hands you the big bag of pills for Marconia?

25      A    Correct.
```

Clayton Rickert
12/15/2020                                                                    Page 102

1        Q    You think he was alert in his intake?

2        A    Yes.

3        Q    Just like normal, like you and I are right

4   now?

5        A    I couldn't -- couldn't confirm what his

6   orientation was, but he was alert.  His eyes was open,

7   he was looking around, he was alert.

8        Q    Okay.  What is his mental status?

9        A    I have no idea.

10        Q    Did you ask him?

11        A    I wasn't -- he wasn't answering any questions.

12        Q    Did you ask him questions?

13        A    No.  Not too many.  It wasn't -- wasn't my

14   part of the -- it wasn't time for me to do my -- my

15   assessment.

16        Q    What -- how would you know anything about him

17   or whether he was cooperative or not if you didn't ever

18   ask him a question?

19        A    Because he wasn't cooperating with the

20   book-in, which has to be done before I get to do my

21   medical examination.

22        Q    Would it -- would it shock you if you never

23   asked him a question?

24             MS. THOMPSON:  Object to form.

25        A    Yeah.

```
 1        Q    (By Mr. Hammons) And that was based on, what?

 2        A    My... just looking at him and watching his

 3   behavior at the time.

 4        Q    Does your training tell you that you still

 5   have to do some sort of assessment on people and you got

 6   to give them the benefit of the doubt?

 7        A    Well, he wasn't very cooperative, so I didn't

 8   figure that the -- I didn't think the -- well, the blood

 9   pressure wouldn't have been very accurate, using the

10   equipment that I had, so I was going to let him -- which

11   I've done in the past, that -- let them calm down and

12   then finish the intake after they've calmed down.

13        Q    So you take it he was being uncooperative,

14   based on your observations?

15        A    Yes.

16        Q    Not that he was having some sort of medical

17   condition?

18        A    Correct.

19        Q    And you don't think it was obvious that

20   something was wrong with him?

21        A    Correct.

22        Q    He had thick, slurred speech?

23             MS. DARK:  Object to the form.

24             MS. THOMPSON:  Object to the form.

25        Q    (By Mr. Hammons) True?
```

 1       Q    Okay?  You said, "Yeah, I saw that.  Oh,

 2   hospital.  Yeah, same thing he did," and then there's

 3   one word that's inaudible.  "Hey, get -- get Beck,

 4   Beckler, Beckwell, out of the padded cell -- Beckwood

 5   out of the padded cell.  I can get his feet."

 6            MS. DARK:  Object to the form.

 7            MS. THOMPSON:  Object to the form.

 8       Q    (By Mr. Hammons) Okay?  Those were the words

 9   you said -- and you'll watch it, we'll -- we'll see it

10   on the deal.  Do you think that's adequate inquiry into

11   Marconia Kessee's condition, to make a determination of

12   what his mental or physical status is?

13            MS. THOMPSON:  Object to the form.

14            MS. DARK:  Object to the form.

15       A    Like I said, I did a visual assessment of him.

16   And the way he was acting.

17       Q    (By Mr. Hammons) Do you wish you would have

18   asked some questions?

19            MS. DARK:  Object to the form.

20            MS. THOMPSON:  Object to the form.

21       A    I wish a lot of things could have happened

22   different.

23       Q    (By Mr. Hammons) Well, specifically, I'm

24   asking:  Do you wish you would have asked questions?

25            MS. THOMPSON:  Object to the form.

 1    it's -- when he'd calmed down and he can -- he's --

 2    gets -- finished the booking process, so I can do my

 3    medical assessment.

 4         Q    Well, what -- what -- was the book-in process

 5    not complete when they threw him in a jail cell?

 6         A    No.

 7              MS. DARK:  Object to the form.

 8         Q    (By Mr. Hammons) Okay.  Did you specifically

 9    tell them, "Come find me," is what I'm asking?

10         A    I don't recall.

11              (Plaintiff's Exhibit 7, Officer Brown's Body

12    Cam Footage, was played off the record).

13         Q    (By Mr. Hammons) Again, to this point now, we

14    still have unimpaired, normal behavior?

15         A    No, that's a behavior.

16         Q    Right.  He's flailing around on the floor,

17    writhing in pain; true?

18              MS. DARK:  Object to the form.

19              MS. THOMPSON:  Object to the form.

20         A    That's not what I saw.

21         Q    (By Mr. Hammons) Okay.

22              MR. WHITWORTH:  Chris, can you tell us what

23    portion of the video you just watched?

24              MR. HAMMONS:  It's -- it's the -- I'm just

25    pushing play every time I start back, but we started at,

1      Q    (By Mr. Hammons) Who taught you that?

2      A    I couldn't -- I don't remember.

3      Q    The Cleveland County Detention Center taught

4   you to stick smelling salts in people's face?

5      A    No.

6           MS. DARK:  Object to the form.

7      Q    (By Mr. Hammons) Who did?

8      A    I don't remember.

9      Q    Turn Key?  Was it Turn Key?

10     A    Somebody at Turn Key.

11     Q    Okay.  Someone at Turn Key said, "Just

12   keep" -- do you keep a pocket full of them?

13     A    Kept them on me at all times, yes.

14     Q    And you just -- whenever you felt like --

15   necessary, you'd break them open and stick them in

16   people's face, see what they did?

17          MS. THOMPSON:  Object to the form.

18          MS. DARK:  Object to the form.

19     A    Only if they were acting like -- if they were

20   having seizures, to see whether they were really having

21   a seizure or faking it.

22     Q    (By Mr. Hammons) And that's a good diagnostic

23   tool for seeing if somebody is faking a seizure?

24     A    It works.

25     Q    How do you know it works?

 1  and stare at him.

 2       Q    (By Mr. Hammons) Okay.  You reached down and

 3  you did something on his neck; true?

 4       A    I was assessing him for his level of

 5  consciousness and then checked for respirations and

 6  pulse.

 7       Q    Okay.  And you -- you drug your pen on his

 8  feet?

 9       A    Yes.

10       Q    Okay.  And then you flipped him over; true?

11       A    True.

12       Q    Okay.  Now, this -- this breathing apparatus

13  that you're pulling out of this bag, do you know how to

14  use it?

15       A    Yes.

16       Q    Okay.  Again, do you believe the 2 minutes and

17  54 seconds before starting CPR are acceptable?

18       A    Under the circumstances, yes.

19       Q    In that 2 minutes and 54 seconds, do you

20  believe Marconia Kessee was breathing or his heart was

21  beating?

22       A    No.

23       Q    Do you believe, at this point in time, as

24  you're sitting there, that Marconia Kessee is dead?

25       A    I can't make that determination.

 1  circumstances; true?

 2      A    Yes.

 3      Q    What makes it acceptable?

 4      A    I was doing an assessment.  I didn't know

 5  that -- I had to do the assessment before I could find

 6  out whether he needed -- that he needed CPR.

 7      Q    Well, just -- and I'm wondering on -- based on

 8  your training -- in my brain, logically speaking, the

 9  first thing that I would do if I find somebody

10  unresponsive is check if they have a pulse or are

11  breathing.  That seems like the first thing.  But you're

12  trying --

13      A    The first thing is -- the first thing is

14  safety.

15      Q    Okay.  So you thought he was maybe faking?

16      A    It's possible.

17      Q    Okay.

18      A    And then I have to check for airway breathing

19  and circulation, which is what I did.

20      Q    And 2 minutes and 54 seconds is acceptable?

21      A    Yes.

22           MS. DARK:  Object to the form.

23           MR. HAMMONS:  Okay.  We're going to start the

24  video again.

25           (Plaintiff's Exhibit 8, Cleveland County

```
 1       A    True.
 2       Q    (By Mr. Hammons) And that's -- that -- that
 3  smelling salts technique was taught to you by Turn Key;
 4  true?
 5       A    True.
 6       Q    And they -- they teach their medical personnel
 7  at jails across the -- Oklahoma and -- well, maybe even
 8  further than Oklahoma -- to stick smelling salts in
 9  people's face to make a determination of whether they're
10  having seizures; true?
11            MS. THOMPSON:  Object to the form.
12       A    True.
13       Q    (By Mr. Hammons) And if they don't react, like
14  Marconia for the nine or 10 seconds in this video, your
15  claim is he just wasn't breathing, he was holding his
16  breath; true?
17            MS. DARK:  Object to the form.
18       A    True.
19       Q    (By Mr. Hammons) So if they're -- if they
20  react, they're faking a seizure, and if they don't, they
21  must be holding their breath; that's your medical
22  training?
23            MS. THOMPSON:  Object to the form.
24       Q    (By Mr. Hammons) True?
25       A    No.
```

1        Q    Okay.  That's what it ends up being, though,

2    isn't it?  It ends up -- that's the end of the game.

3    You told me he didn't react, so you thought he was

4    faking a seizure, and you just said, "Well, he's holding

5    his breath" --

6        A    But that's --

7        Q    -- right?

8        A    It's not the case in every situation.

9        Q    Okay.  Wouldn't the prudent thing to do, the

10   safe choice in this case, wouldn't it be -- a man walks

11   in here like this -- well, sorry, scratch that, he

12   didn't walk in, he was carried in.

13           Wouldn't it be to take his blood pressure,

14   take a temperature, just give him the benefit of the

15   doubt for maybe a minute or two?  Wouldn't that have

16   been the prudent move here?

17           MS. DARK:  Object to the form.

18           MS. THOMPSON:  Object to the form.

19       A    As I've --

20           MS. GOOCH:  Object to the form.

21       A    As I've stated, that I couldn't do his blood

22   pressure because he was in handcuffs and, two, the

23   machine that I used, if they're not cooperative, then it

24   wouldn't have been accurate.

25       Q    (By Mr. Hammons) Do you -- do you make a

```
 1   orientation, oral or written, to inmates?

 2        A    Yes.

 3        Q    And Marconia was in bad enough shape you

 4   couldn't give it to him?

 5             MS. DARK:  Object to the form.

 6             MS. THOMPSON:  Object to the form.

 7        A    Like I said, I thought he was faking.

 8             THE REPORTER:  I'm sorry, what did you say?

 9             THE WITNESS:  I thought he was faking.

10        Q    (By Mr. Hammons) What did you think he was

11   faking?

12        A    Just -- he was just having the behavior issue,

13   thought he was faking his symptoms to...

14        Q    To, what?

15        A    I don't know, to the end, that... because he

16   didn't want to be messed with, I don't know.

17        Q    Well --

18             MS. DARK:  "Didn't want," what?

19             THE WITNESS:  Didn't want --

20             MR. HAMMONS:  To be messed with.

21             THE WITNESS:  -- to be messed with.

22        Q    (By Mr. Hammons) Well, you know, he -- he hits

23   his head once on the wall and that was enough for you to

24   put him into critical observation and -- and have him

25   seen every 15 minutes?  That's the determination?
```

```
 1        A    Yes.

 2        Q    Nothing else about him, just the fact that he

 3   hit his head once on the wall?

 4        A    Yes.

 5        Q    Go to -- if you go to the next page, 10,

 6   No. 5:  "If, at any time, an inmate requires medical or

 7   mental health, dental services that cannot be

 8   appropriately provided or addressed at the facility,

 9   they will be given timely access to an appropriate

10   community provider."  Do you see that?

11        A    Yes.

12        Q    Do you think that Marconia got that timely

13   access?

14             MS. DARK:  Object to the form.

15             MS. THOMPSON:  Object to the form.

16        A    No.

17        Q    (By Mr. Hammons) Go to Bates 11.  Under

18   "Procedure":  "All medical services, including history

19   taking, will be conducted in an area private enough to

20   ensure that the inmate will feel free to discuss

21   problems."

22             Do you think that Marconia got the benefit of

23   that procedure?

24             MS. DARK:  Object to the form.

25             MS. THOMPSON:  Object to the form.
```

```
 1        A    No.

 2        Q    (By Mr. Hammons) He was surrounded by people

 3   telling him to shut up and that he was an idiot and to

 4   sit his ass down and to fuck his ass.  That's all he

 5   got.  He didn't get -- he didn't get that access, did

 6   he?

 7        A    No.

 8             MS. DARK:  Object to the form.

 9             MS. THOMPSON:  Object to the form.

10        A    No.

11        Q    (By Mr. Hammons) If we go to Bates 13, sir.

12   Exhibit 1, Turn Key's policies and procedures.  "Intake

13   Health Screening," this is a section that applies to

14   what we're talking about today, huh?

15        A    Yes.

16        Q    Okay.  "Inmates" -- I'm under "Policy," the

17   first bullet point.  "Inmates are screened upon arrival

18   at the jail, by health-trained staff, qualified -- or

19   qualified healthcare personnel, to provide continuity of

20   care and to identify those who pose a threat to their

21   own or others' health or safety, who may require

22   immediate medical attention."

23             Did -- is -- that policy apply to Marconia?

24        A    Well, I wanted to provide for his safety;

25   that's the reason I asked for him to be put in a padded
```

Clayton Rickert
12/15/2020                                                              Page 211

```
 1   cell.

 2        Q    Right.  And does -- the part that I'm

 3   concerned about or -- it -- it's towards the end of the

 4   second sentence, "and identify those who pose a threat

 5   to their own or others' health or safety."

 6             Did that apply to Marconia?

 7        A    I don't understand.

 8        Q    Well, it seems to me you identified Marconia

 9   as a possible threat to hisself.

10        A    Yeah, I didn't want him to hurt himself.

11        Q    Okay.  So that policy would be applying to

12   Marconia?

13        A    Yes.

14        Q    Okay.  "Inmates" -- second bullet point on

15   Page 13:  "Inmates are screened for suicidal tendencies,

16   chronic medical problems, unresolved acute medical

17   problems, communicable diseases and PREA.  Those are --

18   those with positive findings or receiving screening,

19   will receive a comprehensive medical intake."

20             Of course, Marconia did not get a concer- --

21   comprehensive medical intake; true?

22        A    True.

23        Q    The third bullet point:  "Any patient who is

24   unconscious, semi-conscious, experiencing excessive

25   bleeding, or otherwise obviously in need of immediate
```

1       Q    And I -- I think I asked you this before, but

2    let me make sure.  When you saw his medication and you

3    saw that he might have a mental health issue based on

4    the medication, you then were going to order a mental

5    health assessment?

6       A    Yes.

7       Q    Okay.  And what's -- is -- is he taken

8    somewhere or does somebody come in and do that?

9       A    I'm -- I'm not aware of how that works.

10       Q    Had -- was he your first to do that on?

11       A    No.  There's a book and I put their name in a

12    book.  I -- I don't know -- I don't know how the process

13    goes.

14       Q    In the medical screening room, there's just a

15    book and you write his name in there?

16       A    The book's in the infirmary.

17       Q    Okay.  And it's just a log of some sort?

18       A    Right.

19       Q    Okay.  And what do you write, just his name?

20       A    I -- I don't remember everything you put in

21    there.

22       Q    Well, do you have to write a reason why you

23    want him mentally assessed?

24       A    I -- I don't remember everything you have to

25    put in there.

```
 1        Q    Well, do -- well, do you remember -- I mean,
 2   it seems -- you -- you have to get some reason, right?
 3        A    He -- I don't -- I don't -- I don't -- I don't
 4   remember, I really don't.
 5        Q    Have you looked at that recently, too, that --
 6   whatever you wrote on that...
 7        A    No, I haven't looked at anything.
 8        Q    Well, I'm talking about when you were
 9   reviewing for this deposition.  Did --
10        A    No.
11        Q    -- somebody show you that?
12        A    No.
13        Q    Okay.  I've never seen it.  Do you think it
14   still exists?
15        A    It should.
16        Q    How do you know that?
17        A    Unless I'm getting my jobs confused, I...
18        Q    Go to 26, Exhibit No. 1.  On No. 5, it's
19   talking about "Correctional and healthcare staff will be
20   certified in -- in CPR and trained in proper emergency
21   transfer procedures in order to facilitate immediate
22   movement of inmates."
23             Were you certified in CPR and AED --
24        A    Yes.
25        Q    -- at the time, January 16th, 2018?
```

1      A    That's just how I assessed him and what I felt

2   at the time, that he was faking, yes.

3      Q    (By Mr. Hammons) And your assessment is what

4   we saw in the book-in room?

5      A    Yes.

6      Q    Okay.  And -- and those words that I went

7   over, that you said, that was part of your assessment;

8   true?

9      A    No.

10     Q    Those were just -- just the words you said?

11     A    Yes.

12     Q    Okay.  But other than smelling salts test --

13  salts test, and looking with your own eyes and hearing

14  with your own ears, there was -- that was your

15  assessment?

16     A    Yes.

17     Q    Okay.  On January 16th, 2018, were you the

18  site administrator functioning as Turn Key's on-site

19  representative who ensures quality, accessible and

20  timely health services for the incarcerated individuals?

21     A    I have no idea.

22     Q    If you go to Page 50, Exhibit 1.  "Procedure

23  for inmate death notification."  Have you ever been part

24  of another inmate death?

25     A    No.

```
1        Q    So we saw in the video of -- I think with

2   Officer Brown's video -- that you were standing in the

3   intake area as Mr. Kessee is being brought in from the

4   sally port, correct?

5        A    Yes.

6        Q    So from the time he enters the facility,

7   you're already there, right?

8        A    Yes.

9        Q    And as he enters the facility, as he's sitting

10  in that intake area, does he ever appear to be in any

11  medical distress?

12       A    No.

13       Q    Does he ever appear, to you, to need any

14  elevated level of care that you can't provide there at

15  the jail?

16       A    No.

17       Q    If he had, I assume you would have done

18  something, whether that's send him back out or call for

19  more assistance, right?

20       A    Yes.

21       Q    When Officer Brown told you that he -- that

22  Mr. Kessee had a fit for incarceration slip, you didn't

23  have any reason to not believe him, correct?

24            MR. HAMMONS:  Object to the form.

25       A    Correct.
```

```
 1       Q    (By Ms. Dark) There's no reason to doubt that
 2    a fit slip was coming, correct?
 3            MR. HAMMONS:  Object -- object to the form.
 4       A    I -- like I said, I thought it was there, that
 5    maybe it was in the car.
 6       Q    (By Ms. Dark) Okay.  And at some point, you
 7    saw a fit for incarceration slip, right?
 8            MR. HAMMONS:  Object --
 9       A    Yes.
10            MR. HAMMONS:  Object to the form.
11       Q    (By Ms. Dark) And that fit slip tells you that
12    he has -- Mr. Kessee had been seen at a hospital prior
13    to his arrival, correct?
14       A    Correct.
15       Q    You agree with me that the Norman Regional
16    Hospital is about a 10-minute drive from the jail?  Does
17    that sound right to you?
18            MR. HAMMONS:  Object to the form.
19       A    Yes.
20       Q    (By Ms. Dark) So, as far as you knew,
21    Mr. Kessee had just been seen at the hospital within 10,
22    20 minutes of his arrival at the jail, correct?
23       A    Yes.
24       Q    And we looked at the fit slip earlier, which
25    was Exhibit 11.  And on that slip, it states, "Fit for
```

1   incarceration," and then it gives a phone number for if

2   you called with any -- call with any questions.

3          That fit slip doesn't have any -- on the fit

4   slip itself -- not the discharge paperwork, but the fit

5   slip itself doesn't have any sort of "Call if you see X,

6   Y or Z," does it?

7      A   No.

8      Q   This is unconditional, this is saying, "We've

9   seen him, he's good, he can come into the jail," right?

10     A   Right.

11     Q   At any time that you observed Mr. Kessee, was

12  he vomiting?

13     A   No.

14     Q   Did he have any change in color, skin tone?

15     A   No.

16     Q   Did he ever lose consciousness that you saw?

17     A   No.

18     Q   Did you see any wounds or injuries?

19     A   No.

20     Q   Was he clutching his chest or complaining of

21  chest pain at any time?

22     A   No.

23     Q   Did you ever see him bleeding?

24     A   No.

25     Q   Okay.

Clayton Rickert
12/15/2020                                                                        Page 253

1    diagnose any condition; is that correct?

2         A    Correct.

3         Q    And you're not trained to prescribe

4    medication?

5         A    Correct.

6         Q    Based on your nursing training and experience,

7    are you able to determine if an individual is

8    experiencing signs or symptoms of a condition that would

9    require immediate medical care?

10        A    Yes.

11        Q    And I know you've discussed that a bit with

12   Ms. Dark earlier, but did you see any -- other than

13   behavioral symptoms, did you see any medical symptoms in

14   Mr. Kessee, on January 16th of 2018, that would require

15   immediate medical care --

16        A    No.

17        Q    -- in your opinion?

18             Is that unusual, based on your prior

19   experience in correctional nursing, for an inmate to

20   fake their symptoms?

21        A    No.

22             MR. HAMMONS:   Object to the form.

23        Q    (By Ms. Thompson) Did you encounter that in

24   the past, in your correctional nursing experience?

25        A    Yes.

1   just told you?

2        A    Yeah.

3        Q    Okay.  Did you ask anybody?  Were you

4   concerned about how he died or why he died?

5        A    It -- it's a HIPAA violation.  I -- it's

6   not -- none of my business, after -- after my care was

7   done.

8        Q    When you're talking about all these times that

9   inmates have lied and faked, does your training as a

10  nurse tell you that you start out with the mindset of

11  "That's a faker and they have to disprove faking to me"?

12            MS. THOMPSON:  Objection.

13       A    No.

14       Q    (By Mr. Hammons) You should start out with --

15  even if you think they're faking, you should start out

16  on the basis that they're not faking and -- and you

17  disprove it through your medical education and training;

18  true?

19       A    True.

20       Q    Because that's the way that we don't miss

21  things like this, when we assume people are faking when

22  they're not faking; true?

23            MS. THOMPSON:  Object to form.

24       A    Yes.

25       Q    (By Mr. Hammons) Now, you were asked, earlier,