THIRD EDITION

The American Psychiatric Association Publishing

# TEXTBOOK of FORENSIC PSYCHIATRY



DSM-5 EDITION

EDITED BY

Liza H. Gold, M.D.
Richard L. Frierson, M.D.

EXHIBIT 4

cording. The evaluator should be aware that notes and recordings may be requested by the referring attorney or the court and will constitute part of the record.

The American Academy of Psychiatry and the Law (AAPL) has indicated that recording an interview is acceptable but not mandatory (American Academy of Psychiatry and the Law 1999). Audio or video recording creates a complete record of the interview, which may be most useful in a criminal case when an evaluee with a disturbed mental state was seen immediately after the alleged crime. The recording can be reviewed sometime later, perhaps at a time when the evaluee has recovered from his or her mental illness, immediately prior to trial or at trial. The obverse situation also may occur, in which an evaluee who was not psychotic in an interview immediately after an incident becomes psychotic by the time of trial.

Video recording in these situations may significantly enhance the credibility of the testimony. The pros and cons of recording are discussed in the AAPL Task Force report (American Academy of Psychiatry and the Law 1999). Evaluators should be aware that recordings could demonstrate stylistic problems, such as the use of leading questions, which could damage evaluators' credibility. On the contrary, recordings can protect evaluators against claims of inappropriate behaviors. As a practical matter, recording may produce logistical problems, such as finding suitable interview locations, correcting inadequate lighting, and taking equipment into jails or prisons. Evaluees should give consent to recording as part of the informed consent process.

## Assessments Without an Interview

Certain situations require that evaluators conduct assessments without an interview (e.g., suicide malpractice cases, psychological autopsies, and testamentary capacity cases in which the evaluee is deceased). At times, in criminal cases, evaluators are retained by the prosecution but are declined access to the evaluee and are limited to a record review. The AAPL ethics guidelines state that appropriate efforts should be made to conduct a personal examination, but if not possible, evaluators may nevertheless come to certain conclusions. In these cases, evaluators should state that no personal examination took place and note limitations, if any, to the opinions rendered (American Academy of Psychiatry and the Law 2005).

## Gathering Information

Evaluators must decide, based on their own judgment and experience, whether to begin the interview by asking about the critical forensic issue. In some cases, delaying inquiry into this issue until later in the evaluation process may be a better strategy. This strategy allows the examiner to establish rapport before discussing more sensitive material. For instance, when asking an evaluee about a particular trauma in a psychiatric injury case, a delay in discussing this issue may be best so as not to cause the evaluee to become upset immediately. By asking other necessary questions first, such as those regarding personal history, the evaluee may feel a little more trusting and relaxed and thus be able to build up to talking about the particularly emotional issue. In other cases, beginning with the major issue, before the evaluee becomes bored and irritable, may be best.

When asking about a significant traumatic event, the duration and amount of trauma and the evaluee's perception of the event are generally discussed. Forensic evaluators may have to spend extra time discussing this subject in order to

elicit significant details. When asking about the effect of the trauma, it may be helpful to ask about the immediate effects within the first month; the medium-term effects from 1 month to 1 year after the incident; and the long-term effects lasting longer than 1 year (Glancy et al. 2015).

Conceptualizing claims of emotional damage into categories of social functioning, occupational functioning, and psychological functioning can be helpful. Each domain of functioning may be covered and carefully asked about. Evaluators might question inconsistencies with collateral information and seek an explanation for these inconsistencies. Evaluators should inquire about regular activities such as the activities of daily living. Evaluators also should conduct a separate line of inquiry about other potential stressors and the effect of these on social, occupational, and psychological functioning.

In some criminal cases (e.g., insanity), forensic psychiatrists generally undertake careful questioning about the exact circumstances leading up to an offense. Asking about the evaluee's thoughts and feelings at the material time may be necessary to decide which particular psychological motive was operant. This may require patience and perseverance because the evaluee may try to avoid discussing unpleasant or emotionally charged topics.

The purpose of the insanity evaluation is to determine whether the defendant's thoughts and behaviors at the time of the alleged offense are consistent with the mental impairments necessary to meet the statutory definition of insanity particular to that jurisdiction. Evaluators may ask evaluees whether they knew the act was legally and morally wrong, whether they were laboring under a delusion, or whether they were capable of making a rational choice. Evaluators need to encourage evaluees to answer these questions, but evaluators should be certain not to suggest answers or ask leading questions in this crucial area.

Forensic evaluations need these details and very often take much longer than psychiatric consultations conducted for treatment purposes. Keeping evaluees on topic and concentrating on unpleasant issues is sometimes difficult. In other types of criminal evaluations, such as competency to stand trial, it may not be necessary to elicit details about the alleged crime. Evaluators may need to include only brief questioning about this area to ensure that evaluees understand the nature of the charges against them. In contrast, in an assessment regarding waiving *Miranda* rights, evaluators may need to take evaluees back to their thoughts and feelings pertaining to their mental state at the time that those rights were waived.

## Psychiatric History

Evaluators generally elicit current psychiatric symptoms in a similar manner to the method of a general psychiatric examination conducted for treatment purposes. Current symptoms may be of primary importance when dealing with issues of competency, including competency to stand trial and civil competencies. These symptoms also may be relevant in various types of assessments such as psychiatric injury, disability, and fitness to practice. A retrospective analysis of symptoms is particularly relevant in assessing issues such as insanity, *mens rea* (the defendant's "guilty mind"), or fitness to waive *Miranda* rights.

Eliciting information about previous episodes of psychiatric illness is also helpful. This information can be checked against previous records gathered as collateral information. By examining the psychiatric history, psychiatrists may be

able to formulate the effect of the specific event in question on the course of an illness as well as an evaluee's response to treatment and levels of impairment caused by illness at various times.

Types of treatment (e.g., pharmacological or psychological) and the relative success of each treatment modality may be especially important in cases of disability or alleged psychic harm. The adequacy of past treatments and complete information about the types of treatments may be important in recommending future treatment. In some cases, no history of psychiatric symptoms may exist, because first-episode psychosis may present with a criminal act (Bourget et al. 2004). In the absence of a psychiatric history, good supporting data may be necessary to establish that psychosis contributed to the current issue.

## Personal History

The personal history is helpful in assessing the longitudinal course of an individual's development. Evaluators should ask about any particular delays or anomalies in development. The inquiry may begin with questions about the evaluee's mother's pregnancy and the evaluee's birth. Collateral information may be required to confirm this part of the history.

An informant may be able to provide a more detailed account of the attainment of developmental milestones. However, individuals' earliest memories are subjective, as are their perceptions of the atmosphere in the home. Evaluees' experience of parenting and discipline in the home may affect their future behavior. In particular, inquiry about the evaluee's exposure to violence or domestic violence in the home and the effect of emotional, physical, or sexual abuse may be particularly important in the genesis of future criminal, antisocial, or maladaptive behaviors and may be associated with a range of psychopathology relevant to any formulation.

An educational history, especially if confirmed by collateral gathering of records, may give information about the possibility of developmental delays or learning disabilities, as well as attitudes toward authority. Forensic examiners can elicit the various symptoms of conduct disorder only by the use of leading questions, which are sometimes unavoidable during this part of the history. Academic performance and the highest level of education can be helpful in contributing to various forensic opinions. An occupational history is especially important in disability and other employment-related cases. In these cases, a more detailed occupational history, access to job descriptions if possible, and the evaluee's personnel file are also helpful.

Eliciting social, interpersonal, and relationship histories is also helpful in assessing the individual's ability to maintain intimate and other relationships. Care should be taken in eliciting a sexual history. In certain types of examinations, such as sex offender assessments, a detailed sexual history is appropriate. In other types of cases, such as assessing psychic trauma in some sexual assault cases, it may be inappropriate to take a detailed sexual history, unless the evaluee's sex drive and ability to enjoy sexuality are at issue. In these cases, the reason for exploring this area should be explained to the evaluee before asking these questions.

## Previous Trauma

In many forensic evaluations, including those assessing claims of psychic injury, it is important to ask about previous trauma in detail. The evaluee's history of traumatic exposures and their effect and subsequent coping mechanisms may be related to future behaviors and to a range of subsequent psychopathology.