```
 1                IN THE UNITED STATES DISTRICT COURT

 2              FOR THE WESTERN DISTRICT OF OKLAHOMA

 3
    (1) PATRICIA THOMPSON, as      )
 4  Personal Representative of the)
    Estate of MARCONIA LYNN        )
 5  KESSEE,                        )
                                   )
 6       Plaintiff,                )
                                   )
 7  -vs-                           )    No. CIV-19-113-SLP
                                   )
 8  (1) NORMAN REGIONAL HOSPITAL   )
    AUTHORITY d/b/a NORMAN         )
 9  REGIONAL HOSPITAL, a public    )
    trust, et al.,                 )
10                                 )
         Defendants.               )
11

12

13                        * * * * *

14      VIDEOCONFERENCE DEPOSITION OF KEITH L. HUMPHREY

15           TAKEN ON BEHALF OF THE PLAINTIFF

16               IN OKLAHOMA CITY, OKLAHOMA

17                  ON DECEMBER 21, 2020

18               COMMENCING AT 9:04 A.M.

19                        * * * * *

20

21

22              INSTASCRIPT, L.L.C.
             125 PARK AVENUE, SUITE LL
23         OKLAHOMA CITY, OKLAHOMA  73102
                  405.605.6880
24            schedule@instascript.net

25  REPORTED BY:  BETH A. McGINLEY, CSR, RPR
```

```
 1   Clayton Rickert.
 2           MR. WHITWORTH:  Brandon Whitworth, present by
 3   Zoom, for Defendants Roberts, Holbrook, and Emergency
 4   Services.
 5           MR. JOHNSON:  Steve Johnson and Kaitlyn Dunn,
 6   present by Zoom, for Defendant Norman Regional Hospital
 7   Authority.
 8           THE MONITOR:  Will the court reporter please
 9   swear in the witness?
10                    KEITH L. HUMPHREY,
11   having been first duly sworn, deposes and says in reply
12   to the questions propounded as follows:
13                    *   *   *   *   *   *
14                         EXAMINATION
15   BY MR. HICKS:
16       Q   Well, good morning.  My name is Jason Hicks.
17   I'm representing the Thompson-Kessee family.
18       A   Yes, sir.
19       Q   And this is with regard to an incident that
20   happened on January 16th of 2018.
21       A   Yes, sir.
22       Q   You understand that?
23       A   Yes, sir.
24       Q   We're just going to ask you some questions and
25   try to learn a little more about what happened in this
```

```
 1      A    That is correct.
 2      Q    You did not find that their conduct on
 3   January 16th of 2018 violated any policies or conduct
 4   requirements of the Norman Police Department, other than
 5   the two policies listed on Page 2 of the confidential
 6   report?
 7      A    That is correct.
 8      Q    Let's get -- I'm going to hand you -- I guess
 9   what we've got as Exhibit 7.  This is going to be
10   "Standard of Conduct."  It's Policy 320.  It looks like
11   we're going to be turning to Page 6.  At the bottom, it
12   says, "Standards of Conduct-6."
13           Very quickly, on Page 5, actually, you'll see
14   "320.5.9, Conduct"?
15      A    Yes.
16      Q    And, of course, that's the last line of that
17   section and then we go over to Page 6 --
18      A    Yes.
19      Q    -- for the actual -- actual subsection?
20      A    Yes, sir.
21      Q    This is the subsection that we were
22   referencing in the confidential report, true, 320.5 --
23      A    Yes.
24      Q    -- .9?
25      A    It is, sir.
```

```
 1   there --
 2        Q    (c) and (m)?
 3        A    (c) and -- I'm sorry, yes, (c) and (m), so
 4   there was a concern on their -- on their actions, based
 5   on (c) and (m).
 6        Q    Uh-huh.
 7        A    Yes.
 8        Q    But with regard to (b), (d), (f), (g) and (h),
 9   there was no concern as to their actions?
10        A    That -- that wasn't -- they did not violate
11   those policies.
12        Q    Okay.  And you were not only okay with what
13   they did, but the reason behind why they did what they
14   did?
15        A    Anytime someone violates policy, I can't say
16   I'm okay with it, so I was -- they were disciplined
17   based on a violation -- their violation of policies.
18        Q    Of (c) and (m)?
19        A    (c) and (m), yes.
20        Q    Okay.  But they specifically were not
21   disciplined with regard to a violation of (b)?
22        A    No.
23        Q    And you were fine with any -- (b) is
24   "Unreasonable and unwarranted force to a person
25   encountered or a person under arrest."  You were fine
```

```
 1   with the amount of force and the type of force they used
 2   with Marconia Kessee?
 3        A    If --
 4             MR. KNIGHTON:  Object to -- object as to form.
 5   Go ahead.
 6        A    If -- if I felt that they had violated those
 7   policies specifically, they would have been sustained
 8   and they would have been disciplined for those.  But, at
 9   the time of this incident, (c) and (m) were the -- were
10   the two policies that I observed them violating.
11        Q    (By Mr. Hicks) Okay.
12        A    The -- let it -- let it be noted that any
13   other policy they would have violated, they would have
14   been disciplined for, would have been added to the -- to
15   the charge.
16        Q    And you did a thorough investigation in this
17   case; true?
18        A    Yes, believe so, yes.
19        Q    I mean, were all facts and evidence that
20   you -- that were available -- you reviewed all available
21   facts and evidence at your discretion?
22        A    Yes.
23        Q    Okay.  There's nothing you wanted to see that
24   you didn't get to see?
25        A    I would have liked to have seen the initial
```

 1   then you said "their overall behavior," so I want to
 2   make sure that there's nothing more.
 3       A   No, their overall behavior, you know, the --
 4   the contact, the not asking more questions, not -- not
 5   trying to get an understanding more about what was going
 6   on, the comments that were being made by them regarding
 7   an animal, regarding a behavior, immaturity of a
 8   five-year-old, the laughing, and things like that.
 9   When -- when you look at that, that is not the way, as a
10   police officer, we're supposed to act when we're --
11   especially when we're investigating an incident that
12   we've been called to.
13       Q   Okay.  Very specifically, you did not find
14   that dragging Mr. Kessee was in violation of Norman
15   police policy and training?
16       A   No.
17       Q   Okay.  You did not find that not contacting a
18   supervisor, when they believed Mr. Kessee was faking his
19   symptoms, was in violation of Norman PD policies and
20   training?
21       A   At the time, there was not a policy that says
22   that you had to con- -- contact a supervisor.
23       Q   Okay.  That brings me to a question.  I've got
24   some policies that I don't have marked as exhibits,
25   because I wasn't really sure about them, but I wanted to

 1  you have dragged Marconia Kessee across the parking lot
 2  75 feet?
 3     A   I can't answer that because I wasn't the
 4  officer there.  You were asking me, earlier, as the
 5  police chief, would I have done that?  I don't know what
 6  I would have done as an officer 20-some years ago.  I
 7  don't know.  Don't know.
 8     Q   Okay.
 9     A   And I'm not trying to be unresponsive, I just
10  don't -- I don't know.
11     Q   Okay.  When -- in your training -- let me ask:
12  Are you in charge -- you're the final decision maker at
13  the Nor- -- at -- as of January of 2018, you were the --
14     A   I --
15     Q   -- final decision maker at the Norman Police
16  Department?
17     A   That was -- I was.
18     Q   With regard to the Norman Police Department
19  practices, you didn't have to answer to anybody; true?
20     A   Well, I always had to answer to the city
21  manager.
22     Q   Okay.  Did you have to have your policies or
23  training approved by the city manager?
24     A   Did not.
25     Q   Okay.  So you were the final policy maker?

1     A     That is correct.

2     Q     Okay.  As the final policy maker and the final
3  person in charge of training these officers back in 2018
4  or even 2017, prior to this incident, and that scenario
5  training came up -- and, earlier, you said you would
6  tell them, like, "Oh, maybe you should do this, maybe
7  you should do that."  If this scenario came up, what
8  would you advise your officers to do with regard to
9  dragging somebody, under this scenario?

10    A     Well, I think they had other options.  There
11 was a wheelchair there.  They could have utilized the
12 wheelchair to roll him.  They could have assisted him in
13 walking.  But they felt, at that time, that's what they
14 needed to do.  So there were some other options that
15 they didn't use.

16          Would I have done that?  I don't know -- 20
17 years ago, I don't know if I would have done that or
18 not, if I'd have been in that situation.  But they did
19 have some other options that they could have utilized
20 and -- and I think that was part of the -- that played a
21 role in my final decision, because there were some other
22 options.  There was a wheelchair, there was helping him
23 as far as -- you know, getting other officers to help,
24 so there was some other options there.

25    Q     So if you, as the chief of police at the

1   decision to arrest him.  But as far as moving him

2   from -- removing him from the property, they had the

3   wheelchair, could have carried him, could you have

4   called somebody to come and get him?  I'm sure those are

5   some options they -- they -- they had.

6        Q    Would you have advised your officers to not

7   drag a person under this scenario?

8        A    Before he was arrested?

9        Q    Right, that's when he was dragged, was before

10  any intent to arrest was made.

11       A    Yeah, I prob- -- I would probably -- yeah, I

12  don't -- I don't -- like I said, there were other

13  options of -- other than dragging him, yes.

14       Q    Okay.

15       A    And I would have made that very -- very clear,

16  that that wasn't -- that wasn't the -- the first option.

17       Q    Okay.  Did you ever make that very clear to

18  these officers, either before or after this dragging?

19       A    I did make that clear to Brown during our

20  discussion, if you make -- if you remember, I told you

21  we had a discussion --

22       Q    Uh-huh.

23       A    -- after the discipline was assessed, and I

24  did talk to him about that, yes.

25       Q    At any other point prior to this dragging, did

```
 1   you ever make it clear to your officers that they don't
 2   put -- lay hands on a free person, who is not under
 3   arrest and who is not posing a throat to others?
 4            MR. KNIGHTON:  Object as to form.
 5            MS. GOOCH:  Object to the form.
 6       A    That is part of the training.  The officers
 7   know that you don't just put your hands on people,
 8   period, just because.
 9       Q    (By Mr. Hicks) Okay.  You agree, though, that
10   in this instance, the officers did put their hands on
11   Marconia Kessee prior to arrest -- deciding to arrest
12   him?
13       A    Well, there --
14            MS. GOOCH:  Object to the form.
15       A    There are times when we help escort -- we do
16   escort people.  When a person is not able to move, there
17   are times when we will -- we will help escort a person
18   from a location, from a prop- -- before they are
19   arrested, but -- I mean, that -- that happens.  That's
20   part of the force continuum.
21       Q    (By Mr. Hicks) Okay.  Is this what you would
22   consider escorting people, dragging them?
23       A    It wasn't the best way to -- to -- to get him
24   to leave the -- leave the property.  It was not the best
25   way.
```

```
 1     Q    Uh-huh.  I agree with that, but was it what
 2   you meant when you said "escorting" them?
 3     A    That... they should not have dragged him from
 4   the property prior to any -- any type of arrest.
 5     Q    Okay.  Would you agree that they did not
 6   accidentally drag Marconia Kessee?
 7     A    I would agree to that.
 8     Q    In your pre-disciplinary conference, you told
 9   both of them that they didn't do anything intentional.
10   But that was intentional, wasn't it?
11          MS. GOOCH:  Object to the form.
12     A    I think what I -- what I told them, Mr. Hicks,
13   was I did not believe they did anything to contribute to
14   his -- to his death.
15     Q    (By Mr. Hicks) You used the exact words
16   "intentional."
17     A    Okay.
18     Q    So would you agree that, in fact, they did do
19   something intentional?  They dragged Mr. Kessee
20   intentionally?
21     A    Yeah, they did.
22     Q    Okay.  In the course of dragging Mr. Kessee,
23   the interviewer in the IA recording notes -- and it's in
24   the confidential report -- that when Mr. Kessee fell off
25   the curb, that he made a noise of -- that -- I believe
```

```
 1  page.
 2       Q   No, no, I -- I'll --
 3           (Plaintiff's Exhibit 10, Officer Canaan's Body
 4  Cam Footage, was played off the record).
 5       Q   (By Mr. Hicks) Were --
 6       A   Yes.
 7       Q   -- you able to get a better --
 8       A   Yes.
 9       Q   Okay.  Is it in accordance with Norman Police
10  Department practices and training to drag somebody with
11  their stomach on the ground like that?
12       A   If they're not under arrest?  No.
13       Q   Okay.  But you did not discipline them for
14  that?
15       A   It was all --
16       Q   You did not discipline Officers Canaan and
17  Brown for dragging Mr. Kessee on his stomach?
18       A   It's all inclusive in those two charges.  The
19  wording -- the wording represents the violation that
20  they obser- -- that I observed.
21       Q   Okay.  Earlier, I asked you about excessive
22  force and you said that wasn't included.  In fact, in
23  Section (b) of the policy, there is excessive force and
24  that was not a --
25       A   No.
```

```
 1       Q    -- substantiated finding, was there?
 2       A    It was not, and the reason why is because
 3  there was no intentional excessive force.  This was
 4  basically careless and unprofessional, but there was
 5  nothing that indicates that that was intentional
 6  excessive force.
 7       Q    Earlier, I asked you if dragging him was
 8  intentional and you said yes.
 9       A    That's not what you asked me.  I don't recall
10  you asking --
11            MR. HICKS:  Can I do a search on this?
12       A    -- me -- I don't recall you asking me
13  intentional force.  I --
14            MR. HICKS:  Can you do a search on this?
15       A    I don't recall -- I don't recall --
16            MR. HICKS:  How?
17       A    -- that part.
18            MR. HICKS:  Let's go off the record real
19  quick.
20            THE MONITOR:  Going off the record.  The time
21  is 12:13 p.m.
22            (Recess was had from 12:13 p.m. to 12:14 p.m.)
23            THE MONITOR:  We are back on the record.  The
24  time is 12:14 p.m.
25            THE REPORTER:  Okay.
```

```
 1     A    Yes.
 2     Q    -- wondering why would they do that?
 3     A    There was a vehicle -- yes.
 4     Q    Is it possible, then, that that appears like
 5   that was punitive, to drag him that way?
 6          MS. GOOCH:  Object to the form.
 7     Q    (By Mr. Hicks) You're dragging a guy away from
 8   the vehicle that you're going to put him in, just to get
 9   the vehicle and come over; that sounds -- is that -- was
10   that punishment?
11          MS. GOOCH:  Object to the form.
12     A    Oh, I can't answer that.  It would... I don't
13   think it was -- I don't -- I can't attest to it being
14   punitive, but it's not appropriate.
15     Q    (By Mr. Hicks) Okay.  Would you agree that it
16   could have been punitive?
17     A    I can't agree --
18          MS. GOOCH:  Object to the form.
19     A    -- to that, no, sir, I cannot.
20     Q    (By Mr. Hicks) Okay.  Would you agree that
21   dragging a citizen on the pavement, under the
22   circumstances presented to Defendants Canaan and Brown,
23   as we just watched, was cruel and malicious?
24          MS. GOOCH:  Object to the form.
25     A    I can attest to it being inappropriate, but
```

1   malicious and -- I can't say that, but I -- it would be
2   inappropriate.
3       Q   (By Mr. Hicks) Would you agree that that
4   violates Mr. Kessee's fourth amendment rights?
5           MS. GOOCH:  Object to the form.
6       Q   (By Mr. Hicks) As you understand them, as a
7   police officer and the chief of police?
8           MS. GOOCH:  Object to the form.
9       A   That's difficult for me to answer that
10  question because I would have to know what their thought
11  pattern was when they did that.  I can attest to their
12  actions being inappropriate, but when we start talking
13  about a person's civil rights and stuff, I'm not -- I
14  don't think I'm in a position to answer -- answer that
15  based -- based on -- I don't know what's in their minds,
16  what they were thinking.
17      Q   (By Mr. Hicks) How about that it was at least
18  an unreasonable action, it was an unreasonable use of
19  force?
20          MS. GOOCH:  Object to the form.
21      A   I will -- yes, I will say unreasonable, yes.
22      Q   (By Mr. Hicks) Okay.  Prior to this incident,
23  did you train -- or did Norman PD train their officers
24  not to drag people under circumstances like this?
25      A   I don't think there was anything that