IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) PATRICIA THOMPSON, as Personal Representative of the Estate of MARCONIA LYNN KESSEE, | ) ) ) ) ) |
|      Plaintiff, | ) ) ) |
| -vs- | )   No. CIV-19-113-SLP ) ) |
| (1) NORMAN REGIONAL HOSPITAL AUTHORITY d/b/a NORMAN REGIONAL HOSPITAL, a public trust, et al., | ) ) ) ) ) ) |
|      Defendants. | ) |



* * * * *

VIDEOCONFERENCE DEPOSITION OF STACY SHIFFLETT

TAKEN ON BEHALF OF THE PLAINTIFF

IN OKLAHOMA CITY, OKLAHOMA

ON JANUARY 12, 2021

COMMENCING AT 9:13 A.M.

* * * * *

REPORTED BY:  BETH A. McGINLEY, CSR, RPR

INSTASCRIPT, LLC
125 PARK AVENUE, LL
OKLAHOMA CITY, OKLAHOMA 73102
schedule@instascript.net
Phone:(405)605-6880 Fax:(405)605-6881

EXHIBIT
1

1        Q     And do you believe that the Cleveland County

2   Detention Center consistently treats inmates like they

3   treated Marconia Kessee on January 16, 2018?

4              MS. DARK:  Object to the form.

5        A     I can't speak for everybody, but I know I do.

6        Q     (By Mr. Hammons) Treated -- you treated -- you

7   treat all inmates the same as you treated Marconia

8   Kessee; true?

9        A     Yes.

10       Q     Not better, not worse; the same?

11       A     Correct.

12       Q     If we could go to 313, sir.  Are you there?

13       A     Yes.

14       Q     This is a Policy 1.03.  It's under

15  "Administration."  It's called "Policy and Procedures."

16  Do you see the definitions under that -- in that --

17  middle of that page?

18       A     Yes.

19       Q     Now, a -- the policy -- again, I think we kind

20  of already talked about this, but the policy dictates --

21  that particular policy dictates how the facility must

22  be -- operate; true?

23       A     True.

24       Q     And they're -- basically, the policy is the

25  guiding principles that state what will be done and why

```
 1    training, you don't -- don't necessarily have time to

 2    sit here and read every single page in an eight-hour

 3    shift, so you may not be aware of some of the policies,

 4    but you -- you do them to the best of your ability.

 5         Q    (By Mr. Hammons) But isn't it important to

 6    know the procedures and what the sheriff expects, his

 7    policy?

 8         A    It's important, but it's -- on a day-to-day

 9    basis, you -- sometimes you can't do that, you can't

10    read all the policies.

11         Q    No, but you can follow the policy; true?

12         A    You can't follow it if you don't know it.

13         Q    That's true.  And so some of the policy,

14    you -- you just didn't know?

15              MS. DARK:  Object to the form.

16         A    I did not.  There's way too much policy to

17    know here.

18         Q    (By Mr. Hammons) Okay.  Now, under

19    "Procedure," this is -- this is a better definition than

20    I gave.  "The detailed and sequential actions that must

21    be executed to ensure that a policy is fully

22    implemented.  It is the method of performing an

23    operation or a manner of proceeding on a course of

24    action.  Procedures state how, when and where a task

25    will be accomplished."
```

```
 1              That's the -- the procedures part of this
 2   seems to be the most important part; do you agree with
 3   that?
 4              MS. DARK:  Object to the form.
 5      A    Yes.
 6      Q    (By Mr. Hammons) And understanding how, when
 7   and where a task should be accomplished is important in
 8   a jail facility; true?
 9      A    Not necessarily how or when, because every day
10   is different in a jail.  You don't have the same day
11   twice.  I mean, you -- you do this at different times,
12   you do this at different locations, it just depends
13   on -- it depends on the day.
14      Q    So the procedure changes at the Cleveland
15   County Detention Center?
16              MS. DARK:  Object to the form.
17      A    Not necessarily the procedure, but how or
18   when.  I mean, it just -- it depends.
19      Q    (By Mr. Hammons) Well, you'd expect everyone
20   in a jail facility to know the policies and procedures,
21   wouldn't you?
22      A    No, because it just -- it's -- like, if you
23   were going to, you know, give them a year to sit here
24   and read it, then, yes, but when you do on-the-job
25   training, you don't have time to do this.
```

```
 1        Q    Do you think that -- do you believe that you
 2   didn't have enough time to learn the policies and
 3   procedures, while you were at Cleveland County, well
 4   enough?
 5             MS. DARK:  Object to the form.
 6        A    Well, you do on-the-job training and, when you
 7   have downtime, you -- you read policies and procedures.
 8        Q    (By Mr. Hammons) Yeah, but did you think you
 9   needed more time?
10        A    No.  I mean, I think I had -- I was given the
11   time, but, you know, I only worked there for two and a
12   half years.  That's a lot of pages to read in that short
13   amount of time, with working, too.
14        Q    Okay.  But you -- you understand that certain
15   policies, procedures in here, certainly apply to your
16   specific job duties as a detention officer; true?
17        A    True.
18        Q    And there's not that many; true?
19        A    There's a lot, that I can recall, but -- I
20   mean, there's -- there's a lot of -- a lot of policies
21   and procedures in here.
22        Q    Okay.  And the fact that there's a lot of
23   policies and procedures in there means that there's --
24   the job is important to get -- to know those policies
25   and procedures; true?
```

```
 1        A     I mean, you -- eventually, you did a medical
 2   intake on an inmate.
 3        Q     (By Mr. Hammons) Okay.  So, for instance, if
 4   that policy of doing a medical intake screening is not
 5   done for an inmate, that can lead to death; true?
 6              MS. DARK:  Object to the form.
 7        A     No.
 8        Q     (By Mr. Hammons) Okay.  Why do you do medical
 9   screenings of inmates?
10        A     To get their background.  You want to know if
11   they have any medical problems or -- whatever they ask.
12   I don't remember what they usually ask, but I remember
13   if it was, like, critical observation, and then you took
14   a blood pressure and just their medical history.
15        Q     Right.  So let's use -- let's use your
16   situation for an example.  If you just unfortunately got
17   arrested, and wrongfully arrested because you were
18   having a diabetic episode where you were low on sugar
19   and it mimicked the signs and symptoms of being under
20   the influence of alcohol.  Follow me so far?
21        A     Uh-huh.  Yes.
22        Q     Okay.  And you went in and a jail facility did
23   not do the medical screening, for whatever reason, and
24   they put you in a jail cell, and they didn't ask you,
25   are you a diabetic and are you having troubles and are
```

1   you having problems and what's going on, and you died.

2   That's the reason we have medical screenings, right?

3              MS. DARK:   Object to the form.

4        Q    (By Mr. Hammons) So that doesn't happen?

5              MS. DARK:   Object to the form.

6        A    I mean, yes, but, like I -- I know -- I know

7   we're just talking about policies, but a medical

8   screening is on medical, not a detention officer.  I --

9   I know you're just giving me an example, but -- but,

10  like...

11       Q    (By Mr. Hammons) Overall, what I'm trying to

12  point out is that there's a reason that the sheriff

13  implemented policies and procedures and it was not so

14  that -- it was so that his detention officers and staff

15  would follow those policy and procedures; true?

16       A    True.

17       Q    And what I'm saying is, is there are

18  particular policies and procedures there that are so

19  important that, if they're not followed, people can die?

20             MS. DARK:   Object to the form.

21       Q    (By Mr. Hammons) True?

22       A    True.

23       Q    Or at least be seriously injured; true?

24       A    True.

25       Q    Who makes the policy at the Cleveland County

```
 1                MS. DARK:  Object to the form.

 2        A     True.

 3        Q     (By Mr. Hammons) I mean, you got -- you got a

 4    guy that's supposed to be doing his job and he doesn't

 5    even know what the job is, that's -- that's bad for you;

 6    true?

 7                MS. DARK:  Object to the form.

 8                MS. THOMPSON:  Object to the form.

 9        A     True.

10        Q     (By Mr. Hammons) It could lead to disasters;

11    true?

12                MS. DARK:  Object to the form.

13        A     True.

14        Q     (By Mr. Hammons) Would you expect medical

15    staff at the jail to recognize and be able to recognize

16    and be trained on the signs of overdose?

17                MS. THOMPSON:  Object to the form.

18        A     Yes.

19        Q     (By Mr. Hammons) I mean, even -- even

20    detention officers are trained to see the signs of some

21    overdose; true?

22        A     No.  We didn't get trained on overdose.

23        Q     I guess through your experience, you could

24    probably tell if somebody was having some distress from

25    overdose; true?
```

```
1              MS. DARK:  Object to the form.
2         A    I mean, not really.  Everyone is different.
3    Some people is going to react differently.
4         Q    (By Mr. Hammons) But the medical staff, you'd
5    -- you'd definitely think that they would understand the
6    signs and symptoms of -- of drug overdose?
7         A    Correct.
8         Q    And if the jail staff isn't qualified to see
9    the signs of drug overdose, inmates at the Cleveland
10   County Detention Center couldn't receive medical
11   treatment or medical assessment for that; true?
12             MS. DARK:  Object to the form.
13             MS. THOMPSON:  Object to the form.
14             MS. DARK:  I didn't understand that question.
15             THE WITNESS:  Yeah, I --
16             MR. HAMMONS:  Yeah, it was not a good
17   question.
18             THE WITNESS:  I didn't, either, sorry.
19        Q    (By Mr. Hammons) At the Cleveland County
20   Detention Center, you said, as a detention officer,
21   it's -- it's really not -- what I'm hearing is:  It's
22   not your job to make the determination if somebody is on
23   a drug overdose or not?
24        A    Correct.  That's medical.
25        Q    Okay.  And if the medical person admittedly
```

```
 1        A    As a detention officer, we're just there to

 2   provide security for medical, so I -- I do not know.

 3   That's what my job was, is to provide security for

 4   medical.

 5        Q    Nothing else?

 6        A    Nothing else.

 7             MS. DARK:   Object to the form.

 8        Q    (By Mr. Hammons) Okay.  So you didn't have any

 9   job duties or any duties with respect to whether this

10   process of a medical screening was done or not?

11        A    I don't know.

12        Q    Okay.  If a -- if -- who else -- who else at

13   the jail, on January 16, 2018, would -- would have been

14   able to make a decision on if something was medically

15   wrong with Marconia?

16        A    The nurse or the supervisor on shift is the

17   two people that dealt with that.

18        Q    Well, so, does the supervisor have any medical

19   training?

20        A    I don't know.

21        Q    I mean, you knew him, you worked with him for

22   two years.  Did -- did he have medical training?

23        A    I -- I only worked with Andrews for, like,

24   three months.  I was on nights prior to coming with

25   Andrews, so I'm not sure.
```

```
 1        Q     And did he ever tell you, "Yeah, I'm a nurse
 2   or a doctor"?
 3        A     I'm not sure.
 4        Q     Okay.  Can you at least agree with me that
 5   Clayton Rickert is supposed to know how to provide
 6   medical treatment to inmates?
 7              MS. THOMPSON:  Object to the form.
 8        A     I'm not sure, because I'm not medically
 9   trained.  Like, I don't know what is required of
10   medical.
11        Q     (By Mr. Hammons) I understand you don't know
12   how to treat patients, but there's a different question
13   here.  Are you going to go to the jury and tell the jury
14   that you didn't know that a nurse at the jail was
15   supposed to know how to do medical treatment?
16              MS. THOMPSON:  Object to the form.
17        A     I don't know -- like, I've seen, over time,
18   how a medical intake works, but I wasn't shown how --
19   from -- a nurse didn't go through with me, like, what
20   you do, so I -- whatever they're saying, I would think
21   that's true.  I don't know if it's the correct way,
22   though.
23        Q     (By Mr. Hammons) Not asking you about the way
24   or the procedure.  I'm asking you:  Are you going to be
25   able to tell the jury that you don't know that you -- in
```

```
1    January 16th, 2018, you thought a nurse at the jail
2    would be able to provide medical care.
3              MS. THOMPSON:  Object to the form.
4         A    I'm going to tell them I think a nurse was
5    going to provide medical care.
6         Q    (By Mr. Hammons) It would be insane not to
7    have a nurse there that doesn't know how to provide
8    medical care, right?
9         A    Correct.
10             MS. THOMPSON:  Object to the form.
11        Q    (By Mr. Hammons) I mean, it's obvious.  I'm
12   not trying to trick you.  This is obvious.
13        A    Right, I gotcha.
14        Q    Okay?  Nurse -- Nurse Rickert is supposed to
15   know how to do medical treatment; true?
16             MS. THOMPSON:  Object to the form.
17        A    True.
18        Q    (By Mr. Hammons) I mean, why else is he there?
19             MS. THOMPSON:  Object to the form.
20        A    I'm not sure.
21        Q    (By Mr. Hammons) I mean, I know he had to
22   check some boxes, right?  He had forms to fill out;
23   true?
24        A    I'm not sure on that.
25        Q    As a jailer or detention officer, have you
```

```
 1    things that a detention officer -- if they don't do

 2    their job correctly, can lead to death; true?

 3              MS. DARK:  Object to the form.

 4       A    I don't -- I don't know.  I don't know that.

 5       Q    (By Mr. Hammons) Well, I -- we've given the

 6    example.  If -- if somebody is -- if you're a diabetic

 7    and you need insulin and you're left in a padded cell

 8    alone and no one checks on you and you die, that's on

 9    the detention officer, isn't it?

10              MS. DARK:  Object to the form.

11       A    I don't know.

12       Q    (By Mr. Hammons) You -- you don't know if it

13    is?

14       A    Anybody can walk by and see anything.  Like,

15    that could be on anybody, not just the detention

16    officer.

17       Q    Okay.  Do you -- do you know, or has the

18    sheriff ever trained you, whether or not inmates in the

19    county jail are constitutionally entitled to reasonable

20    medical treatment?

21       A    I don't know that.  I don't remember that.

22       Q    And the -- you were never trained on that by

23    the Cleveland County Detention Center?

24              MS. DARK:  Object to the form.

25       A    I don't -- I don't remember.  I don't know.
```

```
 1        Q    (By Mr. Hammons) Well, do you have any opinion

 2   as to whether they should be constitutionally given

 3   medical treatment?

 4        A    I don't have an opinion on it.  I don't know.

 5        Q    De- -- would it depend on the person?

 6        A    No, everybody gets treated the same.

 7        Q    So either they get treatment or they don't get

 8   treatment?

 9        A    I don't know.  I don't know.

10        Q    And I take it you didn't know that Clayton

11   Rickert -- you didn't know he testified that he cannot

12   assess a medical condition?

13             MS. THOMPSON:  Object to the form.

14        A    I did not know that.

15        Q    (By Mr. Hammons) Does that shock you, that the

16   words, "I'm not qualified," and, "I can't -- cannot

17   assess a medical condition," came out of a nurse's mouth

18   that you were working with?  Does that shock you?

19             MS. THOMPSON:  Object to the form.

20        A    I don't know.  I mean, I don't know.

21        Q    (By Mr. Hammons) Does that sound reasonable?

22        A    I can't --

23             MS. THOMPSON:  Object to the form.

24        A    -- speak for him.  I don't know.

25        Q    (By Mr. Hammons) I'm not speaking for him.
```

```
 1   I'm --

 2       A    I can't --

 3       Q    -- asking you:  Do you, personally, think that

 4   is reasonable?

 5       A    I don't know.  I don't know.

 6       Q    Do you believe, on January 16th, 2018,

 7   Marconia Kessee received great medical treatment?

 8            MS. DARK:  Object to the form.

 9       A    Yes.

10       Q    (By Mr. Hammons) There's nothing wrong with

11   the treatment he got while he was in the jail, in --

12   from the time he was carried in by you and Mr. Barr

13   until the time he was wheeled out, dead, there was

14   nothing wrong with his treatment?

15            MS. DARK:  Object to the form.

16       A    No.  I had a nurse beside me the whole time.

17       Q    (By Mr. Hammons) A nurse that admittedly is

18   not qualified; true?

19            MS. DARK:  Object to the form.

20            MS. THOMPSON:  Object to the form.

21       A    I do not know that.  Like, I know what you're

22   saying, that's what he's saying, but I don't know.  I

23   didn't -- I don't know he wasn't qualified.

24       Q    (By Mr. Hammons) And everything done and said

25   to Marconia was exactly how you were trained to do it;
```

```
 1    through this next section pretty quick and catch us up.
 2              We're going to go to 314 on Exhibit 1, of
 3    the -- the Cleveland County policy and procedure.
 4              Now, what I'm interested in is Letter D.   You
 5    see, towards the bottom, that "Review of Policy and
 6    Procedures"?
 7         A    Yes.
 8         Q    And it says, "Annually, a committee will be
 9    appointed by the administrator to review current
10    policies and procedures, taking into consideration new
11    developments."
12              When you were at Cleveland County Detention
13    Center, were you -- did you ever hear about an annual
14    committee appointed by the administrator?
15         A    Not that I can remember.
16         Q    And I -- so I take it you were never on that
17    committee to review the policy and procedures?
18         A    No.
19         Q    Okay.   Was there ever any review of the policy
20    and procedures, while you were there, concerning new
21    developments?
22         A    Yes, they went to a new policy... like, I
23    don't know -- they went to some new policy.   They did
24    have it then.
25         Q    Okay.
```

```
 1        A     Something the sheriff put in place.

 2        Q     Okay.  So at some point in time, there was at

 3   least a meeting to say, "There is -- there are

 4   developments in our policy and procedure"?

 5        A     Correct.

 6        Q     Okay.  And that was sometime before

 7   Marconia's --

 8        A     This was after.

 9        Q     After Marconia's situation?

10        A     Yes.

11        Q     Okay.  Do you know specifically what the

12   changes were?

13        A     It was a whole new policy system.  That's --

14   it was Lexipol.

15        Q     What is it?

16        A     Lex- -- Lexipol.

17        Q     What's that mean?

18        A     That's the name of the -- the policies.

19        Q     Okay.  At some point in time, was there any --

20   was -- what was the training?  Was it just a meeting?

21        A     For the policies?

22        Q     Yeah.

23        A     Yeah, it was a -- on a computer, you had to

24   acknowledge them.

25        Q     Okay.  So they were sent to you in some way
```

```
 1    electronically or you accessed them at the jail?

 2         A    You got on Lexipol.com and that's how you did

 3    the policies.

 4         Q    Okay.  And then you were able to either --

 5    kind of like we see with lots of things, you scroll to

 6    the bottom and push "acknowledge I've read these," and

 7    sign?

 8         A    Correct.

 9         Q    Is that what you did?

10         A    I don't remember.  I mean, probably on some of

11    them, it -- because I think there's more policies than

12    this, but, on most of them, you read through them, kind

13    of skim through them, the topics, hit the -- like, the

14    bold things and stuff.

15         Q    Right.  Kind of peruse through them and then

16    push "I understand"?

17         A    (Moved head up and down).  Yes, sir.

18         Q    Right?

19         A    Correct.

20         Q    Okay.  Did you -- did you -- when you were

21    perusing that new document, did anything stick out to

22    you that would have applied to January 16, 2018?

23         A    No.

24         Q    All of that seemed to be similar or the same?

25         A    Yes.
```

```
 1        Q     (By Mr. Hammons) I mean, if you -- if -- if

 2   somebody was out of line, the sheriff would tell you,

 3   you were out of line; true?

 4        A     The chief would.  I mean, not with -- the

 5   sheriff, it usually wouldn't make it that -- unless it

 6   was something serious, but --

 7        Q     Okay.

 8        A     -- usually your -- your supervisors handle it.

 9        Q     Right.  And the treatment of Marconia is the

10   way you were trained to treat inmates; true?

11        A     True.

12        Q     And that type of treatment is -- of inmates,

13   was the standard set by Cleveland County; true?

14        A     True.

15        Q     So -- and it wouldn't -- as we were talking

16   about earlier, on fairness, it doesn't matter what the

17   inmate's con- -- condition is, that is the way he --

18   they are treated in Cleveland County, when you worked

19   there?

20        A     That's the way --

21              MS. DARK:  Object to the form.

22        A     -- I treated people.

23              Everybody treats people differently, but I

24   treated...

25        Q     (By Mr. Hammons) But you felt like you were
```

```
1                MS. THOMPSON:  Object to the form.
2         Q    (By Mr. Hammons) If you'd go to three -- let's
3    go to 377, just real fast.  Now, up at 10, this is kind
4    of what we're talking about, right?  "The arrestee will
5    be taken to the medical screening room and overseen by a
6    detention officer."  Is that -- that's kind of the
7    process we're talking about here; true?
8         A    True.
9         Q    Okay.  And then, "Upon completion of the
10   medical screening, the detention officer will have
11   the -- secure the door to processing opened"; true?
12        A    True.
13        Q    Is processing -- I've seen a counter with a
14   bunch of, like, computers, and it's kind of an open
15   room.  Is that processing?
16        A    Yes, that's processing.
17        Q    Okay.  And then -- let's go to 378, and this
18   is 3.02, "Processing."  It's called, "Initial
19   Medical/Mental Health Screening."  Do you see that, sir?
20        A    Yes.
21        Q    And at the time of your working there, you
22   would be familiar with this process; true?
23        A    True.
24        Q    And this, obviously, is an important policy
25   and procedure for a jail facility; true?
```

1       A    True.

2       Q    Okay.  And we talked about some of the

3    reasons.  It's so that we catch these medical conditions

4    or mental health conditions; true?

5       A    True.

6       Q    Because the jail facility doesn't want to

7    place people in jail cells that are having potentially

8    life-threatening problems; true?

9       A    True.

10      Q    And this particular policy and procedure, if

11   it's not followed, this can have catastrophic results;

12   true?

13           MS. DARK:  Object to the form.

14      A    True.

15      Q    (By Mr. Hammons) Before Marconia Kessee,

16   what -- describe for me -- when you first started at

17   Cleveland County, what training on these policies and

18   procedures did you receive?

19      A    Like, re- -- can you reword the question?

20      Q    Sure.  I'm trying to figure out:  Is -- did

21   you -- did you go and sit in a classroom and somebody

22   kind of went through, like we're doing, and said, "Hey,

23   here's some policies and procedures," or did you -- were

24   you just told about them, handed a copy, told where the

25   copy was, and then on the job was the training?

1          Q     Okay.  Was it two straight weeks, every day,

2     or was it sporadically?

3          A     You did a -- a Monday through Friday for two

4     straight weeks.

5          Q     Okay.  And that would have been towards the

6     beginning of your employment?

7          A     I think I went March or April of 2017, so...

8          Q     Okay.

9          A     Pretty close, kind of like the first six or

10    seven months.

11         Q     And then after that -- that training, whenever

12    it was, March of '17, after that and before Marconia's

13    January 16th incident, the policies and procedures

14    specifically, there's not any training done on those?

15               MS. DARK:  Object to the form.

16         A     Not that I can recall.

17         Q     (By Mr. Hammons) Okay.  Nothing like a

18    two-week course again?

19         A     No.

20         Q     Now, this says, on this policy -- back to 378

21    of Exhibit 1 -- "Every new intake to the facility will

22    be given a medical and mental health screening to detect

23    the need for medical, mental healthcare, including

24    medications and emergency treatment."  Do you see that?

25         A     Yes.

```
 1        Q    Does that sound like a familiar policy from

 2    back when you were there?

 3        A    Yes.

 4        Q    And is that a -- a -- a safe policy?

 5             MS. DARK:  Object to the form.

 6        A    Yes.

 7        Q    (By Mr. Hammons) And why is that a safe

 8    policy?

 9        A    Because everyone is getting a medical intake

10    and then medicine.  Like me, for an example, they would

11    know I had insulin and...

12             THE REPORTER:  I can't -- could you speak up?

13             THE WITNESS:  Like for me, for an example,

14    they would know I have insulin, so that would be good

15    then --

16        Q    (By Mr. Hammons) Right.

17        A    -- medical intake.

18        Q    And if we don't do these kinds of intakes,

19    there's the potential that we don't know people are

20    having issues; true?

21        A    True.

22        Q    And January 16, 2018 -- obviously, we'll talk

23    more about the reasons, but the obvious is, is this

24    wasn't done for Marconia; true?

25        A    True.
```

```
 1        Q    Definitions.  "Fit for incarceration."  That
 2   is a slip that's signed by a physician declaring some
 3   new inmate is able to be booked in; true?
 4        A    True.
 5        Q    And January 16, 2018, when Marconia was put
 6   into the padded cell, the Cleveland County Detention
 7   Center did not have a fit slip in that intake room;
 8   true?
 9             MS. DARK:  Object to the form.
10        A    I -- I don't know, I was -- I thought there
11   was.  I was told there was.
12        Q    (By Mr. Hammons) Who told you there was?
13        A    Oh, I'm not really -- I don't remember who
14   told me.  I remember it being said that there was a -- a
15   fit slip -- he had just came from the hospital, had a
16   fit slip, but... I'm not really sure.
17        Q    Do you think it's --
18        A    Remember that.
19        Q    Well, I mean, clearly, you --
20        A    It was said, but I don't really --
21        Q    Yeah.  Well, clearly, when you're in the
22   intake room, you, Mr. Barr, and Clayton Rickert wouldn't
23   know if there was a fit slip unless --
24        A    The --
25        Q    -- Officer Brown told you?
```

```
 1        A     Correct.

 2        Q     So do you believe Officer Brown told you there

 3   was a fit slip in his possession?

 4        A     I don't remember if he said or not.

 5        Q     Okay.  What if he said there was one on the

 6   way, is that sufficient?

 7        A     No.

 8        Q     You got to see it?

 9        A     Correct.

10        Q     Okay.  And if you don't see it and you put

11   somebody in a jail cell, that's a violation of Cleveland

12   County's policy; true?

13              MS. DARK:  Object to the form.

14        A     I believe so, yes.

15        Q     (By Mr. Hammons) Now, do you believe, based on

16   your training and experience as a detention officer,

17   what Mr. Rickert would say, his screening in that intake

18   room -- you've seen the video, right?

19        A     Yes.

20        Q     Do you think what Clayton Rickert did in that

21   intake room was sufficient to make a determination to

22   put Marconia in a padded cell?

23        A     No, but I'm not sure on his training.  I

24   don't -- you know, he may have been able to judge faster

25   than others.
```

 1    kicking me.  Let's take his jeans off.  Does he have

 2    shorts on?  Fuck his ass.  Let's do this."  And I don't

 3    know what the other words were -- they were jumbled --

 4    as y'all were walking out.

 5           Does that sound like a normal intake process

 6    to you?

 7           MS. DARK:  Object to the form.

 8    A    Not a normal, no.

 9    Q    (By Mr. Hammons) Did anybody at the Cleveland

10    County Detention Center ever tell you that wasn't good

11    enough, on the intake process?

12    A    No.

13    Q    Did the sheriff ever tell you that that isn't

14    good enough?

15    A    No.

16    Q    Did the sheriff -- did the sheriff ever

17    question you as to why no one in the room asked Marconia

18    about any medical condition?

19    A    No.

20    Q    Now, that particular process, if we take an

21    inmate that's in a very similar situation of Marconia:

22    mental disability, poor, having whatever issue he's

23    having, I don't know what it is, whatev- -- what -- what

24    you guys thought, but is that the -- what we see in that

25    video, is that consistent with the way that the process

1    was done January 16, 2018, of an intake of an inmate in

2    a similar situation?

3        A    Yes.

4        Q    And all inmates in that similar situation were

5    treated the same as Marconia?

6        A    Correct.

7        Q    Not better, not worse?

8        A    Not better, not worse.

9        Q    So if we took that video and -- we took it and

10   we showed detention officers, for training purposes, you

11   would say, "That's the way to do it" --

12            MS. DARK:  Object --

13       Q    (By Mr. Hammons) -- true?

14            MS. DARK:  Object to the form.

15       A    I mean, everything -- you know, every

16   situation is different, but, if it was the same

17   situation, yes.

18       Q    (By Mr. Hammons) Okay.  If we -- back to

19   Exhibit 1 on 378.  You see it's like -- I think that's

20   Roman Numeral V, "Procedural Guidelines."  Do you see

21   that?

22       A    Yes.

23       Q    Now -- and it's procedural guidelines on how

24   to do the initial mental health/suicide screening.  Do

25   you see that?

1   assessment"; true?

2         A      True.

3         Q      In that situation, when you're in that intake

4   room, is Rickert in charge?

5         A      Of the medical part, yes.

6         Q      So it would be up to him to decide whether to

7   do an initial medical assessment or not?

8         A      Correct.

9         Q      But the policy says to do it; true?

10        A      I'm pretty sure it says -- and I may be

11  wrong -- if -- because, I mean, we've done them before,

12  where if an inmate's, you know, acting out or what --

13  whatever the case may be, you can do an intake later on.

14  You don't have to do it, like, right...

15        Q      Sure.

16        A      I'm pretty sure that's right.  I mean, you

17  know, you don't have to do it, like, right then and

18  there.  It just has to be done at a certain -- sometime

19  while they're staying there.

20        Q      Right.  It sounds reasonable.  But don't you

21  at least ask some questions of the inmate?  Doesn't

22  somebody at least ask and see if he can answer?

23             MS. DARK:  Object to the form.

24        A      Not every time, that I can recall.

25        Q      (By Mr. Hammons) Okay.  Well, with Marconia,

```
 1    there was -- other than, "What size shoe do you wear and
 2    do you have stuff in your pockets," there was no
 3    question asked of -- of his mental or medical condition;
 4    do you agree with that?
 5         A    Yes, that's -- I mean, medical was there, so
 6    we -- and we never ask that.  That was medical.
 7         Q    Right.  But he -- he didn't -- he certainly
 8    didn't ask that?
 9         A    No.
10         Q    If you go to 379, just the very next page.
11    "If the arrestee has been in" -- Letter D, sorry.
12    Letter D, Exhibit 1, 379.  "If the arrestee has been in
13    our facility previously and was classified as critical
14    observation, the medical staff can reference the
15    previous classification on their computer, as well as
16    interview the arrestee regarding their current mental
17    and emotional state."
18              Do you have any knowledge whether or not
19    Marconia had been in the Cleveland County Detention
20    Center be- -- prior to January 16, 2018?
21         A    I don't have any knowledge of that.
22         Q    Is that something that you can look up as a
23    detention officer?
24         A    Yes, you could do a -- a search by their date
25    of birth, their last name, and it would bring up if
```

```
 1    they've been there.

 2         Q    And would it bring up, like -- would it also

 3    log up, like, what medications they might have

 4    previously been on?

 5         A    No, that was medical systems.  Two different

 6    systems.

 7         Q    Oh, so the medical staff could look up that

 8    information, if they had been there?

 9         A    I believe so.

10         Q    Okay.  And that -- that's important

11    information to know, if they had a previous suicidal or

12    critical observation classification; true?

13         A    True.

14         Q    Or if they've recently attempted suicide

15    outside the facility, that would be important to know,

16    too; true?

17         A    True.

18         Q    And that question was never asked of Marconia;

19    true?

20         A    I mean, by what you read me there, I guess

21    not, no.

22         Q    Right.  You never heard, at any point in time,

23    Clayton Rickert ask that question; true?

24         A    Not that I can recall.

25         Q    Right.  And you never asked it; true?
```

```
1          A     True.

2          Q     And no one else at the facility asked it, that

3    you heard?

4          A     That I heard, no.

5          Q     Right.  Did you -- do you have knowledge that

6    Marconia, just a few months before this, tried to kill

7    himself with pills?

8          A     I didn't have knowledge of that.

9          Q     Would that have been good information to know?

10         A     Yes.

11         Q     Officer Brown potentially could have known

12   that information.  Would that have been nice, if he'd

13   have looked that up and told you?

14         A     I mean, I didn't know they could do that, but,

15   yes, if --

16         Q     That would be really important information for

17   you guys at the jail to know; true?

18         A     True.

19         Q     Yeah.

20               MS. GOOCH:  Object to the form.

21               MS. DARK:  We heard you, Ambre.

22               MR. HAMMONS:  We gotcha.

23               MS. GOOCH:  Okay, good, good.

24               MR. HAMMONS:  Scared me.

25               MS. GOOCH:  Sorry.
```

```
 1                MR. HAMMONS:   That's okay.
 2        Q    (By Mr. Hammons) And, again, just want to go
 3   through and make sure.  Oh, let me look at this one here
 4   real fast.  Letter E, obviously -- "If the arrestee
 5   states they recently attempted to end their life,"
 6   Letter E.
 7             Obviously, Marconia didn't relay that to you,
 8   because he wasn't asked, is one reason; true?
 9                MS. DARK:   Object to the form.
10        A    Yes, but, in other cases, inmates would come
11   in and just start screaming that, before they even had a
12   chance to sit down.
13        Q    (By Mr. Hammons) Sure.  But we ask the
14   questions for a reason; true?
15        A    True, yes.
16        Q    Right.  Because sometimes people need to be
17   asked the question and then they can relay and say,
18   "Yeah, you know what, I -- I've had some problems,"
19   right?
20        A    True.
21        Q    And, that way, we know what we're dealing with
22   as an -- for -- for a detention officer; true?
23        A    True.
24        Q    Now, during -- during this process -- and we
25   see it on video, but I just want to make sure and ask
```

1    the questions.  Nothing was asked about his medical

2    conditions; true?

3         A    Not that I can recall.

4         Q    No question was asked about how he was

5    feeling?

6         A    True.

7         Q    No questions was asked about why he was

8    sweating profusely?

9         A    True.

10        Q    No questions were asked about what substances

11   he had ingested; true?

12        A    Not that I can recall.

13        Q    And that would be either prescription or

14   illegal substances, no question was asked; true?

15        A    True.

16        Q    No questions were asked about any injuries he

17   might have had that night; true?

18        A    True.

19        Q    Whether he had hit his head or fallen or been

20   dragged apark- -- across a parking lot, wasn't asked;

21   true?

22        A    Nothing was asked.

23        Q    Nothing was asked about -- nothing was asked

24   about prescription medications; true?

25        A    True.

```
 1        Q    And, obviously, we already went over, nothing

 2   was asked about whether he had had suicidal attempts

 3   or -- or suicidal thoughts; true?

 4        A    True.

 5        Q    No one asked Clayton Rickert, on the video

 6   that we saw, to do those questions and ask those

 7   questions; true?

 8        A    True.

 9        Q    And there was no discussion had about

10   completing that job; true?

11        A    True.

12        Q    And then again, as a detention officer at

13   Cleveland County, Clayton Rickert didn't know there was

14   a policy and procedure, so he might not even have known

15   to ask the questions; true?

16             MS. DARK:  Object to the form.

17        A    True.

18        Q    (By Mr. Hammons) And an easy decision for

19   Mr. Rickert would be to put Marconia in a padded cell

20   and wait till later; true?

21             MS. THOMPSON:  Object to the form.

22        A    I would -- I mean, you know, every nurse is

23   different, how they handle things.

24        Q    (By Mr. Hammons) Right.

25        A    I wouldn't -- I don't know what he was
```

```
 1    thinking during that time.

 2         Q    Now, with respect to a medical assessment --

 3    whatever that is, a medical assessment -- Marconia

 4    clearly wasn't assessed medically; true?

 5              MS. THOMPSON:  Object to the form.

 6              MS. DARK:  Object to the form.

 7         A    Not to my knowledge.

 8         Q    (By Mr. Hammons) Now, anybody, January 16,

 9    2000 -- 2018, other than Clayton Rickert, that would

10    have been responsible for performing that assessment?

11         A    Only medical could assess inmates.

12         Q    Yeah, and it -- it's a bad question.

13              What I'm getting at is:  Was -- other than

14    Clayton Rickert and a CMA, who -- I -- his -- his name

15    is escaping me -- were there any other medically-trained

16    staff on -- at Cleveland County that night?

17         A    Not that I can recall.

18         Q    And Clayton Rickert is the one who ordered

19    Marconia placed in a padded cell; true?

20         A    True.

21         Q    And is that his call?

22         A    Yes.

23         Q    Okay.  Whose job is it to let Clayton Rickert

24    know when it's time for him to give Marconia a medical

25    assessment?
```

1    your training on the policy and procedures that you were

2    taught by the sheriff, that would -- is there a length

3    of time that's too long for it to go by without being

4    done?

5         A    Not that I can recall.

6         Q    So, for instance, Marconia -- y'all could have

7    kept doing the checks and stuff until the next morning,

8    and then do the medical assessment, would be consistent?

9         A    Correct.

10        Q    He could sit in there for two days and that

11   would have been consistent?

12        A    Oh, he'd have got a -- you get fed three times

13   a day in a jail, so for someone to get their tray, they

14   got to get up, so that...

15        Q    So that could be a -- an indicator, if they

16   don't get their tray --

17        A    Correct.

18        Q    -- that they're -- whatever -- dead?

19             MS. DARK:   Object to the form.

20        A    It would indicate whatever is wrong with them,

21   yes, that's true.

22        Q    (By Mr. Hammons) Now, I think I -- I have his

23   deposition here and I can find the exact place in here,

24   but my understanding is -- and I want to know what you

25   think -- is Clayton Rickert says it's your

```
 1    responsibility, as a detention officer, to come find him

 2    and tell him when the medical assessment should have

 3    been done on Marconia Kessee; is that accurate?

 4         A    Not to my knowledge.

 5         Q    Okay.  Now, within the policies and procedures

 6    of Cleveland County, I don't think -- and you tell me if

 7    I'm wrong -- that that is spelled out, whose

 8    responsibility that is, within this policy and

 9    procedures; true?

10         A    I'm not sure.  I'd need to read it again to...

11         Q    Sure.  We'll -- we'll go through it, but I

12    don't find it in there.  Do you have a specific

13    recollection of the sheriff or your training that says,

14    in this kind of situation, whose responsibility it is to

15    come and make -- when the medical assessment is

16    completed?

17         A    No, I do not.

18         Q    Okay.  And Clayton Rickert wouldn't have known

19    what the policy and procedure said because he didn't

20    even know it existed; true?

21              MS. DARK:  Object -- object to the form.  If

22    you -- if you know.

23         A    I -- I don't know, I don't...

24         Q    (By Mr. Hammons) Again, Mr. Rickert was

25    deposed December 15th and I asked him:  "Okay, do you
```

1   think that would have been important, for you to know

2   Cleveland County Department -- or Cleveland County

3   Detention Center's policies and procedures regarding

4   inmate screening and medical care?"  There were two

5   objections.

6               Answer:  "I don't even know if they have one."

7               "Well, would it surprise you if they do?"

8               "Yeah."

9               Then I went on to say:  "But how would you

10  know, if you didn't know the policies and procedures?"

11              "I didn't know that there was one."

12              "No one told you?"

13              Answer:  "True."

14          So, I understand you haven't read that, but

15  this is also a deposition by a codefendant in this case.

16  It seems, from that testimony, Mr. Rickert didn't even

17  know there was a policy and procedure; true?

18      A     True.

19              MR. HAMMONS:  I'm on track.

20              MS. DARK:  Keep up the good work.

21              MR. HAMMONS:  Trying.

22      Q     (By Mr. Hammons) And I take it, from our

23  discussion here -- and let me -- let me make sure that

24  we're on the same page.

25              What I'm trying to figure out is:  Did you

 1    know the signs of drug overdose, who's -- who's going to

 2    help an inmate having an overdose?

 3            MS. DARK:  Object to the form.

 4        A    You would hope and think medical, because they

 5    have the medical training.  I didn't have training on

 6    it.

 7        Q    (By Mr. Hammons) I -- I've read some of these,

 8    and we'll go over these, but there's been a -- there's

 9    records that say "medical observation" and "critical

10    observation."  Okay?

11            What was Marconia on?

12        A    So from my re- -- what I remember is Clayton

13    wanted to do it -- a medical observation, and that was a

14    30-minute sight check, I believe.  And then our

15    supervisor said, "No, we need to do a critical," because

16    it's 15, so it's more times to check on him.

17        Q    Okay.  With respect to a medical observation,

18    would that be medical checking on him every 30 minutes?

19        A    I'm not even sure.  I -- I'm not sure how

20    that... I'm -- I'm not sure on that.

21        Q    And I'm just trying to figure out:  What --

22    what is, seemingly, the difference between a medical

23    observation and critical observation?  Is it

24    specifically just the time or is there other

25    differences?

```
 1          A     Correct.

 2          Q     With respect to suicide watch, this critical

 3     observation suicide watch seemed to be the same thing,

 4     to me.  Is that true?

 5          A     As far as I can remember it, yes.

 6          Q     I guess what I should say is:  Maybe they're

 7     not true in the same sense of the reasons, but they're

 8     practically the same 15-minute checks, et cetera; true?

 9          A     I thought one was 30.

10          Q     Okay.

11          A     I thought medical was 30.  That's what I was

12     under the impression of, but that --

13          Q     Well --

14          A     -- may not be true.

15          Q     Well, yeah, I -- I don't know what medical is,

16     either, but critical observation seems to be the same as

17     suicide watch.  I'm just wondering if there's a

18     difference.

19          A     And there may not be.  I'm not sure.

20          Q     Okay.  What is -- what are -- what is a sight

21     check?

22          A     It's a 15-minute -- you're supposed to stagger

23     them and then you're supposed to just open the door,

24     look for common signs, like bleeding, shaking, you know,

25     throwing up, stuff like that.  And then if they're
```

```
 1    sleeping, they're sleeping.  But sight checks are just

 2    to make sure they're safe in the cell.

 3         Q    How do you tell the difference between

 4    sleeping and dead?

 5         A    You look for chest compressions, like a

 6    stomach moving, stuff like that.

 7         Q    What if they're laying on their stomach?

 8         A    You just assume they're asleep.

 9         Q    You know the old saying about what happens

10    when we assume?

11         A    I do not.

12              MS. DARK:  Object to the form.

13              MR. HAMMONS:  Can we take a break?  I've got

14    to use the restroom.

15              MS. DARK:  Yeah.

16              MR. HAMMONS:  Okay.

17              THE MONITOR:  Going off the record.  The time

18    is 11:21 a.m.

19              (Recess was had from 11:21 a.m. to 11:32 a.m.)

20              THE MONITOR:  We are back on the record.  The

21    time is 11:32 a.m.

22         Q    (By Mr. Hammons) Mr. Shifflett, you good to

23    proceed?

24         A    Yep.

25         Q    Okay.  We were talking about sight checks.  At
```

```
 1    Cleveland County, is -- is it also -- sight check
 2    training, is it also consistent with what we've already
 3    spoke about, where, yes, you kind of have the policy and
 4    procedure, but most of it is on-the-job training?
 5         A    Yes.
 6         Q    And depending on who trained you, would depend
 7    on how the sight checks are completed?
 8         A    Correct.
 9         Q    And sight checks, when we're talking about
10    critical observation, those are important to the health
11    and safety of inmates; true?
12         A    True.
13         Q    Now, have you -- have -- you haven't watched
14    any of the sight checks, videos, preparing for this
15    deposition; true?
16         A    Not that I can recall.
17         Q    Okay.  Now, the padded cell, if you recall --
18    or I -- I don't know if it may be like this on all the
19    cells, but I only know about the padded cell.  You open
20    a door from the outside, a hatch, and there's a window;
21    is that true?
22         A    True.
23         Q    And you -- it opens towards you and you look
24    inside?
25         A    True.
```

```
 1          A    Yes.

 2          Q    So -- and then how about less than a second?

 3          A    I mean, that one is going to be hard, but --

 4     less than a second, that's a short, short time.

 5          Q    But two, three, or one second are consistent

 6     with how the sheriff wants you to do sight checks on

 7     people who are in critical observation; true?

 8               MS. DARK:  Object to the form.

 9          A    True.

10          Q    (By Mr. Hammons) No one told you any

11     different; true?

12          A    No.

13          Q    Okay.  And in, for instance, a second, you are

14     able to, with your training and experience at Cleveland

15     County, determine if somebody is dead or asleep?

16               MS. DARK:  Object to the form.

17          Q    (By Mr. Hammons) True?

18          A    True.

19          Q    And a sight check of a second -- or let's call

20     it one to three seconds.  A sight check of one to three

21     seconds is also consistent in the way in which you --

22     you treated all inmates that were in critical

23     observation during your time at Cleveland County

24     Detention Center?

25          A    Yes.
```

```
 1      Q     And no one ever told you -- the sheriff or --
 2   or any of your sup- -- your superiors told you that a
 3   one-second sight check was insufficient to -- for the
 4   constitutional rights of an inmate?
 5      A     Will you reword that?  Sorry.
 6      Q     Sure.  No one ever reprimanded you for a
 7   one-second sight check and said that's not good enough
 8   for the constitutional rights of an inmate?
 9      A     True.  No one did that.
10      Q     Now...  So inmates that are being observed due
11   to health risks, either physical or mental, are all
12   checked on in the same manner that Marconia was checked
13   on; true?
14      A     True.
15      Q     And that may be a one-second sight check or
16   even a two-second sight check or a three-second sight
17   check; true?
18            MS. DARK:  Object to the form.
19      A     That's the way I did it, yes.
20      Q     (By Mr. Hammons) Okay.  And if I were to
21   obtain a random sampling at the Cleveland County
22   Detention Center of videos of this, that would be
23   consistent -- if we saw one-second sight checks for days
24   on end, that would be consistent with the training and
25   policies that you were trained on at the Cleveland
```

```
 1    policies and procedures that you know of at -- at
 2    Cleveland County?
 3         A    Yes.
 4         Q    And as far as your training tells you, from
 5    Cleveland County Detention Center, one second or less --
 6    well, let's not say the less, you -- I -- I think you
 7    might not go that far.
 8              One second is consistent with providing safe
 9    and constitutionally-protected medical care for an
10    inmate like Marconia?
11              MS. DARK:  Object to the form.
12         Q    (By Mr. Hammons) True?
13         A    True.
14         Q    And you're okay with that; true?
15         A    True.
16         Q    And the Cleveland County Detention Center
17    never told you it was insufficient?
18         A    True.
19         Q    At the jail facilities -- and I -- I see it in
20    most of these -- Cleveland County -- time intervals
21    seems important at a jail facility?
22         A    Yes.  You got to have a timer set to do the
23    sight check or you wouldn't do it.
24         Q    Right.  It seems there's lots of forms and
25    boxes, log sheets, to check at a jail facility, as a
```

```
 1                MS. DARK:  Object to the form.

 2         A    True.

 3         Q    (By Mr. Hammons) Minutes certainly matter for

 4    a person who is potentially not breathing; true?

 5                MS. DARK:  Object to the form.

 6         A    True.

 7         Q    (By Mr. Hammons) And minutes could certainly

 8    mean the difference between dead and living; true?

 9         A    True.

10         Q    If we go back to Exhibit No. 1, if we -- we're

11    going to fast-forward to 464.  And this is Policy 4.15,

12    "Security:  Sight Checks."  Do you see that?

13         A    Yes.

14         Q    And this would be, considering the title,

15    where you go to figure out how to do a sight check;

16    true?

17                MS. DARK:  Object to the form.

18         A    Yes.

19         Q    (By Mr. Hammons) And this would have been a

20    policy back in January 16, 2018, that a detention

21    officer would certainly be aware of; true?

22         A    Yes.

23         Q    And would have training on; true?

24         A    On-the-job training, yes.

25         Q    Okay.
```

```
1                MR. WHITWORTH:  Chris, can you tell us
2     again -- I'm sorry -- what page of the policies you're
3     on?
4                MR. HAMMONS:  Yeah.  464, Policy No. --
5                MR. WHITWORTH:  Thank you.
6                MR. HAMMONS:  -- 4.15.
7                MR. WHITWORTH:  Thanks.
8                MR. HAMMONS:  Yep.
9          Q    (By Mr. Hammons) Other than your on-the-job
10    training, Exhibit 1, Page 464 -- there could be no
11    better place to go, to learn how to do a sight check,
12    than this document; true?
13         A    True.
14         Q    If it's not in the Policy and Procedure 4.15,
15    then a detention officer or someone like Clayton Rickert
16    would not have any direction on how to do it; true?
17               MS. DARK:  Object to the form.
18         A    I can only speak on myself, but I wouldn't
19    know how to do it if I didn't have the policy or
20    procedure.
21         Q    (By Mr. Hammons) And the sheriff believed
22    sight checks were important enough he put it in his
23    policy and procedure; true?
24               MS. DARK:  Object to the form.
25         A    True.
```

```
 1        A    True.

 2        Q    Isn't that what 4.15, titled "Sight Checks,"

 3   is about?

 4             MS. DARK:  Object to the form.

 5        A    Yes, it's about looking, and sight checks,

 6   yes.

 7        Q    (By Mr. Hammons) Yeah, it's about tossing a

 8   cell for contraband; true?

 9        A    True.

10        Q    And it's a page and a half -- or a page and a

11   quarter long; true?

12        A    True.

13        Q    Okay.  Well, it seems, as we look at the

14   procedural guidelines, A, that you pointed out, that the

15   sheriff chose to put sight check procedures for suicide

16   watch, detox and other critical observation, in another

17   section; true?

18        A    True.

19        Q    And the procedure for how to conduct a sight

20   check on inmates in suicide watch or critical

21   observation, detox, is arguably one of the most

22   important policies and procedures in this entire book;

23   true?

24             MS. DARK:  Object to the form.

25        A    Yes, it's a big deal.
```

```
 1        Q    (By Mr. Hammons) Right.  Detoxing inmates can
 2   have major problems; true?
 3        A    Yes.
 4        Q    Suicidal inmates certainly can have problems?
 5        A    Yes.
 6        Q    And then folks that have been determined to be
 7   on critical observation for mental or physical medical
 8   conditions, certainly it's important; true?
 9        A    Yes.
10        Q    Okay.  Now, a sight check procedure for
11   suicide watch, detox or critical observation, if that
12   procedure is not followed, it can lead to death of an
13   inmate; true?
14             MS. DARK:  Object to the form.
15        A    Every situation is different, but, yes, it
16   could possibly lead to that.
17        Q    (By Mr. Hammons) Right.  And it's completely
18   reasonable for the sheriff to put that procedure, sight
19   check procedure, in 3.15, the policy?
20             MS. DARK:  Object --
21             MR. HAMMONS:  That's a terrible question.
22             MS. DARK:  Object -- yeah.
23        Q    (By Mr. Hammons) The sight check procedure on
24   suicide watch, critical observation and detox, he just
25   put it in another section, and that's completely
```

```
 1    reasonable; true?

 2             MS. DARK:  Object to the form.

 3        A    It's probably in -- a more in-depth, you know,

 4    policy or whatever, but, yes, it's --

 5        Q    (By Mr. Hammons) Right.  Because it's an

 6    important one, it might -- it might lend itself to being

 7    its own section?

 8        A    Correct.

 9        Q    Let's go -- we got to -- got to backtrack to

10    Exhibit 1, Bates No. 407.  Okay, you there?

11        A    Yes.

12        Q    Okay.  Now, this 3.15, this is the one that

13    was referenced in 4.15; true?

14        A    Yes.

15        Q    And it makes sense.  It's Critical Observation

16    Inmates; true?

17        A    True.

18        Q    Okay.  Now, if you look in 3.15, it's -- it's

19    about -- it's close to two pages long, and take your

20    time.  If you could, point out, in 3.15, where it

21    describes the procedure for doing a sight check on

22    suicidal, detoxing or critical observation inmates.

23        A    This says, "Sight checks will be performed and

24    logged every 15 minutes."

25        Q    Yeah, that -- that's when they are to be done.
```

```
 1    I'm wondering if -- if -- if you agree with me that
 2    Section 3.15 does not give you any guidance on how to
 3    perform a sight check procedure for suicide watch, detox
 4    and critical observation inmates.
 5         A    By "perform," you mean, like, actually writing
 6    down a number and how -- how to do that part of it?
 7    Because it -- it tells us to do them every 15 minutes,
 8    but that's all it says.
 9         Q    Right.  It doesn't give you the procedural
10    guidelines to do that; true?
11         A    True.
12         Q    There's no definition of it in the definitions
13    section, is there?
14         A    Not that I read.
15         Q    And in the procedural guidelines, you didn't
16    read anything that gives you any guidance on how to do
17    this lifesaving measure of a sight check procedure for
18    suicide, detox or critical observation; true?
19              MS. DARK:  Object to the form.
20         A    No, just -- it just says a time and that's it.
21         Q    (By Mr. Hammons) Right.  That's when it's to
22    be done, but the "how" is super important, right?
23         A    Correct.
24         Q    Now, then we are left to whatever individual
25    taught you how to do them; true?
```

```
 1       Q    (By Mr. Hammons) Probably -- likely not,
 2   right?
 3       A    I'm not sure.  I'm really not sure.
 4       Q    Okay.  And that sight check procedure, one
 5   second, is also consistent even though someone has not
 6   been medically assessed; true?
 7       A    True.
 8       Q    So, like, Marconia hasn't been medically
 9   assessed.  One second is still good enough, even though
10   y'all know nothing about his medical condition or his
11   medications or, basically, anything about him?
12            MS. DARK:  Object to the form.
13       Q    (By Mr. Hammons) True?
14       A    That's what -- yes, I mean, that's true.
15   That's -- I treat everybody the same.
16       Q    Right.  And the sheriff -- that's how the
17   sheriff wants you to treat them, too; true?
18       A    That's -- yes, he didn't have a problem with
19   it.
20       Q    Right.
21            MS. DARK:  Object to the form.  Sorry.
22       Q    (By Mr. Hammons) We can at least agree that if
23   we're looking only at the policy, that the sheriff did
24   not have a policy or training in place to understand
25   what a sight check procedure for suicide watch, detox,
```

1    and critical observation was?

2              MS. DARK:  Object to the form.

3        A    Will you reword that?  Sorry.

4        Q    (By Mr. Hammons) Sure.  Just talking

5    specifically about the policies and procedure in Exhibit

6    1.

7              Will you agree with me that the sheriff did

8    not have a policy or a procedure in place for sight

9    check procedures on suicide watch, detox or critical

10   observation inmates?

11             MS. DARK:  Object to the form.

12       A    Yeah, it just tells you, like, when to put

13   them on and stuff, not how to do it?

14       Q    (By Mr. Hammons) Right.  Let's go to -- back

15   to 380 of Exhibit 1.

16       A    You said 380?

17       Q    Yeah, 380.  I think it's 3.03.  "Booking

18   Procedures."  Are you there?

19       A    Yes.

20       Q    And the booking procedure is certainly

21   something a detention officer would be familiar with at

22   the Cleveland County Detention Center?

23       A    Correct.

24       Q    And that's something you would have been

25   familiar with at -- on January 16th, 2018?

```
 1        A      Correct.

 2        Q      Okay.  It says, "Prior to accept-" -- and this

 3   is the policy, so the overall idea.

 4               "Prior to accepting custody of an inmate,

 5   detention staff will determine that the inmate can be

 6   legally committed to the facility and that the inmate is

 7   not in need of immediate medical attention, to avoid

 8   legal ramifications."  Do you see that?

 9        A      Yes.

10        Q      Okay.  And this policy, at least part of the

11   policy, is to avoid legal ramifications; true?

12        A      True.

13        Q      Like the legal ramifications we're in right

14   now; true?

15        A      True.

16               MS. DARK:  Object to the form.

17        Q      (By Mr. Hammons) Tell me everything that you

18   believe Cleveland County Detention Center staff,

19   including anybody from Turn Key, did to determine

20   Marconia was not in need of immediate medical attention,

21   to avoid legal ramification.

22               MS. DARK:  Object to the form.

23        A      I'm not sure, because I'm only aware of what I

24   did and what, you know, I -- I could do, but I'm not

25   sure on that.
```

```
 1        Q     (By Mr. Hammons) What did you do to avoid --
 2   to -- to make sure and determine that Marconia was not
 3   in need of immediate medical attention, to avoid legal
 4   ramifications?  What did you do?
 5        A     I left that up to medical.  I was standing
 6   beside medical --
 7        Q     Okay.
 8        A     -- during the whole process.
 9        Q     So is it fair to say that, other than that,
10   you took no other step to determine if Marconia needed
11   medical attention?
12              MS. DARK:  Object to the form.
13        A     Yes, it's true.
14        Q     (By Mr. Hammons) As we -- as -- as we sit here
15   right now, in you looking back at that moment -- you
16   know, we've seen the video a million times -- do you
17   think it's obvious that Marconia Kessee had something
18   wrong with him?
19              MS. DARK:  Object to the form.
20              MS. THOMPSON:  Object to the form.
21        A     I mean, knowing what I do now, I -- I mean,
22   obviously, he was, I guess, detoxing or he had something
23   like that in his system, so, yes, he had a -- he had a
24   problem.
25        Q     (By Mr. Hammons) I mean, at the time, this is
```

```
 1    either/or.  That's your decision.
 2         Q    Now, we -- we went over your words and Clayton
 3    Rickert's words.  None of those words that I read to you
 4    earlier would be any help in determining if an inmate is
 5    not in need of immediate medical attention --
 6              MS. DARK:  Object to the form.
 7         Q    (By Mr. Hammons) -- true?
 8         A    True.
 9         Q    Just so -- we'll go over -- I think he's
10    Lead -- Lead Detention Officer Cody Barr's words, too,
11    just now, for -- right now, okay?  They are -- and I --
12    what I'm looking for is:  Are any of these words useful
13    in determining that an inmate is not in need of
14    immediate medical care, okay?
15         A    Okay.
16         Q    "Okay, what size shoe do you wear?  Okay,
17    sounds good.  Okay.  All right, well, you still have
18    your vest on.  On.  Okay.  Chill, dude.  You have
19    nothing else in your pockets?  Don't fucking bite me.
20    I'll get his fucking feet."
21              Any of those words help you to follow the
22    policy that we find in 3.03 on an inmate is not --
23    determining whether an inmate is not in need of
24    immediate medical attention?
25              MS. DARK:  Object to the form.
```

Stacy Shifflett
1/12/2021

Page 138

```
 1        A      That's not my decision, it's medical's.   But,
 2    for me, no, that doesn't -- you know, I can't speak for
 3    that, but it doesn't help me any.
 4        Q      (By Mr. Hammons) Right.   There's no question
 5    about anything medically or -- anything, honestly,
 6    besides your shoes and do you have stuff in your pocket;
 7    true?
 8        A      Well, there wouldn't be any from us because we
 9    didn't ask medical questions.
10        Q      Right.   Does the sheriff teach you guys that
11    if something is so obvious, that you would stand up and
12    say it?
13        A      I mean, I've taught myself that, but when you
14    think someone is detoxing from alcohol, I mean, that's
15    fine, just... I didn't see anything -- during that time,
16    that day, I didn't see anything out of the ordinary from
17    someone that wasn't detoxing from alcohol.
18        Q      Okay.   But you can -- after looking at videos
19    and seeing what's going on, you can understand why the
20    family has a problem with this situation?
21             MS. DARK:   Object to the form.
22        A      I don't know, I really don't.   I -- you know,
23    I look at it and I still think it was alcohol.   That's
24    what -- but that's just me.   I don't know.   I really
25    don't know.
```

```
 1        Q     (By Mr. Hammons)  In your mind --
 2        A     I understand why the family would be upset,
 3    because, you know, you lost a loved one.  I'm sorry for
 4    that.  I would be upset, too, but I --
 5        Q     Well, do you think Marconia Kessee was even --
 6    just even treated decently, period?
 7              MS. DARK:  Object to the form.
 8        A     I know, from what I did, I treated him like
 9    every other inmate.  I can't speak for other officers
10    involved, but that's --
11        Q     (By Mr. Hammons)  Right.  But just because you
12    treated him like every other inmate, doesn't mean that
13    you treated every inmate decently.
14              MS. DARK:  Object to the form.
15        A     I'm not sure.  I treat -- I just treat
16    everybody the same.  I'm not sure, you know.
17        Q     (By Mr. Hammons)  Well, we'll go over it in a
18    minute, but I'm going to -- I'm going to -- I'm going to
19    say you seem like a decent human being, as we've been
20    sitting here talking, and I'm going to go out on a limb
21    and assume that you don't tell people, in your everyday
22    life, and say stuff like, "Fuck his ass."  I'm going to
23    go out on a limb and say that's true.
24        A     That's actually false.
25              MS. DARK:  Hold -- hold on.  He hasn't asked a
```

1    question.

2         Q     (By Mr. Hammons) Would I -- I'm going to go

3    out on a limb and say that's not how you treat people in

4    your everyday life.

5         A     Okay.

6               MS. DARK:  Hold on, still no question.

7         Q     (By Mr. Hammons) Question mark.  That's not

8    how you treat everybody in your everyday life, question

9    mark?

10        A     I talk to people like that.  I truly do.  You

11   can ask my coworkers, you can ask whoever you want to.

12   That's the way I talk.

13        Q     Okay.  And every inmate, whether they're poor,

14   black and mentally ill, like Marconia, or if they're

15   rich, white and well-to-do, gets the same kind of "fuck

16   his ass" treatment by you?

17              MS. DARK:  Object to the form.

18        A     Correct.  It doesn't matter on anything.  I

19   treat -- treat everybody the same.

20        Q     (By Mr. Hammons) Okay.

21              MR. HAMMONS:  I think, Jessica, we're on

22   track.  If we could all scarf down a sandwich and a bag

23   of chips as quickly as -- and expeditiously as possible,

24   and be back in here quickly --

25              MS. DARK:  Yeah.

```
 1                MS. DARK:  I'm just going to go ahead and

 2   object to all the questions about this exhibit.

 3                MR. HAMMONS:  Okay.

 4                MS. DARK:  To preserve that and --

 5                MR. HAMMONS:  We'll just go off the record for

 6   a second.

 7                THE MONITOR:  Going off the record.  The time

 8   is 12:33 p.m.

 9                (Recess was had from 12:33 p.m. to 12:36 p.m.)

10                THE MONITOR:  We are back on the record.  The

11   time is 12:36 p.m.

12        Q    (By Mr. Hammons) All right, we've had a short

13   break.  I got to find the right jail standards, so I'll

14   -- we'll go back to that, so we're not just sitting,

15   waiting on it.

16        A    Okay.

17        Q    Go -- let's go back to January 18, 2000 -- or

18   January 16, 2018.  Who, on that particular shift, would

19   have been considered the boss?

20        A    Sergeant Andrews.

21        Q    Okay.  And was there -- under "sergeant," I

22   see "corporal" and then "detention officer."  Is that

23   accurate?

24        A    Correct.

25        Q    Was there any corporal on duty that particular
```

```
 1    in a very similar circumstance that you saw him in.  Did
 2    you know that?
 3         A    I did not.
 4              MS. GOOCH:  Object to the form.
 5              MR. PURINTON:  Object to the form.
 6         Q    (By Mr. Hammons) Now, within Exhibit No. 6,
 7    this is kind of a recap of Cody Barr's interview, it
 8    seems to me.  I'll ask more about it later, but I
 9    just -- there's a couple of statements here I want to
10    make sure what you -- whether you agree or disagree with
11    them.
12              It says, "Barr was unable to tell what Kessee
13    was saying because it was a jumbled mess."  Do you agree
14    with that?
15              MS. DARK:  Object to the form.
16         A    I don't know what he was thinking, so I...
17         Q    (By Mr. Hammons) Well, I'm just saying, he
18    says Marconia's speech was a jumbled mess.  Do you
19    believe Marconia's speech was jumbled?
20         A    I do believe that.
21         Q    It was incoherent?
22         A    Yes.
23         Q    At -- at -- Mr. Barr stated, in this OSBI
24    statement, that he was unaware as to why Rickert used
25    ammonium capsules on Marconia.  Are you aware of why he
```

Stacy Shifflett
1/12/2021

1    would use ammonium capsules?

2              MS. DARK:   Object to the form.

3      A    I am not.   I remember just seeing it out and

4    him popping it.   That's all I really remember.

5      Q    (By Mr. Hammons) Did -- did Rickert frequently

6    just carry around ammonium capsules and stick them in

7    inmates' faces?

8              MS. THOMPSON:   Object to form.

9      A    No, but medical did carry ammonium strips with

10   them.

11     Q    (By Mr. Hammons) Okay.   And it was -- that was

12   frequently used on inmates, on a regular basis?

13             MS. DARK:   Object to the form.

14     A    From what I remember, yes, if they were

15   having -- I -- I think it was mainly used for, like,

16   seizures and stuff like that.   That's what brings you

17   out -- well, I know it is, I've had a couple of

18   seizures -- but that's -- that's what it was mainly used

19   for around the jail.

20     Q    (By Mr. Hammons) Okay.   Do -- do you know if

21   Marconia was actually having a seizure or not?

22     A    I --

23             MS. THOMPSON:   Object to form.

24     A    I don't know.   I didn't know.

25     Q    (By Mr. Hammons) No one -- no one told you

```
 1    that?

 2         A     No one told me that, no.

 3         Q     Okay.  And Clayton Rickerts didn't know.  He

 4    didn't say anything; true?

 5               MS. THOMPSON:  Object to form.

 6         A     Correct, he didn't say anything.

 7         Q     (By Mr. Hammons) Okay.  But you did witness

 8    him stick a -- an ammonium capsule in Marconia's face?

 9         A     Correct.  It was right under his nose.

10         Q     Okay.  Barr told the OSBI that the -- Marconia

11    started banging his head against the wall after Rickert

12    used the ammonium capsule on him.  Do you see that?

13         A     Yes.

14         Q     That's not accurate, is it?

15               MS. DARK:  Object to the form.

16         A     I don't recall.

17         Q     (By Mr. Hammons) Well, let's -- let's take it

18    this way.  Marconia started banging his head on the

19    wall, whether it's one or three or whatever times, when

20    he was having one of these perceived seizures; true?

21               MS. DARK:  Object to the form.

22         A     Correct.

23         Q     (By Mr. Hammons) And so prior to that, why

24    would Rickert be sticking an ammonium capsule in his

25    face?
```

```
 1        A     I'm not sure.
 2        Q     Well, do you -- do you recall, based on seeing
 3   it -- we'll watch it in a minute.  Do you recall seeing
 4   that on there, that the ammonium came after the head
 5   banging?
 6        A     No, I thought it came -- or it came after the
 7   head banging.
 8        Q     Right.
 9        A     Oh, yeah.
10        Q     Right.  So what I'm trying to get -- make sure
11   that I understand is, is that Rickert didn't pull out an
12   ammonium capsule, stick it in front of Marconia, and
13   then he banged his head --
14        A     Yeah, correct, that didn't happen.
15        Q     -- right?
16        A     Correct.
17        Q     Right.  Now, Barr told the OSBI he -- he felt
18   Marconia was just faking all this stuff.  Did you feel
19   that way, too?
20              MS. DARK:  Object to the form.
21        A     Coming from somebody that's had three
22   seizures, I thought he was faking a seizure, because
23   when he -- when we put him on the floor, he started to
24   shake, and then he pulled away after the ammonia --
25   whatever you call it.
```

```
 1        Q    (By Mr. Hammons) Uh-huh.
 2        A    You know, me, when I have my seizures, it's a
 3   full-on -- like, I think the shortest seizure that I can
 4   remember is -- you're down for, like, 10 or 15 seconds
 5   and then you wake up.
 6        Q    Uh-huh.
 7        A    So I -- I believed he was -- was faking a
 8   seizure, and that is common -- a common thing within the
 9   jail.  People come in and they know that, you know, if
10   they fake a seizure, they could -- could possibly be
11   sent back to the hospital.
12        Q    Okay.  But when they fake seizures, are they
13   sent back to the hospital?
14        A    It's up to medical.  It just depends, case by
15   case.
16        Q    It says, "Then after he bang- -- began banging
17   his head, Barr told the OSBI he, Shifflett and Rickert
18   picked up Marconia off the bench and set him on the
19   ground."  That's not true, is it?
20             MS. DARK:  Object to the form.
21        A    No, I'm pretty sure we just -- or -- I don't
22   remember, because I was on his feet.  I don't know if we
23   picked him up or if he just kind of slid down or...
24        Q    (By Mr. Hammons) Yeah, he just went off into
25   the floor.  I don't think you even touched him when
```

```
 1        A      (Moved head up and down).

 2        Q      Right?

 3        A      Correct.

 4        Q      And that's -- his call number is 403?

 5        A      Yes.

 6        Q      Okay.  And at the very top, it says, "Incident

 7   Type."  Do you see that?

 8        A      Yes.

 9        Q      Top left?

10        A      (Moved head up and down).

11        Q      It says, "Medical Observation."  What's that

12   mean?

13        A      Basically, that he's being put in the padded

14   cell for his own safety, due to medical.

15        Q      Okay.  That's not -- it's not -- is that the

16   same as critical observation?

17        A      There's --

18        Q      Do you know?

19        A      -- two different ones.

20        Q      Okay.  So that one says "medical," so not

21   critical.  Right?

22        A      Correct.

23        Q      Okay.  Now, in this -- in "Observations," if

24   you'll look down in the observations, it says, "Inside

25   the intake, Kessee refused to follow orders."  Do you
```

1     see that?  It's about the third sentence down, halfway

2     through.  "Inside intake, Kessee refused to follow

3     orders."  Do you see that?

4          A     Yes.

5          Q     What orders did he refuse to follow?

6          A     I think I asked him to quiet down or something

7     along the lines of that.  I think we asked him what shoe

8     size.  I'm not sure what else.

9          Q     Well, I mean, at one point in time, you're

10    seeing -- you say, "Stop, stop," and you -- you're

11    pushing your hands down, like "quieten down."  Are you

12    talking about that?  That's the order?

13         A     I mean, that's all I could see of an order.

14         Q     Right.  We've listened -- we've heard the

15    words.  At least from my transcript of what y'all said,

16    I -- I didn't hear any orders to Marconia Kessee.

17         A     Correct.

18         Q     Okay.  So what -- how could that be true,

19    what's in this official incident report, he refused to

20    follow orders?

21               MS. DARK:  Object to the form.

22         Q     (By Mr. Hammons) There just were no orders,

23    were there?

24               MS. DARK:  Object to the form.

25         A     I'm not sure.  From my -- from me, personally,

```
 1    I thought me asking him to -- I didn't really ask.  I
 2    was telling him to calm down and...
 3         Q    (By Mr. Hammons) He seems to calm down in the
 4    video.  So it seems like he complied with that order.
 5         A    I mean, that was an order, but that was from
 6    me.  I don't --
 7              MS. DARK:  Hold on.  Wait for a question.
 8         Q    (By Mr. Hammons) So -- well, in the video,
 9    he's shown and he's trying to tell everybody that he's
10    hot and sweaty.  He says, "Hot and sweaty."  He's trying
11    to talk and that's when you shush him.  He seems to
12    quiet down.  Isn't that complying with your order to
13    hush?
14              MS. DARK:  Object to the form.
15         A    Yes.
16         Q    (By Mr. Hammons) So that wouldn't fall into
17    "refused to follow orders"; true?
18         A    Correct.
19         Q    And I don't know of any order -- we'll listen
20    to it -- that Barr gave him.  He said, "What size shoe
21    do you wear?"  That's not an order.  Right?
22         A    Well, I mean, I'm pretty sure when he got out
23    of the back of the cop car, we asked him to walk.
24    I'm -- I don't really remember.  It's been a couple of
25    days since I saw the video, but --
```

```
 1        Q    Okay.

 2        A    -- I'm pretty sure we gave him orders.

 3        Q    Okay.  Is there a difference between following

 4   orders and just, flat-out, just -- he's not able to

 5   follow the orders?

 6             MS. DARK:  Object to the form.

 7        A    I'm not sure.

 8        Q    (By Mr. Hammons) Okay.  "Began to fake a

 9   seizure and L -- and LPN Rickert administered ammonium

10   capsules.  After administering the ammonia, he began to

11   hit his head on the wall."  Is that how you recall it?

12        A    I do not.

13        Q    Right.  He was laying on the floor when the

14   ammonium came out, right?

15        A    I believe so.

16        Q    He'd already hit his head on the wall; true?

17        A    Yes.

18        Q    And this is all on video, right?

19        A    Yeah, but we weren't allowed to watch the

20   video, so it's all memory you have to go off of.

21        Q    Okay.  "He was then set on the ground to keep

22   him from hitting his head on the wall, so we could do a

23   pat-down."  See that?

24        A    Correct.

25        Q    Did y'all set him on the ground or did he fall
```

```
 1              MS. THOMPSON:  Object to form.

 2     A    That's what I believed.

 3     Q    (By Mr. Hammons) Is -- is that at the -- at

 4   that point, is there any duty on you to say, "Well, how

 5   much have you been drinking", or, "What have you been

 6   drinking", or, "Are -- are you detoxing, are you coming

 7   down"?  Is there any duty for you to do that?

 8              MS. DARK:  Object to the form.

 9     A    No, that was -- that was all medical.

10     Q    (By Mr. Hammons) So if they don't ask it and

11   you don't ask it, it's, like, "Oh, it's on them, no big

12   deal"?

13              MS. DARK:  Object to the form.

14     A    No, because it's on medical.

15     Q    (By Mr. Hammons) I know, but -- well, it's

16   really on Marconia, right, because he's the one who

17   suffers the -- the loss, right?

18              MS. DARK:  Object to the form.

19     A    I'm not sure.

20     Q    (By Mr. Hammons) Well, don't -- aren't inmates

21   entitled to have these things asked of them, so that if

22   they are detoxing or under the influence or having a

23   drug overdose, somebody, a detention officer or medical

24   staff, can make -- be -- become aware of it?

25     A    True.
```

1    now.

2            (Plaintiff's Exhibit No. 5, Officer Brown's

3    Body Cam Footage, was played off the record.)

4            MR. HAMMONS:   I paused it at 38:50.

5        Q    (By Mr. Hammons) So, again, we know, now that

6    we've watched it, for sure, that what Barr told law

7    enforcement about after the ammonium capsule, Kessee

8    banged his head on the wall, that simply wasn't true?

9        A    Correct.

10       Q    And what he reported to law enforcement, that

11   Barr, Shifflett and Rickert picked Kessee up off the

12   bench and sat Kessee on the ground, that's not true, is

13   it?

14       A    Correct.

15       Q    He slid off the bench when he was doing

16   whatever was wrong with him; true?

17           MS. DARK:   Object to the form.

18       A    Correct.

19       Q    (By Mr. Hammons) And it looks, to me -- you

20   tell me -- from my watching of it, it looks like

21   Marconia Kessee was in pain when he came off that bench.

22           MS. DARK:   Object to the form.

23       A    I'm not --

24           MS. GOOCH:   Same objection.

25       A    -- sure.   I'm not sure on that.

```
 1              MS. DARK:  Object to the form.
 2       A    Currently -- currently, I did.
 3       Q    (By Mr. Hammons) You did hear it?
 4       A    But not back...
 5       Q    Yeah.  So now, at that moment in time of the
 6   intake process, there is no fit slip; true?
 7       A    Right now, I guess not, no.
 8       Q    Right.  And by the time -- this doesn't last
 9   much longer -- y'all drag Marconia into that jail cell,
10   there's no fit slip; true?
11       A    True.
12       Q    Right.  So, I mean, that's a violation of
13   Cleveland County Detention Center's policy?
14              MS. DARK:  Object to the form.
15       A    Well, medical -- we didn't -- you know, no one
16   told us to drag him in.  Medical said to put him in a
17   sui- -- or a padded cell.
18       Q    (By Mr. Hammons) I understand that, but
19   there's no fit slip; true?
20       A    Back then, I didn't know that.  Yes, there
21   wasn't one.  Back then, I didn't -- I didn't hear that.
22   I heard it now, but...
23       Q    I know, but don't you have an absolute duty,
24   as a detention officer, to make sure there's a fit slip?
25   Are you going to tell the jury that that's not your job?
```

```
1                  MS. DARK:  Object to the form.

2         A     I'll tell the jury that I'm human and I missed

3    it and that there was a lot going on in that room.

4         Q     (By Mr. Hammons) In this room?

5         A     The officers talking, the nurse is talking,

6    Mr. Kessee was talking.  There -- I mean, there's a lot

7    going on.

8         Q     Isn't that the normal situation?

9         A     Not normal.

10        Q     A detention officer, a jailer, and a cop and

11   an inmate are typically in the intake room; true?

12        A     Current- -- a typical situation, medical would

13   be in the room, an officer would be at the counter

14   making a bag, the officer would walk in, grab the slip,

15   and go start booking him in.  The officer would then go

16   in the other room and fill out his affidavit.  In a

17   normal situation, you have two people in the room.

18        Q     Well, why is this one -- why was this one

19   treated differently?

20        A     Because the officer requested assistance in

21   the sally port and we had to carry him in.

22        Q     Okay.  Now, Exhibit No. 11, now that we've

23   watched the video, obviously Marconia -- obviously he

24   wasn't able to stand without assist and was not able to

25   follow instructions when asked to sit on the bench.  We
```

```
 1    know now, from looking at the video, that's 100 percent

 2    false?

 3                MS. DARK:  Object to the form.

 4         A      Correct.

 5                MR. HAMMONS:  I'm moving the Brown Exhibit 5

 6    video to 39:04.

 7                MR. WHITWORTH:  You cut out a little bit

 8    there.  Can you say that again?

 9                MR. HAMMONS:  Yeah, I may have it wrong.  Let

10    me see what I -- let me get it there and I'll tell you

11    when.  I think I had it wrong on the time.  Just a

12    second, Brandon, I'll get you there.

13                MR. WHITWORTH:  No problem.

14                (Plaintiff's Exhibit No. 5, Officer Brown's

15    Body Cam Footage, was played off the record.)

16                MR. HAMMONS:  Why don't we just start it at

17    30 -- 38:50.  30 --

18                MR. WHITWORTH:  Thanks.

19                MR. HAMMONS:  38:50, we'll start from there.

20         Q      (By Mr. Hammons) Mr. Shifflett, at -- when

21    you -- when -- here is where I want you to pay

22    particular attention to Rickert and his ammonia

23    treatment.

24         A      Okay.

25         Q      Okay?  And do you -- do you consider ammonia
```

```
 1    packets, stuck in people's face, medical treatment?

 2              MS. DARK:  Object to the form.

 3              MS. THOMPSON:  Object to the form.

 4         A    It depends on the situation.

 5         Q    (By Mr. Hammons) Well, in this situation, is

 6    it medical treatment?

 7              MS. THOMPSON:  Object to form.

 8              MS. DARK:  Object to the form.

 9         A    We believed he was having a seizure and that's

10    generally what you do when a seizure is happening.

11         Q    (By Mr. Hammons) No one -- no one talked and

12    communicated with each other that he was having a

13    seizure.  I mean, the word "seizure" is never used.  How

14    did y'all -- I mean, how are y'all, like, "We all know

15    this is a seizure"?  How is that possible?

16              MS. THOMPSON:  Object to form.

17         A    Me, personally, I've -- I've had seizures, but

18    I don't know how all of us was on the same page.  I'm

19    not sure.

20         Q    (By Mr. Hammons) Well, how do you know you

21    were on that page?  There's no mention in any record,

22    any words that I've ever heard, of a seizure.

23         A    Well, because you can put the ammonia -- I

24    mean, you can plug two and two together.  When --

25    usually, when you pull out an ammonia strip, it's
```

```
 1    because of a seizure.  And he's shaking, he just hit his

 2    head, he -- and went to the floor.  That's a pretty

 3    common sign.

 4         Q    Okay.

 5              MR. HAMMONS:  Here we go, 38 -- I've got it at

 6    49 -- but play.

 7              (Plaintiff's Exhibit No. 5, Officer Brown's

 8    Body Cam Footage, was played off the record.)

 9         Q    (By Mr. Hammons) Now, I didn't -- I mean, I'm

10    watching it.  He's got an ammonia packet stuck in

11    Marconia's face and he's -- Marconia is not moving, he's

12    not reacting at all, for -- I've counted it, obviously,

13    preparing for this deposition -- it's about nine

14    seconds.

15         A    I thought he was --

16         Q    He doesn't move.

17         A    I thought he was talking, though, at the

18    beginning.  Was he not talking?

19         Q    No.  Well, we can watch it again.

20              MR. HAMMONS:  Backing it up to 39:18, and I'm

21    going to start it.

22              (Plaintiff's Exhibit No. 5, Officer Brown's

23    Body Cam Footage, was played off the record.)

24         Q    (By Mr. Hammons) I mean, am I -- am I -- am I

25    seeing that inaccurately?  He's got it stuck in his
```

```
 1    face, he ain't moving at all?

 2         A     Correct.

 3               MS. DARK:  Object to the form.

 4         Q     (By Mr. Hammons) But that was the indication,

 5    to all of you that I've talked to so far, that he was

 6    faking?

 7         A     I was looking down the whole time and I was

 8    still under the impression that he was faking a seizure,

 9    and now he's just sitting there.  I didn't -- I didn't

10    know he was holding the ammonia strip there for 10

11    seconds or whatever it was.

12         Q     I mean, you -- but you see it now, I mean, do

13    -- don't you wish Clayton Rickert would have said

14    something at that point?

15               MS. THOMPSON:  Object to form.

16         A     Yes.

17         Q     (By Mr. Hammons) And then all we have now, we

18    have the -- the -- Officer Brown further distracting us,

19    he calls him an idiot, right?

20               MS. GOOCH:  Object to the form.

21         A     I don't -- I don't -- I don't know who said

22    that.  I don't know if it was Officer Brown.

23               (Plaintiff's Exhibit No. 5, Officer Brown's

24    Body Cam Footage, was played off the record.)

25         Q     (By Mr. Hammons) Okay.  That's Barr, right,
```

```
 1        Q     So you believe Marconia Kessee was assaulting

 2    you?

 3        A     No.  I don't think that, at all.  I think --

 4        Q     Or do you think he was involuntary -- his legs

 5    were moving because he's dying?

 6              MS. THOMPSON:  Object to the form.

 7              MS. DARK:  Object to the form.

 8        A     I -- I don't know.  I can't say that.

 9        Q     (By Mr. Hammons) Is -- but "fuck his ass,"

10    that -- that particular attitude is consistent with the

11    way you treat inmates in Cleveland County?

12              MS. DARK:  Object to the form.

13        A     Correct.  That's the way I treat everybody.

14        Q     (By Mr. Hammons) And in this particular

15    instance, you can understand how "fuck his ass" is going

16    to come into play in this -- this case?

17              MS. DARK:  Object to the form.

18        A     I do not.

19        Q     (By Mr. Hammons) Huh?

20        A     I -- I mean, I don't understand what -- what's

21    your question?

22        Q     I'm asking you:  Do you understand why that's

23    going to be a piece of evidence in this case, you

24    saying, "Fuck his ass"?

25              MS. DARK:  Object to the form.
```

```
 1        A     That I was frustrated and said, "Fuck his
 2   ass"?
 3        Q     (By Mr. Hammons) Yeah.
 4        A     I guess I do.  I mean, it -- it will probably
 5   be a big thing, but I own up to saying it.  I was
 6   frustrated and...
 7        Q     I understand, but you can see where it's
 8   heading, because he ends up dead in your jail cell?
 9              MS. DARK:  Object to the form.
10        A     Oh, I -- I don't know.  I don't know.
11        Q     (By Mr. Hammons) You don't know that he ended
12   up dead in the jail cell?
13        A     I don't know where it's leading to.  I know he
14   -- obviously, I know, now, he died in the jail cell, but
15   I don't -- I don't know where it's going to go.
16        Q     But you don't make any apologies for it?
17              MS. DARK:  Object to the form.
18        A     I do not.  You -- I mean, that's jail talk,
19   so...
20        Q     (By Mr. Hammons) That's -- that's talk that
21   inmates in the position of Marconia Kessee deserve?
22              MS. DARK:  Object to the form.
23        A     Like I said before, I treat everybody the
24   same, I talk to everybody the same.
25        Q     (By Mr. Hammons) So if, in fact, this was a
```

    1    20-year-old frat boy from OU walking in here, and he

    2    started acting like this, "Fuck his ass" would be the

    3    same attitude with him, too?

    4         A    Absolutely.

    5         Q    It doesn't matter that Marconia is a poor,

    6    black, mentally ill person?

    7              MS. DARK:  Object to the form.

    8         A    Race or anything doesn't have anything to do

    9    with how I treat somebody.  That's -- a person is a

   10    person, regardless of color.

   11         Q    (By Mr. Hammons) Right.  And an inmate is an

   12    inmate at Cleveland County Detention Center?

   13              MS. DARK:  Object to the form.

   14         A    I treat everybody the same.  I treat the

   15    inmates the same, I treat my parents the same, I treat

   16    the guys I work with now the same.  Everyone.

   17         Q    (By Mr. Hammons) Well, I'm talking

   18    specifically this kind of -- the treatment Marconia

   19    Kessee got on January 16, 2018, is consistent with your

   20    training at the Cleveland County Detention Center?

   21         A    Correct.

   22         Q    Okay.  No one took Marconia's temperature;

   23    true?

   24              MS. THOMPSON:  Object to the form.

   25         A    Correct.

```
 1      Q    It's an incident report by Cody Barr.  Do you
 2   see that?
 3      A    Correct.
 4      Q    Okay.  Down in the last paragraph, it says,
 5   "Kessee was lying on his stomach just as we had left him
 6   after removing his clothes, giving him a blanket.
 7   Kessee was not moving but was muttering loudly to
 8   himself.  I was unable to accurately understand what he
 9   was saying but logged him as awake."  Do you see that?
10      A    Correct.
11      Q    Now, when -- when an individual is placed in
12   this cell under critical observation, and you hear them
13   muttering, is it important to find out what they're
14   muttering?
15      A    No.
16           MS. DARK:  Object to the form.
17      Q    (By Mr. Hammons) What if they're muttering,
18   "Help"?
19           MS. DARK:  Object to the form.
20      A    I'm not sure.
21      Q    (By Mr. Hammons) Right.  That's the point, is:
22   Don't you want to be sure in -- when you're doing a
23   sight check?
24      A    Yeah.
25      Q    And you haven't watched the body cam video
```

```
 1      A     Yes.

 2      Q     Okay.  And it says, "LPN" -- down at the last

 3   paragraph, I'm reading.  "LPN Clayton Rickert stated

 4   it's not a critical observation, it's a medical

 5   observation.  Sergeant Andrews stated to place him on

 6   15-minute sight checks, regardless.  I conducted a sight

 7   check on inmate at approximately 20:16 and I observed

 8   him laying on his stomach at the back of B30 -- 130.

 9   His left leg and left arm were halfway out of the green

10   smock.  Inmate Kessee's head was facing away from me.  I

11   placed a two on the critical observation sheet and

12   returned to my normal duties without further incident."

13            Do you see that?

14      A     Correct.

15      Q     So that -- you -- you looked in, saw his feet

16   were sticking out, and wrote that his feet were sticking

17   out, and then wrote "two" as asleep?

18      A     Correct.

19      Q     Okay.  And that -- that's a consistent sight

20   check with your training?

21      A     Correct.

22      Q     Okay.  Any -- is there anything that you saw

23   in those second and a half, two seconds, that would

24   indicate to you that he was actually -- his heart was

25   beating or he was breathing?
```

```
 1        A     Yes.

 2        Q     "Medical reception information shall be

 3    recorded in the inmate file and shall include a minimum

 4    of the following information."  Is that the same as

 5    yours?

 6        A     Yes.

 7        Q     Okay.  Now, this standard, it seems that

 8    Cleveland County had this process at Cleveland County

 9    when you were there; true?

10        A     True.

11        Q     And medical reception, in my mind, would have

12    been that medical screening room that -- that you would

13    typically take an inmate into; is that accurate?

14        A     Correct.

15        Q     Okay.  And "the minimum following information:

16    Current illnesses and health problems."  Do you see

17    that?

18        A     Yes.

19        Q     And that's -- that's a big one in Marconia's

20    case because we don't know what his current illnesses or

21    health problems were; true?

22        A     Correct.

23        Q     Okay.  "Behavioral observations."  Is that one

24    on your version of this?

25        A     It is --
```

```
 1    care and health services."  Do you see that?
 2         A    Correct.
 3         Q    Okay.  No. 1, you -- isn't that "The
 4    administrator shall" -- is that what yours says?
 5         A    Yes.
 6         Q    "The administrator shall be responsible for
 7    the facility's medical services and shall develop, with
 8    the assistance of the designated medical authority, the
 9    facility's healthcare plan."  Do you see that?
10         A    Yes.
11         Q    Who is the administrator at Cleveland County
12    Jail when you were there?
13         A    I'm not sure.
14         Q    Okay.  Do you know what a designated medical
15    authority is?
16         A    No, I do not.
17         Q    Okay.  Did you know whether or not Cleveland
18    County had a facility healthcare plan?
19         A    I'm not sure.
20         Q    Okay.  No. 2, does it say, "Intake screening"?
21         A    Yes.
22         Q    "Intake screening shall be performed on all
23    inmates immediately upon admission to the facility."
24    See that?
25         A    Yes.
```

```
 1    illnesses/health problems."  You see that?  No. --
 2         A    Yes.
 3         Q    And Letter ii is "Behavioral observations."
 4    Do you see that?
 5         A    Yes.
 6         Q    "Include-" -- does it say, "Including state of
 7    consciousness and mental status"?
 8         A    Yes.
 9         Q    Do you, as a detention officer, have to make
10    behavioral observations about inmates, or are you
11    required to do that?
12         A    We're not required.
13         Q    Did you make any observations of Marconia
14    Kessee about his state of consciousness or mental
15    status?
16         A    No.
17         Q    Okay.  Let me see that back a second.  Thanks.
18              MR. HAMMONS:  If you'll put that with those
19    and you can -- yeah, put it off to the side or whatever,
20    stack it up.
21         Q    (By Mr. Hammons) I'm going to try to just help
22    out and streamline some of this.
23              Do you know Steven Roberts?
24         A    No.
25         Q    He's an ER physician who worked at Norman
```

```
 1    is correct or not; is that correct?

 2         A     Correct.

 3         Q     And you're not qualified to provide any

 4    treatment for any medical conditions; is that correct?

 5         A     Correct.

 6         Q     Is it also accurate that you're not qualified

 7    to pronounce someone dead?

 8         A     Correct.

 9         Q     That would have to be a physician, correct?

10         A     Yes.

11         Q     So even Clayton Rickert, being an LPN, cannot

12    determine whether someone is actually clinically dead,

13    correct?

14               MR. HAMMONS:  Object to the form.

15         A     Correct.

16         Q     (By Ms. Thompson) When Marconia Kessee arrived

17    at the jail, did you observe any injuries on him?

18         A     Not that I can recall.

19         Q     Was he bleeding anywhere?

20         A     Not that I can recall.

21         Q     Was he throwing up?

22         A     No.

23         Q     And based on what you knew at the time, you

24    thought that Marconia Kessee was having a behavioral

25    issue, correct?
```

```
 1                MS. DARK:  Object to the form.

 2                MR. HAMMONS:  Object to the form.

 3        A    I thought he was intoxicated with alcohol.

 4        Q    (By Ms. Thompson) Intoxicated?  Did you

 5   observe anything about Marconia Kessee's behavior that

 6   caused you to believe that he needed to go back to the

 7   hospital?

 8        A    I did not.

 9        Q    If you observed something like that, would you

10   have -- what would you have done about that?

11                MR. HAMMONS:  Object to the form.

12        A    I would have got with Sergeant Andrews, told

13   him, made Sergeant Andrews aware, and then let him take

14   care of it from there.

15        Q    (By Ms. Thompson) And I understand that you're

16   a layperson in the medical field, but, based on what

17   you've seen, you did not feel like Marconia needed to go

18   back to the hospital where he just came from, correct?

19                MR. HAMMONS:  Object to the form.

20        A    No, I did not.  I thought he was just

21   intoxicated from alcohol.

22        Q    (By Ms. Thompson) And while Marconia Kessee

23   was in the padded cell, you, personally, checked on him

24   multiple times, correct?

25        A    I did once.
```

```
 1    "Well, I understand, I'm not -- I'm just asking you if

 2    you don't think you're qualified to make assessments or

 3    not."

 4            He says, "I can't assess a medical condition.."

 5    Same as you; true?

 6        A    Correct.

 7        Q    Right.  So y'all are very similar in the fact

 8    of your medical -- the ability to make medical

 9    assessments in the jail, which is no knowledge?

10            MS. DARK:  Object to the form.

11            MS. THOMPSON:  Object to the form.

12        A    Correct.

13        Q    (By Mr. Hammons) Okay.  So, for instance, when

14    they're asking you about whether you, in that one-second

15    sight check, the one you did -- whether you could

16    determine, in that one second, whether somebody was

17    having a medical problem, you can't decide it because

18    you don't make medical decisions, you don't have medical

19    training; true?

20            MS. DARK:  Object to the form.

21        A    No, but I can see the common signs of bleeding

22    or, you know, jumping around, beating at the door.

23        Q    (By Mr. Hammons) Okay.  You could -- you -- in

24    your -- we went over your report.  His head was facing

25    away from you.  How do you know he hadn't vomited?
```

```
 1      A    I did not.  I just thought he had went to
 2  sleep.
 3      Q    Right.  Well, you were asked, earlier, did --
 4  could you tell if he was vomiting?" and you said he
 5  wasn't, so that's not exactly true.  If his face was
 6  away, he could have been vomiting and choking on it and
 7  you wouldn't have known?
 8           MS. DARK:  Object to the form.
 9      A    Correct, I wouldn't have known.
10      Q    (By Mr. Hammons) Especially in one second;
11  true?
12           MS. DARK:  Object to the form.
13      A    I mean, I judge things pretty fast, so, I
14  mean, I could have saw it if he wasn't facing away from
15  me.
16      Q    (By Mr. Hammons) Right.  You were also asked
17  about your knowledge of Clayton Rickert's qualifications
18  and you didn't know that he considered himself not
19  qualified.  You didn't know that, at the time; true?
20      A    Correct.  I thought he was qualified.
21      Q    But to be fair to you, Mr. Shifflett, that's
22  not your job, to know who they put in as an unqualified
23  nurse, medical staff, at the jail, is it?
24           MS. DARK:  Object to the form.
25           MS. THOMPSON:  Object to the form.
```