Brian Knapp (Lunch $27.60)
1/19/2021                                                        Page: 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE WESTERN DISTRICT OF OKLAHOMA

 3    (1) PATRICIA THOMPSON, as Personal
      Representative of the Estate of
 4    MARCONIA LYNN KESSEE,

 5          Plaintiff,                          Case Number
                                                CIV-19-113-SLP
 6    VS.

 7    (1) NORMAN REGIONAL HOSPITAL
      AUTHORITY d/b/a NORMAN REGIONAL
 8    HOSPITAL, a public trust, et al.,

 9          Defendants.

10

11                       * * * * *

12             DEPOSITION OF BRIAN PATRICK KNAPP
              TAKEN ON BEHALF OF THE PLAINTIFF
13                IN OKLAHOMA CITY, OKLAHOMA
                   ON JANUARY 19, 2021
14               COMMENCING AT 10:01 A.M.

15                       * * * * *

16

17

18

19

20

21
                       INSTASCRIPT, LLC
22                125 PARK AVENUE, SUITE LL
                OKLAHOMA CITY, OKLAHOMA  73102            EXHIBIT
23                      405.605.6880
                  schedule@instascript.net                   3
24

25         Reported by:  Cheryl D. Rylant, CSR, RPR
```

```
 1              MR. YOUNG:  Object to the form.
 2              THE WITNESS:  I do not believe he's acting
 3    normal.
 4         Q. (By Mr. Hammons)  So under that circumstance,
 5    based on your training and experience, what are you,
 6    as a detention officer, supposed to do?
 7         A. Rely on my medical staff to make the
 8    proper -- like, what we should do in this situation.
 9         Q. And is there any -- ever any circumstance
10    that you've been a part of where you disagreed with
11    medical to the point where you raised it as an issue?
12         A. No.
13         Q. Okay.  And would you agree with me that
14    detention officers at Cleveland County are taught to
15    just follow whatever the medical's determination is?
16         A. We've been told that if we need to or we
17    think something is wrong, we would raise our
18    concerns.  But I personally have never felt a need
19    to.  I've never seen anything egregiously wrong with
20    any person we've ever treated.
21         Q. But you don't have any training to make those
22    determinations?
23              MS. DARK:  Object to the form.
24         Q. (By Mr. Hammons)  True?
25         A. I don't have any training on it, but as a
```

```
 1        A lot of times in your job as a detention
 2   officer, you've got -- you have a lot of boxes to
 3   check, paperwork to fill out, times to stamp on lots
 4   of things; true?
 5        A. Correct.
 6        Q. I mean, food, medication, intakes,
 7   log checks, there's a lot of, "I've got to write this
 8   down and I have to get to the next thing to write
 9   down"; true?
10             MS. DARK:  Object to the form.
11             MR. YOUNG:  Object to the form.
12             THE WITNESS:  It is a hectic job, but we
13   are doing the best we can.
14        Q. (By Mr. Hammons)  Right.
15        In Marconia's situation -- well, strike that.
16        When you look into a critical observation cell
17   and you look in for one second, what would you see
18   that would cause you to open the door and check
19   further?
20             MS. DARK:  Object to the form.
21             THE WITNESS:  Usually it's either something
22   seems wrong with them, either -- if they were trying
23   to harm themselves if they had been on critical
24   observation.  Or if I notice -- usually the only
25   thing I think I remember checking on someone like
```

```
 1   that was there was a seizure; so I would open the
 2   door and try and keep them from harming themselves
 3   and let the medical staff know.
 4        Q.  (By Mr. Hammons)  I mean, it just begs the
 5   question:  If somebody is in the cell and they're
 6   potentially unconscious, is the one-second
 7   sight check going to give you the ability to decide
 8   that?
 9             MS. DARK:  Object to the form.
10             THE WITNESS:  When I checked on him and
11   thought I saw his foot move, which is why I shut the
12   door.  Otherwise, I would have checked on him
13   further.
14        Q.  (By Mr. Hammons)  Well, I mean, let's say you
15   would have opened the door and just saw him laying
16   there for 5 seconds --
17        A.  Uh-huh.
18        Q.  -- wouldn't you have just logged "asleep"?
19             MS. DARK:  Object to the form.
20             THE WITNESS:  When I check on someone on
21   critical observation and I don't see chest rise or
22   fall, then I would make sure I check on them further.
23             But with Marconia Kessee, I thought I saw him
24   move, which is why I shut the door.  Because if I
25   can't see chest rise or fall, then something may be
```