IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

(1) PATRICIA THOMPSON, as )
Personal Representative of the )
Estate of MARCONIA LYNN )
KESSEE, )
)
    Plaintiff, )
)
-vs- ) No. CIV-19-113-SLP
)
(1) NORMAN REGIONAL HOSPITAL )
AUTHORITY d/b/a NORMAN )
REGIONAL HOSPITAL, a public )
trust, et al., )
)
    Defendants. )



\* \* \* \* \* \*

VIDEOCONFERENCE DEPOSITION OF ZACHERY ANDREWS

TAKEN ON BEHALF OF THE PLAINTIFF

IN OKLAHOMA CITY, OKLAHOMA

ON JANUARY 13, 2021

COMMENCING AT 1:27 P.M.

\* \* \* \* \* \*

REPORTED BY:  BETH A. McGINLEY, CSR. RPR

INSTASCRIPT, LLC
125 PARK AVENUE, LL
OKLAHOMA CITY, OKLAHOMA 73102
schedule@instascript.net
Phone:(405)605-6880 Fax:(405)605-6881

**EXHIBIT 4**

1    into the record, that Clayton Rickert said, "I was not

2    qualified to see drug overdose and I cannot assess a

3    medical condition." So, even at his own words, there's

4    no medical professional there --

5              MS. DARK: Object to the form.

6              MS. THOMPSON: Object to the form.

7         Q    (By Mr. Hammons) -- true?

8         A    That's a statement he made.

9         Q    Yeah. Well, he's him, he -- he should know

10   about him, right?

11             MS. THOMPSON: Object to the form.

12             MS. DARK: Object to the form.

13        A    I mean, I'm not sure -- I'm not sure how to

14   answer that.

15        Q    (By Mr. Hammons) Okay. Well, what I'm saying

16   is, is that I understand you don't understand medical

17   conditions; that's clear, okay? But you do understand

18   the Cleveland County Detention Center's processes and

19   the sheriff's policies on how inmates are supposed to be

20   brought through your system; true?

21        A    Yes.

22        Q    Right. And when we know that an inmate is

23   supposed to have certain medical screenings, health

24   screenings, mental health screenings, when we know that

25   is the process, and if you saw Clayton Rickert didn't do

```
 1    it, wouldn't do it, would you, as sergeant of the

 2    Cleveland County Detention Center, be able to go to

 3    Clayton Rickert and say, "Get over there and do your

 4    job"?

 5              MS. DARK:  Object to the form.

 6    Q    (By Mr. Hammons) Or is he just free to do --

 7              MS. THOMPSON:  Object to the form.

 8    Q    (By Mr. Hammons) -- whatever he wants?

 9              MS. DARK:  Object to the form.

10    A    I'm not -- I'm not sure how to answer that

11    because I -- I mean... I wasn't involved in the earlier

12    part of that, anyway, so I wasn't sure if he did it, but

13    if he was to not do an intake or something, then I could

14    ask him to do it.

15    Q    (By Mr. Hammons) Yeah, and I'm not talking

16    about a specific thing.  I'm talking about an overall

17    system that y'all have there.

18              Who holds Clayton Rickert, Turn Key, medical

19    staff -- who holds them responsible when they don't do

20    their job in Cleveland County?  Somebody has to tell

21    them, "You're not doing your job," right?

22              MS. DARK:  Object to the form.

23              MS. THOMPSON:  Object to the form.

24    Q    (By Mr. Hammons) If they don't do their job,

25    somebody has to tell them, right?
```

```
 1        A     No.

 2        Q     (By Mr. Hammons) Did you escalate it up the

 3   chain of command that he didn't do his job?

 4              MS. THOMPSON:   Object to the form.

 5        A     No.

 6        Q     (By Mr. Hammons) Okay.  Do you believe that he

 7   did his job, Clayton Rickert?

 8              MS. THOMPSON:   Object to the form.

 9        A     At the time, I thought, based on what I saw,

10   was appropriate.  I'm not a medical professional, so I

11   was following the lead of a medical professional.

12        Q     (By Mr. Hammons) Are -- are you saying that

13   the policy of the sheriff at the Cleveland County

14   Detention Center is to blindly follow whatever Clayton

15   Rickert says in an intake room?

16              MS. DARK:   Object to the form.

17        A     I didn't say that.

18        Q     (By Mr. Hammons) Well, can you, as a detention

19   officer or a sergeant, step in when you see something

20   that's so obvious and say, "Hey, wait a minute, you

21   haven't done anything, you haven't asked him one

22   question, you haven't taken a blood pressure, we don't

23   even have a fit slip, we can't stick him in a room"?

24   Does -- do you have the ability to do that?

25              MS. DARK:   Object to the form.
```

```
1                   MS. THOMPSON:  Object to the form.

2         A     I wasn't present during his introduction into

3    the intake room, so I didn't have prior knowledge of

4    that.

5         Q     (By Mr. Hammons) I know, but do you have the

6    ability to do that if that situation occurs?

7                   MS. DARK:  Object to the form.

8         A     Yes.

9         Q     (By Mr. Hammons) And would he listen to you?

10        A     I would assume so.  I -- I'm not sure.

11        Q     I mean, you -- you have -- you have not seen

12   body cam footage from Officer Brown, right?

13        A     I have not.

14        Q     Okay.  Let's -- Exhibit 1 is a big old stack

15   of paper right there.  It's -- it's -- pull out -- yeah,

16   there you go.  See that?

17        A     Uh-huh.

18        Q     You might pull that over there to you.  We

19   will start this and go through this the best we can.

20   I'll try to keep it relevant to you.

21              Exhibit 1 is -- in the corner are numbers.

22   You see those numbers of -- that's a one, but see those

23   little numbers?

24        A     Yes.

25        Q     Just pretend those are page numbers.  It's
```

1    state what will be done and why.  Is that your

2    understanding of "policy," just -- when we're talking

3    about policy and procedure?

4        A    Yes.

5        Q    Okay, what will be done.  And then the why is

6    really important in policy; true?

7             MS. DARK:  Object to the form.

8        A    Yes.

9        Q    (By Mr. Hammons) For instance, a medical

10   screening is what will be done, right?  In a -- in --

11   one of the policies, is a medical screening will be

12   done?

13       A    Will be done?

14       Q    Sure.  That's a policy of the jail?

15       A    Yes.

16       Q    Okay.  But for jailers, or detention officers,

17   and staff, they need to understand the why, do they not?

18            MS. DARK:  Object to the form.

19       A    Yes.

20       Q    (By Mr. Hammons) And the why is -- why is

21   the -- a medical screening done?

22       A    For -- oh, medications and just asking

23   questions about medical history, things like that.

24       Q    Well, that's how.  That's -- that would be

25   under "Procedure."

```
 1        A    Okay.

 2        Q    Why is it done?  I can give you some hints.

 3             MS. DARK:  Object to the form.

 4        Q    (By Mr. Hammons) It's to make sure -- let me

 5   see if you agree with me.  To make sure an inmate is not

 6   in need of medical treatment?  Is that a why?  Is that

 7   one of the reasons?

 8        A    Yes.

 9        Q    And to make sure they're not experiencing

10   mental health issues; true?

11        A    Yes.

12        Q    Make sure that -- quite frankly, that they're

13   not dying; true?

14             MS. THOMPSON:  Object to the form.

15        A    Yes.

16        Q    (By Mr. Hammons) And to make sure that they

17   are going to be safe while in your custody; true?

18             MS. DARK:  Object to the form.

19        A    Yes.

20        Q    (By Mr. Hammons) Okay.  So real important for

21   jailers -- detention officers -- sorry, I said jailer --

22   detention officers and staff to understand why it's so

23   important to do a medical screening on a new inmate;

24   true?

25             MS. DARK:  Object to the form.
```

1              MS. DARK:  Object to the form.

2              MS. THOMPSON:  Object to the form.

3      A    I'm not sure.  I wasn't involved in that --

4    that portion of it.

5      Q    (By Mr. Hammons) I'm not asking you about that

6    portion of it.  I'm asking you -- you know Clayton

7    Rickert has testified that he doesn't know the signs and

8    symptoms of a drug overdose.  That's an important

9    process to know or important -- in a jail facility, it's

10   extremely important for the jail to have somebody there,

11   qualified to understand the signs and symptoms of drug

12   overdose, isn't it?

13             MS. DARK:  Object to the form.

14             MS. THOMPSON:  Object to the form.

15     A    Yes.

16     Q    (By Mr. Hammons) I mean, you run into that

17   problem in a jail facility all the time, people who are

18   under the influence and potentially overdosing or

19   potentially detoxing; true?

20             MS. DARK:  Object to the form.

21     A    No, not all the time.

22     Q    (By Mr. Hammons) Well it's important enough

23   that there's -- I -- and we're -- we can go through it.

24   There's pages and pages of material and probably most of

25   the time spent in your two weeks were spent on suicide,

```
 1    drug detox, overdosing, right?

 2             MS. DARK:  Object to the form.

 3        A    I don't remember what was covered.

 4        Q    (By Mr. Hammons) Okay.  You have no concept

 5    that in a jail facility, drug overdose and the potential

 6    for drug overdose is an issue in all jail facilities?

 7    You don't know that?

 8             MS. DARK:  Object to the form.

 9        A    Can you repeat that?  I'm sorry.

10        Q    (By Mr. Hammons) Sure.  I'm just asking:  Is

11    one of the major issues, running a jail, is the issue of

12    people potentially having drug overdose?

13        A    I -- I'm not sure how to answer that because

14    at the time --

15        Q    Okay.  You don't think it's --

16        A    -- I don't --

17        Q    -- important?

18             MS. DARK:  Object to the form.

19        A    Yeah.  Yes.

20        Q    (By Mr. Hammons) Yes, it's important or, no,

21    you don't think it's important?

22        A    It's important.

23        Q    Okay.  That was a long one.

24             So do you think there -- in that Exhibit 1, do

25    you believe that there are policies and procedures on
```

```
 1    banging his own head into the wall?

 2         A    I saw him hit his head on the wall.

 3         Q    Sure.  But do you believe he did it

 4    intentionally?

 5              MS. DARK:  Object to the form.

 6         A    I have no reason to think that he didn't.

 7         Q    (By Mr. Hammons) Okay.  So when -- the policy

 8    and procedure at Cleveland County -- if somebody is

 9    intoxicated and hits their head on the wall, then the

10    proper procedure is then to take them to the padded cell

11    and put them on critical observation?

12         A    That's what would have been done.

13         Q    Okay.  Anything about any of the lack of

14    questions asked about anything to do with this

15    individual -- does that cause you any pause --

16              MS. DARK:  Object to --

17         Q    (By Mr. Hammons) -- whatsoever?

18              MS. DARK:  Object to the form.

19         A    I think due to the harm that was -- that was

20    done with the -- the back of the head hit, I think the

21    safety was more important at that particular moment.

22         Q    (By Mr. Hammons) Okay.  So the -- the head

23    hitting the wall the one time is enough to throw

24    somebody in critical observation and take five or six of

25    your detention officers watching them every 15 minutes?
```

```
1                   MS. DARK:  Object to the form.

2        A     Yes, self harm.

3        Q     (By Mr. Hammons) So that's what -- that's why

4    you put him in critical observation?

5                   MS. DARK:  Object to the form.

6        A     I was not involved in -- I didn't -- I didn't

7    have any prior knowledge of that event happening.

8        Q     (By Mr. Hammons) Then why did you put him in

9    critical observation?

10       A     Due to being intoxicated and I -- the hit had

11   something to do with it, for sure.

12       Q     Well, that -- okay, so they take him and put

13   him in the room.  What is relayed to you?  What

14   information?

15       A     I -- I don't remember exactly.  I really

16   don't.  I just saw that somebody needed some assistance,

17   so I -- whatever is on the cam there about clearing a

18   cell out, so I did that to -- to get ready to -- to move

19   him.

20       Q     Okay.  So you don't know the reason -- I think

21   it's in one of these reports, one of your reports,

22   somewhere in there, that Rickert said, "Put him on

23   medical observation," and you said, "No, we're going to

24   do 15-minute critical observation."  Why?

25       A     That didn't happen in the intake room.
```

```
 1        Q     I understand.  Just, anywhere, why did you do
 2     it?
 3        A     Because he hit his head, I didn't feel
 4     comfortable with that being a 30-minute -- or a medical
 5     observation, whatever he called it.
 6        Q     Okay.  So is -- that's what I was asking you.
 7     Somebody said he hit his head on the wall, and were you
 8     putting him in critical observation over that?
 9        A     That would be a reason to do that, yes.
10        Q     Well, is that the reason?  I'm asking you:
11     What is the reason you did it?
12        A     Yes.
13        Q     So one hit on the wall?
14              MS. DARK:  Object to the form.
15        Q     (By Mr. Hammons) Puts people in critical
16     observation; true?
17        A     Harm to oneself can put somebody in critical
18     observation.
19        Q     Okay.  Would -- is there another explanation,
20     like he was dying of a drug overdose, and that's why he
21     was hitting his head on the wall?
22              MS. DARK:  Object to the form.
23        A     I'm not a medical professional, so I can't
24     diagnose anybody with any conditions like that.
25     That's --
```

```
 1    that staff working at the Cleveland County Detention

 2    Center would be trained on policies and procedures?

 3              MS. DARK:  Object to the form.

 4              MS. THOMPSON:  Object to the form.

 5    A    Yes.

 6    Q    (By Mr. Hammons) And why did you have that

 7    expectation?

 8    A    Because it was what was asked of us.

 9    Q    I want to make sure I understand.  The

10    Cleveland County Detention Center does not provide

11    detention officers with training on the signs and

12    symptoms of drug overdose?

13    A    Not that I'm aware of.

14    Q    Okay.  And that's true as of January 16, 2018?

15    A    Yes.

16    Q    Okay.  And this one is real obvious, but

17    detention officers, sergeants like yourself, people

18    working at the Cleveland County Detention Center,

19    weren't able to make medical assessments of inmates?

20    A    Yes.

21    Q    Do you, personally, know the signs of drug

22    overdose, just from your experience working at Cleveland

23    County?

24    A    Not anything off the top of my head, no.

25    Q    And you -- you watched the response to when
```

```
 1                  MS. THOMPSON:  Object to the form.

 2          A     At the time, no.

 3          Q     (By Mr. Hammons) I mean, looking back, it --

 4     three minutes, almost, is a long time, isn't it?

 5          A     Yeah, I -- at the time, I would say I thought

 6     it was appropriate, but if you look at the video, it

 7     probably could have been started sooner.

 8          Q     Yeah.  I mean, within seconds, you'd reach

 9     down and find out if somebody has got a pulse, right?

10          A     I -- I'm not sure.  I hadn't -- that was --

11     I've never had any other prior experience than that, in

12     that moment.

13          Q     I mean, you had CPR training; true?

14          A     Yes, I did.

15          Q     At January 16, 2018 -- I mean, I saw you do

16     CPR for a long time.

17          A     I was CPR certified then, yes.

18          Q     Right.  And what do they -- what do they teach

19     you in CPR, when you find somebody unresponsive?  What

20     do you check?  Two things.  I'll give you a hint.

21          A     Pulse and if they're breathing.

22          Q     Right.  Pretty easy to check, too, right?

23                  MS. DARK:  Object to the form.

24                  MS. THOMPSON:  Object to the form.

25          A     Yes.
```

```
 1        Q     Okay.  And when an inmate is in critical

 2   observation, they're there for a really serious reason;

 3   true?

 4              MS. DARK:  Object to the form.

 5        A     Yes.

 6        Q     (By Mr. Hammons) You wouldn't waste 15-minute

 7   checks on them if it wasn't a serious situation; true?

 8              MS. DARK:  Object -- object to the form.

 9        A     Yes.

10        Q     (By Mr. Hammons) Okay.  And in -- we can

11   eventually time it out, but I'm going to guess some of

12   your checks were less than a second.  Is less than a

13   second consistent with your training at Cleveland County

14   Detention Center?

15              MS. DARK:  Object to the form.

16        A     I felt comfortable with the time I had to --

17   to check in and make that and write that, so, yes, I

18   will say that's consistent.

19        Q     (By Mr. Hammons) Okay.  Do you think there

20   should be a clear policy from Cleveland County on sight

21   checks on inmates in critical observation?

22              MS. DARK:  Object to the form.

23        A     I just think it would be -- it would be tough

24   to -- to have a policy like that for -- for everything.

25   I don't think it was in place for -- the way it is, for
```

```
 1    watch, critical observation, right?

 2         A    I believe that's correct.

 3         Q    Does -- did he fit detox, also, since --

 4    since -- I don't know, somebody said he was intoxicated,

 5    drunk?

 6              MS. DARK:  Object to the form.

 7         A    He looked to be intoxicated, to me.

 8         Q    (By Mr. Hammons) But we don't know because no

 9    one asked him any questions about it.

10              MS. DARK:  Object to the form.

11         A    I wasn't present for this.

12         Q    (By Mr. Hammons) I mean, you saw the video.

13    No one asked him any questions about drugs or alcohol;

14    true?

15         A    As far as I could see on the video.

16         Q    Yeah.  Or as far as we could hear, anyway,

17    right?

18         A    (Moved head up and down).

19         Q    Okay.  All right, so let's turn to 407.  It's

20    -- it would be -- yeah, back the other way.

21              Are you there?

22         A    Yep.

23         Q    Okay.  So what I was looking for are the

24    one -- the polic- -- the sight check procedures for

25    suicide watch, detox and critical observation that were
```

1    referenced in Policy 4.15.

2              I'll save you some time.  They're not in here.

3    That probably would be the place where it would say

4    something like, "One second or less, open the door, shut

5    it as fast as you can," some kind of procedure like

6    that, would be where that -- that policy would be, in

7    3.15; true?

8        A    Yeah, I -- that's where the guidelines would

9    probably be.

10       Q    Right.  It's according to -- according to the

11   sheriff's policy, in sight checks, where we have a page

12   and a half of sight checks about contraband, it

13   references, specifically, sight check procedures for

14   suicide watch, detox and critical observation are found

15   in 3.15.  They're just not there, though?

16             MS. DARK:  Object to the form.

17       Q    (By Mr. Hammons) Right?

18       A    I don't see it here.

19       Q    Right.  So -- but this is where, apparently,

20   the sheriff, if he had bothered to put them in here,

21   would have put a number or a letter and he'd have

22   listed, "One second, open the window, close it, write

23   whatever you observed in that second or less," right?

24             MS. DARK:  Object to the form.

25       A    Could you rephrase that for me?

1   you, "Hey, I just brought these guy -- this guy from the

2   hospital," would you have to have the fit slip or not?

3       A    I -- I don't remember, in that part of the

4   policy.  I don't.

5       Q    You don't know whether or not you'd need to

6   have a fit slip in order to admit them to the Cleveland

7   County Detention Center or not?

8            MS. DARK:  Object to the form.

9       A    Are you saying from the street or from,

10  specifically, the hospital?

11      Q    (By Mr. Hammons) I'm -- I'm more interested --

12  I think they're -- let -- let me -- let's put it this

13  way:  I think that you'd agree with me there are times

14  when folks come in off the street that maybe have a

15  problem and you send them to -- say they need to go to

16  the hospital and get a fit slip to be brought into the

17  jail.  I think that happens on occasion, right?

18      A    Yes, it does.

19      Q    Okay.  I'm more interested when an officer

20  brings -- just like Marconia's situation, January 16,

21  2018 -- brings in an individual and says, "Hey, we" --

22  you know, "we just came from the hospital," for whatever

23  reason.  Is the policy to have the fit slip in hand

24  before admitting them from the intake room into the --

25  into a jail cell?

1      A    I, honestly, don't -- I don't remember if they

2  have to have it or not.

3      Q    Okay.  Then the next procedural guideline is

4  the -- these guidelines are for what a detention center

5  would do and what the medical staff needs to do as far

6  as getting the person to this medical intake room; is

7  that accurate?

8      A    It looks like it, yes.

9      Q    So in the medical intake room we watched in

10  that video, it's kind of behind -- if Mar- -- if we're

11  looking at Marconia's right shoulder in the -- in the

12  video, or the left side of the screen, that intake room

13  is right there, in that video?

14     A    Yes, it is.

15     Q    Okay.  And that's where they'd be taken in and

16  somebody like Clayton Rickert or a medical staff would

17  ask them -- do the medical screening and fill out forms?

18     A    Yes.

19     Q    Okay.  And maybe not as a sergeant, but as a

20  detention officer, you would -- you have been present

21  for that process at least on multiple occasions?

22     A    Yes.

23     Q    Not actually doing the medical screening, but

24  you're there, present as security for the staff?

25     A    Correct.

```
 1    expertise.

 2         Q    Okay.  And that's what I'm getting at.  If --

 3    if -- if, in that situation, a Clayton Rickert, anybody

 4    from Turn Key, said, "Don't worry about it, we'll just

 5    put them in the critical observation room," you would be

 6    okay with that decision?

 7              MS. DARK:  Object to the form.

 8         A    Could you say that again for me?  I'm sorry.

 9         Q    (By Mr. Hammons) Yeah.  I'm just -- you -- do

10    you defer to the medical, no matter what?

11              MS. DARK:  Object -- object to the form.

12         A    No.  But I -- in that particular instance, I

13    defer to their judgment because they're medical

14    professionals.

15         Q    (By Mr. Hammons) Okay.  I -- and I -- that's

16    what I'm trying to figure out, is if any of your first

17    aid, your CPR training, your experience in the jail,

18    gives you any knowledge of any medical condition that is

19    obvious.  I'm just asking, I don't -- I -- it may be no.

20    You may not know the signs of anything.

21         A    I mean, my position on that is:  If there was

22    a medical professional there who that's their career and

23    that's what they do for a living, then you would defer

24    to somebody that knows what they're talking about as far

25    as that goes.
```

1        Q     Okay.  So there's -- if -- if an inmate grabs

2     their chest and they just -- and they start throwing up

3     blood in the floor and they're clearly unconscious and

4     Clayton Rickert says, "Put them in critical observation,

5     they'll be okay," you'd defer to that judgment in that

6     exaggerated example?

7        A     No, I would not.

8        Q     Okay.  So we've found a threshold where you

9     would step in, is at least that threshold?  Where

10    there's blood and vomiting now and the person is

11    unconscious, then that's at least the threshold where

12    you'd say, "I'm -- I'm well aware something is going on

13    here"?

14       A     Yes.

15       Q     Okay.  The video inside, where you began CPR

16    with Clayton Rickert, you -- you watched that back in

17    October, I think you said?

18       A     Yes.

19       Q     Okay.  In that video -- you were present

20    during Stephen Scott, so I'm not going to show it, but

21    I'm just going to ask you a couple of questions.  You --

22    you saw where Clayton Rickert attempted to stand up and

23    then laid down, leaned down -- however you want to

24    express it -- next to Marconia, as he -- as you -- as

25    you and another, I think, are doing CPR?  You saw that

```
 1       A     Just I think the -- my personal opinion would
 2   be just that it would be quicker and -- and more swift,
 3   I -- a quicker response.
 4       Q     (By Mr. Hammons) Did you see in any video
 5   or -- or have a specific recollection of Clayton Rickert
 6   doing a blood pressure on Marconia?
 7       A     Have -- can -- have I seen any video of him
 8   doing a blood pressure on him?
 9       Q     Or do you have any specific recollection that
10   that occurred?
11       A     No.
12       Q     In the video that you watched with me, with
13   Officer Brown, do you recall any of the detention
14   officers, in that particular video, giving Marconia
15   orders?
16       A     Can you rephrase that again?  I'm -- I'm
17   sorry.
18       Q     Yeah, like, an order, to me, would be like,
19   you know, "Get up here, stay still," an order, you know,
20   direction.  Do you recall them giving him any orders,
21   commands?
22       A     Are you asking in the video or just what I
23   actually saw?
24       Q     Well, the video has sound.  I'm just wondering
25   if you heard any commands, any orders given?
```

```
 1        A     Right, I'm -- I'm not arguing with you about
 2   that.  I'm just asking -- I'm just trying to understand
 3   better.
 4        Q     Yeah.
 5        A     Are you asking what -- what we watched right
 6   here, right, and listened to?
 7        Q     Yes.
 8        A     Okay.
 9        Q     Yes.
10        A     Yes.
11        Q     What -- what did they give -- what command did
12   they give him?
13        A     "Sit down."
14        Q     Well, you're talking about when they carried
15   him in and put him on the bench?
16        A     I remember hearing, "Sit down," somewhere in
17   there, is all.
18        Q     Yeah.  Stacy Shifflett said, "Sit your ass
19   down here," and they -- they carried him, and Cody Barr
20   and Shifflett put him there and he said, "Sit your ass
21   down here."  I guess he complied with that order,
22   because he was sitting, right?
23        A     I mean, I -- I don't know how to answer that.
24   That's -- you asked me what order I heard and that --
25   that is the order I heard.  They --
```

```
 1       Q    Well, did -- from what you saw, did he comply

 2   with that order?

 3       A    He was seated.

 4       Q    Right.  I'm just wondering, because there was

 5   reports to the OSBI, made by detention officers, that he

 6   was -- he was not obeying their commands, so I'm trying

 7   to figure out what they're talking about, because I

 8   didn't -- I didn't see them, I didn't hear any commands

 9   in that room.

10            MS. DARK:  Object to the form.  Wait for a

11   question.

12       Q    (By Mr. Hammons) And I'm just wondering if --

13   if you heard any commands.  And you told me the one

14   about "sit down," but it seems he didn't disobey that

15   one.

16       A    That's the only one I can recall.

17       Q    Okay.  From that video, either the one that

18   you watched from the intake camera or Officer Brown's,

19   did you see Marconia -- was he able to stand without

20   assist -- assistance?

21       A    From what I saw, no.

22       Q    And when he walked in, was he standing without

23   assistance and then ordered to sit on the bench, or was

24   he carried in and sat on the bench?

25       A    I think he was -- he was helped in, yeah.
```

```
1       A    Outside of CPR, no, I am not medically

2    trained.

3       Q    Right.  You're not -- you're not trained by

4    anybody, under any circumstances, to make a medical

5    assessment of a medical condition; true?

6       A    I am not.  I'm not qualified or trained.

7       Q    Okay.  And in that way, you're similar to

8    Clayton Rickert's testimony, where he's not -- he admits

9    he cannot make a medical assessment?

10            MS. THOMPSON:  Object to the form.

11      A    That was not known at the time.

12      Q    (By Mr. Hammons) Yeah.  No, I'm just talking

13   about now.  You're the same?

14      A    If --

15            MS. THOMPSON:  Object to the form.

16      A    If his statement is that he's not qualified,

17   I -- I am, also, not qualified.

18      Q    (By Mr. Hammons) Okay.  The same would be

19   true -- you -- you know Stacy Shifflett and Cody Barr's

20   backgrounds and histories as a detention officer at the

21   time of January.  They didn't have medical training,

22   either; true?  I -- specialized medical training, other

23   than first aid, CPR?

24      A    They did not.

25      Q    Right.  So out of the folks in that intake
```