1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF OKLAHOMA

3

4    (1) PATRICIA THOMPSON, as      )
     Personal Representative of the)
     Estate of MARCONIA LYNN        )
5    KESSEE,                        )
                                    )
6         Plaintiff,                )
                                    )
7    -vs-                           )       No. CIV-19-113-SLP
                                    )
8    (1) NORMAN REGIONAL HOSPITAL   )
     AUTHORITY d/b/a NORMAN         )
9    REGIONAL HOSPITAL, a public    )
     trust, et al.,                 )
10                                  )
          Defendants.               )
11

12

13                    *  *  *  *  *

14   **VIDEOCONFERENCE DEPOSITION OF CLAYTON RICKERT**

15        TAKEN ON BEHALF OF THE PLAINTIFF

16          IN OKLAHOMA CITY, OKLAHOMA

17            ON DECEMBER 15, 2020

18         COMMENCING AT 9:10 A.M.

19                    *  *  *  *  *

20

21

22              INSTASCRIPT, L.L.C.
              125 PARK AVENUE, SUITE LL
23       OKLAHOMA CITY, OKLAHOMA  73102
                405.605.6880
24          schedule@instascript.net

25   <u>REPORTED BY</u>:  BETH A. McGINLEY, CSR, RPR

EXHIBIT
8

1      **A**     Currently.

2      **Q**     What about Turn Key nursing -- we left out --

3      **A**     Oh, yeah.

4      **Q**     You left out the reason we're here.

5      **A**     When was that?

6      **Q**     Do you think it's 2016?

7      **A**     It would have been before my injury, so it was

8   before '13 -- no -- or was it after my injury?  I --

9   honestly, I don't remember when it was.

10     **Q**     Well, is it safe to say the job that you had,

11  before the Veterans Affair, was working for Turn Key?

12     **A**     I would say maybe the job before the crisis

13  center was Turn Key.

14     **Q**     Okay.  And what -- when did you -- when did

15  you leave Turn Key?

16     **A**     I don't remember.

17     **Q**     Okay, this -- this incident happened in --

18  January 16, 2018.

19     **A**     Okay.

20     **Q**     Okay?  So, obviously, you were working that

21  day.

22     **A**     Right.

23     **Q**     Okay.  How long after this incident did you

24  stop working for Turn Key?

25     **A**     Two days afterwards.

1    Q    Okay.  Did they fire you?

2    A    They asked me not to come back.

3    Q    So it sounds like they fired you?

4         MS. THOMPSON:  Object to form.

5    Q    (By Mr. Hammons) Right?

6    A    That's just what they said that -- that the

7    sheriff asked me -- he didn't want me to come back.

8    Q    The sheriff said that to you, but what about

9    Turn Key, how --

10   A    No, the sheriff said it to -- what Turn Key

11   told me the sheriff said.

12   Q    Was, "I don't want him back in here," or

13   something to that effect?

14   A    Something to that effect, yes.

15   Q    Okay.  So then Turn Key said, "That's the

16   position we had, bye"?

17   A    They never said "bye" or "terminated" or noth-

18   -- nothing in -- to that effect, but just said that he

19   didn't want me back in there.

20   Q    Okay.  Did you go on unemployment?

21   A    No.

22   Q    What did -- where did you go after Turn Key?

23   A    That would have to have been the crisis

24   center.

25   Q    And how long after you got let go, or whatever

1    about the termination.

2         Q    Okay.  Who's Nicole Cobb?

3         A    Pardon?

4         Q    Who's Nicole Cobb?  Do you know who that is?

5         A    No.

6         Q    Okay.  Do you know who William -- Dr. William

7    Cooper is?

8         A    Yes.

9         Q    Who's he?

10        A    He's a doctor that's in -- he's our medical

11   provider.

12        Q    At -- at --

13        A    Turn Key.

14        Q    At Turn Key?  Was -- would he have been the

15   medical provider, say at Cleveland County Detention

16   Center?

17        A    Yes.

18        Q    Okay.  Did you have access to talk to him?

19        A    Yes.

20        Q    Like, you could call him on his cell if you

21   needed?

22        A    Him or -- or if the PA or nurse practitioner,

23   whoever I had, was on call, depending on who was on

24   call.

25        Q    Like, on a -- a norm- -- a normal night, like

1    January 16, 2018, were you -- were there other LPNs at

2    C -- Cleveland County?

3         **A**    No.

4         **Q**    It was just you and the assistant --

5         **A**    A CMA.

6         **Q**    CMA?

7         **A**    Yes.

8         **Q**    Okay.  What was his name?

9         **A**    I can't think of it right now.

10        **Q**    That's okay.  If you think of it, let me know.

11   It's somewhere in here.  Who trained you at Turn Key?

12        **A**    I -- I don't remember any specific training.

13        **Q**    Okay.  Did anybody ever teach you, at Turn

14   Key, what an inmate's constitutional rights were

15   concerning medical care?

16        **A**    Not that I can recall.

17        **Q**    And do you know what the constitutional rights

18   of an inmate in a jail are?

19        **A**    No.

20        **Q**    Okay.  Did anybody ever -- at Cleveland County

21   Detention Center -- ever train you on that topic?

22        **A**    No.

23        **Q**    Did you ever get any training from Cleveland

24   County on their specific policies and procedure --

25   procedures involving inmate care?

```
 1        A     No.

 2        Q     Does -- does Turn Key provide any specific

 3   training that's tailored to a specific facility?

 4        A     I don't remember.

 5        Q     And what I mean by that is -- is:  Would you

 6   agree that there is a difference between maybe a small

 7   county jail in Grady County and a county jail the size

 8   of Cleveland County Detention Center?

 9        A     No, the work is the same.

10        Q     There's no difference in those two facilities?

11        A     Just the amount of work.

12        Q     Amount of people?

13        A     Amount of people, that's the only difference.

14        Q     Okay.  Each of those facilities have the same

15   setups as far as jail cells and -- and equipment?

16              MS. DARK:  Object to the form.

17        A     I don't understand.

18        Q     (By Mr. Hammons) Well, I'm just trying to

19   think of -- in my mind, Cleveland County Detention

20   Center is a brand new -- was a fairly new facility.

21   Seems like it would have more bells and whistles than,

22   say, a Grady County that's been around for decades.

23        A     Bells and whistles as in, what?  I mean --

24        Q     I don't know.  That's what --

25        A     I mean --
```

1    whether it's a policy or procedure for Turn Key or not?

2        **A**    No.

3        **Q**    Now, since -- did you work at any other

4    county, other than Grady County and Cleveland County

5    Detention Center?

6        **A**    No.

7        **Q**    Okay.  Did the -- did the sheriffs have the

8    same exact policies at Cleveland County and Grady

9    County?

10       **A**    I don't know what the sheriff's policies are

11   at either one of the two counties.

12       **Q**    Okay.  So specifically at Cleveland County

13   Detention Center, you were never trained on their

14   specific facility policies and procedures?

15       **A**    The sheriff's?

16       **Q**    Yes.

17       **A**    No.

18       **Q**    Cleveland County Detention Center's policies

19   and procedures?

20       **A**    No.

21       **Q**    Okay.  Do you think that would have been

22   important, for you to know Cleveland County Department

23   of Correc- -- or Cleveland County Detention Center's

24   policies and procedures regarding inmate screening and

25   medical care?

1    and procedure at Cleveland County Detention Center;

2    true?

3        **A**     I did the paperwork that was given to me.

4        **Q**     Did somebody specifically tell you that there

5    was policies and procedures at Cleveland County

6    Detention Center to follow?

7        **A**     We had access to all the policies and

8    procedures, yes.

9        **Q**     I didn't ask you if you had access.  Did

10   somebody tell you and go over those policies and

11   procedures with you at Turn Key?

12       **A**     I don't remember.

13       **Q**     Did anybody at Cleveland County Detention

14   Center ever say, "These are the specific policies and

15   procedures you need to go over"?

16       **A**     No.

17            **MS. THOMPSON:**   Are we still talking about the

18   Cleveland County Detention Center's policies and

19   procedures, or Turn Key's?

20       **Q**     **(By Mr. Hammons)** Cleveland County Detention

21   Center, you said earlier you didn't know they even had

22   policies and procedures?

23       **A**     Correct.

24       **Q**     Okay.  Since you didn't know them, I'm asking:

25   Did anybody at Cleveland County Detention Center -- a

1  jailer, a sheriff, an administrator -- any human being

2  ever go to you and say, "We have these policies and

3  procedures you need to go over"?

4      **A**    No.

5      **Q**    All right.  So specifically -- I'm not judging

6  you, I'm just asking:  It would have been almost -- it

7  would be impossible for you to follow the policies and

8  procedures at Cleveland County if you didn't know that

9  they existed; true?

10      **A**   True.

11      **MS. DARK:**  Object to the form.

12      **Q**    **(By Mr. Hammons)** I mean, that leaves you at a

13  huge disadvantage if you don't know how to do their

14  intake and medical screening because they didn't tell

15  you how to; true?

16      **MS. THOMPSON:**  Object to the form.

17      **A**    I just did what they told me to do.

18      **Q**    **(By Mr. Hammons)** No, no, no, I'm asking you:

19  If you don't know their policies and procedures and they

20  didn't tell you, that leaves you at a huge disadvantage

21  on knowing what they want; true?

22      **MS. THOMPSON:**  Object to the form.

23      **MS. DARK:**  Object to the form.

24      **A**    Like I said, I never saw anything on paper,

25  but, I mean, I did what they told me to do.

1  **Q**     Could it have been the training that you

2  received on May 7th, 2016?

3  **A**     It's possible.

4  **Q**     But you don't remember any specific training?

5  **A**     No, sir.

6  **Q**     Okay.  And we kind of already went over this.

7  The Cleveland County Detention Center and the

8  sheriff's -- sheriff of Cleveland County, didn't provide

9  any training on intake screening?

10  **A**     No.

11  **Q**     If you could, take me through a -- the intake

12  screening process that's mentioned in this document.

13  **A**     Well, they -- they get brought in, they get

14  booked in by the jail, and then after they're booked in,

15  the officers bring them into medical, for the medical

16  screening.

17  **Q**     Okay.  And what do you do at the medical

18  screening?

19  **A**     Ask them all the questions that's on the

20  questionnaire, do their vitals.

21  **Q**     And these questions would consist of things

22  like, "Do you have any underlying medical conditions?"

23  **A**     Correct.

24  **Q**     "Do you have any mental health issues?"

25  **A**     Correct.

1    they can't sit up straight.

2         Q    Unsteady on their feet?  What about --

3         A    Unsteady gait.

4         Q    -- sweating profusely?

5         A    Yeah.  Yes.

6         Q    Increased body temperature?

7         A    Well, if they had a temperature, yes.

8         Q    Well, wouldn't -- if they're sweating

9    profusely and it's freezing cold outside, wouldn't you

10   connect the dots and say maybe --

11        A    Absolutely not.  You're -- if you have fever,

12   you won't sweat.  Your fever breaks when you start

13   sweating.

14        Q    Huh, okay.  I mean, I sweat -- I had a fever,

15   had COVID, I was sweating.

16        A    Well, COVID may be something different that

17   I'm -- I'm not familiar with.

18        Q    Okay.  Well, what I was getting at is:  If you

19   see somebody sweating profusely and it's cold, do you

20   go, "Oh, I better take their temperature because

21   something is up"?

22             MS. DARK:  Object to the form.

23        A    As I said, to my knowledge, if somebody is

24   sweating profusely, it's not due to a temperature.

25        Q    (By Mr. Hammons) Well, then, would there body

1    be ele- -- could it be due to something else, like --

2        **A**    It could be --

3        **Q**    -- drug overdose?

4        **A**    It could be two --

5            **MS. THOMPSON:**  Object to the form.

6        **Q**    **(By Mr. Hammons)** Drug overdose?

7        **A**    Multiple things.

8        **Q**    Yeah, is drug overdose one of those?

9        **A**    I -- I'm not a doctor.  I couldn't -- I

10   couldn't diagnose --

11       **Q**    You --

12       **A**    -- something like that.

13       **Q**    Oh, wait a minute.  You can't -- you don't --

14   you're not -- you're not trained on seeing the signs and

15   symptoms of somebody that is intoxicated?

16       **A**    No.

17       **Q**    You're not -- and you're not trained on seeing

18   the signs and symptoms of somebody that might be needing

19   detox?

20       **A**    I've seen that before.

21       **Q**    Well, no, are you trained on it?

22       **A**    I have not specifically been trained on it,

23   but I've seen it.

24       **Q**    And you're not trained on the signs and

25   symptoms of drug overdose?

1      **A**     I'm -- I've seen cases, but I haven't had

2    specific training on drug overdose.

3      **Q**     You would consider yourself not qualified to

4    make a decision whether somebody was experiencing a drug

5    overdose or not; true?

6      **A**     No.  I would...

7           **MS. THOMPSON:**  Not true or not qualified?

8      **A**     I'm not qualified.

9      **Q**     **(By Mr. Hammons)** What's that?

10     **A**     I'm not qualified to make a decision whether

11   somebody is having -- actually having a drug overdose or

12   not.  I do my assessment and determine whether they

13   could stay at the jail or if they needed to go to the

14   hospital.

15     **Q**     Well, yeah, the assessment would -- would seem

16   to indicate that you would know problems associated with

17   those things.

18     **A**     Problems --

19          **MS. THOMPSON:**  Object to form.

20     **A**     Problems associated to many things.

21     **Q**     **(By Mr. Hammons)** But you don't think you're

22   qualified to do that?

23     **A**     I'm not a doctor.  I'm just a nurse.

24     **Q**     Well, I understand, and I'm just asking you if

25   you don't think you're qualified to make those

1    assessments or not.

2       **A**    I can't assess a medical condition.

3       **Q**    Okay.  Yeah, you did say you take blood

4    pressures?

5       **A**    Yes.

6       **Q**    Why do you do that?

7       **A**    It's on the form.  I mean...

8       **Q**    No other reason?

9       **A**    Well, to see if their blood pressure is

10   elevated.

11      **Q**    Right.  Why -- why would you want to know

12   that?

13      **A**    See if they have blood pressure issues.

14      **Q**    What else could high blood pressure indicate?

15      **A**    They could be upset, they could...

16      **Q**    And this is based on your medical training and

17   expertise as being a nurse for, I don't know, 20 years?

18      **A**    Like I said, I just assess and treat them, I

19   don't diagnose it.

20      **Q**    So when you -- somebody -- you take their

21   blood pressure, they have high blood pressure, you just

22   write the number down and move on to the next box?

23           **MS. THOMPSON:**  Object to form.

24      **A**    It depends on what the parameters of the blood

25   pressure is.  I have --

1    **Q**    **(By Mr. Hammons)** What is the parameters?

2    **A**    I don't -- I don't recall what the parameters

3    were at the Cleveland County Jail.

4    **Q**    Well, what are they in the normal nursing

5    world that you've been involved in for 20 years?

6    **A**    Every place has different parameters.  And if

7    they're out of parameters, either medicate them per your

8    orders or call the physician on call.

9    **Q**    Okay.  So what would be a number, a blood

10   pressure number that would be so high it would be out of

11   any reasonable parameters?

12   **A**    If the systolic was 190, 200, or the diastolic

13   was above 100.

14   **Q**    Okay.  And specifically at Cleveland County

15   Detention Center, considering you -- you were never

16   taught their policies, you didn't know what those

17   parameters were; true?

18   **A**    I don't remember.

19         **MS. DARK:**  Object to the form.

20   **Q**    **(By Mr. Hammons)** What's that?

21   **A**    I don't remember.

22   **Q**    Well, I mean, we talked about it earlier, very

23   specifically; you were not taught Cleveland County's

24   policies and procedures.  As a matter of fact, you said,

25   "I don't even know if they have any."  True?

1  pressure and it wasn't elevated.

2      Q     Yeah, there's possibilities of everything,

3  but, specifically, Cleveland County Detention Center

4  didn't give you those parameters, so when you take the

5  blood pressure, if you don't know it, what the parameter

6  is, and you put them in a jail cell, they could die

7  because you didn't know the policy and procedure?

8          **MS. DARK:**  Object to the form.

9          **MS. THOMPSON:**  Object to the form.

10     **A**     If -- if it was elevated, like what I was

11 saying, in my experience, I would have called a

12 provider.

13     **Q**     **(By Mr. Hammons)** And you'd have to take that

14 blood pressure to know that, too, right?

15     **A**     Correct.

16     **Q**     All right.  Do you do blood pressure on every

17 screening?

18     **A**     No.

19     **Q**     Are you supposed to?

20     **A**     If -- if possible.

21     **Q**     Okay.  Do you ask -- in those screenings, do

22 you ask them about medications?

23     **A**     Yes.

24     **Q**     Why do you do that?

25     **A**     It's part of the process.  Find out their

```
 1   substances?
 2        A    Yes.
 3        Q    And -- and whether they are under any
 4   prescription medications that they might have taken,
 5   too; true?
 6        A    True.
 7        Q    And why is that important?
 8        A    It could be an adverse reaction.
 9        Q    Yeah.  It could be dying; true?
10             MS. DARK:  Object to the form.
11             MS. THOMPSON:  Object to the form.
12        A    True.
13        Q    (By Mr. Hammons) I mean, you understand
14   Marconia was dying, right, now?
15             MS. DARK:  Object to the form.
16             MS. THOMPSON:  Object to the form.
17        A    Well, I mean, he died, yes; I understand that.
18        Q    (By Mr. Hammons) Well, yeah, I -- but you
19   understand he was dying in your intake room?
20             MS. DARK:  Object --
21        Q    (By Mr. Hammons) You understand that; true?
22        A    No.
23             MS. DARK:  Object to the form.
24             MS. THOMPSON:  Object to the form.
25        Q    (By Mr. Hammons) You don't?
```

```
 1    it -- you were utilizing it at the Cleveland County
 2    Detention Center?
 3         A    Yes.
 4         Q    Okay.  Now, you've read parts of -- you've
 5    looked at parts of the lawsuit against you; true?
 6         A    True.
 7         Q    Now, in there, we make -- we spell out the
 8    facts of the case, based on some of the videos and
 9    things that we've watched; you understand that?
10         A    Yes.
11         Q    Okay.  Now, in the intake process, Officer
12    Brown is in the room; true?
13         A    I don't remember.
14         Q    There's a Norman Police Officer in the room?
15         A    Yes.
16         Q    Okay.  And were you aware he had a body-worn
17    camera on?
18         A    I was not aware, no.
19         Q    Well, you're aware now --
20         A    Yes.
21         Q    -- right?
22              Now, in the intake process, as we watched that
23    video -- and we can pull it up and watch it here in a
24    second, if you'd like -- I think it's lead detention
25    officer Stacy Shifflett is in the room; true?
```

```
 1    population or housing area.  An inmate whose screening
 2    indicates a significant medical or psychiatric problem
 3    or who may be a suicide risk shall be observed
 4    frequently by staff, consistent with the facility's
 5    policy."
 6            Do you see that portion of the -- of the
 7    Oklahoma Jail Standards?
 8        A    Yes.
 9        Q    Okay.  Now, obviously, on January 16, 2018,
10    there was no medical screening done of Marconia Kessee;
11    true?
12            MS. DARK:  Object to the form.
13            MS. THOMPSON:  Object to the form.
14        A    No, I did a visual assessment on him.
15        Q    (By Mr. Hammons) And what was your visual
16    assessment of him?
17        A    I believed, at the time, that he was acting
18    out, having a behavioral issue, and that he was trying
19    to harm himself.
20        Q    Okay.  Do you -- do you -- why did you put him
21    in the cell?
22        A    Because I thought he was trying to harm
23    himself.
24        Q    So you thought he would -- you put him on
25    suicide watch?
```

1    **A**    No, I just -- not necessarily suicide watch,

2    just wanted to protect him from himself if -- so he

3    wouldn't -- couldn't hurt himself.

4    **Q**    Okay.  Well, I guess, what's the difference?

5    **A**    Well, one, you're just trying to hurt yourself

6    to get attention, and the other one, you're trying to

7    kill yourself.

8    **Q**    Okay.  What's the difference in the way you

9    treat those?

10    **A**    There's not any difference.

11    **Q**    Okay.  So at the time of the visual screening,

12    what indications made you believe that he was -- I'm

13    going to use the word "faking."  Is that what you would

14    use?

15    **A**    When he just was -- he made this shaking

16    movement, that I used an ammonia inhalant to prove that

17    it wasn't a seizure, and then he was not cooperative,

18    and that's -- was my assessment.

19    **Q**    Okay.  We can come back to that.

20          Part of this is medications in possession of

21    the inmate at the time of booking.  What did you do

22    with -- it's -- from watching the video back, I see that

23    after you -- y'all put Marconia in the cell, Officer

24    Brown hands you the big bag of pills for Marconia?

25    **A**    Correct.

1      **A**    No.

2      **Q**    Okay.  I guess I don't know what that is.

3    I -- I guess we'll find out.  I don't know what they

4    are.  I've never seen them, I don't think.  But you have

5    it -- somebody has them in their possession; true?

6.     **A**    Somebody, yeah.

7      **Q**    Go to Page 17 of Exhibit 5.  It says -- we've

8    talked about current illnesses and we know that that's

9    an important thing to understand, what their current

10   illness or health problems are; true?

11     **A**    Yes.

12     **Q**    And -- and -- and, obviously, you didn't know

13   anything about Marconia's current health, other than

14   what Officer Brown told you; true?

15     **A**    True.

16     **Q**    Now, you understand -- you've watched back the

17   book-in video; is that what you said?

18     **A**    Yes.

19     **Q**    Okay.  But you haven't -- you haven't watched

20   the body cam version of it?

21     **A**    Just what you just showed me.

22     **Q**    Right.  Okay.  "Behavioral observations,

23   including state of consciousness and mental status."

24   What was the state of consciousness of Marconia?

25     **A**    He was alert.

1      **Q**      You think he was alert in his intake?

2      **A**      Yes.

3      **Q**      Just like normal, like you and I are right

4   now?

5      **A**      I couldn't -- couldn't confirm what his

6   orientation was, but he was alert.  His eyes was open,

7   he was looking around, he was alert.

8      **Q**      Okay.  What is his mental status?

9      **A**      I have no idea.

10     **Q**      Did you ask him?

11     **A**      I wasn't -- he wasn't answering any questions.

12     **Q**      Did you ask him questions?

13     **A**      No.  Not too many.  It wasn't -- wasn't my

14   part of the -- it wasn't time for me to do my -- my

15   assessment.

16     **Q**      What -- how would you know anything about him

17   or whether he was cooperative or not if you didn't ever

18   ask him a question?

19     **A**      Because he wasn't cooperating with the

20   book-in, which has to be done before I get to do my

21   medical examination.

22     **Q**      Would it -- would it shock you if you never

23   asked him a question?

24              **MS. THOMPSON:**  Object to form.

25     **A**      Yeah.

1    **Q**     **(By Mr. Hammons)** Would it shock you that you
2    never asked a question of anybody in the whole book-in
3    process?
4              **MS. DARK:**  Object to the form.
5              **MS. THOMPSON:**  Object to form.
6    **A**     Yes.
7    **Q**     **(By Mr. Hammons)** It's hard to find out
8    information when you don't ask a question; true?
9    **A**     True.
10             **MS. DARK:**  Object to the form.
11   **Q**     **(By Mr. Hammons)** Did -- did Marconia -- based
12   on your training, education and experience as an LPN,
13   did he exhibit any signs of -- of impairment?
14   **A**     No.
15   **Q**     So if Marconia was free to leave the jail
16   facility, you would have been fine for him to just get
17   in a car and drive off?
18   **A**     Yes.
19             **MS. DARK:**  Object to the form.
20   **Q**     **(By Mr. Hammons)** Yes?  So you agree with
21   Officer Brown on that point?  He could drive a car in
22   his -- the condition that you saw him in?
23             **MS. GOOCH:**  Object to the form.
24   **A**     I -- as I said, I -- I believed he was faking
25   his condition.

1   guess, huh?

2           **MS. DARK:**   Object to the form.

3           **MR. WHITWORTH:**   Object to the form.

4           **MS. THOMPSON:**   Object to the form.

5           **MS. GOOCH:**   Object to the form.

6       **A**   I have no idea what everybody else was

7   thinking.

8       **Q**   **(By Mr. Hammons)** We already went over you

9   didn't notice that he had scrapes on his back?

10      **A**   No.

11      **Q**   Because you didn't look; true?

12          **MS. THOMPSON:**   Object to the form.

13      **A**   I didn't do a physical examination on him, but

14  I didn't notice any on his back.

15      **Q**   **(By Mr. Hammons)** On January 16, 2018, did you

16  ever call anybody at Turn Key that night?

17      **A**   Yes.

18      **Q**   Who?

19      **A**   I called Evelyn Fowler.

20      **Q**   What did you tell her?

21      **A**   I told her that we had a patient expire.

22      **Q**   Okay.   What else did you tell her?

23      **A**   That's all I can remember.

24      **Q**   Did you tell her you did CPR on her -- on

25  Marconia?

1     **A**     I'm -- I don't remember.

2     **Q**     Did you text anybody at Turn Key?

3     **A**     Text?

4     **Q**     Yes.

5     **A**     No.

6     **Q**     Did you call anybody besides Evelyn?

7     **A**     I don't remember.

8     **Q**     Did you send any emails, regarding Marconia

9  Kessee, to any official at Turn Key?

10    **A**     Not that I can remember.

11    **Q**     Would you have had an email address that you

12  used to send emails regarding Turn Key work?

13    **A**     Not that I remember.

14    **Q**     You've never used an email at -- for your

15  work?

16    **A**     I don't remember.

17    **Q**     Do you use email, ever?

18    **A**     Not very often.

19    **Q**     What was your cell provider at the time of

20  January 16th, 2018?

21    **A**     I'd have to ask my wife.  I have no idea.

22    **Q**     Okay.

23    **A**     But we're not allowed to have cell phones in

24  there, so...

25    **Q**     Do you just lock them up when you get there or

1   Detention Center to follow; true?

2           **MS. THOMPSON:**   Object --

3           **MS. DARK:**   Object to the form.

4       **A**    Yes.

5       **Q**    **(By Mr. Hammons)** The policy is:  "Every new

6   intake at -- to the facility will be given medical and

7   mental health screening to detect the need for medical

8   and mental healthcare, including medications and

9   emergency treatment."  Do you see that?

10      **A**    Yes.

11      **Q**    That sounds like a good policy, doesn't it?

12          **MS. DARK:**   Object to the form.

13      **A**    Yes.

14      **Q**    **(By Mr. Hammons)** And why is that a good

15  policy?

16      **A**    For what it says.

17      **Q**    Right.   It's important to identify medical and

18  mental health issues of people in emergency situations;

19  true?

20      **A**    True.

21      **Q**    And, again, this -- this initial screening,

22  medical and mental health screening was not done for

23  Marconia on January 16th; too -- true?

24          **MS. DARK:**   Object to the form.

25          **MS. THOMPSON:**   Object to the form.

```
 1        A      True.

 2        Q      (By Mr. Hammons) Now, "fit for incarceration,"

 3   you -- you know what that is right?

 4        A      Yes.

 5        Q      Okay.  And you didn't have a fit slip while

 6   Marconia was in that intake room; true?

 7             MS. DARK:  Object to the form.

 8        A      I didn't have it in my possession, no.

 9        Q      (By Mr. Hammons) Well, you -- you had the word

10   of Officer Brown; true?

11        A      True.

12        Q      But you didn't have it -- the fit slip?

13        A      Correct.

14        Q      What's the -- well, you don't know the

15   Cleveland County policy or procedure, but what -- what

16   does your training and experience tell you if you don't

17   have a fit slip?  What do you do?

18        A      I -- I just went by the officer's word that he

19   had the fit slip.  I...

20        Q      Yeah, I'm not asking you that.  My -- my

21   question is -- is:  What does your training and

22   experience tell you to do when there is no fit slip for

23   an inmate?

24             MS. DARK:  Object to the form.

25        A      If they're coming from the hospital?  They
```

```
 1   have to come from the hospital to have a fit slip.
 2        Q     (By Mr. Hammons) Okay.
 3        A     If they're coming from the hospital and they
 4   don't have a fit slip, that -- the hos- -- the -- the
 5   hospital would have to provide a fit slip before I can
 6   accept them.
 7        Q     Okay.  But that didn't happen in Marconia's
 8   situation; true?
 9        A     I had a fit slip.
10        Q     You didn't at the time you put him in a cell?
11              MS. THOMPSON:  Object to the form.
12        Q     (By Mr. Hammons) -- true?
13        A     It was on the facility.
14        Q     No, it wasn't.
15              MS. THOMPSON:  Are you arguing with the
16   witness?
17        Q     (By Mr. Hammons) Well, I can show you.  I
18   mean, you know Officer Canaan was involved in this;
19   true?
20        A     I don't know the officers' names.
21        Q     Okay.  Well, Officer Brown told you somebody
22   is getting the fit slip; true?
23        A     True.
24        Q     Okay.  Well, Officer Canaan was at the
25   hospital, trying to obtain a fit slip?
```

1     **A**     I was not aware of that.

2     **Q**     Well, did you have the fit slip in your hand,

3     did you ever hold it?

4     **A**     I said I didn't personally have it --

5     **Q**     Right.

6     **A**     -- in my possession.

7     **Q**     Right.  So when Marconia was placed into the

8     padded cell, you did not have a fit slip; it's that

9     simple?

10    **A**     Okay.

11    **Q**     Is that true?

12          **MS. THOMPSON:**  Object to the form.

13    **A**     True.

14    **Q**     **(By Mr. Hammons)** Okay.  So, per your training

15    and experience, you're not supposed to put him in there

16    until you have a fit slip; true?

17          **MS. DARK:**  Object to the form.

18          **MS. THOMPSON:**  Object to the form.

19    **A**     True.

20    **Q**     **(By Mr. Hammons)** But you did; true?

21    **A**     I wasn't -- I wasn't aware of it.

22    **Q**     You weren't aware that you didn't have a fit

23    slip in your hand?

24    **A**     I wasn't aware -- from my understanding, I

25    inferred, from the way it was implied, that they had the

1  fit slip.

2      Q    Well, do you -- what's your process, your

3  training tell you?  Do you just take -- you just say --

4  you just take the word or you get it and you look at it?

5      A    Well, as soon as I came back in from the

6  padded cell, they handed it to me.  I never knew that

7  they didn't have it on their person.

8      Q    Okay.  So your testimony here today is that

9  when you walked back in from the padded cell and you met

10 with Officer Brown, the arresting officer, that he

11 handed you the fit slip?

12     A    I thought so.

13     Q    Well, he handed you some paperwork?

14     A    Yeah.

15     Q    The discharge paperwork.  And you think that

16 that was the fit slip?

17     A    I don't remember.

18     Q    Did you do anything in the book-in room, in

19 that process, except use smelling salts on Marconia?

20     A    No.

21     Q    Now, I will -- I'm going to -- we can watch it

22 real fast.  I'm going to indicate to you that I've

23 written down all the words you've said in the book-in

24 room.

25     A    Okay.

1    **Q**    Okay?  You said, "Yeah, I saw that.  Oh,

2    hospital.  Yeah, same thing he did," and then there's

3    one word that's inaudible.  "Hey, get -- get Beck,

4    Beckler, Beckwell, out of the padded cell -- Beckwood

5    out of the padded cell.  I can get his feet."

6              **MS. DARK:**  Object to the form.

7              **MS. THOMPSON:**  Object to the form.

8    **Q**    **(By Mr. Hammons)** Okay?  Those were the words

9    you said -- and you'll watch it, we'll -- we'll see it

10   on the deal.  Do you think that's adequate inquiry into

11   Marconia Kessee's condition, to make a determination of

12   what his mental or physical status is?

13             **MS. THOMPSON:**  Object to the form.

14             **MS. DARK:**  Object to the form.

15   **A**    Like I said, I did a visual assessment of him.

16   And the way he was acting.

17   **Q**    **(By Mr. Hammons)** Do you wish you would have

18   asked some questions?

19             **MS. DARK:**  Object to the form.

20             **MS. THOMPSON:**  Object to the form.

21   **A**    I wish a lot of things could have happened

22   different.

23   **Q**    **(By Mr. Hammons)** Well, specifically, I'm

24   asking:  Do you wish you would have asked questions?

25             **MS. THOMPSON:**  Object to the form.

1      **A**    Yes.

2      **Q**    **(By Mr. Hammons)** Do you believe Marconia

3   Kessee was trying to communicate with you?

4      **A**    No.

5           **MR. HAMMONS:**  We're going to go to Brown's

6   body cam footage.  I'm going to start at about -- on

7   mine, it says "39:45."  It's the part where they're just

8   about to carry Marconia into the book-in room, for

9   everybody watching at home.

10          **THE REPORTER:**  Is this Exhibit 7?

11          **MR. HAMMONS:**  Yes.

12          (Plaintiff's Exhibit 7, Officer Brown's Body

13   Cam Footage, was played off the record).

14     **Q**    **(By Mr. Hammons)** Okay.  Did you notice that he

15   is sweating?

16     **A**    Yes.

17     **Q**    Did you notice that he was breathing very

18   heavily?

19          **MS. THOMPSON:**  Object to the form.

20     **A**    Yes.

21     **Q**    **(By Mr. Hammons)** Did you know that his -- he's

22   mumbling and babbling incoherently?

23          **MS. DARK:**  Object to the form.

24     **A**    Yes.

25     **Q**    **(By Mr. Hammons)** And at -- did you hear him

1    say, "I'm hot and sweaty"?

2         **A**    I heard him say "hot," yes.

3         **Q**    Did you -- when the officer said he was

4    treated for a headache, did you see him look straight at

5    you and say, "No"?

6         **A**    Yes.

7         **Q**    Okay.  Does that have -- does this -- does it

8    look like he's trying to be uncooperative at this point?

9         **A**    Not at this point, no.

10        **Q**    Okay.  And right now, so far, you're just

11   standing in the screen and it looked like you -- did you

12   open up a smelling salts at that point?

13        **A**    Huh-uh.

14        **Q**    Do you -- do you know what the --

15             **MS. THOMPSON:**  Is that a "yes"?

16        **Q**    **(By Mr. Hammons)** -- FDA approved --

17             **MS. THOMPSON:**  I'm sorry, I was just trying to

18   get him to say "yes" instead --

19        **A**    No.

20             **MS. THOMPSON:**  -- of "uh-huh".

21             **MR. HAMMONS:**  Okay.

22        **Q**    **(By Mr. Hammons)** Do you know what the FDA

23   approved use of smelling salts is for?

24        **A**    No.

25        **Q**    Do you think you should know that?

1      **Q**     **(By Mr. Hammons)** Yeah.  You do it in the

2  screening room, so there's a little bit of privacy and

3  safety in there, isn't there?

4      **A**     Yes.

5      **Q**     Makes them feel a little more comfortable,

6  doesn't it?

7      **A**     Ye- --

8          **MS. DARK:**  Object to the form.

9      **A**     Yes.

10     **Q**     **(By Mr. Hammons)** It's hard to communicate that

11  you're -- you feel something is wrong with you, when

12  officers and jailers are standing around you, telling

13  you to be quiet?

14         **MS. DARK:**  Object to the form.

15         **MS. THOMPSON:**  Object to the form.

16     **Q**     **(By Mr. Hammons)** True?

17     **A**     Yes.

18     **Q**     Well, here in a minute, Officer Brown calls

19  him an idiot.  Do you think that's good language to use

20  to a man that's sitting in that condition?

21         **MS. THOMPSON:**  Object to the form.

22         **MS. GOOCH:**  Object to the form.

23     **A**     No.

24         (Plaintiff's Exhibit 7, Officer Brown's Body

25  Cam Footage, was played off the record).

1    **Q      (By Mr. Hammons)** So at -- to this point, what
2    you've seen is an unimpaired, uncooperative human being?
3    **A      Yes.
4    **Q**     And he's -- there's no impairment with him;
5    if he -- if he wasn't under arrest, he could get up and
6    drive a car home?
7    **A**     I believed that at the time, yes.
8    **Q**     Do you believe it now?
9         **MS. DARK:**  Object to the form.
10        **MS. THOMPSON:**  Object to the form.
11   **A**     Knowing what I know now, no.
12   **Q      (By Mr. Hammons)** Well, isn't it obvious -- now
13   that you're looking at it, it's obvious to an untrained
14   eye that there was something wrong with Marconia Kessee,
15   isn't it?
16        **MS. DARK:**  Object to the form.
17        **MS. THOMPSON:**  Object to the form.
18        **MS. GOOCH:**  Object to the form.
19   **A**     I mean, knowing what I know now, no, it's -- I
20   should have done more.
21   **Q      (By Mr. Hammons)** Well -- well, that's what I'm
22   saying is -- is I -- I'm watching it, I don't have any
23   medical training and 20 years of experience like you,
24   and I know something is wrong with this man.  Don't you
25   know something is wrong with this guy?

1           **MS. DARK:**  No --

2           **MS. THOMPSON:**  Object to the form.

3           **MS. DARK:**  Object to the form.

4           **MS. GOOCH:**  Object to the form.

5     **A**    At the time, I -- like I said, I thought he

6  was faking.

7     **Q**    **(By Mr. Hammons)** It's easier to put him in a

8  jail cell, in a padded cell, isn't it, than do -- do the

9  job, isn't it?

10          **MS. DARK:**  Object to the form.

11          **MS. THOMPSON:**  Object to the form.

12    **A**    No, because I still have to do the job.

13    **Q**    **(By Mr. Hammons)** When?

14    **A**    When they calm down, I still have to come back

15  and do the intake.

16    **Q**    Well, he was in a padded jail cell for two

17  hours and barely moved, so when were you going to do it?

18          **MS. DARK:**  Object to the form.

19    **A**    Well, I was waiting for the officers to tell

20  me that he was calmed down and ready to have an intake

21  done.

22    **Q**    **(By Mr. Hammons)** Did you tell that to the

23  detention officers?  You said, "When he calms down and

24  stops whatever he's doing, come get me"?

25    **A**    They're supposed to call me when -- when

1    it's -- when he'd calmed down and he can -- he's --

2    gets -- finished the booking process, so I can do my

3    medical assessment.

4        Q    Well, what -- what -- was the book-in process

5    not complete when they threw him in a jail cell?

6        A    No.

7            MS. DARK:  Object to the form.

8        Q    (By Mr. Hammons)  Okay.  Did you specifically

9    tell them, "Come find me," is what I'm asking?

10       A    I don't recall.

11           (Plaintiff's Exhibit 7, Officer Brown's Body

12   Cam Footage, was played off the record).

13       Q    (By Mr. Hammons)  Again, to this point now, we

14   still have unimpaired, normal behavior?

15       A    No, that's a behavior.

16       Q    Right.  He's flailing around on the floor,

17   writhing in pain; true?

18           MS. DARK:  Object to the form.

19           MS. THOMPSON:  Object to the form.

20       A    That's not what I saw.

21       Q    (By Mr. Hammons)  Okay.

22           MR. WHITWORTH:  Chris, can you tell us what

23   portion of the video you just watched?

24           MR. HAMMONS:  It's -- it's the -- I'm just

25   pushing play every time I start back, but we started at,

1   behavior?

2              **MS. DARK:**  Object to the form.

3         **Q**    **(By Mr. Hammons)** To treat a human being like

4   that?

5         **A**    No.

6         **Q**    Now, I counted about nine, 10 seconds that you

7   held something to his nose.  What was that?

8         **A**    That's the ammonia inhalant.

9         **Q**    You've had ammonia inhalant stuck up his nose

10  for nine or 10 seconds and he hasn't moved.  What does

11  that tell you?

12             **MS. DARK:**  Object to the form.

13             **MS. THOMPSON:**  Object to the form.

14        **A**    He was holding his breathe for a little while.

15        **Q**    **(By Mr. Hammons)** You believe Marconia Kessee

16  was holding his breath?

17        **A**    Yes.

18        **Q**    Do you often use ammonium capsules or smelling

19  salts as a diagnostic tool in the jail?

20        **A**    Yes.

21        **Q**    And, again, that's without knowing what it's

22  actually for?

23             **MS. THOMPSON:**  Object to the form.

24        **A**    That's what it's used for.  It was what it was

25  used for at the jail.

1     **A**     Because you can't immediately come out -- you

2  can't stop having a seizure just because somebody puts

3  an ammonia inhalant at your nose.

4     **Q**     Do you think Marconia Kessee was having a

5  seizure?

6     **A**     No.

7     **Q**     Then why were you using an ammonium thing?

8     **A**     To prove that it wasn't a seizure.

9     **Q**     Okay.  Is there any medical training

10  documentation journal out there, on earth, that you know

11  of, that says to -- I can determine whether somebody is

12  faking a seizure or not based on a smelling salts

13  caplet?

14     **A**     Not that I'm aware of.

15     **Q**     Ever, ever -- have you ever used the ammonia

16  caplet on people at the nursing homes you were at, to

17  see if they were faking?

18     **A**     No.

19     **Q**     What about the Department of Corrections, did

20  they let you stick ammonium caplets --

21     **A**     Yes.

22     **Q**     -- up people's nose?  They did?

23     **A**     Yes.

24     **Q**     What about any other facility you worked at?

25  The hospital down in Pauls Valley, did they let you do

1    that?

2        **A**    No.

3        **Q**    Why not?

4        **A**    Well, we didn't typically have people faking

5    seizures.

6        **Q**    Okay.  And -- and you believed Marconia was

7    faking on that day?

8        **A**    Yes.

9        **Q**    Okay.

10            (Plaintiff's Exhibit 7, Officer Brown's Body

11    Cam Footage, was played off the record).

12            **MR. HAMMONS:**  I pushed play.  Sorry, guys.

13        **Q**    **(By Mr. Hammons)** Now, again, up to this point,

14    you don't think you could have taken a blood pressure,

15    taken a temperature, done any kind of intake process?

16        **A**    No, he was still in handcuffs.  I couldn't

17    have got a blood pressure on him.

18        **Q**    Okay.  Did you ever take his blood pressure?

19        **A**    No.

20        **Q**    Huh?

21        **A**    No.

22        **Q**    Did you ever tell somebody you took his blood

23    pressure?

24        **A**    No.

25        **Q**    Well, what if somebody says that you told them

1    that?  Are they lying?

2        **A**    I have no idea what somebody else said, but I

3    never said that.

4        **MS. DARK:**  Object to the form, that last

5    question.

6        **Q**    **(By Mr. Hammons)** If we could go back to

7    Exhibit No. 6, the policies and procedures.  I'm on

8    Page 378.  Talking about -- if you look on that No. 5,

9    "Procedural Guidelines."  You see that?  "Initial Mental

10   Health/Suicide Screening"?

11       **A**    Yes.

12       **Q**    "The medical staff, CMA, also interviews the

13   arrestee regarding their past and present mental and

14   emotional status.  Once the screening is over, the

15   arrestee is categorized as critical observation inmate,

16   the detention officer maintains contact with the

17   arrestee throughout the inpre- -- in -- process, never

18   leaving the arrestee's side."

19           What did -- did you ever form any kind of

20   opinion as to Marconia Kessee's mental status?

21       **A**    After -- after I got the medications, I

22   assumed that he had some kind of mental health issue, so

23   I ordered a mental health evaluation.

24       **Q**    Who does those?

25       **A**    A mental health provider.

1    Q    Okay.  So when did you order that?

2    A    I put it in the nurse's notes, ordered it to

3    be done.

4    Q    Before or after he was dead?

5    A    Well, before.  As soon as -- as soon as I got

6    through with the -- the -- with the situation.

7    Q    Okay.  And why did you order one?

8    A    Because of the medications that came with him.

9    Q    Okay.  Now, did that cause -- I mean,

10   obviously it didn't, but did that cause any kind of an

11   alarm in your head, to say, "He's got some mental

12   issues, I'm ordering a mental health evaluation, maybe I

13   should look at this again a little closer"?

14        MS. THOMPSON:  Object to the form.

15   A    Like I said, I was just waiting for them to

16   let me do the rest of my medical evaluation.

17   Q    (By Mr. Hammons) The jailers?

18   A    Yes.

19   Q    Okay.  So it was up to them to determine when

20   you could do that?

21   A    Yes.

22   Q    Now, you never asked Marconia if he had

23   recently attempted to end his life; true?

24   A    True.

25   Q    That would have been important information to

1    know; true?

2        **A**    True.

3        **Q**    Do you know, since then, that he did try to

4    attempt to take his life by drug overdose just months

5    before this?

6        **A**    No.

7        **Q**    And that -- I guess that's why we ask the

8    questions; true?

9        **A**    True.

10           **MS. THOMPSON:**  Object to the form.

11       **Q**    **(By Mr. Hammons)** True?

12       **A**    True.

13       **Q**    Did you ever take out the pills and look at

14   the date on them and see if they're -- they were

15   accounted for?

16       **A**    No, I didn't count the pills.

17       **Q**    If you would have counted them, you would have

18   known that there was a lot more gone than should have

19   been.

20           **MS. THOMPSON:**  Object to the form.

21       **Q**    **(By Mr. Hammons)** True?

22       **A**    Have no idea.  I didn't count them.

23       **Q**    Is that part of the policies and procedures,

24   that you're supposed to inventory and count the pills

25   and log the pills?

1        **A**     No.

2        **Q**     Not part of Turn Key's policies and procedures

3    or not part of Cleveland County's?

4        **A**     As far as I know, it's not part of any policy

5    and procedure, to count and log how many pills are in

6    the bottle.

7        **Q**     Okay.  Now, I've read some of the -- have you

8    read these reports written -- or these typed reports

9    from the jailers and detention officers involved in

10   this?

11       **A**     Just pieces of the ones that were in the -- in

12   the complaint.

13       **Q**     So it seems like there's some disagreement,

14   when I'm reading that record, as to whether you wanted

15   Marconia on critical observation or something called

16   medical observation.  I -- I've seen those two phrases

17   in the record.  What is critical observation?

18       **A**     Critical observation is what he was put on,

19   that he was put in a padded cell and checked on by the

20   detention staff.

21       **Q**     Well, what's the -- what's the parameters for

22   critical observation?  Why are you put in critical

23   observation?

24       **A**     Just because he tried to hurt himself.

25       **Q**     Well, that's what I'm getting at.  Is that

1    the -- is that what you use critical observation for,

2    for just people who hurt themselves, or is it for

3    something else?

4        A    It's suicide watch, people are trying to hurt

5    themselves.

6        Q    Okay.  But you don't think he -- you don't

7    think he was on suicide watch?

8            MS. THOMPSON:  Object to the form.

9        A    Like I've -- I've already answered this, that

10   it's the same process.

11       Q    (By Mr. Hammons) Okay.  Is there any other

12   reason people are put in critical observation?

13       A    I wouldn't be able to answer that question.

14       Q    Well, don't you know what it is?  I mean,

15   how -- how can you not know what critical observation is

16   used for?

17           MS. THOMPSON:  Objection --

18       A    Because --

19           THE WITNESS:  Sorry.

20       A    Because the jail staff can put them in

21   critical observation, doesn't have anything to do with

22   medical staff.

23       Q    (By Mr. Hammons) Okay.  And you don't know

24   what the policy and procedure for Cleveland County says

25   about critical observation; true?

1       **A**     Yes.

2       **Q**     That definition of "critical observation"

3    says, "An inmate who is observed in a more frequent

4    manner due to health risk, either mental or physical."

5            What -- what was Marconia put in there for, on

6    critical observation?

7       **A**     Because he hit his head.

8       **Q**     So it's more of the physical?

9       **A**     Yes.

10      **Q**     Okay.  And when you say "hit his head," you're

11   talking about the one time his head hit the wall?

12      **A**     Yes.

13      **Q**     Okay.  Now, do you know, once an inmate is

14   given a suicide smock, are they considered on suicide

15   watch at that point?

16      **A**     I don't know whether they're considered on

17   suicide watch because -- just because they got a smock

18   or not.

19      **Q**     Okay.  You don't know what the policy at

20   Cleveland County Detention Center, on that, would be?

21      **A**     No.

22      **Q**     What is a sight check?

23      **A**     I don't know.

24      **Q**     You were never trained, at Cleveland County

25   Detention Center or by Turn Key, on what a sight check

1      **A**     True.

2      **Q**     -- true?

3            And hours definitely matter?

4      **A**     True.

5      **Q**     If you could, go to -- on Exhibit No. 6,

6  Page 464.  Do you see that Policy 4.15, "Sight Checks"?

7      **A**     Yes.

8      **Q**     Okay.  And you weren't aware of that policy on

9  January 16th, 2018; true?

10     **A**     True.

11     **Q**     Okay.  Now, "Definitions," it has none.  You

12  see that?

13     **A**     Yes.

14     **Q**     There's no description what a sight check is;

15  true?

16     **A**     True.

17     **Q**     That would have been useful information, to

18  know how to do a sight check; true?

19           **MS. THOMPSON:**  Object to the form.

20     **A**     True.

21     **Q**     **(By Mr. Hammons)** Okay.  Now, on procedural

22  guidelines, it says, "For sight check procedures on

23  suicide watch, detox or other critical observation

24  inmates, refer to Policy 3.15."  You see that?

25     **A**     Yes.

1    **Q**    Now, we were just on 3.15.  And it's on

2    Page 407, if you could just flip back and hold your spot

3    right there on that one.

4         You -- you back to 407?

5    **A**    Yes.

6    **Q**    Okay.  It continues over to 408.  And on

7    No. 5, on 408, it says, "Sight checks will be conducted

8    and logged every 30 minutes for a detoxing inmate, at a

9    minimum, and if on-duty supervisor feels it's necessary,

10   the checks can be made every 15 minutes."  You see that?

11   **A**    Yes.

12   **Q**    Now, nowhere on 407 or 408, that I see, does

13   it give a description of what a sight check should look

14   like.  Can you find it?  See if you see it.

15        Do you see it --

16   **A**    No, sir.

17   **Q**    -- anywhere?

18   **A**    No.

19   **Q**    Now, obviously, you didn't know this policy,

20   because you've never seen it, but this policy, as we

21   look at it -- if we -- we went to sight checks, the

22   policy on 464, and it told us to go back over to 315.

23   We've done that.  The jailers that you worked with that

24   night, they don't have a definition of what a sight

25   check is to learn from, either, do they?

1            **MS. DARK:**  Object to the form.

2       **A**     No.

3       **Q**     **(By Mr. Hammons)** And it would be hard for --

4   like we said earlier, it's hard for somebody to know how

5   to do it if there's not a policy and procedure to tell

6   them how to do it; true?

7            **MS. DARK:**  Object to the form.

8       **A**     True.

9       **Q**     **(By Mr. Hammons)** So then -- then you have

10  jailers making up how to do sight checks; true?

11           **MS. DARK:**  Object to the form.

12      **A**     Yes.

13      **Q**     **(By Mr. Hammons)** Do you think it would have

14  been a difference maker for Marconia Kessee, had

15  somebody taught these jailers how to do a proper sight

16  check and make sure an individual isn't in there in

17  trouble?

18           **MS. DARK:**  Object to the form.

19      **A**     Yes.

20      **Q**     **(By Mr. Hammons)** Because 15 seconds of sight

21  checking, in two hours, isn't even close to being good

22  enough, is it?

23           **MS. DARK:**  Object to the form.

24      **A**     No.

25      **Q**     **(By Mr. Hammons)** That -- they failed Marconia

```
 1    Kessee on that, didn't they?
 2              MS. DARK:  Object to the form.
 3         A    Yes.
 4              MR. HAMMONS:  Why don't we take a break and
 5    grab a sandwich or a snack real fast and then we can --
 6              MS. DARK:  Yeah.
 7              MR. HAMMONS:  -- get back at it.
 8              MS. THOMPSON:  Sounds good.
 9              MR. HAMMONS:  Because this is a good place to
10    stop, because the next is video stuff and that -- you
11    know how that takes a long time.
12              MS. THOMPSON:  Are we getting the sandwiches
13    delivered?
14              THE MONITOR:  Going off the record.  The time
15    is 12:26 p.m.
16              (Recess was had from 12:26 p.m. to 1:05 p.m.)
17              THE MONITOR:  We are back on the record.  The
18    time is 1:05 p.m.
19         Q    (By Mr. Hammons) All right.  We had a little
20    break.  You ready to proceed?
21         A    Yes.
22         Q    Okay.
23              MR. HAMMONS:  I think that with the stuff I
24    sent out to you guys, Jessica tells me that Exhibit 8 is
25    jail video; is that right?
```

1    **Q**    Okay.  So this would be the first time that
2    you've seen what transpires when you've -- walk into the
3    cell?

4    **A**    Yes.

5    **Q**    Okay.  Okay, I'm going to start it and we're
6    going to -- bear with me.  We're going to watch some,
7    pause it, I'll ask some questions; that way, we're
8    trying to get through it.  It's a -- it's a fairly
9    lengthy deal and so I'm going to try to break it up like
10   that, okay?

11          So please pay attention when we're watching
12   it, and we're going to start.  There is no sound, so...

13          (Plaintiff's Exhibit 8, Cleveland County
14   Detention Center Video Footage, was played off the
15   record).

16   **Q**    **(By Mr. Hammons)** Real fast, while I'm thinking
17   of it --

18          **MR. HAMMONS:**  I paused, guys.

19   **Q**    **(By Mr. Hammons)** At -- why did you deter- --
20   why did you decide to enter the cell?

21   **A**    I was knocking on the window and I didn't see
22   or hear any -- get any response from him.

23   **Q**    Okay.  So you went to the outside of the cell.
24   Is there a particular reason that you decided to check
25   on him at this time?

1    **A**    I was in the area for an unrelated reason,

2    somebody else had called for medical, and I just wanted

3    to check on him.

4    **Q**    Okay.

5    **A**    Just because.

6    **Q**    Okay.  And this is -- this is a -- I don't

7    know, an hour and 50 or so minutes after he was placed

8    in the cell, would you say?

9    **A**    I have no idea how long it had been.

10    **Q**    Okay.  Who is the individual in the cell with

11    you on that cam- -- that footage?

12    **A**    I can't tell from this view.

13    **Q**    Okay.  Let me see if I can -- well, if you

14    get -- here in a second, if you get to where you know

15    who it is, tell me, okay?

16    **A**    Okay.

17    **Q**    When you enter the cell in a situation like

18    this and you're -- who's in charge of inside the jail

19    cell on -- on decision making, medically?

20    **A**    Medically?

21    **Q**    Yes.

22    **A**    It would be me.

23    **Q**    Okay.  And right now, it shows you kind of

24    leaned over.  We can't see Marconia's head in the video,

25    but it seems he's face down at this point?

1     **A**     He's on his --

2            **MS. DARK:**  Object to the form.

3     **A**     He's on his stomach, but his head is to the

4     side.

5     **Q**     **(By Mr. Hammons)** Okay.  He's laying on his

6     stomach and his head's to the side.  Do you know which

7     side, when you entered -- was he looking at the back

8     wall or looking towards the door?

9     **A**     I don't remember.

10    **Q**     Okay.  What are you doing in the video right

11    now?

12    **A**     I -- checking on -- checking for his level of

13    consciousness.

14    **Q**     Okay.  How do you -- how do you do that?

15    **A**     Well, you -- first -- well, I started at the

16    door, calling out his name.

17    **Q**     Uh-huh.

18    **A**     And then you check for physical -- right now,

19    I'm checking for a physical sign of movement.

20    **Q**     Are you checking for a pulse?

21    **A**     Not right now.

22    **Q**     Okay.

23    **A**     I'm checking to see if he's physically moving.

24    **Q**     Okay.

25           **MR. HAMMONS:**  I'm going to start it up.

```
 1              (Plaintiff's Exhibit 8, Cleveland County
 2   Detention Center Video Footage, was played off the
 3   record).
 4       Q      (By Mr. Hammons) During that time that we
 5   just -- that little bit of piece where you were leaning
 6   down there, do you think you were checking on a pulse
 7   then?
 8       A      No.
 9       Q      What are you reporting to this jailer?  What
10   are y'all talking about now?
11       A      I -- I don't know.
12       Q      Okay.
13              MR. HAMMONS:  Pushing play.
14              (Plaintiff's Exhibit 8, Cleveland County
15   Detention Center Video Footage, was played off the
16   record).
17              MR. HAMMONS:  Okay, I paused it at 21:54:31.
18       Q      (By Mr. Hammons) And I paused it there --
19   that's when you start chest compressions, or the jailer
20   does.  Do you know who that jailer is now?
21       A      No.
22       Q      Okay.  Now, in the piece of footage we -- you
23   first -- when you first entered the cell, you leaned
24   over, you stood up and you -- you have some
25   conversation, but you start putting on gloves.  Is that
```

1    just standard protocol?

2         **A**    Yes.

3         **Q**    Okay.  What are you thinking when you stand up

4    and you put on gloves?  Do you think -- believe

5    something is wrong?

6         **A**    I --

7              **MS. THOMPSON:**  Object to the form.

8         **A**    I wasn't -- I don't know what I was thinking

9    at the time.

10        **Q**    **(By Mr. Hammons)** Okay.  Now, at this point, do

11   you have any idea whether he has a pulse or not?

12        **A**    Not yet, no.

13        **Q**    Okay.  Now, you walk down and you do kind of

14   a -- what it's called, a Babinski test?

15        **A**    Yes.

16        **Q**    Okay.  There's -- nothing happens?

17        **A**    Correct.

18        **Q**    Okay.  Do you believe he's faking that?

19        **A**    No.

20        **Q**    Why -- why aren't -- why haven't you started

21   CPR at that point?

22        **A**    Well, I turned him over and checked for a

23   pulse and respirations.

24        **Q**    Okay.

25        **A**    And as I did, I called for the rescue bag.

1    **Q**    Why not?

2    **A**    Because I'm not a doctor.

3    **Q**    Well, do you -- do you -- did you think he was

4    saveable?

5         **MS. THOMPSON:**  Object to the form.

6    **A**    I work -- try to save everybody in that

7    condition.

8    **Q**    **(By Mr. Hammons)** I know, I'm just asking what

9    your medical opinion is.  Do you think he was beyond

10   saving?

11   **A**    Absolutely not.

12   **Q**    Okay.  I've heard this through other people.

13   Was there any unwritten policy or procedure, rule,

14   whatever you want to call it, at the Cleveland County

15   Detention Center, that no one is allowed to be called

16   dead inside the cell -- inside the jail?

17        **MS. DARK:**  Object to the form.

18   **A**    I -- I don't know anything about that.

19   **Q**    **(By Mr. Hammons)** I'm just asking --

20   **A**    Unless a doctor is there, nobody can pronounce

21   somebody in -- except a physician.

22   **Q**    Okay.  What I'm saying is:  Is it -- is there

23   a policy, unwritten, that if you find somebody and

24   they're clearly dead -- I mean, they're stiff,

25   dead-dead -- do you start CPR on them and get them out

1  going on inside the cell at this point?

2      **A**    I don't know that there was a conversation

3  going on.

4      **Q**    Okay.  In this -- the freeze frame we have

5  right now at 21:54:56, do you know any of the

6  individuals that are inside that cell?

7      **A**    I believe the gentleman -- well, Shifflett

8  and...

9      **Q**    Here, I'll name them for you, so we can

10 describe it.  There is a person on the right-hand side

11 of the screen that's standing kind of next to the bag,

12 standing --

13     **A**    Right.

14     **Q**    -- up, leaning his head down.  Who is that?

15     **A**    Looks like Shifflett.

16     **Q**    Okay.  And then there's an individual kind of

17 bent over your right shoulder on the left side of the

18 screen.  Who is that?  Do you know?

19     **A**    I seem to recall he's a corporal, but I don't

20 remember his name.

21     **Q**    Okay.  And then we still don't know who is

22 doing chest compressions at this point?

23     **A**    Right.

24     **Q**    Okay.  Now, the 2 minutes and 54 seconds

25 before CPR, you said that was acceptable under the

1    circumstances; true?

2        **A**    Yes.

3        **Q**    What makes it acceptable?

4        **A**    I was doing an assessment.  I didn't know

5    that -- I had to do the assessment before I could find

6    out whether he needed -- that he needed CPR.

7        **Q**    Well, just -- and I'm wondering on -- based on

8    your training -- in my brain, logically speaking, the

9    first thing that I would do if I find somebody

10   unresponsive is check if they have a pulse or are

11   breathing.  That seems like the first thing.  But you're

12   trying --

13       **A**    The first thing is -- the first thing is

14   safety.

15       **Q**    Okay.  So you thought he was maybe faking?

16       **A**    It's possible.

17       **Q**    Okay.

18       **A**    And then I have to check for airway breathing

19   and circulation, which is what I did.

20       **Q**    And 2 minutes and 54 seconds is acceptable?

21       **A**    Yes.

22           **MS. DARK:**  Object to the form.

23           **MR. HAMMONS:**  Okay.  We're going to start the

24   video again.

25               (Plaintiff's Exhibit 8, Cleveland County

1        (Plaintiff's Exhibit 7, Officer Brown's Body

2   Cam Footage, was played off the record).

3        **Q**    **(By Mr. Hammons)** Do you believe his condition

4   that you see in that video was relayed to you by Officer

5   Brown?

6        **A**    No.

7        **Q**    Would that have changed your attitude, if you

8   had known the condition he was in when they drug him

9   across the parking lot over at the hospital?

10       **A**    If I'd seen this footage, yes.

11       **Q**    Even with your medical knowledge -- without

12  your medical knowledge, you can see, clearly, common

13  sense tells you, something is wrong with this man; true?

14            **MS. THOMPSON:**  Object to --

15            **MS. DARK:**  Objection.

16            **MS. THOMPSON:**  Object to form.

17       **A**    I still can see that he could be faking.

18       **Q**    **(By Mr. Hammons)** Now...

19            **MR. HAMMONS:**  Let's go back to the jail

20  footage real fast -- or, actually, no, that's -- that's

21  Brown's footage, isn't it?  Brown, back to the jail.

22  Starting at 16:18.

23            (Plaintiff's Exhibit 7, Officer Brown's Body

24  Cam Footage, was played off the record).

25       **Q**    **(By Mr. Hammons)** Now, he said when he realized

1    he was discharged, he started acting like this.  Would

2    it have helped if you had known that he'd been acting

3    like this, like you saw, for 20-something minutes before

4    they drug him across the parking lot?

5            **MS. DARK:**  Object to the form.

6        **A**    I mean, it probably would have -- no, I

7    mean...

8        **Q**    **(By Mr. Hammons)** It wouldn't have mattered to

9    you?

10           **MS. THOMPSON:**  Object to the form.

11       **A**    That it was just -- I keep saying that I

12   thought he was faking and that's -- I can't...

13       **Q**    **(By Mr. Hammons)** And you made that

14   determination as soon as -- as soon as they set him on

15   that bench, you said he was faking, from that moment,

16   right then?

17       **A**    No.

18       **Q**    When did you decide he was faking?

19       **A**    After the ammonia inhalant.

20       **Q**    After he sat there for 10 seconds and didn't

21   move?

22           **MS. DARK:**  Object to the form.

23           **MS. THOMPSON:**  Object to the form.

24       **Q**    **(By Mr. Hammons)** We can watch it again if you

25   want.

1    **Q**     **(By Mr. Hammons)** Hand you Exhibit No. 9.

2    That's a statement that you gave.  Does that look like

3    your signature on it?

4         **A**     Yes.

5         **Q**     It's Bates Stamp OSBI 95.  Do you see that?

6         **A**     Yes.

7         **Q**     Okay.  I think I got yours highlighted on

8    there, maybe.  Is yours highlighted?

9         **A**     Yes.

10        **Q**     Okay.  Let's see.  Can I see yours real fast?

11        **A**     Uh-huh.

12        **Q**     Save some time.

13             This is your statement you gave to --

14   ultimately, to law enforcement; true?

15        **A**     Yes.

16        **Q**     It says, "On arrival into the intake, inmate

17   was able to stand without assistance."

18             **MR. HAMMONS:**  I'm going to rewind this a

19   little bit, so we can see it.  38:37.

20             (Plaintiff's Exhibit 7, Officer Brown's Body

21   Cam Footage, was played off the record).

22        **Q**     **(By Mr. Hammons)** So he says, "Sit your ass

23   right there," and both Barr and Shifflett place him on

24   the bench; is that true?

25        **A**     Yes.

1    **Q**    Okay.  Why did you tell somebody, in an

2    official statement, that he was able to stand without

3    assistance?

4    **A**    I was confused in my statement.

5    **Q**    Confused, or you were trying to make it look

6    like this man was capable of standing --

7         **MS. THOMPSON:**  Object to --

8    **Q**    **(By Mr. Hammons)** -- without assistance?

9         **MS. THOMPSON:**  Object to the form.

10   **A**    I was confused in my statement.

11   **Q**    **(By Mr. Hammons)** Did you know that there was a

12   body cam footage of this and that it was going to be --

13   everybody was going to save it, hold onto it?

14   **A**    No.

15   **Q**    Right.

16        **MS. GOOCH:**  Object to the form.

17   **Q**    **(By Mr. Hammons)** Right.  So, again, what we're

18   having -- what we're seeing here is:  Everybody involved

19   in this is telling stories to law enforcement that

20   aren't true, correct?

21        **MS. DARK:**  Object to the form.

22        **MS. THOMPSON:**  Object to the form.

23        **MS. GOOCH:**  Object to the form.

24   **A**    I said I was confused in my statement.

25   **Q**    **(By Mr. Hammons)** And it's not true, is it?

1    Your statement is not true and accurate, is it?

2              **MS. THOMPSON:**  Object to the form.

3         **A**     Correct.

4         **Q**     **(By Mr. Hammons)** "Able to follow instructions

5    when asked to sit on the bench."  Not true, is it?

6              **MS. THOMPSON:**  Object to the form.

7         **A**     No, sir.

8         **Q**     **(By Mr. Hammons)** This is an official statement

9    given in a death investigation, to the Oklahoma State

10   Bureau of Investigation, and you said he could stand up

11   without assistance and that he followed orders and --

12   when asked to sit on the bench, and that just isn't

13   true, is it?

14             **MS. DARK:**  Object to the form.

15        **A**     No.

16        **Q**     **(By Mr. Hammons)** As a matter of fact, two --

17   two of these -- Barr and Shifflett carried him in and

18   threw him on the bench and said, "Sit your ass right

19   there," didn't they?

20             **MS. DARK:**  Object to the form.

21        **A**     Yes.

22        **Q**     **(By Mr. Hammons)** Those two are hard to mix up:

23   Carried in, thrown down on the bench, "Sit your ass

24   there," and, "was able to stand without assistance and

25   sit on command."  Those are two very wildly different

```
 1    stories, aren't they?
 2              MS. THOMPSON:  Object to the form.
 3         A    Yes.
 4         Q    (By Mr. Hammons) And, fortunately, we have a
 5    video to show which one of them is true, correct?
 6         A    Yes.
 7              MS. THOMPSON:  Is it okay for a quick break?
 8              MR. HAMMONS:  Sure.
 9              THE MONITOR:  Going off the record.  The time
10    is 1:57 p.m.
11              (Recess was had from 1:57 p.m. to 2:05 p.m.)
12              THE MONITOR:  We are back on the record.  The
13    time is 2:05 p.m.
14         Q    (By Mr. Hammons) Are you ready to proceed,
15    Mr. Rickert?
16         A    Yes.
17         Q    Okay.  Now, just a little bit of overview
18    here.  The process, whatever you want to call it, that
19    took place inside this book-in room, is that consistent
20    with how you treated other inmates while working for
21    Turn Key at Cleveland County Detention Center?
22              MS. THOMPSON:  Object to the form.
23         A    Nev- -- I don't remember ever having a
24    situation like that one.
25         Q    (By Mr. Hammons) Well, consistent in, you make
```

1  a determination of -- based on whatever you used in this

2  situation, and you decide to bypass the medical

3  screening and everything and you put them into the

4  padded cell?

5          **MS. THOMPSON:**  Object to the form.

6      **Q**    **(By Mr. Hammons)** Have you done that to other

7  inmates?

8      **A**     Never done that.

9      **Q**     You've -- you've never bypassed the medical

10  screening process and placed somebody in a --

11     **A**     Never had to bypass a medical screening, that

12  I can recall.

13         **MS. THOMPSON:**  Objection to the last question.

14     **Q**    **(By Mr. Hammons)** Okay.  And never before,

15  the -- the reaction and the CPR situation that happens

16  in the cell after you find Macrony -- Macrony --

17  Marconia, and no heartbeat, no breathing, is that

18  consistent with treatment of other inmates that you've

19  seen in the jail?

20         **MS. DARK:**  Object to the form.

21         **MS. THOMPSON:**  Object to the form.

22     **A**     Can you rephrase the question?

23     **Q**    **(By Mr. Hammons)** Sure.  I'm trying to get a

24  sense of:  Is that reaction and that -- the way you

25  treated Marconia in that cell, consistent with the way

1    whole mission failed; true?

2           **MS. THOMPSON:**  Object to the form.

3           **MS. DARK:**  Object to the form.

4      **A**    True.

5      **Q**    **(By Mr. Hammons)** You have -- as far as the

6    timeline when Marconia was seen by a doctor at Norman

7    Regional Hospital, you have no idea on January 16, 2018;

8    true?

9      **A**    True.

10      **Q**    You had no idea the last time a doctor saw him

11    and -- in -- when I say "last," in time, as it relates

12    to when you saw Marconia; true?

13      **A**    True.

14      **Q**    You don't even know when -- as we sit here

15    right now, when a fit slip arrived at Cleveland County

16    Detention Center; true?

17      **A**    True.

18      **Q**    And a fit slip is only as good as when a

19    doctor last saw that human being; true?

20           **MS. DARK:**  Object to the form.

21           **MS. THOMPSON:**  Object to the form.

22      **A**    I couldn't answer that.  I don't know what the

23    policies and procedures are for fit slips at the

24    hospital.

25      **Q**    **(By Mr. Hammons)** Well, just common sense tells

1   you that a doctor sees somebody, they write a fit for

2   incarceration slip and they give it to somebody, and

3   they don't see the person from that point on; true?

4        **A**    True.

5        **Q**    Okay.  So you don't know how long -- when

6   Officer Brown and Barr and Shifflett come carrying Mar-

7   -- Marconia into your book-in room there, you don't know

8   how long it's been since he's seen a doctor; true?

9        **A**    True.

10        **Q**    You know very little about -- other than what

11   Officer Brown told you -- about -- about his health

12   condition; true?

13        **A**    True.

14        **Q**    Isn't there some training that you undergo,

15   whether it be in LPN school, Turn Key -- we know it's

16   not Cleveland County because they didn't train you on

17   anything, right?

18        **A**    True.

19             **MS. DARK:**  Object to the form.

20        **Q**    **(By Mr. Hammons)** Okay.  So any training that

21   you received that says, "When I see a new patient, I

22   give them the benefit of the doubt and I start from -- I

23   go through this process, I have a process that I have to

24   follow every time so that I don't miss situations like

25   this"?

1          **MS. THOMPSON:**  Object to the form.

2     **A**     Like I said, the process starts after booking,

3   and he was never fully booked in.

4     **Q**     **(By Mr. Hammons)** Yeah, but emergency medical

5   situations like this start right when you see them, if

6   you're looking --

7          **MS. DARK:**  Object --

8     **Q**     **(By Mr. Hammons)** -- true?

9          **MS. THOMPSON:**  Object to the form.

10         **MS. DARK:**  Object to the form.

11    **A**     Like I said, I thought he was faking it.  I

12  didn't feel that he was in an emergency situation.

13    **Q**     **(By Mr. Hammons)** I understand, but what I'm

14  getting at is:  You're basing your -- the faking, off of

15  Officer Brown giving you not very much information and a

16  few seconds of seeing Marconia Kessee fall into a floor,

17  sweating profusely and breathing heavily; true?

18         **MS. DARK:**  Object to the form.

19         **MS. THOMPSON:**  Object to the form.

20    **A**     True.

21    **Q**     **(By Mr. Hammons)** And based on using an FDA --

22  a -- a -- outside-the-FDA-approved methods for smelling

23  salts, sticking it in his face; true?

24         **MS. DARK:**  Object to the form.

25         **MS. THOMPSON:**  Object to the form.

1      **A**     True.

2      **Q**     **(By Mr. Hammons)** And that's -- that -- that

3   smelling salts technique was taught to you by Turn Key;

4   true?

5      **A**     True.

6      **Q**     And they -- they teach their medical personnel

7   at jails across the -- Oklahoma and -- well, maybe even

8   further than Oklahoma -- to stick smelling salts in

9   people's face to make a determination of whether they're

10   having seizures; true?

11          **MS. THOMPSON:**  Object to the form.

12      **A**     True.

13      **Q**     **(By Mr. Hammons)** And if they don't react, like

14   Marconia for the nine or 10 seconds in this video, your

15   claim is he just wasn't breathing, he was holding his

16   breath; true?

17          **MS. DARK:**  Object to the form.

18      **A**     True.

19      **Q**     **(By Mr. Hammons)** So if they're -- if they

20   react, they're faking a seizure, and if they don't, they

21   must be holding their breath; that's your medical

22   training?

23          **MS. THOMPSON:**  Object to the form.

24      **Q**     **(By Mr. Hammons)** True?

25      **A**     No.

1    **A**    It's a prescription -- it's just like a

2    prescription that says "fit to incarcerate" on it.

3    **Q**    Okay.  And you believe Officer Brown had the

4    fit slip with him?

5    **A**    I believe that -- yes.

6    **Q**    Okay.  I'm going to hand you Exhibit No. 11.

7    It's -- the Bates on it is CCSO 14 and CCSO 15, Exhibit

8    11.

9         When you -- when you got into that room,

10   Mr. Rickerts, that we're looking at on that screen, is

11   that -- Exhibit 11, is that what you were handed by

12   Officer Brown, this photocopy kind of looking piece of

13   paper that's got the fit slip photocopied on it?

14   **A**    I don't recall.

15   **Q**    Do you -- do you recall if it was a -- a loose

16   piece of paper or was it photocopied -- placed on here,

17   a photocopied fit slip?

18   **A**    I -- I -- I don't recall.

19   **Q**    Okay.  I -- in the video, I think it shows you

20   kind of flip through some of the discharge paperwork.

21   Is -- did you see the discharge paperwork?  Did you look

22   at it?

23   **A**    Most of it is just informational stuff that

24   doesn't have anything to do with the -- the patient.

25   **Q**    Well, I mean, in this situation, you -- you

1    really don't know a whole lot about Marconia because you

2    haven't done a medical screening, you haven't done any

3    kind of intake.  Did you -- did you take a look at some

4    of it?

5            MS. DARK:  Object to the form.

6            MS. THOMPSON:  Objection to the form.

7        Q    (By Mr. Hammons) Let's just watch some of the

8    video.  That might refresh your memory.  See if you did.

9            (Plaintiff's Exhibit 8, Cleveland County

10    Detention Center Video Footage, was played off the

11    record).

12       Q    (By Mr. Hammons) So it looks like you looked

13    at some of the pill bottles for a minute; true?

14       A    True.

15       Q    And you flipped through the paperwork a little

16    bit, not much, right?

17       A    True.

18       Q    Okay.  Now, this is the -- this is some of the

19    discharge paperwork.  Do you think you had this with

20    you, in your hand?

21       A    Yes.

22       Q    Okay.  And did you -- did you read any of it?

23       A    I'm sure I looked over it.

24       Q    Okay.  On Page 2 of Exhibit 11, CCSO 15, it

25    says, down at the bottom, "Contact your healthcare

```
 1      A    Yes.

 2      Q    One of them has kind of got the fit slip kind

 3   of cockeyed on there like it was -- I guess they went

 4   back and photocopied it in on there or something, and

 5   the other one is perfectly straight on there, isn't it?

 6           MS. THOMPSON:  Object to the form.

 7      A    Yes.

 8      Q    (By Mr. Hammons) Right.  I'm just trying to

 9   figure out where this fit slip actually is or if it ever

10   made it to Cleveland County, and you really don't have

11   any information for me on that, do you?

12      A    Not without looking at the computer.

13      Q    Right.  I just -- in this video, I don't see a

14   piece of paper handed to you by anybody.  And you don't

15   recall that, do you?  These little -- the little --

16      A    Yeah.

17      Q    -- prescription fit slip?

18      A    No.

19      Q    Okay.

20           MR. HOISINGTON:  Chris, do you have the Bates

21   No.?

22           MR. HAMMONS:  On?

23           MR. HOISINGTON:  For Exhibit 12?

24           MR. HAMMONS:  Yeah, Exhibit 12 is -- actually,

25   I don't.  Let me see that -- that 12 over there.  I
```

Clayton Rickert
12/15/2020                                                                Page 212

```
 1    medical attention, will be referred to Community

 2    Hospital for care."

 3              Do you believe Marconia was semi-conscious?

 4    A    No, I believe he was conscious.

 5    Q    Okay.  And we already went over this.  You

 6    don't think he was obviously in need of immediate

 7    medical attention?

 8    A    No.

 9    Q    On -- on No. 2, under "Procedure," the second

10    sentence of that says, "Prebooking medical screening

11    criteria used to guide the determination of medical

12    stability shall be approved by the medical authority."

13              What is the prebooking medical screening

14    criteria?

15    A    I don't know.

16    Q    It says it's used to guide the determination

17    of medical stability.  And you don't know what the

18    criteria for that is?

19    A    No.

20    Q    Did anybody at Turn Key ever teach you that?

21    A    Not that I can remember.

22    Q    Okay.  It might have been in that first day

23    where you went over the -- over 100 categories of

24    training policies in orientation?

25              MS. THOMPSON:  Object to the form.
```

Clayton Rickert
12/15/2020                                                              Page 213

```
1        Q    (By Mr. Hammons) You don't know?

2        A    I don't know.

3        Q    Right.  It would be hard to remember May 7th,

4   2016, and spending two or three minutes on a category;

5   true?

6        A    True.

7             MS. THOMPSON:  Object to the form.

8        Q    (By Mr. Hammons) Okay.  That seems like

9   something -- I -- prebooking medical screening criteria

10  to guide the determination of medical stability seems

11  like something the R -- the LPN in charge of doing

12  medical screenings should be aware of; true?

13       A    True.

14            MS. THOMPSON:  Object to the form.

15       Q    (By Mr. Hammons) And you just weren't aware of

16  that?

17            MS. THOMPSON:  Object to the form.

18       A    True.

19       Q    (By Mr. Hammons) The next page is 14.  We went

20  over a lot of these and I'm not going to try to go over

21  them again, but, on No. 4, it gives you a -- a whole

22  host of things about screening.  Do you see that?

23       A    Yes.

24       Q    Number -- or Letter I, "Drug and alcohol

25  use/abuse, including type, amount, time last used,
```

1      **Q      (By Mr. Hammons)** From alcohol withdrawals, to

2    withdrawing from other illegal substances, can be

3    dangerous; true?

4      **A**      Yes.

5      **Q**      And the signs and -- and symptoms surrounding

6    overdose or withdrawal are extremely important for you,

7    as a medical provider in a jail, to know and understand;

8    true?

9      **A**      Yes.

10      **Q**      And those signs and symptoms, what are some of

11    them, of drug overdose?

12      **A**      Pinpoint pupils...

13      **Q**      Any others that you were trained on?

14      **A**      My -- my mind just went blank.  I'm sorry.

15      **Q**      That's okay.  I can go through some.  What

16    about sweating profusely?

17      **A**      It could be indications for a lot of things.

18    But possible.

19      **Q**      It's -- it's one of the signs or symptoms of

20    overdose, too, also; true?

21      **A**      True.

22      **Q**      Okay.  High blood pressure?

23      **A**      It's possible.

24      **Q**      Unsteady on their feet?

25      **A**      Yes.

1  Q Slurred speech?

2  A Yes.

3  Q Erratic behavior?

4  A Yes.

5  Q Tremors?

6  A I've seen tremors with DTs.

7  Q Right.

8  A Yeah.

9  Q Seizures?

10  A Seizures, yes.

11  Q Okay.  And Marconia had none of those; true?

12  A No.

13    **MS. THOMPSON:**  Not true or he didn't have any?

14    **THE WITNESS:**  Huh?

15    **MS. THOMPSON:**  Did you find no -- did you mean

16 not true, or did -- he didn't have any symptoms?

17    **THE WITNESS:**  He -- the symptoms that he had,

18 I believed were faking, at the time.

19  Q **(By Mr. Hammons)** Right, so he had none of

20 those symptoms?

21  A He had some of those symptoms; like I said, I

22 thought he was faking at the time.

23  Q Okay.  And I take it that's your -- your

24 defense, is that you just thought he was faking?

25    **MS. THOMPSON:**  Object to the form.

1      **Q      (By Ms. Dark)** There's no reason to doubt that

2   a fit slip was coming, correct?

3              **MR. HAMMONS:**  Object -- object to the form.

4      **A**      I -- like I said, I thought it was there, that

5   maybe it was in the car.

6      **Q      (By Ms. Dark)** Okay.  And at some point, you

7   saw a fit for incarceration slip, right?

8              **MR. HAMMONS:**  Object --

9      **A**      Yes.

10             **MR. HAMMONS:**  Object to the form.

11     **Q      (By Ms. Dark)** And that fit slip tells you that

12  he has -- Mr. Kessee had been seen at a hospital prior

13  to his arrival, correct?

14     **A**      Correct.

15     **Q**      You agree with me that the Norman Regional

16  Hospital is about a 10-minute drive from the jail?  Does

17  that sound right to you?

18             **MR. HAMMONS:**  Object to the form.

19     **A**      Yes.

20     **Q      (By Ms. Dark)** So, as far as you knew,

21  Mr. Kessee had just been seen at the hospital within 10,

22  20 minutes of his arrival at the jail, correct?

23     **A**      Yes.

24     **Q**      And we looked at the fit slip earlier, which

25  was Exhibit 11.  And on that slip, it states, "Fit for

1          **MS. DARK:**  If -- Chris, I'm sorry, can you

2   hand him Exhibit 6, the policies and procedures, at CCSO

3   376.

4          **MR. HAMMONS:**  (Handed the witness Exhibit 6.)

5      **Q**   **(By Ms. Dark)** Okay.  And at the bottom of the

6   page, it says -- well, at the middle of the page,

7   there's F, "Admission of a Compliant Arrestee."  Do you

8   see that?

9      **A**   Yes.

10     **Q**   And if you go to the next page, No. 10, "The

11  arrestee will be taken to the medical screening room and

12  overseen by the detention officer."

13     **A**   Yes.

14     **Q**   At that time that Mr. Kessee was in the intake

15  area, you wouldn't call him a compliant arrestee, would

16  you?

17         **MR. HAMMONS:**  Object to the form.

18     **A**   No.

19     **Q**   **(By Ms. Dark)** He was uncooperative, wasn't he?

20         **MR. HAMMONS:**  Object to the form.

21     **A**   Yes.

22     **Q**   **(By Ms. Dark)** And if you look on the page just

23  before that, CCSO 375, E, "Officer assistance with" --

24  sorry, "Officer assistance with new combative arrestee."

25  And then flip the page, so back to CSSO 376, No. 7.  "If

1    compliance is not gained, the arrestee will be escorted

2    to a designated cell."  Did I read that correctly?

3         **A**    Yes.

4         **Q**    And that's what happened here, right?

5    Mr. Kessee was not being compliant, so he was taken to a

6    designated cell, correct?

7         **A**    Yes.

8         **Q**    And you touched on this earlier, but just to

9    be clear:  The -- the plan was to place him in this

10   designated cell, make sure he isn't harming himself, and

11   when he calms down, then you'll be able to finish the

12   intake process, correct?

13        **A**    Yes.

14        **Q**    Are you aware of any requirement in any

15   policy, any standard, that gives an exact amount of time

16   as to when that initial medical screening intake has to

17   occur?

18        **A**    No.

19        **Q**    And it tracks that if you have someone who's

20   not being cooperative, you want to give them time to

21   calm down, so he's able to provide you reliable answers,

22   correct?

23        **A**    Correct.

24        **Q**    In the video, we watched the portion where

25   Mr. Kessee hit his head on the wall, and you agree with

1    **Q**    And I represent Emergency Services of

2    Oklahoma.  Are you familiar with that organization?

3        **A**    No.

4        **Q**    Okay.  I want to make sure I understand a few

5    things.

6            You determined -- in your own mind, you -- you

7    made the determination that you didn't believe

8    Mr. Kessee was under the influence of drugs or alcohol,

9    based on your own observations and interactions with him

10   at the jail; is that correct?

11       **A**    Yes.

12       **Q**    And that is completely independent of whatever

13   treatment and care and evaluation he was provided at

14   Norman Regional, correct?

15       **A**    Yes.

16           **MS. DARK:**  Object to the form.

17       **A**    Yes.

18       **Q**    **(By Mr. Whitworth)** And whatever happened in

19   the emergency department at Norman Regional did not have

20   an effect on your decision making with this patient on

21   that night, correct?

22       **A**    Correct.

23       **Q**    And you -- I want to make sure I understand

24   this.  I think you were asked it, but I want to make

25   sure I heard it correctly.

1              From the first time that you saw the fit slip

2    that had the -- the phone number on it -- do you recall

3    that?  You -- you just today -- I'm -- I'm sorry,

4    I'll -- I'll rephrase my question.

5              Exhibit 11 and Exhibit 12 have a copy of the

6    fit slip?

7         **A**    Yeah.

8         **Q**    Correct?

9         **A**    Yes.

10        **Q**    And that had a phone number on it, right?  Can

11   you -- can you look at Exhibit 11 or 12 for me?

12             **MS. THOMPSON:**  He's looking at those, Brandon.

13             **MR. WHITWORTH:**  Okay.

14        **A**    Okay.

15        **Q**    **(By Mr. Whitworth)** Okay.  So you're looking at

16   both 11 and 12, correct?

17        **A**    Yes.

18        **Q**    And so at the bottom, there's a phone number

19   that says, "Call if any questions," correct?

20        **A**    Correct.

21        **Q**    And so I want to make sure I understand this:

22   Did you make any contact with anyone, any provider at

23   Norman Regional, that night, about Mr. Kessee?

24        **A**    No.

25        **Q**    And you don't know how or even if his

1    condition changed after he left the emergency department

2    that night, correct?

3         **A**    Correct.

4         **Q**    And I believe Ms. Dark, just a few minutes

5    ago, asked you -- or -- asked you if -- if it was your

6    understanding that he had been seen just a matter of,

7    like, 10 or 20 minutes before; do you remember that?

8         **A**    Yes.

9         **Q**    You don't have any idea of how -- what time

10   elapsed be- -- between the time he was discharged out of

11   the ER and -- to the time it got -- he got to you,

12   correct?

13        **A**    Correct.

14        **Q**    And you did not see the fit slip until after

15   you had walked with him and the other officers into that

16   padded cell; is that right?

17        **A**    Seen a fit slip, no.

18        **Q**    I'm sorry, can you say that again?

19        **A**    Yeah, you are correct.

20        **Q**    Okay.  And so that fit slip didn't have any

21   effect on your decision making with regards to

22   Mr. Kessee going to that padded cell, correct?

23        **A**    Correct.

24        **Q**    And then when -- am I right that in the

25   timeline of events, the next time you saw Mr. Kessee is

```
 1    when you happened to be over by the -- the -- that

 2    padded cell, and you looked in and wondered if he was

 3    responsive?

 4         A    Correct.

 5         Q    All right.  And you would agree with me that

 6    patients' conditions can change quickly, right?

 7         A    Yes.

 8         Q    And to this day, have you ever spoken with

 9    anybody, who provided any care to Mr. Kessee at Norman

10    Regional, about Mr. Kessee?

11         A    No.

12              MR. WHITWORTH:  I'll pass the witness.

13              MR. HOISINGTON:  This is Rob Hoisington.

14    We'll reserve.

15              MR. KNIGHTON:  This is Rick Knighton.  We do

16    not have any questions.

17              MS. THOMPSON:  If no one has any other

18    questions, I will ask a few questions to follow up.

19              MR. HAMMONS:  I'll probably have a follow-up

20    after that, but --

21              MS. THOMPSON:  Sure.

22              MR. HAMMONS:  -- it will be quick.

23                        *EXAMINATION*

24    *BY MS. THOMPSON:*

25         Q    Mr. Rickert, as a nurse, you're not trained to
```

1      **A**    From -- until I found him?

2      **Q**    Yes, from the time that you first saw him

3   being brought in and just before you found him.

4      **A**    Okay, just before I found -- no, not that I'm

5   aware of.

6      **Q**    When you were visually assessing Marconia

7   Kessee when he was first brought in, you stated,

8   earlier, that you had observed him being alert; is that

9   correct?

10      **A**    Yes.

11      **Q**    And you had observed him converse with the

12   detention officers; is that correct?

13      **A**    Yes.

14      **Q**    From your observation of that interaction with

15   detention officers, did you make a determination whether

16   Mr. Kessee was in a condition -- whether Mr. Kessee

17   would be able to answer your question about his medical

18   history?

19      **A**    Yes.

20      **Q**    And what was your determination?

21      **A**    That he would not be able to answer

22   appropriately at the time.

23      **Q**    And why did you think that?

24      **A**    Because he wasn't answering appropriately to

25   the officers.

1     **Q**     Was he making sense talking to the officers?

2     **A**     No.

3     **Q**     So you didn't find any need to ask him any

4  further questions, him being -- him behaving this way,

5  correct?

6     **A**     Correct.

7     **Q**     When you were making notes regarding the

8  incident in Marconia Kessee's medical chart regard- --

9  when did you make those notes?

10     **A**     Right after he got put in the padded cell.

11     **Q**     Did you make those notes from your

12  recollection of the events that transpired?

13     **A**     Yes.

14     **Q**     At the time you made those notes, did you

15  accurately record the events as you had remembered them?

16     **A**     Yes.

17     **Q**     Did you purposefully change any facts or make

18  false statements in that report?

19     **A**     No.

20     **Q**     Did you have any reason, at that time, to make

21  any false statements in that report?

22     **A**     No.

23     **Q**     At the time of your encounter with Mr. Kessee,

24  did you know anything about what had transpired before

25  he arrived at the jail, other than what Officer Brown

1   had told you?

2        **A**      No.

3        **Q**      Did you know anything about what had

4   transpired, that you viewed on the body camera video

5   earlier today?

6        **A**      No.

7        **Q**      And you didn't know anything about what type

8   of treatment he may have received earlier that day?

9        **A**      No.

10       **Q**      And you didn't know anything about what type

11  of medications Marconia may have taken earlier that day?

12       **A**      No.

13       **Q**      With regard to the medication bottles that

14  were provided to you, that belonged to Marconia, did you

15  write down the names of those medications?

16       **A**      Yes.

17       **Q**      Did you confirm that those medications were

18  prescribed to Marconia based on the labels on the

19  bottles?

20       **A**      Yes.

21       **Q**      Would it have made a difference if you had

22  counted the number of medication -- let me -- let me

23  rephrase that.

24            Would -- if you had counted the number of

25  pills in each bottle, would that give you any

1    Mr. Kessee?

2        **A**    Yes.

3        **Q**    And regarding policies and procedures, could

4    you confirm to me, because I -- I don't recall

5    specifically, whether you had the opportunity to review

6    the entire policy and procedure manual at some point

7    during your employment with Turn Key?

8        **A**    I don't recall.

9        **Q**    Do you recall where the Turn Key policy and

10   procedure manual was kept?

11       **A**    In the nursing manager's office.

12       **Q**    Did you have access to that manual at all

13   times?

14       **A**    Yes.

15       **Q**    So if you needed to consult with a policy for

16   guidance, you had that opportunity at any time, correct?

17       **A**    Yes.

18           **MS. THOMPSON:**   I'll pass the witness.

19           **MR. HAMMONS:**   Back to me?  Okay, real quick.

20                        ***FURTHER EXAMINATION***

21   ***BY MR. HAMMONS:***

22       **Q**    If I'm not mistaken, we've watched the -- the

23   little intake portion on the body cam footage from

24   Officer Brown a couple of different times.  The only

25   question I remember anybody asking Marconia Kessee is,

```
 1    "What size shoe do you wear?"

 2              Do you recall any other questions being asked

 3    of Marconia Kessee?

 4         A    No.

 5         Q    So when every lawyer here, I think, asked you,

 6    "Well, he -- Marconia wasn't responsive to questions,"

 7    he didn't get asked a question, did he?

 8              MS. DARK:  Object to the form.

 9         Q    (By Mr. Hammons) Besides his shoes?

10              MS. THOMPSON:  Object to the form.

11         Q    (By Mr. Hammons) True?

12         A    Except for the shoes, yes.

13         Q    Yeah.  So how could he respond to a question

14    about his medical care if you never asked him one?

15         A    Like I said, he didn't respond to that one,

16    what...

17         Q    Well, he didn't even get a chance to respond

18    to that one.  Shifflett -- if -- correct me if I'm

19    wrong -- said, "What size shoe?"  He couldn't speak, and

20    he said, "12 it is," and y'all giggled, right?

21              MS. DARK:  Object to the form.

22              MS. THOMPSON:  Object to the form.

23         A    No.

24         Q    (By Mr. Hammons) So how can Marconia Kessee

25    answer questions not asked of him, ever?  That's -- it's
```

1    just not -- it's not a fair statement to say he didn't

2    answer questions, because he wasn't asked questions

3    about his medical care; true?

4            **MS. THOMPSON:**  Object to the form.

5        **A**    I -- I've stated that I didn't ask him

6    questions.

7        **Q**    **(By Mr. Hammons)** I know, but every -- every

8    lawyer here just asked you, "Well, he wasn't responsive

9    to questions, that's why you didn't ask him questions."

10   That's just simply not true.  He wasn't asked questions

11   about his medical care.  He didn't -- he -- he couldn't

12   respond; is that --

13           **MS. DARK:**  Object --

14       **Q**    **(By Mr. Hammons)** -- accurate?

15           **MS. DARK:**  -- to the form.

16           **MR. WHITWORTH:**  Objection.

17       **A**    I don't understand.  I've said it a -- over

18   again.  I didn't ask him any medical questions.

19       **Q**    **(By Mr. Hammons)** Okay.  Your attorney just

20   asked you something to the effect of --

21       **A**    He didn't respond to the --

22           **MS. THOMPSON:**  Let him finish his question.

23       **Q**    **(By Mr. Hammons)** -- asked you something to the

24   effect of, "Is one of the reasons you didn't ask him any

25   further questions because he wasn't responsive to the

1    questions of the officers?"  Do you recall that?

2        **A**    Yes.

3        **Q**    And you said, "Yeah, that's one of the

4    reasons."  You remember answering --

5        **A**    Yes.

6        **Q**    Okay.  Other than, "What size shoe do you

7    wear," he wasn't asked a question; true?

8        **A**    True.

9        **Q**    So, based on not answering what size shoe you

10   wear, you decided not to ask him any medical questions;

11   accurate?

12       **A**    True.

13       **Q**    I'm unclear of this, but, yes or no:  Were you

14   handed the prescription-size fit slip from Officer

15   Canaan, who went and got it?

16       **A**    I don't remember.

17       **Q**    Do you ever recall another human being, Norman

18   Police Officer, handing you that prescription fit slip,

19   ever?

20       **A**    I don't remember.

21       **Q**    Because in -- have you watched any video from

22   the sally port, which I supposedly have all of it, that

23   shows Officer Canaan pulling in there with a fit slip

24   and bringing it in to us?  Have you seen anything like

25   that?

```
 1      A     (Moved head from side to side).

 2      Q     Is that a no?

 3      A     No.

 4      Q     Have you seen any evidence, whatsoever, that

 5   that piece of paper, that fit slip, that little

 6   prescription pad, exists at the Cleveland County

 7   Detention Center?

 8      A     Say that again.

 9      Q     Sure.  I'm assuming, if you get a fit slip,

10   you put it in the file for that -- for that inmate?

11      A     Yes.

12      Q     Have you seen any evidence of that fit slip

13   existing?

14      A     Don't remember.

15      Q     Okay.  Well, that's what I'm asking.  Have you

16   seen, in all of this -- I mean, you have access, you're

17   the defense.  Have you seen the actual piece of paper?

18      A     No.

19      Q     So my question is:  Is it your recollection,

20   as we sit today, January 16th, 2018, you do not recall

21   getting that piece of paper on that day?

22      A     Correct.

23      Q     Okay.  And just -- have you read Officer

24   Canaan's deposition?

25      A     No.
```

1       **Q**     He doesn't recall going out to Cleveland

2    County Detention Center, either, and he's the one who

3    got the fit slip.  You didn't read his --

4            **MS. THOMPSON:**  Objection.

5       **Q**     **(By Mr. Hammons)** You didn't read his

6    deposition?

7       **A**     No.

8       **Q**     Okay.  Now, every -- everybody has asked you

9    about seizures.  Has -- do -- does any -- has anybody

10   diagnosed or said that Marconia had a seizure?  Have you

11   read something about that?

12      **A**     No.

13      **Q**     We don't really know what happened to him,

14   other than he had a massive overdose on drugs; true?

15           **MS. THOMPSON:**  Objection.

16           **MS. DARK:**  Object to the form.

17      **A**     If you say so.

18      **Q**     **(By Mr. Hammons)** Well, do you know that he

19   overdosed on drugs, that's what killed him?

20           **MS. THOMPSON:**  Objection.

21      **A**     If you say so.

22      **Q**     **(By Mr. Hammons)** No, I'm asking if you know.

23      **A**     No.

24      **Q**     Okay.  This is the first time that you're

25   knowing the cause of death of Marconia Kessee, is when I

```
 1  just told you?
 2       A     Yeah.
 3       Q     Okay.  Did you ask anybody?  Were you
 4  concerned about how he died or why he died?
 5       A     It -- it's a HIPAA violation.  I -- it's
 6  not -- none of my business, after -- after my care was
 7  done.
 8       Q     When you're talking about all these times that
 9  inmates have lied and faked, does your training as a
10  nurse tell you that you start out with the mindset of
11  "That's a faker and they have to disprove faking to me"?
12            MS. THOMPSON:  Objection.
13       A     No.
14       Q     (By Mr. Hammons)  You should start out with --
15  even if you think they're faking, you should start out
16  on the basis that they're not faking and -- and you
17  disprove it through your medical education and training;
18  true?
19       A     True.
20       Q     Because that's the way that we don't miss
21  things like this, when we assume people are faking when
22  they're not faking; true?
23            MS. THOMPSON:  Object to form.
24       A     Yes.
25       Q     (By Mr. Hammons)  Now, you were asked, earlier,
```