IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

-oOo-

(1) PATRICIA THOMPSON, as
personal representative of the
Estate of MARCONIA LYNN KESSEE,

        Plaintiff,

  vs.                          No. CIV-19-113-SLP

(1) NORMAN REGIONAL HOSPITAL
AUTHORITY d/b/a NORMAN REGIONAL
HOSPITAL, a public trust, et al.,

        Defendants.

=============================================================

VIDEOTAPED DEPOSITION OF

KATHRYN WILD

June 7, 2021

Reno, Nevada

**EXHIBIT 11**

Reported by:      DIANNE M. BRUMLEY, NV CCR #205
                    California CSR #6796

1  seizure?

2          MR. YOUNG:  Object to the form.

3          THE WITNESS:  I don't know what he was
4  anticipating was going to happen.  You can't just put
5  those -- we don't know what was going on.
6  BY MR. HAMMONS:
7      Q    Well, you'd agree Marconia Kessee would have to
8  know this technique so he could know how to fake it?
9      A    No, not necessarily.
10     Q    Now, you'd agree with me that this situation
11 that we see with Clayton Rickert and Marconia is much
12 different than the typical situation where inmates are
13 coming to a nursing staff and saying I'm having
14 seizures, I had a seizure today, or trying to -- that
15 kind of situation is very different than what we see in
16 Marconia's situation, is it not?
17         MR. YOUNG:  Object to the form.
18         THE WITNESS:  I'm not sure I understand the
19 question.  Mr. Kessee did not come to the nurse and say,
20 I had a seizure or I'm having a seizure, so I'm not
21 really sure what you're asking me.
22 BY MR. HAMMONS:
23     Q    Yeah, it's not a very good question.  I agree.
24         Based on Dr. Keller's article, when Marconia
25 didn't react for those nine seconds, he could

```
 1   potentially have been unconscious, true?
 2              MR. YOUNG:  Object to the form.
 3              THE WITNESS:  He could, but, you know, nine
 4   seconds is a very brief period of time.  Holding your
 5   breath for that amount of time is quite simple.
 6   BY MR. HAMMONS:
 7        Q    I understand, but like I said, I've had medical
 8   working on me and I was unconscious for seconds and they
 9   used it to revive me or wake me up.  I certainly
10   wasn't -- I might have been holding my breath while I
11   was unconscious, but I certainly wasn't holding my
12   breath, so in these particular situations Marconia could
13   have just been simply unconscious for nine seconds,
14   true?
15              MR. YOUNG:  Object to the form.
16              MR. LAFFERRANDRE:  Object to the form.
17              THE WITNESS:  I don't know that we know that.
18   BY MR. HAMMONS:
19        Q    Clayton Rickert didn't know it, either, did he?
20              MR. YOUNG:  Object to the form.
21              THE WITNESS:  Right.
22   BY MR. HAMMONS:
23        Q    Also, in that article, Dr. Keller says that a
24   problem -- that the problem is that many medical
25   practitioners do not know how to use ammonium capsules
```

1  properly and if improperly used, they could be
2  ineffective, misleading, and even worthless.
3          Here we know, at least according to Turn Key,
4  Clayton Rickert had no training from Turn Key about
5  using these ammonium packets, true?
6     A    Right, he had no training from Turn Key.
7     Q    And we know from Clayton Rickert's own
8  testimony that he didn't even know the purpose of
9  using -- the actual regular use of ammonium capsules,
10 true?
11         MR. YOUNG: Object to the form.
12         THE WITNESS: I'm not sure what his response
13 was at that part of the deposition, but he did know this
14 is a tool that you'll use when you come upon a patient
15 that you feel is unresponsive or perhaps having a
16 seizure.
17 BY MR. HAMMONS:
18    Q    In the video that you watched where he did this
19 to Marconia, did you ever see Marconia turn away and
20 start coughing after he shoved that ammonium capsule in
21 his face?
22    A    Gosh, it's been awhile since I've seen it.  He
23 did -- I believe he did turn away.  I don't know if he
24 was coughing or not.
25    Q    Now, later in the article, Dr. Keller, again he

1  points out that you should not even remotely imply that
2  you believe a patient is faking. Get rid of that
3  notion, that's what he says. Do you agree with him?
4      A    I agree that faking and malingering, those
5  particular terms in a healthcare setting are not the
6  best terminology, yeah, I agree with him.
7      Q    And they're not just not the best terminology,
8  they're dangerous?
9           MR. YOUNG: Object to the form.
10          THE WITNESS: They can be.
11 BY MR. HAMMONS:
12     Q    When we label somebody a faker, it changes our
13 perspective on those people and we don't give their
14 symptoms any credibility at all sometimes?
15          MR. YOUNG: Object to the form.
16          THE WITNESS: I don't believe that is strictly
17 as cut-and-dried as that. I believe that you still need
18 to follow-up with your patient, gather as much
19 information as you can.
20 BY MR. HAMMONS:
21     Q    Do you think Rickert gathered as much
22 information as he could in that initial video that you
23 saw with his interaction with Marconia?
24     A    Based on the inmate's behavior at that point in
25 time, he wasn't able to do any more than a visual

1  was being questioned about assessing a patient, his take
2  on assessment was kind of equal to diagnosis.  He can't
3  diagnoses.  He can collect data, he can collect
4  subjective and objective data.
5  BY MR. HAMMONS:
6     Q    What -- during the course of his interaction on
7  body cam, what subjective information did he get from
8  Marconia Kessee?
9     A    Not much, because this arrestee at this point
10 in time was carried into the jail by police officers and
11 Nurse Rickert was told that this behavior had started as
12 soon as he was told to leave the hospital, so the
13 subjective part of that is what Nurse Rickert is
14 gathering, not just from the patient, but from those
15 individuals that had information about what was going on
16 before his arrival at the jail.
17    Q    Are you saying that subjective complaints in
18 this case came from Officer Brown and not Marconia
19 Kessee?
20    A    Right.
21    Q    Probably should have got some of the subjective
22 complaints from Marconia, true?
23    A    Right, but at the time he wasn't answering
24 questions.
25    Q    What questions did he not answer?

1    A    Well, number one, remember, the guards were not
2    letting him answer questions.
3    Q    That's true.
4    A    And the nurse -- when you asked me earlier
5    about teamwork, it's all about when is the nurse able to
6    do his or her screening based on what's going with the
7    security end of the facility, so Nurse Rickert, I didn't
8    see him have any time or ability to do his screening,
9    and remember, Dr. Cooper said that the medical screening
10   doesn't usually occur until after the patient or the
11   inmate has been booked, and this inmate had not been
12   booked yet.
13   Q    Do you know what the book-in process is like at
14   Cleveland County Detention Center?
15   A    Only from the deposition transcripts, that they
16   get booked and then they are taken into a medical
17   screening room where they're given some privacy to
18   answer questions, so only from depositions.
19   Q    Right.  They get a pair of shoes, right, from
20   the Cleveland County jail, they get a pair of shoes?
21   A    I think they get a jail uniform as well.
22   Q    And this medical screening room was probably
23   eight feet away from Marconia Kessee and Clayton
24   Rickert, true?
25   A    Right, but, you know, Clayton Rickert had to

```
 1   rely on the officers to bring him into the screening
 2   room.
 3       Q    So he didn't get an opportunity to do his
 4   evaluation based on that?
 5       A    Right, based on his -- Clayton Rickert's
 6   understanding that the patient had just been cleared at
 7   the hospital, had become uncooperative and wasn't -- he
 8   wasn't ready to be screened at this point in time.
 9       Q    What subjective information or -- what
10   questions did Marconia not answer of Clayton Rickert?
11       A    None.  He didn't have an opportunity to ask the
12   screening questions.
13       Q    He didn't ask anything, did he?
14       A    No.
15       Q    As a matter of fact, I mean, you've read his
16   deposition, I spelled out what the words he said.  Most
17   of it was barely a complete sentence, true?
18            MR. YOUNG:  Object to the form.
19            THE WITNESS:  Right, and you have to understand
20   in these situations where there's a lot of commotion,
21   there's a lot of different officers, the patient is not
22   cooperating which is what Clayton Rickert is being told,
23   it's a difficult situation.
24   BY MR. HAMMONS:
25       Q    You think that was difficult for Clayton
```

```
 1  or inmate.
 2       Q    So this is the exact scenario I'm asking you
 3  is: As for training purposes, this piece of video
 4  footage you could tell your students when you have this
 5  limited information and an officer tells you
 6  information, you can rely on it and this is a perfectly
 7  good intake process, what we see in the video footage,
 8  you would have no problem doing that?
 9            MR. YOUNG:   Object to the form.
10            THE WITNESS:   No.   What I would say is these
11  are the kind of situations you're going to come across
12  in a correctional setting where you're going to get
13  patients that are coming in uncooperative and you're
14  going to get information that's provided to you from
15  third parties, just so people are aware that, you know,
16  it isn't always what it seems.
17  BY MR. HAMMONS:
18       Q    Right, and that's why we have medical
19  procedures and intake procedures to make sure of those
20  situations before we assume somebody is faking?
21       A    And they did have medical procedures and the
22  medical procedure there was you would do the health
23  screening as soon as the person was booked and he hadn't
24  gotten to that point yet.
25       Q    Page 13 of Exhibit 8.
```

```
 1   statements from everybody.
 2            "On arrival into the intake, inmate was able to
 3   stand without assistance."  That probably weighed on --
 4   I mean, do you agree with me that that didn't happen?
 5       A    Right, and I think Mr. Rickert's testimony in
 6   his deposition was that he was confused.  Remember,
 7   everybody was seeing this from different angles.  Who
 8   knows what he actually -- how he actually witnessed
 9   that.
10       Q    Well, there's a big difference when he was
11   standing there and what really happened was two officers
12   threw him on a bench and said, "Set your ass right
13   there."  That's pretty different stories, right?
14       A    Right.
15            MR. YOUNG:  Object to the form.
16   BY MR. HAMMONS:
17       Q    And this statement was given literally on the
18   day this happened, true?
19       A    Oh, Clayton Rickert's statement, yeah.
20       Q    And then he says, this is the one that is
21   confusing to me, he says, "He's able to follow
22   instructions," and you've been saying he's
23   uncooperative.  Here Clayton Rickert's says he's
24   following instructions.  Which is it?
25       A    I don't know.  I don't know.  All I know from
```

```
 1   his testimony is that he was confused at that point.
 2       Q    Clayton Rickert was confused?
 3       A    That's what he testified to in his deposition.
 4       Q    Yeah, and I don't think it's inconsistent.
 5   Marconia was able to set on the bench as he was
 6   instructed to, true?
 7       A    Right.
 8       Q    They said, "Sit your ass on the bench," and he
 9   sat there, true?
10       A    Right.
11       Q    Now, they did ask him his size of shoe and cut
12   him off.  He couldn't answer that, probably didn't care
13   what size of shoe he was wearing at the time, but he was
14   asked that question and I guess that's one thing he
15   didn't follow instructions on.  He didn't say what size
16   of shoe he's wearing, true?
17       A    Right, I think --
18            MR. YOUNG:  Object to the form.
19            THE WITNESS:  -- I think one of the officers
20   decided what size shoe he was wearing.
21   BY MR. HAMMONS:
22       Q    And then the officer several times told him
23   to -- they motioned at him, they hushed him, and he
24   would shut up at that point, stop his attempt to
25   communicate, true?
```

```
 1              MR. YOUNG:  Object to the form.
 2              MR. LAFFERRANDRE:  Object to the form.
 3              THE WITNESS:  I guess that's following
 4   directions.
 5   BY MR. HAMMONS:
 6       Q   Right.  He seems to be following instructions,
 7   true?
 8       A   Right.
 9       Q   He doesn't seem uncooperative at all to me.  Is
10   your take he was uncooperative or cooperative?
11       A   That's what, I believe, they were all told on
12   arrival to the jail, that they were coming in with an
13   uncooperative inmate.
14       Q   And up to this point, he seems to be very
15   cooperative, he hasn't disobeyed one thing that they've
16   said, true?
17              MR. YOUNG:  Object to the form.
18              THE WITNESS:  It was a chaotic situation.  It
19   wasn't the best setting to do a medical screening.  I
20   can see why the medical screening was delayed for a
21   couple of hours until he could calm down.
22   BY MR. HAMMONS:
23       Q   He didn't calm down, though, he died.
24       A   He died.
25       Q   Here it says -- in your report, you note
```

1      A     Yes.

2      Q     We're to the point where you cite -- we went

3  kind of over this earlier.  You cite the NCCHC

4  standards, the jail standards and Turn Key's policies

5  regarding screenings, true?

6      A     Uh-huh.

7      Q     And you would agree with me there wasn't a

8  screening actually accomplished in this case, true?

9           MR. YOUNG:  Object to the form.

10          THE WITNESS:  There was not a full screening

11 done, and I think I cited Dr. Cooper's testimony that

12 the intake health screening generally takes place after

13 the inmate has been booked in and Mr. Kessee hadn't been

14 booked in.

15 BY MR. HAMMONS:

16     Q     So you're relying on Dr. Cooper who says that's

17 reasonable -- he testified that it's reasonable Nurse

18 Rickert -- I'm sorry, this is what he said.  He said

19 it's reasonable of Nurse Rickert to take the word of the

20 officer, I'm sorry.

21     A     Right.

22     Q     So Dr. Cooper, the corporate rep for Turn Key,

23 said it was reasonable to do that.  That's one of the

24 bases for your opinion that it was reasonable, true?

25     A     It was reasonable based on my experience in a