```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE WESTERN DISTRICT OF OKLAHOMA

 3    (1) PATRICIA THOMPSON, as Personal
      Representative of the Estate of
 4    MARCONIA LYNN KESSEE,

 5         Plaintiff,

 6    VS.                              Case Number
                                       CIV-19-113-SLP
 7    (1) NORMAN REGIONAL HOSPITAL
      AUTHORITY d/b/a NORMAN REGIONAL
 8    HOSPITAL, a public trust, et al.,

 9         Defendants.

10

11                    *  *  *  *  *

12            DEPOSITION OF TODD R. GIBSON
          TAKEN ON BEHALF OF THE PLAINTIFF
13            IN OKLAHOMA CITY, OKLAHOMA
                   ON MARCH 18, 2021
14            COMMENCING AT 9:01 A.M.

15                    *  *  *  *  *

16

17

18

19

20

21
                    INSTASCRIPT, LLC
22            125 PARK AVENUE, SUITE LL
          OKLAHOMA CITY, OKLAHOMA  73102
23                 405.605.6880
               schedule@instascript.net
24

25       Reported by:  Cheryl D. Rylant, CSR, RPR
```

EXHIBIT
14

1    was appointed to sheriff in October of 2017.  And

2    then was elected into the position in November of

3    2018.

4         And then, in April of 2020, became chief at

5    Moore Police Department.

6         Q. Okay.  So this incident occurred on

7    January 16th of 2018.  Do you understand that?

8         A. Yes, sir.

9         Q. And this is an incident with regard to

10   Marconia Kessee.  Are you familiar with the incident

11   in general?

12        A. Yes, sir.

13        Q. At the time of this incident on

14   January 16th of 2018, you were the acting sheriff for

15   Cleveland County; true?

16        A. Yes, sir.

17        Q. As the acting sheriff for Cleveland County,

18   you had the final policymaking authority with regards

19   to what occurred in the jail; true?

20        A. Yes, sir.

21        Q. Did you have to have your decisions with

22   regard to the jail approved by any board or -- like

23   the board of county commissioners, for example?

24        A. No, sir.

25        Q. You had the power to set policies in the

1    jail, to create policies?

2        A. Yes, sir.

3        Q. You had the power to enforce those policies?

4        A. Yes, sir.

5        Q. You had the power to establish the customs

6    and practices of the jail?

7            MS. DARK:  Object to the form.

8            THE WITNESS:  In regards to its operation?

9        Q. (By Mr. Hicks)  Its day-to-day operation?

10       A. Yes, sir.

11       Q. You had the power, in that regard, to set

12   forth written procedures for the day-to-day operation

13   of the jail?

14       A. Yes, sir.

15       Q. Okay.  We have what we'll mark as Exhibit 1

16   the Cleveland County Policy and Procedure Manual.

17   I'm going to go ahead and hand it to you and we'll

18   mark it as Exhibit 1.  It's already got a sticker on

19   it.

20       A. Yes, sir.

21           (Exhibit 1 marked.)

22       Q. (By Mr. Hicks)  It's CCSO300 through 578.

23       And you're welcome to thumb through that.  I

24   know it's a lot of pages.  Is that the entirety of

25   the policy and procedures that were in effect at the

```
 1    Turn Key -- and I believe they were previously DSW

 2    and had some other names, but right now we're

 3    referring to them as Turn Key.

 4         Was Turn Key providing medical already when you

 5    first came in, in October of 2017, as sheriff?  Were

 6    they already providing medical at the jail?

 7         A. Yes, sir.  All the contracts -- I came into

 8    that position in the middle of a fiscal year; so all

 9    contracts were already in place and operational,

10    whether it's Turn Key or your commissary contracts

11    like that.

12         Q. When you became sheriff in October of 2017,

13    did you review the contract between the

14    Cleveland County -- well, Cleveland County and

15    Turn Key?

16         A. Review the formal contract?  No.

17         Q. Okay.  Were you aware, at any time prior to

18    January of '18, of what your rights were as the

19    sheriff of Cleveland County to terminate the contract

20    between Cleveland County and Turn Key?

21         A. No.

22         Q. Were you aware, prior to January of '18, what

23    your rights were under the contract to refuse to

24    allow any specific employee of Turn Key to provide

25    medical services in the Cleveland County jail?
```

1      A. No.

2      Q. Did you do anything to make yourself aware of

3   your rights and duties under the contract with

4   Turn Key?

5      A. I had a meeting with Turn Key executives

6   early on in my taking on that role as the interim

7   sheriff.  Sometime between October and this date,

8   that three-month period, I had sat down with Turn Key

9   executives and discussed their contract and the

10   future of their contract and if we would be

11   continuing at the term of the current contract.  But

12   I was not under any impression that I could change a

13   contract that was already existing or ongoing because

14   the county already had an agreement with them.  And

15   technically, those contracts are signed off on by the

16   board of county commissioners, not by me

17   specifically.

18      Q. I will hand you -- we'll mark it as 2.

19   CCO -- CCSO154 through 164.

20          (Exhibit 2 marked.)

21      Q. (By Mr. Hicks)  And it's what's been provided

22   to us as the contract between Cleveland County and

23   Turn Key.

24      Have you seen this contract before?

25      A. No, sir.

1          Q. We'll go through it here in a little bit, but

2     I just wanted to identify it at this point.

3          You have no idea what your rights and

4     obligations are under this contract -- or you had no

5     idea prior to January of '18; true?

6          A. Yes, sir.

7          Q. Tell me about your meeting with the Turn Key

8     rep that occurred sometime after October of 2017

9     before this incident.  What was specifically -- you

10    kind of gave me an overview of what you discussed,

11    but tell me as much as you can remember about the

12    specifics of that conversation.

13         A. It was over a lunch.  And we talked about

14    kind of their position in the marketplace and kind of

15    the services that they provided at the

16    Cleveland County detention --

17              MS. DARK:  Hold on.

18              MR. HICKS:  Let's go off the record.

19              THE MONITOR:  Going off the record.  The

20    time is 9:26 a.m.

21              (Break was taken: 9:26 a.m. to 9:27 a.m.)

22              THE MONITOR:  We are back on the record.

23    The time is 9:27 a.m.

24         Q. (By Mr. Hicks)  All right.  We had a little

25    Zoom hiccup; so we'll get back going.

1       A. No, sir.

2       Q. So you met with mister -- or excuse me -- you

3   had some conversation -- did you meet with mister

4   Junod Flint?

5       A. Prior to that?

6       Q. Prior to January of '18, did you have an

7   in-person meeting, or was this just phone

8   conversations?

9       A. It would be purely speculation, but I believe

10  it was just over the phone.  Now, we have met in

11  person on numerous occasions.  But that -- up

12  until -- because it's such a short time frame, I'm

13  going to say it was over the phone.

14      Q. Okay.  And I don't want you to guess or

15  speculate --

16      A. Right.  I don't want to.

17      Q. -- if you recall --

18      A. I don't recall a specific in-person meeting.

19      Q. You do recall having phone conversations

20  prior to January of '18?

21      A. Yes.

22      Q. With Mr. Junod or whatever his last name

23  might --

24      A. Yes, sir.

25      Q. What was the content -- the specific content

```
 1    of those conversations, to the best of your

 2    recollection?

 3         A. I don't remember specifics.

 4         Q. Did you discuss -- strike that.

 5          Did you have any paperwork or documents that

 6    you referred to in those conversations?

 7         A. No.

 8         Q. Did Mr. Junod have any paperwork or documents

 9    that you felt like he was referring to, like it

10    seemed like he was reading from something?

11         A. No, sir.

12         Q. So it's fair to say, then, that you guys did

13    not review the policies for Cleveland County

14    Detention Center in those conversations?

15         A. These policies (indicating)?

16         Q. Yes.

17         A. No, sir.

18         Q. Is it fair to say you did not review the

19    policies for Turn Key Health Clinics in those

20    conversations?

21         A. Correct.

22         Q. At any point prior to January of '18, did you

23    sit down with a Turn Key employee or representative

24    and review the policies of the Cleveland County

25    Detention Center?
```

1   role as a sheriff of Cleveland County?

2        A. Making sure that we were providing the

3   services to our community of sheriff.

4        Q. Okay.  One of those services being medical

5   for prisoners in the Cleveland County Detention

6   Center?

7        A. Yes, sir.

8        Q. Okay.  Did you talk to anyone else at

9   Turn Key, prior to January of 2018, besides your

10  meeting with Mr. Echols and your phone

11  conversation -- is it a conversation or multiple

12  conversations with Mr. Junod?

13       A. I don't recall.  I will say a conversation.

14       Q. And your phone conversation with Mr. Junod?

15       A. No, sir.

16       Q. So, to your recollection, you had one lunch

17  meeting with John Echols and one phone conversation

18  with Mr. Junod, prior to January of '18, with -- of

19  all the people at Turn Key?

20       A. Yes, sir.

21       Q. Okay.  And you spoke with no one else at

22  Turn Key prior to January of 2018?

23       A. Not that I remember.

24       Q. Okay.  Did you ever speak with Clayton

25  Rickert prior to January of 2018?

```
 1        A. No, sir.
 2        Q. Did you do any sort of evaluation of his --
 3   let me back up.
 4        Was Clayton Rickert the LPN from Turn Key at
 5   the Cleveland County Detention Center when you took
 6   role as sheriff?  Was he already there?
 7        A. Yes, sir.
 8        Q. Did you do anything to determine whether
 9   Clayton Rickert, as opposed to Turn Key as a whole --
10   just Clayton Rickert -- was a good fit as an LPN
11   nurse at the Cleveland County Detention Center prior
12   to January of 2018?
13        A. No, sir.
14            MR. WINTER:  Form.  Anthony.
15        Q. (By Mr. Hicks)  Did you look at his personnel
16   file?
17        A. No, sir.
18        Q. Ask anybody about like how he's doing as an
19   employee, perhaps one of your subordinates?
20        A. No, sir.
21        Q. Anything at all?
22        A. (Shakes head.)
23        Q. Okay.  And that was a no?
24        A. Yeah.  I'm sorry.  No, sir.
25        Q. It's my understanding that Clayton Rickert
```

1    was the most medically trained human being in the

2    Cleveland County Detention Center on January 16th,

3    2018, when Marconia Kessee was there.  Is -- am I

4    wrong in that?

5              MR. WINTER:  Form.

6              THE WITNESS:  To my knowledge, that's

7    correct.

8         Q. (By Mr. Hicks)  Was there anyone else -- and

9    I understand your jailers had CPR and basic first

10   aid.  But was there anyone else in the jail at the

11   same time Marconia Kessee was there, to your

12   knowledge, who had any medical training beyond your

13   basic jailer type training?

14        A. Not that I know of.

15        Q. I think there might have been like a

16   Kurt Russell, ACMA.  And I don't even know what ACMA

17   means.  But do you know who that is?

18        A. No, sir.  And I don't know what ACMA means

19   either.

20        Q. Have you ever spoken with Kurt Russell?

21        A. No, sir.

22        Q. Okay.  Are you even aware that -- were you

23   even aware as to whether or not he was an employee of

24   Turn Key?

25        A. I was not even aware he or Mr. Rickerts were

1    procedures and policies?

2             MR. WINTER:   Same.

3        Q. (By Mr. Hicks)   Those medical staff that are

4    in your jail providing medical care?

5        A. Yes, sir.

6        Q. Did you do anything to ensure, prior to

7    January of 2018, that the Turn Key medical staff was

8    familiar with the Cleveland County Detention Center

9    policies and procedures?

10       A. I had no reason to believe that they weren't

11   aware.  We were in the middle of a contract, and I

12   had no indication that there were any problems, that

13   they hadn't or didn't.  So, no.

14       Q. To be clear, you did nothing to make sure

15   that Clayton Rickert or other employees of Turn Key

16   were familiar with the policies and procedures of the

17   Cleveland County Detention Center with regard to

18   provision of medical care; true?

19       A. True.

20       Q. Why is it important for the medical staff,

21   whether it be -- whether they be employed by Turn Key

22   or anyone else, in your jail -- and when I say "your

23   jail," the Cleveland County Detention Center.  It's

24   just really long to say that.

25             Why is it --

```
 1        Q. Do you know, or did you know back then,
 2   whether anything was actually being rehearsed
 3   whatsoever?
 4        A. Well, as part of my review process and my
 5   discussion, I knew that we -- we practiced for
 6   ambulances and fire trucks coming into the facility.
 7   So I know they have a practice of going through those
 8   exercises so that when it occurs, it's done
 9   appropriately.  But during that three-month period
10   that I was newly in that position, did I know details
11   of it?  No.
12        Q. Okay.  We discussed a little bit about review
13   processes and annual reviews.  Is there a particular
14   date of the year that that all occurs?
15        A. No, sir.
16        Q. How do we know it's actually occurring
17   annually?
18        A. Because we're constantly -- well, under my
19   administration, we were constantly reviewing our
20   processes and policies of operations.
21        Q. Just not in the first three months?
22        A. Right.
23        Q. So when did you start --
24        A. Well, I would argue that we maybe did in the
25   first three months when I sat down with the jail
```

```
 1    chief and got a review of the jail operations.
 2         Q. But that didn't include actually looking at
 3    the policies, did it?
 4         A. No, sir.
 5         Q. That didn't include actually talking about
 6    the individual jailers' evaluations of performance,
 7    whether they were actually meeting those policies,
 8    did it?
 9         A. Correct.
10         Q. That didn't include determining whether
11    Clayton Rickert or anyone at Turn Key was doing --
12    was actually meeting the expectations of the policy
13    and providing adequate medical treatment, did it?
14         A. No.
15         Q. Okay.  No?  Did you say no, it did not
16    include that?
17         A. To clarify, I did not have any specific
18    conversation about Clayton Rickerts prior to
19    January 16th, 2018.  During a review, I was given no
20    indication that there were any issues with the jail
21    or its staff.
22         Q. Did you ask?
23         A. I asked for a review of the facility.
24         Q. Did you ask about the medical provisions of
25    the jail, the medical staff?
```

```
 1        Q. Do you believe it's important to have a full
 2   understanding of policies and procedures and the
 3   operations of your jail and actually read those
 4   policies and procedures way before a full year of
 5   being the sheriff in Cleveland County?
 6             MS. DARK:  Object to the form.
 7             THE WITNESS:  I believe it's important that
 8   staff is aware and operating appropriately inside the
 9   jail.  For me to go through and individually read
10   each policy of the jail, I don't know that that's as
11   important as having the right people running the
12   jail.
13        Q. (By Mr. Hicks)  Who was the sheriff before
14   you?
15        A. Joe Lester.
16        Q. What are your critiques of Joe Lester?
17             MS. DARK:  Object to the form.
18             THE WITNESS:  That would be personal
19   speculation.
20        Q. (By Mr. Hicks)  What is your personal
21   speculation critiques of Joe Lester?
22        A. He's a great politician, a terrible sheriff.
23        Q. Why?  Other than the money?  We talked about
24   the money.
25        A. Because I don't think that he -- I think he
```

```
 1          A. Not at the level I am today.

 2          Q. You had some awareness?

 3          A. Yes, sir.

 4          Q. You knew something wasn't running the way it

 5     should be --

 6          A. And he resigned under controversy.

 7          Q. Doesn't that give you all the more reason to

 8     be reviewing the policies and procedures at what you

 9     say was the best jail in Oklahoma?

10          A. No, sir.

11              MS. DARK:  Object to the form.

12              THE WITNESS:  No, sir.

13          Q. (By Mr. Hicks)  Well, it's got Joe Lester's

14     signature on it, and you wouldn't let him be your

15     number 2 at the City of Moore, you won't even let

16     Rhett Burnett be in the building, but you don't think

17     that you should take a look to see what kind of

18     policies he put out before -- like probably

19     immediately?

20          A. Well, as I said, I did a review.  But I -- as

21     I understood your previous question, it was did I

22     know every policy?  No, I did not know every policy.

23     I think I previously stated that I had signed off on

24     these policies and accepted these policies under my

25     authority.
```

1    sheriff's office in that three-month period, it was

2    clear to see that the operations of the jail was

3    probably one of our highest functioning areas.  But

4    my biggest problems were, quite frankly, patrol.

5         Q. So you didn't have an evaluation of the

6    jailers, you hadn't looked at the Turn Key policy or

7    the entirety of the Cleveland County Detention Center

8    policy, you didn't even know Clayton Rickert was in

9    your building, and you would state that coming in as

10   sheriff in October of 2017, the jail was tip-top, it

11   was good to go for you?

12             MS. DARK:  Object to the form.

13             THE WITNESS:  It was functioning at a

14   high level, yes, sir.

15        Q. (By Mr. Hicks)  And my question is:  If you

16   didn't do any of these things, how do you know that

17   it was functioning at a high level --

18             MS. DARK:  Object to --

19        Q. (By Mr. Hicks)  -- other than reputation?

20             MS. DARK:  Object to the form.

21             THE WITNESS:  Well, as I said, I spoke with

22   Turn Key initially, got a review.  I spoke with my

23   staff, got a review of the jail, and was given no

24   indication that there were any problems.  So I didn't

25   just rely on reputation or speculation.  I did

 1     some -- I put forth some effort to determine if my

 2     assumption or what I deemed as the reputation of the

 3     jail was true and accurate.

 4              MS. DARK:  Is now a good time for another

 5     break?

 6              MR. HICKS:  Sure.

 7              THE MONITOR:  Going off the record.  The

 8     time is 11:07 a.m.

 9              (Break was taken: 11:07 a.m. to 11:22 a.m.)

10              THE MONITOR:  We are back on the record.

11     The time is 11:22 a.m.

12         Q. (By Mr. Hicks)  All right.  Do you understand

13     you're still under oath?

14         A. Yes, sir.

15         Q. And is there anything about your past answers

16     you want to change or add to?

17         A. No, sir.

18         Q. Still on page 312 of the policies and

19     procedures -- or Bates 312 -- and I'm looking at

20     paragraph number 9.  It says:

21              "Progress in attaining all objectives

22         and will be monitored monthly by the

23         administrator to insure appropriate programs

24         and procedures are in effect."

25         Do you see that?

Todd Gibson
3/18/2021                                                              Page: 130

```
 1              THE WITNESS:  Talking with staff.
 2        Q. (By Mr. Hicks)  Right.  And assuming that
 3   they would tell you?
 4        A. Yes.  I had no reason to believe that they
 5   were not telling me the truth and had no incidents
 6   of -- prior knowledge of any incidents or
 7   deficiencies at the jail.
 8        Q. Did you look, prior to January of 2018, to
 9   determine whether there were any prior incidents with
10   the jail?  And specifically regarding provision of
11   medical care?
12        A. No, sir -- well, look?  Like --
13        Q. Did you do any research to see if there was
14   any prior incidents?
15        A. No.  Because I had not heard of any.  So...
16        Q. Were you aware that one, two, three, four,
17   five, six lawsuits had been filed prior to
18   January 2018 related to provision of medical care at
19   Cleveland County by Turn Key?
20              MR. WINTER:  Form.
21              THE WITNESS:  I knew that I had inherited
22   some lawsuits from the previous administration, but I
23   was not -- I did not have details of each of those.
24        Q. (By Mr. Hicks)  Were you aware that in 2012
25   an inmate claims a failure to provide adequate
```

1    medical care?

2        A. No.

3        Q. Were you aware that in 2011, an inmate

4    claimed that there was a failure to provide adequate

5    medical care by --

6        A. No.

7        Q. Was that a no?

8        A. I'm sorry.  Were you finished?

9        Q. No.  I just didn't hear you.

10       A. Oh, yes.  No.  I was not aware of the 2011

11   incident.

12       Q. Were you aware in 2015 that an inmate claimed

13   deliberate indifference to medical needs and

14   negligence against the jail and Turn Key?

15       A. No.

16           MR. WINTER:  Form.

17       Q. (By Mr. Hicks)  Were you aware in 2017, a

18   different inmate claimed failure to provide adequate

19   medical care by Cleveland County and Turn Key?

20           MS. DARK:  Object to the form.

21           MR. WINTER:  Same.

22           THE WITNESS:  Without -- with the

23   information you're providing me, no, I don't recall

24   any specific incident of that.

25       Q. (By Mr. Hicks)  Were you aware that there was

1     a second incident in 2015 where an inmate claimed a

2     failure to provide adequate medical care?

3          A. '15?

4          Q. 2015.

5          A. No, sir.

6          Q. Were you aware there was a second incident in

7     2017 where an inmate claimed that they died at

8     Cleveland County --

9          A. They did die or they claimed that they died?

10         Q. Well, I assume they died.  They claim that it

11    was due to actions of the Cleveland County Detention

12    Center and Turn Key.

13              MS. DARK:  Object to the form.

14              MR. WINTER:  Form.

15              THE WITNESS:  No, sir.

16         Q. (By Mr. Hicks)  I'm going to mark --

17         A. Without any more details, it would be

18    difficult -- I mean, there might have been things in

19    the news, but, no, sir.

20         Q. This was produced by Turn Key.  It's Turn Key

21    192.

22              (Exhibit 6 marked.)

23         Q. (By Mr. Hicks)  Have you ever seen that

24    document before?

25         A. No, sir.

Todd Gibson
3/18/2021

Page: 133

```
1        Q. Did you ask about any prior lawsuits of
2   Cleveland County Detention Center regarding provision
3   of medical care prior to January of 2018?
4        A. No, sir.
5        Q. You just assumed that someone would tell you?
6        A. Well, I knew that we had lawsuits.  I don't
7   know the detail of the -- the fact that they were
8   regarding medical care.
9        Q. And did you ask what deficiencies those
10  lawsuits were claiming with regard to medical care at
11  Cleveland County?
12       A. No, sir.
13       Q. Would it be important --
14          (Reporter clarification.)
15       Q. (By Mr. Hicks)  Would it be important, if
16  someone is claiming that they got deficient medical
17  care, to figure out what they're claiming and see if
18  it was something you could correct?
19          MS. DARK:  Object to the form.
20          MR. WINTER:  Form.
21          THE WITNESS:  If that happened, we would
22  want to look into it, yes.
23       Q. (By Mr. Hicks)  Well, it looks like it
24  happened six times.
25          MR. WINTER:  Form.
```

1      A. Yes.

2      Q. Right?

3           MS. DARK:  Object to the form.

4      Q. (By Mr. Hicks)  Yes?

5      A. We need to have -- we need to have adequate

6   health services at the jail.

7      Q. Okay.  And by just assuming that Turn Key's

8   policies, procedures, and practices are adequate to

9   meet the jail standards that you haven't read and the

10  policy, you would need to know what those procedures

11  say?

12          MS. DARK:  Object to the form.

13          THE WITNESS:  I don't think that I need to

14  know the individual word-for-word details of the

15  Turn Key contract.  I think I discussed with Turn Key

16  their services and how they provide service too.  I

17  did research to know that they are an industry

18  leader.  And I consulted with the leadership at the

19  jail to ensure that there were no deficiencies or

20  problems.  I, up and to this point, up until the

21  moment that we're discussing today, had no prior

22  knowledge of any incidents or concerns at the jail.

23     Q. (By Mr. Hicks)  I assume, then, that you're

24  not aware that Turn Key was sued for failure to

25  provide medical care in the Garfield County Jail in

```
 1    2016?

 2          A. Is that on this?

 3          Q. No?

 4              MS. DARK:  Form.

 5          Q. (By Mr. Hicks)  It's available on public

 6    record.

 7          A. Okay.

 8          Q. You didn't to that; right?  You didn't --

 9          A. I wasn't --

10          Q. -- look that up?

11          A. I wasn't aware of that.

12          Q. You didn't look up the Canadian County case

13    in 2016, did you?

14              MR. WINTER:  Same.

15          Q. (By Mr. Hicks)  You didn't look up the

16    Canadian County case in 2016 where an El Reno man

17    died after being found naked, unconscious, and

18    covered in his own waste in a cell in the

19    Canadian County Detention Center under Turn Key's --

20    ostensibly under the care of Turn Key medical staff.

21              MR. WINTER:  Form.

22          Q. (By Mr. Hicks)  The office of the chief

23    medical examiner found that that man had experienced

24    a seizure in the days before his death.

25          You didn't look that case up, did you?
```

1        A. No, sir.

2        Q. You didn't look the Creek County case up from

3    2016?

4        A. I didn't look up any cases, sir.

5        Q. So this whole list right here that I've got,

6    you're not aware of any of them?

7        A. No, sir.

8        Q. And I've got one, two, three, four, five,

9    six, seven cases in addition to the six cases that

10   are on the list that you've got.  So that's 13 cases

11   from '16 -- that's '16 -- 2016, 2016, 2016, 2016,

12   2017, 2016, and 2016, all within a couple of years of

13   this incident and you being the sheriff and deciding

14   that Turn Key was the way to go and the best in the

15   state.  You didn't know any of those 13 cases, did

16   you?

17       A. Are they at the Cleveland County Jail, sir?

18       Q. No.  But they're available on public

19   record --

20       A. No, sir.

21       Q. -- and they're all in Oklahoma.

22       A. No, sir.  I did not.

23       Q. You didn't look those up?

24       A. No, sir.

25           MR. WINTER:  Jason, are you -- are you

1   referencing a document to be marked as an exhibit?

2   Or what are you talking about, these two lists?  I'm

3   kind of confused.

4           MR. HICKS:  The current document is not an

5   exhibit.

6           MR. WINTER:  And the "current one," is that

7   the one that references suits outside of the

8   Cleveland County Jail, just so I'm following?

9           MR. HICKS:  Yeah.  It's just some notes

10  that I did, you know, 20 minutes of research.  It was

11  pretty easy to do.

12          MR. WINTER:  Do you mind marking that as an

13  exhibit so I can kind of see that at a later date or

14  at least allow me to review that document?

15          MR. HICKS:  We can talk about it.  I only

16  have one copy, and it's all marked up, so -- but we

17  can look at getting you the cases that I'm referring

18  to for sure.  I mean --

19          MR. WINTER:  Okay.  And a list -- and I

20  don't need your annotations, but a list of whatever

21  you're looking at and you're questioning Mr. Gibson

22  on I'd like.  Thank you.

23          MR. HICKS:  Sure.  Yeah.  No problem.

24      Q.  (By Mr. Hicks)  If you'll go to paragraph 2

25  on 5-8, it says:  Medical triage screening shall be

1          Q. (By Mr. Hicks)  Would you agree that you

2     can't determine whether someone is unconscious or

3     sleeping in one second?

4               MS. DARK:  Object to the form.

5               MR. WINTER:  Form.

6               THE WITNESS:  Well, I think you can tell if

7     somebody is alive within that second.

8          Q. (By Mr. Hicks)  How?

9               MS. DARK:  Object to the form.

10              THE WITNESS:  A variety of ways.  Maybe

11    they saw movement, maybe they saw rising and falling

12    with the chest.  You would have to ask them what they

13    saw that led them to believe that he wasn't in some

14    sort of distress or emergency.

15         Q. (By Mr. Hicks)  And you believe, under

16    policy, one second is long enough to make those

17    determinations?

18              MR. WINTER:  Same.

19              THE WITNESS:  I believe that they complied

20    with the policy.

21         Q. (By Mr. Hicks)  And even though Rickert is

22    the person who you said would be most responsible for

23    determining whether Marconia was faking as opposed to

24    having a real injury, you have no criticism of the

25    fact that he didn't come back to look at Marconia for

1    responsible for ensuring that gets done.

2         Q. Who is that training member --

3         A. It's --

4         Q. -- or was it back in --

5         A. I think it was Lieutenant Keller at that

6    point.

7         Q. Keller?

8         A. Keller.

9         Q. K-E-L-L-E-R?

10        A. Yes, sir.

11        Q. Okay.  Does Lieutenant Keller provide any

12   sort of written documentation of this in-service

13   training to either show it happened or anything more

14   specifically, like handouts to show what was said?

15   Did he do that back when you were sheriff?

16        A. I'm not sure.  You'd have to ask him.

17        Q. Okay.  Do you have any oversight or knowledge

18   of what Mr. Keller actually did regarding in-service

19   training when you were sheriff?

20        A. As far as --

21        Q. Do you have any knowledge of what he actually

22   did for in-service training when you were sheriff?

23        A. I remember doing CPR -- within that

24   three-month?  No.  He was in that position for some

25   time, and there was a host of training that he

1    conducted during that time, whether it's defensive

2    tactics, jail academy, jail standards.

3          During that three-month time period that we're

4    discussing there, I don't know any specific courses

5    that he conducted.

6          Q. So, based on your understanding of your

7    policy, what is he supposed to be doing to show that

8    he's actually training these people and what he's

9    training them on, if anything?

10         A. He's supposed to be hosting classes,

11   documenting training, continued educational training

12   in a variety of areas related to the operations of

13   the jail.

14         Q. If you will go to the next page.  How do we

15   prove that he does it?  Is it -- is there any

16   documents that exist in the world that show the

17   training contents that Mr. Keller provided for

18   in-service training?

19         A. Individual training records, you would have

20   to go back to --

21         Q. I've got the individual training -- I guess

22   I've got the individual training records for all the

23   jailers.

24         What I'm asking for is the substance, the

25   outlines --

1        A. You want the materials --

2        Q. -- the visual aids, the materials.

3        A. Oh, okay.  I'm sorry.  I wasn't tracking

4    there.

5        I don't know where that would be.  I don't know

6    that Lieutenant Keller has that.  And I don't have

7    that.

8        Q. Do you know if that ever existed?  Was there

9    ever an outline?  Was there ever a visual aid?

10   You know, a PowerPoint?

11       A. It would -- it would be depicted on each

12   individual class.  Yes.  He commonly used PowerPoint

13   to present a class.  I know that he did maintain our

14   CLEET accreditation standards or our CLEET training

15   standards.  He was our interface through CLEET,

16   Council on Law Enforcement Education and Training,

17   and he routinely worked with them on the particulars

18   of.

19       Absent the training file, where is those --

20   where are those documents?  Do I know that every

21   class he had was CLEET accredited?  I can't answer

22   that.

23       Q. Well, here's part of why I'm asking.  If you

24   will go to 336, if you're not already there.

25       A. Yes, sir.

1    what he specifically meant by the words.

2        Q.  (By Mr. Hicks)  He says -- Mr. Hammons says

3    basically:  "I'm going to go out on a limb and say

4    that you don't actually treat like that -- everyone

5    like that."  I'm paraphrasing.  And I'm on

6    deposition -- Shifflett's deposition 139, starting at

7    line 17.  Chris' deal is rather long.

8        So Mr. Shifflett's says:  "That's actually

9    false."

10       And starting on 140, starting at 7:  "That's

11   not how you treat everybody in your everyday life?"

12       Answer:  "I talk to people like that.  I truly

13   do.  You can ask my coworkers.  You can ask whoever

14   you want.  That's the way I talk."

15       "Okay.  And every inmate, whether they're poor,

16   black, and mentally ill like Marconia, or if they're

17   rich, white, and well-to-do, gets the same kind of

18   'fuck his ass' treatment by you?"

19       "It doesn't matter on anything.  I treat

20   everybody the same."

21       I can keep going with more discussion on that.

22   But we're talking about treatment.  He said, "I treat

23   everyone the same.  Everyone gets the same 'fuck his

24   ass' treatment, whether they're rich or poor, black

25   or white."

```
1                MS. DARK:  Object to form.
2        Q.  (By Mr. Hicks)  Is that treatment, the
3   "fuck his ass" treatment that Mr. Shifflett
4   described, is that consistent with the values and
5   expectations at Cleveland County Detention Center?
6                MS. DARK:  Object to the form.
7                THE WITNESS:  No.
8        Q.  (By Mr. Hicks)  Okay.  You only disciplined
9   him for saying the words, not the treatment; true?
10       A.  Correct.
11       Q.  Okay.  You didn't find any problem with his
12   treatment --
13               MS. DARK:  Object to the form.
14       Q.  (By Mr. Hicks)  -- of Mr. Kessee?
15       A.  No.
16       Q.  Okay.  It is okay for jailers to assume
17   immediately that everyone in there is just trying
18   to -- everyone in here -- there who is acting sick or
19   injured or whatever is trying to fake an illness to
20   get out of jail?
21               MR. WINTER:  Form.
22       Q.  (By Mr. Hicks)  Is that okay with you?
23               MS. DARK:  Object to the form.
24               THE WITNESS:  No.
25       Q.  (By Mr. Hicks)  What have you done to -- or
```

1          Would you consider Marconia to have been

2    resistant?

3          A. I mean, he was definitely uncooperative.

4          Q. Was he acting --

5          A. And, yes, resistant, if he was biting --

6    trying to bite them.

7          Q. Was he what you would consider to be

8    aggressive?

9          A. Yes.

10         Q. If you will go to CCSO435.

11         A. 435?

12         Q. Uh-huh.

13         A. Yes, sir.

14         Q. The second full paragraph says:

15              "Personnel involved in response to

16         resistance to aggression shall complete the

17         proper documentation post response.

18         Documentation to response outside of

19         Cleveland County Detention Center shall

20         include Response to Resistant & Aggressive

21         Persons Contact Form.  Documentation to

22         response inside the Cleveland County

23         Detention Center shall include the Response

24         to Resistant & Aggressive Persons Contact

25         Form - Detention.  See attachment for

```
 1        examples."
 2            Do you see that?
 3        A. Yes, sir.
 4        Q. I could not find in our discovery the
 5   Response to Resistant & Aggressive Persons Contact
 6   Form for Mr. Kessee.
 7        A. Uh-huh.
 8        Q. Does that form exist?
 9        A. I have not seen it.
10            MS. DARK:  Objection to the form.
11        Q. (By Mr. Hicks)  To your knowledge, does that
12   form exist?
13        A. The personal contact form for Mr. Kessee, I
14   haven't seen it.
15        Q. The Response to Resistant & Aggressive
16   Persons Contact Form - Detention, I guess would be
17   the right form.
18        A. I know we have documentation of use of force
19   in the jail.  I don't know of that specific form, but
20   we do have a process for documenting the use of
21   force.
22        Q. Okay.  Your policy has this form.  It's
23   important to follow the policies, true?
24        A. Yes.
25            MS. DARK:  Object to the form.
```

1          Q. (By Mr. Hicks)  It's important -- you made a

2    form -- or you included a form because you felt like

3    a form was important; true?

4               MS. DARK:  Object to the form.

5               THE WITNESS:  I didn't make the form, sir.

6          Q. (By Mr. Hicks)  Well, you included it in your

7    policies because you felt like the form was

8    important; true?

9               MS. DARK:  Same objection.

10              THE WITNESS:  Yes.

11         Q. (By Mr. Hicks)  The form likely contains

12   references to information to make sure that the

13   documentation -- the documentation of resistant and

14   aggressive persons is complete and accurate; true?

15         A. Yes.

16         Q. And you expect your jailers to -- if they

17   experience a resistant or aggressive inmate, to fill

18   out the form that you put in the policy, true?

19              MS. DARK:  Object to the form.

20              THE WITNESS:  Yes.

21         Q. (By Mr. Hicks)  And there's no such form in

22   this case; true?

23         A. I don't know that.

24         Q. I don't have one.  So...

25         A. Okay.

1       Q. So the only conclusion that I could reach, if

2    there's no form, is either that Mr. Kessee was not

3    considered resistant or aggressive or your jailers

4    violated this policy.  Which is it?

5            MS. DARK:  Object to the form.

6            THE WITNESS:  In the Kessee case, I would

7    think that the form probably would have been omitted.

8    Is the question does the form exist?  Or did those

9    deputies fill the form out?

10       Q. (By Mr. Hicks)  Does the form exist?

11       A. If it does, I'm not directly aware of it.

12    I'm making an assumption it does because it's in

13    policy.

14       Q. So let's assume that it exists and it's not

15    filled out because I trust that your lawyers would

16    have sent it to me if it was.

17            Either Mr. Kessee was not being resistant or

18    aggressive, in the opinion of your jailers at the

19    time, or they violated this policy.

20       A. Once the --

21            MS. DARK:  Object to the form.

22       Q. (By Mr. Hicks)  Which is it?

23       A. Neither.  Once they are subject employees of

24    the criminal investigation, I could see where they

25    would not fill out that form because it would be part

1    or the other, which one it was?

2         A. I'm -- I was not able to determine which one

3    it was.

4         Q. If you'll turn the page.  Going back to that,

5    you would agree, though, that if someone -- somebody

6    would have filled that form out if Mr. Kessee was

7    resistant because that's what the policy says?

8         A. If mister --

9              MS. DARK:  Object to the form.

10             THE WITNESS:  If Mr. Kessee had not passed

11   away, at some point in time that evening, I would say

12   yes, I would see a use of force report being

13   completed.

14        Q. (By Mr. Hicks)  And correct me if I'm wrong.

15   To me it seems that where an inmate ultimately dies,

16   the prior uses of force would be all the more

17   important to know.  And this one would be probably

18   more important than if he had walked home and went on

19   with his life.  Would you not agree with that?

20             MS. DARK:  Object to the form.

21             THE WITNESS:  That's why a third-party

22   entity, like the OSBI, would come in and do a

23   detailed investigation in their view on that force

24   used.

25        Q. (By Mr. Hicks)  If you will go to the next

1        Q. (By Mr. Hicks)  Okay.  And then, on number 7,

2    with regard to detox, it says:  "The initial detox

3    period is critical."

4        Why is the initial detox period critical?

5        A. Because we don't want to -- them -- if

6    they're intoxicated, while they're detoxing, we

7    don't -- when somebody is coming into a facility,

8    they could be coming up or coming down on their

9    detox, we don't know.  And if they're going up, they

10   could go into a severe medical condition that

11   requires immediate attention.  If they're cycling

12   down, then it's not as important, and we know that

13   they're sleeping it off or they're coming down.

14       Q. Right.  And then, on the next line, it says

15   because this is when the majority of suicides and

16   critical incidents will occur.  And vigilance is a

17   must.

18       Okay.  I want to make sure I'm clear.  Is this

19   why Mr. Kessee was under critical observation?

20       A. Yes, sir.

21       Q. So this is the policy that applies.

22       Why is vigilance a must for Mr. Kessee, under

23   this policy?

24           MS. DARK:  Object to the form.

25           MR. WINTER:  Form.