IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

(1) PATRICIA THOMPSON, as      )
Personal Representative of the )
Estate of MARCONIA LYNN        )
KESSEE,                        )
                               )
        Plaintiff,             )
                               )
-vs-                           )      No. CIV-19-113-SLP
                               )
(1) NORMAN REGIONAL HOSPITAL   )
AUTHORITY d/b/a NORMAN         )
REGIONAL HOSPITAL, a public    )
trust, et al.,                 )
                               )
        Defendants.            )



* * * * * *

VIDEOCONFERENCE DEPOSITION OF WILLIAM COOPER, D.O.

TAKEN ON BEHALF OF THE PLAINTIFF

IN OKLAHOMA CITY, OKLAHOMA

ON FEBRUARY 8, 2021

COMMENCING AT 9:04 A.M.

* * * * * *

REPORTED BY:  BETH A. McGINLEY, CSR, RPR

INSTASCRIPT, LLC
125 PARK AVENUE, LL
OKLAHOMA CITY, OKLAHOMA 73102
schedule@instascript.net
Phone:(405)605-6880 Fax:(405)605-6881

EXHIBIT
15

Dr. William Cooper (Lunch $65.67)
2/8/2021                                                      Page 11

```
 1        A    Certainly.

 2        Q    Okay.  And I might just say "Doctor" at times,

 3   that's just a habit.  Is that okay?

 4        A    Yes.

 5        Q    Okay.  Dr. Cooper, have you seen this notice

 6   that we sent over to Turn Key?

 7        A    Yes.

 8        Q    Okay.  Now, are you currently an officer or

 9   director of Turn Key?

10        A    I'm the chief medical officer.

11        Q    Chief medical officer.  Okay.  And for lack of

12   better words or terms, is that some sort of managing

13   agent within Turn Key?

14        A    Yes.

15        Q    Okay.  And if you could, just briefly describe

16   what your functions and responsibilities and duties are

17   in that job.

18        A    I mostly oversee the providers, the physicians

19   and nurse practitioners, and psychiatrists, also oversee

20   the dentists and the mental health professionals.

21        Q    Okay.  Would it be fair to say you're at the

22   top of the food chain for medical providers at Turn Key?

23        A    Yes.

24        Q    Okay.  And do -- and in that role, do you have

25   the power to exercise judgment or discretion on those
```

Dr. William Cooper (Lunch $65.67)
2/8/2021

```
 1    providers?

 2          A     Yes, I do.

 3                MR. YOUNG:   Object to the form.

 4          Q     (By Mr. Hammons) Sorry?   I --

 5          A     Yes -- yes, I do.

 6          Q     Okay.   For instance, you could -- you could

 7    hire or fire those individuals in your job?

 8          A     Correct.

 9          Q     Okay.   Now, within Exhibit 1, there's not a

10    lot of categories, but there's -- there's -- there's

11    seven categories of topics there, and have you had a

12    chance to look at those topics?

13          A     Yes.

14          Q     Okay.   And I take it, since you're sitting

15    here, some of these questions are going to be kind of

16    obvious, but I -- I have to ask them for the record,

17    okay?

18                Has Turn Key designated you to testify on its

19    behalf regarding those matters of examination contained

20    in Exhibit 1?

21          A     Yes.

22          Q     And do you have full authority to speak on

23    behalf of Turn Key?

24          A     Yes.

25          Q     Within Turn Key, is there a -- a person or a
```

```
 1    not Cleveland County?

 2         A    Those -- the policies and procedures for both

 3    sites is the same.

 4         Q    Grady County's policies and procedures are the

 5    same as Cleveland County's policies and procedures?

 6         A    The Turn Key policies and procedures are the

 7    same.

 8         Q    I gotcha.  Now, with respect to -- if you look

 9    under "Procedures" on Document -- on Exhibit 4, (A)

10    says, "Training includes the orientation to the specific

11    correctional facility regarding the following."  Do you

12    see that?

13         A    I do.

14         Q    Okay.  And was there specific orientation and

15    training, with respect to Clayton Rickert, for the

16    Cleveland County Detention Center?

17         A    I don't know.

18         Q    Okay.  At least there's no document in his

19    file that would indicate that was done; true?

20         A    True.

21         Q    And in your preparation to come here and give

22    testimony on these -- on this -- on these subjects, you

23    did not see any documentation or were provided any

24    information that would show that he went through any

25    orientation and training for the Cleveland County
```

```
 1    Detention Center; true?

 2         A     True.

 3               MR. YOUNG:   Object to the form.

 4         A     True.

 5         Q     (By Mr. Hammons) Now, have you -- have -- has

 6    Turn Key ever reviewed, as part of this contract,

 7    Cleveland County Detention Center's policies and

 8    procedures?

 9         A     Not to my knowledge.

10         Q     Okay.   Now, how is it that a Turn Key employee

11    can implement the policies and procedures at a Cleveland

12    County Detention Center if they don't know there is a

13    policy?

14               MR. YOUNG:   Object to the form.

15         A     I don't know.

16         Q     (By Mr. Hammons) Did you -- did you say you'd

17    never seen the Cleveland County Detention Center's

18    policies or -- I -- I --

19         A     I have.

20         Q     You have?

21         A     Uh-huh.

22         Q     Inside -- contained in the Cleveland County

23    Detention Center's policies and procedures, there are --

24    there's a lot of policy and procedure on inmate medical

25    care and the intake process; true?
```

```
 1    not, as -- under -- under this agreement you have with

 2    Cleveland County, whether the Cleveland County Detention

 3    Center implements training to Turn Key employees on

 4    their policy and procedures?

 5         A     Not to my knowledge.

 6         Q     Okay.  So it's fair to say a -- an individual

 7    like Clayton Rickert, when they show up at the Cleveland

 8    County Detention Center, do not know the Cleveland

 9    County Detention Center's policies and procedures?

10              MR. YOUNG:  Object to the form.

11         A     That's probably fair to say.

12         Q     (By Mr. Hammons) Okay.  Now, have you ever

13    taken Turn Key's policies and procedures and Cleveland

14    County Detention Center's policies and procedures, and

15    with respect -- we're just -- I'm specifically just

16    talking about inmate care -- okay? -- when I'm asking

17    about this.  I don't -- I don't care about the rest of

18    it, okay?

19              But with respect to the Cleveland County

20    Detention Center's policies and procedures and Turn

21    Key's policies and procedures, and match them up and see

22    if they're the same?

23         A     I haven't done that, personally.

24         Q     Okay.  So you -- as we sit here, Turn Key does

25    not know whether their policy and procedures are in line
```

```
 1    with the Cleveland County Detention Center's policy and

 2    procedures in -- regarding inmate care?

 3              MR. YOUNG:  Object to the form.

 4         A    Well, we ask the jails to review those and see

 5    if there's any discrepancies.

 6         Q    (By Mr. Hammons) Okay.  So the Cleveland

 7    County Detention Center is required to review Turn Key's

 8    policy and procedures and lay out any discrepancies

 9    between the two?

10         A    I wouldn't say that they're required to, but

11    they are asked to.

12         Q    Okay.  But isn't that important to know,

13    whether they actually did it or not?

14              MR. YOUNG:  Object to the form.

15         A    I guess.

16         Q    (By Mr. Hammons) Well, for instance, if the

17    Cleveland County Detention Center has a policy and

18    procedure that is completely different on how to

19    implement, say, suicide watch, than Turn Key's policy

20    and procedure, isn't that important to know?

21         A    Yes.

22         Q    And in this situation, Cleveland County

23    Detention Center and Turn Key, as it stands today, no

24    one looked at those policies and procedures to see if

25    they're the same, that you know of?
```

```
 1        A     I didn't.

 2              MR. YOUNG:   Object to -- object to the form.

 3        A     I didn't.

 4        Q     (By Mr. Hammons) Well, not only you didn't,

 5   Turn Key didn't?

 6        A     Not to my knowledge.

 7        Q     Okay.   And you've never had the Cleveland

 8   County Detention Center contact Turn Key and say, "There

 9   is a problem between your policies and our policies";

10   true?

11        A     True.

12        Q     But, specifically, the Cleveland County

13   Detention Center is asked to review those policies

14   and -- and compare them?

15        A     All the jails are, yes.

16        Q     Okay.   Why are they asked to do that?

17        A     To make sure that we're in compliance with

18   their policies and procedures.

19        Q     Right.   And, ultimately, because those -- that

20   could lead to confusion if those policies and procedures

21   aren't followed; true?

22        A     True.

23              MR. YOUNG:   Object to the form.

24        A     True.

25        Q     (By Mr. Hammons) It also could lead to
```

Dr. William Cooper (Lunch $65.67)
2/8/2021                                                          Page 33

```
 1    confusion between Turn Key staff and Cleveland County

 2    Detention Center staff, if they're both following

 3    different policy and procedures; true?

 4               MR. YOUNG:  Object to the form.

 5      A    True.

 6      Q    (By Mr. Hammons) And confusion could lead to

 7    mistakes; true?

 8      A    True.

 9               MR. YOUNG:  Object to the form.

10      Q    (By Mr. Hammons) Is there anything in the

11    contract between the Cleveland County Detention Center

12    and Turn Key that prohibits the Cleveland County

13    Detention Center from providing training to Turn Key

14    staffers regarding their policies and procedures?

15      A    Not that I recall.

16      Q    But, as far as you know, the Cleveland County

17    Detention Center does not do that for Turn Key

18    employees?

19      A    As far as I know, that's correct.

20      Q    And including back in January of 2018, that --

21    that remains the truth?

22      A    Correct.

23      Q    Okay.  Now, you have read Clayton Rickert's

24    deposition; true?

25      A    True.
```

```
 1        Q     Okay.  And I'm wondering:  Do you agree with

 2   Clayton Rickert that the Cleveland County Detention

 3   Center should carry the blame for not showing him their

 4   policies and procedures?

 5               MR. YOUNG:  Object to the form.

 6        A     Do I agree that they should share the blame?

 7        Q     (By Mr. Hammons)  Yes.

 8        A     No.

 9        Q     Why not?

10        A     He wasn't their employee.

11        Q     Okay.  Do you agree that Clayton Rickert

12   should have had training -- Turn Key should have

13   provided Clayton Rickert with training on the Cleveland

14   County Detention Center's policies and procedures?

15        A     No.

16        Q     Why not?

17        A     Well, we covered the detail within the --

18   like, the first part, right here, covers, you know, kind

19   of what it's like to work in a correctional setting and

20   that sort of thing, so I think that's what's necessary

21   for him to carry out his job duties.

22        Q     Now, is it anticipated by Turn Key that -- or

23   is it foreseeable that Turn Key's medical staff will

24   encounter inmates facing drug overdose?

25        A     That's possible.
```

Dr. William Cooper (Lunch $65.67)
2/8/2021                                                                    Page 35

```
 1        Q     Is it foreseeable that Turn Key's medical

 2    staff might encounter inmates facing detox?

 3        A     Yes.

 4        Q     Okay.  Most -- the Cleveland County Detention

 5    Center's policy and Turn Key's policy both actually

 6    address detox with specific policies and procedures;

 7    true?

 8        A     True.

 9        Q     And that's because it's a common occurrence;

10    true?

11              MR. YOUNG:  Object to the form.

12        A     True.

13        Q     (By Mr. Hammons) Drug-overdosing inmates is

14    also fairly common, too; true?

15        A     Not -- not true.

16              MR. YOUNG:  Object to the form.

17        A     Not true.

18        Q     (By Mr. Hammons) Okay.  When -- when it does

19    occur in -- strike that.

20              Detoxing is more common than drug overdose?

21        A     Much more common.

22        Q     Okay.  Both drug overdose and detox are

23    potentially life-threatening situations; true?

24        A     True.

25        Q     And Turn Key's medical staff must be able to
```

Dr. William Cooper (Lunch $65.67)
2/8/2021                                                                Page 36

```
 1    recognize and medically assess drug overdose and detox

 2    with respect to the Cleveland County Detention Center;

 3    true?

 4              MR. YOUNG:  Object to the form.

 5       A      They must be able to recognize a potentially

 6    bad outcome.

 7       Q      (By Mr. Hammons) And why should -- why do Turn

 8    Key's staff need to be able to recognize the signs of

 9    drug overdose?

10       A      To hopefully prevent a bad outcome.

11       Q      And then, on top of that, the medical staff

12    need to be trained to be able to assess a medical

13    condition; true?

14              MR. YOUNG:  Object to the form.

15       A      Well, not an LPN.

16       Q      (By Mr. Hammons) Okay.  So an LPN should not

17    be able to assess a medical condition?

18       A      Correct.

19       Q      In a situation like the Cleveland County

20    Detention Center, is it true that most of the shifts are

21    covered by LPNs?

22       A      Correct.

23       Q      So the LPN is not required to be able to

24    assess a medical condition; true?

25       A      True.
```

```
 1    through that with you.

 2         A    Okay.

 3         Q    That's a good point.

 4              Now, with respect to LPNs, during that

 5    interview process at Turn Key, it doesn't matter if

 6    they're able to assess a medical condition or not; true?

 7         A    True.

 8         Q    What is the role of an LPN in the jail setting

 9    like the Cleveland County Detention Center?

10         A    Their job is to assist in an assessment.  The

11    assessment takes place by an RN or higher, but their job

12    is to assist Cle- -- they fill out forms,

13    questionnaires, do vital signs.

14         Q    Okay.  Well, like, in a situation where an LPN

15    is the only medical staff on -- on duty, how does an

16    inmate get care if they're having an issue and the LPN

17    can't assess it?

18         A    Well, they're not the only ones on duty.

19    We're always on call, so they have access to an RN or a

20    nurse practitioner or a physician at all times.

21         Q    Okay.  So I guess the question is, is:  If an

22    LPN doesn't understand the medical condition, how is it

23    that they can call for help?

24         A    Use the telephone.

25         Q    Well, but if they don't understand it, they
```

```
 1        A    Yes.

 2        Q    Okay.  Does Turn Key provide any education or

 3   training to medical staff as to what the responsible

 4   health authority is?

 5        A    I believe that's covered in the orientation.

 6        Q    Okay.  And that would be important for staff

 7   to understand; true?

 8        A    True.

 9             MR. YOUNG:  Object to the form.

10        Q    (By Mr. Hammons) Now, go to Page 8, sir.  Now,

11   this is a policy on "Provisions of Treatment, Medical

12   Autonomy."  Do you see that?

13        A    I do.

14        Q    Okay.  Now, the first policy says, "Clinic --

15   Clinical decisions and actions regarding healthcare

16   provided to inmates to meet their serious medical needs

17   are solely the responsibility of qualified healthcare

18   professionals."

19             Now, the -- the decisions, for instance, with

20   respect to Clayton Rickert on January 16, 2018, the

21   clinical decisions and actions, would he have been the

22   qualified healthcare professional that -- that Policy

23   No. 1 is speaking of?

24        A    Yes.

25        Q    Okay.  And would you agree that an LPN working
```

```
 1     in Clayton Rickert's position on January 16, 2018, it
 2     would have been an important skill set for that
 3     individual to be qualified to know the signs and
 4     symptoms of drug overdose?
 5          A     Yes.
 6          Q     Okay.  And to know and recognize the signs of
 7     detox; true?
 8          A     True.
 9          Q     Did -- when you were reading Clayton Rickert's
10     deposition, did it surprise you that he said he was not
11     qualified to make those determinations?
12          A     No.
13          Q     I'm sorry?
14          A     No.
15          Q     Okay.  It did not surprise you that he was not
16     qualified?
17          A     To assess.  He's not qualified to assess.
18          Q     Okay.  Page 72 of his deposition, I'd asked
19     him a question:  "You would consider yourself not
20     qualified to make a decision whether somebody was
21     experiencing a drug overdose or not?"  And there was an
22     objection.
23                And then he said -- or, no, there wasn't an
24     objection, just words.  And his answer was:  "I'm not
25     qualified."
```

```
 1              Isn't it important for him to be qualified to

 2    know the signs and symptoms of drug overdose in his job?

 3              MR. YOUNG:  Object to the form.

 4         A    Yes.

 5         Q    (By Mr. Hammons) Especially when somebody is

 6    having a drug overdose; true?

 7         A    True.

 8              MR. YOUNG:  Object to the form.

 9         A    True.

10         Q    (By Mr. Hammons) Go to Page 11.  It's entitled

11    "Privacy."  This is a policy discussing -- well, tell

12    me -- tell me what this policy is about.

13         A    It's about patient privacy.

14         Q    Okay.  And it's important to give inmates an

15    opportunity to communicate with the health provider at

16    the Cleveland County Detention Center; true?

17         A    True.

18         Q    And you can correct me if I'm wrong, but I

19    take it as this is an opportunity for an inmate to have

20    an unencumbered, open discussion with healthcare

21    providers to answer their questions concerning any

22    medical needs; true?

23         A    True.

24         Q    Okay.  Is there any training of Turn Key's

25    medical staff about the mindset -- when they go in to do
```

Dr. William Cooper (Lunch $65.67)
2/8/2021

```
 1    a second.  I -- I don't know what happened, but when I

 2    first started this, the numbers were wrong on mine, so

 3    I -- I started it right when he was being set down on

 4    the bench.  And it's actually -- would have been -- on

 5    the left-hand number, it would have been around the

 6    38-minute mark.  So the left-hand number is 38.  I don't

 7    know why it was screwy when I first started it.  Just to

 8    let everybody catch up.

 9              Okay, I'm just going to play it from 38:01, so

10    everybody is on the same page.

11              (Plaintiff's Exhibit No. 13, Officer Brown's

12    body cam footage, was played off the record.)

13        Q    (By Mr. Hammons) Okay, so I take it this is

14    the first time you've watched this particular portion of

15    the video?

16        A    Correct.

17        Q    Okay.  And back to this idea of -- the idea

18    behind this policy of privacy, do you believe that that

19    situation is a good situation for an inmate, to be able

20    to communicate with your healthcare provider?

21              MR. YOUNG:  Object to the form.

22        A    No.

23        Q    (By Mr. Hammons) You -- you saw where he was

24    being hushed with hand gestures and called an idiot?

25              MR. YOUNG:  Object to the form.
```

```
 1        A     I didn't hear him being called an idiot.  I --

 2   they said, "Stop acting like an idiot."

 3        Q     (By Mr. Hammons) Okay.  Did you har -- did you

 4   hear them all say -- say, "Fuck his ass"?

 5        A     I didn't hear that part.

 6        Q     Yeah.

 7        A     I read it in the deposition.

 8        Q     Yeah.  At a minimum, this is not conducive to

 9   one of your providers being able to assess medical needs

10   of an individual; true?

11              MR. YOUNG:  Object to the form.

12        A     True.

13        Q     (By Mr. Hammons) Okay.  Now, with respect

14   to -- strike that.

15              Now, you saw on here, Clayton Rickert -- I've

16   asked him -- and I don't know what is in his hand, but

17   I've asked him, it's an ammonia packet that he's using

18   to put in Marconia's face.  You've seen -- you saw that?

19        A     Yes.

20        Q     Did you recognize that to be what he was using

21   in that video we just watched?

22        A     I couldn't see it, but I assumed that because

23   of the -- where he put it.

24        Q     Okay.  What training, by Turn Key or Cleveland

25   County, are you aware of with respect to ammonia packets
```

Dr. William Cooper (Lunch $65.67)
2/8/2021

Page 72

```
 1    being used in this scenario?
 2         A    Well, we don't do any training on ammonia
 3    packets.
 4         Q    Okay.  Did you -- do you know that Turn Key
 5    employees use ammonia packets?
 6         A    Yes.
 7         Q    Okay.  And what is the purpose of using an
 8    ammonia packet with a Turn Key employee?
 9         A    To get somebody that's not arousable to come
10    to.
11         Q    Okay.  Yeah, my understanding is, is -- I
12    mean, what I've seen and -- actually, had them used on
13    me -- is when I was knocked unconscious, somebody would
14    put one in front of my -- and try to awaken me; true?
15         A    That -- that's what I'm talking about, yes.
16         Q    Okay.  You probably read in the deposition
17    that Clayton Rickert says it's some sort of tool to use
18    to determine if somebody has a fake seizure or not.  Is
19    that part of Turn Key's training?
20         A    No.
21         Q    Okay.  That's actually not what ammonia
22    packets are designed for; true?
23              MR. YOUNG:  Object to the form.
24         A    True.
25         Q    (By Mr. Hammons) Okay.  Now, in this
```

1    situation, you heard -- and you've read the deposition,

2    where I spelled out Clayton Rickert's words that he used

3    during this interaction with Marconia Kessee?

4         A    Yes.

5         Q    Okay.  Do you believe that Clayton Rickert's

6    words, his process, were sufficient to make a

7    determination to put somebody into critical observation?

8         A    Yes.

9         Q    Okay.  And do you understand he did not ask

10   one question of Marconia Kessee?

11        A    I understand that.

12        Q    Okay.  He didn't ask him, "Have you been on

13   any medicines?"  True?

14        A    True.

15        Q    Or whether he had medical problems or

16   conditions that -- were unaware of; true?

17        A    True.

18        Q    Okay.  And he -- he wasn't asked any

19   questions, other than from a detention officer, about

20   what size of shoe he had on; true?

21        A    True.

22        Q    Okay.  Is this the in- -- specifically, the

23   actions of Clayton Rickert -- I -- I'm not asking you to

24   make any determinations about the Cleveland County

25   Detention Center's officers.  But with respect to

```
 1    Clayton Rickert, what you've seen so far, is that in

 2    line with Turn Key's trainings and policies and

 3    procedures?

 4         A    Yes.  Yes.

 5         Q    What is your understanding of why Clayton

 6    Rickert wanted to put Marconia in a cell?

 7         A    He was concerned for his safety.

 8         Q    Okay.  Because his head hit the wall?

 9         A    Correct.

10         Q    Is there anything that you observe- -- would

11    you -- strike that.

12              In this scenario, is there anything in the

13    training, that you provide Clayton Rickert with, that

14    requires them to ask some questions before making any

15    determinations?

16         A    Yes.

17         Q    Okay.  If we go to Page 13 on your -- on

18    Exhibit 5.  Now, this is to do with the "Intake Health

19    Screening."  Do you see that title?

20         A    Yes.

21         Q    Okay.  Now, with respect to Clayton Rickert,

22    is this something that he is in charge of when he's

23    there, doing intake health screenings?

24         A    Yes.

25         Q    Okay.  And I take it there is a form that
```

```
 1    is -- he's required to fill out during this intake

 2    health screening process?

 3         A    Yes, after they're booked in.

 4         Q    Okay.  And I've got it paused -- I've got the

 5    video paused at 39:46.  Right behind Clayton Rickert, it

 6    says "Medical" on that door.  Do you see that?

 7         A    Yes.

 8         Q    Is that the medical screening room for the

 9    Cleveland County Detention Center?

10         A    I believe it is.

11         Q    Okay.  And is that where the intake health

12    screening would occur?

13         A    Yes.

14         Q    Okay.  If we go to the next page, sir, No. 14.

15    It's No. 4.  "Reception personnel using a form approved

16    by the medical director conduct a basic receiving

17    screening inquiry."

18              Is -- this form, would you have been the one

19    approving this -- this particular form?

20         A    Yes.

21         Q    Okay.  And is this form something separate and

22    apart from what Clayton Rickert would do in the intake

23    health screening or is this part of it?

24         A    That's part of it.

25         Q    Okay.  All these categories listed in 4, (A)
```

```
 1    through (M)?

 2          A    Correct.

 3          Q    Okay.  And, obviously, none of these were done

 4    during this intake process; true?

 5               MR. YOUNG:  Object to the form.

 6          A    True.  He hadn't been booked in yet.

 7          Q    (By Mr. Hammons) Okay.  Is the process of --

 8    have you been a part of -- of this process before?

 9          A    No.

10               MR. YOUNG:  Object to the form.

11          A    I've seen it, but -- but I've not actually

12    taken part in it.

13          Q    (By Mr. Hammons) Okay.  When the -- the

14    book-in process is completed, are they then taken into

15    the medical screening room?

16          A    Yes.

17          Q    Okay.  And then this list of thing- -- these

18    questions or this form would be gone over?

19          A    Correct.

20          Q    Okay.  Now, if we look through this, under

21    No. 4, "(A):  Current and past illness, health problems,

22    chronic illness or special health needs."

23               That's important, to be able -- an inmate to

24    be able to communicate those current or past health

25    issues; true?
```

```
 1    "appearance, behavior, mental status" on it.

 2        A    Yes.

 3        Q    Okay.  And one of the -- on "appearance",

 4    "sweating, disheveled, tremors."  Those are all listed

 5    on there; true?

 6        A    True.

 7        Q    Why are those actually listed on there?

 8        A    Well, because they're important.

 9        Q    Are they indications of anything?

10        A    Yes.

11        Q    What would that be?

12        A    Well, it could be anxiety or drug overdose,

13    drug intoxication.

14        Q    Right.  The video you just watched of

15    Marconia, did he exhibit any of those?

16        A    Yes.

17        Q    We have "behavioral" -- "mental status".  All

18    important categories to observe when you're doing a

19    screening?

20        A    Yes.

21        Q    The next page is Page 15, "Breathing,

22    hyperventilation."  What is hyperventilation?

23        A    Breathing faster than normal.

24        Q    In the video you just watched, was Marconia

25    Kessee breathing heavy?
```

```
 1      A    Yes.

 2      Q    Now, No. 7, "Healthcare personnel will make

 3    disposition recommendation based on medical assessment

 4    or review of correctional staff screenings."

 5           How does that work with -- how does No. 7 get

 6    implemented when Clayton Rickert is on call?

 7      A    If they exhibit self-harm, threaten self-harm,

 8    then they -- they put them where they -- try to keep

 9    them safe.

10      Q    Yeah, but this -- this -- I don't -- I don't

11    -- No. 7 doesn't seem to be indicating -- talking about

12    self-harm at all.  It says, "Healthcare personnel will

13    make disposition recommended based on the medical

14    assessment."

15           So what I'm asking is, is:  How does that work

16    when you don't have an individual there that can make a

17    medical assessment?

18      A    Well, we always have somebody on call, like I

19    said, so the assessment can be done by somebody on the

20    phone, based on the LPN's assistance.

21      Q    Yeah, so -- but if the -- you know, it's hard

22    for me to understand how the LPN, if he can't make a

23    medical assessment, how he can realize there's a need

24    for medical treatment, if he can't make the medical

25    assessment.  So that's what I'm asking, is:  How is he
```

```
 1    supposed to pick up the phone and call someone qualified

 2    to do a medical assessment if he doesn't even know how

 3    to assess a medical condition?

 4         A    Well, if he's -- if he don't know what

 5    going -- what's going on, then he's supposed to call

 6    the -- somebody higher up.

 7         Q    Okay.  So -- and you -- well, never mind.

 8    Strike that.

 9              Letter "D" on here, do you see Letter "D",

10    "Medical Housing Observation"?

11         A    Yes.

12         Q    And we'll talk about critical observation,

13    also, but I'm curious, you know, as I -- have you read

14    any of the -- some of the jailers' statements done

15    after?

16         A    No, I have not.

17         Q    Okay.  Some reference medical observation and

18    some reference critical observation.  And I'm wondering:

19    What is the -- what is medical observation in -- in Turn

20    Key's view?

21         A    They're placed in the medical unit for medical

22    reasons, for physical medical reasons.

23         Q    Okay.  And these are some of the reasons that

24    they would be placed into medical observation; true?

25         A    True.
```

```
 1        Q    Okay.  And -- such as "seizures,

 2   detoxification monitoring, alcohol intoxication, or

 3   possible drug withdrawal."  Do you see those?

 4        A    Yes.

 5        Q    Okay.  How is it when Clayton Rickert is on

 6   call -- how is an inmate supposed to be put in medical

 7   observation if Clayton Rickert doesn't know the signs

 8   and symptoms of some of those?

 9        A    He would need to call his superior.

10        Q    Well, if he doesn't know to -- what they are,

11   how could he possibly know there's a problem?

12        A    Well, if they're on this list or some other

13   concerning thing, then he would call.

14        Q    Well, you see -- you see the problem here is

15   if -- if Clayton Rickert doesn't know somebody has signs

16   of drug overdose because he doesn't know them, and he

17   reads:  "Drug overdose or drug withdrawal," on your

18   sheet, but he doesn't know it's a drug overdose --

19        A    Uh-huh.

20        Q    -- because he doesn't know, it would be

21   impossible for him to reach out to, say, you, and get

22   help; true?

23        A    True.

24             MR. YOUNG:  Object to the form.

25        Q    (By Mr. Hammons) And you -- I mean, you -- you
```

Dr. William Cooper (Lunch $65.67)
2/8/2021                                                                    Page 83

```
 1    read his deposition where he said -- he uses the -- the

 2    quote:  "I'm not qualified"; true?

 3         A    True.

 4         Q    Okay.  So this -- this particular section of

 5    Turn Key's policies and procedures, while Clayton

 6    Rickert is on staff, is hard to implement because he's

 7    not qualified to do it; true?

 8              MR. YOUNG:  Object to the form.

 9         A    I don't think that it's hard to implement if

10    you know where -- how to use a phone.

11         Q    (By Mr. Hammons) Well, not just use a phone,

12    but know the signs and symptoms of drug overdose, too;

13    true?

14         A    True.

15         Q    Okay.  When they're in medical housing

16    observation, do -- does the Cleveland County Detention

17    Center officers have anything to do with that

18    observation?

19         A    Not the actual observation, they just place

20    them in there.

21         Q    Okay.  They might oversee and make sure

22    they're, you know, not a risk to somebody, but they're

23    not involved in the observation of it; is --

24              MR. YOUNG:  Object to --

25         Q    (By Mr. Hammons) -- that accurate?
```

```
 1      "Why did you say these things in your notes when they're

 2    not true?"

 3         A    I don't know that for a fact.  I don't know.

 4         Q    Okay.  But that was a red flag to Turn Key

 5    that this wasn't exactly as Clayton Rickert said it to

 6    be; true?

 7         A    True.

 8              MR. YOUNG:  Object to the form.

 9         A    True.

10         Q    (By Mr. Hammons) Regardless of the sheriff or

11    the Cleveland County Detention Center's decisions on not

12    wanting Clayton Rickert back into Turn Key, was he going

13    to be fired?

14         A    Not to my knowledge.

15         Q    Hand you Exhibit 10.  It's OSBI 106.  This is

16    an incident report by Brandi Garner.  And I -- I'm not

17    going to -- I'm just going to direct you down to -- in

18    the main body, under "Observations," it's about the, I

19    don't know, third or fourth sentence, it says, "LPN

20    Clayton Rickerts" -- about the one, two, three, four --

21    fifth line down, kind of towards the end, "LPN Clayton

22    Rickerts" --

23         A    Uh-huh.

24         Q    -- "was also present and I asked him what

25    Inmate Kessee's history was, to gain a better
```

```
 1        Q     What is it?

 2        A     That there's --

 3        Q     What could it be?

 4        A     That there's a medical problem.

 5        Q     All right.  You can set that aside there, sir.

 6              If we go back to Exhibit 5, sir, we're going

 7   to go to Page 43.  Now, this, on Page 43, is the suicide

 8   prevention program for Turn Key Health; true?

 9        A     Correct.

10        Q     Okay.  Now, with respect to critical

11   observation, is critical observation addressed in Turn

12   Key's policies and procedures?

13        A     We don't call it critical observation.  We

14   call it suicide watch.

15        Q     Okay, fair enough.  And it seems to me, from

16   reading the Cleveland County Detention Center's

17   policies, is that if you're on critical observation and

18   given a suicide smock, it is essentially suicide watch.

19   Is that your understanding?

20        A     Yes, it is.

21        Q     Okay.  Now, if we go to Page 44 of Exhibit 5,

22   down -- No. -- No. 4, this is still under the suicide

23   prevention program, under "Housing," do you see that?

24        A     Yes.

25        Q     It says, "House staff will follow the
```

Dr. William Cooper (Lunch $65.67)
2/8/2021

```
 1    facility's policies for suicidal or observation patient

 2    housing."  Do you see that?

 3         A    Yes.

 4         Q    Okay.  Now, that would -- "health staff" would

 5    be Clayton Rickert; true?

 6         A    True.

 7         Q    Okay.  And he's supposed to follow the

 8    facility's policies for suicide or observational patient

 9    housing; true?

10         A    True.

11         Q    Okay.  And as we've already discussed, Clayton

12    Rickert was not trained on the Cleveland County

13    Detention Center's policies and procedures by Turn Key;

14    true?

15         A    He probably was on-the-job trained.

16         Q    Okay.  But not specifically their policies and

17    procedures.  There was no training --

18         A    No --

19         Q    -- by Turn Key?

20         A    No formal sit-down lecture training.

21         Q    Okay.  And as far as you know, the Cleveland

22    County Detention Center did not provide specific

23    training on their policies and procedures, either?

24         A    As far as I know, that's correct.

25         Q    Okay.  On a shift like January 16, 2018,
```

```
 1        Q     And I'm asking you:  What is Turn Key's

 2   position on that subject of when an intake, under these

 3   circumstances, should be completed?

 4              MR. YOUNG:  Object to the form.

 5        A     It can -- it can vary, based on what's going

 6   on.  If you've got somebody that's violent or

 7   uncooperative, then you postpone it until they have time

 8   to calm down.

 9        Q     (By Mr. Hammons) And -- and I get that sense

10   of that, but I'm wondering if -- for instance, in this

11   situation, clearly the sight checks are being done by

12   detention officers?

13        A     Correct.

14        Q     Is it incumbent upon those officers to tell

15   your Turn Key staff when the inmate has calmed down

16   enough to finish the intake?

17              MR. YOUNG:  Object to the form.

18        A     That's certainly the way it usually works.

19        Q     (By Mr. Hammons) Okay.  Have you watched any

20   extensive length of video from when Marconia is placed

21   in the cell, just watching his body throughout the

22   couple hours that he's there?

23        A     No, I have not.

24        Q     Okay.  With respect to -- I just asked you

25   about the suicide prevention program and I pointed out
```

```
 1    this No. 4 about "The health staff will follow the

 2    facility's policy for suicidal or observation patient

 3    housing."

 4              Would that also be -- Turn Key members would

 5    follow the guidelines set out in the Cleveland County

 6    Detention Center for critical observation?

 7              MR. LAFFERRANDRE:  Object to the form.

 8         A    Yes, because -- yes, because suicide watch and

 9    critical observation are the same thing, just depends on

10    which policy you're reading.

11         Q    (By Mr. Hammons) Okay.  Now, does the

12    orientation and training or the policy and procedure at

13    Turn Key give Turn Key employees an idea of what is

14    required for a sight check?

15         A    No.

16         Q    Okay.  Is that something -- a sight check, is

17    that something a Turn Key medical staff, like Clayton

18    Rickert, is responsible for at times?

19         A    No.

20         Q    Okay.  That is a function of the jail staff,

21    to do critical observation sight checks?

22              MR. YOUNG:  Object to the form.

23         A    That's correct.

24         Q    (By Mr. Hammons) Okay.  Now, at -- I

25    believe -- and I think I'm correct on this -- that
```

1    Clayton Rickert said that, at times, he has done sight

2    checks on critical observation inmates.  Is that your

3    exper- -- is that the experience of -- of the training

4    that's provided to Turn Key employees?

5          A    Not to my knowledge.

6          Q    Okay.  But, irregardless, a Turn Key employee

7    would look to the policies and procedures of the

8    Cleveland County Detention Center on how to -- on what

9    the specifications of a critical observation are?

10              MR. YOUNG:  Object to the form.

11         A    According to this, yes.

12         Q    (By Mr. Hammons) Okay.  According to

13   Exhibit 5?

14         A    Correct.

15         Q    Okay.  When Turn Key is reviewing the

16   Cleveland County Detention Center's policies and

17   procedures, does Turn Key have any cons- -- put any

18   consideration into what a sight check is in critical

19   observation?

20         A    Well, we do, because we know, usually, it's

21   the security staff that does that, and so, yes, we take

22   that into consideration.

23         Q    So, for instance, you know, if a sight check

24   on somebody, who's in critical observation, isn't done

25   properly, or there's no procedure for it, that could, in

```
 1    turn, affect Turn Key's employees who are responsible

 2    for the medical care; true?

 3              MR. YOUNG:  Object to the form.

 4        A    Theoretically, it could, yes.

 5        Q    (By Mr. Hammons) You know, if they're not

 6    doing the sight check properly and somebody becomes

 7    unresponsive or not breathing, then Turn Key's staff

 8    should have been no- -- notified quicker; true?

 9              MR. YOUNG:  Object to the form.

10              MR. LAFFERRANDRE:  Form.

11        A    Yes.

12        Q    (By Mr. Hammons) Have you, Turn Key, when

13    you're -- when you were evaluating the situation in

14    the -- inside the cell, did Turn Key make any

15    evaluations of sight checks that were done for Marconia

16    Kessee?

17        A    Not that I recall.

18        Q    Okay.  Okay, if we could go back in Exhibit

19    5 -- well, we're going to backtrack to Page 40.

20        A    Okay.

21        Q    Okay.  This is your -- Turn Key's policy on

22    detoxification.  Is part of the training contained in

23    Exhibit 6, and found in the policy and procedures, have

24    to do with the signs of detoxification?

25        A    Yes.
```

```
 1       Q    Okay.  And part of that would be the signs and

 2   symptoms to look for in an inmate who's new to the jail?

 3       A    That's correct.

 4       Q    Now, on No. 2 of the policy, it says there's

 5   -- "Established protocols are followed for the treatment

 6   and observation of individuals manifesting symptoms of

 7   intoxication or withdrawal.  Protocols are approved by

 8   the medical director, are current, and are consistent

 9   with nationally-accepted guidelines."

10            Are those particular established protocols --

11   are those written down somewhere?

12       A    No.

13       Q    They're just part of the training?

14       A    Correct.

15       Q    That's done in --

16       A    For --

17       Q    -- Exhibit 6?

18       A    For -- no, that's for -- training is provided

19   to the providers, the nurse practitioners and doctors.

20       Q    Okay.  But not the LPNs?

21       A    Correct.

22       Q    Okay.  So what happens if the LPN encounters

23   someone who's having these signs and symptoms and they

24   have no training?

25       A    Well, hopefully, they call the provider for
```

Dr. William Cooper (Lunch $65.67)
2/8/2021                                                          Page 111

```
 1    guidance.

 2         Q    No. 4 says, "Patients experiencing severe

 3    life-threatening intoxication, overdose or withdrawal

 4    are transferred immediately to a licensed community

 5    hospital."  That's the Turn Key policy; true?

 6         A    That is correct.

 7         Q    Okay.  How is an individual like Marconia

 8    Kessee, who's potentially having an overdose of his

 9    medications and whatever else in his body -- how is he

10    going to be transferred if -- if it's Clayton Rickert on

11    the job, who doesn't know the signs and symptoms of

12    overdose?

13              MR. LAFFERRANDRE:  Object to the form.

14         A    Nothing -- I would say that history tells us

15    nothing.

16              MR. HAMMONS:  You know, I don't know if the

17    sandwiches are here or not, but I think if we can go off

18    the record and go ahead and do our lunch right now, I

19    can marshal through -- some of my questions are --

20    are -- have been answered.  I can probably streamline

21    this and, after we eat a sandwich, we can be done fairly

22    quickly, if everybody is in agreement to that.

23              MR. YOUNG:  Sure.

24              MS. GOOCH:  That sounds good to me.

25              MR. HAMMONS:  Okay.
```

```
 1        A     That's correct.
 2        Q     All right.  And that's what your company holds
 3   itself out to these jails as being able to provide, that
 4   medical care for all inmates, start to finish, correct?
 5        A     Correct.
 6        Q     And not only that, on Page 3 -- by the way,
 7   the medical care, that it -- is provided, would include
 8   a screening and an assessment, if needed, correct?
 9        A     That's correct.
10        Q     All right.  And moreover, as reflected on
11   Page 3, it would include pharmaceutical services for all
12   inmates, correct?
13        A     Yes, sir, that's correct.
14        Q     And so if an inmate needed medication,
15   certainly, that's part of what Turn Key committed to do
16   within this contract.  Would you agree with that?
17        A     Yes.
18        Q     And would you agree with me that the facility,
19   the jail, has a right to require competent, timely and
20   appropriate attention to the inmates' needs?
21        A     Yes.
22        Q     All right.  And was there ever anything during
23   this contract, that was done by Turn Key, to notify the
24   jail that it was not going to provide these expansive
25   services?
```

```
  1    admission?

  2               MR. HAMMONS:  Object to the form.

  3        A    Not to my knowledge.

  4        Q    (By Mr. Lafferrandre) All right.  Another

  5    thing that Turn Key specializes in is the ability to do

  6    sick call triage, correct?

  7               MR. HAMMONS:  Object to the form.

  8        A    Correct.

  9        Q    (By Mr. Lafferrandre) All right.  And -- and

 10    to some extent, that involves screening inmates for

 11    healthcare problems, correct?

 12        A    Correct.

 13        Q    And Mr. Rickert, in your estimation, was he

 14    qualified to do an appropriate screening of inmates on

 15    intake?

 16               MR. HAMMONS:  Object to the form.

 17        A    Yes.

 18        Q    (By Mr. Lafferrandre) Did he go to nursing

 19    school?

 20        A    Yes.

 21        Q    Did he graduate from nursing school?

 22        A    Yes.

 23        Q    Was he then subjected to a pretty intense

 24    examination of his skills?

 25               MR. HAMMONS:  Object to the form.
```

```
 1       A     Would you repeat the question, please?

 2       Q     (By Mr. Lafferrandre) Part of the problem

 3    with -- with doing an evaluation and a screening of

 4    Mr. Kessee is that he wasn't providing any information

 5    about the meth that he took.

 6             MR. HAMMONS:  Object to the form.

 7       Q     (By Mr. Lafferrandre) Would you agree with

 8    that?

 9       A     Yes, I would agree.

10       Q     And he wasn't giving any information about the

11    toxic amount of anti-depressants that he took, correct?

12       A     Correct.

13       Q     And that makes it more difficult for the

14    Norman ER.  Would you agree with that?

15             MR. HAMMONS:  Object to the form.

16       A     Yes, I would.

17       Q     (By Mr. Lafferrandre) Makes it more difficult

18    for the police officers, correct?

19             MR. HAMMONS:  Object to the form.

20       A     Correct.

21       Q     (By Mr. Lafferrandre) More difficult for the

22    officers at the Cleveland County Detention Center.

23    Would you agree with that?

24             MR. HAMMONS:  Object to the form.

25       A     I would agree.
```

```
 1                MR. HAMMONS:  Object to the form.

 2      A     Not to my knowledge.

 3      Q     (By Mr. Russell) And, Doctor, you are familiar

 4   with the fact that patients can have a change in

 5   condition; true?

 6      A     True.

 7      Q     You volunteered for us that -- at some point,

 8   when you were asked about fit slips, you made a general

 9   statement, and I'm paraphrasing:  "Turn Key will send

10   for a fit slip, if necessary."  Do you remember saying

11   something to that extent?

12      A     Yes.

13      Q     Okay.  Tell me what you meant by "Turn Key

14   will send for a fit slip, if necessary."  What

15   circumstances will Turn Key do that?

16      A     Well, we have a whole list of criteria.

17   Someone that's involved in a motor vehicle accident or

18   injured during arrest.  If unsta- --

19      Q     Where would --

20      A     Go ahead.

21      Q     I'm sorry to interrupt, go ahead.

22      A     No, that's okay.

23      Q     Go ahead.

24      A     I was going to say:  Unstable bio signs, head

25   injuries, elevated blood sugars, lots of things like
```

Dr. William Cooper (Lunch $65.67)
2/8/2021                                                          Page 143

```
 1    that, that could mean they could be, you know, not quite
 2    ready to go to jail.
 3         Q    And where would that criteria -- that criteria
 4    you're describing, where would we find that?
 5         A    It's always posted in booking.
 6         Q    Okay.  Describe what you mean, for me, by
 7    that, please.  As specifically as you can, please.
 8         A    Okay.  In the booking part of the jail, where
 9    they bring new intakes in to be booked in, that's just
10    a -- a room in the jail where they do that process, and
11    so that's where those criteria are posted.
12         Q    Okay.  And in this video, the first video,
13    where Mr. Kessee is sitting on the bench, is that the
14    area where those are -- where that would be posted?
15         A    Yes.
16         Q    All right.  And is that a Turn Key document
17    indicating when it would be appropriate to ask for a fit
18    slip?
19         A    Yes.
20         Q    Okay.  And what would that be labeled?
21         A    "Fit Criteria."
22         Q    Okay.  And is that something that you can
23    provide to me, as a corporate representative of Turn
24    Key, through your counsel?
25         A    Yes.
```

Dr. William Cooper (Lunch $65.67)
2/8/2021                                                    Page 144

```
 1        Q    And I take it from your testimony so far, you

 2    recog- -- you and other members of Turn Key staff

 3    recognize that patient's conditions can deteriorate over

 4    time, correct?

 5        A    Absolutely.

 6        Q    And that fit slip criteria is something that

 7    can be utilized to determine if a patient needs to go

 8    get another fit slip; in other words, needs to be

 9    checked out by an ER physician --

10        A    Correct.

11        Q    -- is that true?

12        A    That's true.

13        Q    Okay.  So Clayton Rickerts did have the

14    independent ability to perform a screening exam and

15    determine if another fit slip needed to be obtained for

16    Mr. Kessee, correct?

17        A    I agree.

18        Q    And that screening exam, I believe you already

19    went over it, I want to make sure we're talking about --

20    I'm communicating and understand the correct things.

21    That would be in your policy and procedures, under

22    "Initial Health Screening," Exhibit 5, roughly starting

23    at Page 13 of that; is that correct?  Feel free to look

24    at that, sir.

25             MR. YOUNG:  Go ahead and look all you want.
```

Dr. William Cooper (Lunch $65.67)
2/8/2021                                                           Page 145

```
 1        A     Yes.

 2        Q     (By Mr. Russell) Okay.  And that -- that's the

 3   screening criteria we've talked about generally,

 4   correct?

 5        A     Well, it's different than the fit criteria.

 6        Q     I understand that, but that's the screening

 7   criteria that Robert asked you about --

 8        A     Yes.

 9        Q     -- previously?

10        A     You're correct.

11        Q     Okay.  And there is a separate fit slip

12   criteria that you and I discussed, correct?

13        A     That's correct.

14        Q     As far as the condition of Mr. Kessee at

15   Norman Regional Health Center or Hospital, you don't

16   know what that condition was, do you?

17        A     No.

18              MR. RUSSELL:  Thank you for your time, Doctor.

19   I appreciate it.  I'll reserve my questions till time of

20   trial.

21              MR. HUFF:  This is Glen Huff.  We have no

22   questions, at this time, on behalf of the hospital.

23              MR. KNIGHTON:  I think I'm the only one that's

24   left, and the City and Keith Humphreys does not have any

25   questions at this time.  Thanks.
```

```
 1    be the responsible health authority in that phrase; is

 2    that correct?

 3         A    That's correct.

 4         Q    Okay.  And did you review the orientation

 5    program, as it says?

 6         A    Yes.

 7         Q    There's been a lot of talk about assessments

 8    versus screening and I was wondering if you could clear

 9    up some of that.  Under Oklahoma law, is an LPN

10    qualified to do an assessment?

11         A    No.

12         Q    Okay.  So when -- okay, kind of explain that

13    to us.  What is the difference between an assessment and

14    a screening?

15         A    Well, the LPNs use screening tools, which are

16    questionnaires, but they can't make an assessment out of

17    that information.  That's why they pass it on up the

18    chain to an RN or a -- a nurse practitioner or a

19    physician for an assessment.

20         Q    So a Turn Key LPN, like Nurse Rickert, would

21    be able to seek out an assessment from someone qualified

22    to do so; is that fair?

23         A    Yeah, that's possible, 24 hours a day.

24         Q    Okay.  From Turn Key's perspective, under

25    these circumstances, why was it okay for Nurse Rickert
```

```
 1    did you hear anybody, other than what size your shoe is,

 2    ask him one question in order to ascertain why he was

 3    acting the way he was?

 4         A    That's the only question I heard asked.

 5         Q    Right.  And we already talked about it,

 6    Marconia clearly was having some problems, in the video;

 7    true?

 8         A    Yes.

 9              MR. YOUNG:  Object to the form.

10         A    Yes.

11         Q    (By Mr. Hammons) Okay.  He's surrounded by

12    four individuals; true?

13         A    True.

14         Q    Okay.  Can't speak very well; true?

15         A    True.

16              MR. YOUNG:  Object to the form.

17         Q    (By Mr. Hammons) Is breathing heavily; true?

18         A    True.

19         Q    Sweating profusely?

20         A    True.

21         Q    Can't walk?

22              MR. YOUNG:  Object to the form.

23         Q    (By Mr. Hammons) True?

24         A    True.

25         Q    And at that moment in time, Turn Key expects
```

```
 1    Marconia Kessee to start rattling off his medications to
 2    them; is that what I'm hearing?
 3              MR. YOUNG:  Object to the form.
 4        A    No.
 5        Q    (By Mr. Hammons) It's not -- that's not
 6    reasonable, to expect Marconia Kessee, at that moment in
 7    time, to have been able to communicate any further than
 8    he already was trying; true?
 9        A    I agree.
10        Q    Yeah.  Now, as far as there's no information
11    about drugs, that's not exactly true, either.  The
12    question was asked, was there's no information, but you
13    pointed out he had a big bag of pills with him; true?
14        A    True.
15        Q    The exact medications that he was taking;
16    true?
17        A    True.
18              MR. YOUNG:  Object to the form.
19        Q    (By Mr. Hammons) And those pills, had somebody
20    looked at them, understood what they did to people if
21    too many were taken -- for instance, Clayton Rickert --
22    that might have helped, given some more information that
23    he could have relayed to a nurse practitioner; true?
24              MR. YOUNG:  Object to the form.
25        A    True.
```

```
 1   happen?

 2              MR. YOUNG:  Object to the form.

 3        A    No, I don't.

 4        Q    (By Mr. Hammons) Yeah, the questions asked

 5   that -- of you, that placed the onus on Marconia Kessee,

 6   as he's dying, to start offering information about his

 7   overdose, are unreasonable questions, are they not?

 8              MR. YOUNG:  Object --

 9              MR. LAFFERRANDRE:  Objection.

10              MR. YOUNG:  -- to the form.

11        A    Are they unreasonable questions?

12        Q    (By Mr. Hammons) Well, it's an unreasonable

13   stance to take?

14        A    Well --

15              MR. YOUNG:  Object --

16              MR. LAFFERRANDRE:  Objection.

17              MR. YOUNG:  -- to the form.

18        A    In hindsight, yes.

19        Q    (By Mr. Hammons) Now, it was asked, your

20   observations of uncooperative in the -- in the room, but

21   you did couch that a little bit:  "Clearly,

22   uncooperative."  What was he uncooperative with?

23        A    Arrest.

24        Q    With what?

25        A    Arrest.
```

```
 1        Q     Well --

 2        A     And going to the Salvation Army.

 3        Q     Okay.  Well, I'm talking about in the intake

 4   room.

 5        A     Oh.

 6        Q     He was -- he was told to sit his ass on the

 7   bench; true?

 8        A     Yes.

 9        Q     And he sat on the bench; true?

10        A     True.

11        Q     He couldn't answer the question about what

12   size shoe he had; true?

13              MR. YOUNG:  Object to the form.

14        A     True.

15        Q     (By Mr. Hammons) Okay.  Any other thing, that

16   he was -- that he was asked or told to do, that he did

17   not do?

18        A     No.

19        Q     So uncooperative -- sometimes inmates --

20   that's why we have these procedures and these screening

21   processes:  Sometimes inmates show up and they are in

22   medical emergency need and they can't cooperate; true?

23        A     True.

24              MR. YOUNG:  Object to the form.

25        Q     (By Mr. Hammons) And just to clarify:  At the
```