1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF OKLAHOMA

3

4   (1) PATRICIA THOMPSON, as        )
    Personal Representative of the)
    Estate of MARCONIA LYNN        )
5   KESSEE,                         )
                                    )
6        Plaintiff,                 )
                                    )
7   -vs-                            )    No. CIV-19-113-SLP
                                    )
8   (1) NORMAN REGIONAL HOSPITAL   )
    AUTHORITY d/b/a NORMAN          )
9   REGIONAL HOSPITAL, a public     )
    trust, et al.,                  )
10                                   )
         Defendants.                )
11

12

13                    *  *  *  *  *

14      **VIDEOCONFERENCE DEPOSITION OF CODY BARR**

15        TAKEN ON BEHALF OF THE PLAINTIFF

16           IN OKLAHOMA CITY, OKLAHOMA

17              ON MARCH 16, 2021

18          COMMENCING AT 12:02 P.M.

19                    *  *  *  *  *

20

21

22              INSTASCRIPT, L.L.C.
             125 PARK AVENUE, SUITE LL
23        OKLAHOMA CITY, OKLAHOMA   73102
                405.605.6880
24          schedule@instascript.net

25   REPORTED BY:   BETH A. McGINLEY, CSR, RPR, RMR

**EXHIBIT**

**19**

```
 1        A      I -- it's -- I think on sight checks, I did,
 2   yes.
 3        Q      Okay.  And I want to talk about it just real
 4   briefly.  Did you -- in -- when you went to work in
 5   2016, with the Cleveland County Detention Center, prior
 6   to that first shift, did you have any training,
 7   whatsoever?
 8        A      No.
 9        Q      Okay.  It was more first shift, get kind of an
10   orientation and -- and start shadowing a -- another
11   detention officer?
12        A      Yes.
13        Q      Okay.  And then at some point in time in that
14   first, I don't know, short time period, there is some
15   classroom work that you -- you do at the Cleveland
16   County Detention Center?
17        A      Yes, a jail academy.
18        Q      Okay.  And that's the two-week thing that we
19   all have been talking about?
20        A      Yes.  I don't remember exactly how long it
21   was, but it was a couple of weeks.
22        Q      Okay.  And in that class, they -- they do some
23   training on these policies and procedures; is that --
24        A      I don't remember exactly.
25        Q      Okay.  Do you remember or recall specifically
```

1    being shown the policies and procedures?

2        **A**    I was shown where to access them if I ever

3    wanted to review them.

4        **Q**    Okay.  And that was on some -- is that

5    still -- was that, at the time, on some kind of computer

6    system?

7        **A**    Yes.

8        **Q**    Okay.  And you -- you've had -- log in or

9    something, you could access it and look -- look up stuff

10   for reference, if you needed it?

11       **A**    Yes.

12       **Q**    Okay.  Now, is it your understanding that your

13   training was based on the policies and procedures of the

14   Cleveland County Detention Center?

15       **A**    As far as I'm aware.

16       **Q**    Right.  That makes sense, right?  Why have the

17   policy and procedure, if they're not going to train you

18   on it, right?

19       **A**    Uh-huh.  Yes.

20       **Q**    Okay.  Was there a requirement that you -- for

21   lack of better words, you log on for the first time on

22   this system, did you have to sign or acknowledge receipt

23   of the policies and procedures?

24       **A**    I don't remember.

25       **Q**    Okay.  That makes sense, what I'm asking you,

```
 1   question.  Let's -- let's break it down.
 2           The -- when an inmate first comes in, somebody
 3   has to determine whether or not that inmate is medically
 4   suitable to be taken into custody; true?
 5       A     It depends on the situation.
 6       Q     In what situation would that determination not
 7   be made?
 8       A     I -- if they came in with behavioral issues,
 9   if they were acting out or just way too intoxicated on
10   whatever they took, we would -- medical would decide to
11   house them, let them sit for an hour or two, or until
12   they calmed down, and then we would revisit it.
13       Q     Yeah, and I'm not being clear.  It's my fault.
14           When an in- -- all inmates, when they come
15   into the facility, medical has to make a determination
16   whether that inmate is medically stable enough to put
17   into the jail; isn't that --
18       A     Yes, medical has to be there...
19       Q     Right.  That's fair to say, isn't it?
20       A     ...to make that decision, yes.
21       Q     Okay.  For instance, if they were in immediate
22   need of medical treatment, that would be in the purview
23   of the medical staff?
24       A     Yes.
25       Q     Okay.
```

1          **MR. SNIDER:**  Object to the form.

2     **Q**    **(By Mr. Hammons)** And, therefore, detention

3    officers would not be trained to make a determination

4    whether somebody was medically fit to be put into the

5    jail; true?

6     **A**    Ye- -- yes, we were not trained.

7     **Q**    Okay.  Detention officers, and yourself, were

8    not trained to see the signs and symptoms and know the

9    signs and symptoms of drug overdose; true?

10    **A**    I can't speak for all officers, but I know I

11   wasn't.

12    **Q**    Okay.  Same question:  Signs and symptoms of

13   drug or alcohol withdrawal?

14    **A**    Same answer:  I can't speak for other

15   officers, but I know I was not trained on it.

16    **Q**    Okay.  Same question with respect to issues

17   with inmates on -- that are detoxing:  Not trained to

18   see those medical signs; true?

19    **A**    Yes.

20    **Q**    And the same question with mental illness;

21   true?

22    **A**    Yes.

23    **Q**    I think you said this already, but is -- was

24   it your understanding, in January of 2018, that any

25   policy and procedure covering those medical issues was

1      **A**      Pretty much the same thing:  Make sure they

2    don't have anything to hurt themselves with, they don't

3    have anything in there they're not supposed to have,

4    just make sure their well-being is protected.

5      **Q**      Critical observation sight checks, you would

6    agree with me, are very important in a jail facility?

7      **A**      Yes, I would say so.

8      **Q**      Now, again, you've heard these questions

9    before, but I'll ask you.  I'm trying to get a sense of

10   the training and the standard at the Cleveland County

11   Detention Center, okay?  So this is only based on your

12   training and your experience in those -- in that time

13   frame that you were at the Cleveland County Detention

14   Center.

15          With respect to critical observation sight

16   checks, is a one-second -- open the door, shut it, in

17   one second -- a suitable compliance -- is that suitable

18   compliance with the Cleveland County Detention Center

19   policies and procedures?

20          **MS. DARK:**  Object to the form.

21      **A**      It would depend on the situation.

22      **Q**      **(By Mr. Hammons)** Well, like this situation,

23   Marconia Kessee?

24      **A**      Well, in this situation, the one sight check I

25   did, we had just placed him in there, and I could hear

1   him muttering to himself, so that was a sufficient sight

2   check, in my opinion.  I can't speak for what any -- any

3   other officer did.

4       **Q**    Right.  So I take it, from that particular

5   sight check, if -- if we put a clock to it and it was

6   one second, that would be in compliance with what you

7   were taught and trained to do?

8       **A**    Yes.

9       **Q**    Okay.  Is there any training or -- or even

10  thought -- to what is the individual muttering in the

11  cell?

12      **A**    I don't remember, no.

13      **Q**    Well, I'm just talking about training-wise.

14  Did a detention officer -- when you were being trained,

15  did you ever see a critical observation sight check done

16  and the individual was muttering or mumbling inside and

17  the officer, training you, said, "Hey, when you hear

18  something like that, you need to find out what they're

19  saying"?

20      **A**    It depends on the situation.

21      **Q**    This situation.  Did you try --

22      **A**    This situation?

23      **Q**    Yeah.  Did you try to find out what he was

24  muttering?

25      **A**    No, because we had just placed him in there.

1    **Q**    Okay.  Well, what if he was muttering "Help"?

2         **MS. DARK:**  Object to the form.

3    **A**    I don't know, because I couldn't accurately

4    understand what he was saying.

5    **Q**    **(By Mr. Hammons)** Right.  And it's really even

6    more difficult to understand that muttering in one

7    second, right?

8         **MS. DARK:**  Object to the form.

9    **A**    It's possible.

10   **Q**    **(By Mr. Hammons)** Right.  So, like, for

11   instance, earlier I told you it might have helped you to

12   hear from the officer that he was muttering "Help" and

13   "Doctor" earlier, that could have given you some clues

14   when you did your sight check and heard him muttering

15   and -- right?

16   **A**    It's possible.

17   **Q**    Right.  If you'd heard it and then you go,

18   "Ooh, maybe he's saying something, I better check," and

19   you walk in there and he's saying, "Doctor, help," that

20   would have been a clue that something might be going

21   wrong, right?

22        **MS. DARK:**  Object to the form.

23   **A**    It's possible.

24   **Q**    **(By Mr. Hammons)** Right.  And if the sheriff's

25   department, the Cleveland County Detention Center, had

```
 1   facilities say that there has to be an individual at the
 2   monitor, watching that camera continuously, when they're
 3   on suicide watch.
 4        A    No.
 5        Q    Okay.
 6             MR. SNIDER:  Object to the form.
 7        Q    (By Mr. Hammons) And if, in fact -- I'm going
 8   to try to save us all a lot of time and punishment to
 9   watching these sight checks, but I -- I will reference
10   to you, I can -- we can watch one, if you want, but I
11   want to make sure that the one-second sight checks that
12   we see, those -- there's nothing inconsistent with doing
13   a one-second, open the door and shut it -- there's
14   nothing inconsistent with your training or the policies
15   and procedures, as Cleveland County taught you?
16             MS. DARK:  Object to the form.
17        A    It depends on the situation.
18        Q    (By Mr. Hammons) Right.  Well, I -- and we're
19   specifically talking about this situation.  So if there
20   was a one-second sight check done on Marconia Kessee on
21   January 16, 2018, no one at Cleveland County told you
22   that was inconsistent with their policy?
23        A    No, nobody told me that, no.
24        Q    Yeah.  No one came to you after the fact and
25   said, "We've watched these back.  You -- you opened the
```

```
 1   Center felt it was important enough to have a -- an
 2   actual -- "For sight check procedures on suicide watch,
 3   detox and critical observation," they wrote that out and
 4   actually direct you to 3.15, to see those procedures;
 5   true?
 6        A    Yes, but, again, it depends on the situation.
 7        Q    All right, we'll -- we'll talk about the
 8   situation in a minute.
 9             Specifically 3.15, as you probably already
10   know, sitting here, there is no sight check procedure --
11   procedural guidelines listed in 3.15, is there?
12        A    I'd have to go back and look.
13        Q    Well, we -- we can, if you want to, 3.15.
14   It's on Page 407, to make it easier.
15        A    It says, "Sight checks will be conducted and
16   logged every 30 minutes for a detoxing inmate, at
17   minimum.  If the duty -- on-duty supervisor feels it is
18   necessary, the checks can be made every 15 minutes."
19        Q    All right.  That's -- that's when to do them.
20   I'm looking for how to do them.
21        A    It doesn't say, no, how to do them.
22        Q    Okay.  So, for instance, knowing how to do
23   a -- whatever -- whatever was going to be referenced
24   from 4.15, what we saw there, sight check procedures on
25   suicide watch, detox or other critical observation, that
```

1   piece of information would be useful for a detention

2   officer to know the -- how to do a sight check on those

3   particular situations?

4           **MS. DARK:**   Object to the form.

5       **A**    It's possible, but, again, it's impossible to

6   account for every situation you're going to run into in

7   a jail.

8       **Q**    **(By Mr. Hammons)** That's probably true, but a

9   procedure would help narrow that down, would it not?

10          **MS. DARK:**   Object to the form.

11      **A**    It's possible.

12      **Q**    **(By Mr. Hammons)** Right.  And what I'm getting

13  at is:  As a detention officer, you would have

14  benefited, having the procedure that they referenced in

15  4.15 -- actually having to read it in 3.15, if it

16  actually existed -- it would have benefited you as a

17  detention officer, would it not?

18          **MS. DARK:**   Object to the form.

19      **A**    It's possible, but, again, every situation is

20  different.

21      **Q**    **(By Mr. Hammons)** Right.  For instance, in

22  Marconia Kessee's situation, if the critical observation

23  procedure said you have to look at them for longer than

24  one second, that might have benefited a detention

25  officer, it might have benefited Marconia Kessee; true?

1          **MS. DARK:**  Object to the form.

2     **A**     It's possible.

3     **Q**     **(By Mr. Hammons)** Right.  Because if we look at

4  him longer than one second, we can -- our eyes can

5  adjust and we can see that he isn't moving, at all.

6  That would have benefited Marconia; true?

7          **MS. DARK:**  Object to the form.

8          **MR. SNIDER:**  Object to the form.

9     **A**     If somebody were to look in there and seen

10  that he was lying on the floor, it's possible to think

11  he could have went to sleep.

12    **Q**     **(By Mr. Hammons)** Right.  And a procedure for a

13  person on critical observation, that would help you

14  determine if he's asleep or dead, would be useful, would

15  it not?

16          **MS. DARK:**  Object to the form.

17    **A**     It's impossible to say.

18    **Q**     **(By Mr. Hammons)** Well, you get -- you get

19  where I'm coming from, right?  One second -- I mean, if

20  we watch the video, this man never moved for an hour.

21  He doesn't move, at all, okay?

22          You -- you have to agree with me, it's not

23  unreasonable to believe that when a person is on

24  critical observation, something serious is wrong with

25  them; true?

1     **A**     It's a possibility.

2     **Q**     When you were shadowing as a detention

3     officer, when you first went on to work, did --

4     depending on the shift, did you have different trainers

5     that -- detention officer trainers that you shadowed?

6     **A**     Yes.

7     **Q**     Okay.  So with respect to the training on

8     sight checks, it just would depend on -- everybody does

9     it a little bit differently, is what I've heard.

10          **MS. DARK:**  Object to the form.

11    **A**     From what I can remember, everybody does it a

12    little bit differently, but the end goal is the same:

13    Make sure of the safety and well-being of the jail and

14    the inmates.

15    **Q**     **(By Mr. Hammons)** Right.  That's the policy,

16    the overall idea behind sight checks, is to make sure

17    inmates are safe and their well-being is -- is secure,

18    right?

19    **A**     Uh-huh.

20    **Q**     Right?

21    **A**     Yes.

22    **Q**     And then -- but the way you're trained is the

23    procedure, how do we implement that policy, right?

24    **A**     Yes.

25    **Q**     And there was no hard and fast rule on site

1    **Q**    Okay.  And the reason for asking those

2    questions is to get a better understanding of their --

3    of the inmate's history; true?

4              **MR. SNIDER:**  Object to the form.

5    **A**    Assuming they're being truthful, yes.

6    **Q**    **(By Mr. Hammons)** Right.  But, again, you have

7    to ask the questions, right, to get the information?

8    **A**    Yes.

9    **Q**    Okay.  Those are questions like:  "Do you have

10   any medical conditions?"  True?

11   **A**    Yes.

12   **Q**    They ask them about medicines that they might

13   be on, prescriptions; true?

14   **A**    Yes.

15   **Q**    Or what substances, maybe illegal substances,

16   they might be on; true?

17   **A**    Yes.

18   **Q**    Alcohol, how much alcohol they've -- they've

19   consumed; true?

20   **A**    Yes.

21   **Q**    Okay.  Maybe they would ask them have they

22   been injured recently; true?

23   **A**    It's possible.

24   **Q**    Like, for instance:  "Have you been drug

25   across a parking lot by a police officer?"  There would

1    be -- that would be -- might injure you; true?

2            **MS. DARK:**  Object to the form.

3       **A**    It's possible.

4       **Q**    **(By Mr. Hammons)** Right.  Oftentimes, they

5    do -- they do take blood pressures from individuals;

6    true?

7       **A**    Yeah.

8       **Q**    Temperatures, sometimes?

9       **A**    Yes.

10      **Q**    Okay.  And all of those things are so that

11   they can make a medical determination if this person has

12   something going on with them, right?

13      **A**    Yes.

14      **Q**    And you would agree with me that Clayton

15   Rickert didn't ask any question of Marconia Kessee?

16           **MR. SNIDER:**  Object to the form.

17      **A**    I did not hear him ask any questions.

18      **Q**    **(By Mr. Hammons)** Right.  He -- Clayton Rickert

19   spoke very little during his encounter with Marconia

20   Kessee; true?

21           **MR. SNIDER:**  Object to the form.

22      **A**    If you say so.  I was more concerned about

23   making sure he was -- Marconia Kessee wasn't going to do

24   anything to hurt himself.

25      **Q**    **(By Mr. Hammons)** Right.  I mean, we see, in

1  **Q** All right.  Well, he -- when -- when somebody

2 uses an ammonia packet, do you know why they use it?

3  **A** No.

4   **MR. SNIDER:**  Object to form.

5  **Q** **(By Mr. Hammons)** I mean, you heard me earlier.

6 I mean, I played football and I -- I -- I've been

7 knocked out a couple of times and they would use those

8 to wake me up.  Smelling salts is -- have you ever heard

9 that?

10  **A** Uh-huh.

11  **Q** Yes?

12  **A** Yes.

13  **Q** Sorry.  And you've probably heard this, too,

14 but Clayton Rickert seemed to indicate that it's some

15 sort of diagnostic tool to indicate somebody is faking a

16 seizure.  Have you ever heard that?

17   **MR. SNIDER:**  Object to the form.

18  **A** I've heard that, but I don't know how true it

19 is.

20  **Q** **(By Mr. Hammons)** Right, what -- yeah.

21   I'm wondering if there's a practice or a

22 polic- -- I know there's not a policy, but maybe a

23 practice that when an -- when an inmate is actually

24 placed into critical observation, is there a practice to

25 communicate to other detention officers why that person

1  is in there?

2      **A**    I don't remember.

3      **Q**    You know what I'm saying?  Like, some

4  people -- it seems that there is a difference between

5  somebody may be on suicide watch or somebody is on detox

6  or some other medical issue.  It seems like that would

7  be important information for the individual, doing a

8  critical observation, to know, but there's no practice

9  of -- of communicating that, is there?

10         **MS. DARK:**  Object to the form.

11      **A**    It's possible.  I mean, me, as an officer, if

12  I was doing sight checks for somebody and they're in a

13  suicide smock, my knowledge and experience would tell me

14  that, at some point in his stay at the jail, he made

15  suicidal comments or tried to harm himself.  But, again,

16  I can't speak for any other officer but me.

17      **Q**    **(By Mr. Hammons)** Yeah, and I'm thinking more

18  along the lines of knowing it before you look into and

19  do the sight check, so that you -- your brain is

20  thinking, "Okay, this is a suicide risk, I better be

21  watching out for blood on his arms or hanging

22  themselves," something like that, as opposed to not

23  knowing anything when you open the door and close it and

24  look in.  Does that make sense?

25         So I'm just wondering if there's a practice

1    of, "Hey, everybody that's going to be doing these sight

2    checks, Marconia Kessee is in the padded cell for these

3    reasons."  Is there a practice of doing that?

4          A     I don't remember.

5          Q     Okay.  You know, it's -- because I think,

6    like, potentially -- I don't recall exactly, but maybe,

7    like, Brian Knapp and Scott might have done the sight

8    check, the one-second look-in, and they had no knowledge

9    of what -- why the person was in there.  So is that the

10   typical situation?

11         A     I don't know.  I -- it's possible.

12         Q     So under that scenario, whether the person is

13   on suicide watch or potentially overdosing or on detox,

14   the job of the detention officer does not change, as far

15   as critical observation sight checks?

16         A     Yes.

17         Q     What is -- I didn't get a good idea of what it

18   was from the last deposition.  What is medical

19   observation?  I just can't figure out what this is.

20         A     My knowledge of a medical observation is that

21   they are to be housed in medical, to be watched over by

22   the nurse and a detention officer.  It -- whether they

23   have a cane, crutches, a wheelchair, or they broke their

24   leg.  That's my idea of medical observation.

25         Q     So they would be taken to the medical ward, so

1    or chest rising up and down. You can see their back

2    expanding from the lungs expanding. Other than that, I

3    don't remember any specific training.

4        Q    (By Mr. Hammons) Okay. So with respect to

5    Marconia Kessee, if you look into the cell, the critical

6    observation cell, and he is showing signs of drug

7    overdose, how would you know that, at the Cleveland

8    County Detention Officer, if you're a detention officer?

9                MS. DARK: Object to the form.

10       A    I don't know the signs of drug overdose.

11       Q    (By Mr. Hammons) So if you looked in there and

12   he was showing these signs, but he -- he was alive,

13   he -- you know, he was awake, maybe he was slumped over,

14   sweating, breathing heavily, and you looked in, your

15   training would tell you to say, "Well, he is alive, he's

16   sitting there," you would write "awake" on the sheet and

17   walk away; true?

18               MS. DARK: Object to the form.

19       A    Depending on the circumstance.

20       Q    (By Mr. Hammons) Well, that circumstance,

21   where he's muttering in the corner, he's sweating, he's

22   breathing heavily, and he just can't stand up, and you

23   look in, you see him, you write "awake," is what your

24   training tells you to do; true?

25               MS. DARK: Object to the form.

1    **A**    It depends on the circumstance.  If we had

2    just placed him in there, after having an incident, then

3    I would have no reason to believe -- he's sweating

4    because he's -- just got done having an incident, and

5    he's breathing heavy because he's tired.  If he's been

6    sitting in there for three hours and he started doing

7    that, I would probably call medical.

8    **Q**    (By Mr. Hammons) Okay.  Well, Marconia

9    didn't -- you carried him in; true?

10   **A**    Yes.

11   **Q**    And he laid in the floor; true?

12   **A**    Yes.

13   **Q**    And he, the whole time, was breathing very

14   heavily and sweating profusely; true?

15              **MR. SNIDER:**  Object to the form.

16   **A**    Yes.  But, again, we had just carried him into

17   the jail -- into the jail.  We had that episode in the

18   intake room, and then we carried him to the jail cell,

19   the padded cell.

20   **Q**    (By Mr. Hammons) Right.  But he wasn't -- I

21   mean, I guess he wasn't active, he wasn't, like, moving

22   around to get out of wind; true?

23   **A**    He was shaking on the floor in the intake

24   room.

25   **Q**    Yeah, I mean, he was shaking, yeah, but -- do

```
 1        A      I don't remember.  I just remember him telling
 2   us not to cuss.
 3        Q      And you don't remem- -- recall anything about
 4   the sufficiency of your sight checks, either?
 5        A      No, I don't remember anything about that.
 6        Q      Okay.  I want to see if you agree that the way
 7   that Marconia Kessee was treated on January 16, 2018, is
 8   the way that all inmates are treated at the Cleveland
 9   County Detention Center.
10             MS. DARK:  Object to the form.
11        A      It would depend on the situation.
12        Q      (By Mr. Hammons) Well, a situation just like
13   that one, he wasn't treated out of the ordinary, in your
14   opinion?
15        A      In my opinion, yes.  He came in, refusing to
16   answer any questions, refusing to do anything we asked,
17   and so...
18        Q      What questions did he refuse to answer?
19        A      I know I asked him what shoe size he wore, and
20   I know, in the video, Stacy said it -- "12 sounds good."
21   And if you watch the video, you can see me stare at
22   Mr. Kessee and I'm giving him an opportunity to answer
23   the question.  He never answers the question.
24        Q      Okay.  And you -- you take that as him not
25   complying with questions, not -- he didn't answer your
```

1    size 12 shoe -- or size of shoe, right?

2        **A**    Yeah, he didn't answer it.

3        **Q**    Okay.  Anything else that you recall?

4        **A**    I believe -- I don't remember exactly, but I

5    believe I asked him, when we got him out of the cop car,

6    if he would stand up, and he didn't.  He appeared to

7    stand on his feet and then act like he couldn't walk.

8        **Q**    Okay.  And that's when y'all carried him in?

9        **A**    Yes.

10       **Q**    Do you believe Marconia was combative?

11       **A**    I wouldn't say combative.  I would say he had

12   behavioral issues.  He definitely didn't want to be at

13   the jail.

14       **Q**    Yeah, he definitely didn't.  He wanted to be

15   at the hospital, is what it sounds like, right?

16               **MR. SNIDER:**  Object to the form.

17               **MS. DARK:**  Object to the form.

18       **A**    I mean, there's a lot of inmates that came in,

19   over the course that I worked there, that said this was

20   wrong with them or, "I'm having a heart attack," or

21   would even fake a seizure, just to try to go out to the

22   hospital, when they arrived at the jail.

23       **Q**    **(By Mr. Hammons)** Right.  Is there any training

24   to deal with that mindset at the Cleveland County

25   Detention Center?

1        **A**     Yes.

2        **Q**     You didn't hear Clayton Rickert attempt a

3    mental or medical health screening; true?

4        **A**     I didn't hear anything, no.

5        **Q**     Right.  I mean, he -- he didn't do it, right?

6    Let's be honest:  He didn't do it, right?

7                **MR. SNIDER:**  Object to the form.

8        **A**     If you say so.

9        **Q**     **(By Mr. Hammons)** Well, did you see him, at any

10   point in time in your interaction, where Clayton Rickert

11   was with Marconia Kessee, do an initial medical/mental

12   health screening?

13       **A**     No, I did not.

14       **Q**     So he might have done one later, just not when

15   you were around?

16       **A**     It's possible.

17       **Q**     Right.  Now, now under definitions on that

18   same section there, "Fit for incarceration:  This is a

19   form signed by a physician that declares an arrestee or

20   inmate is free of any conditions that cannot be handled

21   by our medical staff, meaning they can be booked and

22   housed in our facility with no medical issues."

23              Really, I think I've -- I've gotten differing

24   answers on this.  At the time, January 16, 2018, is

25   there a difference between having a fit slip and the

1  staff -- jail staff seeing it, booking it in, or can you

2  just take the word of an officer that it -- it's on its

3  way?

4         MR. SNIDER:   Object to the form.

5    A    I mean, it -- it depends on the situation.   In

6  this situation, you have two different -- two different

7  officers handling the situation, where one was

8  transporting and one was bringing paperwork.   So it

9  depends.

10   Q    (By Mr. Hammons) Well, I'm -- that's what I'm

11 asking:   On that -- that very situation, what's the

12 policy at Cleveland County?   Can they admit him without

13 a fit slip?

14   A    If he came from the hospital, he has to have a

15 fit slip.

16   Q    But the officer would have to have it, so

17 y'all could see it, right?

18   A    I don't know.   That's --

19         MR. SNIDER:   Object to the form.

20   A    That's a conversation between him and medical.

21   Q    (By Mr. Hammons) Well, I mean, in your

22 experience of doing these, you've seen fit slips before;

23 true?

24   A    Yes.

25   Q    And is it your experience -- and wouldn't that

1    be something that you're -- you're responsible for, is

2    to say -- it doesn't take medical training to say, "Hey,

3    medical, we don't have a fit slip, we -- this guy isn't

4    coming in here."  Is that in your job duties?

5              MS. DARK:  Object to the form.

6        A     I don't know.

7        Q     (By Mr. Hammons) You know what I mean?  That's

8    -- that has to do with security of the jail, is, "Hey,

9    we don't have a fit slip, this isn't the procedure,

10   we're not taking him in."  Is that -- is that the way it

11   goes there?

12             MS. DARK:  Object to the form.

13             MR. SNIDER:  Object to the form.

14       A     We knew there was one on its way.

15       Q     (By Mr. Hammons) According to the officer who

16   has got the gun on his side; true?

17             MS. DARK:  Object to the form.

18             MR. SNIDER:  Object to the form.

19             MS. GOOCH:  Oh, my gosh.  Object to the form.

20       A     Officer Brown, yes.

21       Q     (By Mr. Hammons) Right.  But he -- that's a

22   rule, not to bring that gun in there, isn't it?

23       A     It's a rule, but given this situation where

24   things are escalating quickly...

25       Q     What -- what's escalating quickly?  Y'all

1  inmates, they're -- a lot of times, that's the first

2  time you've ever met them; true?

3      **A**    I would say for most of them, yes.

4      **Q**    Yeah.  And that's why we -- that's why we have

5  these processes to ask them questions and find out about

6  their situation; true?

7      **A**    Yes.

8      **Q**    Right.  Now, I know you'd said he was asked

9  about his size of his shoe and then I recall -- maybe it

10  was you or Shifflett, I'm not sure, asked him if he had

11  anything in his pockets; true?

12      **A**    Somebody asked that, yes.

13      **Q**    Okay.  And -- but there's no question about --

14  from anybody, that you can recall, about how he's

15  feeling; true?

16      **A**    I didn't ask him anything like that.

17      **Q**    Didn't ask him about why he's sweating

18  profusely?

19          **MS. DARK:**  Object to the form.

20      **A**    I didn't, no.

21      **Q**    **(By Mr. Hammons)** No one asked him about any

22  substances that he might have ingested?

23      **A**    I didn't, no.

24      **Q**    About any injuries he might have had recently?

25      **A**    I didn't, no.

102

1       **A**     Yeah.  No, two incidents.  This one is Case

2    No. 2018-0095, and this one is 18-0096.

3       **Q**     Right.  And I'm just trying to get a feel.

4    The 95, Exhibit 5, was done -- were they done at the

5    same time, you just wrote them at different -- because

6    they're different reports, or did you do them at

7    separate times?  Like this one, Exhibit 5, maybe that

8    was done right after Marconia was put in the -- the cell

9    and you went over and typed up your report.

10      **A**     I don't remember.

11      **Q**     Okay.

12      **A**     I just know they had to be done that night.

13      **Q**     Okay.  Now, on Exhibit No. 5, it says, "Was

14   medical attention required?"  It says -- you checked the

15   box "Yes".  Do you see that?

16      **A**     Yes.

17      **Q**     And this is talking about the intake incident;

18   true?

19      **A**     Yes.

20      **Q**     So what -- what medical attention are we

21   talking about?

22      **A**     Well, Clayton Nick- -- Rickert, who was our

23   nurse, was on scene the whole time and made the decision

24   to put him in the padded cell.

25      **Q**     Okay.  Now, up here in the... you -- you

1    actually call these events seizures, too, correct?

2         A    Yes, that's what I wrote down.

3         Q    Okay.  But you -- you don't know if they were

4    seizures or not, right?

5         A    They appeared to me --

6              MR. SNIDER:  Object to the form.

7         A    They appeared to me to be a fake seizure.

8         Q    (By Mr. Hammons) Okay.  Yet -- and you don't

9    have any training on -- to know that, right?

10        A    Just based on what I've seen at the jail from

11   working there.  I've witnessed people have real seizures

12   and I've witnessed people fake.

13        Q    Okay.  Now, on Exhibit No. 4, the overview of

14   your interview with the OSBI, this is where you talk

15   about him -- you don't understand why the ammonia

16   capsule -- Rickert used it.  Have you ever figured out

17   why that was, why he was using that?

18             MR. SNIDER:  Object to the form.

19        A    I haven't asked him since this day.

20        Q    (By Mr. Hammons) You probably hadn't seen,

21   except on the screen or around -- you hadn't talked to

22   Clayton Rickert, at all, since this incident, have you?

23        A    No.

24        Q    Y'all weren't, like, friends outside of work?

25        A    No.

1  actually watch his body, throughout the entire video

2  that he's in the cell; true?

3       **MS. DARK:**  Object to the form.

4       **A**    I've watched bits and pieces, but I've never

5  watched it in its entirety.

6       **Q**    **(By Mr. Hammons)** Okay.  You've never saw the

7  part where his legs shake violently, they stop, and

8  never move again?

9       **MS. DARK:**  Object to the form.

10      **A**    Again, I haven't seen the video in its

11  entirety.

12      **Q**    **(By Mr. Hammons)** Okay.  I take it that one of

13  the things that you're going to tell the jury is that

14  Marconia Kessee was faking?

15      **A**    I believe he was --

16      **MS. DARK:**  Object to the form.

17      **A**    -- facing --

18      **MS. DARK:**  Hold on.  I don't think that was a

19  question.

20      **MR. HAMMONS:**  Yeah, it was definitely a

21  question.  I mean, a hundred percent.

22      **A**    Can you rephrase the question?

23      **Q**    **(By Mr. Hammons)** Are you going to tell the

24  jury that Marconia Kessee was faking?  Question mark.

25      **A**    I'm going to tell the jury that based on my

1   knowledge, he appeared to be intoxicated and he was

2   acting out to get out of jail.

3                   MR. HAMMONS:  Okay.  Nothing further.

4                   MS. DARK:  Anyone else have anything?

5                   MR. RUSSELL:  No.

6                   MR. HUFF:  Nothing here.

7                   MS. GOOCH:  Not me.

8                   MS. DARK:  He will read and sign.

9                   THE MONITOR:  Going off the record.  The time

10  is 2:55 p.m.

11                  (Deposition concluded at 2:55 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25