```
1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE WESTERN DISTRICT OF OKLAHOMA

3    (1) PATRICIA THOMPSON, as Personal
     Representative of the Estate of
4    MARCONIA LYNN KESSEE,

5         Plaintiff,                        Case Number
                                            CIV-19-113-SLP
6    VS.

7    (1) NORMAN REGIONAL HOSPITAL
     AUTHORITY d/b/a NORMAN REGIONAL
8    HOSPITAL, a public trust, et al.,

9         Defendants.

10

11

12                    * * * * *

13    VIDEOCONFERENCE DEPOSITION OF LORI ROSCOE
           TAKEN ON BEHALF OF THE DEFENDANTS
14    TURN KEY HEALTH CLINICS, LLC & CLAYTON RICKERT
            IN PALM BEACH GARDENS, FLORIDA
15                 ON MAY 24, 2021
           COMMENCING AT 10:02 A.M. CST
16
                      * * * * *
17

18

19

20

21
                   INSTASCRIPT, LLC
22             125 PARK AVENUE, SUITE LL
            OKLAHOMA CITY, OKLAHOMA  73102                EXHIBIT
23                 405.605.6880
               schedule@instascript.net                      21
24

25   Reported via Zoom by:  Cheryl D. Rylant, CSR, RPR
```

1    A. Yes.  The copy of the fit slip that I have
2    looks like it's a copy that was made from a fax that
3    came over a fax machine.  And at the top, the header
4    is 2/8/2018.
5    Q. Is it your position that the fit slip that
6    you see in the records was not signed on
7    January 16th, 2018?
8    A. No.  I'm not saying that at all.
9    Q. Okay.
10   A. I'm putting myself in LPN Rickert's position.
11   I don't know that he physically saw the fit slip
12   versus Officer -- I think it was Canaan who escorted
13   Mr. Kessee in and told him about the fit slip.  Or
14   maybe it was Officer Brown a little bit later.
15   Q. Okay.  And so you know that Clayton Rickert
16   was informed by one of the arresting police officers
17   that there was a fit slip; correct?
18   A. A fit slip was coming, yes.
19   Q. What is your understanding of the meaning of
20   a fit slip?
21       MR. RUSSELL:  Objection, form.
22       THE WITNESS:  In my experience, they're
23   sometimes called fit slips, fit for incarceration
24   evaluation, clearance, any number of -- of titles.
25   But what they all mean is that the patient was

```
 1   evaluated by a medical profession -- professional,
 2   excuse me -- and deemed to be appropriate and able to
 3   go to jail and be incarcerated.
 4        Q. (By Mr. Young)  Was it fair for
 5   Clayton Rickert to rely on that fit slip in his
 6   screening of Marconia Kessee?
 7             MR. RUSSELL:  Objection, form.
 8             MR. HICKS:  Object, form.
 9        Are we doing one objection for all here?
10             MR. YOUNG:  I'm fine with that.
11             MR. HICKS:  Okay.
12             MS. GOOCH:  I have no objection to that.
13        Q. (By Mr. Young)  I think you can answer.
14        A. Thank you.
15        No.  In this circumstance, he was also told
16   when the officer came in the door with Mr. Kessee
17   that he was not acting like this inside of the
18   hospital but started this behavior when he was
19   outside of the hospital.
20        And so, by virtue of that, I don't believe that
21   LPN Rickert could -- or Rickert could solely say,
22   because he was cleared inside of the hospital however
23   many -- half hour, 45 minutes ago, because of the
24   fact that he was told that there was a change in
25   Mr. Kessee's behavior and condition, he had to then
```

```
 1   do an assessment.
 2         Q. Okay.  Let's back up a little bit because my
 3   question was a little bit different.
 4         I think that you're saying that it was not okay
 5   to rely solely on the fit slip.  And my question is:
 6   Was it okay to rely at all on the fit slip?
 7              MR. HICKS:  Object to form.
 8              THE WITNESS:  Well, again, because he also
 9   knew that there was a change in Mr. Kessee's
10   presentation and condition, no.  At that point, when
11   you've identified that this patient is not the same
12   as he was in front of the person who was doing the
13   medical clearance for him, then it required another
14   evaluation and/or to be sent back to the emergency
15   department now, in light of this new abnormal
16   behavior that -- that you were seeing.
17         Q. (By Mr. Young)  Okay.  So it's your position
18   that Clayton Rickert was aware of a change in
19   condition?
20         A. Yes.  On the video, the officer says to him,
21   "This started after he got outside of the hospital."
22         Q. And you read Clayton Rickert's deposition;
23   correct?
24         A. Yes.
25         Q. And you're aware that he thought that
```

```
 1    call a provider.
 2         Q. Is it your position that there was no sign
 3    that Mr. Kessee was uncooperative that
 4    Clayton Rickert was aware of?
 5         A. I'm sorry, rephrase the question.
 6         Q. Sure.
 7          In your report, you said that there were no
 8    signs that Mr. Kessee was being uncooperative; is
 9    that right?
10         A. Yeah.  What particular part are you referring
11    to?  When he was in the cell?  When he was in the
12    isolation cell?
13         Q. I'm talking about from -- during the intake,
14    from the perspective of Clayton Rickert, the fact
15    that Marconia Kessee had to be carried into intake,
16    that could be considered a sign of being
17    uncooperative; correct?
18         A. Yes.  Or unable to walk.
19         Q. Is it your position that Clayton Rickert went
20    outside his scope of practice and ordered medicine he
21    wasn't allowed to order?
22         A. He did.
23         Q. All right.  And what are you basing that on?
24         A. I'm basing it on the plan in the medical
25    record where he said -- I wish I had it in front of
```

1  me -- where he said the plan was going to be ordering
2  hypertension medication amlodipine and blood pressure
3  checks.  And he also initiated a medication
4  administration record -- or an MAR we call it -- that
5  showed that amlodipine was ordered and it was to be
6  started administration on 1/17/18.
7       Q. Is there anything in the medical record that
8  you've seen that Marconia Kessee received Norvasc?
9       A. No.  He was dead before it was scheduled to
10 be administered.  But --
11      Q. -- one way or another whether or not it would
12 have required a provider's order before that
13 medication would have been administered?
14      A. It should have, but the fact remains that
15 LPN Rickert initiated an MAR with a doctor's or
16 provider's name on it saying that it was ordered.
17      Q. But you don't know, one way or another,
18 whether he would have given that medication before
19 getting approval from a provider; right?
20           MR. HICKS:  Object to form.
21           THE WITNESS:  I hear your question.  And,
22 no, I can't answer for LPN Rickert.  But the bottom
23 line is:  Whenever a nurse initiates an MAR with a
24 doctor's name on it, they've gotten an order for that
25 medication.  He did not call a provider.

1       THE WITNESS: No. I do know there was a
2  head injury. I saw a head injury.
3       Q. (By Mr. Young) Okay. Have you ever
4  testified that health care can be a joint effort
5  between correctional and the medical --
6       A. I'm sure I did because I believe that.
7       Q. Okay. And you still are going to tell our
8  jury that it wasn't okay for Nurse Rickert to rely on
9  15-minute sight checks by the correctional officers
10 on Marconia Kessee?
11      MR. HICKS: Object to form.
12      THE WITNESS: That's correct. Because
13 there was a medical reason that was required for the
14 checks to be incorporating a medical person who was
15 here on site.
16      Q. (By Mr. Young) Okay.
17      A. There's a difference in working cooperatively
18 and integrally and delegating your duty as a medical
19 professional to a layperson.
20      Q. Are you critical of the resuscitation effort
21 by Clayton Rickert when he found Marconia Kessee
22 nonresponsive?
23      A. Only in that he took almost 3 minutes to
24 determine that he was not breathing and didn't have a
25 pulse, and that's an extraordinary amount of time to

```
 1   do your initial ABC assessment.
 2        Q. So your criticism is it should have been done
 3   faster?
 4        A. It should have been done faster.  And
 5   I believe he, himself, even testified that he did not
 6   believe that Mr. Kessee was in a medical
 7   significantly serious situation but, rather, that he
 8   was faking.  And so his assessment was to
 9   substantiate his opinion at that point in time that
10   Mr. Kessee was faking his unresponsiveness.
11        Q. Are you critical of Clayton Rickert for being
12   too overweight?
13        A. No.  I'm being critical of him for not being
14   able to fulfill his duties as an LPN.
15        Q. And in your review of the records, did you
16   see any prior incidents in which Clayton Rickert
17   was -- to use your words -- unable to fulfill his
18   duties?
19        A. I didn't have any of the records to review.
20        Q. Do you think Clayton Rickert lied to
21   Brandi Garner?
22             MR. HICKS:  Object to form.
23             THE WITNESS:  As I said earlier, that's up
24   to the jury to decide.  If he did lie, that was a
25   serious breach in the standard of care.
```

```
 1          Q. And it was Clayton Rickert who took the
 2   initiative to go back and check on Mr. Kessee after
 3   he had been in the cell for almost two hours; right?
 4               MR. HICKS:  Object to form.
 5               THE WITNESS:  Well, as opposed to who else
 6   would do it.  He should have been there way sooner
 7   than two hours.
 8          Q. (By Mr. Young)  So is your answer to my
 9   question yes, you saw that Clayton Rickert took the
10   initiative to go -- to go check on him?
11               MR. HICKS:  Object to form, asked and
12   answered.
13               THE WITNESS:  Yes.  At the 2-hour mark or
14   thereabouts, LPN Rickert did go to check Mr. Kessee.
15          Q. (By Mr. Young)  What are your criticisms of
16   Turn Key Health Clinics?
17               MR. HICKS:  Object to form.
18               THE WITNESS:  Well, in my review, I didn't
19   see any indication that Mr. Rickert was being
20   supervised or monitored in any way with regard to the
21   care that he was providing.  Mr. Rickert himself said
22   that he didn't have an orientation, he didn't know
23   the policies and procedures and, in fact, didn't
24   really need to know the policies and procedures to do
25   his job because he just simply filled out the answers
```

```
 1        A. I'm sorry?
 2        Q. What evidence do you have to support that
 3   opinion?
 4        A. I don't have any evidence that they did it.
 5        Q. So you don't know, one way or the other;
 6   right?
 7              MR. HICKS:  Object to form.
 8              THE WITNESS:  Whether they did or they
 9   didn't?  Well, certainly --
10        Q. (By Mr. Young)  Right.
11        A. -- there was nothing disclosed in this case
12   that would indicate that they did any kind of quality
13   assurance reviews, that they were checking medical
14   records, that they were supervising their staff.
15        Q. When was the first time you were contacted
16   about this case?
17        A. I'm sorry?
18              MR. HICKS:  Object to form.
19        Q. (By Mr. Young)  Did you say it was August of
20   2020, the first time you were contacted about this
21   case?
22        A. August 31st, yes.
23        Q. Okay.  And in that time, did you ever ask the
24   plaintiff attorneys for any of that information?
25        A. I'm sure that I did.  I usually ask that for
```

```
 1   every case.
 2        Q.  And did you receive it?
 3        A.  If I did, we wouldn't be having this
 4   conversation perhaps.  No, I didn't.
 5        Q.  Okay.  So you said that Turn Key was not
 6   doing audit checks and monitoring its -- and
 7   supervising Clayton Rickert.  Is that what you said?
 8        A.  I said I saw no evidence of that, correct.
 9        Q.  And there's no evidence to suggest that
10   either; right?
11             MR. HICKS:  Object to form.
12             THE WITNESS:  To suggest that they did not?
13        Q.  (By Mr. Young)  Right.
14        A.  Only the actions of Mr. Rickert and his words
15   and testimony.
16        Q.  But you don't know, one way or another,
17   whether or not Turn Key was supervising or auditing
18   the work of its employees; right?
19             MR. HICKS:  Object to form.
20             THE WITNESS:  I do not.
21        Q.  (By Mr. Young)  Any other criticisms of
22   Turn Key?
23             MR. HICKS:  Object to form.
24             THE WITNESS:  I think that's it.
25             MR. YOUNG:  Okay.  I'll pass the witness.
```

```
 1        Q. Upon your review of all of the records that
 2   you have looked at, all of the testimony, at the time
 3   that Mr. Kessee came into the jail, did either the
 4   nurse or the jail staff know that he had used meth?
 5            MR. HICKS:  Object to form, asked and
 6   answered.
 7            THE WITNESS:  No.  I believe Attorney Young
 8   already asked me that.
 9        Q. (By Mr. Wood)  Did they know that he had used
10   Wellbutrin?
11            MR. HICKS:  Object to form, asked and
12   answered.
13            THE WITNESS:  No.
14        Q. (By Mr. Wood)  I don't remember that question
15   being asked, but if it was, I apologize.
16        Did they know that Mr. Kessee had been snorting
17   Wellbutrin or other medications?
18            MR. HICKS:  Object to form.
19            THE WITNESS:  No.  Just to correct
20   something from your last question, though, they
21   were -- at least LPN Rickert was aware at some point
22   that he was prescribed Strattera and Wellbutrin as
23   part of his regular medications.
24        Q. (By Mr. Wood)  And did they -- and by "they,"
25   I mean the nurse or the jail staff -- know at the
```

```
 1   time that they were dealing with Mr. Kessee how many
 2   pills of Wellbutrin or Strattera Mr. Kessee had taken
 3   in the last 24 hours?
 4       A.  No.
 5       Q.  You said in a comment earlier that
 6   malingering was not common in a -- in a jail.  Do you
 7   recall that?
 8       A.  I do.
 9       Q.  And what is that based on, that comment?
10       A.  My experience, my time going to NCCHC
11   conferences and learning about malingering.  It's not
12   common.  It happens.  I'm not saying it never
13   happens.  But that's not the usual typical behavior
14   that we have in jails.
15       Q.  Does malingering occur within the jail at a
16   much higher rate than outside of a jail?
17           MR. HICKS:  Object to form.
18           THE WITNESS:  I would say yes to that.
19       Q.  (By Mr. Wood)  Have there been studies of the
20   incidence of the occurrence of malingering inside
21   correctional settings that find that there is a
22   greatly increased rate of malingering inside a jail
23   or a prison than outside of a jail?
24           MR. HICKS:  Object to form.
25           THE WITNESS:  I'm not familiar with those,
```