```
 1              UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF OKLAHOMA
 2                CASE NO. CIV-10-113-SLP

 3

    PATRICIA THOMPSON, as Personal Representative
 4  of the Estate of MARCONIA LYNN KESSEE,

 5              PLAINTIFFS

 6  VS.

 7
    NORMAN REGIONAL HOSPITAL AUTHORITY d/b/a
 8  NORMAN REGIONAL HOSPITAL, a Public Trust, et al.,

 9              DEFENDANTS

10  ─────────────────────────────────────────────────

         WITNESS:   JEFFREY S. CARTER
11  ─────────────────────────────────────────────────

12       The video deposition of JEFFREY S. CARTER

13  was taken before Jolinda S. Todd, Registered

14  Professional Reporter, CCR(KY) and Notary Public in

15  and for the State of Kentucky at Large, at 3151

16  Beaumont Centre Circle, Suite 375, Lexington,

17  Kentucky on June 11, 2021, commencing at the

18  approximate hour of 10:08 a.m.  Said deposition was

19  taken pursuant to Notice, for all purposes as

20  permitted by the Federal Rules of Civil Procedure.

21

22

23                    EXHIBIT
                        23
24

25
```

**EXHIBIT 23**

Jeffrey S. Carter
Estate of Marconia Kessee v. Norman Regional Hospital, et al

Page 125

1    A       He was shaking.  Most of the time
2    when I saw folks in my facility with my experience
3    having seizures they go unconscious.  Mr. Kessee
4    did not go unconscious.  I don't know if he was
5    having seizures or not.  Like I'm saying, I would
6    have gotten medical -- if I was in that situation
7    with those officers, I would have gotten medical
8    intervention because I would think I have no idea
9    what the hell he was experiencing.
10   Q       And we don't really know if he
11   went unconscious or not, do we?
12   A       No, sir, we do not.
13   Q       I mean, because Clayton Rickert
14   actually put a smelling salt or ammonia packet
15   under his nose and he didn't move for like nine
16   seconds.
17   A       That is correct.
18           MS. GOOCH:  Object to form.
19   BY MR. HAMMONS:
20   Q       So he could have been unconscious
21   there?
22   A       I don't know the exact time, but
23   he did -- but based on his testimony, I don't know
24   what he had in his hand, but he did put something
25   under his nose, and he said it was an ammonia pack,

Jeffrey S. Carter
Estate of Marconia Kessee v. Norman Regional Hospital, et al

Page 139

1     A     That's what I did at the time of
2  reviewing.  I review a lot of cases, and I don't
3  want to get it crossed up with another standard
4  that I've done in Georgia or Louisiana or somewhere
5  like that.  At the time when I was writing this,
6  yes, that was -- I reviewed those.
7     Q     Yeah, and that's what I'm asking
8  you, is it your opinion that the jail staff at
9  Cleveland County Detention Center met the minimum
10 standards without being -- knowing the signs and
11 symptoms of detox, withdrawal and overdose?
12    A     I do not think that -- you're
13 asking my opinion about the Oklahoma standards or
14 are you asking my opinion of what they should be
15 doing?
16    Q     Standard.
17    A     Okay.  I can't recall
18 specifically what the standard states, here --
19 sitting here today without having it in front of
20 me.  What I found was, is in the practice of what
21 they did, they met the standard.  They got medical
22 intervention, because you can have the training of
23 and the knowledge of identifying someone of having
24 that, but, again I'm not going to have my
25 correction staff making a determination, this

Page 140

1   person is withdrawing as opposed to this person
2   being under the influence.
3           Because if you're drunk, they may allow them
4   to sleep it off.  If they're overdosing, that could
5   be a medical problem especially with alcohol, where
6   it could be deadly, even more so than drugs.
7   Therefore I'm not going to have them make that call.
8       Q       I understand they don't make the
9   ultimate call.
10      A       Uh-huh (affirmative).
11      Q       I'm just asking simply, is it the
12  Oklahoma standard that they have some training to
13  see some signs of that?  That's all I'm asking.
14      A       I think it's shall, not may.  I
15  don't think it's required in the standard.  Again,
16  I'd have to review that standard again.
17      Q       Do you know what the standard is
18  in Kentucky?  Do they have to know -- just at least
19  have some training on signs and symptoms of
20  withdrawal and overdose?
21      MS. DARK:  Object to the form.
22      A       All it is in Kentucky is to
23  basically -- medical distress, that's what it's
24  called.  So however you decide or determine what
25  falls under medical distress, you must have that as

```
 1             MS. DARK:  Your arresting officer tells
 2        you, your discharge paper tells you, lots
 3        of ways.  I don't think you are being fair,
 4        is my point.
 5             MR. HAMMONS:  Well, do you want to keep
 6        going?
 7             MS. DARK:  Yeah, go ahead.
 8             MR. HAMMONS:  No, you go ahead.  I'll let
 9        you finish.
10             MS. DARK:  No.  I made my statement for the
11        record.  I am just asking you to be fair in
12        your questions.
13   BY MR. HAMMONS:
14        Q         Do you feel I'm being unfair,
15   sir?  If I am, I'll change my --
16        A         I can handle it.
17        Q         I got to go find it somewhere.
18   I'll find it real fast, and we will read it exactly
19   like it is.
20        "An arrestee who is brought into the
21   facility for booking and has a .3 blood alcohol
22   content will be automatically sent out for a fit
23   slip."  Is that consistent with other policies you
24   have implemented in your past?
25        A         It could be .25 or .3.  What I
```

1  would question there is it doesn't say who is to
2  conduct the actual BAC, right.
3      Q      Yes, this is just in the section
4  of initial medical health screening procedural
5  guidelines.  Do you --
6      A      Yes, sir.
7      Q      Do you think that's part of their
8  procedure, since it's under procedural guidelines
9  for intake?
10     A      Yes, sir, but again, I think the
11 question comes in as -- a BAC is normally done on
12 someone who is charged with DUI.  You got a PBT,
13 which I don't know that that was strong enough to
14 stand up in court.  We utilize it as an
15 administrative thing just to make sure we are not
16 bringing someone in or allowing someone to come in
17 who is under the influence of alcohol if we smell
18 it on their person, okay?  We don't give the
19 handheld BAC if we don't smell alcohol.
20     Q      Okay.
21     A      Okay.  We just -- I mean, there's
22 no indicator stating we should.  We assume then
23 that it's some type of drug activity or drug
24 involvement, therefore we allow medical to make the
25 call, medical intervention.

Page 224

1   at the -- as a culture inside of that facility.
2   That's what I mean by that, in that paragraph.
3         Q        Okay.  So you are going to
4   testify that you find there's no causal effect of
5   death?
6         MS. DARK:  Object to the form.
7         A        I guess in that statement right
8   there I'm going to say that I do not believe as a
9   correctional expert that words killed him.  So if
10  that's a medical determination, then...
11        Q        What is your opinion of the jail
12  staff and the jail in this case?  What are your
13  opinions?  I mean, I know we've talked about a
14  bunch, but could you -- are you able to articulate
15  it?
16        A        As far as how they conduct their
17  business or?
18        Q        Yeah, we can start with the jail
19  staff, the detention officers in this case.
20        A        Well, I think the jail staff had
21  some training.  They were -- they were following
22  that training.  I think they testified on that
23  based on my perception of depositions.
24        They were -- they had -- the jail had
25  policies in place, the officers were following those

```
 1   policies.  And I think they are -- I think they
 2   are -- relating to their conduct, not the
 3   unprofessional side, but as far as how they dealt
 4   with this situation, I find that they were at least
 5   average if not above average concerning the jails
 6   around the country, and I've been in and taught a
 7   lot.
 8           Q        Okay.
 9           A        Now, again, they are not
10   extraordinary.  Everyone has issues, but I feel
11   like they did their job as they were trained, which
12   would meet industry standard based on the jail
13   staff.
14           Q        And the policies and procedures
15   of Cleveland County, have you given opinions on
16   those?
17           A        I think the policies that I
18   reviewed meet industry standard, I think they --
19   the policies were written to specific areas.  Now,
20   could some policies have been added, some content
21   more, of course the more you add is good, but then
22   it can also -- you don't want to add so much that
23   it -- they are hard to follow.
24           Q        And that you find that same
25   opinion with respect to sight checks and critical
```