# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1)** | **PATRICIA THOMPSON, as Personal** | ) |
| | **Representative of the Estate of** | ) |
| | **MARCONIA LYNN KESSEE** | ) |
| | | ) |
| | **Plaintiff,** | ) |
| | | ) |
| **vs.** | | ) **Case No. CIV–19–113-SLP** |
| | | ) |
| **(1)** | **NORMAN REGIONAL HOSPITAL** | ) |
| | **AUTHORITY d/b/a NORMAN** | ) |
| | **REGIONAL HOSPITAL,** | ) |
| | a public trust, et. al. | ) |
| | | ) |
| | **Defendants.** | ) |

---

## PLAINTIFF'S RESPONSE TO DEFENDANT AMASON'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN OPPOSITION

## **<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES ..................................................................................................ii

INDEX TO EXHIBITS..........................................................................................................ivv

PLAINTIFF'S RESPONSE TO DEFENDANT AMASON'S MOTION FOR SUMMARY
JUDGMENT AND BRIEF IN SUPPORT ...........................................................................1

PLAINTIFF'S RESPONSE TO LCvR 56.1(b) STATEMENT OF FACTS ...........................2

STANDARD OF REVIEW ....................................................................................................13

ARGUMENTS AND AUTHORITIES..................................................................................14

   I.   THE UNDERLYING CONSTITUTIONAL VIOLATION.....................................15

   II.  THE COUNTY'S WRITTEN POLICIES, AS WELL AS THEIR UNWRITTEN
POLICIES AND CUSTOMS, VIOLATED KESSEE'S CONSTITUIONAL RIGHTS17

     A.   The County's Policies Were Unconstitutional ...........................................................18

     B.   The County's Policies Were Maintained with Deliberate Indifference..................21

   III. THE COUNTY'S FAILURE TO TRAIN THEIR EMPLOYEES RESULTED IN
THE VIOLATION OF KESSEE'S CONSTITUTIONAL RIGHTS...............................21

     A.   Deficient Training ........................................................................................................22

     B.   Causation ........................................................................................................................25

     C.   Deliberate Indifference................................................................................................26

CONCLUSION .......................................................................................................................27

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505 (1986) ......................................... 14

*A.M. v. Luzerne County Juvenile Detention Center*, 372 F.3d 572, 583 (3d Cir. 2004) ....................19

*Allen v. Muskogee*, 199 F.3d 837 (10th Cir. 1997)................................................................15, 22, 26

*Blackmore v. Kalamazoo*, 390 F.3d 890, 900 (6th Cir. 2004)............................................................19

*Brown v. Gray*, 227 F.3d 1278, 1290 (10th Cir. 2000)..................................................................... 25

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) ............................................ 14, 18

*Choate v. City of Gardner, Kansas*, 2018 WL 3389871, at *5 (D. Kan. July 12, 2018)..................19

*City of Canton v. Harris*, 489 U.S. 378, 387 (1989)............................................................21, 22, 25

*Cordova v. Aragon*, 569 F.3d 1183, 1193 (10th Cir. 2009). .............................................................17

*Crowson v. Wash. Cty. State of Utah*, 983 F.3d 1166  (10th Cir. 2020) ..........................................16

*Curtis v. Oklahoma City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200 (10th Cir. 1998)  ........................ 14

*Garcia v. Salt Lake County*, 768 F.2d 303 (10th Cir. 1985)......................................................... 3, 16

*Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372, 375–76, 378–82 (7th Cir. 2017)................18

*Hayes v. Faulkner County, Arkansas*, 388 F.3d 669, 674 (8th Cir. 2004) ......................................19

*Jackson v. Barnes*, 749 F.3d 755, 763–64 (9th Cir. 2014) ...............................................................19

*Lance v. Morris*, 985 F.3d 787, 800 (10th Cir. 2021) ...................................................22, 23, 24, 26

*Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002). ...............................................21

*Pembauer v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986) ........................................................ 18

*Perrin v. Anderson*, 784 F.2d 1040, 1044 (10th Cir. 1986) .............................................................1

*Tolan v. Cotton*, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014) ..........................................................14

*Weatherford v. Thompson*, 347 Fed. Appx. 400 (10th Cir. 2009) ........................................15, 17, 20

*Z.J. v. Kansas City*, 2017 WL 4390274, at *12 (W.D. Mo. Sept. 29, 2017) ..................................19

**Rules**

Fed. R. Civ. P. 56 ......................................................................................................................13

Fed. R. Evid. 404 .........................................................................................................................1

## INDEX TO EXHIBITS

Plaintiff has filed a Joint Appendix of Exhibits for her Responses to the following Motions for Summary Judgment, filed concurrently:

- Motion for Summary Judgment of Defendant Andrews and Brief in Support [Doc. 250];
- Motion for Summary Judgment of Defendant Cody Barr and Brief in Support [Doc. 251];
- Motion for Summary Judgment of Defendant Todd Gibson and Brief in Support [Doc. 252];
- Motion for Summary Judgment of Defendant Shifflett and Brief in Support [Doc. 253];
- Motion for Summary Judgment of Defendant Amason and Brief in Support [Doc. 255];
- Defendant Turn Key Health Clinics, LLC's Motion for Summary Judgment and Brief in Support [Doc. 261]; and
- Defendant Clayton Rickert's Motion for Summary Judgment and Brief in Support [Doc. 262].

The Exhibits are identified as follows:

1. Shifflett Deposition
2. CCDC Policy 3.02, 3.03, 3.04, 3.05, 3.06, 3.07, 3.15, 4.15, 8.15, C1-01-VIII, p. 3. (FILED UNDER SEAL)
3. Knapp Deposition
4. Andrews Deposition
5. Garner Deposition
6. Scott Deposition
7. Brown Body Cam Video (BBCV) (FILED CONVENTIONALLY)
8. Rickert Deposition
9. Shifflett Report 2018-0095 (FILED UNDER SEAL)
10. Shifflett OSBI Interview Video (FILED UNDER SEAL, FILED CONVENTIONALLY)
11. Wild Deposition
12. "Ammonia Capsules Are a Great Tool For Assessing Pseudoseizures"
13. Jail Intake Video (FILED CONVENTIONALLY)
14. Gibson Deposition
15. Cooper Deposition
16. Barr OSBI Interview Video (FILED UNDER SEAL)
17. TK Medical Record (FILED UNDER SEAL)
18. Rickert OSBI Statement (FILED UNDER SEAL)
19. Barr Deposition
20. Jail Cell Video (FILED CONVENTIONALLY)
21. Roscoe Deposition

22. Brown Deposition
23. Carter Deposition
24. Booking Detail Report (FILED UNDER SEAL)
25. Log sheet (FILED UNDER SEAL)
26. Shifflett Supplemental Report (FILED UNDER SEAL)
27. Jobin Deposition
28. John Report (Defense Expert)
29. Processing Corridor 1 Video (FILED CONVENTIONALLY)
30. Processing Corridor 4, 9:32:03 Screenshot of Shifflett. (FILED CONVENTIONALLY)
31. John Deposition
32. NRH Discharge Paperwork (FILED UNDER SEAL)
33. Sally Port Video (FILED CONVENTIONALLY)
34. TK Policy, J-6, J-9, J-22, J-26 (FILED UNDER SEAL)
35. Canaan Deposition
36. Roscoe Report
37. Garner Incident Report (FILED UNDER SEAL)
38. OK Jail Stds., 310:670-5-8
39. Booking Detail Report (FILED UNDER SEAL)
40. Affidavit of Andrews
41. Rickert Training Materials (FILED UNDER SEAL)
42. Cleveland County/Turn Key Contract
43. Turn Key Lawsuits

## <u>PLAINTIFF'S RESPONSE TO DEFENDANT AMASON'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT</u>

COMES NOW, Plaintiff Patricia Thompson, as Personal Representative of the Estate of Marconia Kessee, in response to the Motion for Summary Judgment filed by Defendant Amason ("Amason"). In opposition to this Motion, Plaintiff would show the Court as follows:

### <u>INTRODUCTION</u>

Plaintiff objects to the irrelevant, biased, and impermissible information Defendant seeks to introduce in his 'factual" background and statement of the case.  Defendant Amason uses this introduction as an attempt to introduce impermissible character evidence into the record. He introduces irrelevant information such as drug tests which Kessee had in the years before his death, his mental health status, and his suicide attempts. The suicide attempts are particularly irrelevant as there is no indication in the record that Kessee's death was not accidental. Defendant also utilizes inflammatory language when describing Marconia Kessee, such as calling him a "transient" and "frequent flyer in emergency rooms." This language and these "facts" are unfairly prejudicial to the Plaintiff.

The Federal Rules of Evidence specifically limits the use of character evidence "in order to show action in conformity therewithin" because there is a high degree of prejudice which comes with the introduction of character evidence. *Perrin v. Anderson*, 784 F.2d 1040, 1044 (10th Cir. 1986) (citing Fed. R. Evid. 404 advisory committee note). Defense counsel are experienced attorneys involved in multiple 42 U.S.C. § 1983 cases, aware of the rules regarding character evidence and its importance. Nevertheless, they make this transparent attempt to move focus away from the real issues by attempting to paint Marconia Kessee in a negative light. Not only is this a waste of the Court's time, but it is grossly improper.

1

As further discussed in Plaintiff's response to Defendant's undisputed facts, the rest of the information presented in this introduction is a gross misrepresentation of the situation, which is inherently biased to the Defendant. Further, Defendant's statement of facts is littered with self-serving statements of irrelevant policies, ambiguous references to "national standards," citations to Jeff Carter 9whose opinion lacks sufficient basis in actual fact as pointed out in Plaintiff's *Daubert* motion against him) and irrelevant references to the Oklahoma Jail Standards. The constitutionality of the actions at issue are to be decided by a jury.

## PLAINTIFF'S RESPONSE TO LCvR 56.1(b) STATEMENT OF FACTS

**Resp. to ¶1:** Admitted in part. Although the ***written*** policies of Cleveland County Detention Center (CCDC) state this. However, the customs, practices, and training at the jail betray this. The statement from Defendant is far from how things actually go. For instance, "once the inmate is secure" there is a dispute – jail staff say it's on Turn Key to come do an evaluation at some point, while Turn Key expects the jailers to notify them when the inmate is "calm." Ex 1, Shifflett Dep., 100:11-17; Ex. 8, Rickert Dep., 124:16-21; Ex 15 Cooper Dep., 106:01-18.) Turn Key's written policy instructs that they will do a Prebooking Screening to make early determinations if an inmate is fit to be in the jail or in need of immediate medical attention. (Ex. 34, TK Policy J-9.) Written policies of the CCDC require the jail staff to "determine an inmate is not in need of immediate medical attention" prior to accepting custody of an inmate." (Ex. 2- CCDC Policy, 3.03, 3.15). Further, the only support Defendant provides for the policies meeting national standards is from their own expert witness, who does not provide his basis for these claims. Further, compliance with the loose confines of the Oklahoma Jail

Standards is irrelevant to a jury's determination of constitutionality of policies and actions of CCDC.

**Resp. to ¶2:** Admitted in part. Relevance is questionable as Kessee was not combative or fighting. Ex. _ - Barr Dep., 68:10-13; Ex. 14 - Gibson Dep., 255:14-260:3; see also Kessee's conduct throughout Ex. 7 - BBCV, 35:29-40:48 and Ex. 20 - Jail Cell Video, 19:51:24-19:55-23.) Kessee was not uncooperative. (Ex.7 - BBCV, 35:29-40:48; Ex.1 - Shifflett Dep., 175:23-178:07; Ex. 15 - Cooper Dep., 153:19-154:23; Ex. 8 - Rickert Dep., 119:5-120:9, 260:22-263:8; Ex. 11 - Wild Dep., 113:20-115:211; Ex. 4 - Andrews Dep., 138:12-140:16; Ex. 19 - Barr Dep., 67:12-68:09). Kessee was not self-harming, he clearly was convulsing and hit his head against the wall. Ex. 7, BBCV, 38:33-38:40. This policy is so poorly administered, one jailer testified Kessee would have to stay in the cell til the next Thursday. (Ex. 3 - Knapp Dep., 79:1-8. There's also a dispute as to whether medical will come to the inmate or wait on the jailers to tell them. See Resp. ¶1.

**Resp. to ¶3:** Admitted in part. Plaintiff denies the implication that Kessee was placed in the padded cell to "cool down." See Resp. ¶2. Kessee's lack of reaction to Rickert's ammonia packet after he was convulsing indicates he was seizing, unconscious, on unresponsive. Ex. 7, BBCV, 38:35-39:14; Ex. 11, Wild Dep., 45:24-46:5. The jailers present at admission claim Kessee was intoxicated. Ex.19 - Barr Dep.,115:23-116:2; Ex. 1 Shifflett Dep., 271:23-272:3 Admitting an unconscious or semi-conscious intoxicated person to jail is a constitutional violation. *See Garcia v. Salt Lake County,* 768 F.2d 303 (10th Cir. 1985). There are confines to these policies beyond the mere text.

**Resp. to ¶4:** Plaintiff admits the text of this irrelevant policy. This has nothing to do with critical observation sight checks or Kessee.

**Response to ¶5:** The text of the policy is admitted. The description of its application is disputed. Jailers conducted sight checks of 5 seconds, 2-3 seconds, 1 second, and less than 1 second on the night at issue for a total of 15 seconds over nearly two hours. Ex. _, Cell Video, 19:55:32-21:50:48. Brian Knapp said 1 second sight checks were in accordance with their training. Ex. 3 Knapp Dep. 20:24-22:7. Gibson saw the sight checks at issue and said 1 second was good enough. Ex _- Gibson Dep., 194:15-20.

**Response to ¶6:**   Plaintiff admits the text of this policy; the self-serving description is irrelevant. This has nothing to do with the actual events and actions of jail staff, or their actions pursuant to CCDC policies and customs on Jan. 16, 2018.

**Response to ¶7:** Plaintiff admits the text of this policy; the self-serving description is irrelevant. This has nothing to do with the actual events and actions of jail staff, or their actions pursuant to CCDC policies and customs on Jan. 16, 2018.

**Response to ¶8:** Admitted.

**Response to ¶9:** Disputed. Although Gibson states he reviewed the policies, and procedures, he later contradicts himself and says he was not familiar with and hadn't looked at the entirety of the policies of the CCDC. Ex 14 - Depo. of Gibson p. 110:1-12; 114:7-25. He also admits he did not review the jail policies and procedures, Turn Key's procedures, or do an evaluation of the jail because he thought it was "functioning at a high level." But this opinion was based off reputation and opinions of others. Ex. 14 - Gibson Dep. p. 116:5-117:3.

**Response to ¶10:** Admitted as to Mr. Wheeler's actions. His self-serving belief of the sufficiency of the policies is irrelevant and disputed.

**Response to ¶11:** Admitted, but irrelevant. As the final policy maker, Gibson had a duty to ensure his staff was trained on commonly occurring scenarios which could likely result in a constitutional violation.

**Response to ¶12:** Given the widespread indications of the attitude and general indifference toward inmates demonstrated by the jailers involved on Jan. 16, 2018, and Gibson's acceptance of that behavior, disputed. The rest of the statement is irrelevant.

**Response to ¶13:** Objection. Not only is it unclear which policies Defendant is referring to, but the only support they offer for this fact is from their own expert who fails to provided a basis for his opinions.

**Response to ¶14:** Irrelevant.

**Response to ¶15:** This self-serving statement is irrelevant.

**Response to ¶16:** Plaintiff disputes that the on the job training received by jail staff is consistent with the written policies or the Oklahoma Jail Standards. Plaintiff disputes the training on conducting sight checks was adequate. Despite the obvious knowledge of the importance of sight checks, the complete failure to have any guidance on how to do critical observation sight checks is glaring. See Ex.2 CCDC Policy 3.15. Jailers have testified their on the job training just depended on who they shadowed, and that things weren't consistent. Ex. 19, Barr 52:2-14.

**Response to ¶17:** Admitted, irrelevant.

**Response to ¶18:** Disputed. The statements of involved jailers betray this training. Shifflett stated he just assumes someone laying on their stomach is asleep. Further, the actions of the jailers on the night at issue, glancing in 1-second or so betrays this description. Ex. 20, Cell Video, 19:55:32-21:50:48.

**Response to ¶19:** Disputed. Again, the actions of the jailers doing sight checks on the night in question betray these self-serving statements. See, e.g., Ex 1 - Shifflett Dep. 113:7-8.

**Response to ¶20:** Disputed. Plaintiff denies that Andrews, Barr, and Shifflett knew how to conduct **adequate** sight checks. There was no official policy guidance on how long a critical observation sight check should last or even policy guidance on what to look for. (Ex. 1 - Shifflett Dep., p. 113:25-114:8, 117:6-9, 132:22-133:13, 122:10-123:20, 125:19-25, 127:18-128:20, 128:21-23.) Their sight checks on the night in question raise quite the question of what they were trained to do. Ex. 20, Cell Video, 19:55:32-21:50:48. Policy informs jailers that "vigilance is a must" on sight checks. (Ex. 2, CCDC Policy 3.15.) But their actions were otherwise, for instance Shifflett performed a sight check at approximately 8:15 p.m. The sight check was *1 second* long. (Ex. 20, Cell Video, 20:16:20-20:16:23.) Shifflett knew Kessee was unable to stand, unable to walk, had at least one seizure, had been sweating profusely, could not speak coherently, and had begun this decline *after* discharge from the hospital (around an hour earlier).

**Response to ¶21:** This self-serving statement is disputed. Their sight checks would have to last long enough to perceive a need. Further, this general claim is undercut by the clear constitutionally violative treatment of Kessee during intake. Ex. 7 - BBCV 36:04-40:31.

**Response to ¶22:** Admitted. However, the jail then relied on these non-medical personnel to identify signs of medical distress and asked to monitor inmates placed on critical observation due to a health risk, either mental or physical, in order to preserve their safety and well-being." Further, "…Detention Staff [were expected to] determine an inmate is not in need of immediate medical attention" prior to accepting custody of an inmate. (Ex.2 - CCDC Policy, 3.03, 3.15.

**Response to ¶23:** Objection. Carter provides no basis for this opinion. The intake on the night in question is on video for all to see, and betrays the assertion it was in any way appropriate. Ex. 7 - BBCV 36:04-40:31.

**Response to ¶24:** Disputed. The sight checks are on video. Further, they do not take place in a vacuum. Jailers knew quite a bit about Kessee's obvious medical condition and need by that point and disregarded it by looking in on him for seconds. Ex. 7- BBCV 36:04-40:31; Ex. 20, Cell Video, 19:55:32-21:50:48.

**Response to ¶25:** Admitted Roscoe said that as to the written policies from a correctional healthcare point of view. However, the application of those policies, and the customs and insufficient training of the County are a different story. Further, no expert's opinion is dispositive in this case.

**Response to ¶26:** Admitted.

**Response to ¶27:** Admitted in part. Plaintiff admits this is what the agreement stated but denies the implication that this excuse the CCDC staff from liability for medical care. Detention Staff still had a duty to ensure inmates received proper medical care and Gibson had a duty to train them to do so. The CCDC policies state "prior to accepting custody of an

inmate, Detention Staff will determine that the inmate can be legally committed to the facility

and is not in need of immediate medical attention to avoid legal ramifications." (Ex. 2 - CCDC

Policy 3.03-3.07). But the officers were not trained on or aware of this policy. Ex. – Depo of

Barr – p. 21:6-22:6.

**Response to ¶28:** Admitted in part. Plaintiff disputes that an *appropriately trained* medical

professional was always on-duty. Further, Plaintiff disputes any implication that CCDC staff's

actions or failures are excused by blind reliance on medical staff being on duty; their reliance

on Clayton Rickert on Jan. 16, 2018, was clearly unreasonable.

**Response to ¶29:** Admitted as to the text of the contract.

**Response to ¶30:** Gibson did little research as to prior incidents of Turn Key's culpable

conduct. Ex. 14 Gibson Dep., 130:13-133:22.

**Response to ¶31:** Admitted in part. Plaintiff admits that Gibson spoke with Flint Junod but

denies any implication that this was adequate research to ensure Turn Key would provide

adequate medical care to inmates at Cleveland County Detention Center. Gibson can't even

remember specifics. Ex. 14, Gibson Dep., 50:19-51:3.

**Response to ¶32:** Disputed. Gibson was unaware of the thirteen lawsuits filed against Turn

Key prior to January 16, 2018 regarding their failure to provide medical care. Ex. 14 - Gibson

Dep., p. 168:23-170:23. These lawsuits are public record and were easily discovered through

less than twenty minutes of research. Ex. 14 - Gibson Dep., p. 170:17-171:11. Gibson was also

unaware of the six lawsuits filed specifically against Cleveland County and Turn Key regarding

adequate medical care. Ex. 14 Gibson Dep., p. 130:16-132:25. Gibson did not ask Turn Key

or anyone else about prior lawsuits against Cleveland County. Ex. 14 Gibson Dep., p. 133:1-12.

**Response to ¶33:** Admitted in part. Although Plaintiff admits that Gibson expected Turn Key to provide adequate medical care to inmates, Plaintiff disputes that this reliance was *reasonable.* Gibson still had an obligation to supervise and ensure things were being done properly. Plaintiff disputes any implication that Gibson's actions are excused by blind reliance on Turn Key to handle all medical care, as the Detention Staff still had a duty to ensure inmates received proper medical care and Gibson had a duty to train them to do so. The CCDC policies state "prior to accepting custody of an inmate, Detention Staff will determine that the inmate can be legally committed to the facility and is not in need of immediate medical attention to avoid legal ramifications." (Ex. 2 - CCDC Policy 3.03-3.07). But the CCDC detention staff were not trained on how to ensure inmates received the proper medical care or how to perform medical intakes Ex. 19  Barr Dep., .21:21-22:6; Ex. 4 Andrews Dep., p. 145:3-6. Instead, they were only trained to rely on medical staff, even if the symptoms were obvious and medical provided no treatment. (Ex. 4 - Andrews Dep., p.132:15-25; Ex 1, Shifflett Dep., 53:6-16 Further the detention staff had the power to override the decisions of the medical staff in certain situations. Ex. 2 - CCDC Policy 3.02 ("The Supervisor on duty has the authority to send an arrestee out for a [medical evaluation], even in circumstances where the Medical Staff deem it unnecessary"); Ex. 2 - CCDC Policy 3.15 ("Medical's decision to place an inmate on Suicide Watch can be overridden by the on-duty supervisor if they strongly disagree. The supervisor must be able to verbalize their decision to do so"). Whether Gibson's, the jail staff's,

and the County's reliance on Turn Key was reasonable in a given scenario – specifically the night at issue - is a factual question.

**Response to ¶34:** Disputed. See Resp. ¶33.

**Response to ¶35:** Admitted in part. Plaintiff disputes that Rickert was an *appropriately qualified* medical professional. Rickert was not trained to recognize the signs of a drug overdose or intoxication and is not qualified to recognize such conditions. Ex. _ - Rickert Dep., p. 71:13-72:8. Viewing his actions at the intake in question betray any claims that Rickert was trained to do a medical screening. Ex. 7 - BBCV 36:04-40:31. Rickert had authority, training, and *according to Dr. Cooper*, a sign – in the *exact room he is standing in on camera* – listing criteria to check for a "prebooking" screening over "fit criteria" to be sure even an inmate coming in with a fit slip does not need to be sent out for another fit slip or reevaluation. (Ex. 34, TK Policy, J-9, Procedure (2); Ex. 15, Cooper Dep., 142:7-144:12; 144:18-145:13.) Rickert was unaware of this and, thus did not do it. (Ex. 8, Rickert Dep., 212:9-213:16.; Ex. 34, TK Policy, J-9 Procedure (2).)

**Response to ¶36:** Admitted in part; however, Gibson did *nothing* to find out *anything* about Rickert. Ex.14 - Gibson Dep., 60:24-61:24.

**Response to ¶37:** Admitted in part; however, Gibson did *nothing* to find out *anything* about Rickert. Ex. 14- Gibson Dep., 60:24-61:24.

**Response to ¶38:** Rickert was cited for yelling at an inmate on 1/11/17. Ex. _8 - Rickert Citation.

**Response to ¶39:** Admitted; however, Defendant, as employer, still had a duty to supervise employees, not sit back and wait for a problem to be brought to their attention.

**Response to ¶40:** Disputed. See Resp. 32, 38.

**Response to ¶41:** Admitted in part. Plaintiff disputes the inference that Gibson's lack of knowledge immunizes him or the County from liability. Further, Gibson and the County had a duty to ensure his staff was trained on commonly occurring situations that could result in a constitutional violation.

**Response to ¶42:** Admitted in part. Plaintiff disputes the inference that Gibson's lack of knowledge immunizes him or the County from liability. Further, Gibson and the County had a duty to ensure his staff was trained on commonly occurring situations that could result in a constitutional violation.

**Response to ¶43:** Admitted; however, Gibson kept Turn Key on, despite seeing what their poorly trained staff did. Getting rid of one employee did not change the culture of Turn Key. They still had been sued 6 times in Cleveland County alone.

**Response to ¶44:** Promises, promises. An employer still has a duty to supervise his employees and a constitutional duty to ensure that the policies, procedures, customs and training in his jail meet constitutional muster.

**Response to ¶45:** The two entities had policies and procedures that were supposed to overlap and coordinate. But no one really knew what the other half was doing. Turn Key was not sure if their policies and procedures were in line with CCDC's. Ex. 15 Cooper Dep.., 30:24-33:22. Gibson believed it was important for medical staff to be familiar with the policies of CCDC to be sure that they are complying with his policies, but did nothing to ensure that. Ex. 14Gibson Dep., 69:6-19.

11

**Response to ¶46:** Disputed. Jail staff was also liable for the medical conditions of inmates CCDC policy states: "Prior to accepting custody of an inmate, Detention Staff will determine that the inmate can be legally committed to the facility and that the inmate is not in need of immediate medical attention to avoid legal ramifications" Ex. 2 - CDCC Policies 3.03-3.07. Jail Supervisors were also given the authority to override medical personnel decisions. . Ex. 2 - CCDC Policy 3.02 ("The Supervisor on duty has the authority to send an arrestee out for a [medical evaluation], even in circumstances where the Medical Staff deem it unnecessary"); Ex. 2 - CCDC Policy 3.15 ("Medical's decision to place an inmate on Suicide Watch can be overridden by the on-duty supervisor if they strongly disagree. The supervisor must be able to verbalize their decision to do so"). Turn Key may have declared this, but the actions of Clayton Rickert on Jan. 16, 2018 indicate this was not the case. He placed orders for medication that he was not authorized to do. Ex. 36- Roscoe Rep. p.7-9; Ex. 17 TK Medical Records, p.4. At multiple instances throughout his encounter with Kessee, Rickert should have contacted a higher ranking qualified medical provider and did not. Not when he saw Kessee's severe symptoms, not when he saw Kessee have a seizure. Not even when he decided to defer the intake. Ex. 36 - Roscoe Rep. 7-9. Ex. _ - Rickert Dep,. 106:165-23. Further, the practice of Turn Key employees of putting inmates in critical observation and then leaving non-medically trained jailers to do the sight checks is a violation of the standard of care for correctional healthcare. Ex. _ - Roscoe Rep., 9; Ex. _ Cooper Dep. 106:9-13.

**Response to ¶47:** These policies existed on paper, but were not followed. Rickert had authority, training, and *according to Dr. Cooper*, a sign – in the *exact room he is standing in on camera* – listing criteria to check for a "prebooking" screening over "fit criteria" to be sure even an

inmate coming in with a fit slip does not need to be sent out for another fit slip or reevaluation. (Ex. 34, TK Policy, J-9, Procedure (2); Ex. 15, Cooper Dep., 142:7-144:12; 144:18-145:13.) Rickert was unaware of this and, thus did not do it. (Ex. 8, Rickert Dep., 212:9-213:16.; Ex. 34, TK Policy, J-9 Procedure (2).)

**Response to ¶48:** But their staff weren't trained on the signs and symptoms of drug overdose or many other life-threatening conditions. Rickert couldn't identify an overdose.

**Response to ¶49:** Irrelevant. Kessee was never given the chance to request medical. When he said "I need, I need," jailers and Rickert ignored him. The culture of deliberate indifference toward medical needs of inmates shouted him down. Ex. 7 - BBCV 36:04-40:31

**Response to ¶50:** Irrelevant.

**Response to ¶51:** Irrelevant.

**Response to ¶52:** Irrelevant.

**Response to ¶53:** Policy may have said this, but the actual implementation was far below the bounds of constitutionally adequate care. No one in the jail, on Jan. 16, 2018, could recognize the signs and symptoms of drug overdose. Ex. _ Cooper Dep. 112:7-15.

**Response to ¶54:** But when Rickert claimed he believed Kessee was self-harming and potentially suicidal, he did not follow any of those procedures or call anyone above him.

**Response to ¶55:** Plaintiff herein incorporates all factual responses and assertions from her responses to the Motions for Summary Judgment of Andrews, Barr, and Shifflett.

## STANDARD OF REVIEW

Summary judgment is only proper if "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56. The movant bears the burden of showing no genuine issue of material fact

exits, and "the court must draw all reasonable inferences in favor of the nonmoving party." *Curtis v. Oklahoma City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1215 (10th Cir. 1998). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); *Tolan v. Cotton*, 134 S. Ct. 1861, 1863, 188 L. Ed. 2d 895 (2014).

## ARGUMENTS AND AUTHORITIES

To establish municipal liability, a plaintiff must first demonstrate a "municipal policy or custom," which may take one of the following forms:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

A reasonable juror could find that the County written policies regarding sight checks, their informal practices and customs regarding medical intakes, and their failure to train their employees on commonly occurring situations all resulted in the violation of Kessee's constitutional rights.

*First*, in what Defendant refers to as the "written-policy" *Monell* liability claim, hey ignore that a policy need not be written to serve as a basis for this claim. An "informal custom or policy" that is a "widespread practice" can also serve as a policy. *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010). Not only is there a question of fact regarding the constitutionality of Defendant's written policies regarding sight checks, but there is a question of fact regarding the constitutionality of the unwritten policies and customs at the CCDC.

*Second*, on the failure to train claim if a situation in which a county failed to train their employees is a recurring one which presents an "obvious potential" for a constitutional violation then this is sufficient to establish municipal liability. *Allen v. Muskogee*, 199 F.3d 837, 842 (10th Cir. 1997). The jail staff admits that medical intakes are common at the jail and that it is common for them to interact with individuals who have overdosed or are on drugs. Yet, the County failed to train their employees on how to properly identify an overdose or perform medical intakes. For this reason, the Court should deny the County's Motion for Summary Judgment.

## I.   THE UNDERLYING CONSTITUTIONAL VIOLATION

As discussed in further detail in the Responses to the Motions for Summary Judgment of Defendants Andrews, Barr, and Shifflett, the detention staff was deliberately indifferent to Kessee's medical needs. The presentation of Kessee's symptoms was so obvious and serious that any reasonable person would have recognized the serious risk in failing to provide him with proper medical care, as this Court has already found based on the allegations. Those symptoms have been confirmed. Shifflett even admits they thought he was having a seizure, and others admit Kessee did not look well. The detention staff also cannot rely on Rickert's presence to escape liability. The jailers present admit that Rickert asked no questions regarding Kessee's medical state and that his utter lack of medical treatment was grossly inadequate. Due to this, their claimed reliance on Rickert's medical opinion was wholly unreasonable. See *Weatherford v. Thompson*, 347 Fed. Appx. 400 (10th Cir. 2009)( holding a jailer could not escape liability through reliance on a medical opinion, as the prisoner's condition deteriorated after the medical evaluation making the reliance unreasonable). As such, an underlying

constitutional violation is established. Further, their clear knowledge of Kessee's obvious medical need and disregard of it, along with their offensive comments demonstrate a culture of deliberate indifference. Many of the jailers have confirmed that Stacy Shifflett's "fuck his ass" attitude is pervasive in the jail.

Unlike Defendant claims, even if this Court holds none of the officers liable for the violation of Kessee's constitutional rights, the County can and should still be held liable. "*Monell* does not require that a jury find an individual defendant liable before it can find a local governmental body liable." *Garcia v. Salt Lake Cty.*, 768 F.2d 303, 310 (10th Cir. 1985)("Although the acts or omissions of no one employee may violate an individual's constitutional rights, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights.") In *Crowson v. Wash. Cty. State of Utah*, the Tenth Circuit clarified that normally an officer must commit a constitutional violation for the municipality to be held liable. 983 F.3d 1166, 1191 (10th Cir. 2020). But the exception in *Garcia* still rings true. *Id.* Even if no individual officer's actions rise to a constitutional violation, but the sum of officers' actions violate the plaintiff's constitutional rights, then the municipality can be held liable. *Id.* The Court notes that in situations where policies divide responsibilities amongst many officers, this is precisely the reason the policy might be unconstitutional as it allows no officer to prevent the violation. *Id.* ("the municipality may not escape liability by acting through twenty hands rather than two")

Barr, Shifflett, and Andrews actions were all particularly egregious and they should be held individually liable for the reasons set forth in their motions for summary judgment. But even if this Court finds they are not individually liable, the systemic failures of all the CCDC

staff, which was caused by the County's policies, customs, and failures to train resulted in Kessee's death. Therefore, the County can and should still be held liable.

For the reasons stated in Shifflett, Barr, and Andrews motions for summary judgment, the right to medical care was clearly established, as was the fact that unreasonable reliance on a medical professional will not shield individual officers from liability. *Weatherford*, 347 Fed. Appx. at 404. Even so, if this Court finds the individuals are entitled to qualified immunity, the municipality should still be liable. The qualified immunity analysis does not apply to municipalities. *Cordova v. Aragon*, 569 F.3d 1183, 1193 (10th Cir. 2009). A plaintiff need not show a right was clearly established, they need only establish that a constitutional violation occurred and that a municipal policy or custom was the moving force behind the violation. *Id.*

## II.   THE COUNTY'S WRITTEN POLICIES, AS WELL AS THEIR UNWRITTEN POLICIES AND CUSTOMS, VIOLATED KESSEE'S CONSTITUIONAL RIGHTS

This Court is well aware a municipality is liable for a civil rights violation if the Plaintiff shows: "(1) an official policy or custom; (2) causation; and (3) the state of mind. Defendant incorrectly draws the Court's attention away from multiple deficiencies in their unwritten policies and customs by claiming Plaintiff only takes issue with their ***written*** policies. This is untrue. Plaintiff also takes issue with multiple informal customs of the County, such as believing every inmate's claimed illness is fake, deferring medical intakes and depriving inmates of medical care; and the County's widespread culture of intimidation and belittlement of inmates and ignoring their medical needs. All these scenarios fall under an official policy. The official policy refers to "formal rules or understandings" which need not always be written.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986). A policy or custom can take the form

of:

> (1) a formal regulation or policy statement; (2) an informal custom amounting
> to a widespread practice that, although not authorized by written law or express
> municipal policy, is so permanent and well settled as to constitute a custom or
> usage with the force of law; (3) the decisions of employees with final
> policymaking authority; (4) the ratification by such final policymakers of the
> decisions—and the basis for them—of subordinates to whom authority was
> delegated subject to these policymakers' review and approval; or (5) the failure
> to adequately train or supervise employees, so long as that failure results from
> deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010).

### A. The County's Policies Were Unconstitutional

Plaintiff contends that the County maintained unconstitutional written policies

regarding sight checks. Specifically, the written policy guidance how to do a critical observation

sight check. The importance is obviously recognized by the reference to the policy, but the

actual procedure is gone. The County understood the import of these sight checks, as they

have discussed extensively. They understood the dangers that could come from not paying

attention to an inmate's needs, but they never wrote out any guidance. Bbut it is not only

written policies which she takes issues with. Plaintiff also contends that the County's unofficial

customs of (1) deferring medical intakes and depriving inmates of any medical care; (2)

inadequate sight checks; and (3) widespread culture of deliberate indifference to inmates'

medical needs caused the violation of Kessee's constitutional rights.

The failure to have a policy is tantamount to a policy in itself. *See Glisson v. Indiana Dep't*

*of Corrections*, 849 F.3d 372, 375–76, 378–82 (7th Cir. 2017) (en banc), *cert denied*, 138 S. Ct. 109

(2017) (holding that private correctional healthcare entity does not get a free constitutional

violation pass; further holding that a failure to adopt a policy for treatment of ill detainees can be a constitutional violation in itself); *Jackson v. Barnes*, 749 F.3d 755, 763–64 (9th Cir. 2014) (holding that a policy of inaction is a policy and omissions in a policy are policies that can hold entities liable under § 1983); *Blackmore v. Kalamazoo*, 390 F.3d 890, 900 (6th Cir. 2004) (reversing summary judgment where the record reflected a lack of policies to a prisoner's medical care); *Hayes v. Faulkner County, Arkansas*, 388 F.3d 669, 674 (8th Cir. 2004) (holding that no policy as to confinement is a policy in itself to satisfy a § 1983 claim); *A.M. v. Luzerne County Juvenile Detention Center*, 372 F.3d 572, 583 (3d Cir. 2004) (holding that a failure to establish a policy for following up on incident reports amounts to deliberate indifference); *Choate v. City of Gardner, Kansas*, 2018 WL 3389871, at *5 (D. Kan. July 12, 2018) (denying summary judgment where a plaintiff failed to show any prior deadly force or policy violations because the plaintiff showed a lack of policy as to how to handle suicidal or mentally disturbed persons); *Z.J. v. Kansas City*, 2017 WL 4390274, at *12 (W.D. Mo. Sept. 29, 2017) (denying summary judgment because a reasonable jury may find defendant's failure to adopt a policy as deliberately indifferent).

Along with the written policies (and lack of written policies) Plaintiff contends there are multiple unwritten policies and customs which are so widespread that they amount to a formal policy. *First*, Plaintiff contends there is an unwritten policy of assuming all inmates were "faking" their illnesses. Shifflett, Barr, and Andrews all admit they believe inmates are faking it until proven otherwise. Second, there was a custom of relying on medical personnel even when that reliance was unreasonable. Whenever asked medical questions, officers simply reply "that was medical's job," as an excuse for them ignoring Kessee's obvious symptoms But the

Tenth Circuit has made clear that officers cannot use the presence of medical personnel to escape liability when the reliance is unreasonable. *Weatherford v. Thompson* Third, Plaintiff contends there is a custom of not providing medical care to inmates before placing them in cells at the CCDC. Not only do jail staff claim this is a typical intake, but there is video of evidence of another inmate being brought in and not provided with a medical screening. Ex. _ - Processing Corridor 1 Video, 9:31:10-9:35:53.

Finally, Plaintiff contends there is a widespread culture of acting with deliberate indifference to inmates' medical needs. Kessee attempted to communicate his medical needs but was intimidated and belittled by the staff at the CCDC. Shifflett particularly was demeaning when he stated, "fuck his ass" Shifflett also hushed Kessee when he attempted to communicate. Yet, no officer saw any issue with these actions. Shifflett even went as far as to state he would use the video for training purposes. Plaintiff also contends the custom of believing all incoming inmates were "faking" their illnesses caused Kessee's death. A reasonable person could view these statements as proof that the County had a widespread culture of ignoring the needs of inmates, contrary to what written policies state.

It is reasonable to believe the lack of written policies regarding sight checks and these customs caused Kessee's death. When Kessee arrived at the jail he had a 90% chance of survival according to Dr. Michael Jobin. After he was seen by Rickert, he had an 80% chance of survival. Throughout the intake, the officers followed their training and ignored Kessee's obvious medical needs. They continued to follow their training and perform inadequate sight checks. If the officers had been properly trained to identify obvious medical needs or properly trained to perform adequate sight checks, it is reasonable to believe this training would have

caused one of them to seek help for Kessee and he likely would have survived. They might have bothered to listen to his muttering, knock on the glass, or even call out to him. These factual disputes show a reasonable jury could conclude the County's failure to train the officers did cause Kessee's untimely death. If at any time during the intake process or during sight checks, Shifflett, Barr, or Andrews had sought the medical care Kessee needed, it is reasonable to believe he would have likely survived. Rickert even believed that at the time he found Kessee in his cell, he was savable. These factual disputes show a reasonable jury could conclude Shifflett's actions did cause Kessee's untimely death.

### B. The County's Policies Were Maintained with Deliberate Indifference

Plaintiff can show deliberate indifference because the violation of Kessee's constitutional rights was a "highly predictable or plainly obvious consequence" of the County's actions. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002). The County attempts to use their reliance on Turn Key and Rickert to shield them from liability, but when viewing the facts in a light most favorable to the Plaintiff, a jury could conclude this reliance was unreasonable and thus the County was deliberately indifferent. The obvious consequences of such indifferent attitudes – delay of medical care, denial of medical care – came to fruition. They are the reason Kessee is dead. No one gave him a chance to speak, no one gave him a chance to get help. No one gave him a chance.

### III. THE COUNTY'S FAILURE TO TRAIN THEIR EMPLOYEES RESULTED IN THE VIOLATION OF KESSEE'S CONSTITUTIONAL RIGHTS

An unconstitutional policy is not the only way which a municipality can be held liable under 42 U.S.C. § 1983. *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). A supervisor's failure to train can serve as a basis for municipal liability when the failure amounts to deliberate

indifference. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). A plaintiff can recover for a failure to train if they can prove:

> "1. the existence of a county policy or custom involving deficient training

> 2. the policy or custom's causation of an injury

> 3. the county's adoption of a policy or custom with deliberate indifference"

*Lance v. Morris*, 985 F.3d 787, 800 (10th Cir. 2021). Plaintiff need not establish a pattern of constitutional violations, they need only show the "municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation [.]" *Allen v. Muskogee, Okla.*, 119 F.3d 837, 842 (10th Cir. 1997). There are ample facts which could lead a reasonable person to believe the County failed to train its employees on commonly occurring situations which would likely lead to a violation of one's constitutional rights. Specifically, the detention officers were not trained on sight checks or medical intakes.

## A. Deficient Training

Pursuant to jail policy, Detention staff was expected to determine that an inmate is not in need of immediate medical attention prior to accepting custody of them. Turn Key disputes that they are not involved in this decision and that they do not provide medical care until an individual is in custody. Their Prebooking Screening policy says otherwise. The CCDC also has a policy of relying on officers to recognize serious medical conditions during sight checks and know when to call a nurse to assist. Turn Key may have put those untrained officers in that position, well outside the standard of care, but it was the Sheriff's failure to pay attention to what was going on, acknowledge the risks of untrained persons checking on those in need in matters of seconds. Due to this policy, and the fact that Turn Key staff at the jail were not

qualified to make assessments, recognize overdoses, or even recognize a seizure and the need for treatment arising from those conditions, it is reasonable to believe that failing to provide officers *any training whatsoever* in recognizing emergency medical conditions created an obvious risk of harm that no one will recognize when to call for help and seek medical attention. This is what led to Kessee's death. He was left in untrained, indifferent hands while no one at the top had been paying attention to the rot setting in below.

In *Lance v. Morris*, for instance, the Tenth Circuit denied summary judgment to a municipality that had a policy which required supervisors to determine "the immediacy of medical complaints and take appropriate action." 985 F.3d 787, 801 (10th Cir.) But they failed to train their employees on how to determine this. *Id.* Their failure caused an injury when an inmate suffered from a priapism and the officers did not provide him with medical care for three days. Id. at 792. The Tenth Circuit held the first aid and CPR training, coupled with shadowing employees and monthly safety meetings was inadequate as the employees still were not trained on when to call for medical attention.

The CCDC officers have testified they did not receive training on how to identify when an inmate was experiencing an overdose or training to help them determine what constitutes a medical emergency. But they admit these are commonly occurring scenarios at the CCDC. Shifflett and Barr also testify they did not receive particular training on what to identify during sight checks or when to call medical. They did not even know how to tell if an inmate laying on his stomach was breathing or alive. They glanced in and went on.

The officers in question were provided no training on how to independently evaluate if an inmate needed attention and blindly relied on inadequate, and sometimes completely

nonexistent medical treatment. Yet, they were asked to determine if an inmate could be admitted and when they might need medical attention.

The County also failed to adequately train their officers on how to properly conduct sight checks, even though they noted their importance and they were a frequent duty. The officers in question all admit that one second sight checks were in accordance with their training. Defendant claims officers were trained to "look for signs of life," but every officer involved says one second sight checks were in accordance with their training and Shifflett admits there was no policy guidance on how long critical observation sight checks should last or what they should look for. However, common sense can prevail that one second is not automatically sufficient to determine if one is showing signs of life, yet every officer said one second sight checks were in accordance with their training. The officers also admit they were not trained to look further if an inmate appeared asleep or to investigate further if they hear an inmate muttering under their breathe. Not only is it common sense these sight checks would be inefficient, the Tenth Circuit themselves has held periodic sight checks to only see if an inmate is "still alive" especially when there are other factors involved which a reasonable person would think required closer observation, is not sufficient. These officers knew so much more about Kessee's condition before those checks and they ignored those facts. See *Weatherford v. Taylor*, 347 Fed. Appx. 400, 403 (10th Cir.)(noting that moving an inmate to an observation cell was a "step in the right direction" but the failure to communicate with the inmate and inadequate sight checks still amounted to deliberate indifference).

24

### B. Causation

Causation may be shown by establishing that "the identified deficiency in [the municipality's] training program [is] closely related to the ultimate injury so that it actually caused the constitutional violation." *Brown v. Gray*, 227 F.3d 1278, 1290 (10th Cir. 2000) (quotation marks and citations omitted). This involves asking whether "the injury [would] have been avoided had the employee been trained under a program that was not deficient in the identified respect." *City of Canton v. Harris*, 489 U.S. 378, 391 (1989). The jury must "[p]redict[] how a hypothetically well-trained officer would have acted under the circumstances." *Id.*

Here a reasonable jury could find that a hypothetically well-trained officer or one with knowledge about medical issues, specifically overdosing, would have recognized Kessee was suffering from an overdose and have insisted he receive medical care. Specifically, a jury could find if Shifflett, Barr, or Andrews had been properly trained on how to recognize an overdose, they would not have blindly relied on the inadequate medical care of Rickert and belittled Kessee while he was suffering from a seizure, with Shifflett saying "fuck his ass." Instead, he would have insisted Kessee be reevaluated and receive medical attention. A jury also could find if Shifflett, Barr, or Andrews had been properly trained on sight checks, they would have done more then glance in the window and assume Kessee was sleeping. At the very least, a jury could find adequate raining would have led them to ask Kessee some questions regarding his condition and would not have hushed Kessee when he asked for help. But Shifflett and the other officers did not do any of that. Instead, they belittled Kessee, spoke down to him, and ignored his cries of pain and his pleas for help.

### C. Deliberate Indifference

Finally, Plaintiff must show the County acted with deliberate indifference. Under this prong of the analysis, "[d]eliberate indifference can exist when a [City] fails to train [officers] on how to handle recurring situations presenting an obvious potential to violate the Constitution." *Lance*, 985 F.3d at 801, citing *Allen v. Muskogee*, 119 F.3d 837, 842 (10th Cir. 1997). To evaluate this prong, the Tenth Circuit has adopted the three-part test devised by the Second Circuit Court of Appeals, which requires: (1) The City's "policymakers know 'to a moral certainty' that their employees will confront a given situation"; (2) "The situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult"; and (3) "The wrong choice…will frequently cause the deprivation of a citizen's constitutional rights." *Id.* at 802.

The training and facts which Defendant compares to *Lance* to differentiate the case at bar, ignore the true claims and issues. *First,* Defendants claim this case is not like Lance because unlike Lance, there was always a medical professional present, and the County was certain that officers would never have to make an independent medical assessment. But the CCDC's policies require jail staff to be able to assess if an inmate can be admitted or if they need medical attention, as to avoid legal ramifications. Policy and practice also require these officers to assess medical needs during sight checks and know when to contact a nurse. These circumstances could lead a jury to believe it is morally certain that the jail staff would need to be able to recognize obvious signs of a need for medical attention. Yet, the County failed to train them on what reasons they should contact medical staff for, including failing to train

them on the signs of an overdose, a situation which employees admit is frequent and that training would have assisted them in this situation.

It is also morally certain fficers would be conducting sight checks for critical observation inmates. CCDC policy even states vigilance is a must in these situations, and multiple employees admit these checks are a "life or death situation." Yet, no officer can say they were provided with comprehensive training regarding sight checks. They were left to learn from whoever they shadowed. Although medical staff were always present, CCDC staff was not properly trained to notice obvious symptoms which would require medical attention. A reasonable juror could conclude this failure caused employees to make the wrong choice and not seek medical care for Kessee, resulting in his death.

## **CONCLUSION**

Defendant Amason has moved for summary judgment based on his interpretation of his employees' actions on January 16, 2018. His motion ignores numerous factual disputes and claims against the County. Instead Amason attempts to escape liability by claiming his failures are not unconstitutional because of his and his staff's reliance on Turn Key. In doing so, he attempts to scapegoat Turn Key and ignores his duties as a supervisor and his shortcomings in training his employees.

WHEREFORE, in consideration of the foregoing reasons, it is respectfully requested that Gibson's Motion for Summary Judgment be denied.

Respectfully submitted,

s/ Jonathan R. Ortwein
Chris Hammons, OBA #20233
Jason M. Hicks, OBA# 22176
Jonathan R. Ortwein, OBA #32092
LAIRD, HAMMONS, LAIRD, PLLC
1332 S.W. 89th Street
Oklahoma City, OK 73159
Telephone:     (405) 703-4567
Facsimile:     (405) 703-4061
E-mail:     Chris@lhllaw.com
            Jason@lhllaw.com
            Jonathan@lhllaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 12, 2021, I electronically transmitted the attached document to the Clerk of Court using the Electronic Case Filing System for filing. Based on the records currently on file in this case, the Clerk of Court will transmit a Notice of Electronic Filing to those registered participants of the ECF System.

s/ Jonathan R. Ortwein
Jonathan R. Ortwein